# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, ex rel. ERIC S. SCHMITT, in his official capacity as Missouri Attorney General, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. _____ |
| THE PEOPLE'S REPUBLIC OF CHINA, THE COMMUNIST PARTY OF CHINA, NATIONAL HEALTH COMMISSION OF THE PEOPLE'S REPUBLIC OF CHINA, MINISTRY OF EMERGENCY MANAGEMENT OF THE PEOPLE'S REPUBLIC OF CHINA, MINISTRY OF CIVIL AFFAIRS OF THE PEOPLE'S REPUBLIC OF CHINA, PEOPLE'S GOVERNMENT OF HUBEI PROVINCE, PEOPLE'S GOVERNMENT OF WUHAN CITY, WUHAN INSTITUTE OF VIROLOGY, and CHINESE ACADEMY OF SCIENCES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff State of Missouri, at the relation of Attorney General Eric S. Schmitt, states the following:

## NATURE OF THE ACTION

1.    In this case, the State of Missouri seeks recovery for the enormous loss of life, human suffering, and economic turmoil experienced by all

Missourians from the COVID-19 pandemic that has disrupted the entire world.
An appalling campaign of deceit, concealment, misfeasance, and inaction by
Chinese authorities unleashed this pandemic.  During the critical weeks of the
initial outbreak, Chinese authorities deceived the public, suppressed crucial
information, arrested whistleblowers, denied human-to-human transmission
in the face of mounting evidence, destroyed critical medical research,
permitted millions of people to be exposed to the virus, and even hoarded
personal protective equipment—thus causing a global pandemic that was
unnecessary and preventable.  Defendants are responsible for the enormous
death, suffering, and economic losses they inflicted on the world, including
Missourians, and they should be held accountable.

2.      Missouri faces an urgent public health crisis due to the COVID-19
pandemic.

3.      As of April 20, 2020, Missouri had more than 5,800 confirmed
infections from COVID-19, and more than 177 Missourians had died, with
these numbers increasing on a daily basis.[1]

---

[1] COVID-19 Outbreak, Missouri Department of Health and Senior Services
(Apr.            20,            2020),            available            at:
https://health.mo.gov/living/healthcondiseases/communicable/novel-
coronavirus/.

4.     Missouri is not alone: the virus unleashed by the Communist Party of China and the Chinese government has left no community in the world untouched.

5.     This COVID-19 pandemic is the direct result of a sinister campaign of malfeasance and deception carried out by Defendants.

6.     Defendants, in violation of their duties to the international community, engaged in dangerous activities that imperiled the lives and health of millions.

7.     When their actions began to kill hundreds of thousands of people across the globe, Defendants sought to minimize the consequences, engaging in a coverup and misleading public relations campaign by censoring scientists, ordering the destruction and suppression of valuable research, and refusing cooperation with the global community, all in violation of international health standards.

8.     Defendants' actions and inactions had profound effects in Missouri. Literally every Missourian has been adversely affected by Defendants' course of conduct.

9.     This civil action seeks to hold Defendants accountable for the extraordinary public-health crisis that they created and to allow the State of Missouri to recoup billions of dollars lost as a result of Defendants' actions and inactions.

## PARTIES

10.     Eric S. Schmitt is the Attorney General of Missouri (the "Attorney General").

11.     Under Missouri law, "[t]he attorney general shall institute, in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary; and he may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved."  Mo. Rev. Stat. § 27.060.

12.     Plaintiff State of Missouri is a sovereign State that has sustained direct and substantial injuries and losses as a result of the conduct described herein.

13.     The Attorney General is suing, in part, to vindicate the State's injuries to its own economic and proprietary interests that it has directly suffered due to the actions of Defendants.

14.     The Attorney General is also suing as *parens patriae* on behalf of all Missouri citizens, to vindicate general injuries inflicted on Missouri citizens by the pandemic caused by Defendants.

15.     As a sovereign State, Missouri has "a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).

16.     A state like Missouri, through its Attorney General, may act as "a representative of the public" in "complaining of a wrong which, if proven, limits the opportunities of her people [and] shackles her industries." *Alfred L. Snapp*, 458 U.S. at 606 (stating that "in matters of grave public concern" a state "has an interest apart from that of particular individuals who may be affected").

17.     Defendant People's Republic of China ("PRC" or "China") is a communist nation in Asia.

18.     Defendant Communist Party of China ("CPC" or "Communist Party") is the sole governing party within China, and the Communist Party's General Secretary becomes the president of the PRC.

19.     On information and belief, the Communist Party is not an organ or political subdivision of the PRC, nor is it owned by the PRC or a political subdivision of the PRC, and thus it is not protected by sovereign immunity. *See, e.g., Yaodi Hu v. Communist Party of China*, 2012 WL 7160373, at *3 (W.D. Mich. Nov. 20, 2012) (holding that the Communist Party of China is not entitled to immunity under the Foreign Sovereign Immunities Act).

20.     On information and belief, at all relevant times, the Communist Party exercised direction and control over the actions of all other Defendants.

21.     Defendant National Health Commission of the People's Republic of China ("National Health Commission") is a ministry of the PRC's State Council charged with formulating health policies.

22.     Defendant Ministry of Emergency Management of the People's Republic of China ("Ministry of Emergency Management") is a ministry of the PRC's State Council charged with emergency management and emergency rescue.

23.     Defendant Ministry of Civil Affairs of the People's Republic of China ("Ministry of Civil Affairs") is a ministry of the PRC's State Council charged with social and administrative affairs.

24.     The People's Government of Hubei Province ("Hubei Province") is the provincial government of the geographical Hubei province in the PRC.

25.     The People's Government of the City of Wuhan ("City of Wuhan") is the city government of the capital city of Hubei Province in the PRC.

26.     On information and belief, at all relevant times, the PRC, National Health Commission, Ministry of Emergency Management, Ministry of Civil Affairs, Hubei Province, and City of Wuhan (collectivity, the "Chinese Government Defendants") and the Communist Party acted in concert with one

another and acted as agents and/or principals of one another in relation to the conduct described herein.

27.    The Wuhan Institute of Virology ("Wuhan Institute") is located in Wuhan and is a research institute that studies virology and related topics.

