IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, | ) | |
| ex rel. ERIC S. SCHMITT, in his official | ) | |
| capacity as Missouri Attorney General, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE PEOPLE'S REPUBLIC OF CHINA, | ) | |
| THE COMMUNIST PARTY OF CHINA, | ) | Case No.: 1:20-cv-00099-SNLJ |
| NATIONAL HEALTH COMMISSION | ) | |
| OF THE PEOPLE'S REPUBLIC OF | ) | |
| CHINA, MINISTRY OF EMERGENCY | ) | |
| MANAGEMENT OF THE PEOPLE'S | ) | |
| REPUBLIC OF CHINA, MINISTER OF | ) | |
| CIVIL AFFAIRS OF THE PEOPLE'S | ) | |
| REPUBLIC OF CHINA, PEOPLE'S | ) | |
| GOVERNMENT OF HUBEI | ) | |
| PROVINCE, PEOPLE'S GOVERNMENT | ) | |
| OF WUHAN CITY, WUHAN INSTITUTE | ) | |
| OF VIROLOGY, AND CHINESE | ) | |
| ACADEMY OF SCIENCES, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF OF *AMICUS CURIAE*
LAWYERS FOR UPHOLDING INTERNATIONAL LAW IN OPPOSITION TO
PLAINTIFF THE STATE OF MISSOURI'S COMPLAINT AGAINST
DEFENDANTS THE PEOPLE'S REPUBLIC OF CHINA, *ET AL.***

**STATEMENT OF INTEREST**

As noted in the Motion for Leave to File this *amicus curiae* brief, Movant Lawyers for Upholding International Law is comprised of Dr. Geert-Jan Alexander Knoops and Dr. Tom Zwart. Both Dr. Knoops and Dr. Zwart are leading experts in the field of international law, and have specific knowledge regarding the interplay between the Chinese government and international legal matters. Given Movant's expertise in this field, as well as the unprecedented and novel nature of Petitioner State of Missouri's Complaint, Movant has a special interest in providing this Court with analysis regarding the legal deficiencies of the Complaint and requesting that this Court consider dismissing the Complaint *sua sponte*.

The Complaint was filed on April 21, 2020 and summons was issued on Defendants on July 17, 2020. No other action has been taken in this matter.

**INTRODUCTION**

On April 21, 2020, Missouri Attorney General Eric Schmitt initiated proceedings in the federal District Court against the People's Republic of China and some of its entities, such as the National Health Commission, the Chinese Academy of Sciences, and the local governments of Hubei and Wuhan.[1]

With the help of a 47-page complaint, AG Schmitt is seeking recovery for the loss of life, human suffering and economic turmoil resulting from the COVID-19 virus as experienced by Missourians. According to AG Schmitt, the Corona pandemic was due to a failure to act by the Chinese authorities. The Missouri case, which has since been joined by the state of Mississippi, is one of several such cases, including class actions, which have been brought in the U.S. against China.

This brief proceeds in four sections. In section 2, the arguments put forward by Missouri will be analysed and the prospect of their success will be assessed. Section 3 will explain why

---

[1] *See* Compl., Doc. # 1, 04/21/20.

bringing the case fits into a pattern that has emerged during the past two decades within federal relations in the US. Section 4 contains some concluding observations.

## ARGUMENT

### I.   Missouri Does Not Have An Arguable Case

#### A.   Standing

Under federal U.S. law, a claimant needs to pass a three-pronged test in order to have standing:[2]

1) She or he must have suffered an 'injury in fact', *i.e.* an invasion of a legally protected interest. This invasion must be concrete and particularized, and actual or imminent rather than conjectural or hypothetical.

2) There must be a causal connection between the injury and the conduct complained of. This means that the injury has to be fairly traceable to the challenged action of the defendant and should not be the result of the independent action of some third party not before the court.

3) It must be likely, as opposed to merely speculative, that the injury will be redressed by a favourable decision by the court.

U.S. standing law is, therefore, close to the private interest model, which regards injury to body, property, or reputation as a prerequisite for standing. Overall, courts have kept out those who could not claim to have a personal interest in the outcome.

