**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

THE STATE OF MISSOURI,          )
ex rel. ERIC S. SCHMITT, in his official   )
capacity as Missouri Attorney General,   )
                                  )
      Plaintiff,               )
                                  )
v.                            )      Case No. 1:20-cv-00099-SNLJ
                                  )
THE PEOPLE'S REPUBLIC OF CHINA,   )
THE COMMUNIST PARTY OF CHINA,    )
NATIONAL HEALTH COMMISSION      )
OF THE PEOPLE'S REPUBLIC OF        )
CHINA, MINISTRY OF EMERGENCY    )
MANAGEMENT OF THE PEOPLE'S     )
REPUBLIC OF CHINA, MINISTRY OF    )
CIVIL AFFAIRS OF THE PEOPLE'S    )
REPUBLIC OF CHINA, PEOPLE'S      )
GOVERNMENT OF HUBEI             )
PROVINCE, PEOPLE'S GOVERNMENT   )
OF WUHAN CITY, WUHAN INSTITUTE  )
OF VIROLOGY, and CHINESE         )
ACADEMY OF SCIENCES,           )
                                  )
      Defendants.            )

**PLAINTIFF STATE OF MISSOURI'S MEMORANDUM REGARDING THE COURT'S
SUBJECT-MATTER JURISDICTION RESPONDING TO THE *AMICUS CURIAE*
BRIEF OF THE CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW
<u>SUGGESTING *SUA SPONTE* DISMISSAL FOR LACK OF JURISDICTION</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

I.    The China Society Raises a "Facial Attack" on the Court's Subject-Matter

Jurisdiction, So the Court Should Not Consider Facts Outside the Pleadings ..............1

II.    FSIA Immunity Does Not Apply to the Non-Governmental Defendants Communist

Party of China, Chinese Academy of Sciences, and Wuhan Institute of Virology ......3

    A.  Based on well-pleaded facts, the Communist Party of China is not an agency or

instrumentality of the People's Republic of China ...................................................5

    B.  Based on the well-pleaded facts, there is no basis to conclude that CAS and WIV

are cloaked with FSIA immunity ...........................................................................9

III.    The Commercial Activity Exception Applies to Missouri's Claims .........................11

    A.  The Complaint plausibly alleges many "direct effects" in the United States from

Defendants' conduct in unleashing the COVID-19 pandemic ...........................11

    B.  The Complaint alleges many kinds of "commercial activity" .............................19

    C.  The Complaint raises claims that are based on actions taken "in connection with"

commercial activity ...............................................................................................29

IV.    Even If the Commercial Activity Exception Did Not Apply, the Non-Commercial

Activity Exception Would Apply to Strip Immunity From the Defendants ..............32

V.    The Court Should Not Consider the China Society's Non-Jurisdictional Arguments,

and They Are Uniformly Meritless In Any Event ....................................................37

    A.  The act-of-state doctrine has not been properly raised and does not apply to

Missouri's PPE-hoarding claim ............................................................................37

B.  Missouri has *parens patriae* standing to vindicate injuries to a substantial segment of its population ......................................................................39

C.  Service on CPC, WIV, and CAS was proper .......................................................40

D.  The China Society's arguments regarding choice of law and duty of care are meritless ...............................................................................................................41

CONCLUSION ......................................................................................................................42

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adler v. Fed. Republic of Nigeria*,
  107 F.3d 720 (9th Cir. 1997) ............................................................... 4, 10, 28, 30

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982) ........................................................................... 40

*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*,
  600 F.3d 171 (2d Cir. 2009) ........................................ 20, 23, 24, 30, 31

*Antares Aircraft, L.P. v. Fed. Republic of Nigeria*,
  999 F.2d 33 (2d Cir. 1993) ................................................................. 13, 14

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) ..................................................................... 33, 35, 36

*Asociacion de Reclamantes v. United Mexican States*,
  735 F.2d 1517 (D.C. Cir. 1984) .......................................................... 34

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  813 F.3d 98 (2d Cir. 2016) ................................................................. 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................... 8

*Bigio v. Coca-Cola Co.*,
  239 F.3d 440 (2d Cir. 2000) ................................................................ 37

*Carlsen v. GameStop, Inc.*,
  833 F.3d 903 (8th Cir. 2016) ......................................................... 2, 3, 8

*Chen v. China Cent. Television*,
  No. 06CIV414PAC, 2007 WL 2298360 (S.D.N.Y. Aug. 9, 2007) .......................................... 7

*Conroy v. Aniskoff*,
  507 U.S. 511 (1993) ........................................................................... 35

*Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of,*
  *Can.*, 600 F.3d 661 (D.C. Cir. 2010) ...................................... 12, 13, 15, 16

*Dumont v. Saskatchewan Gov't Ins.*,
  258 F.3d 880 (8th Cir. 2001) ......................................................... 14, 16

*Elbasir v. Kingdom of Saudi Arabia*,
  468 F. Supp. 2d 155 (D.D.C. 2007) .................................................. 20, 21

*First Union Nat'l Bank ex rel. Se. Timber Leasing Statutory Tr. v. Pictet Overseas Tr. Corp.*,
   351 F.3d 810 (8th Cir. 2003) ................................................................ 37

*Gates v. Victor Fine Foods*,
   54 F.3d 1457 (9th Cir. 1995) ................................................................. 4

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ............................................................................. 35

*Hanil Bank v. PT. Bank Negara Indonesia*,
   148 F.3d 127 (2d Cir. 1998) ................................................................. 14

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 109 (2d Cir. 2013) ........................................................... 34, 35

*Jerez v. Republic of Cuba*,
   775 F.3d 419 (D.C. Cir. 2014) ............................................................. 34

*Jungquist v. Sheikh Sultan bin Khalifa Al Nahyan*,
   115 F.3d 1020 (D.C. Cir. 1997) ........................................................... 21

*Kashef v. BNP Paribas S.A.*,
   925 F.3d 53 (2d Cir. 2019) ................................................................... 39

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................................. 40

*Matter of Sedco, Inc.*,
   543 F. Supp. 561 (S.D. Tex. 1982) ...................................................... 34

*McDonnell Douglas Corp. v. Islamic Republic of Iran*,
   758 F.2d 341 (8th Cir. 1985) ............................................................... 20

*Milner v. Dep't of Navy*,
   562 U.S. 562 (2011) ............................................................................. 35

*Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*,
   937 F.3d 1067 (7th Cir. 2019) ............................................................. 38

*Oppenheimer Fund, Inc. v. Sanders*,
   437 U.S. 340 (1978) ............................................................................. 10

*Princz v. Fed. Republic of Germany*,
   26 F.3d 1166 (D.C. Cir. 1994) ............................................... 14, 15, 20

*Pudlowski v. The St. Louis Rams, LLC*,
   829 F.3d 963 (8th Cir. 2016) .......................................................... 10, 25

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) ............................................................... 12, 16, 19, 21, 22, 25, 27

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004) ................................................................................................ 37

*Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*,
    877 F.2d 574 (7th Cir. 1989) ......................................................................... 22, 23, 24

*Saludes v. Republica de Cuba*,
    577 F. Supp. 2d 1243 (S.D. Fla. 2008) ..................................................................... 7

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) .................................................................... 19, 24, 26, 27, 28

*Sharon v. Time, Inc.*,
    599 F. Supp. 538 (S.D.N.Y. 1984) .......................................................................... 39

*Siderman de Blake v. Republic of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ................................................................................... 38

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
    493 U.S. 400 (1990) .......................................................................................... 38, 39

*Yaodi Hu v. Communist Party of China*,
    No. 1:12-CV-1213, 2012 WL 7160373 (W.D. Mich. Nov. 20, 2012) ...................... 7

**Statutes**

28 U.S.C. § 1603(a) ........................................................................................................ 5

28 U.S.C. § 1603(b) .................................................................................................... 5, 6

28 U.S.C. § 1603(b)(1)–(2) ........................................................................................ 5, 6

28 U.S.C. § 1603(b)(2) .............................................................................................. 7, 10

28 U.S.C. § 1603(d) ................................................................................................ 19, 21

28 U.S.C. § 1605(a) ........................................................................................................ 7

28 U.S.C. § 1605(a)(2) ........................................................... 11, 12, 14, 19, 26, 27, 28

28 U.S.C. § 1605(a)(5) ........................................................... 32, 33, 34, 35, 36, 37

28 U.S.C. § 1608 ......................................................................................................... 41

28 U.S.C. § 1608(b) ..................................................................................................... 41

28 U.S.C. § 1608(b)(3)(C) ........................................................................................ 41

Article 5, Constitution of the People's Republic of China ............................................ 9

**Rules**

Fed. R. Civ. P. 12(h)(1) ............................................................................................ 41

Fed. R. Civ. P. 15(a)(1)(B) ......................................................................................... 3

**Other Authorities**

5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350
    (3d ed.) ................................................................................................................ 2

RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW, § 18 .................................... 42

RESTATEMENT OF CONFLICT OF LAWS § 377 (1934) .................................................... 13

## INTRODUCTION

In this case, the State of Missouri asserts claims against the People's Republic of China (PRC), five of its political subdivisions, and three Chinese non-governmental entities—the Communist Party of China (CPC), the Chinese Academy of Sciences (CAS), and the Wuhan Institute of Virology (WIV)—based on their actions in unleashing and exacerbating the global COVID-19 pandemic.  Doc. 1.  The latter three non-governmental entities are in default, Doc. 29, while service is still being finalized on the six governmental defendants.  Even though no party has yet appeared, *amicus curiae* The China Society of Private International Law (the "China Society"), which is part of the International Law Institute of Wuhan University in Wuhan, China, *see* Doc. 34, at 1, contends that this Court should dismiss the entire case for lack of subject-matter jurisdiction because all Defendants are supposedly shielded from all claims by foreign sovereign immunity under the Foreign Sovereign Immunities Act (FSIA).  *See id.*  Because this Court may consider questions of subject-matter jurisdiction *sua sponte*, Plaintiff the State of Missouri provides this memorandum to address the jurisdictional issues raised by the China Society.  The China Society's arguments disregard the well-pleaded allegations in the Complaint, improperly rely on unsubstantiated and implausible factual allegations that lie outside the pleadings, ignore the plain language of the FSIA and governing Supreme Court case law, and mischaracterize the cases on which it relies.  Its arguments are uniformly without merit.

