**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | |
|---|---|
| THE STATE OF MISSOURI, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE PEOPLE'S REPUBLIC OF CHINA, ) <br> et al., ) <br> ) <br> Defendants. ) | Case No. 1:20-cv-00099-SNLJ |

**THE *AMICUS* CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MEMORANDUM REGARDING
THE COURT'S SUBJECT-MATTER JURISDICTION**

COMES NOW The China Society of Private International Law ("The Society"), by and through the undersigned counsel, and for its Memorandum in Opposition to Plaintiff's Memorandum Regarding the Court's Subject-Matter Jurisdiction (ECF No. 35), states as follows:

**I.    Plaintiff's Memorandum violates the local rule on page limitation.**

As a preliminary matter, Plaintiff's Memorandum exceeds page limitation under the Local Rule 4.01(D): "No party shall file any motion, memorandum, or brief which exceeds fifteen (15) numbered pages, exclusive of the Table of Contents, Table of Authorities, signature page, and attachments, without leave of Court." Plaintiff's Memorandum contains forty-two (42) numbered pages and Plaintiff failed to seek leave of Court before filing the same, therefore Plaintiff is in violation of the page limitation.

**II.   Based on Defendants WIV, CAS, and CPC's status, they are entitled to immunity under the FSIA.**

Where foreign law is concerned, this Court has the power to consider "any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of

1

Evidence." Fed. R. Civ. P. 44.1.  Plaintiff alleges in its Memorandum that the Society's *amicus curiae* brief refers to facts outside of the Complaint's allegations, and thereby goes beyond making a purely facial analysis of the Complaint.  However, Plaintiff alleges that the WIV, CAS, and CPC are not a part of the Chinese state. Whether the WIV, CAS, and/or the CCP qualifies as an "agency or instrumentality of a foreign state" is a matter of law. Because the WIV, CAS, and CPC are Chinese entities, this Court should consult Chinese law to determine whether they constitute "agenc[ies] or instrumentalit[ies]" of China. *See, e.g.*, *Yessenin-Volpin v. Novosti Press Agency*, 443 F. Supp. 849 (S.D.N.Y. 1978) (analyzing U.S.S.R. statutes to determine the status of a defendant press agency).

Consulting Chinese authorities to determine the parties' status is important for purposes of this FSIA claim where none of the Defendants has entered appearance, because "even if the foreign state does not enter an appearance to assert an immunity defense, a district court still *must* determine that immunity is unavailable under the Act." *Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 494 n.20 (1983) (emphasis added).  *See also* 28 U.S.C. § 1608(e) ("No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief *by evidence satisfactory to the court*.") (emphasis added).

The CAS is an agency of the State Council of the People's Republic of China. *See* State Council's Notice on the Establishment of Agencies.[1] The President and vice presidents of CAS are

---

[1] The State Council's Notice on the Establishment of Agencies, Sᴛ. Cᴏᴜɴᴄɪʟ, http://www.gov.cn/zhengce/content/2018-03/24/content_5277121.htm (last visited Dec. 6, 2021) (China).

appointed by the State Council.[2] Regarding the status of WIV and CAS, China's State Council's Interim Regulations on Registration Administration of Institutions[3] provides as follows:

> The term "public institutions" as mentioned in this Regulation refers to public service organizations that are established by state organs or other organizations using state-owned assets for the purpose of engaging in activities of education, science, technology, culture, and public health.

Interim Regulations on Registration Administration of Institutions, Section 2. Both WIV and CAS are licensed public institutions. *See* Exhibit A to the Society's *Amicus Curiae* Brief, ECF No. 34-1. In addition, the assets of the WIV and CAS are state-owned. Therefore, they are agencies or instrumentalities of the Chinese state.

Plaintiff also alleges that the Communist Party of China (CPC) is not a part of the Chinese state. ECF No. 35, at 5. However, the definition of "agency or instrumentality of a foreign state" under the FSIA "is ill-suited to concepts which exist in socialist states . . . ." *Yessenin-Volpin v. Novosti Press Agency*, 443 F. Supp. 849 (S.D.N.Y. 1978). Therefore, pigeonholing a party like the CPC into one of the FSIA's definitions can be difficult.

