IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| THE STATE OF MISSOURI,<br>ex rel. ERIC S. SCHMITT, in his official<br>capacity as Missouri Attorney General,<br><br>     Plaintiff,<br><br>v.<br><br>THE PEOPLE'S REPUBLIC OF CHINA,<br>THE COMMUNIST PARTY OF CHINA,<br>NATIONAL HEALTH COMMISSION<br>OF THE PEOPLE'S REPUBLIC OF<br>CHINA, MINISTRY OF EMERGENCY<br>MANAGEMENT OF THE PEOPLE'S<br>REPUBLIC OF CHINA, MINISTER OF<br>CIVIL AFFAIRS OF THE PEOPLE'S<br>REPUBLIC OF CHINA, PEOPLE'S<br>GOVERNMENT OF HUBEI<br>PROVINCE, PEOPLE'S GOVERNMENT<br>OF WUHAN CITY, WUHAN INSTITUTE<br>OF VIROLOGY, AND CHINESE<br>ACADEMY OF SCIENCES,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.: 1:20-cv-00099-SNLJ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**SUPPLEMENTAL BRIEF OF *AMICUS CURIAE* LAWYERS FOR UPHOLDING
INTERNATIONAL LAW IN OPPOSITION TO PLAINTIFF THE STATE OF
MISSOURI'S COMPLAINT AGAINST DEFENDANTS THE PEOPLE'S
REPUBLIC OF CHINA, *ET AL.*.**

## INTRODUCTION

This supplemental brief is meant to provide the Court with additional analysis to clarify some observations made in the original brief and to respond to further claims made by the Attorney-General.

Comments are made regarding the standing of the Attorney-General to bring the case (I), the nonjusticiability of the complaint under the political question doctrine (II), the immunity of the Communist Party (III), and the defence of force majeure (IV). Based upon these arguments, Movants respectfully request that this Court consider dismissing Plaintiff's Complaint *sua sponte*.

## ARGUMENT

### I.    STANDING

#### A.    *Injury in Fact*

On behalf of the State of Missouri, the Attorney General claims to have standing on two grounds, namely proprietary (§ 13) and *parens patriae* standing (§ 14).

#### 1.    Proprietary Standing

A large part of the complaint has been devoted to the profound effects of the pandemics on Missouri consisting of the loss of life, human suffering and economic turmoil experienced by Missourians. However, the consequences of the pandemic for Missouri residents cannot serve as the basis for Missouri's proprietary standing, as recognized by the Supreme Court in *Alfred L. Snapp & Sons, Inc. v. Puerto Rico ex rel. Barez*,[1] since they have been suffered by Missourians rather than the state.

The only claim made in the complaint which might serves as the basis for proprietary standing can be found in § 122, where Missouri alleges to have suffered direct economic losses as a result of the pandemic, "including loss of revenues and budgetary shortages, with direct

---

[1] 458 U.S. 592, 601-602 (1982).

effects on state services, state pension funds, and many other state proprietary and economic interests." However, these claims are not sufficiently concrete and specific to warrant standing.

Consequently, Missouri lacks proprietary standing to bring the case.

**2.      Parens Patriae Standing**

a.      <u>Introduction</u>

The Attorney-General invoked *parens patriae* standing on the basis of *Snapp*.[2] As the Supreme Court has made clear in its judgment in this case, in order to validly claim *parens patriae* standing a state needs to meet two requirements.[3] First, it must be more than a nominal party and therefore articulate an interest apart from the interests of particular private parties. Second, the state must express a quasi-sovereign interest, such as an interest in the health and well-being of its citizens.

b.      <u>Articulating an interest which is apart from the interests of particular private parties</u>

Since its interest should be apart from the interests of particular private parties,[4] a state is not allowed to claim an injury which would sustain an action by a private person.[5] It is not allowed to merely litigate, as a volunteer, the personal claims of its citizens,[6] and therefore its interest should amount to more than just the sum of private injuries suffered by them.[7]

This means that states can only rely on *parens patriae* standing if no means of establishing an injury would otherwise exist.[8] A state may, therefore, only act as *parens patriae* to protect its citizens when they are incompetent to act for themselves.[9] Consequently, *parens*

---

[2] *Id.*

[3] *Id.* at (607).

