**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | |
|---|---|
| THE STATE OF MISSOURI, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )     Case No. 1:20-cv-00099-SNLJ |
| | ) |
| THE PEOPLE'S REPUBLIC OF CHINA, | ) |
| et al., | ) |
| | ) |
|     Defendants. | ) |

**THE *AMICUS* CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW'S
MEMORANDUM ON CERTAIN THRESHOLD QUESTIONS
IDENTIFIED BY THE COURT**

COMES NOW *Amicus*, The China Society of Private International Law ("The Society"),

by and through the undersigned counsel, in response to the Court's Memorandum and Order

(ECF No. 47) identifying certain threshold questions that must be addressed, and states as

follows:

Status of Defendants.  The Court has recognized that "[t]he proper classification of

defendants [Communist Party of China ('the Communist Party' or 'CPC'), the Chinese Academy

of Sciences ('CAS'), and the Wuhan Institute of Virology ('WIV')] goes to subject matter

jurisdiction and is a question of law the Court must address *sua sponte*." ECF No. 47, at 5. The

existence of subject-matter jurisdiction is indeed fundamental, and a federal court has no power

to act without it.[1] As the Supreme Court has observed:

> no action of the parties can confer subject-matter jurisdiction upon a federal court.
> Thus, the consent of the parties is irrelevant, *California* v. *LaRue*, 409 U.S. 109
> (1972), principles of estoppel do not apply, *American Fire & Casualty Co.* v.

---

[1] As the Court has recognized, whatever the burden-shifting rules may be when a sovereign defendant does appear, *Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) makes clear that a court still has the fundamental obligation to determine if it has subject-matter jurisdiction when such a defendant does not appear.

>*Finn*, 341 U.S. 6, 17-18 (1951), and a party does not waive the requirement by
>failing to challenge jurisdiction early in the proceedings.  Similarly, a court,
>including an appellate court, will raise lack of subject-matter jurisdiction on its
>own motion.  "[The] rule, springing from the nature and limits of the judicial
>power of the United States is inflexible and without exception, which requires this
>court, of its own motion, to deny its jurisdiction, and, in the exercise of its
>appellate power, that of all other courts of the United States, in all cases where
>such jurisdiction does not affirmatively appear in the record." *Mansfield, C. &
>L.M.R. Co.* v. *Swan*, 111 U.S. 379, 382 (1884).

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)

(distinguishing the power to impose a finding of personal jurisdiction as a sanction from the

incapacity to do so for subject-matter jurisdiction).  If a default judgment is issued but subject-

matter jurisdiction was in fact lacking, that judgment may be vacated by way of collateral attack.

*Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 (D.C. Cir. 1987).

Because jurisdiction is a threshold question, a court may look outside the pleadings to

determine whether subject matter jurisdiction exists. *See Green Acres Enterprises, Inc. v. United

States*, 418 F.3d 852, 856 (8th Cir. 2005); *Osborn v. United States*, 918 F.2d 724, 728 (8th Cir.

1990).  A court considering dismissal pursuant to Rule 12(h)(3) for lack of subject-matter

jurisdiction applies the same standards as under Rule 12(b)(1). *Missouri Primate Found. v.

People for Ethical Treatment of Animals, Inc.*, No. 4:16 CV 2163 CDP, 2017 WL 4176431, at *3

(E.D. Mo. Sept. 21, 2017).[2]

---

[2] The court has the authority to consider matters outside the pleadings when subject matter jurisdiction is
challenged under Rule 12(b)(1). *TKE Enterprises, Inc. v. Crack Team, U.S.A., Inc.*, No. 4:11CV1435
HEA, 2013 WL 1883072, at *1 (E.D. Mo. May 6, 2013) (citing *Harris v. P.A.M. Transport, Inc.,* 339
F.3d 635, 637, n.4 (8th Cir. 2003)). In such a challenge, the court is "free to weigh the evidence and
satisfy itself as to the existence of its power to hear the case." *Id.* (citing *Osborn,* 918 F.2d at 729). "No
presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts
will not preclude the court from evaluating for itself the merits of jurisdictional claims." *Id. See also
Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) ("On a Rule
12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the
disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and
if necessary, hold an evidentiary hearing.").

