## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, | ) | |
| ex rel. ERIC S. SCHMITT, in his official | ) | |
| capacity as Missouri Attorney General, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-00099-SNLJ |
| | ) | |
| THE PEOPLE'S REPUBLIC OF CHINA, | ) | |
| THE COMMUNIST PARTY OF CHINA, | ) | |
| NATIONAL HEALTH COMMISSION | ) | |
| OF THE PEOPLE'S REPUBLIC OF | ) | |
| CHINA, MINISTRY OF EMERGENCY | ) | |
| MANAGEMENT OF THE PEOPLE'S | ) | |
| REPUBLIC OF CHINA, MINISTRY OF | ) | |
| CIVIL AFFAIRS OF THE PEOPLE'S | ) | |
| REPUBLIC OF CHINA, PEOPLE'S | ) | |
| GOVERNMENT OF HUBEI | ) | |
| PROVINCE, PEOPLE'S GOVERNMENT | ) | |
| OF WUHAN CITY, WUHAN INSTITUTE | ) | |
| OF VIROLOGY, and CHINESE | ) | |
| ACADEMY OF SCIENCES, | ) | |
| | ) | |
|     Defendants. | ) | |

## PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING SERVICE AND FSIA IMMUNITY IN RESPONSE TO THE COURT'S ORDER

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iv

STATEMENT OF FACTS ...................................................................................................... 1

   A.   Missouri Files its Lawsuit Seeking Truth and Accountability from China About the
Origins of the COVID-19 Pandemic........................................................................................ 1

   B.   China Unlawfully Thwarts Service Under the Hague Convention.................................... 3

   C.   Missouri Makes a Good-Faith Determination that CPC, CAS, and WIV Are Not "Foreign
States" and Seeks to Serve Them as Non-State Defendants......................................................... 4

      1.   The Communist Party of China is not a "foreign state." .......................................... 5

      2.   Publicly available information indicates that the Chinese Academy of Sciences is
not a "foreign state." ....................................................................................................... 8

      3.   Publicly available information indicates that the Wuhan Institution of Virology is
not a "foreign state." ....................................................................................................... 13

   D.   Missouri Obtains Leave to Serve CPC, CAS, and WIV by Email Under Rule 4(f)(3), and
Effects Service by That Method. ............................................................................................. 15

ARGUMENT ......................................................................................................................... 17

   I.   The Communist Party of China, the Chinese Academy of Sciences, and the Wuhan
Institute of Virology Are Not "Foreign States." ...................................................................... 18

     A. Legal Standards for "Political Subdivision" and "Agency or Instrumentality." .............. 18

     B. The Communist Party of China Is Not a "Foreign State.".................................................. 21

     C. The Chinese Academy of Sciences Is Not a "Foreign State." ........................................... 25

     D. The Wuhan Institute of Virology Is Not a "Foreign State." ............................................. 27

   II.   Missouri Properly Effected Service on the Communist Party of China, the Chinese
Academy of Sciences, and the Wuhan Institute of Virology..................................................... 29

     A. Missouri Fully Complied With the Court's Order Authorizing Email Service of CPC,
CAS, and WIV. ....................................................................................................................... 29

       1.   Missouri validly served CAS at its official email address. ...................................... 29

       2.   Missouri validly served WIV at its chief Directors' email addresses, which were
posted on WIV's website. ................................................................................................. 30

       3.   Missouri validly served the CPC by submitting the service packet to the "service
email" for the CPC's official communications organ..................................................... 30

       4.   Missouri's email service was reasonably calculated to provide actual notice to WIV
and CPC. .......................................................................................................................... 33

     B.   The Court Should Not Require "Strict Compliance," but "Substantial Compliance,"
With Service Requirements for CPC, CAS, and WIV....................................................... 34

C.    CPC, CAS, and WIV Were Properly Served Even If They Are "Agencies or Instrumentalities" of the PRC. ............................................................................... 35

III.    The Court Should Not Consider Facts Outside the Pleadings in Assessing Whether CPC, CAS, and WIV Are "Foreign States" for Jurisdictional or Service Purposes. ......................... 37

A.    The Court Should Consider Only the Facts Pleaded in the Complaint, and Missouri Had No Initial Burden to Plead or Prove Defendants' Foreign-State Status. ...................... 37

B.    If the Court Conducts Any Factual Inquiry, It Should Require, At Most, Only a *Prima Facie* Showing that CPC, CAS, and WIV Are Not Foreign States. ..................................... 41

C.    If the Court Conducts Any Factual Inquiry, It Should Authorize Missouri to Seek Third-Party Jurisdictional Discovery Relating to Any Disputed Facts. .............................. 43

D.    The Factual Information Submitted by Amici Is Not Subject to Judicial Notice. ..... 44

IV.    The FSIA's Exceptions Apply to Any Defendants Deemed To Be "Foreign States." ..... 46

A.    The Complaint Plausibly Alleges "Direct Effects" From Defendants' Acts. ............. 46

B.    Missouri's Claims Are "Based Upon" Acts Performed "In Connection With" Defendants' "Commercial Activities." ................................................................................... 48

C.    The Non-Commercial Activities Exception Applies to Missouri's Claims. ............. 50

CONCLUSION ................................................................................................................ 52

# **TABLE OF AUTHORITIES**

## Cases

*A.O.A. v. Rennert*,
　　350 F. Supp. 3d 818 (E.D. Mo. 2018).................................................................. 46

*Adler v. Federal Republic of Nigeria*,
　　107 F.3d 720 (9th Cir. 1997) ...................................................... 37, 38, 50

*Aldy on Behalf of Aldy v. Valmet Paper Mach.*,
　　74 F.3d 72 (5th Cir. 1996) .......................................................................... 48

*Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc.*,
　　183 F.3d 1277 (11th Cir. 1999) ................................................................... 43

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*,
　　138 S. Ct. 1865 (2018) ........................................................................ 45, 46

*Arriba Ltd. v. Petroleos Mexicanos*,
　　962 F.2d 528 (5th Cir. 1992) ...................................................................... 44

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
　　734 F.3d 1175 (D.C. Cir. 2013) ................................................................... 38

*Brewer v. Socialist People's Rep. of Iraq*,
　　890 F.2d 97 (8th Cir. 1989) ........................................................................ 38

*Broidy Capital Management, LLC v. Benomar*,
　　944 F.3d 436 (2d Cir. 2019)................................................................... 38, 39

*Conroy v. Aniskoff*,
　　507 U.S. 511 (1993)................................................................................. 52

*Dole Food Co. v. Patrickson*,
　　538 U.S. 468 (2001) ............................................................................ 21, 24

*Dumont v. Saskatchewan Gov't Ins. (SGI)*,
　　258 F.3d 880 (8th Cir. 2001) ...................................................................... 47

*Enahoro v. Abubakar*,
　　408 F.3d 877 (7th Cir. 2005) ................................................................. 38, 39

*Enter. Rent-A-Car Co. v. U-Haul Int'l, Inc.*,
　　327 F. Supp. 2d 1032 (E.D. Mo. 2004)......................................................... 45

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
   12 F.3d 1270 (3d Cir. 1993) ................................................................ 38

*Filler v. Hanvit Bank*,
   378 F.3d 213 (2d Cir. 2004) ........................................................ 20, 21

*Forsythe v. Saudi Arabian Airlines Corp.*,
   885 F.2d 285 (5th Cir. 1989) .............................................................. 38

*Garb v. Republic of Poland*,
   440 F.3d 579 (2d Cir. 2006) ........................................ 19, 22, 25, 28

*Gerding v. Republic of France*,
   943 F.2d 521 (4th Cir. 1991) .............................................................. 38

*Hernandez v. City of Vancouver*,
   277 F. App'x 666 (9th Cir. 2008) ...................................................... 42

*In re Aluminum Warehousing Antitrust Litig.*,
   2014 WL 4211353 ................................................................................ 43

*Janvey v. Libyan Inv. Auth.*,
   840 F.3d 248 (5th Cir. 2016) ...................................................... 20, 23

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
   213 F.3d 841 (5th Cir. 2000) ......................................... 19, 20, 41, 42, 43

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*,
   184 F. Supp. 2d 277 (S.D.N.Y. 2001) .............................................. 49

*Lyon v. Agusta S.P.A.*,
   252 F.3d 1078 (9th Cir. 2001) ........................................................... 48

*Magness v. Russian Fed'n*,
   247 F.3d 609 (5th Cir. 2001) ............................................................. 35

*McIvor v. Credit Control Servs., Inc.*,
   773 F.3d 909 (8th Cir. 2014) ...................................................... 44, 45

*Moran v. Kingdom of Saudi Arabia*,
   27 F.3d 169 (5th Cir. 1994) ............................................................... 41

*O'Bryan v. Holy See*,
   556 F.3d 361 (6th Cir. 2009) ............................................................. 38

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) .............................................................................. 52

*Orient Min. Co. v. Bank of China*,
  506 F.3d 980 (10th Cir. 2007) ........................................... 38

*Patrickson v. Dole Food Co.*,
  251 F.3d 795 (9th Cir. 2001) ................................. 20, 22, 25, 26, 27, 28

*Phoenix Consulting Inc. v. Republic of Angola*,
  216 F.3d 36 (D.C. Cir. 2000) ............................. 40, 41, 42, 44

*Prakash v. American University*,
  727 F.2d 1174 (D.C. Cir. 1984) ........................................... 42

*Qandah v. Johor Corp.*,
  799 F. App'x 353 (6th Cir. 2020) ........................................... 20

*Qatar v. First Abu Dhabi Bank PJSC*,
  432 F. Supp. 3d 401 (S.D.N.Y. 2020) ........................................... 43

*Rote v. Zel Custom Mfg. LLC*,
  816 F.3d 383 (6th Cir. 2016) ........................................... 47

*Rubin v. The Islamic Republic of Iran*,
  637 F.3d 783 (7th Cir. 2011) ........................................... 38, 40

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ........................................... 41

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
  30 F.3d 148 (D.C. Cir. 1994) ........................................... 35, 37

*United States v. Pangang Group Co., Ltd.*,
  6 F.4th (9th Cir. 2021) ................................. 21, 38, 39, 40, 42

*U.S. S.E.C. v. Shehyn*,
  No. 04 CIV 2003 (LAP), 2008 WL 6150322 (S.D.N.Y. Nov. 26, 2008) ........................................... 16, 33

*USX Corp. v. Adriatic Ins. Co.*,
  345 F.3d 190 (3d Cir. 2003) ................................. 20, 21, 27

*Velidor v. L/P/G Benghazi*,
  653 F.2d 812 (3d Cir. 1981) ........................................... 35

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) ........................................... 37

*Vermeulen v. Renault, U.S.A., Inc.*,
  985 F.2d 1534 (11th Cir. 1993) ........................................... 48

*Virtual Countries, Inc. v. Republic of S. Africa*,
    300 F.3d 230 (2d Cir. 2002) ............................................................... 38, 39

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006) ............................................................. 43

*Yessenin-Volpin v. Novosti Press Agency*,
    443 F. Supp. 849 (S.D.N.Y. 1978) ............................................................. 5, 6

*Zhang v. Baidu.com*,
    239 F.R.D. 508 (S.D.N.Y. 2013) ............................................................. 4

## Statutes

28 U.S.C. § 1603 ............................................................................................. 18

28 U.S.C. § 1603(a) ......................................................................................... 19

28 U.S.C. § 1603(b) .......................................................................... 19, 23, 26

28 U.S.C. § 1603(b)(2) ...................................... 19, 20, 21, 23, 26, 27, 29

28 U.S.C. § 1608(b)(3) .............................................................................. 35, 36

28 U.S.C. § 1605(a)(1) ...................................................................................... 44

28 U.S.C. § 1605(a)(5) .............................................................................. 50, 51

28 U.S.C. § 1608(a) ............................................................... 4, 17, 24, 35

28 U.S.C. § 1608(a)(2) ........................................................................................ 4

28 U.S.C. § 1608(b) ........................................................ 5, 24, 34, 35, 36

28 U.S.C. § 1608(b)(3)(C) ......................................................................... 35, 36

28 U.S.C. § 1609 ............................................................................................ 40

Article 5, Constitution ................................................................................... 6

Article 6, Constitution .................................................................................. 27

## Rules

Fed. R. Civ. P. 4(f)(3) ............................................................... 15, 16, 18, 36

Fed. R. Civ. P. 8(a)(2) ..................................................................................... 48

Fed. R. Evid. 201 ............................................................................................ 44

Rule 44.1 of the Federal Rules of Civil Procedure ................................................................. 45, 46

## Other Authorities

1976 U.S.C.C.A.N. at 6613 ......................................................................................................... 19

H.R. Rep. No. 94–1487.............................................................................................................. 19

Restatement (Fourth) of the Foreign Relations Law of the United States, § 451 ....................... 24

In its Order dated January 6, 2022, Doc. 47, the Court requested supplemental briefing on three questions: "(1) whether the Communist Party, CAS, and WIV fall under the FSIA definition of 'foreign state,' that is, whether each is a 'foreign state or political subdivision' or an 'agency or instrumentality' under the statute; (2) whether plaintiff properly effected service on the Communist Party, CAS, and WIV; and (3) whether an exception to foreign sovereign immunity applies." Doc. 47, at 3-4. The Court also requested briefing on what factual information, if any, the Court should consider in addressing these three questions. *Id.* at 7. In this supplemental brief, Missouri has attempted to provide a comprehensive response to these questions. If the Court, after reviewing the briefing, has any questions or doubts about any issues in the case, Missouri respectfully requests the opportunity to present oral argument before the Court.

## STATEMENT OF FACTS

### A.    Missouri Files its Lawsuit Seeking Truth and Accountability from China About the Origins of the COVID-19 Pandemic.

