**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

THE STATE OF MISSOURI,                                )
ex rel. ERIC S. SCHMITT, in his official              )
capacity as Missouri Attorney General,                )
                                                      )
      *Plaintiff*,                                   )
                                                      )
v.                                                    )          Case No. 1:20-cv-00099-SNLJ
                                                      )
THE PEOPLE'S REPUBLIC OF CHINA,                       )
THE COMMUNIST PARTY OF CHINA,                         )
NATIONAL HEALTH COMMISSION                            )
OF THE PEOPLE'S REPUBLIC OF                           )
CHINA, MINISTRY OF EMERGENCY                          )
MANAGEMENT OF THE PEOPLE'S                            )
REPUBLIC OF CHINA, MINISTRY OF                        )
CIVIL AFFAIRS OF THE PEOPLE'S                         )
REPUBLIC OF CHINA, PEOPLE'S                           )
GOVERNMENT OF HUBEI                                   )
PROVINCE, PEOPLE'S GOVERNMENT                         )
OF WUHAN CITY, WUHAN INSTITUTE                        )
OF VIROLOGY, and CHINESE                              )
ACADEMY OF SCIENCES,                                  )
                                                      )
      *Defendants*.                                  )

**PLAINTIFF'S RESPONSE TO THE COURT'S SHOW CAUSE ORDER REGARDING
<u>VENUE IN THE EASTERN DISTRICT OF MISSOURI</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 2

    A. The Complaint Alleges Extensive Personal Injuries Inflicted in Missouri as Direct Effects of Defendants' Tortious Conduct. ................................................. 2

    B. The Complaint Alleges Substantial Conduct by Defendants Occurring in Missouri With Respect to the PPE-Hoarding Scheme. ............................................... 5

LEGAL STANDARDS ................................................................................................. 12

ARGUMENT ................................................................................................................ 13

    I.   Defendants Have Waived Any Objection to Venue by Failing to Answer, and the Court Should Not Raise an Objection to Venue *Sua Sponte*. ......................................................... 13

    II.  In Tort Cases, Personal Injuries Inflicted Within the Judicial District Constitute Events "Giving Rise to the Claim" in That District. ............................................................. 16

    A. The plain meaning of "events … giving rise to the claim" includes personal injuries inflicted in the judicial district by defendants' tortious conduct. ........................ 17

    B. The overwhelming weight of authority is consistent with the principle that a personal injury inflicted in the district constitutes an "event … giving rise to the claim." ............. 21

    C. The Eighth Circuit's decisions in *Steen* and *Woodke* do not hold that venue is improper in a judicial district where personal injuries were inflicted. ................................... 23

    III. Defendants' Actions of Purchasing PPE From Missouri and Shipping Defective PPE Into Missouri Constitute a "Substantial Part of the Events … Giving Rise to the Claim(s)" That Occurred in the Judicial District. ........................................................ 26

CONCLUSION ............................................................................................................. 31

CERTIFICATE OF SERVICE .................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adhikari v. KBR, Inc.*,
  JCC 115-CV-1248, 2016 WL 4162012 (E.D. Va. Aug. 4, 2016)............................................ 22

*Antares Aircraft, L.P. v. Federal Republic of Nigeria*,
  999 F.2d 33 (2d Cir. 1993) .................................................................................................... 20

*Arriaga v. Imperial Palace, Inc.*,
  252 F. Supp. 2d 380 (S.D. Tex. 2003) .................................................................................. 21

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  813 F.3d 98 (2d Cir. 2016)............................................................................................. 20, 21

*Automobile Mechanics Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA,*
  *Inc.*, 502 F.3d 740 (7th Cir. 2007) ...................................................................................... 15

*Basile v. Walt Disney Co.*,
  717 F. Supp. 2d 381 (S.D.N.Y. 2010)................................................................ 2, 13, 30, 31

*Bates v. C & S Adjusters, Inc.*,
  980 F.2d 865 (2d Cir. 1992)................................................................................ 19, 20, 30

*C2F, Inc. v. Bee Paper Co.*,
  No. 08-CV-479-AC, 2008 WL 4791012 (D. Or. Oct. 28, 2008)........................................... 28

*Cartier v. Micha, Inc.*,
  No. 06 Civ. 4699, 2007 WL 1187188 (S.D.N.Y. Apr. 20, 2007)...................................... 2, 13

*Chenevert v. Springer*,
  No. CIV.A.C-09-35, 2009 WL 2215115 (S.D. Tex. July 22, 2009)...................................... 21

*Clarendon Nat. Ins. Co. v. T.M.I. Enterprises, LLC*,
  No. CIV. A. 07-1637, 2008 WL 3838025 (W.D. La. Aug. 14, 2008) .................................. 13

*Commercial Casualty Ins. Co. v. Consolidated Stone Co.*,
  278 U.S. 177 (1929)............................................................................................................... 14

*Concesionaria DHM, S.A. v. Int'l Fin. Corp.*,
  307 F. Supp. 2d 553 (S.D.N.Y. 2004)................................................................................... 12

*Cranford v. Tennessee Steel Haulers, Inc.*,
  No. CV ELH-17-2768, 2018 WL 3496428 (D. Md. July 20, 2018)................................ 22, 31

*Daniel v. Am. Bd. of Emergency Med.*
  428 F.3d 408 (2d Cir. 2005)................................................................................................... 31

*Eddie Kane Steel Prod., Inc. v. Alabama Plate Cutting Co.*,
  No. CV1815167MASLHG, 2019 WL 3281623 (D.N.J. July 19, 2019) ............................... 13

*Estate of Abtan v. Blackwater Lodge & Training Ctr.*,
  611 F. Supp. 2d 1 (D.D.C. 2009) .................................................................................... 13, 22

*Estate of Moore v. Dixon*,
  460 F. Supp. 2d 931 (E.D. Wis. 2006)................................................................................... 31

*Florida Nursing Home Ass'n v. Page*,
  616 F.2d 1355 (5th Cir. 1980) .............................................................................................. 26

*Greenblatt v. Gluck*,
  265 F. Supp. 2d 346 (S.D.N.Y. 2003).................................................................................... 31

*H&R Block E. Enterprises, Inc. v. J&M Sec., LLC*,
  No. 05-1056-CV-W-DW, 2006 WL 1128744 (W.D. Mo. Apr. 24, 2006) .............................. 27

*Herrington v. Verrilli*,
  151 F. Supp. 2d 449 (S.D.N.Y. 2001) .................................................................................... 15

*Hoffman v. Blaski*,
  363 U.S. 335 (1960) ..................................................................................................... 14, 15

*Holloway v. Holy See*,
  537 F. Supp. 3d 502 (S.D.N.Y. 2021) .................................................................................. 21

*In re Volkswagen AG*,
  371 F.3d 201 (5th Cir. 2004) ............................................................................................... 21

*Kaliannan v. Liang*,
  2 F.4th 727 (8th Cir. 2021) ................................................................................................... 28

*Master Tech Products, Inc. v. Smith*,
  181 F. Supp. 2d 910 (N.D. Ill. 2002) .................................................................................. 31

*McEvily v. Granai*,
  No. 01 CIV. 5430 (DLC), 2001 WL 1098005 (S.D.N.Y. Sept. 18, 2001) ............................. 22

*Myers v. Bennett Law Offices*,
  238 F.3d 1068 (9th Cir. 2001) ............................................................................................. 22

*Neufeld v. Neufeld*,
  910 F. Supp. 977 (S.D.N.Y. 1996) ...................................................................................... 31

*Pasulka v. Syke*,
  131 F. Supp. 2d 988 (N.D. Ill. 2001) .................................................................................. 30

*Pecoraro v. Sky Ranch for Boys, Inc.*,
  340 F.3d 558 (8th Cir. 2003) ............................................................................................... 25

*Peridyne Tech. Solutions, LLC v. Matheson Fast Freight, Inc.*,
  117 F. Supp. 2d 1366 (N.D. Ga. 2000) ............................................................................... 27

*Red Mortg. Cap., LLC v. Shores, LLC*,
  No. 2:16-CV-678, 2017 WL 1196170 (S.D. Ohio Mar. 31, 2017) ........................................ 28

*Richards v. United States*,
  369 U.S. 1 (1962) ................................................................................................................. 18

*Rothstein v. Carriere*,
  41 F. Supp. 2d 381 (E.D.N.Y. 1999) ................................................................................... 23

*Sack v. Low*,
  478 F.2d 360 (2d Cir. 1973) ................................................................................................. 20

*Santa's Best Craft, LLC v. Janning*, No. 02-C-5521,
  9529, 2003 WL 21504522 (N.D. Ill. June 30, 2003) ........................................................... 23

*Sarantakis v. Gruttadauria*,
  No. 02 C 1609, 2003 WL 1338087 (N.D. Ill. Mar. 17, 2003) ................................... 28, 29, 30

*SEC v. Ernst & Young*,
  775 F. Supp. 411 (D.D.C. 1991) .......................................................................................... 13

*Seidel v. Kirby*,
  296 F.Supp.3d 745 (D. Md. 2017) ................................................................................. 22, 23