28.    Since at least November 2019, the Wuhan Institute has conducted research on coronaviruses.

29.    Cables from the United States Department of State have warned of safety concerns at the Wuhan Institute.[2]

30.    The United States is currently conducting "a full-scale investigation into whether the novel coronavirus, which went on to morph into a global pandemic that has brought the global economy to its knees, escaped from" the Wuhan Institute.[3]

31.    Defendant Chinese Academy of Sciences ("Chinese Academy of Sciences") is the national academy of the natural sciences for the PRC and

---

[2] "State Department cables warned of safety issues at Wuhan lab studying bat coronaviruses," Washington Post (Apr. 14, 2020), available at: https://www.washingtonpost.com/opinions/2020/04/14/state-department-cables-warned-safety-issues-wuhan-lab-studying-bat-coronaviruses/.

[3] "US officials confirm full-scale investigation of whether coronavirus escaped from Wuhan lab," Fox News (Apr. 17, 2020), available at: https://www.foxnews.com/politics/us-officials-investigation-coronavirus-wuhan-lab.

describes itself as "the linchpin of China's drive to explore and harness high technology and the natural sciences for the benefit of China."[4]

32.     The Chinese Academy of Sciences seeks to "commercialize" its discoveries and boasts about spinning off hundreds of companies from its activities.[5]

33.     The Chinese Academy of Sciences administers the Wuhan Institute.

34.     On information and belief, at all relevant times, the Wuhan Institute and the Chinese Academy of Sciences (collectively, the "Laboratory Defendants"), along with the Chinese Government Defendants and the CPC, acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

## JURISDICTION AND VENUE

35.     Article III, Section 2 of the United States Constitution extends the judicial power of federal courts to "all Cases … between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

36.     This Court is given jurisdiction of this matter under 28 U.S.C. § 1330, which provides for jurisdiction over foreign states, and 28 U.S.C.

---

[4]  "About Us," Chinese Academy of Sciences, available at: http://english.cas.cn/about_us/introduction/201501/t20150114_135284.shtml.
[5]  *Id.*

§ 1332(a), which provides for jurisdiction over citizens of a State and citizens or subjects of a foreign state and a foreign state itself, where the amount in controversy exceeds $75,000.

37.    The amount in controversy in this matter exceeds $75,000.

38.    This Court has jurisdiction over cases filed against foreign states such as the Chinese Government Defendants under the commercial activity exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(2), which provides:

> (a)  A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— … (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

39.    A commercial activity is defined to be "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

40.    On information and belief, the conduct of Defendants described below arises out of commercial activities that have caused a direct effect in the United States and in the State of Missouri, including, but not limited to: (1)

operation of the healthcare system in Wuhan and throughout China; (2) commercial research on viruses by the Wuhan Institute and Chinese Academy of Sciences; (3) the operation of traditional and social media platforms for commercial gain; and (4) production, purchasing, and import and export of medical equipment, such as personal protective equipment ("PPE"), used in COVID-19 efforts.

41.    Additionally and in the alternative, this Court has jurisdiction over cases filed against foreign states such as the Chinese Government Defendants under the non-commercial tort exception to the FSIA, 28 U.S.C. § 1605(a)(5), which provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— ... (5) not otherwise encompassed by [the commercial activities exception], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to— (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

42.    The non-commercial tort exception of 28 U.S.C. § 1605(a)(5) applies here because money damages are sought against "a foreign state for

personal injury or death, or damage to or loss of property, occurring in the United States."

43.    Specifically, for purposes of the non-commercial tort exception of 28 U.S.C. § 1605(a)(5), each of the counts enumerated below are torts occurring in the United States.

44.    In addition, the Communist Party is not a foreign state or an agency or instrumentality of a foreign state, and is not entitled to any form of sovereign immunity.

45.    This Court has personal jurisdiction over the Defendants because the torts, harms, and injuries occurred in this District and in this Division of this District, and they otherwise have sufficient contacts in Missouri and the rest of the United States to render the exercise of jurisdiction by this Court permissible.

46.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and in this Division of this District.

## GENERAL ALLEGATIONS

### THE ORIGINS OF COVID-19

47.    COVID-19 is an infectious disease that is caused by a novel coronavirus, severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

48.    Humans are believed to have first contracted COVID-19 in late 2019, although the precise date is unknown.

49.    Some sources date the first known case in China to November 17, 2019, or possibly earlier.[6]

50.    A variety of sources also date the first known case to December 2019.

51.    One theory on the origin of the virus is that it made a zoonotic transmission from animals at a wet market in Wuhan (the "Wuhan Seafood Market").[7]

52.    Another emerging theory on the origin of the virus is that it was released from the Wuhan Institute of Virology, which was studying the virus as part of a commercial activity.[8]

53.    After first transmission, the virus began to spread rapidly.

---

[6] "Coronavirus: China's first confirmed Covid-19 case traced back to November 17," South China Morning Press (March 13, 2020), available at: https://www.scmp.com/news/china/society/article/3074991/coronavirus-chinas-first-confirmed-covid-19-case-traced-back.

[7] "Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China," The Lancet (January 24, 2020), available at: https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183-5/fulltext.

[8] "Sources believe coronavirus outbreak originated in Wuhan lab as part of China's efforts to compete with US," Fox News (Apr. 15, 2020), https://www.foxnews.com/politics/coronavirus-wuhan-lab-china-compete-us-sources.

54.    According to The Lancet, one of the earliest known patients—a man affiliated with the Wuhan Seafood Market—had a symptom onset date of December 1, 2019.[9]

55.    Just five days later, the wife of this patient—who had no affiliation with the market—began exhibiting symptoms, indicating human-to-human transmission.[10]

56.    According to a study in the Chinese Medical Journal, sometime between December 18 and 29, 2019, laboratory testing was being done on patients who exhibited symptoms consistent with COVID-19.[11]

57.    The study in the Chinese Medical Journal attributed the illnesses to "[a] novel bat-borne [coronavirus] … that is associated with severe and fatal respiratory disease in humans."[12]

58.    According to a study in the New England Journal of Medicine, "[t]he majority of the earliest cases included reported exposure to the Huanan

---

[9] "Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China," The Lancet (January 24, 2020), available at: https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183-5/fulltext.

[10] Id.

[11] "Identification of a novel coronavirus causing severe pneumonia in human: a descriptive study," Chinese Medical Journal (February 21, 2010), available at:
https://journals.lww.com/cmj/Abstract/publishahead/Identification_of_a_novel_coronavirus_causing.99423.aspx.

[12] Id.

Seafood Wholesale Market, but there was an exponential increase in the number of nonlinked cases beginning in late December."[13]

59.     Thus, on or around late December 2019, healthcare professionals in Wuhan were reporting infections indicating human-to-human transmission.