In the case at hand, Missouri has much difficulty in meeting the second requirement. The state claims injury in fact as being the costs in terms of health, life, the economy and the toll on human relationships, but it has failed to demonstrate that there is a causal relationship between the alleged injury and the conduct complained of.

---

[2] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

At first sight, the state might be able to circumvent this standing requirement by relying on a concept introduced by the Supreme Court in *Massachusetts v. E.P.A.* in which a number of states' Attorneys General had challenged the refusal of the federal Environmental Protection Agency to regulate carbon dioxide and other greenhouse gasses as pollutants.[3] The Court's majority, led by Justice Stevens, pointed out that when a state enters the Union it surrenders certain sovereign prerogatives.[4] Although they have delegated these powers to the Union, the states still retain a residual interest in the way they are being exercised. This 'special solicitude' provides them with standing to initiate proceedings to protect these quasi-sovereign interests.[5] This special solicitude standing appears to trump the three-pronged test applied by the courts in 'ordinary' standing cases.

However, this special solicitude standing doctrine is not an entrenched part of the Court's case law. First, the judgment in *Massachusetts v. E.P.A.* was a narrow 5-4 decision, accompanied by a fierce dissenting opinion submitted by Chief Justice Roberts in which the 'special solicitude' concept was heavily criticised by the Justices who were in the minority.[6] Before the concept could be regarded as part of *stare decisis*, a confirmation in a subsequent case was therefore required.

The *Texas v. U.S.* case, which was brought in 2014 by a large number of Attorneys General, seemed well suited for this purpose.[7] The Attorneys General challenged administrative actions taken by the Obama administration making the deportation of undocumented aliens without criminal histories the lowest priority for removal and giving a more secure status to

---

[3] 549 U.S. 497 (2007).
[4] *Id.* at 519.
[5] Bradford C. Mank, *State Standing in United States v. Texas: Opening the Flood Gates to States Challenging the Federal Government, or Proper Federalism?*, 2018 U. Ill. L. Rev. 211 (2018).
[6] 549 U.S. at 536.
[7] 809 F.3d 134 (5th Cir. 2015).

undocumented immigrants who are the parents of U.S. citizens.[8] The United States Court of Appeal for the Fifth Circuit decided that the orders issued by President Obama violated the rulemaking requirements of the Administrative Procedure Act.[9] The Court found that the Attorneys General had standing on the basis of the special solicitude test.[10] However, the much anticipated judgment of the Supreme Court did not bring the desired clarity.[11] As a result of the unexpected passing of Justice Scalia, the case had to be decided by the eight remaining Justices, who split 4-4.[12] Consequently, the judgment of the Court of Appeal was affirmed, but this decision did not have any precedential value.

Even if Missouri would be entitled to special solicitude standing in cases regarding federalist or even national issues, it is highly doubtful whether it could also claim a quasi-sovereign interest in international matters, since concepts as the foreign affairs doctrine and the political question doctrine tend to limit the capacity of the states to interfere with the national government's prerogative in foreign affairs.[13]

### B.       The Political Question Doctrine

Since the complaint clearly interferes with U.S. foreign policy towards China, which currently amounts to a balancing act involving highly sensitive trade negotiations, it is bound to be declared a non-justiciable political question. The case of *Marbury v Madison* is usually considered the cradle of the non-justiciability doctrine.[14] In his opinion, Chief Justice Marshall made a distinction between decisions based on duties assigned by law and discretionary

---

[8] *Id.*
[9] *Id.* At 177–78.
[10] *Id.* at 150–63.
[11] *U.S. v. Texas*, 579 U.S. __, 136 S. Ct. 2271 (2016).
[12] *Id.*
[13] Daniel Abebe and Aziz Z. Huq, *Foreign Affairs Federalism: A Revisionist Approach*, 66 Vand. L. Rev. 723 (2013).
[14] 5 U.S. 137 (1803).

decisions. The former were suited to adjudication by the courts, while the latter ought to be decided by the political branches.[15]