## I.      The China Society Raises a "Facial Attack" on the Court's Subject-Matter Jurisdiction, So the Court Should Not Consider Facts Outside the Pleadings.

As an initial matter, the China Society admits that it raises a "facial attack," not a "factual attack," on the Court's subject-matter jurisdiction.  Doc. 34 at 1 (admitting that the China Society must "assume that the allegations in Plaintiffs' complaint are true").  Notwithstanding this admission, the China Society repeatedly asserts its own unsupported "facts" in its brief.  The Court

1

should disregard its factual assertions that lie outside the pleadings because the China Society's challenge to this Court's subject-matter jurisdiction is a facial attack. *See, e.g.*, *Carlsen v. GameStop, Inc*., 833 F.3d 903, 908 (8th Cir. 2016). Indeed, because the China Society presents no affidavits or other admissible evidence purporting to contradict the pleadings (it attaches only one unverified, unauthenticated exhibit that does not contradict the pleadings), its challenge to the Court's jurisdiction can be construed only as a facial attack. *See id.*; *see also* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (3d ed.). Accordingly, the Court should limit itself to the well-pleaded allegations in the Complaint, and disregard the China Society's improper attempt to interject unpleaded, unverified, and unsubstantiated facts that lie entirely outside the pleadings.[1] *Carlsen*, 833 F.3d at 908 ("In a facial attack, the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6).") (quotation marks omitted).

Moreover, a non-party cannot raise a "factual attack" on the Court's jurisdiction when no party has yet appeared and no jurisdictional discovery is yet available. Plaintiff's complaint was filed over a year and a half ago, on April 20, 2020. Doc. 1. Missouri effected service on the three non-governmental defendants—Communist Party of China (CPC), Chinese Academy of Sciences (CAS), and Wuhan Institute of Virology (WIV)—in May, and all three are in default. Missouri is requesting a court order to authorize discovery without a Rule 16 conference, including third-party discovery, to prove its claims against those three defaulted entities, *see* Doc. 31, but none of those

---

[1] The China Society alleges that some of the Complaint's allegations are "outrageous and unfounded," Doc. 34, at 1, but it does not identify a single allegation that supposedly meets this description. Indeed, the Complaint provides a detailed factual basis for its assertions by citing dozens of sources in 78 footnotes, and the China Society does not dispute a single one.

defendants has appeared or raised any argument in its own defense.  With regard to the six governmental defendants—the People's Republic of China (PRC) and five of its political subdivisions—the Clerk of the Court submitted the service packet to the U.S. State Department on June 15, and the State Department has advised Missouri that it delivered that service packet to China's foreign ministry on October 12, 2021, with confirmation currently en route to the Clerk of the Court.  *See* Email Chain with FSIA-LR, attached as Exhibit 1.  No governmental defendant has yet appeared or raised any jurisdictional objections to the lawsuit, and Missouri has yet had no opportunity to take jurisdictional discovery from any Defendant.  This provides all the more reason for the Court to "accept[] as true all of Plaintiff's allegations and constru[e] all reasonable inferences in Plaintiff's favor," and to "consider only the materials that are necessarily embraced by the pleadings and exhibits attached to the complaint," *Carlsen*, 833 F.3d at 908—not the China Society's unsupported assertions.[2]

## II.   FSIA Immunity Does Not Apply to the Non-Governmental Defendants Communist Party of China, Chinese Academy of Sciences, and Wuhan Institute of Virology.

The China Society argues that FSIA immunity applies to the non-governmental defendants Communist Party of China, Chinese Academy of Sciences, and Wuhan Institute of Virology—*i.e.*, the three Defendants who have been served and are in default.  Doc. 34 at 13–15.  These arguments

---

[2] In addition, in the year and a half since filing, many new facts have come to light regarding Plaintiff's claims, some of which bear upon the jurisdictional questions raised by the China Society.  In the ordinary course, when a party files a motion to dismiss for lack of subject-matter jurisdiction, the plaintiff may file an amended Complaint alleging additional facts as of right under Rule 15(a)(1)(B).  *See* Fed. R. Civ. P. 15(a)(1)(B) ("A party may amend its pleading once as a matter of course within: …  (B) if the pleading is one to which a responsive pleading is required, … 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.").  Here, no party has appeared or filed a jurisdictional motion to dismiss.  If one did so, Missouri would be able to amend its Complaint include new facts arising since April 2020.  To the extent that the Court has any jurisdictional concerns at this stage—which it should not—the proper course would be to permit Missouri to file an amended pleading to address any such jurisdictional concerns.

have no merit.  Based on the well-pleaded allegations in the Complaint, there is no basis to conclude that these non-governmental defendants are cloaked with governmental immunity under FSIA.  On the contrary, the China Society repeatedly goes outside the pleadings to argue facts not in evidence to make these arguments, which fail anyway.

As an initial matter, the China Society's arguments "rest on a misunderstanding of the procedures a district court must follow in making a jurisdictional ruling under the FSIA."  *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727–28 (9th Cir. 1997).  In pleading its claims, Missouri had no burden to allege facts to establish that entities like CPC, CAS, and WIV are *not* foreign states, or agencies or instrumentalities of foreign states.  *Id.* at 728.  Rather, when a plaintiff raises claims that may be subject to such FSIA defenses, "*the defendant has the initial burden* of establishing that it is a sovereign state," including whether it is an agency or instrumentality of a foreign state.  *Id.* (emphasis added).  "If the foreign state succeeds, it is presumptively immune," and "[t]he plaintiff then has the burden of going forward with the evidence by offering proof that an FSIA exception applies."  *Id.* (citing *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1470 (9th Cir. 1995).  "Once the plaintiff has done so, the defendant must prove by a preponderance of the evidence that the asserted exception does not apply."  *Id.*  Thus, the China Society's arguments that certain defendants are agencies or instrumentalities of foreign states are not amenable to resolution in a facial attack on the pleadings—because the plaintiff has no burden to allege facts on that point in the Complaint.  Rather, the initial onus lies on *Defendants* to come forward with evidence that they are "agencies or instrumentalities" of the PRC.  If they do, then Missouri has the burden of rebutting that evidence and/or establishing that exceptions to FSIA immunity apply.

Moreover, the China Society's arguments are meritless even if they could be raised at this stage.  The FSIA provides for foreign sovereign immunity only for a "foreign state," a "political

4

subdivision" of a foreign state, or an "agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a) (defining "foreign state" to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)").  The China Society does not (and cannot) contend that the CPC, the CAS, or the WIV are foreign states or political subdivisions of foreign states.  *See* Doc. 34 at 13–15.  Accordingly, it must contend that these three defendants are "agencies or instrumentalities" of foreign states.  *See* 28 U.S.C. § 1603(a).  Though the China Society ignores it, the FSIA provides a specific definition of "agency or instrumentality of a foreign state," immediately after its definition of "foreign state."  28 U.S.C. § 1603(b).  Under that definition, as relevant here, "an 'agency or instrumentality of a foreign state' means any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or a political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof …."  28 U.S.C. § 1603(b)(1)–(2).  Based on the allegations in the Complaint, there is no basis to conclude that the CPC, CAS, or WIV satisfies this definition.

### A.   Based on well-pleaded facts, the Communist Party of China is not an agency or instrumentality of the People's Republic of China.

First, as the China Society acknowledges, the Complaint pleads that the Communist Party of China is not an agency or instrumentality of the People's Republic of China.  Doc. 1 ¶ 19 (alleging that, on information and belief, the CPC is not an organ or political subdivision of the PRC, nor owned or controlled by the PRC, "and thus it is not protected by sovereign immunity"); Doc. 1 ¶ 44 (alleging that the "Communist Party is not a foreign state or an agency or instrumentality of a foreign state").  The China Society disputes this allegation by citing facts outside the pleadings to argue that the CPC is an "agency or instrumentality" of the PRC because

it effectively controls the PRC.  Doc. 34, at 13–14.  This argument is both legally and factually meritless.

First, the argument is legally meritless because it rests on the premise that the CPC is an agency or instrumentality of a foreign state because it "exercise[s] direction and control over" that foreign state.  Doc. 34 at 14 (quoting Doc. 1 ¶ 20).  But that is not the definition of "agency or instrumentality of a foreign state."  28 U.S.C. § 1603(b)(1)–(2).  On the contrary, that definition requires that an "agency or instrumentality" must either (A) be an "organ" of a foreign state or its political subdivision, or (B) be such that "a majority of … shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b).  The China Society does not cite any evidence or even argue that the CPC is an "organ" of the Chinese government, or that the PRC owns the majority of the shares or other ownership interests of the CPC.  Doc. 34 at 13–14.  The CPC simply does not fit within the definition of "agency or instrumentality."

In fact, the China Society's argument flips the plain meaning of "agency or instrumentality" on its head.  Based on plain English and common sense—as reflected in the statutory definition—an "agency" or "instrumentality" of a foreign state is something that is *controlled by* the foreign state.  *See, e.g.*, *Agency*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (defining "agency" as "a person or thing through which power is exerted or an end is achieved: instrumentality"); *Instrumentality*, *id.* (defining "instrumentality" as "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out: a part, organ, or subsidiary branch esp. of a governing body").  Here, the China Society does not argue that the Communist Party is merely a "part" or "subsidiary branch" of the Chinese government, subject to the PRC's "controlling force," *id.*—on the contrary, the China Society argues the exact opposite.  It argues that the *Party* dominates and controls the

6

government, not vice versa.  Doc. 34 at 13–14.  That makes the Communist Party the *principal*, not the "agent"—the opposite of an "agency or instrumentality."  28 U.S.C. § 1605(a).

For this reason, the statement in *Yaodi Hu* cited in the Complaint that the "Communist Party of China" is "not entitled to FSIA immunity," *Yaodi Hu v. Communist Party of China*, No. 1:12-CV-1213, 2012 WL 7160373, at *3 (W.D. Mich. Nov. 20, 2012) (cited in Doc. 1 ¶ 19), is persuasive and correct.  And the district court decision in *Chen* holding that the "state-owned television station, CCTV," was an agency or instrumentality of the PRC, *see* Doc. 34 at 13–14 (citing *Chen v. China Cent. Television*, No. 06CIV414PAC, 2007 WL 2298360, at *1 (S.D.N.Y. Aug. 9, 2007)), is entirely consistent with Missouri's position and the statute's plain language.  A "state-owned" television station is plainly an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b)(2).  But the China Society provides no evidence that the CCP is "state-owned" in this definitional sense.  *See Chen*, 2007 WL 2298360, at *4 ("The FSIA applies to such instrumentalities either because they are owned by a foreign state or because they are "an organ of a foreign state or political subdivision" of the state….").