Despite Plaintiff's argument that is not a part of the Chinese state, Plaintiff's Complaint alleges that the CPC exercises state power.  *See* Complaint, ¶¶ 17-20.  Notably, this allegation accords with the position of the U.S. Government on the CPC: "The Chinese Government has always been subordinate to the Chinese Communist Party (CCP); its role is to implement party policies." Dep't of State, China Country Note (China 10/04), available at https://2009-2017.state.gov/outofdate/bgn/china/40557.htm. *See also Chen v. China Cent. TV*, 2007 U.S. Dist.

---

[2] Charter of The Chinese Academy of Sciences, CHINESE ACADEMY OF SCIENCES, https://www.cas.cn/zj/yk/201410/t20141017_4225627.shtml (last visited Dec. 6, 2021).

[3] Shiye Danwei Dengji Guanli Zanxing Tiaoli (事业单位登记管理暂行条例) [Interim Regulations on Registration Administration of Institutions] (promulgated by the St. Council, Oct. 25, 1998; rev'd June 27, 2004), ST. COUNCIL, http://www.gov.cn/zhengce/2020-12-26/content_5574292.htm (last visited Dec. 6, 2021) (China).

LEXIS 58503 (S.D.N.Y., Aug. 9, 2007) (holding that China Central Television ("CCTV") was an agency or instrumentality of the PRC by reasoning that, inter alia, CCTV is the "mouthpiece of the *Chinese Communist Party*") (emphasis added).  This means that the *Chen* court considered the CPC as part of the foreign state.[4]

In the current case, regardless of whether the CPC is most properly characterized as an integral part of the foreign state, a political subdivision, or an agency or instrumentality of a foreign state,[5] by virtue of the allegations in the Complaint that the CPC exercises paramount state power, the CPC must be recognized as covered by the FSIA and entitled to immunity.

### III.   The non-commercial torts exception to immunity under § 1605(a)(5) does not apply.

Plaintiff alleges in its Memorandum that the non-commercial activity exception under 28 U.S.C. § 1605(a)(5) applies to strip immunity from the Defendants. Plaintiff alleges that the "entire tort" requirement of § 1605(a)(5) contradicts the Supreme Court's ruling in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989).  ECF No. 35, at 32.  Plaintiff's interpretation of *Amerada Hess* is incorrect. In *Amerada Hess*, the Supreme Court analyzed legislative intent to illustrate the territorial requirement under § 1605(a)(5):

> Section 1605(a)(5) is limited by its terms, however, to those cases in which the damage to or loss of property occurs *in the United States*. Congress' primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for ***traffic accidents and other torts committed in the United States***, for which liability is imposed under domestic tort law. See H.R.Rep., at 14, 20–21; S.Rep., at 14, 20–21. . . . [T]he noncommercial tort exception, § 1605(a)(5) . . . makes no mention of

---

[4] Plaintiff continually refers to "governmental" and "non-governmental" defendants, but the terminology used by the FSIA is "foreign states," not "foreign governments."  States have governments.  The term "state" is broader than "government."  *See* Restatement Fourth of the Foreign Relations Law of the United States § 451 cmt. e ("foreign state" "includes the state itself, its government ***and its components that perform 'core functions,'*** its political subdivisions, and its agencies and instrumentalities, unless explicitly noted") (emphasis added).

[5] The Society does not contend that the CPC should necessarily be categorized as an "agency or instrumentality of a foreign state."  The Society proposes that the CPC may be more appropriately categorized as a part of the "foreign state" or as a "political subdivision."

4

"territory outside the United States" or of "direct effects" in the United States. Congress' decision to use explicit language in § 1605(a)(2), and not to do so in § 1605(a)(5), indicates that the exception in § 1605(a)(5) covers only ***torts occurring within the territorial jurisdiction of the United States***.