[4] *AU Optronics Corp. v. South Carolina*, <u>699 F.3d 385</u> (4th Cir. 2012).

[5] *Louisiana v. Texas*, <u>176 US 1</u> (1900).

[6] *Pennsylvania v. New Jersey*, <u>426 US 660</u> (1976).

[7] *Utah Division of Consumer Protection v. Stevens*, <u>398 F. Supp. 3d 1139</u> (D. Utah 2019).

[8] *Challenge v. Moniz*, <u>218 F. Supp. 3d 1171</u> (E.D. Wash. 2016).

[9] *Cashman v. Dolce Intern./Hartford, Inc.* <u>225 F.R.D 73</u> (D. Conn. 2004); *New York by Scheiderman v. Utica City School District*, <u>177 F. Supp. 3d 739</u> (N.D. N.Y. 2016); *People ex*

*patriae* actions fail when the citizens on whose behalf they are brought are able to challenge the harm directly and can obtain relief through a private suit.[10]

In the case at bar, the state of Missouri is claiming *parens patriae* standing to merely litigate the personal claims of its citizens and therefore it lacks such *locus standi*.

   c. <u>Pursuing a quasi-sovereign interest</u>

The cases in which courts have acknowledged that states were pursuing a quasi-sovereign interest mainly concern enjoining public nuisance across inter-state borders. No authority exist which recognizes litigating an international case as pursuing a quasi-sovereign state interest. States are not allowed to act in this way at the international level, since that would amount to exercising the foreign affairs power, which has been entrusted by international law and the Constitution to the Federation.[11]

That states should not encroach on the Federal foreign affairs power was made clear by the Supreme Court in *Zschernig v. Miller*.[12] The state of Oregon had adopted a statute providing that foreign citizens could inherit under Oregon law only if they could take the property without confiscation. State judges applying the statute usually ruled against heirs from socialist countries, because the inherited property was likely to be seized by the authorities there. The Court determined that the statute and its application by the state courts had great potential for disruption and embarrassment of international relations. According to the Court, the foreign affairs power, which the Constitution has entrusted solely to the Federal Government, bars such

---

*rel. Miller v. Tool*, <u>35 Colo 225 </u>(1905); *State ex rel. McCain v. Metschan*, <u>32 Or 372</u> (1898); *Adelman v. Elfenbein*, <u>174 So. 3d 516</u> (Fla. 4th DCA 2015).
[10] *Mississippi ex rel. Hood v. AU Optronics Corp.*, <u>876 F. Supp. 2d 758</u> (5th Cir. 2012); *Lubin v. Farmers Group, Inc.*, <u>157 S.W.3d 113</u> (Tex. App. Austin 2002).
[11] *U.S. v. Curtiss-Wright Export Corp.*, <u>57 U.S. 299</u>, at 316-319.
[12] <u>389 U.S. 429</u> (1968).

state involvement in foreign affairs and international relations.[13] This ruling has since been confirmed in *American Insurance Association v. Garamendi*.[14]

By initiating the current litigation, the Attorney-General has entered a domain which has been reserved to the Federal Government. According to the Court, the potential impairment of foreign relations is sufficient to block action by the state.[15] As was indicated in the original brief submitted by *amici*, impairment of the foreign relations between the U.S. and China as a result of this lawsuit is highly likely. Since China and the US are currently engaged in discussions on trade, the status of Hong Kong, the treatment of Uyghurs in Xinjiang Autonomous Region and the handling of the COVID-19 pandemic, the situation is tense, and a court case like the current one might fan the flames. Action by Missouri is further pre-empted by the fact that President Biden has taken charge of establishing the causes of the pandemic by ordering a closer intelligence review of the hypothesis that the virus escaped from a Wuhan laboratory,[16] for which he secured the backing of the members of the G7.[17]

In *Zschernig* due weight was given by the Court to the fact that the decisions taken by the state legislature and the state courts were political in the sense that the authorities tried to impact the way in which the Cold War was being conducted.[18] Those kind of considerations were deemed to be part of the prerogative of the Federal Government. Similarly, through this court case the Attorney-General is trying to impact U.S.-China relations. Managing these relations too belongs to the foreign affairs prerogative of the Federal Government.