The *amici curiae* have provided relevant information concerning the Chinese law relevant to determining which Chinese entities qualify as "foreign states" under the FSIA, which is essential to determining subject-matter jurisdiction.  The Court has raised the question "whether additional factual information can be submitted for use in the Court's analysis and, if so, the extent to which such information may be submitted or judicially noticed."  ECF No. 47, at 7.  In fact, the Court has the power to receive, locate and use information outside of the pleadings concerning Chinese law, pursuant to Fed. R. Civ. P. 44.1.  In *de Fontbrune v. Wofsy*, 838 F.3d 992 (9th Cir. 2016), the Ninth Circuit ruled that "Rule 44.1 authorizes district courts to consider foreign legal materials outside the pleadings in ruling on a motion to dismiss," because "Rule 44.1 treats foreign law determinations as questions of law, not fact."  *Id*. at 996.  As the Ninth Circuit explained:

> Rule 44.1 thus unshackles courts and litigants from the evidentiary and procedural requirements that apply to factual determinations. It accordingly permits courts to consider "any relevant material, including testimony, without regard to its admissibility under Rule 43," authorizes the court to "engage in its own research," eschews any requirement that the court formally take judicial notice of foreign law, and obviates the need for the court to provide "formal notice to the parties of its intention to engage in its own research on an issue of foreign law which has been raised by them, or of its intention to raise and determine independently an issue not raised by them." Fed. R. Civ. P. 44.1 advisory committee's note.

*Id*. The "deliberately flexible procedures for presenting and utilizing material on issues of foreign law . . . cut against a determination that district courts should be prohibited from considering relevant foreign legal materials at the motion to dismiss stage." *Id.* at 999 (citing Fed. R. Civ. P. 44.1 advisory committee's note) (internal quotation marks omitted).

The Court also has the authority to take judicial notice of government publications. "Courts in [the Eighth Circuit] have routinely recognized that it is proper to take judicial notice of 'sources whose accuracy cannot reasonably be questioned, *such as publications of official*

government agencies.'" *ACE Am. Ins. Co. v. AERCO Int'l, Inc.*, 525 F. Supp. 3d 990, 994 (E.D. Mo. 2021) (internal citations omitted); *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016). Other jurisdictions agree that government agency websites have often been treated as proper subjects for judicial notice. *See, e.g., Paralyzed Veterans of Am. v. McPherson*, No. C064670SBA, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008) (collecting cases). Therefore, this Court can take judicial notice of government publications, including those on government websites, cited by *amici curiae* previously and herein.

With respect to the Communist Party, the Court can take judicial notice of the U.S. Government's position concerning China's state structure.[3]  *See also Chen v. China Cent. TV*, 2007 U.S. Dist. LEXIS 58503 (S.D.N.Y. Aug. 9, 2007), *aff'd*, 2009 U.S. App. LEXIS 7321 (2d Cir. Apr. 7, 2009) (holding that China Central Television is an instrumentality of the PRC under the FSIA because it is the "mouthpiece of the Chinese Communist Party").[4] That and Plaintiff's allegations in its own Complaint that the CPC exercises state power[5] are by themselves sufficient for the Court to conclude for purposes of its analysis that the CPC is a "foreign state" under the FSIA.

---

[3] "State Structure[:] The Chinese Government has always been subordinate to the Chinese Communist Party (CCP); its role is to implement party policies." Dep't of State, China Country Note (China 10/04), available at https://2009- 2017.state.gov/outofdate/bgn/china/40557.htm. *See* Restatement (Fourth) of the Foreign Relations Law of the United States § 451 cmt. e (2018) ("foreign state" "includes the state itself, its government **and its components that perform 'core functions,'** its political subdivisions, and its agencies and instrumentalities, unless explicitly noted") (emphasis added); United Nations Convention on Jurisdictional Immunities of States and Their Property, art. 2(1)(b)(iii) ("state" includes "agencies or instrumentalities of the State **or other entities**, to the extent that they are entitled to perform and are actually performing acts in the exercise of sovereign authority of the State") (emphasis added.)