On April 21, 2021, Missouri filed this lawsuit against the People's Republic of China (PRC), the Communist Party of China (CPC), and seven other defendants, claiming that Defendants' misfeasance had unleashed the COVID-19 pandemic and ensured its spread to Missouri and the rest of the world. Doc. 1. Missouri claimed that the virus released from a lab operated by the Wuhan Institute of Virology, which is a research institute of the Chinese Academy of Sciences, *see id.* ¶¶ 52, 150-162; and that Defendants actively concealed the virus from the rest of the world during the critical initial stages of the outbreak, suppressing information about the virus's transmissibility while permitting millions of people to travel through Wuhan during Chinese New Year, sending the infection directly to the United States and the rest of the world, *see id.* ¶¶ 54-115. Missouri also claimed that, during the initial stages of the outbreak while Defendants were suppressing the outbreak's true nature, Defendants hoarded PPE by buying up

1

quality PPE from the United States and elsewhere, and exported only low-quality PPE in the United States and elsewhere, resulting in artificial PPE shortages that rendered critical equipment unavailable in treating the first waves of patients of the pandemic.  *Id.* ¶¶ 130-138.

Defendants immediately recognized this lawsuit's significance.  Once the lawsuit was filed, the PRC and CPC responded immediately with a P.R. campaign to attack and discredit the lawsuit. On April 22, 2020, the day after the lawsuit was filed, the PRC's Foreign Ministry issued a public statement attacking the lawsuit, describing it as "very absurd" and having "no factual or legal basis at all."  *See, e.g., China Calls virus Lawsuit Brought by US State 'Very Absurd'*, AP NEWS (April 22, 2020), *at* https://apnews.com/article/public-health-lawsuits-ap-top-news-michael-brown-virus-outbreak-0d28f84369c35ebcd9184b3a48cad0a1.    From April to August 2020, the Communist Party ran at least eight articles seeking to attack and discredit this lawsuit through its communications organ, the People's Daily, in the English-language online version alone—including two authored by "the President of the Chinese Society of International Law."[1]   The

---

[1] *See, e.g., US Lawsuits Against China Nothing But a Farce*, PEOPLE'S DAILY ONLINE (Aug. 5, 2020) ("On April 21, Republican-controlled Missouri became the first US state to file a lawsuit against China for 'spreading the novel coronavirus' across the world."); *Suing China Over COVID-19 Pandemic Would Be a "Huge Mistake": U.S. Senator*, PEOPLE'S DAILY ONLINE (Aug. 2, 2020) (quoting Senator Dianne Feinstein and noting that "[h]er comments came three months after Missouri Attorney General Eric Schmitt filed a lawsuit demanding that the Chinese Government take responsibility and make compensation for the global pandemic"); Huang Jin, *Lawsuits Filed in U.S. Courts Against China Over COVID-19 Violate International Law*, PEOPLE'S DAILY ONLINE (May 29, 2020) ("[T]he Attorney General for the State of Missouri field a lawsuit in the U.S. District Court for Eastern Missouri, demanding that the Chinese government take responsibility and make compensation for the global pandemic."); Huang Jin, *To Claim Compensation From China for COVID-19 Losses Has No Legal Basis*, PEOPLE'S DAILY ONLINE (May 29, 2020) ("Missouri Attorney General in April filed a lawsuit in US District Court for the Eastern District of Missouri….") (both noting that "Huang Jin is president of the Chinese Society of International Law"); *Suing China for COVID-19 Pandemic Unfair: Cambodian Scholar*, PEOPLE'S DAILY ONLINE (May 27, 2020) (discussing "the lawsuits filed by the U.S. states of Missouri and Mississippi last month blaming China for their losses during the COVID-19 outbreak"); *US-China Decoupling Unfeasible: US Expert*, PEOPLE'S DAILY ONLINE (May 4, 2020) ("Missouri became the first US state to file a lawsuit against China for its handling of the COVID-

People's Daily's affiliated tabloid, the Global Times, published at least another seven articles attacking this lawsuit in the same time.[2]

**B.    China Unlawfully Thwarts Service Under the Hague Convention.**

---

19 outbreak…"); *Commentary: Suing China for Pandemic Damage Is Nothing But Political Pandering*, PEOPLE'S DAILY ONLINE (April 30, 2020) ("Missouri Attorney General Eric Schmitt alleged that China lied about the dangers of the virus and did not do enough to slow its spread…."); *Commentary: US Shifting Blame to China Leads Nowhere*, PEOPLE'S DAILY ONLINE (April 27, 2020) ("Recently, attorney generals [*sic*] of the states of Missouri and Mississippi filed lawsuits against China, demanding it should take responsibilities and compensate losses incurred during the coronavirus outbreak.") (all visited Feb. 4, 2022) (all available at en.people.cn, by searching for "Missouri lawsuit" in the search text widget).

[2] *Missouri Lawsuit Against China Difficult to Bring Forward, a Political Move: Observers*, GLOBAL TIMES (April 22, 2020) ( describing this lawsuit as "[a] real-life political farce … Suing China [i]s part of a choreographed 'Blame China' campaign led by American hawks like Missouri Attorney General Eric Schmitt…"); Staff Editorial, *Missouri's Ridiculous Lawsuit Against China Impossible to Win*, GLOBAL TIMES (April 22, 2020) ("The US state of Missouri on Tuesday became the first US state to sue the Chinese government over its handling of COVID-19."); Mu Lu, *Ex-Colonialists Should Prepare for China's Counterpunch*, GLOBAL TIMES (April 22, 2020) (describing "Missouri Attorney General Eric Schmitt," because he filed this lawsuit, as one of "the ghosts of Western imperialists and colonialists who raided the world, burning and looting with guns and cannons," with a "pirate-style mentalitiy"); Staff Report, *US Lawsuit Against China a Political Scheme, 'No Chance to Win,'* GLOBAL TIMES (April 23, 2020) ("Missouri became the first US state to file a lawsuit against the Chinese government for its handling of the novel coronavirus pneumonia (COVID-19) outbreak…."); Chen Qingqing et al., *China Targets GOP Hawks, US Firms, States Over Lawsuits*, GLOBAL TIMES (May 14, 2020) (reporting that "China is considering punitive countermeasures against US individuals, entities and state officials, such as Missouri's attorney general Eric Schmitt, who filed a lawsuit against China, seeking compensation for the coronavirus pandemic"); Staff Editorial, *US Malicious Rhetoric Picking Quarrels Will Feel China Response*, GLOBAL TIMES (May 14, 2020) (calling for China to make "thorough investigations" of possible economic sanctions against "those individuals who file relevant lawsuits, such as Missouri's attorney general Eric Schmitt"); Zhao Huecheng et al., *Blackmailing China Over COVID-19 'Daydreaming': Chinese FM*, GLOBAL TIMES (May 24, 2020) (describing additional public comments on May 24, 2020, by the Chinese foreign minister Wang Yi criticizing "Missouri's attorney general Eric Schmitt, who filed a lawsuit against China seeking compensation for the coronavirus pandemic") (all available by searching for "Eric Schmitt" in the Search widget of www.globaltimes.cn); *see also, e.g.,* Global Times, Wikipedia.org, *at* https://en.wikipedia.org/wiki/Global_Times ("The *Global Times* is a daily tabloid newspaper under the auspices of the Chinese Communist Party's flagship *People's Daily* newspaper….").

To serve the lawsuit, Missouri was first required to go through the laborious and expensive process of attempting service under the Hague Convention. *See* 28 U.S.C. § 1608(a)(2); Doc. 19, at 2-4. Missouri's Hague Convention-compliant service packet was submitted to China's central authority on August 7, 2020. Doc. 19, at 1, 4. The PRC was obligated to take action within six months, as Article 15 of the Hague Convention permits a judge to enter default judgment if the foreign state's central authority does not respond within six months. *See* Article 15, *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters* (Nov. 15, 1965) ("Hague Convention"), at https://www.hcch.net/en/instruments/conventions/full-text/?cid=17. China's central authority waited almost six months – to February 1, 2021 – and then posted on its website a notice (without notifying Missouri's international process server) that it objected to service under Article 13 of the Hague Convention. Doc. 19, at 4.

This objection was frivolous. Article 13 of the Hague Convention provides that a signatory nation may object to service if the objecting nation believes that *the act of service* would violate its sovereignty. Hague Convention, art. 13. Objections to the *underlying lawsuit* are not a proper basis for an objection under Article 13. *See, e.g., Zhang v. Baidu.com*, 239 F.R.D. 508, 513 (S.D.N.Y. 2013) ("*Baidu II*"). Because China otherwise serves documents under the Hague Convention, China's objection to serving Missouri's lawsuit is an impermissible objection to "the lawsuit itself." *Baidu II*, 239 F.R.D. at 513.

### C.    Missouri Makes a Good-Faith Determination that CPC, CAS, and WIV Are Not "Foreign States" and Seeks to Serve Them as Non-State Defendants.

Missouri then sought the Court's leave to pursue alternative methods of service. Doc. 19, at 5-14. As to the PRC and its five political subdivisions, Missouri served those six Defendants through diplomatic channels under 28 U.S.C. § 1608(a). Docs. 36-41. "[T]he record reflects proof of service on those six defendants." Doc. 47, at 3. No one has questioned the validity of these.

4

As to CPC, CAS, and WIV, Missouri was required to make a preliminary determination, based on publicly available information, as to whether CPC, CAS, and WIV were "agencies or instrumentalities" of a foreign state.  *Compare* 28 U.S.C. § 1608(b) *with* Rule 4(f).  Accordingly, Missouri made a good-faith determination that they are *not* "political subdivisions" or "agencies or instrumentalities" of the Chinese state.  Because the Court has called on Missouri to justify its actions in serving process, and because the Court is weighing whether to consider such publicly available information in its jurisdictional and service determinations in any event, Missouri recounts some of that publicly available information in some detail here.[3]

### 1.    The Communist Party of China is not a "foreign state."

***Communist Party of China.***   As an initial matter, the CPC and the PRC are historically distinct entities.  The CPC preceded the PRC—the CPC was founded in 1921, while the PRC was created in 1949.  *See* U.S. State Dep't, Office of the Historian, *The Chinese Revolution of 1949*, *at* https://history.state.gov/milestones/1945-1952/chinese-rev.  As both an ideological principle and a matter of Chinese fundamental law, the PRC and CPC insist that they are separate entities from one another.  The PRC is the state, and the CPC is a political party that leads the state.

The Constitutions for both the People's Republic of China and the Communist Party of China emphasize the distinction between the two entities.  The Constitution of the PRC states

---

[3] In doing so, Missouri has relied in large part on sources showing how *China itself* characterizes these entities, both in Chinese fundamental law and in the entities' own self-descriptions that they hold out to the world.  Missouri acknowledges that the People's Republic of China is a totalitarian, Communist state, and that practical reality in such states often varies from these legal characterizations and public-facing self-descriptions.  But U.S. courts have emphasized such sources in making jurisdictional determinations as to entities in Communist states—as the China Society concedes.  *See, e.g.,* Doc. 42, at 2 (citing *Yessenin-Volpin v. Novosti Press Agency*, 443 F. Supp. 849 (S.D.N.Y. 1978)); *see also Yessenin-Volpin*, 443 F. Supp. at 853-54 (looking to Soviet law, Soviet statutes, and the Soviet entity's self-description and "stated purposes" to assess whether Novosti was an "agency or instrumentality" of the U.S.S.R.).

multiple times that the CPC is subject to the Constitution and laws of the PRC.  "The Constitution … is the fundamental law of the State and has supreme legal authority.  The people of all nationalities, all state organs, the armed forces, *all political parties* and public organizations and all enterprises and institutions in the country must take the Constitution as the basic standard of conduct."  *Preamble*, Constitution of the People's Republic of China, *at* npc.gov.cn (emphasis added).  "All State organs, the armed forces, *all political parties* and public organizations and all enterprises and institutions must abide by the Constitution and other laws…. No organization or individual is privileged to be beyond the Constitution or other laws."  Article 5, Constitution of the People's Republic of China (emphasis added).  The PRC's Constitution states that the Communist revolution was achieved "under the leadership of the Communist Party of China," but it emphasizes that the PRC was founded by the people and is distinct from the CPC: ""the Chinese people of all nationalities led by the Communist party of China … founded the People's Republic of China."  *Preamble*, Constitution of the People's Republic of China.  The PRC's Constitution states that China has a multi-party system in which the CPC is the dominant party: "The system of multi-party cooperation and political consultation led by the Communist Party of China will exist and develop for a long time to come."  *Id.*

The Constitution of the Communist Party of China, likewise, provides that the CPC is a separate and distinct entity from the PRC, with entirely different membership and organization. *See* Constitution of the Communist Party of China (revised Oct. 24, 2017), *at* http://news.xinhuanet.com/english/download/Constitution_of_the_ Communist_Party_of_China.pdf.  The preamble of the CPC's Constitution distinguishes the Party from the People's Republic of China, claiming that the Party "led the Chinese people of all ethnic groups" in revolutionary struggle and "founding the People's Republic of China, a people's

6

democratic dictatorship." *Id.* at 1. The CPC's Constitution emphasizes that it has its own distinct membership and organization: "The Party is an integral body organized under its own program and Constitution and on the basis of democratic centralism." *Id.* at 14 (ch. 2, art. 10). And the CPC's Constitution acknowledges that the CPC, like other Chinese organizations, is subject to the Constitution and laws of the PRC: "The Party must act within the scope of the country's Constitution and the law." Id. at 10 (pmbl.).