*Service Women's Action Network v. Mattis*,
  320 F. Supp. 3d 1082 (N.D. Cal. 2018) ........................................................................ 22, 30

*Setco Enters. Corp. v. Robbins*,
  19 F.3d 1278 (8th Cir. 1994) ........................................................................................ passim

*Smith v. Schmidt*,
  52 F. App'x 11 (9th Cir. 2002) ............................................................................................. 22

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ..................................................................... 17, 18, 19, 20
*State Farm Mut. Auto. Ins. Co. v. Est. of Bussell*,
   939 F. Supp. 646 (S.D. Ind. 1996) .................................................................... 21
*Steen v. Murray*,
   770 F.3d 698 (8th Cir. 2014) ................................................................. 16, 17, 24
*Taylor v. City & County of Honolulu*,
   No. 7:16-CV-410-D, 2017 WL 3526660 (E.D.N.C. Aug. 16, 2017) ...................... 21
*Vera Bradley Designs, Inc. v. Denny*,
   No. 1:18-CV-70-TLS, 2018 WL 3633986 (N.D. Ind. July 30, 2018) ...................... 31
*Woodke v. Daum*,
   70 F.3d 983 (8th Cir. 1995) ........................................................................ 24, 25

## Statutes

28 U.S.C. 1406(b) ............................................................................................ 14
28 U.S.C. § 1391(f)(1) ............................................................................... passim
28 U.S.C. § 1391(b)(2) .............................................................................. passim

## Rules

Fed. R. Civ. P. 12(b)(3) .................................................................................... 14
Fed. R. Civ. P. 12(h)(1) .................................................................................... 14
Fed. R. Civ. P. 12(b) ........................................................................................ 14
Fed. R. Civ. P. 12(g) and (h) ............................................................................ 15

## Other Authorities

14D Fed. Prac. & Proc. Juris. § 3806 (4th ed.) ........................................ 20, 23, 24
14D Fed. Prac. & Proc. Juris. § 3826 (4th ed.) ................................................. 14
Ester, *Borrowing Statutes of Limitation and Conflict of Laws*,
   15 U. Fla. L. Rev. 33 .................................................................................... 18
Restatement (First) of Conflict of Laws § 379 (1934) ..................................... 18
Restatement (Second) of Conflict of Laws § 412 (1969) .................................. 19
Restatement of Conflict of Laws § 377 (1934) ................................................. 20
4D Fed. Prac. & Proc. Juris. § 3829 (4th ed.) .................................................. 15

## INTRODUCTION

The Court should hold that venue is proper in this judicial district for at least three reasons.

*First*, all Defendants have been validly served with process, and all Defendants have defaulted.  As the Supreme Court has held, a default constitutes an effective waiver of any objection to improper venue.  Once a defendant has waived a venue objection, the court should not cure that waiver by raising the issue *sua sponte*.  As Wright & Miller's treatise states, "a court should never raise the issue after the defendant has waived any venue objection."  And even if the Court had discretion to do so, it should not exercise its discretion in favor of these Defendants.

*Second*, Missouri alleges extensive personal injuries occurring in the judicial district, including the deaths of thousands and injuries to hundreds of thousands of Missourians.  When 28 U.S.C. § 1391(f)(1) was adopted and amended, it was well-established that a tort claim "arises" in the forum where personal injury was inflicted.  The Supreme Court has emphasized this point in interpreting the FTCA.  As Wright & Miller recognizes, for venue purposes, a different rule applies for purely *economic* injuries, which typically are not sufficient to support venue where inflicted.  But in tort cases involving personal injuries, such as this case, venue lies where the personal injury was inflicted.  The Eighth Circuit's case law, including *Steen* and *Woodke*, is fully consistent with these principles, because those cases involved purely economic injuries.

*Third*, Missouri alleges that Defendants perpetrated a PPE-hoarding scheme that involved two forms of misconduct occurring in Missouri—purchasing high-quality PPE from Missouri, and shipping defective PPE into Missouri.  These allegations provide a substantial part of the basis for Missouri's claims.  Actions by Defendants directed into the forum—such as instructing proxies to buy up quality PPE from Missouri, and shipping low-quality PPE into the forum—constitute conduct by Defendants "occurring" in the forum, under a strong line of authority.

1

## FACTUAL BACKGROUND

As relevant here, the Complaint alleges at least two broad classes of conduct that support venue in this judicial district: (1) extensive personal injuries inflicted in the forum, and (2) PPE-hoarding activities—such as purchasing high-quality PPE from Missouri and shipping defective PPE into Missouri—that were performed in and directed into this judicial district.  Public reports confirm Missouri's factual basis for these allegations.[1]

**A.**    **The Complaint Alleges Extensive Personal Injuries Inflicted in Missouri as Direct Effects of Defendants' Tortious Conduct.**

First, the Complaint alleges a host of personal injuries—including death, illness, physical suffering, and non-economic injuries such as emotional harms, loss of religious opportunities, and loss of educational opportunities—that were inflicted in Missouri and that Missouri residents suffered in Missouri.  In Paragraph 1, the Complaint alleges that "the State of Missouri seeks recovery for the enormous *loss of life, human suffering*, and economic turmoil experienced by all Missourians from the COVID-19 pandemic that has disrupted the entire world…  Defendants are responsible for the enormous *death, suffering*, and economic losses they inflicted on the world, including Missourians…."  Doc. 1, at 1-2, ¶ 1 (emphasis added).  It alleges that such personal injuries were inflicted everywhere in Missouri, including eastern Missouri: "Defendants' actions and inactions had profound effects in Missouri.  Literally every Missourian has been adversely affected by Defendants' course of conduct."  Doc. 1, at 3, ¶ 8.

The Complaint alleges specific facts of death and illness inflicted in Missouri: "As of April 20, 2020, Missouri had more than 5,800 confirmed infections from COVID-19, and more than 177

---

[1] In considering venue, "the Court may consider documents outside of the complaint."  *Basile v. Walt Disney Co*., 717 F. Supp. 2d 381, 386 (S.D.N.Y. 2010) (quoting *Cartier v. Micha, Inc*., No. 06 Civ. 4699, 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007)); *see also infra*, Legal Standards.

Missourians had died, with these numbers increasing on a daily basis." Doc. 1, at 2, ¶ 3; *id.* at 29, ¶ 117. The Complaint also alleges extensive non-economic personal injuries inflicted in Missouri: "Beyond the costs in terms of health, life, and the economy, the toll to human relationships has been enormous, as Missourians are unable to visit family and friends, celebrate major life milestones like high school or college graduations, or even attend Easter or Passover religious services. Literally every Missourian has suffered an economic, emotional, and/or spiritual toll of the coronavirus." Doc. 1, at 31, ¶ 126. "Missouri families with loved ones in nursing homes have been unable to visit them, and some have been unable to visit dying relatives." Doc. 1, at 31, ¶ 127. "[D]octors and other medical professionals on the front line are … being separated on from their families." Doc. 1, at 32, ¶ 128. "Defendants' course of conduct has inflicted enormous educational disruption on Missouri students at every level, from preschool through graduate studies. Schools have been closed for months, graduations and tests canceled, students isolated at home, libraries closed, and learning completely disrupted." Doc. 1, at 32, ¶ 129.

These personal injuries inflicted in Missouri form a critical part of the basis for all four Counts in the Complaint. Count I: Public Nuisance alleges that "Defendants … in violation of the common good and Missourians' *life and health*, failed to quarantine its population against a virus known to be exceptionally dangerous." Doc. 1, at 36, ¶ 143 (emphasis added). "The repeated unlawful and unreasonable acts and omissions of the Defendants, including their commercial activities, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of substantial numbers of Missouri residents…." Doc. 1, at 36, ¶ 145.

Likewise, Count II: Abnormally Dangerous Activities alleges that "Defendants, in violation of the common good and Missourians' life and health took steps … that impeded the ability of the medical community and others to stop the spread of COVID-19…." Doc. 1, at 39-

3

40, ¶ 158.  "Defendants' abnormally dangerous activities—as well as the resulting harm to the health, well-being, comfort, … and rights of Missouri and its residents—continue unabated."  Doc. 1, at 40, ¶ 162.  Count III: Breach of Duty: Allowing Transmission of COVID-19 alleges that "[t]he unleashing of COVID-19 on the world has caused countless injuries to public health … that would not have occurred in the absence of breach of duty on the part of Defendants."  Doc. 1, at 42, ¶ 166.  "The repeated breaches of duty by the Defendants, as alleged herein, have been injurious to … the lives, health, and safety of substantial numbers of Missouri residents, ruining lives…"  Doc. 1, ¶ 170; *see also id.* ¶ 171 (alleging "substantial non-economic damages"); *id.* ¶ 173 ("Defendants' breach of duty and negligence—as well as the resulting harm to health, well-being, safety, comfort, … and rights of Missouri and its residents—continue unabated.").