60.     According to Chinese sources cited in the National Review, on December 25, 2019, "Chinese medical staff in two hospitals in Wuhan [were] suspected of contracting viral pneumonia and [were] quarantined. This is additional strong evidence of human-to-human transmission."[14]   This was corroborated by the Wall Street Journal.[15]

61.     According to the South China Morning Press, "On December 27, Zhang Jixian, a doctor from Hubei Provincial Hospital of Integrated Chinese and Western Medicine, told China's health authorities that the disease was caused by a new coronavirus. By that date, more than 180 people had been infected, though doctors might not have been aware of all of them at the time."[16]

---

[13] "Early Transmission Dynamics in Wuhan, China, of Novel Coronavirus–Infected Pneumonia," New England Journal of Medicine (Jan. 29, 2020), available at: https://www.nejm.org/doi/10.1056/NEJMoa2001316.

[14] "Devastating Lies," National Review (March 23, 2020), available at: https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

[15] "How It All Started: China's Early Coronavirus Missteps," The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

[16] "Coronavirus: China's first confirmed Covid-19 case traced back to November 17," South China Morning Press (March 13, 2020), available at:

62.    According to CNN, on December 30, 2019, Dr. Li Wenliang, using the popular chat application WeChat, told his medical school alumni group about patients at his hospital suffering from a SARS-like illness that may have originated from a coronavirus.[17]

63.    In his messages, Dr. Li Wenliang shared details of what would be named COVID-19, urging them to take precautions against the risk of human-to-human transmission.[18]

64.    A study of patients admitted through January 2 found that only 27 of 41 patients had a link to the Wuhan Seafood Market, indicating human-to-human transmission in December.[19]

65.    Despite the previously-mentioned evidence to the contrary, on December 31, 2020, the Wuhan Municipal Health Commission declared, "[t]he

---

https://www.scmp.com/news/china/society/article/3074991/coronavirus-chinas-first-confirmed-covid-19-case-traced-back.

[17] "This Chinese doctor tried to save lives, but was silenced. Now he has coronavirus," CNN (Feb. 4, 2020), available at: https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.

[18] *Id.*

[19] "Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China," The Lancet (January 24, 2020), available at: https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183-5/fulltext.

investigation so far has not found any obvious human-to-human transmission and no medical staff infection."[20]

66.     The World Health Organization ("WHO") was finally informed of these events on December 31, with the organization saying that "the WHO China Country Office was informed of cases of pneumonia unknown etiology (unknown cause) detected in Wuhan City, Hubei Province of China."[21]

67.     On information and belief, part of the Defendants' coverup involved misleading the WHO, an international organization under the United Nations whose objective is "the attainment by all peoples of the highest possible level of health," according to its Constitution.[22]

68.     On information and belief, the Chinese Government Defendants delayed reporting COVID-19 to the WHO for weeks after the outbreak was identified in the Chinese medical community.

69.     Under Article 6.1 of the International Health Regulations, China had a duty to report "all events which may constitute a public health emergency of international concern within its territory" within 24 hours.

---

[20] "Devastating Lies," National Review (March 23, 2020), available at: https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.
[21] "Novel Coronavirus (2019-nCoV) SITUATION REPORT – 1," World Health Organization (January 21, 2020), available at: https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200121-sitrep-1-2019-ncov.pdf.
[22] World Health Organization Constitution, Article I, available at: https://apps.who.int/gb/bd/PDF/bd47/EN/constitution-en.pdf?ua=1.

70.     When China did inform the WHO of the disease, Chinese authorities denied human-to-human transmission, despite having significant evidence to the contrary.   On information and belief, Defendants' denial induced the WHO to also deny or downplay the risk of human-to-human transmission in the critical weeks while the virus was first spreading.

## DEFENDANTS ALLOW THE VIRUS TO SPREAD

71.     According to data gather by the New York Times, approximately 175,000 individuals left Wuhan on January 1 alone to travel for the Lunar New Year. [23]

72.     As stated by the New York Times, because of the Lunar New Year travel, "[t]he timing of the outbreak could not have been worse."[24]

73.     According to the Wall Street Journal, China "went ahead with New Year celebrations despite the risk of wider infections" and let "some five million people leave Wuhan without screening."[25]

74.     Many of these travelers went not only to other parts of China, but spread out across the globe.

---

[23] "How the Virus Got Out," The New York Times (Mar. 22, 2020), available at: https://www.nytimes.com/interactive/2020/03/22/world/coronavirus-spread.html?action=click&module=Spotlight&pgtype=Homepage.
[24] *Id.*
[25] "How It All Started: China's Early Coronavirus Missteps," The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

75.     In mid-January, on or around January 16, despite knowing the risks of doing so, Wuhan leaders hosted a potluck dinner for 40,000 residents, increasing the potential spread of the virus.[26]

76.     Defendants allowed these massive public gatherings and massive exodus from Wuhan despite knowing the risks of COVID-19, including the risk of human-to-human transmission.

## THE COVERUP BY DEFENDANTS

77.     On December 30, 2019, the Wuhan Municipal Health Commission released a notice to medical institutions that patients visiting the Wuhan Seafood Market had contracted a pneumonia-like illness. [27]

78.     The notice warned medical professionals, "Any organizations or individuals are not allowed to release treatment information to the public without authorization."[28]

79.     Within hours of sending his warning to colleagues via WeChat on December 30, screenshots of Dr. Li Wenliang's message had been shared

---

[26] "Is Wuhan's mayor being set up to be the fall guy for the virus outbreak?", CNN (Jan. 29, 2020), available at https://www.cnn.com/asia/live-news/coronavirus-outbreak-01-29-20-intl-hnk/h_6d8cf9d5c0b2cf01447dd24325ed6dd3.
[27] "This Chinese doctor tried to save lives, but was silenced. Now he has coronavirus," CNN (Feb. 4, 2020), available at: https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.
[28] *Id.*

widely on social media, but government censors then took action to stop the circulation.[29]

80.   On or about December 31, researchers at the University of Toronto began to notice censoring of key words about the virus on Chinese social media platforms. [30]

81.   One of the censored platforms was WeChat, and as explained by the researchers, WeChat "has become increasingly popular among [Chinese] doctors who use it to obtain professional knowledge from peers. Because of social media's integral role in Chinese society and its uptake by the Chinese medical community, systematic blocking of general communication on social media related to disease information and prevention risks substantially harming the ability of the public to share information that may be essential to their health and safety."[31]

---

[29] "How It All Started: China's Early Coronavirus Missteps," The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

[30] "How Information on the Coronavirus is Managed on Chinese Social Media," Censored Contagion: How Information on the Coronavirus is Managed on Chinese Social Media, (Mar. 3, 2020), available at https://citizenlab.ca/2020/03/censored-contagion-how-information-on-the-coronavirus-is-managed-on-chinese-social-media/.