In Justice Brennan's majority opinion in *Baker v Carr* the discretion/non-discretion distinction was replaced by a division into six categories.[16] According to Justice Brennan an issue is non-justiciable in case of:

- a textually demonstrable constitutional commitment of the issue to a coordinate political department;

- a lack of judicially discoverable and manageable standards for resolving it;

- the impossibility of deciding the issue without an initial policy determination of a kind clearly not for judges to make;

- the fact that adjudication would result in a lack of respect for one of the coordinate branches;

- the need to adhere unquestioningly to a political decision already made;

- and the embarrassment that could be caused by more than one department pronouncing itself on the same question.

According to Justice Brennan, foreign affairs issues tend to be covered by the political question doctrine for three reasons: frequently they turn on standards that defy judicial application; they may involve the exercise of a discretion demonstrably committed to the executive or legislature; or they uniquely demand single-voice statement of the government's views.[17] For these reasons the Missouri complaint deserves to be dismissed as being non-justiciable.

**C.    Immunity**

*1.    Immunity under the Foreign Sovereign Immunities Act and public international law*

---

[15] *See id.*
[16] 369 U.S. 186, 217 (1962).
[17] *Id*. at 211.

Foreign states, like China, enjoy sovereign immunity before U.S. Courts under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1604, and public international law. AG Schmitt has tried to circumvent this bar by listing the Communist Party of China as a defendant, while claiming that "the Communist Party is not an organ or political subdivision of the PRC, nor is it owned by the PRC or a political subdivision of the PRC, and thus it is not protected by sovereign immunity".[18]

This position is contrary to international law, according to which state immunity extends to all organs, components, and entities of the state, which, of course, also includes the Communist Party. Furthermore, the Secretary General of the Communist Party also serves as the head of state, who by definition enjoys the protection of state immunity. The actions challenged in the Missouri Complaint are all attributable, either directly or indirectly, to the President of China.

## 2.    *The commercial activities exception*

In addition, the complaint has invoked the commercial activities exception to sovereign immunity under the FSIA, 28 U.S.C. § 1605(a)(2), by claiming that the conduct which allegedly caused the pandemic was commercial in nature. These commercial activities allegedly included the operation of the Chinese healthcare system; commercial research on viruses conducted by the Wuhan Institute and the Chinese Academy of Sciences; the operation of traditional and social media platforms for commercial gain; and the production, purchasing and import and export of medical equipment.[19]

The Complaint fails to identify which specific activities performed by which entity or entities should be characterised as 'commercial activities' within the meaning of this provision.

---

[18] Compl., Doc. #1, ¶ 19.
[19] *Id.* at ¶ 40.

Instead, it limits itself to making sweeping and generalised statements and, therefore, it does not meet the legal requirements of § 1605(a)(2).[20]

Since the Complaint fails to identify concrete activities, it cannot be established whether these activities meet the test developed by the U.S. Supreme Court in *Verlinden B.V. v. Central Bank of Nigeria*,[21] according to which a foreign state engages in commercial activities when it exercises powers that can also be exercised by private citizens.

Missouri invokes the third clause of § 1605(a)(2), which confers jurisdiction over actions that are "based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere that causes a direct effect in the United States".[22] It fails to demonstrate which direct effects the activities it described in general terms may have had in the United States. In *Republic of Argentina v. Weltover*,[23] the U.S. Supreme Court stated that in order to be 'direct' the effect must follow as an *immediate consequence* of the foreign state's activity. Missouri has not showed that the activities it listed did have direct effects in the US which could be characterised as the immediate consequences of activities performed by China or its instrumentalities.

### 3.   The tortious conduct exception

Furthermore, Missouri has invoked the tortious conduct exception laid down in § 1605(a)(5) by claiming that the activities which allegedly caused the pandemic amounted to torts occurring in the US.[24] It has not identified any damage or loss of property which resulted from the acts that were listed in the complaint, let alone demonstrated that those occurred in the

---

[20] *Hoban v. Sovereign Republic of Peru*, 204 F.Supp.3d 1368 (S.D. Fla. 2016); *Harris v. Vao Intourist, Moscow*, 481 F.Supp. 1056 (E.D. N.Y. 1979).
[21] 461 U.S. 480 (1983).
[22] Compl., Doc. #1, ¶ 38.
[23] 504 U.S. 607 (1992).
[24] Compl., Doc. #1, ¶ 41.