By contrast, the other district court decision cited by the China Society, *Saludes v. Republica de Cuba*, 577 F. Supp. 2d 1243 (S.D. Fla. 2008) (cited in Doc. 34 at 13–14), is not persuasive on this point.  *Saludes* held that "the Communist Party of Cuba, is an agency or instrumentality of Cuba" solely because it "the Cuban Communist Party *controls* the government of Cuba."  *Id.* at 1253 (emphasis added).  No further analysis was provided, and the decision did not address the plain language of the statutory definition.  It did not state that the Cuban state owned a controlling stake in the Communist Party of Cuba, and it did not purport to explain how an entity that allegedly *controls* the State is an "agency" of the State—rather than vice versa.

7

The China Society's argument suffers from factual problems as well.  To support its argument, it relies on facts outside the pleadings—*i.e.*, a quotation from the Constitution of the People's Republic of China that states that "[t]he leadership of the Communist Party of China is the defining feature of socialism with Chinese characteristics."  Doc. 34 at 14 (quoting Xianfa art. 1, § 2 (1982) (China)).  As the China Society admits earlier in its brief, reliance on such factual materials outside the pleading is improper in its jurisdictional challenge to the adequacy of the pleadings.  *See* Doc. 34 at 1 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In challenging subject-matter jurisdiction based on the Complaint's allegations, the China Society may not rely of facts outside the pleadings that would be subject to jurisdictional discovery. *Carlsen*, 833 F.3d at 908.  The precise relationship of dominion and control between the Communist Party of China and the PRC is a factual question not subject to judicial notice that would have to be addressed through jurisdictional discovery.

But even if the Court were to consider such extra-record materials at this stage, such materials do not support the China Society's position.  In fact, as a formal legal matter and as an ideological principle, the Communist Party affirmatively maintains that it is *separate and distinct* from the PRC, *i.e.*, not an organ or agency of the People's Republic of China.  For this reason, it is unlikely that the Communist Party (if it had appeared to defend itself) would have argued that it is a mere "organ," "agency," or "instrumentality" of the Chinese state.  According to the PRC's constitution, the Communist Party is the governing party within China, and it provides "leadership" to the PRC, along with eight other parties of China.  *See Preamble*, Const. of the People's Republic of China (1982, as amended March 11, 2018).  The PRC insists that the Communist Party is but one of many valid political parties in China: "China is a country of many political parties.  Apart from the CPC, which is in power, China has eight non-Communist parties."

*Political Parties and Social Organizations*, Ministry of Foreign Affairs of the People's Republic of China, https://www.fmprc.gov.cn/mfa_eng/ljzg_665465/zgjk_665467/3579_665483/t17851.-shtml.  According to the Constitution of the People's Republic of China, the Communist Party, like all other organizations and individuals in the People's Republic, is bound by the constitution and laws of the state.  *See* Article 5, Constitution of the People's Republic of China.  The constitution of the Communist Party of China requires that the Party "act within the scope of the country's Constitution and the law," and the constitution of the Communist Party draws clear distinctions between the Party's principles and "state laws."  Const. of the Communist Party of China (revised Oct. 24, 2017), http://news.xinhuanet.com/english/download/Constitution_of_the_Communist_Party_of_China.pdf.

Thus, based on the PRC's and CPC's foundational documents, the Communist Party of China is an independent juridical entity, with its own organizational structure, by-laws, and over 90 million members, the vast majority of whom have no leadership position within the state.  *See, e.g.*, Paul Mazor, *U.S. Wants To Bar Members of China's Communist Party. Who Are They?*, N.Y. TIMES (July 16, 2020), https://www.nytimes.com/2020/07/16/world/asia/china-communist-party-travel-ban-explain.html (noting that the Party has 92 million members).  Thus, both as a legal matter and as a matter of Chinese ideology, the CPC views itself and holds itself out to the world, not as an "organ," agency, or majority-owned subsidiary of the PRC, but as a separate juridical and political entity within Chinese society and government.

**B.    Based on the well-pleaded facts, there is no basis to conclude that CAS and WIV are cloaked with FSIA immunity.**

The China Society's argument that CAS and WIV are cloaked with FSIA immunity is meritless based on the allegations in the Complaint.  The China Society's sole argument on this point relies exclusively on matters outside the pleadings.  Doc. 34 at 14.  The Society argues that

"both of these entities are the type of Chinese legal person known as a 'public institution,' directly owned by the Chinese state (as evidenced by their public institution registration certificates, attached with translations, see **Exhibit A**)." *Id.*  But the Complaint contains no allegations that WIV and CAS are "public institutions" or "directly owned by the Chinese state," *id.*, and the China Society's Exhibit A does not support this allegation.  *See* Doc. 34-1, at 1–2.  The China Society's Exhibit A consists of unauthenticated documents that purport to be translated versions of CAS's and WIV's "public institution registration certificates," *id.*, which do not address whether CAS and WIV are supposedly "directly owned by the Chinese state."  Doc. 34 at 14.  On the contrary, they do not address CAS or WIV's *ownership* at all.  Doc. 34-1 at 1–2.  Both putative certificates provide cryptic lines for "Funding Source" and "Management Authority," *id.*, but no line addressing "Ownership."  *Id.*  Even if these putative certificates could properly be considered at this stage (which they cannot, *see Adler*, 107 F.3d at 727–28), they do not support the conclusion that either CAS or WIV is an "organ" of the PRC or that "a majority of [their] shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b)(2).

Of course, if WIV and CAS were to appear and mount a factual attack on jurisdiction, Missouri would be entitled to jurisdictional discovery on this point.  *Pudlowski v. The St. Louis Rams, LLC*, 829 F.3d 963, 964 (8th Cir. 2016) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) (noting that "where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues").  Missouri has had no opportunity to take jurisdictional discovery to test this factual assertion that WIV and CAS are wholly owned by the PRC, because these entities have failed to appear and are in default.  And nothing in the Complaint

10

or the unauthenticated exhibit submitted by the China Society provides any support for the notion that WIV and CAS are "agencies or instrumentalities" of the PRC.

## III.     The Commercial Activity Exception Applies to Missouri's Claims.

The Complaint pleads that Missouri's claims fall within FSIA's "commercial activity" exception of 28 U.S.C. § 1605(a)(2).  Doc. 1 ¶¶ 38–40.  The "commercial activity" exception to foreign sovereign immunity provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the action is based … upon an act outside the territory of the United States *in connection with* a *commercial activity* of the foreign state elsewhere and that act causes a *direct effect* in the United States."  28 U.S.C. § 1605(a)(2) (emphases added).  The China Society argues that this exception does not apply because (1) the Complaint supposedly does not allege a "direct effect," (2) the Complaint supposedly does not allege any "commercial activity," and (3) the Complaint supposedly does not allege actions taken "in connection with" with commercial activities.  Doc. 34 at 3–13.  All of these arguments lack merit.

### A.     The Complaint plausibly alleges many "direct effects" in the United States from Defendants' conduct in unleashing the COVID-19 pandemic.

The China Society argues that the Complaint fails to allege a "direct effect" in the United States from Defendants' actions.  Doc. 34 at 4–5.  This argument rests on the facially implausible contention that Defendants' conduct of releasing a highly contagious, lethal coronavirus and then engaging in a campaign of deceit and malfeasance in the critical initial weeks of the virus's outbreak—thus unleashing the global COVID-19 pandemic that killed hundreds of thousands of Americans—had no "direct effect" in the United States.  The argument is wrong both legally and factually.  Where, as here, the Complaint asserts tort claims and alleges "direct effects" in the United States that are *the actual injuries inflicted by those torts*, the "direct effect" test is satisfied.

11

In defining what constitutes a "direct effect," the Supreme Court has "reject[ed] the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992). Rather, under the FSIA, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's activity.'" *Id.* (citation omitted). Effects that are "speculative" or "too remote and attenuated" do not "satisfy the 'direct effect' requirement of the FSIA." *Id.* In *Weltover*, the Supreme Court had "little difficulty concluding that Argentina's unilateral rescheduling of the maturity dates" of Argentina-issued bonds had a "direct effect" in the United States, because it delayed payments that otherwise would have been deposited in the United States—*i.e.*, the injury from the allegedly wrongful conduct was directly felt in the United States. *Id.* at 619 ("Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."). As the D.C. Circuit has stated, where the defendants' conduct "led inexorably to" an injury or loss in the United States, the "direct effect" test is satisfied. *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661, 665 (D.C. Cir. 2010).

The Complaint repeatedly alleges that Defendants' conduct in unleashing the COVID-19 pandemic had "direct effect[s]" in the United States, including Missouri. *See, e.g.*, Doc. 1, ¶ 5 ("This COVID-19 pandemic is the direct result of a sinister campaign of malfeasance and deception carried out by Defendants."); *id.* ¶ 12 (alleging that Missouri has sustained "direct and substantial injuries and losses" from Defendants' conduct); *id.* ¶ 13 (alleging injuries to Missouri's "own economic and proprietary interests that it has directly suffered due to the actions of Defendants"); *id.* ¶ 40 (alleging direct effects from identified commercial activities of Defendants); *id.* ¶ 122 (alleging "direct economic losses" to Missouri's government entities, including "direct effects on state services, state pension funds, and many other state proprietary and economic

12

interests"); *see also id.* ¶¶ 123–129 (alleging injuries as direct effects on individuals within Missouri).  The Complaint alleges that Defendants' conduct in unleashing and covering up the virus "led inexorably to" these injuries in the United States and Missouri.  *Cruise Connections*, 600 F.3d at 665.  Indeed, each of these direct effects—injuries to life and health, economic harms, and non-economic injuries—is an injury that satisfies the damages element of the torts alleged in the Complaint.  Thus, the locus of the tort is in the United States and in Missouri, and the torts inflicted "direct effects" in this country.