*Amerada Hess*, 488 U.S. at 439–41(emphases added).

The House Report cited here by the Supreme Court states as follows:

[§ 1605(a)(5)] denies immunity as to claims for personal injury or death, or for damage to or loss of property, caused by the tortious act or omission of a foreign state or its officials or employees, acting within the scope of their authority; ***the tortious act or omission must occur within the jurisdiction of the United States***, and must not come within one of the exceptions enumerated in [§ 1605(a)(2)].

H.R. REP. 94-1487, 21 (emphasis added). Thus, Plaintiff's allegation that the Second Circuit in *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109 (2d Cir. 2013) misconstrued the *Amerada Hess* case is incorrect. *See* ECF No. 35, at 35.

In addition, the "entire tort" rule was recently applied to dismiss a coronavirus case against the World Health Organization, *Kling v. World Health Organization*, 532 F. Supp. 3d 141 (S.D.N.Y. Apr. 5, 2021). The *Kling* court again held that the "entire tort" rule means that to be within the noncommercial tort exception to the FSIA, not only the injury ***but also the act precipitating that injury*** must occur within the territorial jurisdiction of the United States. 532 F. Supp. 3d at 150 (internal citations omitted). All alleged acts and omissions alleged by Plaintiff to be torts occurred in China. Accordingly, the "entire tort" rule dictates that the noncommercial tort exception to immunity does not apply.

Plaintiff cites various sources for how it believes Justice Scalia would have construed § 1605(a)(5) according to various principles of construction. *See* ECF No. 35, at 33, 35. We know already, however, how Justice Scalia would have construed § 1605(a)(5). Then-Judge Scalia was the author of the D.C. Circuit opinion applying the "entire tort" rule in *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517 (D.C. Cir. 1984). Rejecting a broader interpretation,

5

then-Judge Scalia added: "We decline to convert this [§ 1605(a)(5)] into a broad exception for all alleged torts that bear some relationship to the United States." *Id.* at 1525. Of note, Justice Scalia also joined in the majority opinion in *Amerada Hess*.

Of note, Plaintiff's Memorandum does not respond to the Society's position that even if § 1605(a)(5) did apply, the "discretionary function" and "misrepresentation" exceptions thereto would bar suit. *See also Kling* (determining that suit would be barred even if § 1605(a)(5) applied). In short, this Court does not have subject-matter jurisdiction under 28 U.S.C. § 1605(a)(5).

**IV.     The commercial activity exception to immunity under § 1605(a)(2) does not apply.**

Other than conclusory allegations, Plaintiff's Complaint fails to show that Defendants engaged in any "commercial activities" defined by the FSIA, that the alleged acts had a direct effect in the U.S., and that the alleged acts were "in connection with" a commercial activity. In this regard, the arguments in Plaintiff's Memorandum lack merit.

Direct effect. Plaintiff relies on *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992), for its claim that it has pleaded "direct effects" as required under the "direct effect" prong of the commercial activity exception. *See* ECF No. 35, at 12. *Weltover* does not support Plaintiff's position, however. The reason why there was a "direct effect" in *Weltover* was that the payment in question was contractually required to be made in the United States; when the defendant failed to make the payment, necessarily and immediately there was a "direct effect" in the United States. Cases where a U.S. plaintiff claims injury due to non-payment but the payment has not been required to be made in the United States have different results. In those cases, although the plaintiff may ultimately have suffered an injury in the United States caused by the non-payment, there is no "direct effect in the United States," and therefore no subject-matter jurisdiction. *See Peterson*

6

*v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83 (D.C. Cir. 2005); *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131 (2d Cir. 2012).

Plaintiff's Memorandum incorrectly states that the Society "cites no cases to support its implied proposition that there can be *no* 'intervening' causal events in a 'direct effects' case." ECF No. 35, at 15.[6] Moreover, Plaintiff itself quotes *Weltover*'s requirement that an effect must be "immediate" in order to be "direct." *See* ECF No. 35, at 12. That is, it must not be mediated by some other event.