---

[13] *Id.* at 431.
[14] 539 U.S. 396 (2003).
[15] *Zschernig v. Miller*, 389 U.S. 429 (1968) at 441.
[16] https://www.cnbc.com/2021/05/26/biden-orders-us-intelligence-to-intensify-investigation-into-covid-19-origins.html
[17] https://www.lbc.co.uk/news/g7-calls-for-covid-19-origin-study-as-biden-considers-lab-leak-theory/
[18] 389 U.S. 429 (1968) at 438.

## B.   *Causation*

In five respects Missouri has failed to show that a causal link exists between the losses suffered and the management of the pandemic in China.

First of all, many losses suffered by Missourians, such as those flowing from restrictions on labor, have been caused by measures taken by Missouri itself, such as the stay-at-home orders issued by Missouri authorities.

Second, Missouri has failed to demonstrate that a causal link exists between the outbreak in Wuhan and the alleged consequences occurring in Missouri. In American political discourse the COVID-19 virus is often described as the 'China virus', which assumes that the virus transferred from animals to humans on Chinese territory. The Attorney-General also subscribes to this theory.

However, there is *prima facie* proof that the COVID-19 virus did not first emerge in China, but in Italy. Thus, Italian medical scholars have discovered an unexpected very early circulation of COVID-19 among asymptomatic individuals in Italy, several months before the first patient was identified in Wuhan.[19] It cannot be ruled out, therefore, that the virus was not imported into Europe from China, but from Europe into China. That would turn COVID-19 into a 'Europe virus' rather than a 'China virus'.

Additionally, there is anecdotal evidence that the COVID-19 virus was imported into Missouri from Europe rather than from China. The first patient was an exchange student from Italy,[20] while the second contracted the virus in Austria.[21] Details on the geographic origin of the virus which infected other Missourians are not available.

---

[19] Giovanni Apolone *et al.*, Unexpected Detection of SARS-Co-2 Antibodies in the Prepandemic Period in Italy, (2020) *Tumori Journal* (online).

[20] https://news.stlpublicradio.org/health-science-environment/2020-03-08/first-missouri-coronavirus-case-is-in-st-louis-county

[21] https://apnews.com/article/4cfabb1477eef536c4fb1d275e2e5a00

Furthermore, there is *prima facie* evidence that the COVID-19 virus may even have been introduced to the U.S. prior to the Wuhan outbreak, which also cast doubts on the 'China virus' assumption.[22]

Therefore, the scenario that the virus spread from Europe to the U.S., rather than from China to the U.S. is plausible. To establish causality the Attorney-General should have refuted this hypothesis.

Third, several claims made by the Attorney-General also do not find support in the Joint WHO - China Study Team Report called *WHO Convened Global Study of Origins of SARS-CoV-2: China Part*.[23] Thus, the Report considers introduction of the virus through a laboratory incident as an 'extremely unlikely pathway'.

Fourth, evidence shows that when China and the WHO were already alarmed by the nature of the virus and its spread within the community and where taking urgent measures to keep it under control, no such sense of urgency existed in the US.[24] Thus, while the US was informed on 3 January 2020 about the nature of the COVID-19 virus, its implications were only discussed by the National Security Council on 14 January.[25] Even when a first case emerged in the US, the Administration did not consider it necessary to take action.[26] When Wuhan went into lockdown on 23 January, US health authorities kept sending out reassuring messages and claimed that they were prepared for what might come.[27] Proposals to suspend travel from China were dismissed.[28] Only on 31 January a national declaration of Public Health Emergency was

---

[22] Basavaraju *et al.*, Serologic Testing of US Blood Donations to Identify Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-Co V-2) - Reactive Antibodies: December 2019 - January 2020, (2021) 72 *Clinical Infectious Diseases*, 1004-1009.
[23] https://www.who.int/publications/i/item/who-convened-global-study-of-origins-of-sars-cov-2-china-part
[24] Sharri Markson, *What Really Happened in Wuhan*, Sydney, 2021, 49.
[25] *Id.* at 33.
[26] *Id.* at 46.
[27] *Id.* at 48.
[28] *Id.* at 68.

issued.[29] This raises questions about the way US authorities dealt with the virus when it became known that it was contagious and lethal, which should have been addressed by the Attorney-General.