[4] *See also* Chimène Keitner, *Missouri's Lawsuit Doesn't Abrogate China's Sovereign Immunity*, Just Security (Apr. 22, 2020), available at https://www.justsecurity.org/69817/missouris-lawsuit-doesnt-abrogate-chinas-sovereign-immunity/.

[5] *See* Complaint, ¶ 17 ("Defendant People's Republic of China ('PRC' or 'China') is a communist nation in Asia"); ¶ 18 (CPC "is the sole governing party within China"); ¶ 20 ("the Communist Party exercised direction and control over the actions of all other Defendants").

Notably, Plaintiff claims to have served the CPC by serving People's Daily, reportedly the "mouthpiece" of the CPC. *See* ECF No. 47, at 6. The People's Daily was determined to be a "foreign state" under the FSIA and accordingly was dismissed on grounds of foreign sovereign immunity in *Wang Bingzhang v. Renmin Ribao [People's Daily]*, Civil Action No. 8645-85 (D.C. Sup. Ct. dismissed Feb. 11, 1988).  If the People's Daily, a mouthpiece of the CPC, is a "foreign state," then the CPC is also a "foreign state" or a part of a "foreign state," and therefore covered by the FSIA.

The additional information on Chinese law provided by *amici curiae* further confirm that the CPC is a "foreign state" under the FSIA.  The Constitution of the PRC enunciates the leadership role of the CPC in the state. *See* ECF No. 34, at 14; ECF No. 46-1, at 11-13.[6]

With respect to CAS, despite alleging that it is "the national academy of the natural sciences for the PRC," Complaint, ¶ 31, Plaintiff's position seems to be that it can postpone the Court's finding that CAS is an "agency or instrumentality of a foreign state" under the FSIA on the basis that Plaintiff has refrained from alleging the obvious, that CAS is wholly and directly owned by the Chinese state.  It employs the same tactic with respect to WIV, which it alleges is administered by CAS. *Id.*, ¶ 33.[7]  Such a tactic would deny these Defendants the protections of the FSIA, which presumptively entitles qualifying Defendants to "an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Phoenix*

---

[6] Plaintiff has alleged that the Communist Party was an agent of other Defendants that are indisputably "foreign states" under the FSIA.  Complaint ¶ 26.  Even if *arguendo* the Communist Party were not a "foreign state" under the FSIA, it should still be immune, possessing derivative immunity based on such agency.  *See Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000).  Even if such derivative immunity were not available from the FSIA, it could be available under common law.  *See Broidy Cap. Mgmt. LLC v. Muzin*, 12 F.4th 789 (D.C. Cir. 2021) (denying common-law derivative immunity for factual reasons).
[7] Plaintiffs in another case relating to COVID-19 have taken the position that CAS and WIV should be treated, at least provisionally, as covered by the FSIA.  *See* [Plaintiffs'] Supplemental Briefing Pursuant to Court Order, ECF No. 157 (June 11, 2021), at 4, 4 note 3, *Reyes et al. v. People's Republic of China et al.*, Case No. 1:20-cv-21108-AMC (S.D. Fl.).

*Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).  It would impede the Court from discharging its duty, made clear by *Verlinden*, to determine if it actually has subject-matter jurisdiction even when Defendants do not appear.

The Society has presented to this Court the registration documents of CAS and WIV as well as the relevant Chinese law. ECF No. 34-1; ECF No. 42, at 2-3. This Court has the power under Rule 44.1 to determine the relevant Chinese law, and can take judicial notice of the registration documents issued by the Chinese authorities, and thus has sufficient information to conclude that both CAS and WIV qualify as agencies and instrumentalities of a foreign state.[8]

<u>Service</u>.  The three Defendants at issue have not been served as "foreign states" under the FSIA.  ECF No. 47, at 6. Because they are such, they must be served in accordance with Rule 4(j) and 28 U.S.C. § 1608 of the FSIA.