Consistent with both these Constitutions, the PRC insists that China is a multi-party state with at least nine political parties. "China is a country of many political parties. Apart from the CPC, which is in power, China has eight non-Communist parties." *Political Parties and Social Organizations*, Ministry of Foreign Affairs of the People's Republic of China, https://www.fmprc.gov.cn/mfa_eng/ljzg_665465/zgjk_665467/3579_665483/t17851.-shtml. This is consistent with the PRC's Constitution, which affirms that China has a "system of multi-party cooperation and political consultation led by the Communist Party of China." *Preamble*, Constitution of the People's Republic of China. And the PRC's Constitution insists that it is the supreme law, governing the CPC and all other parties, as noted above.

Thus, as a formal legal matter and as an ideological principle, both the PRC and the Communist Party affirmatively maintain that the CPC is separate and distinct from the PRC, *i.e.*, not an organ or agency of the People's Republic of China. To be sure, Missouri acknowledges that China is a totalitarian state largely under the *de facto* control of the CPC, and the CPC exercises a substantial degree of domination, direction, and control over the PRC and other entities in China. *See* Doc. 1, ¶ 20. The precise nature and degree of such control, however, are facts that would have to be found through jurisdictional discovery. But, as discussed further below, *de facto*

7

control is not the test for whether an entity is an "agency or instrumentality" of that state.  In fact, the U.S. Supreme Court has explicitly rejected "control" as the statutory test.  *See infra*, Part I.

        **2.**       **Publicly available information indicates that the Chinese Academy of Sciences is not a "foreign state."**

*Chinese Academy of Sciences.*  The Chinese Academy of Sciences is not the Chinese government agency with authority over science and technology policy; on the contrary, that entity is the PRC's Ministry of Science and Technology.  *See, e.g.*, Ministry of Science and Technology (China), https://en.wikipedia.org/wiki/Ministry_of_Science_and_Technology_(China).  "The Ministry of Science and Technology of the People's Republic of China, formerly the State Science and Technology Commission, is the central government ministry which coordinates science and technology activities in the country."  *Id.*; *see generally* most.gov.cn/eng/.

Instead, as its name suggests, the Chinese *Academy* of Sciences was consciously modeled after well-established Western national academies of science, which are independent, non-governmental institutions.  These include the USA's National Academy of Sciences (http://www.nasonline.org/) ("The National Academy of Sciences (NAS) is a *private*, nonprofit organization of the country's leading researchers."); the USA's National Academy of Engineering (https://www.nae.edu/19580/About) ("[T]he National Academy of Engineering (NAE) is a *private, independent*, nonprofit institution…."); the USA's National Academy of Medicine (nam.edu/about) ("[T]he National Academies are *private*, nonprofit institutions that work *outside of government* to provide objective advice…."); The Royal Society of Great Britain (https://royalsociety.org/) ("We are an *independent* scientific academy of the UK and the Commonwealth…."); and the Max Planck Society of Germany (https://en.wikipedia.org/wiki/Max_Planck_Society) ("a *formally independent non-governmental* and non-profit association of German research institutes.") (all emphases added).

8

CAS is structured just like these national science academies, holds itself out as performing the same roles as these academies, and is designed to be directly analogous to them. *See generally* Chinese Academy of Sciences, https://en.wikipedia.org/wiki/Chinese_Academy_of_Sciences. Just like those Western national academies of science, the CAS has a voting membership of academics who are leading experts in their fields, *id.*; and just like the Western national academies, "[m]embership of the Chinese Academy of Sciences … is a lifelong honor given to Chinese scientists who have made significant achievements in various fields." *Id.*; *see also* Chinese Academy of Sciences, About Us, *at* english.cas.cn ("CAS membership is the highest academic accolade in the field of science and technology in China.").

On its own website, the Chinese Academy of Sciences touts, as its principal functions, two non-state, non-governmental roles—*i.e.*, the role of a national academy of scientists, and the role of a commercial incubator of science and technology start-up companies. *See* About Us, Chinese Academy of Sciences, *at* english.cas.cn. As to the first role, CAS's website emphasizes three non-governmental functions: (1) performing original scientific research, *id.* ("History of Achievement," "Research Strength"); (2) developing scientific talent for the academy through recruitment and education of high-quality young scientists, *id.* ("Emphasis on Talent"); and (3) conducting research partnerships with private, non-governmental Western research institutes, *id.* ("International Collaboration"). All three of these functions are analogous to the functions performed by private, non-governmental Western science academies.

Moreover, CAS adds a fourth function, which is even less governmental in nature: (4) that of a technology business incubator and seed-level investor that aims to commercialize research into new technologies. CAS's website boasts that it "aims to further promote innovation and try to turn scientific discoveries into technologies that power economic growth and sustainable

9

development." *Id.*  CAS "aims to improve the quality of research by supporting risky and long-term projects and encouraging scientists to study the frontiers of knowledge." *Id.*  According to its website, CAS performs this high-risk-investment role on a truly massive scale.  CAS has "established science parks … to turn basic research into marketable technologies, especially in the areas of information technology, space science, renewable energy and health." *Id.*  "CAS has strengthened ties with the industrial sector to conduct joint research and commercialize discoveries…" *Id.*  CAS "has established 39 technology transfer or incubation centres and over 250 join research entities.  CAS has reached 10,538 technology transfer contracts…  In 2014 alone, over 700 CAS spin-off companies have grossed about RMB 350 billion (US$56 billion)." *Id.*

In this business-incubator role, CAS "has … created hundreds of commercial enterprises, Lenovo being one of the most famous."  Chinese Academy of Sciences, https://en.wikipedia.org/wiki/Chinese_Academy_of_Sciences.  In fact, when the CAS founded the technology giant Lenovo—the world's largest personal computer vendor—Lenovo was initially called "the *Chinese Academy of Sciences* Computer Technology Research Institute New Technology Development Company."  *See* Lenovo, https://en.wikipedia.org/wiki/Lenovo (emphasis added).  And Lenovo is just the tip of the iceberg: "CAS has invested in or created over 430 science- and technology-based enterprises in eleven industries."  Chinese Academy of Sciences, https://en.wikipedia.org/wiki/Chinese_Academy_of_Sciences.

CAS's website repeatedly describes itself as a "think tank," which is a phrase intended to emphasize CAS's independence from the Chinese government.  *See* Chinese Academy of Sciences, About Us, *at* english.cas.cn (describing CAS as "*a think tank* delivering S&T advice and a community for training young S&T talent."); *id.* ("Since then [i.e. 1956], it has participated in the preparation of all national S&T development plans, serving as a national *think tank*."); *id.*

10

("These divisions function as a national scientific *think tank* in partnership with the whole academy."). CAS touts its "think tank" role as an independent advisor of both governmental and non-governmental entities alike: "Members provide advice to the government and society on major issues concerning China's economy, social development and S&T progress." *Id.*

Like Western national scientific academies, the Chinese Academy of Sciences holds itself out as modeling objectivity and independence from government, particularly in the current era under President Xi Jinping. Notably, CAS heavily emphasized its independence and non-governmental nature in a 2016 article drafted by three members of CAS's Institute of Policy and Management. *See* Xiaoxuan Li et al., *Scientific Advice in China: the Changing Role of the Chinese Academy of Sciences*, PALGRAVE COMMUNICATIONS (July 12, 2016), *at* https://www.nature.com/articles/palcomms201645. The article noted that, when it was founded in 1949, CAS initially performed governmental functions by "perform[ing] as the administrative organ of national science and technology," id. at 2, but that CAS has not performed that governmental role since the late 1950s, to ensure its independence from the government. *Id.* at 3 ("As the administrative function of CAS had seriously affected its construction as national scientific research center, CAS had no longer undertaken the function as national science and technology administration since 1950s….").

In the same article, CAS emphasized that, since 2012, the Xi government has placed great importance on protecting the independence of CAS from the Chinese state. *Id.* at 4-6. "[T]he new government Xi Jinping has … encourag[ed] involvement of various *non-government* forces in governance… [T]he central government extremely advocates the construction of 'science and technology think tanks,' identifying 25 high-quality think tanks as pilot units in December, 2015." *Id.* at 4 (emphasis added). CAS was one of the "25 high-quality think tanks," *i.e.*, a "non-

11

government force[]." *Id.* These "high-quality think tanks" are "third-party organizations," separate from the government: "The central government states that it should decentralize its administrative authority and invite third-party organizations to evaluate the effect of its policies and measures." *Id.* at 5. CAS emphasizes that its role as third-party advisor is distinct and separate from a governmental role: "In contrast to the previous performance assessments of government department's programs … , this assessment project was conducted by an independent third party, CAS, which could perform with a relatively objective perspective to assess the performance of government…" *Id.*

Just like the National Academy of Sciences and the Royal Society, CAS emphasizes its independence and objectivity: "As one of the critical measures taken by the central government to promote the reform of government management system, the third-party evaluation plays an important role to push the construction of a sound supervision mechanism of government, which requires the third party must be *objective and scientific*…. As the third party, CAS can play a relatively objective role in assessment of the performance of" government programs. *Id.* at 6 (emphasis added). Indeed, CAS explicitly likens itself and its internal organization to the USA's National Academy of Sciences and the UK's Royal Society, both of which are independent, non-governmental science academies as discussed above. *See id.*

In short, according to CAS's own authors, the dominant feature of CAS in the Xi era is *independence* from the government. CAS holds itself out as a "third-party organization," and an independent "think tank" that provides advice to governmental and non-governmental bodies, just like Western national academies. *Id.* at 7.[4]

---

[4] To be sure, CAS's expressions of "independence" must be taken with some skepticism, since China is a totalitarian state and the Communist Party undoubtedly exercises some degree of control over CAS—as Missouri alleges actually occurred in this case. *See* Doc. 1, ¶ 20. But

### 3.    Publicly available information indicates that the Wuhan Institution of Virology is not a "foreign state."

***Wuhan Institute of Virology.***  WIV holds itself out, not as an independent entity, but as a department or institute within CAS.  *See* Wuhan Institute of Virology, *at* whiov.cas.cn (WIV describing itself as "Wuhan Institute of Virology, CAS" and "Wuhan Institute of Virology, Chinese Academy of Sciences").  Consistent with this, WIV is listed as a "research institute" of the CAS on Wikipedia.  https://en.wikipedia.org/wiki/Chinese_Academy_of_Sciences.  WIV likewise describes itself as a "research institute" of CAS on its website, stating that in 1999, it "successfully passed classification and positioning of Chinese Academy of Sciences, [and] was included in the high-tech research and development-base type *research institute*."  Wuhan Institute of Virology, About WIV, *at* english.whiov.cas.cn (emphasis added).  According to its website, WIV was founded within the CAS and initially served as a "branch" of CAS, was transferred to the Hubei province in 1970, and then in 1978 "returned to the Chinese Academy of Sciences, known as Wuhan Institute of Virology, Chinese Academy of Sciences."  *Id.*  Because WIV is a "branch" of CAS, which is not a "foreign state," WIV likewise is not a "foreign state."

WIV's self-identified principal function is non-governmental, *i.e.*, to perform basic scientific research on viruses – "insect virus, animal virus, molecular virus, virus classification preservation, environmental microbes, fermentation microorganisms and microbial sensors."  Wuhan Institute of Virology, About WIV, *at* english.whiov.cas.cn.  Like CAS, WIV's website indicates that its research is oriented on commercializing scientific discoveries, especially in the health fields.  *See id.* (describing WIV's focus on "researches of HIV, influenza virus, hepatitis virus, tumor virus and zoonotic virus and virus replication and antiviral drugs").  WIV "focuses

---

control *by the Party* does not render CAS an agency or instrumentality of the *PRC*, since the Party is distinct from the PRC, *see supra*; and "control" is not the relevant legal test.  *Infra*, Part I.

on basic and applied basic research in virology, immunology, *emerging biotechnology*, etc." *Id.* (emphasis added). WIV states that it "strives to make breakthroughs in *cutting-edge scientific research* on pathogens of emerging infectious diseases, to markedly improve its capacity of *technological innovation*, system integration and *technology transfer*…" *Id.* (emphases added).

Publicly available sources indicate that WIV's ultra-hazardous scientific research on coronaviruses—the conduct at issue in this case—was part of a commercial enterprise. For example, the Complaint cites an article from April 15, 2020, entitled "Sources believe coronavirus outbreak originated in Wuhan lab as part of China's efforts to compete with US." Doc. 1, ¶ 52, n.8 (citing *Sources Believe Coronavirus Outbreak Originated in Wuhan lab as Part of China's Efforts to Compete with US*, Fox News (Apr. 15, 2020), https://www.foxnews.com/politics/coronavirus-wuhan-lab-china-compete-us-sources). Notably, in the earliest stages of the pandemic, WIV raced to file patents on scientific research behind coronavirus treatments, to ensure it could profit from the pandemic. "In January 2020, Chinese researchers at the Wuhan Institute of Virology filed for a patent covering the use of remdesivir, an experimental antiviral drug, to treat COVID-19." Enrico Benadio, et al., *COVID-19, Patents and the Never-Ending Tension between Proprietary Rights and the Protection of Public Health* (Cambridge University Press April 11, 2020), *at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7156563/; *see also Wuhan Institute of Virology Applies for a Patent on Gilead's Remdesivir*, National Law Review (Feb. 6, 2020), *at* https://www.natlawreview.com/article/wuhan-institute-virology-applies-patent-gilead-s-remdesivir.