Count IV: Breach of Duty: Hoarding of Personal Protective Equipment also alleges personal injuries inflicted in Missouri: "Defendants had a duty not to hoard PPE and not to provide ineffective PPE to medical providers, and doing so has cause injury across the state of Missouri, allowing further spread of COVID-19."  Doc. 1, at 44, ¶ 176.  "The repeated breaches of duty by the Defendants, as alleged herein, have been injurious to … the lives, health, and safety of substantial numbers of Missouri residents, ruining lives…."  Doc. 1, at 45, ¶ 178.

Missouri has not had a chance to take discovery or amend its Complaint, and no Defendant has appeared to defend this case, but subsequent reports have confirmed these allegations.[2]  For example, the Complaint (filed April 21, 2020) alleged that "Missouri has more than 5,800 confirmed infections from COVID-19, and at least 177 Missourians have died."  Doc. 1, at 29, ¶ 117.  Over two years later, shortly before this filing, those numbers have increased to 1.46 million confirmed cases, including many thousands of hospitalizations, and 20,586 deaths of Missourians

---

[2] *See supra*, note 1; *infra*, Legal Standards.

from COVID-19.  *See Tracking Coronavirus in Missouri: Latest Map and Case Count*, NEW YORK TIMES (May 17, 2022), at https://www.nytimes.com/interactive/2021/us/missouri-covid-cases.html.  Since the Eastern District of Missouri is more heavily populated than the Western District, more than half of these deaths and hospitalizations likely occurred in this judicial district.

**B.   The Complaint Alleges Substantial Conduct by Defendants Occurring in Missouri With Respect to the PPE-Hoarding Scheme.**

In addition, the Complaint alleges a PPE-hoarding scheme as an integral part of the malfeasance claimed in Counts I, II, and IV.  This PPE-hoarding conduct involved at least two kinds of malfeasance by Defendants occurring in Missouri: (1) buying up high-quality PPE from Missouri, rendering it unavailable to treat patients in Missouri in the pandemic's opening stages; and (2) selling and shipping low-quality PPE into Missouri to profiteer off the pandemic, putting patients and first responders at risk.  *See* Doc. 1, ¶¶ 130-138.

The Complaint alleges that Defendants engaged in "commercial activities that have caused a direct effect in the United States and *in the State of Missouri*, including, but not limited to: … (4) production, *purchasing*, and import and *export* of medical equipment, such as personal protective equipment ('PPE'), used in COVID-19 efforts."  Doc. 1, at 9-10, ¶ 40 (emphases added).  The section of the Complaint entitled, "Defendants' Actions As to PPE," Doc. 1, at 32-34, ¶¶ 130-138, provides specific allegations based on publicly available information at the time of filing, indicating that Defendants bought up quality PPE from the United States, including Missouri, rendering it unavailable for use in Missouri, and shipped defective PPE to Missouri.  This section alleges that "China did not just stop selling masks—it also bought up much of the rest of the world's supply." Doc. 1, at 33, ¶ 142 (quoting *The World Needs Masks. China Makes Them, But Has Been Hoarding Them*, THE NEW YORK TIMES (Mar. 13, 2020), *available at* https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html).   It alleges that

"Defendants' hoarding efforts resulted in it going 'from being a net exporter of personal protective equipment, as it is the largest producer in the world, to a net importer.'"  Doc. 1, at 33, ¶ 133 (quoting *Navarro: China Went from a Net Exporter of PPE to a Large Net Importer*, BREITBART.COM (April 19, 2020), at https://www.breitbart.com/clips/2020/04/19/navarro-china-went-from-a-net-exporter-of-ppe-to-a-large-net-importer/).  It alleges that "China's actions of hoarding and importing PPE were a 'deliberate attempt by China to corner the market as it concealed and downplayed the danger posed by the outbreak.'"  Doc. 1, at 33, ¶ 134 (quoting *U.S. sent millions of face masks to China early this year, ignoring pandemic warning signs*, WASHINGTON POST (April 18, 2020), *available at* https://www.washingtonpost.com/health/us-sent-millions-of-face-masks-to-china-early-this-year-ignoring-pandemic-warning-signs/2020/04/18/aaccf54a-7ff5-11ea-8013-1b6da0e4a2b7_story.html).

The Complaint also alleges that Defendants shipped defective PPE to Missouri, impeding medical care in Missouri.  "The little PPE that China has released has drawn complaints from governments and hospitals across the world for being faulty, raising the prospect that it is keeping quality materials for itself while shipping defective equipment elsewhere."  Doc. 1, at 34, ¶ 136 (citing *U.S. Asks China to Revise Export Rules for Coronavirus Medical Gear*, NEW YORK TIMES (April 16, 2020), at https://www.nytimes.com/reuters/2020/04/16/world/asia/16reuters-heath-coronavirus-usa-china.html).  "On information and belief, the Defendants' hoarding of PPE has been motivated, at least in part, by the desire to profit from increased worldwide demand of PPE during the viral outbreak, including in Missouri."  Doc. 1, at 34, ¶ 137.  "On information and belief, Defendants' hoarding of PPE has adversely impaired the ability of health care providers throughout the world, including … in Missouri, from safely and effectively treating patients with the virus."  Doc. 1, at 34, ¶ 138.

These PPE-hoarding activities—including purchasing quality PPE from Missouri, and exporting defective PPE to Missouri—provide an important part of the basis for the claims in Counts I, II, and IV of the Complaint.  Count I alleges that "Defendants, in violation of the common good and Missourian's life and health, took steps—including (but not limited to) … hoarding PPE for gain … that impeded the ability of the medical community and others to stop the spread of COVID-19 and its consequences."  Doc. 1, at 36, ¶ 144.  Count II alleges that "Defendants, in violation of the common good and Missourians' life and health took steps—including (but not limited to) … hoarding PPE for gain … that impeded the ability of the medical community and others to stop the spread of COVID-19…."  Doc. 1, at 39-40, ¶ 158.  And Count IV alleges that "Defendants had a duty not to hoard PPE and not to provide ineffective PPE to medical providers, and doing so has cause injury across the state of Missouri, allowing further spread of COVID-19."  Doc. 1, at 44, ¶ 176.  Count IV alleges that "Defendants have restricted exports of PPE and allowed the export of ineffective PPE, all while knowing (and even suppressing) the dangers of COVID-19."  Doc. 1, at 44, ¶ 177.  "The repeated breaches of duty by the Defendants, as alleged herein, have been injurious to—and have significantly interfered with—the lives, health, and safety of substantial numbers of Missouri residents, ruining lives and damaging the public order and economy of the State of Missouri."  Doc. 1, at 45, ¶ 178.

There is, moreover, a strong factual basis for Missouri's allegations that Defendants purchased high-quality PPE from Missouri, rendering it unavailable for treatment of patients in Missouri, and shipped low-quality PPE to Missouri.[3]  For example, shortly before the Complaint was filed, then-U.S. Trade Representative Peter Navarro described Defendants as "vacuum[ing] up" PPE throughout the world, including in the United States: "They basically went around and

---

[3] *See supra* note 1; *infra*, Legal Standards.

vacuumed up virtually all of the PPE around the world, including a lot from this country, which was, for humanitarian reasons, sharing our PPE with them." *Navarro: China Went from a Net Exporter of PPE to a Large Net Importer, supra* (cited in Doc. 1, at 33, ¶ 133). "And what that did was leave people in New York, Milan, and everywhere in between defenseless when it came time to have that PPE. Now what's happening today, which is equally alarming, is China is sitting on that hoard of PPE, where it cornered the market, and it's profiteering. I have cases coming across my desk where 50-cent masks made in China are being sold to hospitals here in America for as much as $8." *Id.* (quoting Peter Navarro).

Other public reports have provided confirmation of these activities, including the direct involvement of Missouri, and confirmed the particular role of the Communist Party of China (CPC), acting through state-owned enterprises (SOEs) and CPC-influenced organizations abroad.

The CPC directs the commercial activities of state-owned enterprises (SOEs) through party boards. A state regulation directs that "[a]ll major business and management decisions must be discussed by the Community Party organ before being presented to the board of directors or management for a decision." *China cements Communist Party role at the top of its SOEs, should 'execute the will of the party*, SOUTH CHINA MORNING POST (Jan. 8, 2020), https://www.scmp.com/economy/china-economy/article/3045053/china-cements-communist-partys-role-top-its-soes-should. The United Front Work Department ("United Front") is a high-level arm of the Communist Party of China that, according to a Bloomberg Businessweek report, uses influence and pressure operations to direct civic organizations around the world, including more than 250 associations in the United States, to support the objectives of the Communist Party. *China's Epic Dash for PPE Left the World Short on Masks*, BLOOMBERG BUSINESSWEEK (Sept. 17, 2020), https://www.bloomberg.com/news/articles/2020-09-17/behind-china-s-epic-dash-for-

ppe-that-left-the-world-short-on-masks; *see also, e.g., China's Oversees United Front Work: Background and Implications for the United States*, U.S.-China Economic and Security Review Commission (Aug. 24, 2018), https://www.uscc.gov/research/chinas-overseas-united-front-work-background-and-implications-united-states.  The United Front has "longstanding and formal ties" with Confucius Institutes located on dozens of U.S. college and university campuses, including two in Missouri, at Webster University in St. Louis and (until August 2020) the University of Missouri.  *See id.*; *see also MU to terminate Confucius Institute partnership due to changes in federal guidance*, University of Missouri (Jan. 14, 2020), https://showme.missouri.edu/2020/mu-to-terminate-confucius-institute-partnership-due-to-changes-in-federal-guidance/;  *Confucius Institute*, Webster University, at http://www.webster.edu/confucius-institute/.