[31] *Id.*

82.     On January 1 or 2, the Wuhan police stated that they had "taken legal measures" against eight people who "published and shared rumors online," and one of them is believed to be Dr. Wenliang.[32]

83.     According to CNN, "The police announcement [against the eight people] was broadcast across the country on CCTV, China's state broadcaster, making it clear how the Chinese government would treat such 'rumormongers.'"[33]

84.     The message reportedly said, "The internet is not a land beyond the law ... Any unlawful acts of fabricating, spreading rumors and disturbing the social order will be punished by police according to the law, with zero tolerance."[34]

85.     As described by the St. Louis Post-Dispatch, "The punishment of eight doctors for 'rumor-mongering,' broadcast on national television on Jan. 2, sent a chill through the city's hospitals," and suppressed information from reaching the rest of the world.[35]

---

[32] "This Chinese doctor tried to save lives, but was silenced. Now he has coronavirus," CNN (Feb. 4, 2020), available at: https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.

[33] *Id.*

[34] *Id.*

[35] "Six days of silence when China didn't warn public of likely pandemic," The St. Louis Post Dispatch, (Apr. 16, 2020), available at: https://www.stltoday.com/news/national/your-daily-6-nurses-suspended-over-

86.    On January 1, 2020, "after several batches of genome sequence results had been returned to hospitals and submitted to health authorities, an employee of one genomics company received a phone call from an official at the Hubei Provincial Health Commission, ordering the company to stop testing samples from Wuhan related to the new disease and destroy all existing samples."[36]

87.    Also on January 1, 2020, Dr. Ai Fen, who ran an emergency department at a Wuhan hospital, ordered her staff to put on masks, suspecting human-to-human transmission. [37]

88.    But that night, "the hospital's discipline department summoned her for a chat the next day.  She was criticized for 'spreading rumors,' according to Dr. Ai.  She tried to argue that the disease could be contagious.  They said her action caused panic and 'damaged the stability' of Wuhan.  The hospital's leadership also banned staff from discussing the disease in public or via texts or images."[38]

---

masks-cheaper-iphone-and-how-six-days-of-silence/collection_a2b87190-132f-5438-a36d-1c48c64be013.html#1.

[36] "How early signs of the coronavirus were spotted, spread and throttled in China," The Strait Times (Feb. 28, 2020), available at: https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-were-spotted-spread-and-throttled-in-china.

[37] "How It All Started: China's Early Coronavirus Missteps," The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

[38] *Id.*

89.    On January 2, 2020, the Wuhan Institute completed its genome sequencing of the virus. [39]

90.    Discovery of the genome sequence was not announced at the time.[40]

91.    On January 3, 2020, Dr. Wenliang was forced to confess to a misdemeanor, prepare a self-criticism, and agree not to commit any additional "unlawful acts."[41]

92.    On January 3, 2020, "China's National Health Commission (NHC), the nation's top health authority, ordered institutions not to publish any information related to the unknown disease, and ordered labs to transfer any samples they had to designated testing institutions, or to destroy them."[42]

93.    The National Review, quoting Chinese sources, stated that on January 3, the "Wuhan Municipal Health Commission released another statement, repeating, 'As of now, preliminary investigations have shown no

_____

[39] *Id.*

[40] *Id.*

[41] "This Chinese doctor tried to save lives, but was silenced. Now he has coronavirus," CNN (Feb. 4, 2020), available at: https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-hnk/index.html.

[42] "How early signs of the coronavirus were spotted, spread and throttled in China," The Strait Times (Feb. 28, 2020), available at: https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-were-spotted-spread-and-throttled-in-china.

clear evidence of human-to-human transmission and no medical staff infections.'"[43]

94.    According to the Wall Street Journal, on January 5, "a medical research center in Shanghai notified the National Health Commission that one of its professors had also identified a SARS-like coronavirus and mapped the entire genome using a sample from Wuhan."[44]

95.    Like the genome discovery by the Wuhan Institute on January 2, the January 5 genome mapping was not made public for several days. [45]

96.    On January 5, 2020, relying on information from Chinese officials, WHO released a statement saying, "Based on the preliminary information from the Chinese investigation team, no evidence of significant human-to-human transmission and no health care worker infections have been reported."[46]

---

[43] Devastating Lies," National Review (March 23, 2020), available at: https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.
[44] "How It All Started: China's Early Coronavirus Missteps," The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.
[45] *Id.*
[46] "Pneumonia of unknown cause – China," WHO Disease Outbreak News (Jan. 5, 2020), available at: https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/.

97.    On January 6, the United States Centers for Disease Control offered to send a research team to assist Defendants, but Defendants did not extend permission to enter the country.[47]

98.    On January 8, 2020, WHO, relying on information from Chinese officials, said, "WHO does not recommend any specific measures for travelers. WHO advises against the application of any travel or trade restrictions on China based on the information currently available."[48]

99.    Chinese authorities, including Defendants, did not publicly confirm the outbreak as originating from a novel coronavirus until January 9, 2020, despite having a mapping of its genome and other details showing that it was a new virus.[49]

---

[47] "Exclusive: U.S. axed CDC expert job in China months before virus outbreak," Reuters (Mar. 22, 2020), available at: https://www.reuters.com/article/us-health-coronavirus-china-cdc-exclusiv/exclusive-u-s-axed-cdc-expert-job-in-china-months-before-virus-outbreak-idUSKBN21910S.

[48] "WHO Statement regarding cluster of pneumonia cases in Wuhan, China," WHO (Jan. 9, 2020), available at: https://www.who.int/china/news/detail/09-01-2020-who-statement-regarding-cluster-of-pneumonia-cases-in-wuhan-china.

[49] "How It All Started: China's Early Coronavirus Missteps," The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

100.   On January 10, the New York Times attributed to the Wuhan City Health Commission a statement that "[t]here is no evidence that the virus can be spread between humans."[50]

101.   According to the National Review, citing Chinese sources, on January 11, the Wuhan City Health Commission issued a statement saying, "All 739 close contacts, including 419 medical staff, have undergone medical observation and no related cases have been found . . . No new cases have been detected since January 3, 2020. At present, no medical staff infections have been found, and no clear evidence of human-to-human transmission has been found."[51]  This statement directly contradicted then-existing evidence.