United States, to which § 1605(a)(5) is limited, according to the Supreme Court in *Argentine Republic v. Amerada Hess Shipping Corp.*[25]

### 4.    The Act of State doctrine

Moreover, since all activities complained of took place within China they are covered by the Act of State doctrine, according to which states enjoy immunity for acts performed within their territory. The importance of this doctrine was recognized by the U.S. Supreme Court in *Underhill v. Hernandez,*[26] where Chief Justice Fuller for a unanimous Court stated that "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." Therefore, the Act of State doctrine provides China with immunity for all 'commercial' acts referred to by Missouri.

In the meantime Republican Senator Tom Cotton (Arkansas) and Republican Representative Dan Crenshaw (Texas) have introduced legislation to amend the FSIA, which, if enacted, would deprive China of immunity in COVID-19 cases.[27] This it would do with retroactive effect to January 1st, 2020, while it would also apply to cases which are already pending, such as the suit brought by Missouri.

Congress is prohibited from passing such *ex post facto* laws by Article 1 § 9 of the U.S. Constitution. In addition, even if a later act can set aside an earlier act under the *lex posterior* rule, it cannot revoke the Act of State doctrine, because it has constitutional underpinnings. This was made clear by Justice Harlan for an almost unanimous U.S. Supreme Court in *Banco Nacional de Cuba v. Sabbatino*.[28] Justice Harlan emphasised that the separation of powers prescribes the immunity of foreign states for acts performed within their territory.[29] Since the

---

[25] 488 U.S. 428 (1989).
[26] 168 U.S. 250, 252 (1897).
[27] *Press Release: Cotton, Crenshaw Bill Would Allow Americans to Sue China for Virus Damages*, Apr. 16, 2020, https://www.cotton.senate.gov/?p=press_release&id=1352.
[28] 376 U.S. 398 (1964).
[29] *Id*. at 401.

Act of State doctrine has its basis in the Constitution, it can only be set aside or amended through a Constitutional amendment and not through an Act of Congress.

**D.      The Defence of Force Majeure**

Furthermore, assuming *arguendo* that COVID-19 would have its origin in China, the country might invoke one of the defences under the law of state responsibility, such as *force majeure*, necessity or distress, which would absolve the country from state responsibility. The most prominent defence in this regard would be that of *force majeure*. This defence has been formulated in Article 23 of the International Law Commission's Articles on the Responsibility of States for Internationally Wrongful Acts (ARS) as: "the occurrence of an irresistible force or of an unforeseen event, beyond the control of the State, making it materially impossible in the circumstances to perform the obligation."[30]

On the basis of the text of Article 23 ARS, five requirements will have to be met for a defence of *force majeure* to be successfully invoked:[31]

1)  The occurrence of an irresistible force or an unforeseen event;

2)  Beyond the control of the State;

3)  Making it materially impossible in the circumstances to perform the obligation.

4)  The situation should not be due to the State invoking it;

5)  Nor should the State have taken the risk of the situation occurring.

As far as the irresistibility requirement is concerned, there must be a constraint which the State was unable to avoid or oppose by its own means.[32] It can be argued that this outbreak

---

[30] UN Document A/56/10, Articles on State Responsibility, Art. 23, Int'l Law Commission (2001), https://casebook.icrc.org/case-study/international-law-commission-articles-state-responsibility.

[31] Cf. Frederica Paddeu & Freya Jephcott, *COVID-19 and Defences in the Law of State Responsibility: Part I*, EJIL:Talk! (Mar. 17, 2020), https://www.ejiltalk.org/covid-19-and-defences-in-the-law-of-state-responsibility-part-i/.