Well-reasoned case law holds that, when the FSIA's commercial activity exception is applied to *tort* cases, the "direct effect" prong is satisfied if the "locus" of the tort was in the United States—*i.e.*, when the injury complained of occurred in the United States.  *See, e.g.*, *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016) (citing *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993)).  In *Atlantica Holdings*, the Court noted that "[a] tort's locus … is the place 'where the last event necessary to make an actor liable for an alleged tort takes place.'"  *Id.* (citing RESTATEMENT OF CONFLICT OF LAWS § 377 (1934)).  "Since a tort action traditionally has not been viewed as complete until the plaintiff suffers injury or loss, the cause of action has generally been considered to arise at the place where this damage was sustained."  *Id.* (citations and quotation marks omitted).  "Thus, a determination that a tort's locus is the United States is, in effect, often a determination that the plaintiff has been injured in this country by the defendant's tortious actions—*meaning that those actions caused a 'direct effect' (the plaintiff's injury) in this country*."  *Id.* (emphasis added).  "As a result, such a determination will ordinarily be sufficient, if not invariably necessary, to confer FSIA jurisdiction…."  *Id.* (citing cases).  In other words, when Defendants' tortious conduct *caused Plaintiff's alleged injuries* in the United States—which the Complaint here plainly

13

alleges—that causation satisfies the "direct effect" prong of 28 U.S.C. § 1605(a)(2).  *Id.*; *see also, e.g.*, *Antares Aircraft*, 999 F.2d at 36 ("In tort, the analog to contract law's place of performance is the locus of the tort."); *Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127, 133 (2d Cir. 1998) ("Further, it need not be the location where the *most* direct effect is felt, simply *a* direct effect.").

The Eighth Circuit's case law is consistent with this well-founded principle.  For example, in *Dumont v. Saskatchewan Gov't Ins.*, SGI, a subsidiary of the Canadian government, provided insurance coverage to Canadian citizens who were killed in a car accident in North Dakota.  258 F.3d 880, 883 n.6 (8th Cir. 2001).  The Canadian victims' survivors sued SGI in North Dakota to compel the Canadian governmental insurer to pay their wrongful-death claims.  Where the locus of the underlying tort was in the United States—*i.e.*, fatal injuries in the car crash—the Eighth Circuit held that the "direct effect" test of the commercial activities exception was satisfied, with "[t]he direct effect being the provision of automobile liability and family security insurance coverage to [the Canadian car-accident victims] while they traveled by automobile in the United States."  *Id.*  This was true even though the lawsuit raised insurance-coverage claims that arose at a step removed from the underlying tort claims.  *See id.*  Here, by contrast, the "direct effects" are injuries arising directly from the alleged torts, so the "direct effects" test is even more clearly satisfied.

The China Society disregards these cases, and instead relies on authority that is entirely inapposite.  It cites *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994), to argue that there is no "direct effect" here.  Doc. 34 at 4.  But *Princz* bears no resemblance to this case.  In *Princz*, a victim of the Holocaust who had been forced to perform slave labor in concentration camps by the Nazis in Poland and Germany in 1942–1945 sued Germany in the

United States decades later, alleging a "direct effect" of that forced slave labor in the United States. 26 F.3d at 1172–73.  But the plaintiff identified no clear or direct effect in the United States that "flow[ed] in a straight line without deviation or interruption" from his slave labor in Poland and Germany.  *Id.* at 1172.  Rather, "[m]any events and actors necessarily intervened between any work that Mr. Princz performed—as a bricklayer for I.G. Farben in Poland or as a laborer in the Messerschmidt aircraft works in Germany—and any effect felt in the United States."  *Id.*  The plaintiff also argued that Germany's alleged "uses [of] the mail, wire, and banking systems of the United States to administer pension and other reparation programs for the victims of the Third Reich" constituted "direct effects," but the D.C. Circuit noted that "such activities, conducted years after the alleged 'commercial activity' giving rise to this suit, cannot be considered an 'immediate consequence' of the enslavement of Mr. Princz and others.  Again, there are too many intervening elements between the asserted cause and effect."  *Id.*  Here, by contrast, the Complaint alleges immediate, direct, and "inexorabl[e]" consequences from the release of a deadly, highly contagious virus and the campaign of misinformation and deceit that concealed its release in the critical initial weeks of the outbreak.  *Cruise Connections*, 600 F.3d at 665; *see also, e.g.*, Doc. 1 ¶¶ 5, 12–13, 122–129.

The China Society argues that "a chain of causal events" between the virus's outbreak in China and its arrival in the United States, consisting of "intervening interpersonal transmission through international travel," renders the effects in the United States less than direct.  Doc. 34, at 4.  But the China Society cites no cases to support its implied proposition that there can be *no* "intervening" causal events in a "direct effects" case—and no such case exists.  Virtually every case of a tort committed abroad that inflicts injuries in the United States necessarily involves some "chain of causal events" giving rise to the injury in America.  *Id.*  The China Society's argument

rests on adopting an artificially narrow interpretation of "direct effects" just like the one that the Supreme Court rejected in *Weltover*.  504 U.S. at 618.  The test in *Weltover* is whether the effect arises as an "immediate consequence" of the foreign activity, instead of being "speculative" or "too remote and attenuated" from that activity—the test is not whether there are zero intervening causes, no matter how direct and inevitable the causal chain.  *Id.*  Effects that arise directly and immediately through intervening causes readily satisfy the "direct effect" test, as multiple cases (including those discussed above) have held.  *See, e.g.*, *Weltover*, 504 U.S. at 618 (finding a "direct effect" where Argentina's inability to pay on government loans led to the issuance of government bonds, which led to the Argentinian default on those bonds, which led to Argentina's failure to make scheduled payments, which led to direct economic effects in the United States); *Dumont*, 258 F.3d at 884 n.6 (finding a "direct effect" where the car crash in North Dakota led to the victims' death, which led to the survivors' wrongful-death suit, which led to the Canadian governmental insurer's refusal to pay claims, which led to a lawsuit against SGI in North Dakota); *Cruise Connections*, 600 F.3d at 665 (finding a "direct effect" where the Canadian government contracted for cruise ships to dock in Vancouver during the Olympics, and then promised the cruise-ship subcontractors that it would waive tax liability, but later breached that promise, which led to the third-party subcontractors to withdraw from the contract, which led to the contractor's default, which led to Canada's termination of the contract, which led to financial injuries in the United States).  So long as that "chain of causal events," Doc. 34 at 4, "led inexorably to" injuries in the United States, *Cruise Connections*, 600 F.3d at 665, the "direct effect" test is satisfied.

The China Society also argues that the effects in the United States "hinge[] on third parties' independent conduct," because "[t]he direct cause of infection to the vast majority of persons in the United States" was not China's egregious malfeasance, but "the failure of U.S. authorities to

16

take effective measures to suppress the spread of the coronavirus and the failure of persons to take proper preventive measures." Doc. 34 at 4–5. This "blame-the-victims" argument is meritless for several reasons. First, it relies on highly questionable "facts" outside the pleadings—such as the assumption that "U.S. authorities" supposedly could have stopped the spread of COVID-19 if only they had taken more "effective measures to suppress the spread of coronavirus." *Id.* Given the virus's spread to every corner of the globe, including New Zealand (which locked down its entire country), that unsupported assumption is implausible at best. Among other things, during the period of China's initial cover-up, the Complaint alleges that Defendants, with full knowledge of the virus's outbreak which they concealed from the world, allowed *five million* people to travel through Wuhan during January 2020, rendering the global pandemic inevitable. Doc. 1, ¶¶ 71–76. Once the initial critical weeks of the outbreak were past and the early opportunity to contain and control the outbreak was lost, a worldwide pandemic was inevitable and no preventative measures could have prevented widespread injury, death, suffering, and economic disruption.

Second, the China Society's argument overlooks that the Complaint expressly pleads that U.S. authorities were *prevented* from adopting timely prevention measures to forestall the spread of the disease by *Defendants' own misconduct*. Doc. 1, ¶ 1 (alleging that "[d]uring the critical weeks of the initial outbreak," Defendants' malfeasance and concealment "caus[ed] a global pandemic that was unnecessary and preventable"); *id.* ¶¶ 77–115 (alleging a long series of actions by Defendants between December 2019 and January 20, 2020, that concealed the outbreak during initial weeks of spreading that prevented world health authorities from containing the outbreak). Any reasonable opportunity to stem the virus's spread was extinguished by Defendants' malfeasance in concealing the initial outbreak of the virus until after it was too late to prevent a global pandemic, as the Complaint explicitly pleads. *See id.*

17

Third, the China Society's argument overlooks that such supposedly "effective measures to suppress the spread of coronavirus," Doc. 34 at 5, themselves constitute many of the very *injuries* of which Missouri complains—such as economic losses from lockdowns, disruption of education, social isolation, missed weddings, cancellation of religious services and graduations, lost sporting seasons, and separation from family and dying loved ones, among others. *See, e.g.*, Doc. 1, ¶¶ 123–124, 126–129. In effect, the China Society argues that Missouri should have inflicted *more* such injuries on itself to prevent the virus's spread. By contending that such mitigation measures were necessary and essential to prevent greater death and suffering, this argument confirms that such injuries are a "direct effect" of Defendants' conduct in releasing the virus and causing the outbreak to become a pandemic. Doc. 34 at 5. Thus, the China Society bolsters, not undermines, Missouri's allegations that China's role in unleashing the global pandemic had a "direct effect" in the United States.

Finally, the China Society argues that Missouri's PPE-hoarding claim fails to allege a "direct effect" in the United States. Doc. 34 at 9–10. This argument fails for the same reasons set forth above. As discussed further below, the Complaint alleges that Defendants purchased large quantities of quality personal protective equipment (PPE) from the United States at a time when they alone knew (because of their malfeasance) that such protective equipment would be desperately needed, rendering quality PPE unavailable in the United States and Missouri during the pandemic's initial stages; and that Defendants also sold low-quality, defective PPE back into the United States and Missouri during the initial stages of the pandemic. Doc. 1, ¶¶ 132–133, 136–138, 175–176. Both sets of allegations plainly involve clear and direct effects in the United States. When Defendants purchased large quantities of high-quality PPE from the United States, they directly caused such PPE to be unavailable in the United States right as the pandemic hit the U.S.

18

And when Defendants sold defective PPE into the United States, they directly caused health-care providers in the United States to suffer the consequences of treating patients with defective equipment. Thus, Plaintiff has sufficiently pleaded direct effects for its PPE-hoarding claim.