Notably, even the case cited by Plaintiff, *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661 (D.C. Cir. 2010), supports the Society's position. In this case, the defendant Royal Canadian Mounted Police terminated a contract with the plaintiff, a U.S. company, to provide cruise ship services in Canada. *Id.* at 662. This left the plaintiff unable to consummate subcontracts with U.S.-based cruise lines, causing lost revenues. *Id.* The court held that direct effect existed, reasoning that "***no intervening event*** stood between [the defendant's] termination of the contract and the [plaintiff's] lost revenues from the travel agency contract and the Charter Party Agreements." *Id.* at 664 (emphasis added).

In the present case involving coronavirus, the virus was transmitted as a result of a series of interpersonal transmission through international and domestic travel, and economic harms would then have resulted from this state of affairs. Without this chain of transmission constituting a series of intervening links, the alleged harms in Missouri would not have occurred. After the domestic transmission in the United States started, the direct cause of infection to the vast majority

---

[6] Such authorities are stated in the Society's *Amicus Curiae* Brief, ECF No. 34, at 4.

7

of persons in the United States would have been other infected persons in the United States as well as the U.S. authorities' response.[7]

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98 (2d Cir. 2016), cited in Plaintiff's Memorandum, is factually distinguishable. In that case, the defendant SK Fund and non-party BTA Bank issued certain securities "extensively in the United States, and directed that marketing to U.S. investors." 813 F.3d at 103. The plaintiff alleged that the defendant SK Fund misrepresented the value of the securities. *Id.* at 102. The court found that losses suffered by the U.S. investors in the securities as a result of SK Fund's alleged misrepresentations about those securities' value qualify as a "direct effect," reasoning, inter alia, that the securities at issue "were marketed in the United States and directed toward United States persons." *Id.* at 110-111. The present case is different from *Atlanta Holdings*, because the alleged acts and/or omissions of Defendants did not take place in the United States and the alleged wrongs were not directed at the United States.

Another case cited in Plaintiff's Memorandum, *Dumont v. Saskatchewan Gov't Ins.* 258 F.3d 880 (8th Cir. 2001), is also distinguishable. In that case, defendant SGI is an insurance company that issued certain insurance policies to the plaintiff insureds in Canada. 258 F.3d at 881-82. The policies provided uninsured motorist coverage and family security coverage. *Id.* at 882. The insureds had an accident while in the U.S. *Id.* at 881. The court held that the defendant's act, writing the policies outside the U.S., caused a direct effect in the U.S. *Id.* at 883 n.6. The court held that the direct effect was the provision of insurance coverages to the insureds while they traveled in the U.S. *Id.* Providing insurance coverage pursuant to the terms in the insurance policy

---

[7] *See*, *e.g.*, E. Yong, *How the Pandemic Defeated America,* The Atlantic, September 2020 ("the United States . . . has just 4 percent of the world's population but a quarter of its confirmed COVID-19 cases and deaths. . . . . Despite ample warning, the U.S. squandered every possible opportunity to control the coronavirus.").

is the direct result of issuing the policy and is expected by every insured. There are no intervening events between the issuance of policies and the provision of coverage under the policies pursuant to the terms. Therefore, *Dumont* is distinguishable because as noted above, there are numerous intervening factors between the alleged acts of the Defendants and the alleged injuries of Plaintiff.

<u>Commercial activities</u>. Plaintiff's Complaint conclusorily attaches the label of "commercial" to Defendants' activities. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (internal citations omitted). To dismiss a complaint for lack of subject-matter jurisdiction, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). Plaintiff's conclusory characterization of Defendants WIV and CAS's research as "commercial" does not make the factual allegations "well-pleaded." *See* Complaint ¶ 40; ECF No. 35, at 24. Plaintiff's Complaint apparently asserts a bare conclusion necessary to support a viable cause of action under the FSIA, therefore cannot be credited in a facial analysis of the Complaint.