Fifth, throughout the month of January 2020, President Trump acknowledged on several occasions that China had been working very hard to contain the virus, that it was being transparent and that it was working closely with the US.[30] These statements contradict the claims made by the Attorney-General in § 1 of the complaint that China was lax in dealing with the virus and was hiding information. This contradiction should have been explained by the Attorney-General.

## II.    THE POLITICAL QUESTION DOCTRINE

In *Baker v. Carr* the Supreme Court has identified six factors, any one of which indicates the presence of a nonjusticiable political question.[31] In foreign affairs cases the fourth - showing a lack of respect due coordinate branches of government and the sixth factor - the possibility of causing embarrassment from multifarious pronouncements by various departments on one question - mainly play a role.

Usually, courts deal with suits like the current one under the Foreign Sovereign Immunities Act and/or the Act of State doctrine, and, consequently, they do not touch upon nonjusticiability under the political question doctrine. Therefore, case law on international litigation by states in relation to the political question doctrine is rare. However, in the two cases which have been reported, the courts have declared the claims to be nonjusticiable under the political question doctrine because of the negative impact of the litigation on the foreign policy pursued by the Executive Branch.

---

[29] *Id.* at 76.
[30] *Id.* at 48, 75-76.
[31] 369 U.S. 186 (1962).

Thus, in *In re Refined Petroleum Products Antitrust Litigation*, plaintiffs had filed antitrust suits against several companies which produced refined petroleum products for allegedly conspiring which member states of OPEC to fix the price of products in the U.S.[32] The court pointed out that that public policy statements made by the Executive during a thirty years' period showed a commitment to cooperation instead of confrontation with oil-producing countries. Therefore, the adjudication of plaintiffs' claims would threaten to disrupt the operation of longstanding diplomatic relations nurtured by the Executive Branch across decades.[33]

In *Corrie v. Caterpillar*, the family of a peace activist who was run over and killed by a military bulldozer in the Gaza Strip, and a number of Palestinians who lived in the Gaza Strip and the West Bank brought action against a manufacturer of bulldozers used by the Israeli Defence Force (IDF) seeking damages as well as an order directing the manufacturer to cease providing equipment to the IDF.[34] The Court made clear that neither the Executive Branch nor Congress had urged or enjoined the sale of weapons to Israel nor restrained trade with Israel in any other manner. If the Court would preclude sales of Caterpillar products to Israel it would be making a foreign policy decision and impinge directly upon the prerogatives of the Executive Branch. The Court emphasized that the lawsuit challenged the official acts of an existing government where diplomacy is delicate and U.S. interests are great. Therefore, it dismissed the case as a nonjusticiable political question.[35]

In both cases the Courts declined to consider the merits, because adjudicating the plaintiffs' claims would go against longstanding executive policy. The same would happen in the case at bar. As was the case in *In re Refined Petroleum Products Antitrust Litigation*,[36]

---

[32] 649 F.Supp.2d 572 (S.D. Tex. 2009).
[33] *Id.* at 598.
[34] 403 F. Supp.2d 1019 (W.D. Wash. 2005).
[35] *Id.* at 1032.
[36] 649 F.Supp.2d 572 (S.D. Tex. 2009).

adjudicating the Attorney-General's complaint would be contrary to longstanding executive policy to solve differences with China in a non-confrontational manner. Since President Nixon in 1972 brought China back into the family of nations by reaching out to it, the policy of the U.S. has constantly been to solve differences by diplomatic means rather than through litigation. The Government describes its current policy as 'strategic competition', which includes results-oriented diplomacy with China.[37]

In both cases discussed above, the courts felt that the fact that the issues were already covered by existing executive policy pre-empted them from deciding on the claims. This is what Abebe calls first-mover bias.[38] Clearly, such first-mover bias manifests itself in the case at bar. Since President Biden has ordered a closer intelligence review of the hypothesis that the virus escaped from a Wuhan laboratory, he has turned the question of the cause of the pandemic into one reserved for the Executive Branch, which therefore should be regarded as nonjusticiable. As Abebe has explained, the need for speaking with one voice is bigger when the US is not dominating the field but is operating in a highly competitive international political environment.[39] Since the U.S.-China tensions relate to (perceived) challenges to the superpower status of the U.S. by China as an emerging power, the need to speak with one voice is the strongest.