Plaintiff's motion for authorization of alternative service was predicated on its position that Rule 4(h)(2) (and thereby Rule 4(f), specifically Rule 4(f)(3)) applied, because these were "nongovernmental entities located abroad."  ECF No. 19, at 5.  It relied primarily on *Zhang v. Baidu.com Inc.*, 293 F.R.D. 508, 510 (S.D.N.Y. 2013), a Rule 4(f) case.  *See generally* ECF No. 19.  But these Rules do not apply and *Baidu* is inapposite, because each Defendant is a "foreign state" under the FSIA. Rule 4(j) applies, requiring service "in accordance with 28 U.S.C. § 1608." Such service has not been made.

When it acceded to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, China filed (as the Convention permits) a reservation objecting to "the service of documents in the territory of the People's Republic of China by the methods provided

---

[8] In the event that the Court believes that it cannot conclude yet that CAS and WIV are agencies or instrumentalities of the foreign state, China, the Society respectfully submits that the Court should still examine, at least provisionally, the claims against them with reference to the FSIA's exceptions to immunity, the same as it will examine such claims against the Defendants that are indisputably covered by the FSIA.

by Article 10 of the Convention."[9]  Despite this, Plaintiff took the position in its motion that email service on Chinese Defendants would be permissible under Fed. R. Civ. P. 4(f)(3).  *See* ECF No. 19, at 9.  The case law on the scope of Article 10 reservations is mixed.  The case on which Plaintiff relied, *Zhang v. Baidu.com Inc.*, 293 F.R.D. 508 (S.D.N.Y. 2013), suggested that email service in China "would run afoul of the Hague Convention and thus be prohibited." *Id.* at 515 n.2. China's reservation should be considered to bar email service, because "China's Article 10 objection embraces all forms of service the Article allows," and "email would bypass the methods of service the Hague Convention authorizes."  *Luxottica Grp. S.p.A. v. P'ships & Unincorporated Ass'ns Identified On Schedule "A"*, 391 F. Supp. 3d 816, 827 (E.D. Ill. 2019). *See also Facebook, Inc. v. 9 Xiu Network (Shenzhen) Technology Co., Ltd.*, Case No. 19-cv-1167, ECF No. 45 (N.D. Cal., July 28, 2020, adopted Aug. 19, 2020) (service by e-mail not among the "approved methods of service" specified in the Hague Convention).[10] And in any event, whether email service is precluded by China's Article 10 reservation is actually not an issue here: the alternative service rule of Fed. R. Civ. P. 4(f)(3) ("other means not prohibited by international agreement") does not apply in this case.  The FSIA service rules, employing different criteria, apply.

Under 28 U.S.C. § 1608(b)(3)(C), if service upon an agency or instrumentality of a foreign state cannot be made under (b)(1) or (b)(2), service must be "consistent with the law of the place where service is to be made." Email service is not permitted in China, except where the

---

[9] Hague Convention on Private International Law, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=393&disp=resdn (last visited January 31, 2022).

[10] In the Chinese courts' application of this reservation, "[i]f the State where the addressee resides is a contracting party to the Hague Service Convention and has made a statement of opposition to postal service, it should be presumed that electronic service is also opposed to by that State, and the people's court should not adopt the method of electronic service." Minutes of Nationwide Courts' Symposium on Adjudication of Foreign Related Commercial and Maritime Cases, art. 11.

party to be served consents.[11]  In addition, "[n]o foreign authority or individual shall, without permission from the competent authorities of the People's Republic of China, serve process or conduct investigation and collection of evidence within the territory of the People's Republic of China."[12]  Thus, an email purporting to constitute service of process unilaterally sent by a foreign authority or individual would not be "consistent with the law of the place where service is to be made."

Plaintiff's purported Proof of Service, ECF No. 23, reveals other defects.  As the Court has noted, ECF No. 47, at 6, Plaintiff purported to serve the Communist Party by emailing another entity, People's Daily, reportedly "an official communications organ and mouthpiece of the Communist Party of China."  ECF No. 23, at 2.[13]  And while it states that it sent its email to the People's Daily's "service email" address, *see id.*, it does not inform the Court that the Chinese word for "service" here is service in the sense of "customer service," not service in the sense of "service of process."[14]  Thus, even assuming *arguendo* that email service is permissible, Plaintiff has not actually served the CPC or an authorized agent of it. Plaintiff also purported to serve WIV by emailing CAS. As noted previously, WIV and CAS are separate Chinese legal persons.[15]

In short, Plaintiff has not properly served the Communist Party, CAS or WIV.  The entries of default against these Defendants should be vacated.