WIV "filed the remdesivir usage patent on Jan. 21, [2020]." Y. Roulin, *Wuhan's Much-Maligned Virology Institute Seeks Patent on US Drug*, Sixth Tone (Feb. 11, 2020), *at*

http://www.sixthtone.com/news/1005169/wuhans-much-maligned-virology-institute-seeks-

patent-on-us-drug.  WIV filed the patent the *day after* Chinese authorities first admitted human-

to-human transmission was occurring.  *See* Doc. 1, ¶ 109.  Critical observers "view[ed] the

virology institute's move as a *callous cash grab* after it failed to warn and protect the people of

Wuhan."  Roulin, *supra* (emphasis added).  At the first moment of outbreak, WIV immediately

focused on the *commercial opportunities* of the pandemic: "Given the scale of the COVID-19

pandemic, one would expect a virology institute located at its original epicentre to devote its

resources and energy to containing the spread of the underlying virus, or perhaps to researching

new therapies and vaccines – not to patenting (supposedly new) uses for drugs it neither developed

nor tested."  Benadio, *supra*.  WIV's conduct has been described as a "patent race" with American

companies that also held intellectual property rights.  Thomas Moga, *The Curious Case of Wuhan's*

*Institute of Virology and remdesivir*, LIFE SCIENCES INTELLECTUAL PROPERTY REVIEW (April 20,

2020), *at* https://www.lifesciencesipreview.com/article/the-curious-case-of-wuhan-s-institute-of-

virology-and-remdesivir.

### D.    Missouri Obtains Leave to Serve CPC, CAS, and WIV by Email Under Rule 4(f)(3), and Effects Service by That Method.

After China blocked service under the Hague Convention, Missouri sought leave to effect

service by email under Rule 4(f)(3), which authorizes service "by other means not prohibited by

international agreement, as the court orders."  Fed. R. Civ. P. 4(f)(3).  Service by email has at least

one significant downside, however—it can be easy to block, especially if the Defendant knows it

is coming.  Email accounts can be set to reject email from disapproved senders.

On March 8, 2021, Missouri filed a motion seeking this Court's leave to serve CPC, CAS,

and WIV by email.  Doc. 19.  Missouri noted that "[o]ne factor in considering whether due process

is satisfied is whether a defendant served by alternative means *possesses some knowledge of the*

15

*pending lawsuit against her.*" *Id.* at 8 (emphasis added) (quoting *U.S. S.E.C. v. Shehyn*, No. 04 CIV 2003 (LAP), 2008 WL 6150322, at *3 (S.D.N.Y. Nov. 26, 2008)).  Here, there was no doubt that Defendants already "possesse[d] some knowledge of the pending lawsuit against" them, *id.*, since (1) China's foreign ministry made a public statement attacking the lawsuit the day after it was filed, (2) the CPC had run at least fifteen articles attacking the lawsuit in its communications organs, (3) China's central authority had received and reviewed Missouri's Hague Convention service packet, which translated included summons and complaints for all nine Defendants, and (4) the lawsuit had been widely discussed in Chinese, international, and social media for months.

Missouri "request[ed] authority to serve the non-governmental defendants Communist Party of China, Chinese Academy of Sciences, and Wuhan Institute of Virology by the simple expedient of emailing them copies of the translated service packets … *to publicly available email addresses for those defendants.*"  Doc. 19, at 9 (emphasis added); *see also id.* at 13.  Missouri did not claim that there was only one, official email address on one website for each Defendant.  *Id.*

On May 11, 2021, the Court granted Missouri's motion for leave to pursue service by email under Rule 4(f)(3).  Doc. 22.  The Court ordered that "plaintiff may serve defendants the Communist Party of China, the Wuhan Institute of Virology, and the Chinese Academy of Sciences by providing translations into simplified Chinese of the Complaint and Summons by email at *publicly available email addresses provided by those organizations.*"  Doc. 22, at 7.

On May 18, 2021, Missouri effected service by email pursuant to the Court's Order.  Doc. 23.  Unsurprisingly, some of Missouri's initial attempts to serve CPC and WIV were blocked by rejection notices from email addresses for those organizations.  *See* Doc. 23, at 2, 3.  But Missouri identified multiple email addresses for each organization on websites maintained by those organizations.  *See id.* at 2-4.  In particular, Missouri successfully emailed the service packet to

the Chinese Academy of Sciences at cas_en@cas.cn, "which is identified on the website of the Chinese Academy of Sciences as the contact email for the Academy." *Id.* at 2-3.  Missouri successfully emailed the service packet for WIV to the Director General and the three Deputy Directors General of WIV—the four most senior leadership positions at WIV—at the email addresses for those directors that were posted on WIV's own website.  *Id.* at 3 (noting that the email addresses for WIV's directors were posted on WIV's own website, www.whiov.cas.cn). And Missouri successfully emailed the service packet for the CPC to kf@people.cn, which was listed as the "service email" on the website of the People's Daily, which is a department within the Communist Party of China and the official communications organ of the CPC's top leadership.  *Id.* at 2.  In its proof of service filed on March 18, 2021, Missouri noted that the People's Daily is "the official newspaper of the Central Committee of the Communist Party of China," that the People's Daily's website identifies itself as "an organ newspaper of the Central Committee of the Communist Party of China," and that "the People's Daily is widely recognized as an official communications organ and mouthpiece of the Communist Party of China." *Id.*

In its proof of service filed on May 18, 2021, Missouri described its process of service in detail, seeking to be fully transparent with the Court.  Doc. 23.  Missouri noted that it had been forced to make multiple attempts to serve CPC and WIV after its initial attempts were blocked by rejection notices, and Missouri specifically identified and described each email address at which service had been effected.  *See id.* at 2-4.

## ARGUMENT

As an initial matter, Missouri emphasizes that six of the nine Defendants, including the People's Republic of China itself and five political subdivisions, were validly served through diplomatic channels under 28 U.S.C. § 1608(a) on October 7, 2021.  Docs. 36-41.  As the Court

notes, "[t]he record reflects proof of service on those six defendants." Doc. 47, at 3. No question has been raised by the Court or any *amicus curiae* about the validity of service on those six Defendants. All six defaulted, and the Clerk of the Court correctly entered defaults against them on December 15, 2021. Doc. 45. And, for the reasons discussed below, *see infra* Part III, Missouri's claims against them fall within well-established FSIA exceptions under §§ 1605(a)(2) and (a)(5). Regardless of the Court's conclusions regarding the status or service of CPC, WIV, and CAS, the case against these six Defendants should be allowed to proceed.

**I.   The Communist Party of China, the Chinese Academy of Sciences, and the Wuhan Institute of Virology Are Not "Foreign States."**

For the reasons stated below, *see infra* Part III, the Court should not consider facts outside the pleadings, at this stage of the case. But even if the Court considers all the facts that both Missouri and China's supporting *amici* have submitted, the Court should still conclude that CPC, CAS, and WIV are not "foreign states," that they are not cloaked with FSIA immunity, and that they were properly served under Rule 4(f)(3). All the facts submitted to the Court to date point in the same direction—these entities are not "foreign states."

**A.   Legal Standards for "Political Subdivision" and "Agency or Instrumentality."**

As relevant here, 28 U.S.C. § 1603 provides:

(a) A "foreign state", except as used in section 1608 of this title, includes a ***political subdivision of a foreign state or an agency or instrumentality of a foreign state*** as defined in subsection (b).

(b) An "agency or instrumentality of a foreign state" means any entity—
    (1) which is a separate legal person, corporate or otherwise, and
    (2) which is an ***organ of a foreign state*** or political subdivision thereof, or ***a majority of whose shares or other ownership interest is owned by a foreign state*** or political subdivision thereof, and
    (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(a), (b) (emphases added).  Here, subparagraphs (1) and (3) are not in dispute, as *amici* concede that CPC, CAS, and WIV are "separate legal person[s]" from the PRC, at least as a formal matter, and no one contends that they are citizens of the United States or were created under the laws any third country.  Thus, a defendant such as CPC, CAS, or WIV is a "foreign state" only if: (1) it is a "***political subdivision***" of the PRC; or it is an "***agency or instrumentality***" of the PRC, established in one of two ways: (2) if it is an "***organ***" of the PRC or of one of its political subdivisions, or (3) if "***a majority of [its] shares or other ownership interest*** is owned by a foreign state or political subdivision thereof."  *Id.* (emphases added).

  ***Political subdivision.*** According to Black's Law Dictionary, a "political subdivision" is "[a] division of a state that exists primarily to discharge some function of local government." BLACK'S LAW DICTIONARY 1197 (4th ed. 2008).  "Political subdivisions" include constituent sub-units of local government, such as municipal or regional governments.  *See id.*  Thus, under the FSIA, "[t]he term 'political subdivisions' includes all governmental units beneath the central government, including local governments*." Garb v. Republic of Poland*, 440 F.3d 579, 596 (2d Cir. 2006) (quoting H.R. Rep. No. 94–1487, at 15, reprinted in 1976 U.S.C.C.A.N. at 6613).

  ***Organ.*** "Most cases have determined § 1603(b)(2) agency/instrumentality status using the 'ownership,' rather than the 'organ,' prong." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846 (5th Cir. 2000).  The FSIA does not define "organ."  *See* 28 U.S.C. § 1603(b). Neither does Black's Law Dictionary.  Webster's Third defines an "organ" as an "instrumentality." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1589 (2002) (defining "organ" as "an instrumentality exercising some function or accomplishing some end … *specif.* a governmental instrumentality operating as a part of a larger organization"); *see also, e.g., Organ*, Merriam-Webster Online (visited Feb. 3, 2022), *at* https://www.merriam-webster.com/dictionary/organ

(defining "organ" as "a subordinate group or organization that performs specialized functions," as in "the various *organs* of government").

Courts have struggled to define the word "organ." "[T]here is no 'clear test' for determining agency or instrumentality status under the § 1603(b)(2) 'organ' prong." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 847 (5th Cir. 2000). There are three overlapping multi-factor tests. The Second, Fifth, and Sixth Circuits consider "(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law." *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 259 (5th Cir. 2016); *see also Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004); *Qandah v. Johor Corp.*, 799 F. App'x 353, 358 (6th Cir. 2020). The Ninth Circuit considers "[1] the circumstances surrounding the entity's creation, [2] the purpose of its activities, [3] its independence from the government, [4] the level of government financial support, [5] its employment policies, and [6] its obligations and privileges under state law." *Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir. 2001). The Third Circuit considers "(1) the circumstances surrounding the entity's creation; (2) the purpose of its activities; (3) the degree of supervision by the government; (4) the level of government financial support; (5) the entity's employment policies, particularly regarding whether the foreign state requires the hiring of public employees and pays their salaries; and (6) the entity's obligations and privileges under the foreign state's laws," as well as "(7) the ownership structure of the entity." *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3d Cir. 2003).

In applying these factors, the Courts of Appeals have relied on more specific considerations as well. For example, (1) if an entity's "activities … have been predominantly (or entirely)

commercial," that weighs against a finding that it is an "organ." *USX Corp.*, 345 F.3d at 209. By contrast, (2) an entity that "performs functions traditionally performed by the government" is more likely to constitute an "organ." *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004).

*Majority ownership by the foreign state.* A foreign entity is an "agency or instrumentality" if "a majority of [its] shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). Importantly, "control" by a foreign state does *not* make something an "agency or instrumentality" of that foreign state. The Supreme Court has "explicitly rejected the proposition that, 'in determining instrumentality status under the [FSIA], control may be substituted for an ownership interest.'" *Pangang*, 6 F.4th at 958 (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2001)). In *Dole Food*, indirectly owned subsidiaries of Israel represented that Israel "exercised considerable control over their operations." *Dole Food*, 538 U.S. at 477. They argued that, "in determining instrumentality status under the Act, control may be substituted for an ownership interest." *Id.* The Supreme Court rejected this argument, noting that "[c]ontrol and ownership … are distinct concepts." *Id.* "Majority ownership by a foreign state, not control, is the benchmark of instrumentality status." *Id.* "The statutory language will not support a control test that mandates inquiry in every case into the past details of a foreign nation's relation to a corporate entity in which it does not own a majority of the shares." *Id.*

## B.    The Communist Party of China Is Not a "Foreign State."

The CPC is not a "foreign state" under any of these definitions. In fact, if one looks at the plain language of the statute, this is not a close question. By the PRC's and CPC's own accounts, the Communist Party lies *outside* the state, it is *independent* from the state, and it exercises *control* over the state or at least many state functions. It is not the state itself, and it is not subordinate to the state. But all the words in the statute—"political subdivision," "agency," "instrumentality," and "organ"—refer to entities that are *subordinate* to the foreign state. *See, e.g.,* BLACK'S LAW

DICTIONARY 1197 (4th ed. 2008) (defining "political subdivision" as "[a] division of a state that exists primarily to discharge some function of local government"); *id.* at 67 (defining "agency" as "[a] governmental body with the authority to implement and administer particular legislation"); *id.* at 814 (defining "instrumentality" as "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body"); WEBSTER'S THIRD, at 1589 (defining "organ" as "an instrumentality exercising some function or accomplishing some end … *specif.* a governmental instrumentality operating as a part of a larger organization"); *Organ*, Merriam-Webster   Online   (visited   Feb.   3,   2022),   *at*   https://www.merriam-webster.com/dictionary/organ (defining "organ" as "a *subordinate* group or organization that performs specialized functions," as in "the various *organs* of government") (first emphasis added). The Communist Party, which founded and largely controls the PRC, is not a subordinate "subdivision," "organ," "agency," or "instrumentality" of the PRC.

Not only does the CPC fail to fit within any of the plain meaning of these terms, it also does not fit within the standards in the case law.  *First*, it is not a "political subdivision" of the PRC.  "The term 'political subdivisions' includes all governmental units beneath the central government, including local governments*."  Garb*, 440 F.3d at 596.  The PRC is not a "governmental unit beneath the central government," and it is not a "local government."[5]

*Second*, the Party is not an "organ" of the PRC.  The China Society agrees with this point, admitting that it "does not contend that the CPC should necessarily be categorized as an 'agency

---

[5] The China Society, having contended in its first *amicus* brief that the CPC is an "agency or instrumentality," abandons that position in its second *amicus* brief, and shifts its position to contend that the CPC is a "political subdivision."  Doc. 42, at n.5.  But the China Society cites no authority to support this argument.  *See id.*  If anything, "political subdivision" is an even worse fit for the CPC than "agency or instrumentality."  *See Garb*, 440 F.3d at 596.

or instrumentality of a foreign state.'" Doc. 42, at 4.n.5. Applying *Janvey*'s multi-factor test, all factors weigh against finding an "organ," and the result would be the same with the other tests.