According to well-documented reports, in January 2020, the Communist Party of China, through its United Front network, directed such state-owned enterprises and civic organizations in dozens of countries across five continents to purchase PPE from around the world and ship it back China.  *China's Epic Dash for PPE*, *supra*.  According to one whistleblower inside the Greenland Group, a massive state-owned enterprise that has operations in the United States and Missouri, staff of that global property giant around the world were directed to pause their normal work in order to source bulk supplies of essential medical items and ship them back to China.  *Chinese-backed company's mission to source Australian medical supplies*, Sᴠᴅɴᴇʏ Mᴏʀɴɪɴɢ Hᴇʀᴀʟᴅ (Mar. 26, 2020), https://www.smh.com.au/national/chinese-backed-company-s-mission-to-source-australian-medical-supplies-20200325-p54du8.html.  The Greenland Group, which received this worldwide instruction, evidently does business in Missouri, with a principal office in Raytown and registered office in Kansas City.  *See* Greenland Holdings, LLC, *at* https://bsd.sos.mo.gov/BusinessEntity/BusinessEntityDetail.aspx?page=beSearch&ID=1861538;

9

*see also* Greenland Holdings, https://en.wikipedia.org/wiki/Greenland_Holdings (noting that "Greenland Holdings" is "known as the Greenland Group" and is "a Chinese real estate developer" that "was founded as a state-owned enterprise," and, with $58 billion in assets, is "the largest real estate developer in the world").  To be sure, Missouri has not yet been granted discovery on these issues, but there is ample reason to infer at the pleading stage that "China's Epic Dash for PPE" included "vacuuming up" PPE from Missouri, through such Missouri-based intermediaries.

According to a report from the U.S. Department of Homeland Security, in January 2020, China increased its imports of surgical masks by 278 percent, surgical gowns by 72 percent, and surgical gloves by 32 percent.  *DHS report accuses China of hiding coronavirus info so it could hoard supplies*, POLITICO, (May 3, 2020), *at* https://www.politico.com/news/2020/05/03/dhs-china-hiding-coronavirus-info-supplies-233185.   This worldwide effort was effective: "By the end of February, as other countries were realizing their own need for masks and protective equipment, the campaign had sent 2.5 billion items to China."  *Id.*  "According to whistleblower reports, participants in this scheme then sold PPE at inflated prices once medical providers around the world realized they faced the prospect of depleted supplies of PPE during a global pandemic."  *Amid pandemic, Chinese officials ordered medical supplies from abroad, then sold them for profit*, EPOCH TIMES (Sept. 17, 2020), *at* https://www.theepochtimes.com/amid-pandemic-chinese-officials-ordered-medical-supplies-from-abroad-then-sold-them-for-profit_3469200.html.  At the same time, China stopped allowing U.S. companies to bring PPE or coronavirus test kits back to the United States, citing quality concerns.  *Coronavirus: China backs free trade in masks despite shortages*, SOUTH CHINA MORNING POST (Mar. 5, 2020),  https://www.scmp.com/economy/china-economy/article/3065264/china-backs-free-trade-masks-despite-coronavirus-induced;   *China's Export Restrictions Strand Medical Goods U.S. Needs to Fight Coronavirus, State Department*

*Says*, WALL STREET JOURNAL (Apr. 16, 2020), at https://www.wsj.com/articles/chinas-export-restrictions-strand-medical-goods-u-s-needs-to-fight-coronavirus-state-department-says-11587031203?mod=hp_lead_pos2.

According to media reports, "authorities posted officials at factories around the country to ensure that every mask they made was used for domestic government priorities." *China's manufacturing industry struggles to keep up with demand for ventilators, masks amid coronavirus outbreak*, GLOBE & MAIL (Mar. 23, 2020), https://www.theglobeandmail.com/world/article-chinas-manufacturing-industry-struggles-to-keep-up-with-demand-for/.   Meanwhile, at the direction of the Communist Party, Chinese state-owned enterprises with no previous experience producing medical devices rushed to manufacture PPE.   *China dominates medical supplies, in this outbreak and the next*, N.Y. TIMES (July 5, 2020), https://www.nytimes.com/2020/07/05/business/china-medical-supplies.html.   "Some of these pop-up PPE factories faked U.S. government medical device approvals and credentials, deceiving authorities and consumers in order to export PPE into the United States." *As the world turns to China for PPE, U.S. buyers risk knock-offs and price gouging*, CBS NEWS (Apr. 13, 2020), https://www.cbsnews.com/news/china-ppe-us-buyers-knock-offs-price-gouging/.

Defendants then hid their efforts to hoard quality PPE while permitting the export of sub-standard medical equipment, merging January and February trade figures while delaying the release of trade data.   *DHS report accuses China of hiding coronavirus info so it could hoard supplies*, POLITICO (May 3, 2020), https://www.politico.com/news/2020/05/03/dhs-china-hiding-coronavirus-info-supplies-233185.   The little PPE that China released drew complaints from governments and hospitals across the world for being faulty, raising the prospect that it was keeping quality materials for itself while shipping defective equipment elsewhere.   *U.S. Asks*

*China to Revise Export Rules for Coronavirus Medical Gear*, NEW YORK TIMES (April 16, 2020), at https://www.nytimes.com/reuters/2020/04/16/world/asia/16reuters-heath-coronavirus-usa-china.html.

Such faulty shipments were made directly to Missouri.  In one notable incident, over 48,000 N95 masks imported directly from China and given to Missouri first responders in April 2020—at the height of the initial crisis—were recalled as a result of their substandard quality, leaving countless medical providers, public officials, and private consumers vulnerable to the then-novel coronavirus.  *Missouri recalls 48K masks from China given to first responders in April*, MISSOURI TIMES (Apr. 14, 2020), https://themissouritimes.com/missouri-recalls-48k-masks-given-to-first-responders-in-april/.  These faulty masks affected "local law enforcement and fire service partners across the state," including eastern Missouri.  *Id.*  According to media reports, roughly half of Missouri hospitals reported shortages of PPE in March 2020, with the lack of medical equipment and protective gear reaching "crisis proportions."  *'They're scared': Doctors lack safety gear in fight against coronavirus in KC region*, KANSAS CITY STAR (Mar. 29, 2020), at https://www.kansascity.com/news/coronavirus/article241468706.html.

## LEGAL STANDARDS

Section 1391(f)(1) provides that "[a] civil action against a foreign state as defined in section 1603(a) of this title may be brought— (1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred…."  28 U.S.C. § 1391(f)(1).  Its operative language is nearly identical to Section 1391(b)(2).  *See* 28 U.S.C. § 1391(b)(2) (providing that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred"); *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 558 (S.D.N.Y. 2004) (because 1391(b)(2) and (f)(1) "use the same statutory

language," they "require the same analysis"). "Under the amended statute, we no longer ask which district among two or more potential forums is the 'best' venue…. Rather, we ask whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts*." Setco Enters. Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994).

In assessing venue at the pleading stage, "the court will accept as true undisputed facts in the plaintiff's pleadings, resolve any conflicts in the evidence plaintiff's favor, and afford the plaintiff the benefit of the doubt when determining the governing facts." *Clarendon Nat. Ins. Co. v. T.M.I. Enterprises, LLC*, No. CIV. A. 07-1637, 2008 WL 3838025, at *2 (W.D. La. Aug. 14, 2008); *see also Eddie Kane Steel Prod., Inc. v. Alabama Plate Cutting Co*., No. CV1815167MASLHG, 2019 WL 3281623, at *3 (D.N.J. July 19, 2019) ("[A] court must accept the complaint's allegations as true, unless contradicted by the defendant"). In addition, in considering venue, "the Court may consider documents outside of the complaint." *Basile v. Walt Disney Co*., 717 F. Supp. 2d 381, 386 (S.D.N.Y. 2010) (quoting *Cartier v. Micha, Inc*., No. 06 Civ. 4699, 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007)). This makes sense "because lack of venue is an affirmative defense," and so "the plaintiffs are not required to include allegations showing that the district in which the action has been brought is one of proper venue." *Estate of Abtan v. Blackwater Lodge & Training Ctr*., 611 F. Supp. 2d 1, 10 (D.D.C. 2009); *SEC v. Ernst & Young*, 775 F. Supp. 411, 412 (D.D.C. 1991) ("The plaintiff need not plead venue; rather, lack of venue is an affirmative defense.").

## ARGUMENT

### I.    Defendants Have Waived Any Objection to Venue by Failing to Answer, and the Court Should Not Raise an Objection to Venue *Sua Sponte*.