102.   Chinese authorities, including Defendants, did not share the genome sequence—which the Wall Street Journal described as a "critical step[] toward containing the epidemic and designing a vaccine"—with the international community until January 12.[52]

---

[50] "China Reports First Death From New Virus," The New York Times (Jan. 10, 2010), available at: https://www.nytimes.com/2020/01/10/world/asia/china-virus-wuhan-death.html?searchResultPosition=9.

[51] "Devastating Lies," National Review (March 23, 2020), available at: https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

[51] "How It All Started: China's Early Coronavirus Missteps," The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

[52] *Id.*

103.   The first case outside of China was reported in Thailand on January 13.[53]

104.   Following the Thai case, Defendants did not tell the public about the new evidence directly confirming human-to-human transmission.[54]

105.   For instance, PRC and CPC officials continued denying human-to-human transmission and failed to inform the public, despite overwhelming evidence of the virus's contagiousness.[55]

106.   According to the National Review, citing Chinese sources, on January 14, the Wuhan City Health Commission issued another statement saying, "Among the close contacts, no related cases were found."[56]

107.   According to the Wall Street Journal, when President and General Secretary Xi Jinping, leader of the PRC and CPC, made "his first public statement on the crisis on January 20, he made no explicit mention of human-to-human transmission."[57]

---

[53] "Six days of silence when China didn't warn public of likely pandemic," The St. Louis Post Dispatch, (Apr. 16, 2020), available at: https://www.stltoday.com/news/national/your-daily-6-nurses-suspended-over-masks-cheaper-iphone-and-how-six-days-of-silence/collection_a2b87190-132f-5438-a36d-1c48c64be013.html#1.

[54] *Id.*

[55] *Id.*

[56] "Devastating Lies," National Review (March 23, 2020), available at: https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

[57] "How It All Started: China's Early Coronavirus Missteps," The Wall Street Journal (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-all-started-chinas-early-coronavirus-missteps-11583508932.

108. By the time President Xi made his statement, millions of travelers passed through Wuhan, and "more than 3,000 people had been infected during almost a week of public silence, according to internal documents obtained by The Associated Press and expert estimates based on retrospective infection data."[58]

109. The Wuhan City Health Commission continued publicly to deny human-to-human transmission until January 20,[59] at which point a Chinese authorities finally confirmed for the first time that human-to-human transmission was occurring.[60]

110. On January 20 and 21, 2020, the WHO was able to conduct a mission on the ground in China and said afterward, "Data collected through detailed epidemiological investigation and through the deployment of the new test kit nationally suggests that human-to-human transmission is taking place

---

[58] "Six days of silence when China didn't warn public of likely pandemic," The St. Louis Post Dispatch, (Apr. 16, 2020), available at: https://www.stltoday.com/news/national/your-daily-6-nurses-suspended-over-masks-cheaper-iphone-and-how-six-days-of-silence/collection_a2b87190-132f-5438-a36d-1c48c64be013.html#1.

[59] *Id.*

[60] "China confirms human-to-human transmission of coronavirus," The Guardian (January 20, 2020), available at: https://www.theguardian.com/world/2020/jan/20/coronavirus-spreads-to-beijing-as-china-confirms-new-cases.

in Wuhan.  More analysis of the epidemiological data is needed to understand the full extent of human-to-human transmission."[61]

111.  On January 23, 2020, China began its first steps towards quarantining Wuhan residents.

112.  Weeks after the lockdown slowed cases in Wuhan, China continued to mislead the world about its knowledge of the nature of the virus, and on April 17, 2020, it upwardly revised the death toll in Wuhan by more than a thousand cases, attributing the error to "incorrect reporting, delays and omissions."[62]

113.  Chinese citizen journalists, who posted videos from Wuhan of overcrowded hospitals and other scenes from the COVID-19 pandemic, have gone missing in recent weeks.[63]

114.  On information and belief, China continues to mislead the world about the infection rate, fatality rate, and other key statistics of COVID-19.

_____

[61] "Mission summary: WHO Field Visit to Wuhan, China 20-21 January 2020," WHO (Jan. 22, 2020), available at: https://www.who.int/china/news/detail/22-01-2020-field-visit-wuhan-china-jan-2020.
[62] "China Raises Wuhan Death Stats By Half To Account For Reporting Delays And Omissions," National Public Radio (Apr. 17, 2020), available at: https://www.npr.org/sections/coronavirus-live-updates/2020/04/17/836700806/china-raises-wuhan-death-stats-by-half-to-account-for-reporting-delays-and-omiss.
[63] "2 Wuhan whistleblowers missing months after helping expose coronavirus outbreak, activists say," Fox News (Apr. 15, 2020), available at: https://www.foxnews.com/world/wuhan-whistleblowers-missing-exposing-coronavirus.

115.   China has launched a "massive public relations campaign to avoid blame for the COVID-19 pandemic" and has spread conspiracy theories that the U.S. military had spread the virus.[64]

## THE EFFECTS OF DEFENDANTS' ACTIONS

116.   Due to Defendants' malfeasance, COVID-19 spread rapidly across the world, and as of April 20, 2020, the New York Times reports 770,138 confirmed cases in the United States and 37,186 deaths.[65]

117.   As of April 20, 2020, Missouri has more than 5,800 confirmed infections from COVID-19, and at least 177 Missourians have died.[66]

118.   In addition to the toll on human life and health, the pandemic has caused enormous economic disruptions across the United States and in Missouri, with tens of millions of Americans and many thousands of Missourians filing jobless claims.[67]

---

[64] "Guest on Chinese-produced Arabic-language program claimed US may be to blame for coronavirus pandemic," Fox News (Apr. 19, 2020), available at: https://www.foxnews.com/world/chinese-arabic-language-program-us-coronavirus-pandemic.

[65] "Coronavirus in the U.S.: Latest Map and Case Count," The New York Times (Apr. 20, 2020), available at: https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[66] COVID-19 Outbreak, Missouri Department of Health and Senior Services (Apr. 20, 2020), available at: https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/.

[67] "The Impact of COVID-19 on Labor Markets across the U.S.," The Federal Reserve Bank of St. Louis (Apr. 13, 2020), available at:

119.   Before the pandemic, Missouri had one of its lowest unemployment rates of the past decade,[68] but on information and belief, Missouri's unemployment rate is now the highest it has been since the Great Depression.

120.   The pandemic unleashed by Defendants has had enormous economic impacts on both the Missouri government and on virtually every citizen of Missouri.