[32] UN Document, Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, Int'l Law Commission, 76 (2001), https://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf.

was due to an irresistible force. In order to counter this argument, the plaintiffs will have to prove that China would have been able to bring the virus under control far earlier, and that this could have prevented a further transmission of the virus abroad.

To have been unforeseen the event must have been neither foreseen nor of an easily foreseeable kind.[33] The occurrence of the COVID-19 can arguably be qualified as an unforeseen event for China, where the virus suddenly emerged and less so for the states to which the virus subsequently spread after the outbreak became apparent.

Article 23 ARS also requires that the specific event was beyond the control of the state. This requirement implies an element of impossibility, in other words, an event that overpowers the state.[34] In the legal literature there is no consensus on whether the impossibility must be absolute. Assuming that this element of absolute impossibility applies, the plaintiffs in the Missouri case will have to prove that China had an opportunity to prevent the outbreak.

Material impossibility of performance may be due to a natural or physical event or to humanitarian intervention, or some combination of the two.[35] The emergence of an unknown virus would qualify as a natural event, from the effects of which China could not escape. To validly invoke the defence of force majeure, the State should be able to prove actual impossibility rather than increased difficulty of performance.[36] In this case China could validly claim actual impossibility.

Moreover, the defence of *force majeure* does not apply if the event can be attributed to the conduct of the State in question, or if the state has taken the risk of that situation occurring.

---

[33] *Id.*

[34] UN Document A/CN.4/SER.A/1997, 1 Yearbook of the International Law Commission, 1997, 234, para. 3.

[35] UN Document, Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, Int'l Law Commission, 76 (2001), https://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf.

[36] *Id.* at 77.

Again, the burden of proof is on the plaintiffs in the present case. It is up to them to demonstrate that China was negligent in the prevention of the specific outbreak and in the control thereof.

Importantly, the outbreak of COVID-19 seems to involve an asymptomatic type of transmission and this would mean, therefore, that the first and second condition of Article 23 have been met.[37] In the event that China would invoke the defence of *force majeure*, the plaintiffs bear the burden to show that China did substantially contribute to the specific outbreak. Again, the fact that the virus is characterised by an asymptomatic type of transmission may also show that China was not reasonably able to swiftly respond to the situation at hand in order to suppress the spread of the virus.

Therefore, in view of the special nature of this specific virus, the outbreak of COVID-19 might qualify as triggering the defence of *force majeure*. Especially in light of the fact that much is still unknown about the way in which the virus multiplies and spreads, the first, second, fourth and fifth criterion of Article 23 ARS seem to have been met in favour of China.

## II.     The Missouri Case as an Example of Federalist Activism

The lawsuit brought by Missouri can be regarded as the next phase in the trend of activist federalism which has been developing in the US. As the chief legal officers of the respective states, the Attorneys General are responsible for enforcing state law and defending the state against legal challenges.[38] Traditionally, they have initiated court proceedings against the federal government to resist its usurpation of the responsibilities of the states as laid out in the constitutional arrangements. In addition to these 'vertical' law suits, since the 1990s Attorneys

---

[37] Monica Gandhi, Deborah S. Yokoe and Diane v. Havlir, *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control COVID-19*, New Eng. J. Med., 2158-2160 (May 2020), https://www.nejm.org/doi/full/10.1056/NEJMe2009758.
[38] Margaret H. Lemos & Ernst A. Young, *State Public-Law Litigation in an Age of Polarization*, 97 Tex. L. Rev. 43, 65 (2018).

General have increasingly become engaged in 'horizontal' proceedings in which they have tried to impact the national policy of the federal government.[39]

Thus in 2004, in *Massachusetts v. E.P.A.*, a number of states attorneys general successfully challenged the refusal of the federal Environmental Protection Agency to regulate carbon dioxide and other greenhouse gasses as pollutants.[40] In 2010, several attorneys general challenged the constitutionality of the Patient Protection and Affordable Care Act, also known as Obamacare, before the Supreme Court. In its judgment in *National Federation of Independent Business v. Sebelius*, the Court upheld most of the provisions of the Act as being constitutional.[41] In 2014, in *United States v. Texas* a large number of attorneys general challenged administrative actions taken by the Obama administration making the deportation of undocumented aliens without criminal histories the lowest priority for removal and giving a more secure status to undocumented immigrants who are the parents of U.S. citizens.[42] The United States Court of Appeal for the Fifth Circuit decided that the order issued by President Obama violated the rulemaking requirements of the Administrative Procedure Act.[43] This decision was affirmed by the Supreme Court in 2016.[44] In *Texas v. U.S.*, a number of states have again challenged the Patient Protection and Affordable Care Act. The case will be decided later this term by the Supreme Court.