> **B.    The Complaint alleges many kinds of "commercial activity."**

Next, the China Society argues that the Complaint's "alleged commercial activities of Defendants are not commercial in nature." Doc. 34 at 5. This argument has no merit. As noted above, the "commercial activity" exception denies foreign sovereign immunity for conduct taken "in connection with a ***commercial activity*** of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2) (emphases added). In defining "commercial activity," the statute adopts an objective test: "A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

Under this definition, "commercial activity" is conduct that is "based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation." *Weltover*, 504 U.S. at 614. The Supreme Court elaborated:

> [W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."

*Id.* (quoting BLACK'S LAW DICTIONARY 270 (6th ed. 1990)); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (holding that "a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts 'in the manner of a private player within' the market").

19

As the Eighth Circuit has explained, "FSIA recognizes that sovereign immunity is the exception, rather than the rule, and should be confined to a foreign sovereign's truly governmental acts and not extended to strictly commercial activities." *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 348 (8th Cir. 1985) (citation omitted).  "Under this approach immunity is confined to the sovereign or public acts of the foreign state and does not extend to its commercial or private acts."  *Princz*, 26 F.3d at 1169.

Here, the Complaint alleges several "commercial activities" conducted in China, "including, but not limited to: (1) operation of the healthcare system in Wuhan and throughout China; (2) commercial research on viruses by the Wuhan Institute and Chinese Academy of Sciences; (3) the operation of traditional and social media platforms for commercial gain; and (4) production, purchasing, and import and export of medical equipment, such as personal protective equipment ('PPE'), used in COVID-19 efforts."  Doc. 1, ¶ 40.  The China Society contends that none of these activities is "commercial in nature," Doc. 34 at 5–12, but its arguments are meritless.

**1. Operating hospitals and health-care facilities is commercial activity.**

First, the China Society argues, with little elaboration, that "the 'commercial activity' exception of the FSIA does not encompass the administration of a government program to provide for the health and welfare of a sovereign's citizens and residents."  Doc. 34 at 6 (citing *Elbasir v. Kingdom of Saudi Arabia*, 468 F. Supp. 2d 155, 161–62 (D.D.C. 2007), and *Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*, 600 F.3d 171, 178 (2d Cir. 2009)).  This argument contradicts the plain language of the statute and the Supreme Court's guidance in *Weltover*.

As noted above, *Weltover* held that, when considering whether activity is "commercial," "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or

commerce.'"  504 U.S. at 614 (quoting BLACK'S LAW DICTIONARY 270).  Here, operating health-care facilities is plainly "the *type* of actions by which a private party engages in 'trade and traffic or commerce,'" *id.*, because such facilities are operated by for-profit companies throughout the world.

The China Society relies principally on a district court decision that states, counterintuitively:  "Provision of such health care benefits—including the provision of medical treatment—are 'uniquely sovereign in nature.'" *Elbasir*, 468 F. Supp. 2d at 161 (quoting *Jungquist v. Sheikh Sultan bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030 (D.C. Cir. 1997)).  However, to the extent that those cases hold that providing health-care treatment is a uniquely sovereign activity, *Elbasir* and *Jungquist* are unpersuasive. *Elbasir* does not analyze the nature of the transaction, instead relying solely on *Jungquist* for the point of law.  And *Jungquist* was a unique fact pattern that should not be extended to this very different context.  In *Jungquist*, the Crown Prince of the United Arab Emirates badly injured a woman in an accident, and promised to provide medical care for her. *Jungquist*, 115 F.3d at 1023.  The government directed two officials in the Abu Dhabi medical program to provide that care. *Id.*  The Second Circuit held that those officials who carried out the sheikh's orders did not engage in "commercial activity" because bureaucrats following the orders of an executive official are not engaging in commercial activity. *Id.* at 1030.  But that reasoning is inconsistent with the test set forth by the Supreme Court in *Weltover*, as well as the plain language of the statute. *See Weltover*, 504 U.S. at 614; 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.").  Courts should not consider the purpose of the action, but the objective nature of the action—whether it is the sort

21

of action that private parties engage in for trade, traffic, commerce, or commercial gain. *Weltover*, 504 U.S. at 614. Here, operating health-care facilities satisfies this test.

For this reason, the Seventh Circuit's opinion in *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574 (7th Cir. 1989), is far more persuasive here. In that case, Greece contracted to pay doctors and an organ bank for kidney transplants performed on Greek nationals because its constitution mandates the government to provide health care services to citizens. *Id.* at 575. Because kidney transplants are not widely performed in Greece, the government contracted with American doctors for the service. *Id.* When Greece failed to pay for services rendered, a doctor sued for breach of contract and quantum meruit. *Id.* at 576. Greece argued that was immune under the FSIA because its conduct—performance of a duty imposed by Greece's constitution—was not commercial activity. *Id.* at 580.

The Seventh Circuit rejected the argument that the commercial activity exception did not apply to the provision of social security and health benefits by the government. *Id.* Instead, it held that providing health care services is a commercial activity. *Id.* at 581. The Seventh Circuit stated that Greece's argument "impermissibly departs from the 'nature' of Greece's conduct, and instead focuses primary attention on the 'purpose.'" *Id.* at 580. The court identified the core question: "we must ask whether private parties ever enter contracts to reimburse health care providers for medical services performed on third parties, *assuming* that the private party has a preexisting obligation to attend to the third parties' medical needs." *Id.* at 581.

To answer that question, the Seventh Circuit correctly noted that "[t]he purpose behind the defendants' execution of the kidney transplant contract is irrelevant to the immunity question." *Id.* at 580. "Whether the obligation to provide these services arises from the relation of government to citizen, or employer to employee, or insurer to insured is simply irrelevant—the 'basic

exchange' of money for health care services is the same in each context." *Id.* at 581. "Moreover, the administrative trappings which may surround Greece's reimbursement scheme are ancillary to the 'basic exchange' at issue here—an undertaking to reimburse for health care services performed." *Id.* On that point, the court concluded that "nothing about the provision of and payment for health care services … is uniquely governmental." *Id.* This Court should follow *Rush-Presbyterian* and similarly conclude that there is nothing uniquely sovereign about providing health care services and operating health-care facilities.

The China Society also cites *Anglo-Iberia Underwriting Mgmt.*, 600 F.3d 171 (2d Cir. 2010), but that case is clearly distinguishable. In *Anglo-Iberia*, the plaintiffs sued P.T. Jamsostek, Indonesia's social security insurer, for failure to supervise employees who committed a commercial reinsurance fraud against the plaintiffs. *Id.* at 174. The Second Circuit held that "Jamsostek 'does not sell insurance to workers in any traditional sense.' … Rather ... Jamsostek 'provides a general "floor" for health insurance for all workers in Indonesia' and ensures that 'Indonesian employers with at least ten employees' comply with the governmental mandate that they provide, at a minimum, basic health insurance coverage to their workers." *Id.* at 177–78. The court "conclude[d] that Jamsostek's acts of providing basic health insurance to Indonesia's workforce and monitoring employers' compliance with the governmental mandate under the national social security program are carried out in its capacity as Indonesia's default health insurer." *Id.* at 178.

On the first point—providing basic health insurance to Indonesia's workforce—*Anglo-Iberia* is unpersuasive under *Weltover*. Just as issuance of government bonds is still commercial activity, the provision of health care by a government is commercial activity. On the second point—monitoring employers' compliance with the law—*Anglo-Iberia* was correct. The ability

23

to monitor and enforce compliance with a legal duty is "peculiarly sovereign."  *Nelson*, 507 U.S. at 361, because "a private insurer could not compel employers to purchase coverage."  600 F.3d at 178 n.6.  But this point is irrelevant because the Complaint does not allege that any enforcement action is a commercial activity under the FSIA.

In short, this Court should follow the better-reasoned authority holding that operating health-care facilities is plainly commercial activity under *Weltover* because it is "the *type* of action by which a private party engages in 'trade and traffic or commerce.'"  *Weltover*, 504 U.S. at 614. "There is nothing about the provision of and payment for health care services which is uniquely governmental"—as the business models of hundreds of U.S. health-care companies reflect.  *Rush-Presbyterian*, 877 F.2d at 581.

### 2. Engaging in ultra-hazardous research on coronaviruses as part of a commercial enterprise is commercial activity.

Next, the China Society contends that conducting ultra-hazardous research on contagious coronaviruses as part of a commercial enterprise is not a "commercial activity."  Doc. 34 at 6–7. Again, this argument has no merit.

On this point, the Complaint alleges that "[t]he Chinese Academy of Sciences administers the Wuhan Institute [of Virology]," and that "[t]he Chinese Academy of Sciences seeks to 'commercialize' its discoveries and boasts about spinning off hundreds of companies from its activities."  Doc. 1 ¶¶ 32–33 (quoting CAS's website).  The Complaint alleges that "the Wuhan Institute of Virology … was studying the [SARS-Cov-2] virus as part of a commercial activity." Doc. 1 ¶ 52.  It alleges that CAS and WIV "engaged in commercial … research on coronaviruses through the Wuhan Institute," *id.* ¶ 152, and that the virus arose by "release from the Wuhan Institute, a laboratory with known safety concerns."  *Id.* ¶ 153; *see also id.* ¶¶ 154–156.  These well-pleaded allegations plainly plead "commercial activities."  Conducting scientific research as

24

part of a commercial enterprise—such as "commercializ[ing]" scientific discoveries and "spinning off companies" for profit, *id.* ¶ 32—are plainly "the *type* of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (quotation omitted). Indeed, as alleged in the Complaint, WIV's and CAS's activities are just the sort of activity that businesses like Pfizer, Moderna, and many other Western biotech companies conduct—all of which are engaged in "commercial activity."