Plaintiff argues that scientific research is commercial because private parties can engage in scientific research. This argument cannot stand. A foreign state's activity is "commercial" for purposes of the FSIA only if "the ***particular actions*** that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in '***trade and traffic or commerce.***'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (emphasis added) (quoting *Weltover,* 504 U.S. at 614). Scientific research into important human health issues such as that carried out by the Wuhan Institute of Virology ("WIV") of China and the National Institute of

9

Allergy and Infectious Diseases (NIAID) of the U.S. is not in itself commercial in "nature."[8] While a state-owned organization might engage in commerce by commercializing its research, for example by contracting with a drug manufacturer for commercial exploitation of scientific discovery, there is not any non-conclusory allegation in the Complaint regarding such commercial activity, or how such an activity would be related to the alleged harms.

Similarly, with respect to "operation of the healthcare system in Wuhan and throughout China," Plaintiff has not identified the particular actions that it attempts to characterize as "commercial." It seeks to avoid the precedents of *Elbasir v.Kingdom of Saudi Arabia*, 468 F. Supp. 2d 155, 161–62 (D.D.C. 2007), and *Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*, 600 F.3d 171, 178 (2d Cir. 2009)), and instead relies on *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574 (7th Cir. 1989). *See* ECF No. 35, at 22. However, in *Rush-Presbyterian*, the "particular actions" are "contracts to reimburse health care providers for medical services performed on third parties." 877 F.2d at 581. However, the present case does not involve any contract between a foreign state and a private party for the purchase and sale of goods and services. Further, Plaintiff has not shown how the Chinese health care system differs from the systems in *Elbasir* and *Anglo-Iberia Underwriting*, and has not identified the particular actions concerning the Chinese health care system that allegedly constitute any commercial activities.

Plaintiff has also alleged that the Defendants have been engaged in buying and selling PPE, without specifying which of the Defendants, if any, allegedly have been engaged in such activity. In addition, it appears that Plaintiff attributes the activities of all Chinese entities, including commercial companies that buy and sell PPE, to the Chinese state itself. A U.S. court cannot disregard the juridically separate status of different state-owned persons from one another -- or, *a*

---

[8] The Supreme Court has noted that the FSIA "leaves the critical term 'commercial' largely undefined." *Weltover*, 504 U.S. at, 612

10

*fortiori*, the juridically separate status of non-state-owned legal persons from the state and from other legal persons. *See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983); *Walters v. Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 298-99 (2d Cir. 2011). Contrary to Plaintiff's claim that it has presented a well-pleaded complaint, the Complaint does not identify which of the named Defendants, if any, has engaged in the alleged activities of buying and selling PPE.

Similarly, regarding Defendants' alleged conduct of "the operation of traditional and social media platforms for commercial gain," Complaint ¶ 40, Plaintiff identifies one such media platform, WeChat. *Id.* ¶¶ 62, 79, 81. However, Plaintiff does not plead that WeChat is either owned or operated by any of the named Defendants.[9] Again, it appears that Plaintiff attempts to attribute the activities of independent Chinese corporations to the Defendants. Accordingly, Plaintiff fails to show that Defendants were engaged in any commercial activities under the FSIA.

"In connection with." The commercial activity exception in the FSIA contains two requirements: (1) there must be an act outside the United States in connection with a commercial activity of the foreign state that causes a direct effect in the United States, and (2) the plaintiff's suit must be based upon that act. *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384 (2d Cir. 2000) (citing 28 U.S.C.A. § 1605(a)(2)). However, Plaintiff's Complaint does not plead a genuine connection between the alleged acts and any underlying commercial activity.