## III.    IMMUNITY

### A.    *Introduction*

Foreign states, like China, enjoy sovereign immunity before US Courts under the US Foreign Government Immunities Act and public international law. General Schmitt has tried to circumvent this bar by listing the Communist Party of China as a defendant, while claiming that

---

[37] https://www.state.gov/u-s-relations-with-china/
[38] Daniel Abebe, One Voice or Many? The Political Question Doctrine and Acoustic Dissonance in Foreign Affairs, 2012 *Sup. Ct. Rev.* 233 (2012), at p. 234.
[39] *Id.* at 737-738.

"the Communist Party is not an organ or political subdivision of the PRC, nor is it owned by the PRC or a political subdivision of the PRC, and thus it is not protected by sovereign immunity".[40] In his motion for entry of default the Attorney-General makes a similar claim for purposes of service.[41] The authority invoked by the Attorney-General in support of this position is *Yaodi Hu v. Communist Party of China*,[42] in which a magistrate judge had decided that the Communist Party is not entitled to sovereign immunity.

On page 4 of the original brief *amici* have already stated that the Communist Party of China belongs to the organs, components, and entities of the state to which state immunity extends. We argue that *Yaodi Hu* and the position taken by the Attorney-General find no basis in Chinese constitutional law. The case was already wrongly decided in 2012 and can no longer serve as authority since 2018.

### B.    *Yaodi Hu Was Wrongly Decided*

Even when the magistrate took his decision, it was already incorrect in view of Chinese constitutional law, for two reasons.

First, as the seventh recital of the Preamble to the Chinese Constitution emphasises, the Chinese constitutional model is based on Marxism-Leninism. Both the *Communist Manifesto* authored by Karl Marx and Friedrich Engels,[43] and *What is to be done?*,[44] authored by Vladimir Lenin underscore that the Communist Party plays the leading role in a Socialist system.

Since China has a Marxist-Leninist system, the leadership role of the Communist Party at the time was a 'latent rule', which was part of the Chinese Constitution, although it had not been mentioned in the core of the document.[45]  Such latent rules, which do not require express

---

[40] § 19 of the Complaint.
[41] P. 2.
[42] 2012 WL 7160373 (W.D. Mich. Nov. 20, 2012).
[43] London, 1848, Chapter II, Proletarians and Communists.
[44] Moscow, 1952.
[45] Qianfan Zhang, *The Constitution of China, A Contextual Analysis*, Oxford, 2012, p. 99.

11

constitutional recognition because they are inherent to the constitutional system, are common in other systems as well. Thus, courts in the US enjoy the power to engage in judicial review of the constitutionality of legislation, despite the fact that such power has not been included in the written Constitution.

Second, although until 2018 the leadership role of the Communist Party was not mentioned in the main body of the Constitution, it was included in the Preamble, and therefore it had constitutional significance.

Therefore, when the magistrate handed down his decision in *Yaodi Hu* in 2012, it already conflicted with Chinese constitutional law in force at the time.

## C.     *Yaodi Hu no longer applies*

Since *Yaodi Hu* was decided, the implied constitutional position of the Communist Party has been made explicit. Thus, in 2018, an amendment to the Constitution was adopted by the National People's Congress, which became part of Article 1, section 2 of the Constitution:

> "Leadership by the Communist Party of China is the defining feature of Socialism with Chinese characteristics".

This amendment was meant to reaffirm the leadership role of the Communist Party in China's constitutional system by providing it with a solid foundation in the main body of the text.[46] This means that *Yaodi Hu* no longer applies.