FSIA Exceptions to Foreign Sovereign Immunity.  It is clear that the tortious acts or omissions alleged by Plaintiff occurred within China, placing them outside the ambit of the tort

---

[11] *See* Minshi Susong Fa (民事诉讼法) [Civil Procedure Law] (promulgated by the Nat'l People's Cong., Apr. 9, 1991; revised by the Standing Comm. Nat'l People's Cong., Dec. 24, 2021, effective Jan. 1, 2022), art. 90, CLI.1.5113165(EN) (China).

[12] *Id.*, art. 284.

[13] *See* discussion above of this attempted service through the People's Daily.

[14] The original Chinese on the People's Daily's website is 服务邮箱.

[15] It appears that there also are no confirmations that Plaintiff's emails were actually received.

exception, § 1605(a)(5). Plaintiff's position that they fit within the exception contradicts the clear words of the statute ("occurring in the United States") and case law stretching from *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517 (D.C. Cir. 1984), to *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), to *Kling v. World Health Organization*, 532 F. Supp. 3d 141 (S.D.N.Y. 2021). Even if §1605(a)(5) did apply, the "discretionary function" and "misrepresentation" exceptions thereto would still bar the suit. *See Kling*, 532 F. Supp. 3d at 151.

Unable to fit its claims within the tort exception, Plaintiff tries to connect them to allegedly commercial activities in an attempt to make them fit within the commercial activity exception. They do not fit within that exception for a number of reasons. First, they do not satisfy the direct effect requirement. Injuries suffered in the United States would not have occurred but for a series of intervening events; if these intervening events had not occurred, the chain of infection would not have reached the United States, and the spread of infection could have been materially curtailed at many points along the causal chain. To try to leapfrog over the intervening events, Plaintiff relies on *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016) and its citation to a rule from the 1934 First Restatement of Conflict of Laws that "[a] tort's locus . . . is the place 'where the last event necessary to make an actor liable for an alleged tort takes place.'" *See* ECF No. 35, at 13. However, the court in *Atlantica Holdings* identified ample basis for finding a direct effect in the United States without the need to invoke such a general rule.[16] Moreover, such a general rule

---

[16] The claims in *Atlantica Holdings* were based on alleged misrepresentations actionable under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a). The court that decided *Atlantica Holdings* had "previously held that the locus of an alleged misrepresentation actionable under Section 10(b) is the forum 'where the loss is sustained, not where fraudulent misrepresentations are made,'" 813 F.3d at 109, so the court appeared constrained to rule that this particular tort occurred in the United States, without regard to whether there might be a more general rule. The court also stated that the

cannot be grafted on to the FSIA.[17]  If it did apply, torts committed overseas where it is alleged they eventually resulted in an injury to persons in the United States would fall within the tort exception (§ 1605(a)(5)), since that injury would be "the last event necessary to make an actor liable," thereby deeming the tort to be one "occurring in the United States" -- even though the tortious act actually had not occurred in the United States.  That is the kind of expansion to the tort exception -- to "alleged torts that bear *some relationship* to the United States" -- that then-Judge Scalia rejected in *Reclamantes*.  *See id.*, 735 F.2d at 1525 (emphasis added).

The *Atlantica Holdings* court noted that it had previously ruled that "'the fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the [direct-effect commercial activity] exception.'"[18]  813 F.3d at 110. The court explained the difference between its holding and similar cases finding no direct effect:

> The intervening actions of a third party may sometimes break the causal chain between a defendant's allegedly tortious actions and an effect felt in the United States—rendering the effect in this country not "direct"—where the defendant's actions affect the third party, who in turn takes some independent action that causes a further effect in the United States.