First, (1) it is not true that "the foreign state created the [CPC] for a national purpose," *Janvey*, 840 F.3d at 259, because the CPC predates the PRC, and the CPC created the PRC, not vice versa. Second, (2) it is not true that "the foreign state actively supervises [the CPC]," *id.*, because, if anything, the CPC "actively supervises" the PRC, not vice versa. Third, (3) there is no indication that "the foreign state requires the hiring of public employees and pays their salaries" for CPC workers. *Id.* Fourth, (4) the Party does not "hold[] exclusive rights to some right in the [foreign] country," *id.*, and none has been identified for the Court's consideration. Fifth, (5) "the entity is treated under foreign state law," *id.*, like any other entity, because both the entities' Constitutions insist that the CPC subject to the Constitution and laws of the PRC on the same footing as any other entity.

*Third*, the CPC is not an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). The CPC is a political party and does not appear to have "shares" or "other ownership interest." *Id.*

Thus, the CPC simply does not fit into any of the statutory categories to qualify as a foreign state. The China Society concedes as much, admitting (in an understatement) that "pigeonholing a party like the CPC into one of FSIA's definitions can be difficult." Doc. 42, at 3. Yet the China Society contends that the Court should bend the meaning of American law to adapt to such entities in Communist states, because it contends that the FSIA's definitions are "ill-suited to concepts which exist in socialist states." *Id.* (quotation omitted). This argument is meritless. The FSIA was enacted in 1977, by which time Communist regimes and ruling Communist parties had been around for 60 years, and Congress had plenty of experience with them. If Congress had wished to

23

change the text of the FSIA to reflect "concepts which exist in socialist states," *id.*, it could have done so.  Instead, it enacted the definitions of "foreign state" and "agency or instrumentality" in 28 U.S.C. § 1608(a) and (b), and those provide the legally governing standards.

The China Society also argues that the CPC must be a "foreign state" because it *controls* the CPC.  Doc. 42, at 3.  The China Society argues that the CPC "exercises state power," *id.*, but this statement is incorrect as a matter of Chinese fundamental law. Under that law, the CPC does not "exercise[] state power." *Id.*  Rather, it "leads" the Chinese state from outside and above, while the PRC and its departments and subdivisions are what "exercise[] state power."  *Id.*  The sources the China Society cites all state this.  The China Society quotes the State Department as stating that "[t]he Chinese Government has always been subordinate to the Chinese Communist Party." *Id.*  But the fact that Chinese government is *subordinate* to the CPC does not make the CPC a "subdivision" or "agency or instrumentality" of the Chinese government, for two reasons.  First, this would turn the plain meaning of these words on their heads.  These words describe *subordinate* roles, and the CPC is not *subordinate* to the Chinese state, as all the sources cited by the China Society attest.  *See* Doc. 47, at 3-4.  Second, as *Dole Food* held, "control" is not the relevant test for determining "agency or instrumentality" status.  *Dole Food*, 538 U.S. at 477.

Finally, the China Society argues that the CPC is a "foreign state" because it supposedly exercises the "core functions" of a state.  Doc. 42, at 4 n.4 (quoting Restatement (Fourth) of the Foreign Relations Law of the United States, § 451 cmt. e).  This is wrong for at least two reasons.  First, as the very language quoted by the China Society emphasizes, only a "component" of the foreign state that exercises such "core functions" is a "foreign state."  *See id.* (stating that the "foreign state" "includes the state itself, its government and its ***components*** that perform 'core functions'…") (emphasis added).  A "component" is a subordinate division of the foreign state.

24

*See* *Component*, Merriam-Webster Online, *at* https://www.merriam-webster.com/dictionary/component (defining "component" as "a constituent part: ingredient"). The CPC is *not* an "ingredient" or "constituent part" of the PRC. Second, the CPC does not perform "core functions" on behalf of the PRC. Rather, the CPC controls the PRC from outside and above, while the PRC's various subdivisions perform "core functions" for the PRC.

## C.     The Chinese Academy of Sciences Is Not a "Foreign State."

Likewise, the Chinese Academy of Sciences does not fit within any of the statutory definitions of a "foreign state." *First*, it is not a "political subdivision." It is not "[a] division of a state that exists primarily to discharge some function of local government." BLACK'S LAW DICTIONARY 1197. It does not "discharge some function of local government," and (as discussed above) it insists that it is not "a division of the state" at all. *Id.* And CAS is not a "governmental unit[] beneath the central government, including local governments*." Garb*, 440 F.3d at 596.

*Second*, CAS is not an "organ" of the PRC. Considering the Ninth Circuit's factors, for example, all factors point toward a finding that CAS is not an "organ." First, (1) "the circumstances surrounding the entity's creation," *Patrickson*, 251 F.3d at 807, do not support finding it is an "organ." Though it initially had a government role, CAS claims that it abandoned any governmental role in the late 1950s to preserve independence from the PRC. Second, (2) "the purpose of its activities," *id.*, weigh against finding CAS is an organ. As discussed above, CAS's "activities" comprise two major roles: (1) a national science academy, whose stated purpose is to be independent of the state; and (2) a technology-business incubator that commercializes scientific discoveries, which is also not a governmental purpose. Third, (3) the factor of "independence from the government," *id.*, strongly favors a finding that CAS is not an "organ." As noted above, both the PRC and the CAS strongly emphasize the CAS's role as an independent, objective advisor that is independent of the PRC. Fourth, (4) "the level of government financial support," *id.*, does not

25

support finding that CAS is an "organ." The PRC's financial support for CAS appears to come in the form of grants for scientific research, which is not the sort of financial support that an "organ" typically receives. Fifth, (5) the CAS's "employment policies," do not support an "organ" finding, as there is no indication that CAS's employees are direct employees of the state. Sixth, (6) the CAS's "obligations and privileges under state law," *id.*, reflect its supposed *independence* from the PRC. Thus, all six of these factors point in the same direction, as would the other tests.

*Third*, CAS is not an organization "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). CAS is an academic society, and does not appear to have "shares" or "other ownership interest." *Id.*

The China Society argues that CAS is a "foreign state" because it is supposedly an "agency of the State Council of the People's Republic of China," Doc. 42, at 2. The China Society cites an online document translated as "Notice of the State Council on the Establishment of Institutions," *at* www.gov.cn/shengce/content/2018-02/24/content.htm (simplified English translation link). In fact, this document indicates that CAS is *not* an "organ" of the PRC. The document lists CAS beneath that heading "public institutions directly under the state council." *Id.* But the same document distinguishes "public institutions" from "*organs* directly under the state council," *id.* (emphasis added), which demonstrates that "public institutions" are *not* "organs" of the Chinese state. And CAS is *not* listed as an "organ" of the state council. *Id.* Because CAS is not an "organ," then it is not an "agency or instrumentality" under FSIA. 28 U.S.C. § 1603(b).

The China Society also argues that CAS must be an "agency or instrumentality" because "[t]he President and Vice President of CAS are appointed by the State Council." Doc. 42, at 2-3. But that fact, even if true, does not demonstrate that CAS is an "agency or instrumentality." The method of appointment of leaders is not listed as a factor for determining "organ" status in any of

the tests employed by the federal Courts of Appeals, and all the other factors weigh against finding CAS is an "organ." To be sure, the alleged fact that the State Council appoints senior leaders could be considered under the Ninth Circuit's and Third Circuit's third factors—*i.e.*, the entity's "independence from the government," *Patrickson*, 251 F.3d at 807, and "the degree of supervision by the government," *USX Corp.*, 345 F.3d at 209. But that fact that both the PRC and the CAS stoutly insist that CAS is *independent* of the Government and must act that way, outweighs the manner of selection of its leaders under this factor.

Finally, the China Society argues that "the assets of the WIV and CAS are state-owned." Doc. 42, at 3. It is not clear if this factual assertion is true, as the China Society provides only indirect and scant support for it. *See id.* Even if true, this argument proves almost nothing, because under the PRC's fundamental law, China has a socialist economy in which virtually *all* significant assets are state-owned. *See* Article 6, Constitution of the People's Republic of China ("The basis of the socialist economic system of the People's Republic of China is socialist public ownership of the means of production, namely, ownership by the whole people and collective ownership by the working people."); *id.* Article 7 ("The State-owned economy, namely, the socialist economy under ownership by the whole people, is the leading force in the national economy."); *id.* Article 8 ("The various forms of cooperative economy in cities and towns such as those in the handicraft, industrial, building, transport, commercial and service trades, all belong to the sector of socialist economy under collective ownership by working people."). If having state-owned assets renders a Chinese entity an "agency or instrumentality," virtually every entity in China would be a "foreign state." In any event, having "state-owned *assets*" is not the test; the statute requires state-owned "*shares* or other ownership interest." 28 U.S.C. § 1603(b)(2). CAS does not have those.

### D.    The Wuhan Institute of Virology Is Not a "Foreign State."

Finally, WIV is not a "foreign state."  As discussed above, WIV holds itself out as a mere "branch" or "research institute" of CAS.  Because CAS is not a "foreign state," neither is WIV.

Further, WIV does not fit within any of the definitions of "foreign state."  *First*, WIV is not a "political subdivision" for the same reasons as CAS.  WIV is a research institute engaging in scientific research for commercial gain, not "[a] division of a state that exists primarily to discharge some function of local government."  BLACK'S LAW DICTIONARY 1197. Likewise, WIV is not a "governmental unit[] beneath the central government, including local governments*."  Garb*, 440 F.3d at 596.  It is not a "governmental unit" at all, and it does not perform any functions of "local government[]."  Rather, it performs scientific research on viruses for commercial gain.

*Second*, WIV is not an "organ" of the Chinese government.  Employing the Ninth Circuit's test, for example, none of the factors support that finding.  First, (1) "the circumstances surrounding the entity's creation," *Patrickson*, 251 F.3d at 807, were that WIV was founded as a branch of CAS in Wuhan to perform scientific research. Second, (2) "the purpose of its activities," *id.*, are to conduct scientific research and to commercialize its discoveries, which are non-governmental purposes.  Third, (3) its "independence from the government," *id.*, is the same as that of CAS, because WIV is an institute within CAS, which insists on its independence from the PRC.  Fourth, (4) "the level of government financial support," *id.*, comes in the form of grants for scientific research, which does not favor finding WIV to be an "organ," because that is the kind of financial support associated with private parties, not organs or agencies of government.  Fifth, (5) there is no indication that WIV's "employment policies," *id.*, involve hiring only state employees, or that WIV's employees are PRC employees.  Sixth, WIV's "obligations and privileges under state law," *id.*, do not appear involve any special governmental duties or privileges.

28

*Third*, WIV is not an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). There is no indication that PRC owns stock or other ownership interest in WIV, or even that WIV (a scientific research institute) has "shares" at all. The China Society contends that "the assets of WIV … are state-owned," Doc. 42, at 3, but that argument is meritless for the reasons discussed above. The China Society also argues that WIV, like CAS, is a "public institution," Doc. 42, at 3. But even if this is true, it would make no difference. The State Council Notice cited by the China Society distinguishes "public institutions" from "organs," and thus WIV is *not* an "organ" of the PRC.

## II. Missouri Properly Effected Service on the Communist Party of China, the Chinese Academy of Sciences, and the Wuhan Institute of Virology.

Next, the Court directed the parties to address "whether plaintiff properly effected service on the Communist Party, CAS, and WIV." Doc. 47, at 4. Missouri respectfully submits that it did so, and that it fully complied with the Court's order on alternative methods of service.

### A. Missouri Fully Complied With the Court's Order Authorizing Email Service of CPC, CAS, and WIV.

Missouri respectfully submits that it complied, strictly and in good faith, with the Court's order authorizing email service on CPC, CAS, and WIV. As noted above, this Court authorized Missouri to serve those defendants "by email at publicly available email addresses provided by those organizations." Doc. 22, at 7. That is what Missouri did. To be sure, Missouri did not list in its Motion the specific email addresses upon which it would attempt service; to do so would have been self-defeating, as it would have permitted Defendants easily to block service.

#### 1. Missouri validly served CAS at its official email address.

First, Missouri's service of CAS complied with the Court's order. As stated in the proof of service, Missouri served CAS at cas_en@cas.cn, "which is identified on the website of the

Chinese Academy of Sciences as the contact email for the Academy."  Doc. 23, at 2-3.  Missouri

is not aware of any reason to think that this email failed to comply with the Court's order.

### 2.    Missouri validly served WIV at its chief Directors' email addresses, which were posted on WIV's website.

Second, Missouri respectfully submits that it served WIV in compliance with the Court's

Order.  Missouri served WIV by emailing the service packet to email addresses for the Director

General of WIV, and the three Deputy Directors General of WIV.  Doc. 23, at 3.  These are the

most senior leadership of the WIV.  *See Directors*, Wuhan Institute of Virology, CAS, *at*

http://english.whiov.cas.cn/About_Us2016/Directors2016/.    These email addresses for the

Director General and Deputy Directors General constitute "publicly available email addresses

provided by those organizations," Doc. 22, at 7, and they were posted on WIV's own website.  *See*

Doc. 23, at 3 (identifying the email addresses and noting that they were listed on WIV's website

at  http://www.whiov.cas.cn/sourcedb_whiov_cas/yw/rck/index_65432.html).    Further,  emailing

the service packet directly to the Director General and the Deputy Directors of the WIV is very

well calculated to give actual notice to WIV.