First and foremost, the Court should not raise this issue *sua sponte*. As discussed in detail in Missouri's prior briefing, all Defendants have been validly served and have failed to file an

answer or responsive pleading in a timely fashion.  Accordingly, Defendants have waived any objection to venue. *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960) ("A defendant … waives venue by failing seasonably to assert it, *or even simply by making default*.") (emphasis added); *Commercial Casualty Ins. Co. v. Consolidated Stone Co*., 278 U.S. 177, 180-81 (1929) (holding that an objection to venue was waived when "[t]he defendant, although duly served with a proper summons apprising it of the time within which it was required to appear and answer, permitted that time to elapse without making any objection to the venue").

In general, "[a]n objection to venue is a personal privilege of the defendant, so the burden is on the defendant to assert an object in a proper and timely way.  The failure to raise the objection properly waives the defense." WRIGHT & MILLER, 14D FED. PRAC. & PROC. JURIS. § 3826 (4th ed.) (§ 3826 Raising Objections to Venue).  "Under Civil Rules 12(g) and (h), improper venue must be raised in the defendant's first response under Rule 12, whether that response is by motion or responsive pleading.  Failure to do so results in waiver of the defense." *Id.*; *see also* Fed. R. Civ. P. 12(h)(1); Fed. R. Civ. P. 12(b)(3) (holding that a defense of "improper venue" is waived if not raised in a party's initial answer or Rule 12(b) motion); 28 U.S.C. § 1406(b) ("Nothing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue.").

Some courts hold that improper venue may be raised *sua sponte* if it has not yet been waived, while other courts disagree. *See* Wright & Miller § 3826 ("Because of the waiver principle and the personal nature of the venue defense, some courts consider it inappropriate to dismiss an action *sua sponte* for improper venue in the absence of a proper objection. Other courts will address the issue on their own motion….").  But an objection to venue should not be raised by the Court when the objection has been waived by the Defendants:

14

Venue generally is considered a privilege and a form of protection provided to defendants. Therefore, a defect in venue may be waived under Civil Rule 12(g) and (h) if not asserted in timely fashion. As discussed in detail elsewhere, some courts say it is proper to raise the issue of defective venue sua sponte, at least if the parties have an opportunity to present their views on the question. *But a court should never raise the issue after the defendant has waived any venue objection*.

Wright & Miller, § 3829 (emphasis added) (citing cases); *see also, e.g., Automobile Mechanics Local 701 Welfare and Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 745–746 (7th Cir. 2007); *Herrington v. Verrilli*, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001).  Nor should the Court do so here.

This Court noted in its prior order that the six governmental defendants were validly served in October 2021 and have thus been in default for many months.  Doc. 47, at 3 ("The record recently reflects proof of service on those six defendants"); Doc. 36-41 (proof of service of six governmental defendants on October 7, 2021); Doc. 44 (clerk's entry of default against these six defendants on December 15, 2021).  And, as Missouri has argued in detail elsewhere, Doc. 54, at 29-37, the other three Defendants (CPC, CAS, WIV) were validly served in May 2021 and have also been in default for many months.  *See id.*; Doc. 23 (May 18, 2021 proof of service on CPC, CAS, and WIV); Doc. 29 (clerk's entry of default against those three defendants on August 16, 2021).  All Defendants have been validly served, all Defendants are fully aware of this lawsuit, all Defendants have had a full and fair opportunity to respond, and all Defendants have affirmatively chosen not to do so.  Doc. 54, at 29-37.  Any objection to venue has been waived, and the Court lacks authority to cure that waiver on behalf of Defendants—especially as to the six Defendants that the Court has already ruled are in default.  *Hoffman*, 363 U.S. at 343 (a venue objection is waived "simply by making default").

Moreover, even if the Court concludes that it has discretion to raise venue *sua sponte*, it should not exercise its discretion in favor of these Defendants.  Missouri's lawsuit alleges

15

egregious, horrific wrongdoing that killed millions of people, including tens of thousands of Missourians.  It asserts those claims against some of the most heavily resourced, powerful, and sophisticated entities in the world—including the People's Republic of China and the Communist Party of China, which exercise totalitarian control over one of the world's largest economies.  If the PRC, the Communist Party, and other Defendants thinks this case should be litigated in another venue, let them appear and convince the Court on their own.  They certainly have the resources to do so.  This Court has no duty to raise the issue for them.

## II.  In Tort Cases, Personal Injuries Inflicted Within the Judicial District Constitute Events "Giving Rise to the Claim" in That District.

Even if the issue were properly before the Court, venue is proper in this judicial district on multiple grounds.  First, Section 1391(f)(1) of Title 28 provides that "[a] civil action against a foreign state as defined in section 1603(a) of this title may be brought— (1) in any judicial district in which a substantial part of the events or omissions *giving rise to the claim* occurred, or a substantial part of property that is the subject of the action is situated."  28 U.S.C. § 1391(f)(1) (emphasis added).  Here, the Complaint alleges extensive personal injuries—death, illness, physical suffering, emotional injuries, and other non-economic harms—that were inflicted and experienced by Missouri residents throughout Missouri (including the Eastern District of Missouri) as a direct result of Defendants' tortious conduct.  Such injuries are alleged in all four Counts of the Complaint, and they unquestionably constitute "a substantial part of the events or omissions giving rise to the claim" that "occurred" in this judicial district.  *Id.*

This Court's show-cause order correctly notes that, in *Steen v. Murray*, 770 F.3d 698, 703 (8th Cir. 2014), the Eighth Circuit instructed that, in a case involving purely *economic* harms, "the court's *focus* must be on relevant activities of the defendant in the forum state, not on the effect of those activities on the plaintiff in the forum state."  Doc. 57, at 2 (quoting *Steen*, 770 F.3d at 703).

16

But the Eighth Circuit did not adopt a *per se* rule that injuries suffered by the plaintiff in the forum state can *never* be considered in the venue analysis.  On the contrary, the immediately preceding sentence in *Steen* says the opposite: "We do not read *Woodke* as holding that a court in applying § 1391(b)(2) may *only* consider the defendant's allegedly wrongful activities."  *Steen*, 770 F.3d at 703 (emphasis in original).  Most notably here, the Eighth Circuit has never held that venue is improper in a tort case where *personal injury was inflicted in the forum*.  Any such holding would be extremely surprising, and it would contradict the plain meaning of the statute, longstanding principles of tort law, and the overwhelming weight of authority.

A.     **The plain meaning of "events … giving rise to the claim" includes personal injuries inflicted in the judicial district by defendants' tortious conduct.**

First, the plain language of the statute provides that venue is proper in a judicial district where a substantial part of the events or omissions "giving rise to the claim" occurred.  28 U.S.C. § 1391(f)(1).  In personal-injury cases, under longstanding principles of tort law, the claim "arises" in the venue where the *injury was inflicted*.  Usually, but not always, this coincides with the venue where the defendant's misconduct occurred.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the U.S. Supreme Court endorsed this very principle.  Interpreting the similar phrase "arising in" in the Foreign Tort Claims Act, the Supreme Court held that "arising in" refers to the place where the injury was inflicted: "Congress understood a claim 'arising in a foreign country' to be a claim for *injury or harm occurring in a foreign country*."  *Id.* at 704 (emphasis added).  "This sense of 'arising in' was the common usage in state borrowing statutes contemporary with the [FTCA], which operated to determine which State's statute of limitations should apply in cases involving transjurisdictional facts."  *Id.*  Such state statutes "were typically restricted by express terms to situations where a cause of action was time barred in the State '*where [the] cause of action arose, or accrued, or originated*.'"  *Id.*

17

(quoting 75 A.L.R. 203, 211 (1931)) (emphasis in original).  Such "variations on the theme of 'arising in' were interpreted in tort cases in just the same way that we read the FTCA today," *i.e.*, according to the longstanding rule that a tort "arises in" the place where the injury occurred: "A commentator noted in 1962 that, for the purposes of these borrowing statutes, '[t]he *courts unanimously hold that a cause of action sounding in tort arises in* the jurisdiction where the last act necessary to establish liability occurred'; i.e., '*the jurisdiction in which injury was received*.'" *Id.* at 705 (emphasis added) (quoting Ester, *Borrowing Statutes of Limitation and Conflict of Laws*, 15 U. FLA. L. REV. 33, 47).

Thus, *Sosa* interpreted the FTCA's phrase "arising in" and similar phrases (*i.e.*, "variations on the theme of 'arising in,'" *id.*) to refer to the *place where the injury was inflicted*. *Id.*  This made sense because, both then and later, "courts unanimously hold that a cause of action sounding in tort arises in … the jurisdiction in which injury was received."  *Id.* (quotation omitted).