121.   Responding to the pandemic has required shutting down businesses, disrupting ordinary production and trade, and dislocating workers.

122.   Missouri's government entities have suffered direct economic losses as a result of the pandemic, including loss of revenues and budgetary shortages, with direct effects on state services, state pension funds, and many other state proprietary and economic interests.

123.   In addition, innumerable citizens of Missouri have suffered economic losses as a result of the pandemic.  These include loss of jobs, loss of income, loss of business opportunities, and other economic losses.

124.   A preliminary analysis by an economist at the University of Missouri estimates that the economic impact of the pandemic on Missouri could total in the tens of billions of dollars, even if only one outbreak occurs.

---

https://www.stlouisfed.org/on-the-economy/2020/april/impact-covid-19-labor-markets-us.
[68] "Missouri Economic Dashboard," Office of the Missouri State Treasurer (Apr. 19, 2020), available at: https://treasurer.mo.gov/economicdashboard/

125.   The Governor of Missouri, anticipating a steep decline in revenues, has restricted millions of dollars in state expenditures.[69]

126.   Beyond the costs in terms of health, life, and the economy, the toll to human relationships has been enormous, as Missourians are unable to visit family and friends, celebrate major life milestones like high school or college graduations, or even attend Easter or Passover religious services. Literally every Missourian has suffered an economic, emotional, and/or spiritual toll of the coronavirus.

127.   As one example of the human toll, due to actions by Defendants, Missouri families with loved ones in nursing homes have been unable to visit them, and some have been unable to visit dying relatives.  As one St. Louis area woman tragically said of her stepfather, who died alone in a nursing home due to COVID-19, "He was always there for everyone.  At the end he was all alone."[70]

---

[69] "Governor Parson Announces Expenditure Restrictions to Ensure Balanced Budget, Funds to Combat COVID-19," Office of the Missouri Governor (Apr. 1, 2020), available at: https://governor.mo.gov/press-releases/archive/governor-parson-announces-expenditure-restrictions-ensure-balanced-budget.
[70] "'No dignity': Forced apart by coronavirus, families of nursing home dead left in the dark," The St. Louis Post Dispatch (Apr. 19, 2020), available at: https://www.stltoday.com/news/local/metro/no-dignity-forced-apart-by-coronavirus-families-of-nursing-home-dead-left-in-the-dark/article_b66439b5-3167-56b0-bfc7-4ab0bf08e96b.html#tracking-source=home-top-story.

128.   As another example, doctors and other medical professionals on the front line are also being separated from their families.  One St. Louis-area doctor has bought a camping trailer and is sleeping in it in her family's driveway, unable to see her husband and two children while she works to treat infected persons.[71]

129.   In addition to emotional turmoil and economic disruption, Defendants' course of conduct has inflicted enormous educational disruption on Missouri students at every level, from preschool through graduate studies. Schools have been closed for months, graduations and tests canceled, students isolated at home, libraries closed, and learning completely disrupted.

## DEFENDANTS' ACTIONS AS TO PPE

130.   On March 13, 2020, the New York Times ran a story documenting China's hoarding of PPE, saying China has "claimed mask factory output for itself."[72]

131.   According to the New York Times report, "Peter Navarro, an adviser to President Trump on manufacturing and trade, contended on Fox

---

[71] "Doctor on front line of St. Louis' fight against coronavirus: 'Don't waste all the effort and pain,'" The St. Louis Post Dispatch (Apr. 17, 2020), available at: https://www.stltoday.com/lifestyles/health-med-fit/coronavirus/doctor-on-front-line-of-st-louis-fight-against-coronavirus-don-t-waste-all-the/article_bffd3a8b-f91b-50f5-8353-925876451e98.html.
[72] "The World Needs Masks. China Makes Them, but Has Been Hoarding Them," The New York Times (Mar. 13, 2020), available at: https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html.

Business last month that China had essentially taken over factories that make masks on behalf of American companies. Beijing, he said, had opted to 'nationalize effectively 3M, our company.'"[73]

132.   According to the New York Times, "China did not just stop selling masks—it also bought up much of the rest of the world's supply."[74]

133.   Defendants' hoarding efforts resulted in it going "from being a net exporter of personal protective equipment, as it is the largest producer in the world, to a net importer."[75]

134.   According to a recent piece in the Washington Post, White House officials believe China's actions of hoarding and importing PPE were a "deliberate attempt by China to corner the market as it concealed and downplayed the danger posed by the outbreak."[76]

---

[73] *Id.*

[74] *Id.*

[75] "Navarro: China Went from a Net Exporter of PPE to a Large Net Importer," Fox News (Apr. 19, 2020), available at: https://www.breitbart.com/clips/2020/04/19/navarro-china-went-from-a-net-exporter-of-ppe-to-a-large-net-importer/.

[76] "U.S. sent millions of face masks to China early this year, ignoring pandemic warning signs," The Washington Post (Apr. 18, 2020), available at: https://www.washingtonpost.com/health/us-sent-millions-of-face-masks-to-china-early-this-year-ignoring-pandemic-warning-signs/2020/04/18/aaccf54a-7ff5-11ea-8013-1b6da0e4a2b7_story.html.

135.   China is not currently allowing U.S. companies to bring PPE or coronavirus test kits back to the United States, citing quality concerns.[77]

136.   The little PPE that China has released has drawn complaints from governments and hospitals across the world for being faulty, raising the prospect that it is keeping quality materials for itself while shipping defective equipment elsewhere.[78]

137.   On information and belief, the Defendants' hoarding of PPE has been motivated, at least in part, by the desire to profit from increased worldwide demand of PPE during the viral outbreak, including in Missouri.

138.   On information and belief, Defendants' hoarding of PPE has adversely impaired the ability of health care providers throughout the world, including in the United States and in Missouri, from safely and effectively treating patients with the virus.

## COUNT I: PUBLIC NUISANCE

### (Against All Defendants)

---

[77] "China's Export Restrictions Strand Medical Goods U.S. Needs to Fight Coronavirus, State Department Says," The Wall Street Journal (Apr. 16, 2020), available at: https://www.wsj.com/articles/chinas-export-restrictions-strand-medical-goods-u-s-needs-to-fight-coronavirus-state-department-says-11587031203?mod=hp_lead_pos2.
[78] "U.S. Asks China to Revise Export Rules for Coronavirus Medical Gear," The New York Times (Apr. 16, 2020), available at: https://www.nytimes.com/reuters/2020/04/16/world/asia/16reuters-heath-coronavirus-usa-china.html.