As these cases show, the states' Attorneys General, by bringing these cases, have become important players at the national level.[45] They are operating within a highly polarized

---

[39] The terminology was developed by Lemos & Young, *id*. at 48.
[40] 549 US 497 (2007).
[41] 567 US 519 (2012).
[42] 809 F. 3d 134 (5th Cir. 2015).
[43] *Id*.
[44] 579 US __, 136 S. Ct. 2271 (2016).
[45] Paul Nolette, *Federalism on Trial: States Attorneys General and National Policymaking in Contemporary America*, (2015); Paul Nolette, *The Dual Role of State Attorneys General in American Federalism: Conflict and Cooperation in an Era of Partisan Polarization*, 47 Publius: The J. of Federalism 3, 342 (2017).

political climate.[46] As a result, Attorneys General of the same political persuasion tend to join forces, which has let to groups of 'red' (Republican) and 'blue' (Democrat) Attorneys General teaming up, sometimes on opposite sides in the same case. Therefore, the case bought by Missouri should be regarded an extension of the tendency of Attorneys General to engage in national politics.

## CONCLUSION

It is submitted that Missouri does not have an arguable case. Missouri appears to lack standing to bring the case, which should be deemed a non-justiciable political question. In addition, China and its instrumentalities enjoy immunity in US Courts and the exceptions invoked by Missouri, *i.e.* the commercial activities exception and the tortious conduct exception, do not apply. Furthermore, the Act of State doctrine acts as a barrier to the suit. Finally, China may successfully invoke the defence of *force majeure*.

Through this case, which represents a new phase in the growing federalist activism of states Attorneys General in the US, the Attorney General of Missouri probably aims to secure a victory in the court of public opinion rather than in the court of law. As such, it is part of a highly polarized debate between the US and China which is having a corrosive impact on the international political order. Consequently, the international legal order at the moment is the only available channel left to secure peace and security. It is the duty and responsibility of the legal community to ensure that the legal channel continues to operate properly. We have filed this amicus brief to discharge our responsibility in this respect.

Thus, for the foregoing reasons, the Lawyers for Upholding International Law respectfully request that this Court dismiss Plaintiff State of Missouri's Complaint against Defendants, and for such other orders as this Court may find just and equitable.

---

[46] Lemos & Young, *supra* note 38, at 50–64.

Dated:          September 25, 2020

        Respectfully submitted,

        */s/ Geert-Jan Alexander Knoops*
        Dr. Geert-Jan Alexander Knoops, A09070
        Knoops' Advocaten International Lawyers
        Concertgebouwplein 25
        1071 LM Amsterdam
        P: +31 (0)20-470-5151
        F: +31 (0)20-675-0946
        office@knoopsadvocaten.nl

        */s/ Tom Zwart*
        Dr. Tom Zwart
        Newtonlaan 201, 3584 BH
        Utrecht, The Netherlands
        P: 316 2705 2580
        t.zwart@uu.nl

        ***Lawyers for Upholding International Law***

        THE SIMON LAW FIRM, P.C.

        */s/ Amy Collignon Gunn*
        Amy Collignon Gunn #45016MO
        Elizabeth S. Lenivy #68469MO
        800 Market Street, Ste. 1700
        St. Louis, Missouri 63101
        P: (314) 241-2929
        F: (314) 241-2029
        agunn@simonlawpc.com
        elenivy@simonlawpc.com

        ***Local Counsel for Lawyers for Upholding International Law***