The China Society argues that WIV and CAS were engaged in scientific research *unrelated* to commercial activity, likening their actions to NIH and NIAID in the United States. Doc. 34 at 11. But this argument relies entirely on facts outside the pleadings. The Complaint alleges the exact opposite—*i.e.*, that the WIV's research was part of the "commercial activities" about which CAS openly boasts on its own website. Doc. 1, ¶¶ 32-33; *see also* Chinese Academy of Sciences, https://english.cas.cn/about_us/introduction/201501/t20150114_135284.shtml (last visited Nov. 1, 2021) (CAS's website proclaiming that it seeks to "commercialize discoveries," that it has engaged in "10,538 technology transfer contracts till 2014," and that it created "over 700 CAS spin-off companies" in 2014 alone that "have grossed about RMB 350 billion (US$56 billion)"). The China Society's argument is improper at this pleading stage, and it flies in the face of publicly available facts. *Id.* In any event, the China Society offers no evidence to support argument, besides its own *ipse dixit*, so it provides no basis for a factual attack on the pleadings. And even if it did, Missouri would then be entitled to jurisdictional discovery on the nature and character of research conducted by WIV and CAS, especially that research conducted at the Wuhan Institute of Virology. *See Pudlowski*, 829 F.3d at 964.

Again, without citing any evidence, the China Society asserts that the CAS's commercialization of its scientific research should be disregarded because "[t]he Chinese

Academy Sciences … is a different Chinese legal person from WIV." Doc. 34 at 6. But the Complaint alleges that "[t]he Chinese Academy of Sciences administers the Wuhan Institute," Doc. 1 ¶ 32, so their activities are directly intertwined. In fact, WIV's own website identifies itself as the "Wuhan Institute of Virology, **CAS**," and the website identifies its copyright as held by the "Wuhan Institute of Virology, ***Chinese Academy of Sciences***." *See* Wuhan Institute of Virology, CAS, http://english.whiov.cas.cn/ (last visited Nov. 1, 2021) (emphases added). Thus, the China Society's assertion of the supposed legal separateness of WIV and CAS is dubious at best. As before, the China Society simply asserts facts without any evidentiary support that contradict the Complaint's well-pleaded allegations.

In the alternative, the China Society argues that the Complaint is not "based upon" the commercial activities of WIV and CAS. Doc. 34 at 7. Again, the Society is incorrect. The commercial-activity exception provides that the action must be "based … upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere …." 28 U.S.C. § 1605(a)(2). Here, the Complaint alleges, and the action is "based upon," many such "act[s] outside the territory of the United States" that were conducted "in connection with a commercial activity of a foreign state." *Id.* Most notably, Count Two of the Complaint alleges that the virus released from the Wuhan Institute of Virology, which was conducting ultra-hazardous research on coronaviruses as part of a commercial endeavor. Doc. 1, ¶¶ 152–153. That claim is plainly "based upon" the virus's release from WIV within the meaning of *Saudi Arabia v. Nelson*, 507 U.S. at 357, and the virus's release clearly occurred "in connection with" the WIV's commercial activity of developing scientific research for commercial gain. *See Nelson*, 507 U.S. at 357 (holding that the phrase "based upon" "is read most naturally to mean

those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case").

### 3. Operating traditional media and social-media networks is commercial activity.

The Complaint alleges that "the operation of traditional and social media platforms for commercial gain" constitutes "commercial activity." Doc. 1, ¶ 40. The China Society does not directly dispute this allegation, and it cannot do so, because some of the most commercially successful companies in the world (such as Google, Amazon, Facebook, Disney, etc.) operate such traditional-media and social-media platforms for profit. Thus, such activity is plainly "the *type* of action by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (quotation omitted).

Instead, relying again on *Saudi Arabia v. Nelson*, the China Society argues that the Complaint's claims are not "based upon" such activities, but instead are "based upon" sovereign activities such as censoring media, arresting whistleblowers, suppressing information, and other "monstrous" abuses of power. Doc. 34 at 7–8. Missouri freely agrees that Defendants' conduct was "monstrous," as it directly caused the deaths of millions of people, including thousands in Missouri. *Id.* (quoting *Nelson*, 507 U.S. at 361). But the China Society's reliance on *Nelson* is mistaken. In *Nelson*, the Supreme Court interpreted a different clause in the commercial-activity exception of 28 U.S.C. § 1605(a)(2), which requires that the action must be "***based upon a commercial activity*** carried on in the United States by the foreign state." *Nelson*, 507 U.S. at 351 (quoting 28 U.S.C. § 1605(a)(2)) (emphasis added). Here, Missouri invokes the third clause in the same subsection, which requires that the action be "***based … upon*** an act outside the territory of the United States ***in connection with*** a commercial activity of the foreign state…" 28 U.S.C. § 1605(a)(2) (emphasis added). Unlike the language at issue in *Nelson*, this third clause does not

require the claims to be "based upon a commercial activity," but only that they be "based upon an act outside the territory of the United States" that was done "*in connection with* a commercial activity of a foreign state." *Id.* (emphasis added). Needless to say, this is a significantly broader exception that then language at issue in *Nelson*. Indeed, the Ninth Circuit in *Adler* made this very distinction between the third clause of § 1605(a)(2) and the earlier clauses. *See Adler*, 107 F.3d at 726 (discussing *Saudi Arabia v. Nelson* and observing that, in *Nelson*, "the Court noted that Congress made an important distinction between the first clause of section 1605(a)(2) and the second and third clauses," and that, under the third clause, "Adler's claims need not be 'based upon' commercial activity; they must merely be based upon acts made 'in connection with' such activity."). The China Society does not dispute that the Chinese government owns, controls, and operates traditional media and social media networks in China. And, for the reasons discussed below, there is a clear "connection" between that indisputably "commercial activity" and the acts that form the basis of the Complaint.

### 4.    Purchasing PPE on global markets and selling Defective PPE are commercial activities.

The China Society argues that purchasing and selling personal protective equipment (PPE) on global markets is not "commercial activity" because these allegations are supposedly based "on the sovereign regulatory actions of the Chinese state." Doc. 34 at 8. This argument, once again, ignores the well-pleaded facts in the Complaint and is legally meritless.

The Complaint alleges that, at the outset of the pandemic, Defendants both "stop[ped] selling masks" outside China and "bought up much of the rest of the world's supply." Doc. 1 ¶ 132. These "hoarding efforts" resulted in the net importation of much of the world's supply of quality PPE. *Id.* ¶ 133. In addition to buying up quality PPE on world markets during the time period when only Defendants understood the gravity of the risks of transmission of COVID-19

28

(due to their own malfeasance and concealment), Defendants also deliberately sold "faulty" PPE and "defective equipment" to the rest of the world.  *Id.* ¶ 136.  This "hoarding of PPE" was designed "to profit from the increased worldwide demand for PPE during the viral outbreak."  *Id.* ¶ 137.  These actions of purchasing quality PPE and selling defective PPE directly affected the United States, including Missouri, both by profiteering on sales and by "impair[ing] the ability of health care providers throughout the world, including in the United States and Missouri, from safely and effectively treating patients with the virus."  *Id.* ¶ 138.  The Complaint alleges that Defendants "allowed the export of ineffective PPE, all the while knowing (and even suppressing) the dangers of COVID-19," *id.* ¶ 175; and that Defendants "provide[d] ineffective PPE to medical providers," and in doing so "caused injury across the state of Missouri," *id.* ¶ 176.

The China Society argues that "[m]uch of Plaintiff's 'hoarding' claim is based on allegations concerning a Chinese government ban on exports of PPE," which it contends is shielded by the act-of-state doctrine.  Doc. 34 at 8–9.  But this statement simply mischaracterizes the allegations in the Complaint.  The Complaint alleges commercial activities that involve direct market participation—buying up quality PPE on world markets, including from the United States, at a time when Defendants alone (due to their own concealment and malfeasance) knew of the imminent necessity for such PPE; and deliberately selling defective PPE to the United States and Missouri instead of the quality PPE they were hoarding.  Doc. 1, ¶¶ 132, 133, 136, 137, 175, 176.  Such direct buying and selling of goods are quintessential "commercial activities," and they are not shielded by the act-of-state doctrine, as discussed further below.

The China Society also argues that Defendants' PPE hoarding did not have a "direct effect" in the United States, Doc. 34 at 9–10, but the Society is mistaken for the reasons discussed above.

**C.    The Complaint raises claims that are based on actions taken "in connection with" commercial activity.**

29

Without any reference to the Complaint's allegations, the China Society argues that Missouri does not allege actions taken "in connection with" commercial activity of a foreign state because the alleged acts have merely a "tangential" or "attenuated" connection to commercial activities.  Doc. 34 at 12–13 (quoting *Anglo-Iberia*, 600 F.3d at 178, 179).  This argument is meritless, as the China Society's own cases demonstrate.

To satisfy the "in connection with" requirement, cases have held the acts complained of must have some "substantive connection" or a "causal link" to the commercial activity.  *Adler*, 107 F.3d at 726 (9th Cir. 1997).  Where, as here, the "acts complained of" are thoroughly and inextricably intertwined with commercial activities, such a "substantive connection" and "causal link" is plainly established.  *See id.* (holding that Nigeria's actions of fraudulently inducing the plaintiff to enter a scam agreement, breaching the agreement, and fraudulently inducing the plaintiff to pay millions of dollars under the agreement, were "substantively connected to the underlying agreement," which was a commercial activity).

So also here, "the acts complained of" are thoroughly and inextricably intertwined with, and closely causally connected to, commercial activities.  Defendants' conduct of releasing the deadly virus from the Wuhan Institute of Virology was directly and causally connected to their research on that virus at the laboratory.  *See* Doc. 1, ¶¶ 27–28, 52, 152–157, 169.  Defendants' conduct of suppressing and concealing critical information about the virus's initial outbreak in Wuhan health-care facilities—to which information they had unique, exclusive, and privileged access, because they *own and operate* the Wuhan health-care facilities—was directly and causally connected to their operation of the Wuhan health-care facilities.  *See* Doc. 1, ¶¶ 1, 7, 169. Defendants' conduct of buying high-quality PPE from the United States, selling defective PPE to the United States, and profiteering on PPE is directly and causally connected with (indeed, it is

identical to) their commercial activity of buying and selling PPE from and to the United States. *See* Doc. 1, ¶¶ 132–133, 136–137, 175–176. Defendants' conduct of controlling information on traditional and social media networks to conceal and suppress critical information about the virus's initial outbreak is directly and causally connected to their ownership and operation of such traditional and social media networks. *See* Doc. 1, ¶¶ 1, 7, 40, 79–81. Indeed, the China Society's failure to discuss the Complaint's allegations at all in its argument on this point, *see* Doc. 34 at 12–13, is very telling, because the "substantive" and "causal" connections to commercial activity alleged are clear, direct, and obvious.