In *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), the Supreme Court explained that Congress intended to codify in the FSIA the "restrictive" theory of foreign sovereign immunity, as opposed to the "absolute" theory of foreign sovereign immunity, such that when a state engages

---

[9] WeChat is in fact owned and operated by Tencent Holdings Ltd., a non-state-owned company. *See, e.g.*, https://www.tencent.com/en-us/business.html

11

in commercial activity and does not exercise "powers peculiar to sovereigns," it will not be immune from suit.  507 U.S. at 359-360.  In that case, although the alleged wrongs in question were in retaliation for whistle-blowing in the course of plaintiff's employment at a hospital owned and operated by Saudi Arabia -- the employment being the relevant commercial activity -- the Supreme Court held that no subject-matter jurisdiction existed because the brutal retaliation was conducted not by the employer hospital but by the Saudi police, and in so doing the Saudi police had engaged in a sovereign function, "a foreign state's exercise of the power of its police." *Id.* at 361.  Thus, although the wrongful sovereign acts were arguably connected to a commercial activity, the court held that subject-matter jurisdiction did not exist under the FSIA's commercial activity exception.

*Nelson* is instructive in explaining why the "in connection with" requirement in the "direct effect" prong of the commercial activity exception has been interpreted narrowly:

> *Nelson* rest[s] on a broader principle, directing district courts first to ascertain the claim's gravamen to determine whether the FSIA plaintiff is simply using creative nomenclature as a "semantic ploy," *Nelson,* 507 U.S. at 363, 113 S.Ct. 1471, to shroud the true essence of its theory and obtain jurisdiction over a claim that Congress did not intend to be brought against a foreign sovereign.

*Leutwyler v. Off. of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 299 (S.D.N.Y. 2001). "[T]here is little doubt that, at a minimum, there must be a 'significant nexus' between the commercial activity at issue and the causes of action."  *Id.*. at 293-294. The underlying rationale of the restrictive theory of foreign sovereign immunity is to deny immunity to a foreign state when it acts in the manner of a private commercial actor.  Consequently, when a case is based on an act "in connection with" commercial activity, that act must have a genuine connection to commercial activity.

12

In addition, the phrase "based upon" within § 1605(a)(2), at a minimum, implies a causal relationship. *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000). It "requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements." *Id.* (citing *Nelson*, 507 U.S. at 357).

Plaintiff claims that "the acts complained of" are "thoroughly and inextricably intertwined with" the commercial activities they have identified. *See* ECF No. 35, at 30. However, the acts complained of here are nothing like the commercial or quasi-commercial torts, or wrongs in furtherance of commercial schemes, found to be viable "in connection with" cases, such as the case discussed by Plaintiff, *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720 (9th Cir. 1997), where the "acts complained of" were acts amounting to fraudulent inducement to enter into a commercial agreement, and fraudulent inducement to pay money under the agreement. *See* ECF No. 35, at 30.[10] With respect to the allegedly commercial activities of operating a health care system and of operating social media platforms, Plaintiff does not allege acts that are "thoroughly and inextricably intertwined with" those operations. Instead, Plaintiff alleges sovereign acts in the nature of government censorship that allegedly have been ***imposed*** on these operations: "suppressing and concealing critical information about the virus's initial outbreak in Wuhan health-care facilities," ECF No. 35, at 30, and "conceal[ing] and suppress[ing] critical information about the virus's initial outbreak." *Id*. at 31. "[Missouri's] lawsuit appears to be based primarily upon Chinese authorities' alleged concealment of information rather than on the alleged commercial activity." Congressional Research Service, *Foreign Sovereign Immunity and COVID-*

---

[10] Other examples of cases where "the acts complained of" are actually "thoroughly and inextricably intertwined with" commercial activities are the *Cruise Connections* and *Atlantica Holdings* cases cited by Plaintiff. The gravamen of these cases is clearly commercial activity, unlike this case.

13

*19 Lawsuits Against China* (May 15, 2020) at 2. *See also* Complaint, ¶¶ 79-85. These alleged acts are sovereign acts, exercises of a state's police power, and do not arise from commercial activities.