According to Heuser, 'leadership' means the authority of the Communist Party to set directions for and practice surveillance of all organs of the state.[47] This means that the Communist Party controls the government.[48] Thus, the Party exclusively nominates candidates

---

[46] Annotated Translation: 2018 Amendment to the P.R.C. Constitution, npcobserver.com/2018/03/11/translation-2018-amendment-to-the-p-r-c-constitution/
[47] Robert Heuser, *The Legal Status of the Chinese Communist Party*, Occasional Papers/Reprints Series in Contemporary Asian Studies, No. 4, 1987 (81), p. 8)
[48] Kenneth Lieberthal, *Governing China, From Revolution Through Reform*, 2nd edition, New York, 2004, 233-239.

for the high offices of state, such as the Presidency and the position of Prime Minster.[49] Also according to the standards applied by the US Supreme Court, the Party should therefore be considered a state agent rather than a voluntary association.[50] In addition, the Party directs state policy through the Leading Small Groups and the State Council Information Office, which is then implemented by the government departments.[51]

Interestingly, it is the Attorney-General himself who highlighted this leadership role of the Communist Party in § 20 of his complaint: "On information and belief, the Communist Party exercised direction and control over the action of all other defendants".

Consequently, the Party is a state entity which enjoys sovereign immunity.

## IV.    THE DEFENCE OF FORCE MAJEURE

The original brief submitted by *amici* refers on pages 10-12 to the Draft Articles on State Responsibility, in particular to Article 23 which deals with *force majeure*. Although formally the Articles are drafts, they are very often relied upon in litigation before international courts and tribunals, in arbitration awards, in state practice, and in separate opinions submitted by Judges at the International Court of Justice.

Therefore, it is generally accepted that they enjoy the status of customary international law.[52] According to Caron it is likely, therefore, that paradoxically the Draft Articles have more influence in their present form than they might have as a multilateral treaty.[53] In light of the observation that the ILC draft articles are to be qualified as part of customary international law,

---

[49] *Id*. at 234.
[50] *Smith v. Allwright* 321 US 649, 663 (1944).
[51] Lance L.P. Gore, The Communist Party-Dominated Governance Model of China: Legitimacy, Accountability, and Meritocracy, 51 (1) (2019) *Polity*, 161-194, at 178-180.
[52] Silvia Borelli, State Responsibility in International Law, *Oxford Bibliographies*, https://www.oxfordbibliographies.com/view/document/obo-9780199796953/obo-9780199796953-0031.xml
[53] David Caron, The ILC Articles on State Responsibility: The Paradoxical Relationship between Form and Authority, 96 (4) (2002) *American Journal of International Law*, 857-873.

the defence of force majeure excludes any kind of liability on the part of China and its entities, as explained in the original *amicus* brief.

## <u>CONCLUSION</u>

Based on the Attorney-General's lack of standing to bring the case, the nonjusticiability of the complaint under the political question doctrine, the immunity of the Communist Party, and the defence of force majeure, Movants respectfully request that this Court consider dismissing Plaintiff's Complaint *sua sponte* and for such other orders as this Court may find just and equitable

Dated:              January 4, 2022

                                        Respectfully submitted,

                                        */s/ Geert-Jan Alexander Knoops*
                                        Dr. Geert-Jan Alexander Knoops, A09070
                                        Knoops' Advocaten International Lawyers
                                        Concertgebouwplein 25
                                        1071 LM Amsterdam
                                        P: +31 (0)20-470-5151
                                        F: +31 (0)20-675-0946
                                        office@knoopsadvocaten.nl

                                        */s/ Tom Zwart*
                                        Dr. Tom Zwart
                                        Newtonlaan 201, 3584 BH
                                        Utrecht, The Netherlands
                                        P: 316 2705 2580
                                        t.zwart@uu.nl

                                        *Lawyers for Upholding International Law*

14

THE SIMON LAW FIRM, P.C.

/s/ *Amy Collignon Gunn*
Amy Collignon Gunn #45016MO
Elizabeth S. Lenivy #68469MO
800 Market Street, Ste. 1700
St. Louis, Missouri 63101
P: (314) 241-2929
F: (314) 241-2029
agunn@simonlawpc.com
elenivy@simonlawpc.com

***Local Counsel for Lawyers for Upholding
International Law***