*Id.* at 112.  To illustrate this, it contrasted a press release at issue in *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 235 (2d Cir. 2002), with the misrepresentations at issue in *Atlantica Holdings*.  In *Virtual Countries*, the plaintiff claimed that a press release issued by

---

"securities . . . were marketed in the United States and directed toward United States persons," and for those reasons it had "no difficulty concluding that Plaintiffs' loss 'follow[ed] as an immediate consequence'" of the alleged misrepresentations.  *Id.* at 110-11.  (Please note that in the Society's previous submission, ECF No. 42, at 8 line 5, the words "issued certain securities" should read "marketed certain securities.")

[17] In the very same opinion, the *Atlantica Holdings* court appears to recognize that there is not such a categorical rule after all:  "where the economic injury is itself the 'last event necessary to make the actor liable for the alleged tort,' thus locating the tort within the United States, *see* First Restatement § 377— the connection between the foreign sovereign's act and its effects *may often, if not invariably*, be 'direct'" (emphasis added).

[18] These cases generally discuss financial loss (or "economic injury," *see id.*) rather than injury in general because these are, after all, commercial-activity exception cases.

the Republic of South Africa had a direct effect on the plaintiff in the United States by discouraging third parties to do business with and invest in it. *Atlantica Holdings*, 813 F.3d at 114. The *Atlantica Holdings* court observed that the press release had an "initial effect" on third parties, who then had to take "further action" "in order for the American plaintiff to be affected at all." *Id.* However, in *Atlantica Holdings*, the court stated, the "misrepresentations **acted directly on** those whom they allegedly affected," *i.e.*, the plaintiffs.  *Id.* (emphasis added).

The situation in this case is more analogous to *Virtual Countries* than it is to *Atlantica Holdings*.  The alleged wrongs would have had to have affected persons in China before they affected anyone in the United States, and the earlier-affected persons would have had to have taken action (such as by traveling to other jurisdictions) before other persons could be affected. Consequently, the direct effect requirement of § 1605(a)(2) is not satisfied.

A second reason why jurisdiction does not exist under the commercial activity exception in this case is that the alleged acts upon which Plaintiff's suit is based lack the required substantive connection or causal link to commercial activity;[19] these alleged acts are extraneous to the allegedly commercial activities that Plaintiff has identified.

To test whether the requisite connection exists, it is necessary first to "zero[ ] in on the core of the[ ] suit" and identify the "'particular conduct' that constitutes the 'gravamen' of the suit." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (quoting *Saudi Arabia v. Nelson,* 507 U.S. 349, 358 (1993)).[20]  Thus, in *Nelson*, for instance, the Supreme Court

---

[19] *See Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997). *See also Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000); *Drexel Burnham Lambert Group Inc. v. Committee of Receivers for A.W. Galadari*, 12 F.3d 317, 330 (2d Cir. 1993); *Letuwyler v. Off. of Her Majesty Queen Rania Al-Abdulah*, 184 F. Supp. 2d 277, 299 (S.D.N.Y. 2001); *Doe v. Holy See*, 434 F. Supp. 2d 925, 942, 947 (D. Or. 2006), *aff'd in part, rev'd in part,* 557 F.3d 1066 (9th Cir. 2009).

[20] Determining the gravamen of a case is necessary with respect to all prongs of the commercial activity exception, including the "direct effect" prong.  *See Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 156 (2d

determined that the gravamen of the suit consisted of Saudi sovereign acts constituting alleged torts, "not the arguably commercial activities that preceded their commission."  507 U.S. at 358. "While these [arguably commercial] activities led to the conduct that eventually injured the Nelsons, they are not the basis for the Nelsons' suit."  *Id*.  Likewise, in this case, even assuming *arguendo* that the activities alleged by Plaintiff to be commercial, are in fact commercial, those activities merely preceded the alleged acts or omissions on which Plaintiff's suit is based.