### 3.    Missouri validly served the CPC by submitting the service packet to the "service email" for the CPC's official communications organ.

Third, Missouri served the CPC by emailing the translated service packet to the "service

email" listed on the website of the People's Daily, kf@people.cn.  Doc. 23, at 2.  In its proof of

service, Missouri noted that "[c]onsistent with its own website, the People's Daily is widely

recognized as an official communications organ and mouthpiece of the Communist Party of

China," and that "[e]ver since its founding, the People's Daily has been under direct control of the

Party's top leadership."  *Id.*  Missouri respectfully submits that this email strictly complied with

the Court's order.  The service email for the People's Daily is a "publicly available email address[]" provided by those organizations," *i.e.*, by the Communist Party.  Doc. 22, at 7.

In its January 6 Order, the Court described this email as a "different email channel[] that the Court did not approve and that appear[s] dubious."  Doc. 47, at 6.  Missouri respectfully submits that this concern is based on a misunderstanding of the People's Daily and its role within the Communist Party.  The People's Daily is not a separate entity from the Communist Party—it is a department *within* the Party, which serves a critical role in Party functions.

The People's Daily describes itself as "an official newspaper of the Central Committee of the Communist Party of China."  *See* www.peopledaily.com.cn/english/9811/26/about.htm.  Publicly available sources routinely describe the People's Daily as an organ and mouthpiece of the CPC.  The People's Daily "is an official newspaper of the Central Committee of the Chinese Communist Party," which "provides direct information on the policies and viewpoints of the CCP."  People's Daily, Wikipedia.org, *at* https://en.wikipedia.org/wiki/People%27s_Daily.

Thus, the People's Daily is correctly described as an "organ" of the CPC, because it "functions as the print media of first instance for the central party leadership in its communication with the general public."  Organization of the Chinese Communist Party, Wikipedia.org, *at* https://en.wikipedia.org/wiki/Organization_of_the_Chinese_Communist_Party  (identifying  the People's Daily as an "organ" of the CPC).  Within the CPC's organization, the People's Daily is an internal department of the CPC on the same footing as various other internal departments of the CCP, such as the General Office of the CCP (described as "[t]he nerve center of the CCP"); the CCP's Central Security Bureau; the Central International Liaison Department of the CCP; the Central United Work Front Department of the CCP; and the External Propaganda Office of the

31

CCP's Central Committee. *Id.* (citing, *inter alia*, Colin Mackerras, et al., *Dictionary of the Politics of the People's Republic of China* (Routledge 2001)).

Both Chinese and non-Chinese authorities routinely identify the People's Daily as an organ and mouthpiece of the CPC, not a separate entity distinct from the Party. *See, e.g.,* Xinmei Shen, *China's Communist Party urges 'orderly' capital development after year of regulatory crackdown*, SOUTH CHINA MORNING POST (Feb. 8, 2022), *at* https://www.scmp.com/tech/policy/article/3166279/chinas-communist-party-urges-orderly-capital-development-after-year (describing the People's Daily as "the party mouthpiece" speaking directly for the Party); Ryan Hass, *Assessing China's 'Common Prosperity' Campaign*, Brookings (Sept. 9, 2021), *at* https://www.brookings.edu/blog/order-from-chaos/2021/09/09/assessing-chinas-common-prosperity-campaign/ (describing the People's Daily as the "[p]arty mouthpiece" and suggesting that it issues "authoritative" statements for the CPC); Chang-tai Hung*, Inside a Chinese Communist Municipal Newspaper: Purges at the Beijing Daily*, 49 J. OF CONTEMP. HISTORY 341, 342 (April 2014), at https://www.jstor.org/stable/43697303 (describing the People's Daily as "the flagship newspaper" of the CCP after 1949); Eric Fish, *China's Angriest Newspaper Doesn't Speak for China*, FOREIGN POLICY (April 28, 2017), *at* https://foreignpolicy.com/2017/04/28/chinas-angriest-newspaper-doesnt-speak-for-china/ (stating that "the *People's Daily* … legitimately lays claim to the title of 'Communist Party mouthpiece,'" and describing it as "the Chinese Communist Party's flagship paper"). Sarah Cook, *Chinese Government Influence on the U.S. Media Landscape*, Testimony Before the U.S.-China Economic Security Review Commission (May 4, 2017) *at* https://www.uscc.gov/sites/default/files/Sarah%20Cook%20May%204th%202017%20USCC%20testimony.pdf (describing the People's Daily as a "flagship CCP mouthpiece[]"). The People's

Daily is an organ or constituent of the Party itself, not a separate entity, so serving the People's Daily is like serving the communications department of an organization or political party.

### 4.    Missouri's email service was reasonably calculated to provide actual notice to WIV and CPC.

In its January 6 Order, the Court raised the additional concern that Missouri's email service on WIV and CPC might not have provided actual notice of Missouri's lawsuit.  Doc. 47, at 6-7. Missouri respectfully submits that this concern is misplaced.

As to WIV, Missouri emailed the service packets in English and simplified Chinese to the email addresses of the organizations Director General and Deputy Directors, as provided on WIV's own website.  As noted above, this method is very well calculated to give actual notice.

As to CPC, serving the official communications organ of a large organization like the CPC is the *best* method reasonably calculated to provide actual notice, short of emailing the top Party leadership directly.  Emailing the People's Daily, which operates under the direct control of the Party's top leadership, is like emailing the White House communications staff if one wants to contact the Office of the President.  It is better calculated to provide actual notice than emailing virtually any other department within the Party.

Moreover, Missouri notes that there is overwhelming evidence that the CPC has actual notice of this lawsuit.  *See Shehyn*, 2008 WL 6150322, at *3 ("One factor in considering whether due process is satisfied is whether a defendant served by alternative means possesses some knowledge of the pending lawsuit against her.").  The day after Missouri filed the lawsuit, China's foreign ministry issued a public statement attacking the lawsuit as "very absurd" having "no factual or legal basis at all."  *See, e.g., China calls virus lawsuit brought by US state 'very absurd'*, AP NEWS (April 22, 2020), *at* https://apnews.com/article/public-health-lawsuits-ap-top-news-michael-brown-virus-outbreak-0d28f84369c35ebcd9184b3a48cad0a1.    During the next few

months, the CPC ran at least eight articles attacking this lawsuit in the People's Daily, and at least seven articles in its affiliated tabloid, the Global Times. *Supra*, notes 1-2. In August 2020, Missouri submitted its Hague Convention service packet to the PRC's central authority, which contained service documents for the CPC. The PRC's central authority reviewed for six months and then rejected it as a violation of China's sovereignty. In May 2021, the lawsuit was emailed to the CAS and all the senior directors at the WIV, both of which have Party officials embedded within them. In September, the PRC and CPC sent the China Society as a proxy *amicus* to raise jurisdictional objections so that they would not have to appear to defend the case. *Infra*, note 8. In October 2021, the entire service packet was served on the PRC and five of its political subdivisions, Docs. 36-41—and China's *amici* contend that the PRC is *not distinct from the CPC*. The CPC has been aware of and followed this case from the beginning. Any claim by the Communist Party that it lacks actual notice of this lawsuit—after it has spent two years trying to discredit, evade, and derail it—would echo Captain Renault in Rick's *Café Americain*: "I'm shocked, shocked to find that gambling is going on in here!" CASABLANCA (Warner Bros. 1942).

**B.    The Court Should Not Require "Strict Compliance," but "Substantial Compliance," With Service Requirements for CPC, CAS, and WIV.**

The Court's order of January 6 expresses the concern that "Plaintiff did not strictly comply with the Court's order regarding email service." Doc. 47, at 6. Missouri respectfully submits that it *did* strictly comply with the Court's order, for the reasons discussed below. *See supra* Part III.A. But even if that were not so,the Court should not require "strict compliance," but *substantial* compliance, *i.e.*, compliance calculated to give actual notice to CPC, CAS, and WIV.

Most courts do not require "strict compliance" with service rules in serving agencies or instrumentalities under 28 U.S.C. § 1608(b). "[S]ubstantial compliance with the provisions of service upon an agency or instrumentality of a foreign state—that is, service that gives actual notice

34

of the suit and the consequences thereof to the proper individuals within the agency or instrumentality—is sufficient to effectuate service under section 1608(b)." *Magness v. Russian Fed'n*, 247 F.3d 609, 616 (5th Cir. 2001). Here, the foreign are not even agencies or instrumentalities. The standard under Rule 4(f)(3) should not be stricter than 28 U.S.C. § 1608(b).

As the Fifth Circuit noted in *Magness*, "[o]ur holding as to section 1608(b) is in accord with the Third, Sixth, Ninth, Eleventh, and D.C. Circuits, all of which have determined that substantial compliance with section 1608(b) is sufficient so long as the defendants have actual notice of the suit." *Id.* at 616. "Rather than making service on foreign instrumentalities a rigid, technical, or cumbersome procedure, Congress sought to facilitate the ability of private plaintiffs to serve foreign entities." *Id.* (quoting *Velidor v. L/P/G Benghazi*, 653 F.2d 812, 821 (3d Cir. 1981)). Under these cases, "actual notice" is "the determining consideration." *Id.* (citing cases). "The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153–54 (D.C. Cir. 1994). Here, Missouri's service by email was calculated to provide, and did provide, actual notice of the suit to the foreign defendants. The Court should not require more "rigid, technical" compliance, *Magness*, 247 F.3d at 616, than it would under § 1608(b).

## C. CPC, CAS, and WIV Were Properly Served Even If They Are "Agencies or Instrumentalities" of the PRC.

Even if the Court concludes that one or more of these entities is an "agency or instrumentality" of the PRC—which it should not—the Court should still conclude that they were validly served under 28 U.S.C. § 1608(b)(3)(C). As Missouri noted in prior pleadings, one virtue of its method of service for these entities under Rule 4(f)(3) was that it also satisfies § 1608(b)(3). Indeed, Rule 4(f)(3) and § 1608(b)(3)(C) have similar requirements, so that service under one provision naturally satisfies the other: Rule 4(f)(3) permits service by "other means not prohibited

by international agreement, as the court orders," Fed. R. Civ. P. 4(f)(3); and § 1608(b)(3) permits service "as directed by order of the court consistent with the law of the place where service is made." 28 U.S.C. § 1608(b)(3)(C).

The Court observed that Missouri "did not seek authorization to serve these defendants under § 1608(b)(3)(C), and the Court did not address that question" in its order authorizing email service. Doc. 47, at 6. But § 1608(b)(3)(C) allows the Court to authorize service on agencies or instrumentalities by the same method that Missouri has already served these entities, nine months ago. 28 U.S.C. § 1608(b)(3)(C). To require Missouri to seek leave and re-attempt service by the very same method that Missouri has already served these entities would serve no useful purpose but to inject more needless delay. Moreover, it could very well also prove to be futile, as Defendants would now be able to block service by setting the relevant email accounts to reject emails from Missouri.

Further, as noted above, service under § 1608(b) requires only "substantial compliance" calculated to give "actual notice. Even if the Court decides its prior order did not authorize service by email under § 1608(b)(3)(C), it should conclude that Missouri has "substantially complied" with that provision by providing service authorized by a court order that is consistent with the laws of the foreign state and reasonably calculated to provide actual notice. 28 U.S.C. § 1608(b)(3)(C). In the alternative, if the Court deems it necessary, the Court should issue a new order authorizing Missouri's May 18, 2021 email service under § 1608(b)(3)(C) *nunc pro tunc*.

The D.C. Circuit has aptly stated: "Service of process should be the prologue to the suit rather than the central drama. When the adequacy of service is made to turn on a complex inquiry carried out long after the litigation has begun, and in which the court must apply foreign law to foreign facts, the service provisions may derail cases rather than ensuring their prompt and orderly

36

commencement." *Transaero*, 30 F.3d at 152. It is now almost two years since this lawsuit was filed, all Defendants have been validly served, and all Defendants have abundant notice of the proceedings. The Court should allow the case's "prompt and orderly commencement." *Id.*

## III. The Court Should Not Consider Facts Outside the Pleadings in Assessing Whether CPC, CAS, and WIV Are "Foreign States" for Jurisdictional or Service Purposes.

The Court correctly holds that the existence of foreign sovereign immunity is a jurisdictional question that the Court may consider *sua sponte*. Doc. 47, at 4-5. Missouri agrees with this well-established principle. *See* Doc. 35, at 1; *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 494 n.20 (1983). But *Verlinden* does not explain what underlying facts the Court should consider when it does raise the question. At this stage of the case, when no party has appeared to defend the lawsuit and jurisdictional discovery is not yet available, the Court should consider only the facts alleged in the Complaint, not extraneous "facts" submitted by *amici*.

### A. The Court Should Consider Only the Facts Pleaded in the Complaint, and Missouri Had No Initial Burden to Plead or Prove Defendants' Foreign-State Status.

In its prior brief, Missouri cited the "burden-shifting" framework of *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 727-28 (9th Cir. 1997), to argue that (1) "[i]n pleading its claims, Missouri had no burden to allege facts that establish that entities like CPC, CAS, and WIV are *not* foreign states, or agencies or instrumentalities of foreign states," Doc. 35, at 4; and (2) the Court should not consider unverified "facts" asserted by non-party *amici curiae* at this stage, *id.*

Under the burden-shifting framework, "where a plaintiff alleges that his claim is based on a foreign state's commercial acts, *the defendant has the initial burden of establishing that it is a sovereign state*." *Adler*, 107 F.3d at 728 (emphasis added). "If the foreign state succeeds, it is presumptively immune." *Id.* "The plaintiff then has the burden of going forward with the evidence by offering proof that an FSIA exception applies." *Id.* Thus, Missouri had no initial burden to

plead and prove in the first instance that CPC, CAS, and WIV are *not* "foreign states."  *See id.*

First, Defendants must provide *prima facie* evidence that they *are* "foreign states."