As *Sosa* further observed, both the First and Second Restatements of Conflict of Laws supported this interpretation that a tort claim "arises" where the injury is inflicted.  "When the FTCA was passed, the dominant principle in choice-of-law analysis for tort cases was *lex loci delicti*: courts generally applied the law of the place where the injury occurred."  *Id.* (citing RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 379 (1934) (defendant's liability determined by "the law of the place of wrong"), and *Richards v. United States*, 369 U.S. 1, 11–12 (1962) ("The general conflict-of-laws rule, followed by a vast majority of the States, is to apply the law of the place of injury to the substantive rights of the parties.")).  *Sosa* quoted the Second Restatement as follows: "The original Restatement stated that, with minor exceptions, all substantive questions relating to the existence of a tort claim are governed by the local law of the 'place of wrong.' This was described ... as 'the state where the last event necessary to make an actor liable for an alleged

tort takes place.' Since a tort is the product of wrongful conduct and of resulting injury and since the injury follows the conduct, the state of the 'last event' is *the state where the injury occurred*." *Id.* at 705 n.3 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 412 (1969)).  As *Sosa* noted, "[t]he Second Restatement itself, encouraging the general shift toward using flexible balancing analysis to inform choice of law, includes a default rule for tort cases rooted in the traditional approach: '[i]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties….'"  *Id.* at 709 (quoting Restatement (Second) § 146).  And *Sosa* quoted the Second Restatement as specifically addressing cases, like this case, where the tortious conduct and personal injuries occur in separate forums: "On occasion, conduct and personal injury will occur in different states. In such instances, the local law of ***the state of injury will usually be applied to determine most issues involving the tort***."  *Id.* at 709 (quoting Restatement (Second), § 146 cmt. e) (emphasis added).

Precisely the same analysis applies to 28 U.S.C. § 1391(b)(2) and (f)(1).  Like the FTCA, this venue statute "was written at a time when the phrase 'arising in' was used in state statutes to express the position that a claim arises where the harm occurs."  *Sosa*, 542 U.S. at 711.  The same meaning applies to "variations on the theme of 'arising in,'" *id.* at 705, such as the phrase "giving rise to the claim" in Section 1391.  Section 1391 was first amended in 1966—while the First Restatement was in effect, and shortly before the adoption of the Second Restatement—to provide for venue in a judicial district "in which the claim arose."  *Bates v. C & S Adjusters, Inc*., 980 F.2d 865, 866–67 (2d Cir. 1992).[4]  But "[t]his phrase gave rise to a variety of conflicting

---

[4] "Congress first provided for transactional venue in the general venue statute in 1966.  It did so, however, with unfortunate terminology, allowing venue in the district "in which the claim arose." The phrasing implied that there was only one place in which any claim arose, which was unfortunately and unnecessarily restrictive.  Moreover, the statute gave no guidance on how one is to assess where a claim arises.  Responding to criticism on these and other grounds, Congress

interpretations," and courts struggled in particular with the question whether venue was appropriate in only one location.  *See id.*  Thus, the statute was amended in 1990, consistent with ALI recommendations, to replace the phrase "in which the claim arose" with the new language "a substantial part of the events and omissions giving rise to the claim occurred."  *Id.*  "Against this background," the Second Circuit observed, "Congress' 1990 amendment [was] at most a marginal expansion of the venue provision."  *Id.* at 867.  Moreover, the Second Restatement was in effect in 1990 when Congress clarified the statute.

Thus, the phrase "giving rise to the claim" in the current (1990) version of the statute merely clarifies the previous phrase "in which the claim arose" from the prior (1966) version of the statute.  Both are "variations on the theme of 'arising in,'" *Sosa*, 542 U.S. at 705—which, in tort cases, was universally understood at the time to encompass *the place of injury*.  *Id.*

Moreover, as Missouri pointed out in prior briefing, this same principle has been adopted and applied specifically in FSIA cases, in expounding the "direct effects" requirement of FSIA.  *See, e.g., Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016); *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993).  As *Atlantica Holdings* held, "[a] tort's locus—also known as the *locus delicti*, or 'place of wrong'—is the place 'where the last event necessary to make an actor liable for an alleged tort takes place.'"  *Atlantica Holdings*, 813 F.3d 98, 109 (quoting RESTATEMENT OF CONFLICT OF LAWS § 377 (1934)).  "And, 'since a tort action traditionally has not been viewed as complete until the plaintiff suffers injury or loss,' the cause of action has generally 'been considered to arise at the place where this damage was sustained.'"  *Id.* (quoting *Sack v. Low*, 478 F.2d 360, 365 (2d Cir.

---

finally responded in 1990, when it adopted the language found today in Section 1391(b)(2)."  WRIGHT & MILLER, 14D FED. PRAC. & PROC. JURIS. § 3806 (4th ed.) (hereinafter WRIGHT & MILLER).

1973)).  So also here, Missouri's claims for personal injuries "arise at the place where this damage was sustained," *id.*—*i.e.*, in Missouri, including its eastern District.

**B.    The overwhelming weight of authority is consistent with the principle that a personal injury inflicted in the district constitutes an "event … giving rise to the claim."**

This conclusion, moreover, is consistent with the overwhelming weight of authority in cases interpreting Section 1391.  For tort claims involving *personal* injuries, as opposed to purely economic injuries, cases routinely uphold venue in the district where the injury was inflicted.  On the other hand, after diligent research, Missouri has found no tort case holding that venue was improper in the judicial district where personal injuries giving rise to the claim were inflicted.

These principles hold true in many cases.  *See, e.g., Taylor v. City & County of Honolulu*, No. 7:16-CV-410-D, 2017 WL 3526660, at *3 (E.D.N.C. Aug. 16, 2017) (holding that venue was improper in North Carolina for a North Carolina plaintiff who was injured in bus accident in Honolulu, where the "injury [was] suffered in Hawaii"); *State Farm Mut. Auto. Ins. Co. v. Est. of Bussell*, 939 F. Supp. 646, 650 (S.D. Ind. 1996) (holding venue was proper in an insurance-coverage dispute where the car accident occurred and the injuries were inflicted in the forum); *In re Volkswagen AG*, 371 F.3d 201, 205 (5th Cir. 2004) (issuing a writ of mandamus to compel the district court to transfer an auto-accident case to the San Antonio division of the Western District of Texas, which was the "situs of the accident" where the injuries occurred); *Chenevert v. Springer*, No. CIV.A.C-09-35, 2009 WL 2215115, at *4 (S.D. Tex. July 22, 2009) (in a sexual-abuse case, holding that the case should be transferred to the Middle District of Louisiana, because "[a]ll of the alleged abuse of Plaintiffs" occurred there); *Holloway v. Holy See*, 537 F. Supp. 3d 502 (S.D.N.Y. 2021) ("The law is clear that venue in sexual abuse cases lies in the district where the abuse occurred."); *Arriaga v. Imperial Palace, Inc*., 252 F. Supp. 2d 380, 387–88 (S.D. Tex. 2003)

(holding that venue lay in Nevada for a slip-and-fall case where the fall and injuries occurred in Nevada, but the plaintiff received medical care for the injuries in Texas); *McEvily v. Granai*, No. 01 CIV. 5430 (DLC), 2001 WL 1098005, at *1 (S.D.N.Y. Sept. 18, 2001) (in a gunshot-wound case, holding that venue was proper only in Georgia, not New York, where the gunshot wound and injuries were inflicted in Georgia, but the plaintiff received medical care in New York); *Cranford v. Tennessee Steel Haulers, Inc.*, No. CV ELH-17-2768, 2018 WL 3496428, at *9 (D. Md. July 20, 2018) (in a car-accident case, holding that venue was proper where the negligent driving and injuries occurred, because "[w]hen considering transactional venue for torts cases, courts will generally consider both where the activities arose *and* where the harm was felt") (emphasis in original) (quoting *Seidel v. Kirby*, 296 F.Supp.3d 745, 752 (D. Md. 2017)); *Adhikari v. KBR, Inc.*, JCC 115-CV-1248, 2016 WL 4162012, at *5 (E.D. Va. Aug. 4, 2016) (holding that "[i]n human trafficking and forced labor cases, the venue assessment typically turns on where the victims were trafficked and where they were forced to work," which "is consistent with courts' general practice in tort cases of emphasizing the location where the harm and the tortious acts occurred"); *Estate of Abtan v. Blackwater Lodge & Training Ctr.*, 611 F. Supp. 2d 1, 8 (D.D.C. 2009) (holding that venue in D.D.C. was improper in a case based on alleged shootings in Iraq, in part because "courts focus on include the place where the allegedly tortious actions occurred and the place where the harms were felt"); *see also, e.g., Service Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1087–88 (N.D. Cal. 2018) ("[F]or purposes of venue under § 1391, the Court looks to the general rule that, 'in a tort action, the locus of the injury [is] a relevant factor'") (quoting *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2001)).[5]

---

[5] This principle is also consistent with cases involving non-physical, non-economic injuries, such as those experienced in defamation, invasion-of-privacy, and wrongful imprisonment cases. *See, e.g., Smith v. Schmidt*, 52 F. App'x 11, 12 (9th Cir. 2002) (in wrongful-imprisonment case, holding

Aptly summarizing these and many other cases, Wright & Miller reports that, in applying § 1391 "[i]n tort cases, courts tend to focus on where the allegedly tortious actions took place and *where the harms were felt*."  14D WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 3806 (emphasis added).  Moreover, the treatise goes on to note that this place-of-injury principle typically is not extended to merely *economic* harms, because a plaintiff typically experiences an economic harm wherever he or she resides: "There is a tendency to conclude that suffering economic harm within a district is not by itself sufficient to warrant transactional venue there.  This is probably the correct view, because otherwise venue almost always would be proper at the place of the plaintiff's residence, an option that Congress abolished in the general venue statute 1990." WRIGHT & MILLER, 14D FED. PRAC. & PROC. JURIS. § 3806 (4th ed. April 2022 update). But for *personal* injuries, courts "tend to focus on … where the harms were felt," *id.*, not just where the tortious actions occur.