139.   Plaintiff repeats, restates, and incorporates by reference all allegations in Paragraphs 1 to 138.

140.   Under Missouri law, a defendant is liable for the tort of public nuisance when its conduct unreasonably interferes with a right common of the general public, such as interference with the public health and public safety.

141.   As one court has explained, "A public or common nuisance is an offense against the public order and economy of the state, by unlawfully doing any act or by omitting to perform any duty which the common good, public decency, or morals, or the public right to life, health and the use of property requires, and which at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights of property of the whole community, or neighborhood, or of any considerable number of persons, even though the extent of the annoyance, injury or damage may be unequal, or may vary in its effect upon individuals." *St. Louis v. Varahi*, 39 S.W.3d 531, 536 (Mo. App. E.D. 2001).

142.   Each Defendant owed a duty to the public, including Missouri's residents, not to offend, interfere with, or damage the common rights of Missourians through fraudulent, reckless, and negligent actions and omissions.

143.    Defendants, in violation of the International Health Regulations, and in violation of the common good and Missourians' life and health, failed to quarantine its population against a virus known to be exceptionally dangerous.

144.    Defendants, in violation of the common good and Missourians' life and health, took steps—including (but not limited to) censoring media, ceasing and censoring research, destroying scientific materials, making false and/or misleading statements to the international community, hoarding PPE for gain, and punishing medical professionals—that impeded the ability of the medical community and others to stop the spread of COVID-19 and its consequences.

145.    The repeated unlawful and unreasonable acts and omissions of the Defendants, including their commercial activities, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of substantial numbers of Missouri residents, ruining lives and damaging the public order and economy of the State of Missouri.

146.    As a proximate result of Defendants' conduct, the State and its residents have suffered billions—and possibly tens of billions—of dollars in economic damages, as well as substantial non-economic damages.

147.    The conduct of the Defendants was knowing, willful, and in reckless disregard of the rights of the State and its residents. Defendants demonstrated a complete indifference to or conscious disregard for the safety

of the public and their conduct was unreasonable and was reckless in light of the known risks to them of COVID-19.

148. Defendants have engaged in a continuing course of conduct. Defendants' unreasonable bad acts—as well as the resulting harm to the health, well-being, safety, comfort, economic interests, and rights of Missouri and its residents—continue unabated.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, jointly and severally against each and every Defendant, as follows: (a) determine that all Defendants created a public nuisance; (b) order that Defendants pay all restitution authorized by law; (c) order that all Defendants abate the nuisance, reimburse the cost of the State's abatement efforts, and pay compensatory damages for harms caused by the nuisance; (d) issue injunctive relief; (e) order that Defendants pay punitive damages; (f) order that Defendants pay all reasonable costs attributable to the prosecution of this civil action; (g) order that Defendants pay prejudgment interest; and (h) order such further relief as the Court deems just and appropriate.

## COUNT II: ABNORMALLY DANGEROUS ACTIVITES

(Against All Defendants)

149. Plaintiff repeats, restates, and incorporates by reference all allegations in Paragraphs 1 to 148.

150. Missouri recognizes strict liability for abnormally dangerous activities through adoption of the Restatement (Second) of Torts § 519, which provides: "(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm. (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854, 867 (Mo. App. E.D. 1985) (applying strict liability for radiation damage based on the Restatement); *Fletcher v. Conoco Pipe Line Co.*, 129 F.Supp.2d 1255, 1260 (W.D. Mo. 2001) ("Missouri courts appear to have adopted the Restatement's definition of strict liability—they apply the Restatement's list of factors to determine whether the risks of a perilous activity outweigh the benefits, to the extent that strict liability should apply.").

151. "In determining whether an activity is abnormally dangerous, the following factors are to be considered: (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." Restatement (Second) of Torts § 520.

152.   On information and belief, the Chinese Government Defendants, the Communist Party, and the Laboratory Defendants engaged in commercial and other research on coronaviruses through the Wuhan Institute.

153.   On information and belief, one likely source for the origin of the virus is through release from the Wuhan Institute, a laboratory with known safety concerns.

154.   Research on contagious viruses is an unusual activity with a high risk of harm, and the harm that can result from that research is great, with an inability to eliminate the risk of harm.

155.   On information and belief, the type of research carried on at the Wuhan Institute was inappropriate to the place where the research was conducted, especially in light of known safety concerns at the lab.

156.   On information and belief, the community value of the activity at the Wuhan Institute was low, but the activity was nonetheless dangerous.

157.   On information and belief, Defendants have engaged in a coverup about the origins of the virus, including its release from the Wuhan Institute.

158.   Defendants, in violation of the common good and Missourians' life and health, took steps—including (but not limited to) censoring media, ceasing and censoring research, destroying scientific materials, making false and misleading statements to the international community, hoarding PPE, and

punishing medical professionals—that impeded the ability of the medical community and others to stop the spread of COVID-19 and its consequences.

159.   The repeated abnormally dangerous activities of the Defendants, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of substantial numbers of Missouri residents, ruining lives and damaging the public order and economy of the State of Missouri.

160.   As a proximate result of Defendants' conduct, the State and its residents have suffered billions—and possibly tens of billions—of dollars in economic damages, as well as substantial non-economic damages.

161.   The conduct of the Defendants was knowing, willful, and in reckless disregard of the rights of the State and its residents. Defendants demonstrated a complete indifference to or conscious disregard for the safety of the public and their conduct was unreasonable and was reckless in light of the known risks to them of COVID-19.

162.   Defendants have engaged in a continuing course of conduct. Defendants' abnormally dangerous activities—as well as the resulting harm to the health, well-being, safety, comfort, economic interests, and rights of Missouri and its residents—continue unabated.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, jointly and severally against each and every

Defendant, as follows: (a) determine that the Chinese Government Defendants, the Communist Party, and the Laboratory Defendants engaged in abnormally dangerous activities; (b) order that Defendants pay all civil damages and restitution authorized by law; (c) order that all Defendants cease the abnormally dangerous activities, reimburse the cost of the State's abatement efforts, and pay compensatory damages for harms caused by the abnormally dangerous activities; (d) issue injunctive relief; (e) order that Defendants pay punitive damages; (f) order that Defendants pay all reasonable costs attributable to the prosecution of this civil action; (g) order that Defendants pay prejudgment interest; and (h) order such further relief as the Court deems just and appropriate.