The China Society relies on *Anglo-Iberia*, Doc. 34 at 12–13, but that case provides no support for its position. In *Anglo-Iberia*, the Second Circuit held that the "in connection with" requirement was not satisfied where the plaintiff claimed that rogue employees of Indonesia's state-provided insurance company had defrauded them without the authorization or knowledge of their government employer through a "fraudulent side business." *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d at 179. "In essence, Anglo-Iberia faults Jamsostek for failing to stop [the rogue employee] from enlisting the help of a few of his Jamsostek colleagues, some of whom claimed to be acting unwittingly, in establishing a fraudulent side business." *Id.* In other words, the fact that the perpetrators of the fraud were employed by the government-owned insurer was merely tangential to the scheme, and there was no direct, substantive, or causal connection between the government's alleged commercial activities and the acts complained of. *See id.* For this reason, the Second Circuit concluded that there was "nothing more than the barest connection between" defendant's conduct and the foreign state's commercial activities, and that the defendant's conduct was "wholly unrelated to" and "plainly unrelated to" Indonesia's alleged commercial activities. *Id.* Here, for the reasons stated above, the exact opposite is true.

31

**IV.     Even If the Commercial Activity Exception Did Not Apply, the Non-Commercial Activity Exception Would Apply to Strip Immunity From the Defendants.**

In the alternative, the Complaint pleads that, even if the commercial activity exception did not apply, Missouri's claims would still be subject to the non-commercial activity exception of 28 U.S.C. § 1605(a)(5).  *See* Doc. 1, ¶ 41–43.  The China Society argues that the non-commercial tort exception does not apply to Missouri's claims on the ground that this exception applies only when the "entire tort" occurs within the territorial jurisdiction of the United States.  Doc. 34 at 2–3.  This argument contradicts the plain language of the FSIA and the Supreme Court's statement of the rule in *Amerada Hess*.

As relevant here, the non-commercial activity exception provides that "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case," not otherwise covered by the commercial activities exception of (a)(2), "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, ***occurring in the United States*** and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting in the scope of his office or employment …."  28 U.S.C. § 1605(a)(5) (emphases added).  Thus, under the plain language of the statute, the non-commercial activities exception applies when money damages are sought for "personal injury or death, or damage to or loss of property," that is (1) "occurring in the United States," *id.*, "***and***" those injuries or damage must be (2) "caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting in the scope of his office or employment."  *Id.*  Thus, under the statute's plain language, only the personal injury, death, or property loss must "occur[] in the United States," while the "tortious act or omission" of the foreign state or official need *not* occur in the United States.  *Id.*  In fact, the United States Supreme Court has endorsed this exact interpretation of Section 1605(a)(5): "Section 1605(a)(5)

32

is limited by its terms … to those cases in which ***the damage to or loss of property*** occurs *in the United States*." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989) (first emphasis added).

Basic principles of statutory interpretation support this commonsense interpretation. The "last-antecedent canon" confirms that the modifier "occurring in the United States" applies to the immediately preceding phrase "personal injury or death, or damage to or loss of property," and not to the subsequent phrase "caused by the tortious act or omission of that foreign state or any official or employee of that foreign state," which occurs *after* the conjunction "and."  28 U.S.C. § 1605(a)(5); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 144-46 (2012) (discussing the last-antecedent canon).  "It is clearly the case that an anaphoric (backward-looking) or cataphoric (forward-looking) [modifier] should be placed as near as the construction allows to the noun or noun phrase to which it refers …." SCALIA & GARNER, at 144. This is a "commonsense principle of grammar." *Id.* Here, the "anaphoric (backward-looking)" phrase "occurring in the United States," modifies what immediately *precedes* it in the statute—*i.e.*, the phrase "personal injury or death, or damage to or loss of property." 28 U.S.C. § 1605(a)(5).

The China Society's interpretation also contradicts the rule that courts should add or engraft language into statutes containing new limitations that the text did not provide.  Based on the statute's plain language, the death, injury, or property loss must be (1) "occurring in the United States" *and* (2) "caused by the tortious act or omission" of a foreign state or foreign official.  28 U.S.C. § 1605(a)(5).  The China Society would add a new qualifier to the second of these conjunctive requirements, reading the statute to provide immunity unless "money damages are sought against a foreign state for personal injury or death, or damage to or loss of property,

33

occurring in the United States and caused by the tortious act or omission ***also occurring in the United States*** of that foreign state …."  But Congress did not include that added, bold-italicized phrase—it does not appear in the statute.  *See* 28 U.S.C. § 1605(a)(5).  Accordingly, the China Society seeks to engraft language onto the statute that it simply does not contain.

The China Society cites out-of-circuit cases to support its counter-textual interpretation of the non-commercial activities exception.  *See* Doc. 34 at 3 (citing *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014), and *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 116 (2d Cir. 2013)).  To the extent these decisions adopt an interpretation that is contrary to the statute's plain text, they are unpersuasive and should not be followed.  This "entire tort" doctrine— cited in *Jerez* and *In re Terrorist Attacks*—traces back to a partially vacated opinion by the Southern District of Texas that cited only legislative history in the form of a House Report, and not the statute's plain text, for support.  *See Matter of Sedco, Inc*., 543 F. Supp. 561, 567 (S.D. Tex. 1982), *vacated in part sub nom. Complaint of Sedco, Inc.*, 610 F. Supp. 306 (S.D. Tex. 1984) (reasoning that the "legislative history appears to reject this theory with respect to the FSIA," and citing the House Committee Report to hold that "the tort, in whole, must occur in the United States"); *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984) (citing only *Matter of Sedco* to opine in dicta that "the tort, in whole, must occur in the United States"); *Jerez*, 775 F.3d at 424 (citing only *Asociacion de Reclamantes* to hold that "'the entire tort'—including not only the injury but also the act precipitating that injury—must occur in the United States*")*; *In re Terrorist Attacks*, 714 F.3d at 116 (citing, *inter alia*, *Asociacion de Reclamantes* to support the "entire tort" rule).  Notably, the Second Circuit has effectively admitted that this "entire tort" rule is not consistent with the statute's plain meaning.  *See In re Terrorist Attacks*, 714 F.3d at 116 (quoting a prior Second Circuit case admitting that "the words of the

34

statute are cast in terms that may be read to require that *only the injury* rather than the tortious acts occur in the United States") (emphasis added) (cleaned up).  This Court should not follow this discredited approach to statutory interpretation of relying on legislative history to change the plain meaning of the statute's text.  *See, e.g., Hamdan v. Rumsfeld*, 548 U.S. 557, 665 (2006) (Scalia, J., dissenting) ("We have repeatedly held that such reliance [on legislative history] is impermissible where, as here, the statutory language is unambiguous."); *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("We are governed by laws, not by the intentions of legislators."); *Milner v. Dep't of Navy*, 562 U.S. 562 (2011) (Kagan, J.) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").

*In re Terrorist Attacks* also claimed that the Supreme Court had adopted the "entire tort" rule in the *Amerada Hess* case, *see* 714 F.3d at 116, but the Second Circuit plainly misconstrued the Supreme Court's opinion in that case.  As noted above, *Amerada Hess* correctly endorsed the opposite rule—*i.e.*, that the *injury* must occur in the United States, not the "entire tort."  488 U.S. at 439.  In *Amerada Hess*, two Liberian corporations sued the Argentine government in United States federal court, alleging unlawful destruction of their shipping vessels on the high seas during Argentina's conflict with Great Britain over the Falkland Islands.  *Amerada Hess*, 488 U.S. at 431–32.  The only connections to the United States were that a shipping contract was executed in the United States and the ship's journey commenced in the United States.  *Id.*  Literally nothing of the alleged *tort*—duty, breach, causation, or damages—occurred in the United States.  *Id.*  Most importantly, all the alleged "damage to or loss of property," 28 U.S.C. § 1605(a)(5), occurred outside the United States.  *See Amerada Hess*, 488 U.S. at 431–32.  The ship was unlawfully attacked by Argentina, bombed, damaged, and ultimately scuttled on the high seas, all thousands of miles from the United States.  *See id.  Amerada Hess*, therefore, did not hold that a tortious act

occurring outside the United States that inflicts personal injury, death, or injury to loss or property in the United States lies outside the non-commercial tort exception—because that question was not presented in the case.

Moreover, as noted above, *Amerada Hess* repeatedly endorsed the very same plain-meaning interpretation of the statute that Missouri advances here:  "Section 1605(a)(5) is limited by its terms, however, to those cases in which *the damage to or loss of property* occurs *in the United States*."  488 U.S. at 439 (first emphasis added).  The Supreme Court held that the non-commercial tort exception did not apply because "*the injury to respondent's ship* occurred on the high seas some 5,000 miles off the nearest shores of the United States."  *Id.* at 440 (emphasis added).  Again, the Court held: "Because *respondents' injury* unquestionably occurred well outside the 3-mile limit then in effect for the territorial waters of the United States, the exception for noncommercial torts cannot apply."  *Id.* at 441 (emphasis added).  These statements provide the clear context for the Court's statement in the subsequent paragraph—quoted by the Second Circuit—that "the exception in § 1605(a)(5) covers only *torts* occurring within the territorial jurisdiction of the United States."  *Id.* (emphasis added).  In context, the Supreme Court was clearly (and correctly) referring to the statute's clear requirement that the *injury* from the tort must occur in the United States, not that the "entire tort" must occur in the United States.  *See id.*  This is demonstrated by the Court's three immediately preceding statements that "the damage to loss or property," "the injury to respondent's ship," and "respondent's injury" must have occurred in the United States for the exception to apply.  *Id.* at 439, 440, 441.

In short, the "entire tort" doctrine advanced by the China Society contradicts the plain meaning of the FSIA and the Supreme Court's guidance in *Amerada Hess*.  The out-of-circuit authorities cited by the China Society rely on a plain misreading of *Amerada Hess* and the

discredited approach of relying on legislative history to change a statute's plain meaning. Missouri's Complaint alleges enormous "personal injury [and] death, [and] damage to [and] loss of property, occurring in the United States," 28 U.S.C. § 1605(a)(5), as a result of Defendants' tortious acts.  The China Society's argument is meritless.

## V.     The Court Should Not Consider the China Society's Non-Jurisdictional Arguments, and They Are Uniformly Meritless In Any Event.