With respect to Plaintiff's speculation that the WIV released the coronavirus, *see* ECF No. 35, at 30, that hypothesized act concededly would have been "in connection with" coronavirus research. However, as noted above, Plaintiff's allegation that such research was "commercial" is conclusory and cannot simply be accepted as true even if in a facial analysis of the Complaint. With regard to the allegations concerning the buying and selling of PPE, as noted above it appears that Plaintiff attributes to the Defendants the actions of separate and distinct Chinese legal persons. To the extent that the Complaint concerns the sovereign act of imposing an export ban, said act would be something imposed on, rather than "intertwined with," buying and selling activities of commercial actors. In addition, because it would be a sovereign act undertaken on Chinese territory, it should be protected by the act of state doctrine or a cognate doctrine such as considerations of comity. (See below.)

**V.     Under the act of state doctrine, this Court should dismiss the action.**

As Plaintiff acknowledges in its Memorandum, the act-of-state doctrine is applicable when "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). ECF No. 35, at 38. However, courts have dismissed cases, particularly politically sensitive transnational cases, even when the foreign state's acts may not satisfy the precise criterion set forth in the *Kirkpatrick* case. In *International Association of Machinists v. Organization of Petroleum Exporting Countries* (*IAM v. OPEC*), 649 F.2d 1354 (9th Cir. 1981), *cert. denied*, 454 U.S. 1163 (1982), the OPEC countries did not appear in the district court. 649 F.2d at 1356. The district court granted judgment

in favor of the non-appearing defendants, holding that it lacked jurisdiction under the FSIA and that default judgment could not properly lie against the non-appearing defendants. *Id.* at 1356-57. The appellate court upheld the dismissal of the case on the basis of what it termed the act of state doctrine. *Id.* at 1361. The appellate court observed:

> When the courts engage in piecemeal adjudication of the legality of the sovereign acts of states, they risk disruption of our country's international diplomacy. The executive may utilize protocol, economic sanction, compromise, delay, and persuasion to achieve international objectives. Ill-timed judicial decisions challenging the acts of foreign states could nullify these tools and embarrass the United States in the eyes of the world.

*Id*. at 1358.  The appellate court concluded that "a judicial remedy is inappropriate regardless of whether jurisdiction exists," and chose to exercise judicial abstention.  *Id*. at 1362.  Therefore, even if the foreign sovereign acts in the present case do not fit the precise criterion set forth in the *Kirkpatrick* case, this Court still should exercise judicial abstention and dismiss the action.

## CONCLUSION

For the reasons stated above, the China Society of Private International Law respectfully submits that this Court should dismiss Plaintiff's Complaint *sua sponte* for lack of subject-matter jurisdiction.

Respectfully submitted,

**THE CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW**
c/o International Law Institute of Wuhan University
Wuchang District
Wuhan, China 430072


**BROWN & JAMES, P.C.**

*/s/ Jackie M. Kinder*
Jackie M. Kinder, #52810MO
800 Market Street, Suite 1100
St. Louis, Missouri 63101-2501
314-421-3400 – Phone
314-421-3128 – Fax
jkinder@bjpc.com
*Local Counsel for The China Society of Private International Law*


**CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing was sent via the Court's electronic filing system this 6th day of December, 2021, to:

| | |
|---|---|
| Justin D. Smith | Amy Collignon Gunn |
| Dean John Sauer | THE SIMON LAW FIRM PC |
| OFFICE OF THE ATTORNEY GENERAL | 800 Market Street |
| OF MISSOURI – Jefferson City | Suite 1700 |
| 207 W. High St. | St. Louis, MO 63101 |
| P.O. Box 899 | 314-241-2929 |
| Jefferson City, MO 65102-0899 | 314-241-2029 (fax) |
| 573-751-3321 | agunn@simonlawpc.com |
| 573-751-0774 (fax) | *Attorneys for Amicus, Lawyers for Upholding* |
| justin.smith@ago.mo.gov | *International Law* |
| john.sauer@ago.mo.gov | |
| *Attorneys for Plaintiff* | |

/s/ *Jackie M. Kinder*

26965044.1