A third reason why jurisdiction does not exist under the commercial activity exception is that, whether or not there is a substantive connection to the alleged wrongful acts, the alleged commercial activities are not commercial.  Two of the alleged commercial activities are "operation of the healthcare system in Wuhan and throughout China" and "the operation of traditional and social media platforms for commercial gain."  Complaint, ¶ 40.  As the Society previously indicated, the operation of the national healthcare system is not a commercial activity.[21] *See* ECF No. 34 at 6; ECF No. 42, at 10.  In addition, the operation of the social media platform identified is not an activity of the Defendants. The social media platform WeChat referred to in the Complaint is not a Defendant and is not owned or operated by any of the Defendants.  *See* ECF. No. 42, at 11.

The alleged wrongful acts "in connection with" operating the healthcare system and social media are "suppressing and concealing critical information about the virus's initial outbreak in Wuhan health-care facilities" and "conceal[ing] and suppress[ing] critical

---

Cir. 2007) ("we do not believe that the phrase 'based upon' has distinct meanings in different parts of the same provision of the statute"); *Atlantica Holdings*, 813 F.3d at 107 n.3.

[21] Proper characterization of the relevant activity is important, because it can be subject to manipulation: "A federal trial, for example, could be characterized in the broadest, generic terms as a form of dispute resolution, or, more specifically, as government-sponsored adjudication. But whereas the broad category of dispute resolution encompasses activities that might be considered commercial, such as paid-for arbitration, the narrower category of adjudication defines an intrinsically public activity, invested with the sovereign authority of the state."  *De Sanchez v. Banco Central de Nicaragua*, 770 F. 2d 1385, 1392 (5th Cir. 1985).

information about the virus's initial outbreak." ECF No. 35, at 30-31; Complaint, ¶¶ 79-81. Therefore, the gravamen of these claims is an alleged cover-up or censorship of information concerning COVID-19.  This is the kind of exercise of police power that the Supreme Court identified in *Nelson* as the gravamen of the suit.  It is extraneous to the alleged commercial activity identified by Plaintiff.

The direct-effect case on which Plaintiff relies, *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574 (7th Cir. 1989), *see* ECF No. 35, at 22-24, illustrates what constitutes a genuine substantive connection between "an act" and a commercial activity.  There, the Greek government executed a contract to reimburse health care providers for medical services performed on Greek nationals in Chicago; the direct effect resulted from Greece's failure to pay. *See* 877 F.2d at 575. "A contract between a foreign state and a private party for the purchase and sale of goods and services is presumptively commercial."  Fed. Judicial Center, *The Foreign Sovereign Immunities Act: A Guide for Judges* (2d ed. 2018) at 52.  Greece's failure to pay was obviously an act (or omission) substantively connected to that contract.  Here, however, the alleged acts forming the gravamen of Plaintiff's claims lack a substantive connection to an alleged commercial activity.

Another of the activities alleged by Plaintiff to be commercial was "research on viruses by the Wuhan Institute and Chinese Academy of Sciences."  Complaint, ¶ 40.  The Society has pointed out that this is not a commercial activity, no more than the research carried out by the National Institutes of Health is.  *See* ECF No. 34, at 7-8; ECF No. 42, at 9-10. Plaintiff does allege that the research was commercial, but as the Society has explained, in an FSIA case such an allegation is conclusory, apparently made because "commercial" is a legal conclusion necessary for subject-matter jurisdiction under the FSIA.  But scientific research into viruses is

13

not commercial, and no allegation has been made that injury has resulted from an alleged wrong committed in connection with a commercializing activity concerning COVID-19 by WIV or CAS.

Lastly, Plaintiff alleges that the Defendants engaged in "production, purchasing, and import and export of medical equipment . . . used in COVID-19 efforts."  Complaint, ¶ 40. Plaintiff does not allege specifically which of the Defendants, if any, have been engaged in such activity. It appears that Plaintiff attributes the activities of all Chinese entities, including private companies that make, buy and sell PPE, to the Chinese state itself. A U.S. court cannot disregard the juridically separate status of different state-owned persons from one another -- or, *a fortiori*, the juridically separate status of non-state-owned legal persons from the state and from other legal persons. *See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983); *Walters v. Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 298-99 (2d Cir. 2011). To the extent that Plaintiff's claim is based upon a ban on the export of PPE, such activity is an exercise of the state police power, is extraneous to any commercial activity that preceded it, and is immune. *See Nelson*, 507 U.S. at 359 (holding exercise of the state police power immune).