*Adler* is not an outlier on this point.  Nine federal Circuits have adopted this burden-shifting framework—including the Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth Circuits, and D.C. Circuits.  *See, e.g., United States v. Pangang Grp. Co., Ltd.*, 6 F.4th 946, 954 (9th Cir. 2021).  "[W]hen (as here) it is not obvious or uncontested that the defendant is a 'foreign state,' the defendant seeking to assert FSIA immunity bears the initial burden to make a prima facie case that it is a foreign state.  Once this prima facie case has been established, the burden shifts to the plaintiff to make a sufficient showing that an exception to the FSIA applies."[6]

The Court raises the question whether this burden-shifting doctrine has been called into doubt in two cases: *Broidy Capital Management, LLC v. Benomar*, 944 F.3d 436, 443 (2d Cir. 2019); and *Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 799 n.15 (7th Cir. 2011).  Neither

---

[6] *See also, e.g., O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) ("The party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state…."); *Orient Min. Co. v. Bank of China*, 506 F.3d 980, 991 (10th Cir. 2007) ("The defendant must first establish a prima facie case that it is a sovereign state, creating a rebuttable presumption of immunity."); *Enahoro v. Abubakar*, 408 F.3d 877, 882 (7th Cir. 2005) ("The party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state."); *Virtual Countries, Inc. v. Republic of S. Africa*, 300 F.3d 230, 241-42 (2d Cir. 2002) ("[A]fter a defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward…."); *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1285 n.13 (3d Cir. 1993) ("Once the foreign state has produced prima facie evidence of immunity, the burden of going forward shifts…."); *Gerding v. Republic of France*, 943 F.2d 521, 525 (4th Cir. 1991) ("Thus, evidence must be produced to establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the defendant in the suit…."); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989) (per curiam) ("Under the FSIA, Saudi carried the burden of persuading the court that it was entitled to immunity. Once it made a prima facie showing of FSIA protection, however, Forsythe assumed a burden of going forward…."); *see also Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  The Eighth Circuit, while not yet addressing this question, has endorsed the principle that "[g]enerally, the party seeking to invoke immunity is allocated the burden of proof on that issue."  *Brewer v. Socialist People's Rep. of Iraq*, 890 F.2d 97, 100-01 (8th Cir. 1989).

*Broidy* nor *Rubin held* that the burden-shifting framework no longer applies in FSIA cases, because neither directly addressed a question of FSIA immunity, and both were bound by pre-existing Circuit precedent adopting the burden-shifting framework in FSIA cases in any event.  *See Virtual Countries, Inc.*, 300 F.3d at 241-42; *Enahoro*, 408 F.3d at 882.

Moreover, in *Broidy*, the framework that the Second Circuit actually applied is identical to what Missouri contends should apply here.  In *Broidy*, the defendant who claimed he was protected by diplomatic immunity first filed a letter and a declaration with the Court to establish a *prima facie* case that he was a diplomat protected by immunity.  *Id.* at 440-41.  Once defendant submitted such evidence indicating that he was a diplomatic protected by diplomatic immunity, the burden shifted to the plaintiff.  *Id.* at 441.  The *Broidy* court held "that, *where a defendant has demonstrated diplomatic status*, plaintiffs bear the burden of proving by a preponderance of the evidence that an exception to diplomatic immunity applies and that jurisdiction exists."  *Id.* at 440 (emphasis added); *see also id.* at 443, 444 (stating that the burden to prove that exception to diplomatic immunity applies once "the defendant has demonstrated diplomatic status").  This is the very same burden-shifting framework that Missouri contends should apply here.  "When (as here) it is not obvious or uncontested that the defendant is a 'foreign state,'" each Defendant must first "make a prima facie case that it is a foreign state." *Pangang*, 6 F.4th at 954.[7]

*Rubin*, likewise, did not question the point that the defendant bears the initial burden of establishing a *prima facie* case that it is a "foreign state."  *Rubin* addressed attachment immunity

---

[7] To be sure, *Broidy* observed that, in that case, "[t]he United States argues as amicus that *this statement* in the legislative history was in error and is inconsistent with the text of the FSIA." *Broidy*, 944 F.3d at 443 (emphasis added).  But "*this statement* in the legislative history" was the claim that "the defendant claiming FSIA immunity still bears the *ultimate burden of persuasion* that the FSIA exception does not apply."  *Id.* at 443 (emphasis added) (quotation marks omitted).  That issue is not presented here, since no Defendant has yet appeared.

for foreign *property* under 28 U.S.C. § 1609. *Rubin*, 637 F.3d at 784-85. Rather, *Rubin* rejected the argument that immunity for a foreign sovereign's property is personal to the sovereign, such that the sovereign must appear and personally assert attachment immunity for the immunity to attach. *Rubin*, 637 F.3d at 799 n.15. In the cited footnote, *Rubin* merely rejected the claim that "sovereign immunity is an affirmative defense that must be specially pleaded" and cannot be raised *sua sponte*. *Id.* So also here, Missouri agrees that the Court may raise questions of FSIA immunity *sua sponte* because they address the Court's subject-matter jurisdiction.

Further, the burden-shifting framework is fully consistent with the text of the FSIA. Neither *Broidy* nor any other case cites any provision of the FSIA that contradicts this framework. No *amicus* in this case has cited one. And Missouri is aware of none. Under this framework, Missouri has no initial burden to plead or prove the negative proposition that CPC, CAS, and WIV are *not* foreign states. No jurisdictional deficiency appears on the face of the Complaint, and no valid factual attack has been raised, so no further inquiry is required by the Court.

To be sure, if the Defendants had appeared to defend the lawsuit, they could have raised a "factual attack" and submit evidence of their status. *Pangang*, 6 F.4th at 554 (quotation omitted); *see also Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "If the defendant makes a factual challenge, the defendant may introduce testimony, affidavits, or other evidence to dispute the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* But no factual attack has been raised. In considering jurisdiction *sua sponte* at this stage, the Court should do what it does for a *facial* challenge—consider only whether a jurisdictional defect appears on the face of the Complaint.

Finally, this approach is consistent with our adversarial system and will prevent the very gamesmanship that Defendants are currently attempting. If Defendants wish to raise a factual

attack on the Court's jurisdiction, they are entitled to do so by filing a jurisdictional motion under Rule 12(b)(1) supported by evidence.  *Phoenix Consulting*, 216 F.3d at 40.  But doing so would come with burdens and responsibilities.  At very least, they would have to appear in the case, subject themselves to the jurisdiction of the Court, and participate in any jurisdictional discovery ordered by the Court in good faith.  Instead, Defendants are trying to have it both ways: They seek to avoid the risks and burdens of litigating as a party, while still launching a factual attack on this Court's jurisdiction, by using the China Society (an entity under their control) as a proxy to file unverified, self-selected "facts" in *amicus* filings.[8]  This approach is fundamentally unfair, because Missouri is denied the opportunity to test amicus's self-selected "facts" through the discovery process.  Defendants "cannot use this have-its-cake-and-eat-it-too strategy" to attack the Court's jurisdiction.  *Texas v. Biden*, 20 F.4th 928, 958 (5th Cir. 2021) (Oldham, J.).

**B.     If the Court Conducts Any Factual Inquiry, It Should Require, At Most, Only a *Prima Facie* Showing that CPC, CAS, and WIV Are Not Foreign States.**

District courts have "broad discretion" in crafting procedures to conduct factual inquiries to address questions of FSIA jurisdiction.  *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000).  But, in the usual case, the district court does so only after "a party" has raised a factual attack on jurisdiction.  *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994).  For the reasons discussed above, *supra* Part III.A, the Court should limit any factual inquiry

---

[8] The China Society identifies itself as an institute of Wuhan University.  See China Society of Private International Law, at www.cspil.org/Plus/m_default/Cms/default.php.  Wuhan University holds itself out as operating "directly under the administration of the Ministry of Education" of the PRC.  Wuhan University, About WHU, *at* https://en.whu.edu.cn/About_WHU1/Overview.htm.  Ironically, if one were to apply the China Society's analysis, Wuhan University, and thus the China Society itself, would be an "agency or instrumentality" of the PRC—not an *amicus*.

at this stage to the pleadings.  But if it does not, it should consider only, at most, whether Missouri has made a good-faith, *prima facie* showing about the status of CPC, CAS, or WIV.

Principles of FSIA law would support this approach.  Many courts recognize a plaintiff's entitlement to jurisdictional discovery when a factual attack is raised.  "A district court is *not* required to defer ruling on a jurisdictional motion until all discovery contemplated by the plaintiff has been accomplished," but "an *opportunity* for discovery is required."  *Kelly*, 213 F.3d at 855 (italics in original).  FSIA case law recognizes the need for targeted and flexible jurisdictional discovery on disputed factual points relating to the FSIA immunity: "The district court … must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (quoting *Prakash v. American University*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984)).  Where Missouri has been blocked from "secur[ing] … evidence relevant to the existence of jurisdiction," *id.*, by Defendants' default, the Court should require no more than a threshold, *prima facie*, good-faith determination of the foreign entities' status at this stage of the case.

Second, a *prima facie* showing is the only initial burden that FSIA case law places on *defendants* when they appear and contest jurisdiction.  *See, e.g., Pangang*, 6 F.4th at 954; *supra* Part I.A. This is not a particularly heavy burden.  *See, e.g., Hernandez v. City of Vancouver*, 277 F. App'x 666, 669 (9th Cir. 2008) ("The quantum of evidence needed to establish a *prima facie* case is 'minimal' and less than a preponderance of the evidence.").  It would be disproportionate, to say the least, to impose a greater initial burden on the *plaintiff* before any defendant has actually appeared to defend itself, especially because plaintiff lacks privileged access to the facts.

This approach is also consistent with the Federal Rules of Civil Procedure and basic pleading requirements.  To be sure, FSIA immunity is a jurisdictional issue that the Court may

42

raise *sua sponte*; but as between the *parties*, it is an affirmative defense to be raised and pled by the defendants, not by the plaintiff.  The question whether CAS, WIV, and CPC are "foreign states" under § 1603 is not an element of Missouri's claims.

The approach also adheres to fundamental fairness.  Prior to discovery, domestic plaintiffs will often be at an informational disadvantage on factual issues related to both immunity and liability.  Foreign-entity defendants, by contrast, have unique knowledge of their own status with their respective foreign governments.  Thus, the alleged instrumentality should "bear the burden of production in this inquiry.  And that makes sense; the alleged 'instrumentality and its related government frequently possess most of the information needed to establish organ status.'"  *Qatar v. First Abu Dhabi Bank PJSC*, 432 F. Supp. 3d 401, 411 (S.D.N.Y. 2020) (quoting *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481 KBF, at *8 (S.D.N.Y. 2014)).  "Courts must be mindful of the fact that the 'instrumentality and its related government' frequently possess most of the information needed to establish organ status."  *In re Aluminum Warehousing Antitrust Litig*. 2014 WL 4211353, at *8 (citation omitted).  "These foreign entities obviously have little incentive to provide information that will help the plaintiff's case, and it may be difficult for the plaintiff to obtain discovery from them."  *Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc*., 183 F.3d 1277, 1285 n.19 (11th Cir. 1999); *see also Weininger v. Castro*, 462 F. Supp. 2d 457, 495 (S.D.N.Y. 2006) (same).

## C.    If the Court Conducts Any Factual Inquiry, It Should Authorize Missouri to Seek Third-Party Jurisdictional Discovery Relating to Any Disputed Facts.

If the Court imposes any factual burden on Missouri, Missouri should be granted the opportunity to seek third-party discovery on any disputed facts.  As noted above, when there is a factual dispute about jurisdiction, "an *opportunity* for discovery is required."  *Kelly*, 213 F.3d at 855 (italics in original).  "The district court … must give the plaintiff ample opportunity to secure

and present evidence relevant to the existence of jurisdiction." *Phoenix Consulting*, 216 F.3d at 40 (quotation omitted).

To be sure, courts have cautioned that jurisdictional discovery in FSIA cases should be "ordered circumspectly," to avoid imposing excessive burdens of discovery on defendants who claim to be shielded by FSIA immunity. *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992). But here, there would be no discovery burdens on Defendants, because Defendants will surely not cooperate in discovery. Yet it is likely that third parties within the reach of process may possess information relating to disputed factual points regarding the Court's jurisdiction.[9]

**D.    The Factual Information Submitted by Amici Is Not Subject to Judicial Notice.**

The Court requested briefing on "the extent to which [additional factual] information may be … judicially noticed." Doc. 47, at 7. "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. "Judicial notice of facts outside of the record is not appropriate 'unless the facts are matters of common knowledge or are capable of certain verification.'" *McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014). Under this standard, the Court may take judicial notice of facts Missouri discusses above regarding the

---

[9] Potential topics for third-party jurisdictional discovery would include: the nature and extent of WIV and CAS's commercial activities in the United States in collaboration with U.S. entities such as the EcoHealth Alliance and American universities, including the extent to which WIV researchers filed patents or otherwise sought to commercialize their discoveries; whether American entities collaborated with WIV and CAS in commercial activity relating to the research on coronaviruses; and whether WIV and CAS entered into agreements with research partners and agencies that involved voluntarily submitting to the jurisdiction of U.S. courts, which would constitute a waiver of sovereign immunity, "either explicitly or by implication," under 28 U.S.C. § 1605(a)(1); among many others.

status of CPC, CAS, and WIV—such as the descriptions of those entities on their own websites and in public journals, and the contents of the People's Daily website.  *See, e.g., Enter. Rent-A-Car Co. v. U-Haul Int'l, Inc.*, 327 F. Supp. 2d 1032, 1042 & n.4 (E.D. Mo. 2004) (taking judicial notice of defendant's websites because "[f]acts concerning the two websites at issue in this case are both capable of ready determination and widely available to anyone with Internet access").