### C.     The Eighth Circuit's decisions in *Steen* and *Woodke* do not hold that venue is improper in a judicial district where personal injuries were inflicted.

The Eighth Circuit's decisions in *Steen*, *Woodke*, and similar cases are fully consistent with the plain meaning of § 1391(f)(1) and this strong line of authority.  These cases do not hold that venue is improper in a district where the personal injury was inflicted.

---

that "[b]ecause Smith alleged that the 'locus of the injury' was the parole hearing, which occurred in the Central District of California, venue was proper under 28 U.S.C. § 1391(b)(2)"); *Santa's Best Craft, LLC v. Janning*, No. 02 C 9529, 2003 WL 21504522, at *2 (N.D. Ill. June 30, 2003) (upholding venue because "[t]wo allegedly defamatory letters were published in this district," whereas "defamation occurs where the allegedly defamatory statement is published," and "the injury (if any) from the defamation was incurred in this district"); *Rothstein v. Carriere*, 41 F. Supp. 2d 381, 385 (E.D.N.Y. 1999) (upholding venue in New York in a malicious-prosecution case where the false information given to law enforcement and the filing of false criminal charges both occurred in other districts, but the plaintiff suffered both physical and economic injuries in the district); *Seidel v. Kirby*, 296 F. Supp. 3d 745, 752-53 (D. Md. 2017) (noting that "[w]hen considering transactional venue for torts cases, courts will generally consider both where the activities arose *and* where the harm was felt").

23

*First*, as noted above, *Steen* itself emphasized that it did *not* hold that courts can never consider the effects on the plaintiff in assessing venue under § 1391.  The Eighth Circuit stated: "We do not read *Woodke* as holding that a court in applying § 1391(b)(2) may *only* consider the defendant's allegedly wrongful activities."  *Steen*, 770 F.3d at 703 (emphasis in original).  Instead, *Steen* merely asserted that "the court's *focus* must be on relevant activities of the defendant in the forum state."  *Id.* (emphasis in original).  This is consistent with also considering—where appropriate—the locus of the injuries inflicted on plaintiff, especially because these frequently coincide with the locus of defendant's wrongdoing.

*Second*, both *Steen* and *Woodke* (the case *Steen* was expounding) involved purely *economic* injuries, which (as Wright & Miller notes) are treated differently than *personal* injuries for venue analysis, and for good reason.  Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3806.  Per Wright & Miller, courts treat purely economic injuries differently than personal injuries because, unlike personal injuries, economic injuries are typically experienced wherever the plaintiff resides.  *Id.*  In fact, the Eighth Circuit relied on this very rationale in *Woodke*, explaining why the purely economic injuries experienced in the district did not support venue: "[W]hile damages or potential adverse economic effect are a necessary part of a Lanham Act claim, if Congress had wanted to lay venue where the plaintiff was residing when he was injured, it could have said so expressly."  *Woodke v. Daum*, 70 F.3d 983, 985 (8th Cir. 1995).  As Wright & Miller notes, this rationale is consistent with treating the "place where the harms were felt" as proper venue for cases involving non-economic injuries, such as personal injuries.  Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3806.  Notably, *Steen* was a legal malpractice case that involved only economic injuries, which were felt at the plaintiffs' residence in Iowa, while the "alleged malpractice … was entirely performed in Nebraska."  770 F.3d at 704.  Likewise, *Woodke* was a trademark infringement action

24

under the Lanham Act, involving purely economic injuries which the plaintiff experienced at his residence in the district, while the allegedly infringing activity occurred entirely out of the district. *Woodke*, 70 F.3d 985.  By contrast, in *Pecoraro*, where the defendant allegedly kidnapped the plaintiff from Nebraska and sexually abused him multiple times in South Dakota, the Eighth Circuit held that venue would be proper in both districts, and emphasized that the place of the personal injury was unquestionably a proper venue: "While South Dakota's connection to the defendants is much stronger, we find … that Nebraska also has a substantial connection to Pecoraro's claim."  *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 563 (8th Cir. 2003).

*Third*, the Eighth Circuit has considered factors other than the locus of the defendants' conduct in assessing the propriety of venue under § 1391.  For example, in *Setco Enterprises*, the Eighth Circuit upheld venue in the Western District of Missouri in a fraudulent-transfer case where none of the defendants' fraudulent conduct either occurred in or was directed toward that district.  *Setco Enterprises Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994).  Instead, the challenged transfers were fraudulent because they were perpetrated in violation of an order issued by the bankruptcy court in the Western District of Missouri.  *Id.*  Even though the defendants had taken no actions in or directed toward the district, the Eighth Circuit held that venue was proper because "Setco's fraud claim is based in large part on the Robbins' violation of this order" issued in the district, "the Robbins' assets were under the jurisdiction of the bankruptcy court," and "the records relating to Setco's claim are located in the Western District."  *Id.*  These factors, of course, relate to the effects on the plaintiff, not the defendant's conduct.  Far from a *per se* rule based on defendants' conduct alone, the Eighth Circuit cited a much more flexible test: "venue is proper if the events in a district were not insubstantial and the forum is a convenient one balancing the

equities and fairness to each party." *Id.* (quoting *Florida Nursing Home Ass'n v. Page*, 616 F.2d 1355, 1361 (5th Cir. 1980)).  That test, of course, is easily satisfied here.

*Fourth*, a rigid, inflexible rule that focused solely on defendants' conduct, and refused to consider the place of personal injury, would lead to unreasonable, even absurd, conclusions.  This case vividly illustrates such concerns.  Missouri seeks recovery for injuries that include over 20,000 deaths of Missouri residents and many thousands of hospitalizations—every single one of which occurred in Missouri, and more than half of which occurred in this judicial district.  All the evidence relating to these devastating injuries—including individual witnesses who will attest to the injuries and losses they suffered—is located in Missouri.  By contrast, the District for the District of Columbia is a "fallback" venue that has no direct relation to this case, other than the fact that some third-party evidence may be located there.  The notion that the Eastern District of Missouri lacks a "substantial" connection to claims involving the injuries of hundreds of thousands and the deaths of thousands occurring in this judicial district, is surprising and insupportable.  The Eighth Circuit has not adopted any such rule.  Neither should this Court.

## III.  Defendants' Actions of Purchasing PPE From Missouri and Shipping Defective PPE Into Missouri Constitute a "Substantial Part of the Events … Giving Rise to the Claim(s)" That Occurred in the Judicial District.

As noted above, the Complaint alleges that, as part of their PPE-hoarding scheme, Defendants (1) purchased PPE from Missouri, rendering it unavailable for treatment of patients in Missouri during the early stages of the pandemic, and (2) shipped defective PPE into Missouri, rendering quality PPE unavailable to healthcare providers and other first responders in Missouri. These actions occurring in Missouri, which comprise critical parts of the PPE-hoarding and PPE-profiteering scheme alleged in Counts I, II, and IV of the Complaint, constitute a substantial part of the events or omissions giving rise to Missouri's claims.

*Actions of Defendants.*   The Court's show-cause order expresses concern that the Court should focus on actions of *Defendants* in assessing venue.  Doc. 57, at 2.  These PPE-hoarding actions are actions of Defendants, as the Complaint alleges.  *See, e.g.,* Doc. 1, ¶¶ 130-138.

*Occurring in Missouri.*   These actions also occurred in Missouri, including the Eastern District of Missouri.  To be sure, the Defendants' PPE-purchasing actions occurred through proxies, such as SOEs and Communist Party-influenced organizations like the Greenland Group, and its PPE-shipping activities were initiated in China and directed into Missouri from abroad. But it is well-established that actions outside the forum that are purposely directed into the forum— such as shipping items into the forum by mail, communicating by telephone or email into the forum, accessing computer servers in the forum remotely from computers outside the forum, and such remote, forum-directed activities—constitute actions "occur[ing]" in that forum.  For example, in *H&R Block E. Enterprises, Inc. v. J&M Securities, LLC*, the plaintiffs alleged that defendants had somehow unlawfully accessed confidential client information stored in the district, though plaintiffs were unsure of the method used.  *H&R Block E. Enterprises, Inc. v. J&M Sec., LLC*, No. 05-1056-CV-W-DW, 2006 WL 1128744, at *1 (W.D. Mo. Apr. 24, 2006).  The Western District of Missouri found that unlawfully accessing information stored within the district, even if done remotely, supported venue in the district: "Defendants allegedly accessed information stored in this District, causing harm or loss. The Court finds that venue here is proper."  *Id.* at *2 (citing *Setco Enterprises Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994)).  *See also, e.g., Peridyne Tech. Solutions, LLC v. Matheson Fast Freight, Inc.*, 117 F. Supp. 2d 1366, 1373 (N.D. Ga. 2000) ("[T]he plaintiff alleges that the [defendants] illegally accessed the plaintiff's computer systems in Georgia. The fact that the defendants used computers and telephones to enter Georgia does not make venue in Georgia improper.") (quoting in *H&R Block*, 2006 WL 1128744, at *2).  Likewise,

in *Kaliannan v. Liang*, 2 F.4th 727, 734 (8th Cir. 2021), the Eighth Circuit upheld venue in North Dakota against a Singapore-based defendant in part because the defendant "communicated extensively with various North Dakota entities in connection with the [fraudulent] sales." *Id.*