<u>COUNT III: BREACH OF DUTY:</u>

<u>ALLOWING TRANSMISSION OF COVID-19</u>

(Against All Defendants)

163. Plaintiff repeats, restates, and incorporates by reference all allegations in Paragraphs 1 to 162.

164. Under Missouri law, a defendant is liable for breach of duty where a plaintiff establishes "(1) legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) a breach of that duty; (3) a proximate cause between the conduct and the resulting injury; and (4) actual damages to the claimant's person or property."

*Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc./Special Products, Inc.*, 700 S.W.2d 426, 431 (Mo. banc 1985).

165.   Under Missouri law, the doctrine of *res ipsa loquitur* "simply allows the plaintiff who can show that the injury does not occur in the absence of negligence to present to the jury an inference that the defendants were negligent." *Sides v. St. Anthony's Medical Center*, 258 S.W.3d 811, 819-820 (Mo. banc 2008).

166.   The unleashing of COVID-19 on the world has caused countless injuries to public health and economic injuries that would not have occurred in the absence of breach of duty on the part of Defendants.

167.   Under Missouri law, the doctrine of *negligence per se* applies when the standard of care is defined by legal rules, and therefore, a violation of the legal rule constitutes a breach of the duty of care. *Parr v. Breeden*, 489 S.W.3d 774, 781 (Mo. banc 2016).

168.   The Chinese Government Defendants had a duty to report "all events which may constitute a public health emergency of international concern within its territory" within 24 hours under Article 6.1 of the International Health Regulations, yet it failed to do so.

169.   In violation of their duties to the world, Defendants engaged in a coverup and misleading public relations campaign, censoring scientists, ordering the destruction and suppression of valuable research, and refusing

cooperation with the global community, all in violation of international health standards.

170.   The repeated breaches of duty by the Defendants, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of substantial numbers of Missouri residents, ruining lives and damaging the public order and economy of the State of Missouri.

171.   As a proximate result of Defendants' conduct, the State and its residents have suffered billions—and possibly tens of billions—of dollars in economic damages, as well as substantial non-economic damages.

172.   The conduct of the Defendants was knowing, willful, and in reckless disregard of the rights of the State and its residents. Defendants demonstrated a complete indifference to or conscious disregard for the safety of the public and their conduct was unreasonable and was reckless in light of the known risks to them of COVID-19.

173.   Defendants have engaged in a continuing course of conduct. Defendants' breach of duty and negligence—as well as the resulting harm to the health, well-being, safety, comfort, economic interests, and rights of Missouri and its residents—continue unabated.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, jointly and severally against each and every Defendant, as follows: (a) determine that the Defendants were negligent and

breached duties owed to Missouri and Missourians; (b) order that Defendants pay all civil damages and restitution authorized by law; (c) order that all Defendants cease their negligence, reimburse the cost of the State's abatement efforts, and pay compensatory damages for harms caused by their negligence; (d) issue injunctive relief; (e) order that Defendants pay punitive damages; (f) order that Defendants pay all reasonable costs attributable to the prosecution of this civil action; (g) order that Defendants pay prejudgment interest; and (h) order such further relief as the Court deems just and appropriate.

## COUNT IV: BREACH OF DUTY:

## HOARDING OF PERSONAL PROTECTIVE EQUIPMENT

(Against All Defendants)

174. Plaintiff repeats, restates, and incorporates by reference all allegations in Paragraphs 1 to 173.

175. Defendants have restricted exports of PPE and allowed the export of ineffective PPE, all while knowing (and even suppressing) the dangers of COVID-19.

176. Defendants had a duty not to hoard PPE and not to provide ineffective PPE to medical providers, and doing so has caused injury across the state of Missouri, allowing further spread of COVID-19.

177. Defendants' actions with respect to PPE are commercial activities.

178. The repeated breaches of duty by the Defendants, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of substantial numbers of Missouri residents, ruining lives and damaging the public order and economy of the State of Missouri.

179. As a proximate result of Defendants' conduct, the State and its residents have suffered billions and possibly tens of billions of dollars in economic damages, as well as substantial non-economic damages.

180. The conduct of the Defendants was knowing, willful, and in reckless disregard of the rights of the State and its residents. Defendants demonstrated a complete indifference to or conscious disregard for the safety of the public and their conduct was unreasonable and was reckless in light of the known risks to them of COVID-19.

181. Defendants have engaged in a continuing course of conduct. Defendants' breach of duty and negligence—as well as the resulting harm to the health, well-being, safety, comfort, economic interests, and rights of Missouri and its residents—continue unabated.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, jointly and severally against each and every Defendant, as follows: (a) determine that the Defendants were negligent and breached duties owed to Missouri and Missourians; (b) order that Defendants pay all civil damages and restitution authorized by law; (c) order that all

Defendants cease their negligence, reimburse the cost of the State's abatement efforts, and pay compensatory damages for harms caused by their negligence; (d) issue injunctive relief; (e) order that Defendants pay punitive damages; (f) order that Defendants pay all reasonable costs attributable to the prosecution of this civil action; (g) order that Defendants pay prejudgment interest; and (h) order such further relief as the Court deems just and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff, and enter an order jointly and severally against each and every Defendant that:

(a)     Awards Plaintiff all restitution authorized by law;

(b)     Enters injunctive relief;

(c)     Awards Plaintiff all civil penalties authorized by law;

(d)     Awards Plaintiff all actual damages authorized by law;

(e)     Awards Plaintiff all direct and consequential damages authorized by law;

(f)     Order that all Defendants abate the nuisance, reimburse the cost of the State's abatement efforts, and pay compensatory damages and other damages for harms caused by the nuisance;

(g)     Order that the Chinese Government Defendants, the Communist Party, and the Laboratory Defendants cease engaging in the abnormally

dangerous activities, reimburse the cost of the State's abatement efforts, and pay compensatory and other damages for harms caused by the abnormally dangerous activities;

(h)     Enters punitive damages against Defendants;

(i)     Awards Plaintiff all reasonable costs attributable to the prosecution of this civil action authorized by law;

(j)     Awards Plaintiff all pre-judgment interest authorized by law; and

(k)     Awards Plaintiff such further relief as the Court deems just and appropriate.

Dated: April 21, 2020                    Respectfully submitted,

                                        **ERIC S. SCHMITT**
                                        **ATTORNEY GENERAL**

                                        */s/ Justin D. Smith*
                                        Justin D. Smith, #63253MO
                                          Deputy Attorney General
                                        Missouri Attorney General's Office
                                        Post Office Box 899
                                        Jefferson City, MO 65102
                                        Tel: (573) 751-8870; Fax: (573) 751-0774
                                        Justin.Smith@ago.mo.gov