The China Society also raises a series of arguments—many in conclusory fashion—that are not based on FSIA immunity and thus do not implicate the Court's subject-matter jurisdiction. These non-jurisdictional arguments and defenses have not been raised by any party and are not properly before the Court; therefore, the Court should not consider them at this stage.  *See First Union Nat'l Bank ex rel. Se. Timber Leasing Statutory Tr. v. Pictet Overseas Tr. Corp.*, 351 F.3d 810, 815 (8th Cir. 2003) ("A district court should refrain from considering and crediting nonjurisdictional defenses not raised by the parties.").  In any event, even if they could be properly considered, these arguments are uniformly meritless.

### A.     The act-of-state doctrine has not been properly raised and does not apply to Missouri's PPE-hoarding claim.

The China Society argues that Missouri's PPE-hoarding claim violates the act-of-state doctrine because it is supposedly premised solely on China's export ban on PPE, which the China Society contends is "a quintessential sovereign act."  Doc. 34 at 8–9.  The act-of-state doctrine is an affirmative defense that is not jurisdictional in nature, and so the Court should not consider it unless and until it is raised by a party.  *See Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004) ("Unlike a claim of sovereign immunity, which … raises a jurisdictional defense, the act of state doctrine provides foreign states with a substantive defense of the merits."); *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 451 (2d Cir. 2000) ("[T]he act of state doctrine is not jurisdictional.");

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992) ("In contrast to the jurisdictional nature of foreign sovereign immunity under the FSIA, the act of state doctrine is not a jurisdictional limit on courts."); *Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*, 937 F.3d 1067, 1080 (7th Cir. 2019) ("Unlike the political question doctrine or claims of sovereign immunity, the act of state doctrine is not a jurisdictional bar nor a theory of abstention; rather, it is a substantive doctrine considered on the merits of the case.").

In any event, even if it were properly raised at this stage, the China Society's argument is meritless. It rests entirely on the premise that an "export ban" on PPE is a "quintessential sovereign act that can only be conducted by a sovereign state." Doc. 34, at 8. The China Society simply ignores the allegations in the Complaint that Defendants directly purchased high-quality PPE from the United States (when they had unique knowledge of the virus's risks that they were concealing from the world) for the purpose of hoarding it and profiteering on it, and also sold defective PPE to the United States (including Missouri) while hoarding the high-quality PPE. *See* Doc. 1, ¶¶ 132, 133, 136, 137, 175, 176. Purchasing PPE to hoard and profiteer off its scarcity, and selling defective PPE to desperate purchasers, are not "quintessential sovereign act[s]," but rather commercial actions of the type often conducted by unscrupulous private parties.

Furthermore, the act-of-state doctrine does not apply even to Missouri's allegations regarding Defendants' "export ban" on PPE. The act-of-state doctrine is applicable when "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). To constitute an "official act" subject to the act-of-state doctrine, the act "must be imbued with some level of formality, such as authorization by the foreign sovereign through an official 'statute, decree, order, or resolution.'"

*Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019) (citation omitted).  The Complaint does not allege any such formal "statute, decree, order, or resolution" banning PPE exports, and the China Society cites none.  Doc. 34, at 8-9.  In fact, the Chinese government has specifically *denied* having any such formal policy,[3] so the act-of-state doctrine does not apply.

Furthermore, even if the PPE export ban were an "official act" of the Chinese state, Missouri's claims do not require this Court to declare the *validity or invalidity* of that official act— only to determine whether it occurred and whether it had the consequences Missouri alleges.  *See Kirkpatrick*, 493 U.S. at 406.  In *Kirkpatrick*, the Court held that the act of state doctrine did not apply to plaintiff's claims against U.S. defendants who secured a contract with the Nigerian government by promising to pay a bribe.  *Id.* at 402.  In order to prevail, the plaintiff had to prove that foreign officials in Nigeria received the unlawful bribe.  *Id.* at 406.  The Court held that the act-of-state doctrine did not apply, because the litigated issue was "not whether the alleged acts are valid, but whether they occurred."  *Id.* (quoting *Sharon v. Time, Inc.*, 599 F. Supp. 538, 546 (S.D.N.Y. 1984)).  Regardless of whether it was valid or invalid as a matter of Chinese law, the export ban—so long as it *occurred*—formed part of a course of conduct which Missouri claims is legally actionable.  Because the alleged ban's *validity* is not an element of Missouri's claim, the doctrine does not apply.  *See also Kashef*, 925 F.3d 53, 60 (2d Cir. 2019) ("This inquiry into occurrence rather than validity is precisely what the Supreme Court in *Kirkpatrick* held was not precluded by the act of state doctrine.").

**B.**     **Missouri has *parens patriae* standing to vindicate injuries to a substantial segment of its population.**

---

[3] China's Director of the Foreign Trade Department of the Ministry of Commerce, Li Xingqian, stated that China was committed to free trade and free exports, and that China was not limiting exports or requisitioning PPE.  Orange Wang, *Coronavirus: China backs free trade in masks despite shortages*, SCMP (Mar. 5, 2020, 10:45 PM), https://www.scmp.com/economy/china-economy/article/3065264/china-backs-free-trade-masks-despite-coronavirus-induced.

The China Society argues in a footnote that Missouri cannot sue in its capacity as *parens patriae* because "the FISA does not authorize such actions."  Doc. 34, at 4 n.3.  This argument fundamentally misunderstands the nature of *parens patriae* standing.  Missouri's authority to sue as *parens patriae* to assert quasi-sovereign interests on behalf of a "substantial segment" of its population is not conferred by federal statutes, including the FSIA, but is inherent in the State's sovereign authority as a co-equal sovereign in our federalist system.  *See, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982) ("This prerogative of *parens patriae* is inherent in the supreme power of every State….") (citation omitted).  No federal statute was required to authorize *parens patriae* suits by States to enforce provisions of the Clean Air Act or federal anti-discrimination laws, for example.  *See id.* at 608 (allowing a *parens patriae* suit by Puerto Rico to enforce federal anti-discrimination statutes); *id.* at 600-07 (citing many cases involving *parens patriae* claims by States, none requiring a federal statute to authorize the suit); *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (allowing a *parens patriae* lawsuit by Massachusetts to enforce provisions of the Clean Air Act).  Missouri has inherent authority as a sovereign State to assert claims as *parens patriae*, and no express authorization from the FSIA or any other federal statute is needed.  Missouri "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general," which it may sue to vindicate.  *Alfred L. Snapp*, 458 U.S. at 607.  In any event, Missouri alleges direct injuries to sovereign and proprietary interests as well, so the existence of *parens patriae* standing is only one of several valid theories of Missouri's ability to sue.

### C.      Service on CPC, WIV, and CAS was proper.

The China Society implies that service on CPC, WIV, and CAS was improper because they are supposedly agencies and instrumentalities of the Chinese state.  Doc. 34, at 14.  The China

Society cannot raise this argument, because an alleged defect in service is not jurisdictional and must be raised by a party or it is waived.  Fed. R. Civ. P. 12(h)(1).  And this argument is meritless because, as discussed above, there is no basis to conclude that WIV and CAS are agencies or instrumentalities at this stage.  *See supra*.  Moreover, even if WIV and CAS were agencies or instrumentalities, Missouri pursued a "belt-and-suspenders" approach to serving those entities by effecting service on WIV, CAS, and CPC by a method that satisfies *both* Rule 4(f)(3), which governs service on non-governmental organizations located abroad, *and* 28 U.S.C. § 1608(b), which governs the service of agencies or instrumentalities of foreign states.  *See* Doc. 26, at 2-3 (describing how Missouri's service of CPC, CAS, and WIV "satisfied Rule 4(f)(3)," and "consistent with Missouri's belt-and-suspenders approach to service throughout this case … also satisfied 28 U.S.C. § 1608," particularly § 1608(b)(3)(C)); *see also* Doc. 22, at 7 (granting Missouri's method for alternative methods of service).  Accordingly, the China Society's unsupported suggestion is meritless.

### D.  The China Society's arguments regarding choice of law and duty of care are meritless.

The China Society argues, in a few conclusory lines, both that the Chinese Defendants owed no duty of care to Missouri and its citizens on any of Missouri's claims, and that Chinese law, not Missouri law, should apply to Missouri's claims.  Doc. 34, at 10-11.  These arguments plainly go to the merits, not to the Court's jurisdiction, so the Court should not consider them unless and until they are raised by a party.  In any event, the arguments are meritless.  According to Section 18 of the Restatement (Second) of Foreign Relations Law:

> A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either
>
> (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or

(b) (i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.

RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW § 18 (1965).  Both of these clauses (a) and (b) apply in this context, and they authorize the application of Missouri law, including Missouri's duty-of-care rules, to the conduct of the Defendants located in China.  The China Society cites no cases or authority to the contrary.  Likewise, "[t]he state may exercise judicial jurisdiction over the defendant if the effects which could have been anticipated and which actually occurred are of a sort highly dangerous to persons or things.  This is so even though the defendant has no other relationship to the state.  So one who in state X explodes dynamite close to the border of state Y is subject to Y's judicial jurisdiction as to causes of action arising from injuries caused by the explosion to persons or to things in Y."  RESTATEMENT (SECOND) OF THE CONFLICT OF LAWS § 37 cmt. a (1971).  Here, unleashing the COVID-19 virus upon the world is a "highly dangerous" activity akin to "explod[ing] dynamite" with direct consequences in Missouri.  *Id.*

## CONCLUSION

For the reasons stated, the Court should disregard the suggestion of the China Society as *amicus curiae* that the Court lacks subject-matter jurisdiction over Missouri's Complaint.  *See* Doc. 34.  Instead, the Court should grant Missouri's Motion for Authorization to Seek Discovery on its Claims Against Defaulting Defendants Communist Party of China, Chinese Academy of Sciences, and Wuhan Institute of Virology, Doc. 31.

Dated: November 2, 2021                    Respectfully submitted,


                                           **ERIC S. SCHMITT**
                                           **ATTORNEY GENERAL**

                                           */s/ D. John Sauer*
                                           D. John Sauer, #58721MO
                                             Solicitor General
                                           Missouri Attorney General's Office
                                           Post Office Box 899
                                           Jefferson City, MO 65102
                                           Tel: (573) 751-8870
                                           Fax: (573) 751-0774
                                           John.Sauer@ago.mo.gov