In sum, no exception to foreign sovereign immunity applies, and therefore subject-matter jurisdiction does not exist with respect to Plaintiff's claims. "[U]nder current U.S. law, there is no civil jurisdiction over China, or any Chinese governmental entity, for damages arising from China's governmental misconduct in concealing or failing to prevent the spread of COVID-19."[22]

Finally, in international law a state is responsible for the actions of its political subdivisions.  Thus, in international law the actions of the U.S. political subdivision, the State of

_____

[22] Testimony of Chimène Keitner to United States Senate Committee on the Judiciary, "The Foreign Sovereign Immunities Act, Coronavirus, and Addressing China's Culpability" (June 23, 2020), available at https://www.judiciary.senate.gov/imo/media/doc/Keitner%20Testimony.pdf.

Missouri, are attributable to the United States. It is a cardinal principle of international law that dispute settlement between states requires the consent of the states.[23]  To interpret the FSIA to permit a U.S. political subdivision such as the State of Missouri to sue a foreign state would violate this principle, because it would effectively allow litigation between the two states, the United States and China, without the state parties' consent. Having U.S. States sue piecemeal, one by one, does not somehow cause this principle not to be violated. To avoid violating international law, the FSIA should be interpreted not to permit suits by U.S. political subdivisions against foreign states, such as this suit.[24]  This is required under the longstanding *Charming Betsy* canon of construction, first set out in *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"). Thus, even if an exception to immunity were to apply (none does, for the reasons set out above and previously), suit by the Plaintiff here should still be barred.

## CONCLUSION

WHEREFORE, *Amicus Curiae*, The China Society of Private International Law, respectfully submits that the Court should dismiss this case *sua sponte* pursuant to Rule 12(h)(3).

---

[23] International claims "cannot, in the present state of the law as to international jurisdiction, be submitted to a tribunal, except with the consent of the States concerned." Reparation for Injuries, [1949] I.C.J.Rep. 174, 177-78 (Advisory Opinion), *quoted in* Reporters' Note 3, § 902, Restatement (Third) of the Foreign Relations Law of the United States.  *See id*., § 902.

[24] The legislative history of the FSIA makes clear that it was enacted for the benefit of private litigants. *See* H.R. Rep. 94-1487 (1976), *reprinted in* U.S. Code Cong. & Admin. News 6604, 6607 (before enactment of FSIA, "private litigant" dealing with legal dispute with foreign state was subject to "considerable uncertainty"); *id.* at 6622 (28 U.S.C. § 1608 designed "to insure that private persons have adequate means for commencing a suit against a foreign state to seek redress in the courts").

Respectfully submitted,

**THE CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW**
c/o International Law Institute of Wuhan University
Wuchang District
Wuhan, China 430072


**BROWN & JAMES, P.C.**

*/s/ Jackie M. Kinder*
Jackie M. Kinder, #52810MO
800 Market Street, Suite 1100
St. Louis, Missouri 63101-2501
314-421-3400 – Phone
314-421-3128 – Fax
jkinder@bjpc.com
*Local Counsel for The China Society of*
*Private International Law*


<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that a true and correct copy of the foregoing was sent via the Court's electronic filing system this <u>14th day of February, 2022</u>, to:

Justin D. Smith
Dean John Sauer
OFFICE OF THE ATTORNEY GENERAL
OF MISSOURI – Jefferson City
207 W. High St.
P.O. Box 899
Jefferson City, MO 65102-0899
573-751-3321
573-751-0774 (fax)
justin.smith@ago.mo.gov
john.sauer@ago.mo.gov
*Attorneys for Plaintiff*

Amy Collignon Gunn
THE SIMON LAW FIRM PC
800 Market Street
Suite 1700
St. Louis, MO 63101
314-241-2929
314-241-2029 (fax)
agunn@simonlawpc.com
*Attorneys for Amicus, Lawyers for Upholding*
*International Law*


*/s/ Jackie M. Kinder*

16