But the facts that China's *amici* seek to introduce clearly do not satisfy this standard. "Facts" like the degree of control exercised by the CPC over the PRC, the relationship between the PRC and CAS, the relationship between the PRC and WIV, the status of CAS and WIV as "public institutions," and similar questions are not "capable of certain verification" without adversarial testing in discovery.  *McIvor*, 773 F.3d at 914.

The China Society correctly points out that Rule 44.1 of the Federal Rules of Civil Procedure authorizes the Court to conduct its own inquiry on questions of Chinese law.  Doc. 42, at 1-2.  Rule 44.1 provides that "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing.  In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.   In reviewing questions of Chinese law, the Court is not required to give controlling weight to China's account of its own law.  *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co*., 138 S. Ct. 1865, 1873–74 (2018).

Matters of foreign law raised under Rule 44.1 are not subject to judicial notice, but generally require a fact-like inquiry that is often based on expert submissions.  The Advisory Committee Note states: "The new rule refrains from imposing an obligation on the court to take 'judicial notice; of foreign law … and it avoids use of the concept of 'judicial notice' in any form…."  *Id.*, 1966 Advisory Committee Note.  Further, as the text of the Rule indicates, matters

raised under Rule 44.1 are raised, at least initially, by a *party*: "To avoid unfair surprise, the *first sentence* of the new rule requires that a party who intends to raise an issue of foreign law shall give notice thereof." *Id.* (italics in original). No party has done so here.

Indeed, a party who fails to make timely notice under Rule 44.1 may be deemed to have waived the foreign-law issue, and courts typically do not raise such issues on a party's behalf. As this Court recently held, "[a]lthough a court making a Rule 44.1 determination may examine any relevant material, it is under no obligation to do so if the party whose burden it is fails to produce sufficient evidence that foreign law applies." *A.O.A. v. Rennert*, 350 F. Supp. 3d 818, 847 (E.D. Mo. 2018) (quotation omitted). "Where the parties do not adequately prove foreign law so as to enable the court to apply it in a particular case, the law of the forum applies." *Id.* (quotation omitted). "A court has no duty to make further inquiries of a party who fails to prove the content of the applicable foreign law." *Id.* Here, where no party has appeared to raise disputed questions of Chinese law, and the parties have had no occasion to submit expert declarations or testimony on such issues, the Court should not launch such an intensive inquiry on its own motion. *Id.*

## IV. The FSIA's Exceptions Apply to Any Defendants Deemed To Be "Foreign States."

The Court requested briefing on "whether an exception to foreign sovereign immunity applies." Doc. 47, at 4. Missouri incorporates by reference its prior briefing on these topics, Doc. Doc. 35, at 11-37, and limits itself to addressing the principal new arguments raised in the most recent round of amicus briefs. Doc. 42, Doc. 46-1.

### A. The Complaint Plausibly Alleges "Direct Effects" From Defendants' Acts.

Among other things, the Complaint alleges that, while suppressing their knowledge of human-to-human transmission, Defendants permitted millions of people to travel in and out of

Wuhan during the Chinese New Year, many of whom became infected and traveled directly to the rest of the world, including the United States. Doc. 1, ¶¶ 73-76.

The China Society argues that there was no "direct effect" because "the virus was transmitted as a result of a series of interpersonal transmission through international and domestic travel." Doc. 42, at 7.  The Eighth Circuit's opinion in *Dumont v. Saskatchewan Gov't Ins. (SGI)*, 258 F.3d 880, 884 n.6 (8th Cir. 2001), contradicts the China Society's argument.  In *Dumont*, the Canadian governmental insurer (SGI) issued an insurance policy in Canada for Canadian citizens located in Canada.  *Id.* at 882. Those Canadian citizens then *traveled to the United States*, where they were killed in North Dakota in a drunk-driving accident.  *Id.* at 881.  The Eighth Circuit held that the commercial activity performed abroad (*i.e.*, providing an automobile insurance policy) had a "direct effect" in the United States when the insured motorists *traveled to the United States*, with the "direct effect being the provision of automobile liability and family security insurance coverage to Ernest Smith, Helen Smith, and Mary Dumont while they traveled by automobile in the United States."  *Id.* at 883 n.6.  Here, exactly the same intervening cause occurred as in *Dumont*— international travel.  The insured Canadian citizens had to engage in "international and domestic travel" from Canada to the United States before the "direct effect," *i.e.*, the "provision of automobile and family coverage … in the United States," occurred in the United States.  *Dumont*, 258 F.3d at 883 n.6.

Likewise, defective products manufactured abroad, which end up injuring consumers in America after traveling through international commerce, cause "direct effects" in the United States.  For example, in *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 396 (6th Cir. 2016), the Sixth Circuit held that a piece of faulty ammunition manufactured in Argentina had a "direct effect" in the United States when it exploded and injured the hand of a man in Ohio.  *Id.* at 396.  The Sixth

47

Circuit noted that, "in the context of product-liability cases, courts have routinely held that an injury caused by an allegedly defective product meets the 'direct effect' element." *Id.*; *see also Vermeulen v. Renault, U.S.A.*, Inc., 985 F.2d 1534, 1545 (11th Cir. 1993) (holding that an injury in Georgia from a defective automobile manufactured in France was a "direct effect" of foreign commercial activity, because "[w]e can hardly imagine a more immediate consequence of the defendant's activity"); *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083–84 (9th Cir. 2001) (holding that it was "pellucid" that deaths in the United States from a defective aircraft manufactured abroad were "direct effects" of the foreign commercial activity); *Aldy on Behalf of Aldy v. Valmet Paper Mach.*, 74 F.3d 72, 75 (5th Cir. 1996) (holding that deaths in the United States from a defective paper machine manufactured in Finland were "direct effects" of foreign commercial activity). Just as these defective products traveled in international commerce before inflicting "direct effects" in the United States, so also did the deadly virus that Defendants released and concealed.

**B.    Missouri's Claims Are "Based Upon" Acts Performed "In Connection With" Defendants' "Commercial Activities."**

The China Society argues that the Complaint does not alleges that CAS and WIV were engaged in "commercial activities" in engaging in scientific research about coronaviruses. Doc. 42, at 9-10. On the contrary, the Complaint repeatedly and clearly alleges that CAS and WIV were researching dangerous viruses as part of a commercial enterprise aimed and commercializing scientific discoveries. *See, e.g.,* Doc. 1, ¶¶ 32, 40, 52, 152 (alleging that CAS and WIV "engaged in commercial … research on coronaviruses through the Wuhan Institute").

The China Society complains that these allegations are too "threadbare" and "conclusory," Doc. 42, at 9, but that is plainly incorrect. The allegations provide "a short and plain statement of the claim," which is what the Rules require. Fed. R. Civ. P. 8(a)(2). In any event, the China

Society's complaint about the *specificity* of the allegations in the Complaint is an argument under Rule 12(b)(6), not Rule 12(b)(1).  The argument is not jurisdictional and must be raised by a party.

The China Society argues that Missouri merely assumes that all scientific research is commercial.  Doc. 42, at 9.  This is a strawman.  The Complaint alleges that the specific, relevant scientific research on coronaviruses *conducted by CAS and WIV*, which led to the virus's release, was part of a commercial enterprise.  Doc. 1, ¶¶ 32, 40, 52, 152.  This fact distinguishes CAS and WIV from the ordinary conduct of Western government entities like NIAID.  *See* Doc. 42, at 10.

The China Society disputes the Complaint's factual allegations that Defendants engaged in buying high-quality PPE and selling low-quality PPE.  Doc. 42, at 10.  The China Society asserts that other "Chinese entities" (which it does not identify) were the ones buying and selling PPE as part of the hoarding scheme.  *Id.*  This is obviously a *factual* dispute that cannot be raised by an *amicus* or resolved on the pleadings.  *Id.*  Moreover, the China Society's contention that "[a] U.S. court cannot disregard the juridically separate status of different state-owned persons from one another," *id.*, is highly ironic, because in the same brief, the China Society vigorously contends that this Court *should* disregard the "juridically separate status" of CPC, CAS, and WIV.  And the China Society's objection that the Complaint does not provide sufficient specificity about which Defendants engaged in which particular course of conduct is both meritless and non-jurisdictional. The same problem applies to the China Society's complaints about the specificity of the allegations regarding the operation of healthcare facilities and systems and the operation of traditional and social media platforms for commercial gain.  Doc. 42, at 10-11.

The China Society also argues that Defendants' tortious conduct occurring outside the United States was not done "in connection with" a commercial activity, because it contends there was no "genuine connection" or "significant nexus" between the tortious actions and the

49

commercial activities.  Doc. 42, at 11-12 (quoting *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 299 (S.D.N.Y. 2001)).  This argument is plainly meritless.  There is a "genuine connection" and a "significant nexus" between (1) conducting high-risk research on bat coronaviruses as part of a commercial enterprise, and (2) accidently releasing one of the genetically modified viruses to cause a global pandemic. There is a "genuine connection" and a "significant nexus" between (1) operating health-care facilities and hospital systems in Wuhan, and (2) suppressing information about human-to-human transmission emerging from patients and doctors in those healthcare facilities.  There is a "genuine connection" and a "significant nexus" between (1) operating traditional and social media networks in a commercial enterprise, and (2) censoring information on those media networks under one's direct ownership and control to avoid reporting the spread of the virus.  There is a "genuine connection" and "significant nexus" between (1) buying and selling PPE in the United States and on world markets, and (2) buying high-quality PPE and selling low-quality PPE in the United States and on world markets in the first stages of the pandemic.

The China Society argues the Missouri's claims are not "based upon" commercial activities, Doc. 42, at 13-14, but that argument gets the statute wrong.  Under the third clause of § 1605(a)(2), which applies here, the claim does *not* have to be "based upon commercial activities."  Rather, it must be "based upon" an act done "in connection with a commercial activity."  28 U.S.C. § 1605(a)(5).  The tortious conduct itself does not have to be a "commercial activity."  *Id.*  The tortious conduct need only have a "connection with" a commercial activity.  *Id.*  That is all the statute requires.  *Adler*, 107 F.3d at 726.

### C.    The Non-Commercial Activities Exception Applies to Missouri's Claims.

Missouri alleges in the alternative that, if Defendants' activities are found to be non-commercial, the case still falls within the non-commercial-activities exception of § 1605(a)(5). *See* Doc. 1, ¶ 41.  The China Society invokes the "entire tort" doctrine adopted by certain out-of-circuit cases, arguing that the *tortious conduct*, not just the injury, must occur in the United States for this exception to apply.  Doc. 42, at 4-6.  Here, the tortious conduct occurred in China, but the injuries occurred in the United States.

Based on the statute's plain language, only the "personal injury or death, or damage to or loss of property" must be "occurring in the United States."  28 U.S.C. § 1605(a)(5).  The statute provides that the non-commercial activities exception applies in cases "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, [1] occurring in the United States *and* [2] caused by the tortious act or omission of that foreign state…."  28 U.S.C. § 1605(a)(5) (emphasis added).  This statute is not ambiguous.  The *injury* ("personal injury or death, or damage to or loss or property") must be two things: (1) it must be "occurring in the United States," and (2) it must be "caused by the tortious act or omission of that foreign state."  *Id.*  The statute simply does *not* state that the "tortious act or omission of that foreign state" must *also* be "occurring in the United States."  *Id.*  The phrase "occurring in the United States" modifies the phrase immediately preceding it ("personal injury or death, or damage to or loss of property"), *not* the phrase that follows it ("tortious act or omission of that foreign state"), which is *separated* from "occurring in the United States" by the additional phrase "*and* caused by."  *Id.*  This is a straightforward application of the "last-antecedent canon," which is a "commonsense principle of grammar."  SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 18, at 144 (2012).  In addition, the conjunction "and" makes clear that the two separate phrases—"occurring in the United States," and "caused by the tortious act or omission of

51

that foreign state"—confirms that these two phases both modify, on equal footing, the phrase "personal injury or death, or damage to or loss of property." They modify the *injury*; they do not modify each other.

The China Society's reliance on the supposed "primary purpose" of the FSIA is meritless. The plain language of the FSIA, not the intuited "purposes" of Congress, is what governs. "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("We are governed by laws, not by the intentions of legislators.").

## CONCLUSION

For the reasons stated, Missouri respectfully requests that this Court hold that (1) no jurisdictional defect under the FSIA appears on the face of the Complaint or elsewhere, (2) all nine Defendants have been validly served with process and are in default, and (3) Missouri may renew its motion for discovery and a scheduling order to prove its claims by "evidence satisfactory to the Court."

Dated: February 14, 2022                    Respectfully submitted,

                                            **ERIC S. SCHMITT**
                                            **ATTORNEY GENERAL**

                                            */s/ D. John Sauer*
                                            D. John Sauer, #58721MO
                                             Solicitor General
                                            Missouri Attorney General's Office
                                            Post Office Box 899
                                            Jefferson City, MO 65102
                                            Tel: (573) 751-8870
                                            Fax: (573) 751-0774
                                            John.Sauer@ago.mo.gov

## **CERTIFICATE OF SERVICE**

On February 14, 2022, I caused the foregoing to be filed through the Court's electronic filing system to be served by electronic notice on all counsel for parties and *amici* who have appeared in this case.

*/s/ D. John Sauer*

53