Other cases are in accord, holding that activities by defendants originating outside the forum, but directed into the forum—such as sending letters into the forum, or communicating by telephone or email into the forum—constitute events that "occurred" within the forum for the purposes of venue. *See, e.g., Red Mortg. Cap., LLC v. Shores, LLC*, No. 2:16-CV-678, 2017 WL 1196170, at *8 (S.D. Ohio Mar. 31, 2017) (holding that venue over California defendants was proper in Ohio where "negotiations for the Loan were primarily made through telephonic or electronic communication between California and Ohio"); *C2F, Inc. v. Bee Paper Co.*, No. 08-CV-479-AC, 2008 WL 4791012, at *9 (D. Or. Oct. 28, 2008) (upholding venue where the outstate defendant "engaged in business in this forum by initiating telephone negotiations with a corporation in Oregon," and "[a] letter of intent and preliminary due diligence materials were sent by [defendant] and received … in Oregon"); *Sarantakis v. Gruttadauria*, No. 02 C 1609, 2003 WL 1338087, at *7 (N.D. Ill. Mar. 17, 2003) (upholding venue in Illinois in a case against tax preparers who had never entered the district where the "Plaintiffs … exchanged documents … with the [out-of-district] Defendants,… including the transmittal of the prepared tax returns").

The court in *Sarantakis* aptly summarized this doctrine, citing similar cases: "Even when the defendant never personally enters the forum district, venue can nonetheless be appropriate in that district."  2003 WL 1338087, at *7.  "That is because the test for venue looks not to the defendant's contacts with the forum, but the location of the events giving rise to the cause of action."  *Id.*  For this reason, "[t]elephone conversations and correspondence can support venue under § 1391(b)(2) depending on the nature of the contacts and their relationship to the claim."  *Id.*

28

Defendants' alleged conduct here—such as instructing CPC proxies to purchase high-quality PPE from Missouri, and shipping defective PPE into Missouri—likewise constitute actions that "occurred" in Missouri under 28 U.S.C. § 1391(f)(1).  If anything, these constitute even more direct and deliberate actions occurring in Missouri than those that were held to support venue in *H&R Block*, *Peridyne*, *Bee Paper*, *Sarantakis*, and similar cases.  The Complaint does not need to allege that Defendants physically entered Missouri themselves to establish conduct by defendants occurring in Missouri.  Their activities directed to Missouri from abroad constitute events "occurring" in the judicial district.  "That is because the test for venue looks not to the defendant's contacts with the forum, but the location of the events giving rise to the cause of action." *Sarantakis*, 2003 WL 1338087, at *7.

**Substantial.**  In addition, these PPE-purchasing and PPE-shipping actions directed into Missouri constitute a "substantial" part of the events or omission giving rise to the claims.  As noted above, these allegations are central to Missouri's Count IV (Breach of Duty: Hoarding of Personal Protective Equipment), and they also provide an important part of the broader course of conduct alleged in Missouri's Count I (Public Nuisance) and Count II (Abnormally Dangerous Activities).  *See* Doc. 1, at 36, ¶ 144 (Count I) (alleging "hoarding PPE for gain" as part of the public-nuisance claim); Doc. 1, at 39-40, ¶ 158 (Count II) (alleging "hoarding PPE for gain" as part of the Defendants' abnormally dangerous activities); Doc. 1, at 44, ¶ 176 (Count IV) ("Defendants had a duty not to hoard PPE and not to provide ineffective PPE to medical providers, and doing so has cause injury across the state of Missouri, allowing further spread of COVID-19.").  Further, Defendants' PPE-hoarding conduct exacerbated the harms alleged in Missouri's Count III ("Breach of Duty: Allowing Transmission of COVID-19"), as the Complaint alleges.

29

Doc. 1, ¶ 138.  Thus, the PPE-hoarding activities constitute a substantial part of the events and omissions giving rise to that claim as well.[6]

The Court's show-cause order focuses on other malfeasance by Defendants occurring principally in China, such as their concealment of the virus's initial outbreak in Wuhan.  Doc. 57, at 2-3.  But it would be a mistake to overlook Defendants' PPE-hoarding activities, and their direct connection to Missouri.   As the Eighth Circuit emphasized immediately after the 1990 amendments, "[u]nder the amended statute, we no longer ask which district among two or more potential forums is the 'best' venue…. Rather, we ask whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts."  *Setco Enterprises Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994) (citing *Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992)).   Section 1391 no longer requires a "best venue" test: "Under the amended statute, we no longer ask which district among two or more potential forums is the 'best' venue…. Rather, we ask whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts*." Setco*, 19 F.3d at 1281. "To establish venue, a plaintiff need only demonstrate that 'a substantial part' of the events or omissions giving rise to the claim occurred within the forum district, not that a majority of the events took place there."  *Sarantakis*, 2003 WL 1338087, at *7 (citing *Pasulka v. Syke*, 131 F.

---

[6] Even if the Court concludes that the PPE-hoarding activities in Missouri do not support venue for Count III, it should retain Count III under the doctrine of pendent venue. *See, e.g., Basile v. Walt Disney Co*., 717 F. Supp. 2d 381, 387 (S.D.N.Y. 2010) ("[U]nder the doctrine of pendent venue, a federal court may in its discretion hear pendent claims which arise out of the same nucleus of operative fact as a properly venued federal claim, even if venue of the pendent claim otherwise would not lie.") (quotation omitted); *Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1089 (N.D. Cal. 2018) ("[U]nder the pendent venue doctrine, when one or more claims are closely related … , venue is proper as to all claims so long as venue is established for just one claim.  This is because, where there is a close relationship, then judicial economy, convenience, and fairness all weigh in favor of adjudication in one proceeding.").

Supp. 2d 988, 994 (N.D. Ill. 2001)).  "Plaintiff need not establish that this district has 'the most substantial contacts to the dispute; rather it is sufficient that a substantial part of the events occurred here, even if a greater part of the events occurred elsewhere.'"  *Basile*, 717 F. Supp. 2d at 386 (quoting *Neufeld v. Neufeld*, 910 F. Supp. 977, 986 (S.D.N.Y. 1996)); *see also Greenblatt v. Gluck*, 265 F. Supp. 2d 346, 352 (S.D.N.Y. 2003) (same).[7]

"To be 'substantial' the events that occurred in the forum district must be 'part of the historical predicate' of the claim.  *Id.* (citing *Master Tech Products, Inc. v. Smith*, 181 F. Supp. 2d 910, 914 (N.D. Ill. 2002)).  "For events to be considered 'substantial' under the statute, it is sufficient for the plaintiff to establish that the events occurring in the forum district 'were part of the historical predicate for the instant suit.'"  *Vera Bradley Designs, Inc. v. Denny*, No. 1:18-CV-70-TLS, 2018 WL 3633986, at *2 (N.D. Ind. July 30, 2018) (quoting *Estate of Moore v. Dixon*, 460 F. Supp. 2d 931, 936 (E.D. Wis. 2006)). "The relevant events must have a 'close nexus' to the alleged claim." *Id.* (quotation marks omitted) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 433 (2d Cir. 2005)).  Here, the PPE-hoarding activities readily satisfy this standard. They are "part of the historical predicate" of Missouri's claims, and they have a "close nexus" to Missouri's claims, since they form an integral part of the misconduct alleged against Defendants.

## CONCLUSION

For the reasons stated, Missouri respectfully requests that the Court hold that venue is appropriate in this judicial district.

---

[7] Of course, even if the test were a "best venue" test, E.D. Mo. would be far superior to D.D.C., which is a mere "fallback" venue, in which the Complaint alleges *no* events or omissions giving rise to Missouri's claims.  *See Cranford v. Tennessee Steel Haulers, Inc.*, No. CV ELH-17-2768, 2018 WL 3496428, at *9 (D. Md. July 20, 2018) (discussing "fallback" venue under § 1391(b)(3)).

Dated: May 20, 2022                    Respectfully submitted,

                                       **ERIC S. SCHMITT**
                                       **ATTORNEY GENERAL**

                                       */s/ D. John Sauer*
                                       D. John Sauer, #58721MO
                                        Solicitor General
                                       Missouri Attorney General's Office
                                       Post Office Box 899
                                       Jefferson City, MO 65102
                                       Tel: (573) 751-8870
                                       Fax: (573) 751-0774
                                       John.Sauer@ago.mo.gov


### CERTIFICATE OF SERVICE

On May 20, 2022, I caused the foregoing to be filed through the Court's electronic filing system to be served by electronic notice on all counsel for parties and *amici curiae* who have appeared in this case.

*/s/ D. John Sauer*