**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **THE STATE OF MISSOURI,** ) | |
| **ex rel. ERIC S. SCHMITT, in his** ) | |
| **official capacity as Missouri Attorney** ) | |
| **General,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No 1:20 CV 99 SNLJ** |
| ) | |
| **THE PEOPLE'S REPUBLIC OF** ) | |
| **CHINA, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM AND ORDER</u>**

Amidst the wreckage of the COVID-19 pandemic, plaintiffs across the United

States have filed civil suits seeking damages against the People's Republic of China and

related entities for their role in the pandemic.  This is one such suit.  Plaintiff, the State of

Missouri ex rel. Missouri Attorney General Eric Schmitt ("Plaintiff"), sues nine Chinese

defendants for injuries suffered within the State of Missouri because of the pandemic.

The Court stayed the proceedings and ordered supplemental briefing on several subject

matter jurisdiction issues involving the Foreign Sovereign Immunities Act, 28 U.S.C. §§

1603, et. seq. ("FSIA").  As the Supreme Court recently stated, the FSIA "spell[s] out, as

a matter of federal law, the suits against foreign sovereigns that American courts do, and

do not, have power to decide." *Cassirer v. Thyssen-Bornemisza Collection Foundation*,

142 S. Ct. 1502, 1508 (U.S. 2022).  Upon consideration of plaintiff's supplemental brief,

and for the reasons explained below, the Court determines that it has no power under the FSIA to decide the merits of the case and dismisses the complaint for lack of subject matter jurisdiction.

## I.  BACKGROUND

**The complaint**.  The complaint names as defendants (1) the People's Republic of China (PRC), (2) the Communist Party of China (CCP), (3) PRC's National Health Commission, (4) PRC's Ministry of Emergency Management, (5) PRC's Ministry of Civil Affairs, (6) People's Government of Hubei Province, (7) the People's Government of Wuhan City, (8) the Wuhan Institute of Virology (WIV), and (9) the Chinese Academy of Sciences (CAS).  The following is a broad-brush summary of the complaint's allegations, with details added later in the opinion as needed to address the legal issues.

Defendants engaged in research on coronaviruses at the WIV, a laboratory with known safety concerns.  On November 17 or even earlier, people began to contract COVID-19, an infectious disease caused by a novel coronavirus.  One theory is that the virus originated from animals at a Wuhan seafood market while another theory (later) posited that the virus escaped from WIV's laboratory.  On December 31, 2019, despite ample evidence to the contrary, the Wuhan Municipal Health Commission announced that investigation had found no obvious human-to-human transmission and no infection of medical staff.  Defendants delayed reporting the virus to the World Health Organization (WHO) and misled it about the nature and extent of the problem, inducing the WHO to deny or downplay the risk of human-to-human transmission in the critical

weeks while the virus was first spreading.  Further, defendants moved forward with Chinese New Year celebrations, hosted a potluck dinner in Wuhan for some 40,000 residents, and allowed five million people to leave Wuhan without screening.  Many of these persons travelled across the globe.

Defendants censored or silenced any reporting of human transmission of the virus. One notable example is when a Dr. Li Wenliang shared on social media that his patients were suffering from a SARS-like illness possibly linked to a coronavirus:  he was publicly punished by Wuhan police for spreading rumors.  Defendant National Health Commission forbade publication of information on the disease and ordered labs to transfer samples to designated testing institutions or to destroy the samples.  Members of the United States Center for Disease Prevention and Control were denied entry into China.

Defendants also delayed world-wide disclosure that it had mapped the genome of the virus, and that the virus was transmissible person-to-person.  They delayed as well in quarantining Wuhan's residents after initial reports of the virus and its human transmissibility.  Finally, defendants hoarded personal protection equipment (PPE) by nationalizing factories that made masks for American companies, by ceasing the export and sales of its masks, and by buying much of the rest of the world's supply.  What little PPE defendants did release across the world was defective.  As of the filing of the Complaint in April 2020 the virus had resulted in the deaths of scores of United States

citizens including Missourians.  In addition to its toll on human life and health, the virus caused emotional turmoil as well as economic and educational losses.

The complaint brings four alternative tort claims:  Count I for Public Nuisance, Count II for Abnormally Dangerous Activities, Count III for Breach of Duty by Allowing Transmission of COVID-19, and Count IV for Breach of Duty by Hoarding PPE.  Each Count is brought against all defendants, who allegedly acted in concert, and the complaint seeks monetary damages as well as injunctive and other relief.

In support of subject matter jurisdiction, plaintiff cites 28 U.S.C. § 1330(a), which authorizes a civil action under the FSIA against a "foreign state" that "is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement."  28 U.S.C. § 1603(a).  Plaintiff also cites the diversity-of-citizenship statute, which vests federal courts with jurisdiction over civil actions involving more than $75,000 that are between citizens of a state "and citizens or subjects of a foreign state."  *See* 28 U.S.C. § 1332(a)(2).  [R. Doc. ¶¶ 33-44.]

**Procedural history.**  After the complaint was filed, plaintiff attempted Hague Convention service, but China posted notice on its web site that it was refusing service under Article 13 of the Convention, which allows signatories to refuse service that would violate sovereignty.  *See* 28 U.S.C. § 1608(a)(2); Art. 13, Hague Convention.

Plaintiff sought and obtained alternative service methods.  As to three defendants—CCP, WIV, and CAS—that plaintiffs viewed as non-foreign-state defendants and thus not subject to sovereign immunity, the Court authorized service

4

through e-mail addresses that were publicly available and posted on websites maintained by these defendants.  Plaintiff thereafter filed proof of service through e-mail; and when none of the three defendants appeared or answered, plaintiff successfully moved for clerk's entry of default judgment under Federal Rule of Civil Procedure 55.  As to the remaining six defendants—whose foreign state status is uncontested—this Court authorized service through diplomatic channels.  *See* 28 U.S.C. 1608(a)(4).  After filing proof of service, plaintiff successfully moved for clerk's entry of default judgment against those defendants as well when they failed to appear.  Plaintiff then sought discovery to adduce the additional evidence necessary to prove its claims before entry of judgment.

**The stay.**  This Court denied plaintiff's motions for discovery and a case-management order without prejudice, and stayed the proceedings, *sua sponte*, in order to comply with its independent obligation to determine whether subject matter jurisdiction exists.  *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983) ("At the threshold of every action in a District Court against a foreign state . . . the court must satisfy itself that one of the [FSIA] exceptions applies—and in doing so it must apply the detailed federal law standards set forth in the [FSIA].")  In this regard, this Court ordered additional briefing on the following issues of subject matter jurisdiction:

(1) the proper classification of CCP, CAS, and WIV, and in particular, whether they are foreign states within the meaning of the FSIA;

(2) whether plaintiff properly served CCP, CAS, and WIV;

(3) whether an FSIA exception to sovereign immunity applied to any of the defendants; and

(4) whether and to what extent additional factual information could be properly submitted to or judicially noticed by the Court.  [Doc. 47.][1]

## II.  DISCUSSION

**A.  <u>Scope of review/material properly considered</u>.**  The issue before the Court is this:  what is the proper scope of review in determining whether subject matter jurisdiction exists under the FSIA when (1) the only filings are the complaint and briefs, and (2) defendants have not appeared or answered?  And in these circumstances, what material ***may*** a district court consider beyond the pleadings if the court elects to do so?

The Court has not identified an Eighth Circuit case discussing subject matter jurisdiction review in an FSIA suit in which no defendant has appeared.  There is some help, however, in other circuits.  In an FSIA case, *Nikbin v. Islamic Republic of Iran*, 471 F.Supp.2d 53, 58 (D.D.C. 2007), the district court noted that the defendants' failure to appear precluded the court from making any factual findings that were inconsistent with the allegations of the complaint, and the court limited its review "to considering jurisdiction as a matter of law"; the court thus considered whether the unchallenged

---

[1]*Amici* Lawyers for Upholding International Law and The China Society of Private International Law have also submitted briefs on these questions, with leave of court.  Some of the issues have also been the subject of a helpful law review article assessing the viability of this complaint.  *See* Paul Larkin, *Suing China Over COVID-19,* 100 B. U. L. Rev. Online 91, 100 (2020).

factual allegations, assumed as true, were sufficient to give rise to jurisdiction over claims against a foreign state.  *Id.*

The decision in *Siderman v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992), is also helpful.  There, the district court granted default judgment on a torture claim against the Republic of Argentina, which had not appeared.  Argentina then appeared and moved to set aside the default based on FSIA immunity. *Id.* at 702.  Finding that the district court had erred in failing to determine subject matter jurisdiction under the FSIA as a threshold matter, the court of appeals "review[ed] the record to determine whether the [plaintiffs had] sustained their initial burden of alleging jurisdiction under the FSIA." *Id.* at 707.  The appeals court did so by assuming as true the complaint allegations and considering declarations that the plaintiffs had submitted with their complaint, noting, however, that "complaint allegations can themselves be sufficient to require a response from the foreign state defendant."  *See id.* at 722 n.9.

And finally, in yet another FSIA case where the defendant did not appear, the district court considered--in *sua sponte* reviewing subject matter jurisdiction under the FSIA--only the factual allegations in the complaint and the applicable law.  *Chen v. Central China Television*, 2007 WL 2298360, at **4-6 (S.D.N.Y. 2007).

Plaintiff argues that "[a]t this stage of the litigation, where no party has appeared to defend the lawsuit and jurisdictional discovery is not yet available, the Court should consider only the facts alleged in the Complaint, not extraneous 'facts' submitted by *amici*."  [Doc. 54 at 45.]  The Court agrees with plaintiff that review should be limited to

the facts alleged in the complaint.  This is similar to the type of review a court would

conduct in reviewing a defendant's facial challenge to subject matter jurisdiction under

Federal Rule of Civil Procedure 12(b)(1).  *See Osborn v. United States,* 918 F.2d 724,

729 n. 6 (8th Cir.1990) (in a facial review, "the court restricts itself to the face of the

pleadings . . . and the non-moving party receives the same protections as it would

defending against a motion brought under [Federal Rule of Civil Procedure] 12(b)(6).")

(cited cases omitted); *see also BP Chemicals Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677,

680 (8th Cir. 2002) (considering Rule 12(b)(1) challenge to subject matter jurisdiction

under FSIA as facial because defendant limited attack to complaint allegations; citing

*Osborn*, 918 F.2d at 792 n.6).

But in addition to the complaint allegations, and as plaintiff recognizes, federal

rules allow the Court to take judicial notice of any fact that is "not subject to reasonable

dispute in that it is either (1) generally known within the territorial jurisdiction of the trial

court or (2) capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned."  *See* Fed. R. Evid. 201(b).  The Eighth

Circuit has made this principle clear in the context of motions to dismiss. "In adjudicating

Rule 12(b) motions, courts are not strictly limited to the four corners of complaints. . . .

As we recently stated,

> [w]hile courts primarily consider the allegations in the complaint in
> determining whether to grant a Rule 12(b)(6) motion, courts additionally
> consider 'matters incorporated by reference or integral to the claim, items
> subject to judicial notice, matters of public record, orders, items appearing
> in the record of the case, and exhibits attached to the complaint whose

authenticity is unquestioned;' without converting the motion into one for
summary judgment.

*Dittmer Properties, L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013).

Therefore, in examining its subject matter jurisdiction this Court has considered
only the complaint's factual allegations, as well as a few facts that are appropriate for
judicial notice. *McIvor v. Credit Control Services, Inc.*, 773 F.3d 909, 914 (8th Cir.
2014) ("[J]udicial notice of facts outside of the record is not appropriate 'unless the facts
are matters of common knowledge or are capable of certain verification.'")  And to be
clear, the Court has considered the complaint's *factual* allegations as true as required in
considering a motion to dismiss under Rule 12(b)(6).  *See Osborne,* 918 F.2d at 792 n.6.
Because the Court is not conducting a factual inquiry, only a facial one based on the
complaint allegations, jurisdictional discovery would be premature.

Plaintiff argues it does not have the burden of proof on FSIA subject matter
jurisdiction, citing to cases describing the burden-shifting process in FSIA cases in which
a defendant seeks sovereign immunity.  But no defendant has appeared to assert its
sovereign immunity.  Rather, the Court is conducting a *sua sponte* threshold examination
of its subject matter jurisdiction as required by *Verlinden*, which necessarily requires
examination of the FSIA and a facial review of the complaint.   As the Eighth Circuit
explains, "[t]he party seeking to invoke federal jurisdiction . . . carries the burden, which
may not be shifted to another party." *Jones v. U.S.*, 727 F.3d 844, 846 (8th Cir. 2013)
(cited case omitted).  And as another federal court recently noted--in directing a plaintiff
to show cause why his COVID-related complaint against PRC should not be dismissed

for lack of subject matter jurisdiction--a plaintiff must demonstrate that the court has jurisdiction to hear the claim and that a sovereign is not immune from suit.  *Eisenberg v. People's Republic of China Through Wang*, 2022 WL 1591541, at *3 (D. Mass. 2022) (quoted case omitted).

Having determined its scope of review, this Court turns next to the issue of proper classification of CCP, WIV, and CAS.

**B.  Are the CCP, WIV, and CAS private, non-governmental entities or are they are "foreign states" within the meaning of the FSIA?**

**FSIA definition of "foreign state.**  To begin, the Court notes that the FSIA "if it applies, is the 'sole basis for obtaining jurisdiction over a foreign state in federal court.'" *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (quoted case omitted).  "For the most part, the [FSIA] codifies, as a matter of federal law, the restrictive theory of sovereign immunity. A foreign state is normally immune from the jurisdiction of federal and state courts, 28 U.S.C. § 1604, subject to a set of exceptions specified in §§ 1605 and 1607." *Verlinden*, 461 U.S. at  488

This Court will address the exceptions later in this opinion.  But for now, the Court focuses on the issue of whether CCP, WIV, and CAS should be deemed to be foreign states within the meaning of the FSIA.  *See* 28 U.S.C. § 1604.  For purposes of

determining whether a defendant is a "foreign state" entitled to sovereign immunity,[2] the FSIA identifies three types of "foreign state" defendants:

(1) a foreign state,

(2) a political subdivision of a foreign state, and

(3) an agency or instrumentality of a foreign state.

28 U.S.C. § 1603.

The FSIA defines only the third type of foreign state:  an agency or instrumentality.  To be an agency or instrumentality, the entity must meet three requirements.  First, it must be a separate legal person, corporate or otherwise.  Second, it must be an "organ" of a foreign state or political subdivision, *or* "a majority" of the entity's "shares or other ownership interest" must be "owned by a foreign state or political subdivision thereof."  Third, it must not be a United States citizen or created under the law of any third country.

**Case law analyzing foreign-state and political-subdivision status.**  Citing the Restatement, the Supreme Court concluded that "[t]he term 'foreign state' on its face indicates a body politic that governs a particular territory[.]" *Samantar*, 560 U.S. at 314. The Court added that, although the Restatement's definition of statehood includes an entity with defined territory and a population under the control of a government, and that engages in foreign relations, the FSIA established a broader meaning of foreign state by

---

[2]The FSIA excludes this broad definition of "foreign state" from the service-of-process provision:  service requirements for an "agency or instrumentality" are less rigorous than for "a foreign state or its political subdivision."  *See* 28 U.S.C. §§ 1603(a), 1608.

including its political subdivisions, agencies, and instrumentalities.  *Id.*  A "political subdivision" includes all governmental units beneath the central government, including local governments."  *Garb v. Republic of Poland*, 440 F.3d 579, 596 (2d Cir. 2006) (quotation marks omitted).

**Case law examining political subdivision versus agent or instrumentality.**  A large body of law has developed around the issue of whether a foreign entity is (1) a "state or political division" versus (2) an "agency or instrumentality of the state."  This is because the FSIA treats an agency or instrumentality as "legally separate" from--and thus warranting different treatment than--a state or political subdivision for purposes of (1) amenability to suit for property taken in violation of international law, known as the "takings" exception, *see* 28 U.S.C. § 1605(a)(3); (2) liability for punitive damages, *see id.* § 1606; and (3) service of process, *see id.* § 1608.

Specifically, "[t]o determine whether an entity is an agency or instrumentality-- and thus legally separate from the foreign state--or a mere political subdivision, courts ask 'whether the core functions of the foreign entity are predominantly governmental or commercial.'"  *Wye Oak Technology, Inc. v. Republic of Iraq*, 666 F.3d 205, 214 (4th Cir. 2011) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 151 (D.C. Cir. 1994)).  "If the core functions are commercial, courts treat the entity as an agency or instrumentality--legally separate from the foreign state; if the core functions are governmental, courts treat the entity as a mere political subdivision--not legally separate from the foreign state."  *Wye Oak Technology, Inc.*, 666 F.3d at 214-15.  This so-called

"categorical" approach was first adopted by the *Transaero* court and is followed by other circuits.

An additional factor considered in *Transaero* court was "whether the defendant is the type of entity 'that is an integral part of a foreign state's political structure, [or rather] an entity whose structure and function is predominantly commercial.'" *Transaero*, 30 F.3d at 151. There also is precedent for deeming an entity to be such an integral part of the foreign state as to be considered the foreign state itself. This was the approach taken in *Transaero* where the court found that "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." *Id*. at 153. The court noted that "'powers to declare and wage war' are among the 'necessary concomitants' of sovereignty." *Id*. (quoting *United States v. Curtiss-Wright Export Corp*., 299 U.S. 304, 318 (1936)).

Although *Transaero* involved the FSIA's service of process provision, courts have applied its core-functions test to other FSIA provisions. *Wye Oak Technology, Inc.*, 666 F.3d at 215. These cases include *Garb,* 440 F.3d at 594-95 (takings exception); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234–35 (D.C. Cir. 2003) (terrorism exception); *Servaas Inc. v. Republic of Iraq,* No. 10–828–CV, 2011 WL 665334, at *2–3 (2d Cir. Feb. 16, 2011) (unpublished) (treating Iraq's Ministry of Industry as single entity with Republic of Iraq for purposes of commercial-activities exception). Notably, one court applied the core-functions test to find that WIV was a "foreign state" rather than its

"agent or instrumentality" for purposes of service of process.  *See Photos v. People's Rep. of China*, 2020 WL 6889016, at *5 (N.D. Tex. Nov. 24, 2020).

**Case law examining agent-or-instrumentality status.**  As the FSIA definition prescribes, when an entity is a "separate legal person" from the state, the entity is an agency or instrumentality if it is not a United States citizen or created under the laws of a third country, *and* it meets one of two alternative "prongs."  One prong is whether the entity is an "organ" of the state, and the other prong is whether "a majority" of the entity's "shares or other ownership interest is owned by a foreign state or political subdivision."  28 U.S.C. § 1603.

The majority-ownership prong is essentially self-defining:  does the state own a majority of the interest in the entity at issue?  *See* Ernesto Sanchez, *The Foreign Sovereign Immunities Act Deskbook*  (2013) at 85 ("Establishing that a foreign state or political subdivision thereof has a majority ownership interest is quite straightforward.")  By contrast, the "organ" prong is based on multiple factors, and there is no clear test.  *See Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 847 (5th Cir. 2004) (finding no clear test for determining agency or instrumentality status under §1603(b)(2) "organ" prong); *see also* Sanchez, *supra*, at 85 ("[S]tatus as an organ of a state or its subdivision depends on a series of discretionary factors roughly indicating the extent of interdependence with the state or subdivision.  Court cannot apply these factors mechanically, if only because potential organs will likely share characteristics with both

purely governmental and nongovernmental entities.")  Plaintiff describes the multi-factor, overlapping tests that various circuit courts apply. The Fifth Circuit considers

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

*Janvey v. Libyan Inv. Auth*., 840 F.3d 248, 259 (5th Cir. 2016).  The Second and Sixth Circuits follow that test.  S*ee Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004); *Qandah v. Johor Corp.*, 799 Fed. Appx. 353, 358 (6th Cir. 2020).  The Third and Ninth Circuits follow similar tests that examine the circumstances around the entity's creation; the purpose of its activities; its independence from the government, including in matters of financial support and employment practices; and its state-law obligations and privileges, with the Third Circuit also considering "the ownership structure of the entity." *See Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir. 2001); *USX Corp. v. Adriatic Ins. Co*., 345 F.3d 190, 209 (3d Cir. 2003).

### *Yaodi Hu v. Communist Party of China*, 2012 WL 7160373 at *3 (W.D. Mich. 2012).

This Court will address *Yaodi Hu* in some detail because plaintiff relies on it almost exclusively in support of the allegation that CCP is not entitled to sovereign immunity.  *Yaodi Hu* was brought for violation of free speech against CCP, PRC, several Chinese individuals, and an internet site.  The court dismissed the complaint prior to service of process under 28 U.S.C. § 1915 as frivolous or failing to state a claim.  As relevant here, the district court concluded that PRC was entitled to sovereign immunity

under the FSIA, and added that, "[a]lthough the remaining defendants (Communist Party of China, certain past and present Chinese government officials, and an Internet site) are not entitled to FSIA immunity, plaintiff's complaint fails to state a claim upon which relief can be granted against them." *Id.* at *3.

This Court does not view *Yaodi Hu* as persuasive much less dispositive authority. The Court's views on *Yaodi Hu* are well reflected in the comments of the law review article discussing the legal viability of this complaint. *See supra,* fn.1. First, "Missouri's interpretation of *Yaodi Hu* is not a factual assertion that a court must assume to be true; it is a legal argument that a court reviews independently." Second, the statement about FSIA immunity was made "almost in passing and likely in dictum." Third, the *Yaodi Hu* court "did not discuss the issue of whether [CCP was] responsible for directing the actions of the PRC and components of the Chinese government. Missouri, however, has raised that issue by virtue of its allegation that 'the Communist Party exercised direction and control over the action of all other Defendants.' That *is* a factual allegation, and a court must accept it as true." Accordingly, *Yaodi Hu* "offers no support for Missouri." *See* Paul Larkin*, Suing China Over COVID-19,* 100 B. U. L. REV. ONLINE 91, 100-01 (2020)*.

On the other hand, some courts have concluded that entities comparable to those at issue are in fact foreign states--but again, with little to no legal reasoning. This Court

need not rely on those decisions either.[3]  Rather, the Court has conducted its own review of how the complaint allegations bear on the status of the entities, beginning with CCP.

**Complaint allegations and judicially noticeable facts in determining foreign-state status of CCP.**  Plaintiff alleges that CCP is not a foreign state or an instrumentality of a foreign state and thus is not entitled to sovereign immunity.  [Doc. 1 ¶¶ 19, 44.]  This allegation is a legal conclusion, not a factual assertion:  "foreign state" and "sovereign immunity" are terms that have specific legal consequences and that are defined by the statute which the Court must apply.

Plaintiff does, however, make a number of factual allegations that will be assumed as true.  Specifically, CCP is the sole governing party within China, and that CCP's General Secretary becomes the president of the PRC.  And according to the complaint, at all times CCP exercised direction and control over the actions of all other defendants; and "at all relevant times, the PRC, National Health Commission, Ministry of Emergency Management, Ministry of Civil Affairs, Hubei Province, and City of Wuhan (collectively, the 'Chinese Government Defendants') and the CCP acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein."  [*Id.* ¶¶ 18, 20, 26.)

---

[3]In *Saludes v. Republica de Cuba*, 577 F.Supp.2d 1243, 1253 (S.D. Fla. 2008), a court summarily found that the Communist Party of Cuba was an agency or instrumentality of Cuba "based on" the FSIA's definition of agency or instrumentality.  And in *Chen*, 2007 WL 2298360, at **4, 6, the court referred to a television statement as an instrumentality of the PRC, pointing out elsewhere in the opinion that the plaintiff had described the defendant as CCP's "mouthpiece."

To further assist in properly classifying the CCP, the Court has taken judicial notice of an "Executive Summary" by the United States State Department 2020 Country Report on Human Rights Practices in China, which describes CCP's role as follows[4]:

> [PRC] is an authoritarian state in which [CCP] is the paramount authority. [CCP] members hold almost all top government and security apparatus positions. Ultimate authority rests with the CCP Central Committee's 25-member Political Bureau (Politburo) and its seven-member Standing Committee. Xi Jinping continue[s] to hold the three most powerful positions as party general secretary, state president, and chairman of the Central Military Commission.

https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/china.

To be sure, CCP does not neatly fit within any of FSIA's definitions of foreign state. Nonetheless, for the following reasons, the Court concludes that CCP is a foreign state or the equivalent of one, and thus can be sued only under the FSIA.

*First*, given CCP's alleged control over PRC, CCP can and should be seen--no less than PRC itself--as a "body politic that governs a particular territory." *See Samantar,* 560 U.S. at 314. Indeed, it is fair to say that CCP is a political party that encompasses a defined geographical territory--China--and governs that particular territory. Further the Court is persuaded by *Samantar's* statement that the FSIA intended to create a broader definition of statehood than that strictly fitting the Restatement definition. And consistent with the Restatement's definition, it cannot be disputed that CCP engages in

---

[4]*See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (taking judicial notice of state website showing corporation was in good standing; citing *Pickett v. Sheridan Health Care Ctr.,* 664 F.3d 632, 648 (7th Cir. 2011) (recognizing "the authority of a court to take judicial notice of government websites")).

18

foreign relations through its control of PRC.  In fact, CCP is essentially an organization that functions as an umbrella over PRC.

Second, given that CCP exercises control over PRC, that CCP's General Secretary and PRC's president are one and the same, and that CCP's General Secretary also commands the military, the Court is persuaded that CCP is such an integral part of the geographical PRC state that it should be considered a foreign state as well.  As the Transaero court found--in concluding that Bolivia's armed forces were such an "integral part" of Bolivia as to be considered the foreign state itself--the power to declare and wage war are necessary concomitants of sovereignty.  See Transaero, 30 F.3d at 153; see also Sanchez, supra, at 94 (stating, in summarizing conclusions on FSIA foreign-state status that "[n]ational governments are the equivalent of a foreign state proper.").

Third, given that CCP controls PRC, the Court is at a loss to understand how excluding CCP from the FSIA while including PRC would serve the FSIA's purpose of codifying the restrictive theory of sovereign immunity.  See Verlinden, 461 U.S. at 488. Taken to its logical extreme, excluding CCP while including PRC would mean that FSIA immunity is lost for all CCP-ordered acts, no matter how sovereign in nature, so long as CCP is the named defendant.

Fourth (although more of an observation than a reason to find foreign-state status), if CCP is not a foreign state, then jurisdiction is possible only under the diversity statute permitting civil actions against a "citizen or subject of a foreign state."  Plaintiff does not

explain how the CCP--a political party that controls PRC and its military--is "a citizen or subject" of PRC.

The Court has carefully considered plaintiff's arguments in support of finding that CCP is not a foreign state.  Plaintiff argues, based on their constitutions, that CCP and PRC are historically distinct entities because the CCP preceded and established the PRC; and that, as both an ideological principle and a matter of Chinese fundamental law, PRC and CCP insist they are separate entities:  PRC is the state while CCP is a political party that leads the state, and through its constitution PRC insists it is the supreme law and governs the CPC.  Setting aside the issue whether the complaint allegations would support the separateness of CCP and PRC, the Court fails to see how being technically separate is dispositive:  based on case law and the purpose of the FSIA, the Court sees the relevant question as whether CCP conducts itself in the manner of a foreign state, thus generating the type of conduct that the FSIA was intended to cover, not whether CCP views itself as separate from PRC.  And regardless of PRC's constitution, the complaint alleges CCP exercises control, and the Court must assume that allegation as true.

Plaintiff counters that CCP's control of the PRC does not make it a foreign state, however, because under Chinese law, CCP "leads" the PRC "from outside and above" and does not exercise actual state power.  The Court views this argument as more of an exercise in semantics:  plaintiff is bound by its complaint allegation that the CCP exercises control over the other defendants.  Plaintiff protests that "[t]he precise nature and degree of such control . . . are facts that would have to be found through

20

jurisdictional discovery." But as noted, the Court is conducting a facial--not factual-- review of the complaint, and thus jurisdictional discovery is not warranted.

      **Complaint allegations and judicially noticeable facts in determining foreign- state status of WIV and CAS.** In contrast to the complaint's allegations against CCP, the complaint is silent as to the foreign-state status of WIV and CAS. (Plaintiff asserted that they were private, nongovernmental entities later in these proceedings.) In the complaint, plaintiff alleges that WIV is located in Wuhan, is a research institute that studies virology and related topics, and has done research on coronaviruses since at least November 2019. [Doc. 1 ¶¶ 27, 28.] WIV was studying the virus that caused COVID-19 as part of commercial activity, and an emerging theory is that the virus "was released" from the laboratory. [*Id.* ¶ 52.] On January 2, 2020, WIV "completed its genome sequencing of the virus." [*Id.* ¶ 89.] However, China's National Health Commission ordered institutions not to publish information on the unknown disease and ordered labs to transfer or destroy their samples [*id.* ¶ 92]; and ultimately the genome sequencing was not "made public" for several days [*id.* ¶ 95.]

      According to the complaint, CAS "is the national academy of the natural sciences for the PRC and describes itself as 'the linchpin of China's drive to explore and harness high technology and the natural sciences for the benefit of China.'" [*Id.* ¶ 31.] CAS seeks to "commercialize" its discoveries and boasts of "spinning off hundreds of companies from its activities." [*Id.* ¶ 32.] CAV "administers" WIV and the two acted in

concert with the remaining defendants "and as agents and/or principals of one another in relation to the [described] conduct."  [*Id.* ¶¶ 33, 34.]

Plaintiff focuses on the coronavirus research, alleging that "the Chinese Government Defendants, the Communist Party, and the Laboratory Defendants engaged in commercial and other research on coronaviruses through [WIV] . . . and the type of research carried on at [WIV] was inappropriate to the place where the research was conducted . . ." [*Id.* ¶¶ 152, 155.]  After the virus manifested itself in Wuhan, defendants "engaged in a coverup about the origins of the virus, including its release from [WIV]." [*Id.* ¶ 157.]

The gist of the allegations against WIV and CAS--combined with the prior allegation that CCP "exercised direction and control over the actions of all other Defendants"--is that WIV and CAS collaborated with the remaining defendants, under the umbrella control of the CCP, to hide COVID-related events and discoveries in China from its own residents and the rest of the world.  In addition, CAS allegedly conducts its work "for the benefit of China."  In this Court's view, the alleged conduct--both by CAS and WIV independently, and in cooperation with the remaining defendants--paints a picture that looks far more like core governmental functions integral to China's national interests rather than predominantly commercial activities.  The Court thus finds that WIV and CAS are political subdivisions of the foreign state. *See Wye Oak,* 666 F.3d at 214. The Court's conclusion is consistent with that reached by the federal court in *Photos*, which stated, "[I]f the Court were to take judicial notice of the English version of

22

[WIV's] website, it would further support that [WIV], identified as part of [CAS], provides services traditionally associated with governments.  *See Photos*, 2020 WL 6889016, at *5 (describing website information on WIV's possession of "the key laboratory . . . for newly emerging and fulminating infectious disease pathogen and biosecurity" and "for agricultural and environmental microbiology").

Further, even if CAS and WIV are not political subdivisions, they are at least "agents or instrumentalities" based on the complaint allegations and applicable law. Their classification as such is particularly apparent under the "organ" prong, with its focus on the interdependence of the entity at issue with the state or political subdivision. *See* Sanchez, *supra,* at 85.  The complaint allegations show that WIV and CAS did not function independently, but at the behest of the foreign-state defendants, regarding the timing, nature, and extent of information about the virus.  As plaintiff alleges, China's National Health Commission ordered institutions not to publish information on the virus and ordered laboratories to transfer or destroy their samples; and the genome sequencing that WIV had completed on January 2, 2020, was not made public for several days. [Doc. 1 ¶¶ 89, 92, 95.]  In addition, this Court takes judicial notice of a Congressional report on China's organizational structure, which describes how China's State Council "carries out the administrative functions of the Chinese government" and lists CAS in a chart of "Institutions Directly Under the State Council."  *See* CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA https://www.cecc.gov/chinas-state-organizational-structure (last visited 7/7/2022).

Once again, the Court has carefully considered plaintiff's arguments in support of finding that WIV and CAS are not foreign states.  Plaintiff alleges that CAS seeks to commercialize its discoveries and has spun hundreds of companies from those discoveries.  The balance of plaintiff's arguments come from its supplemental brief and facts cited from websites, articles, and constitutions.  The material can be generally summarized as follows:  (1) CAS was modeled after well-established Western national academies of sciences, which are independent, non-government institutions; (2) CAS touts its principal functions as being non-state and non-governmental, namely, taking on the role of a national academy of scientists, being a commercial "incubator" of science and technology start-up companies, and seeking to commercialize research into new technologies, functions that are analogous to those performed by private Western academies; (3) CAS characterizes itself as a "think tank," which is a phrase intended to emphasize its independence from the Chinese government; and (4) a 2016 article authored by three CAS members extensively discusses CAS's performance of nongovernmental functions to ensure its independence from the government.

As to WIV, plaintiff argues that WIV holds itself out as being a department within CAS; that its self-identified function--performing basic scientific research of viruses--is non-governmental; and that, because WIV is a "branch" of CAS, and CAS is not a foreign state, WIV likewise is not a foreign state.  Plaintiff contends that WIV's coronavirus research was part of a commercial enterprise because early during the

pandemic, WIV filed patents on its research on COVID treatments as a cash grab to ensure that it could profit from the pandemic.

Plaintiff argues further that CAS is not a political subdivision within the meaning of Black's Law Dictionary because it does not exist primarily to discharge a function of the government.  Plaintiff contends that CAS is not an "organ" of the government either, because it has abandoned its governmental functions in favor of nongovernmental ones; it views itself as independent from the government; its financial support appears to come from scientific grants, which is not the sort of financial support that an organ typically receives; and there is no direct indication that its employees are direct employees of the state.  Plaintiff dismisses *amici's* statement that the State Council of China appoints CAS's president and vice president, arguing that "method of appointment of leaders is not listed as a factor for determining 'organ' status, and in any event, that fact is outweighed by the stout insistence of PRC and CAS that they are independent.  Further, plaintiff relies on *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003), for the proposition that "control" over an entity does not confer foreign-state status on the entity.

These arguments notwithstanding, the Court once again grounds itself in its core task of determining whether the complaint, based on its allegations, shows jurisdictional deficiencies on its face.  The collection of information that plaintiff has gathered does not—cannot—trump the complaint allegations on which the Court has based its conclusion that WIV and CAS are political subdivisions, or agencies or instrumentalities, of a foreign state.  Further, plaintiff's reliance on *Dole* is irrelevant.  In *Dole*, the

25

Supreme Court held in that case that a foreign state's direct ownership of a majority of shares satisfied the majority-ownership prong, but that the wholly-owned subsidiaries of those state-owned corporations could not be deemed majority-owned by the state-- regardless of how much control the state exercised over the subsidiaries. *Id. at* 477.  This Court, however, is not using the majority-ownership prong to conclude that CAS and WIV are agents or instrumentalities.

Finally, this Court does not find it necessary to determine at this juncture whether CAS and WIV are political subdivisions, or whether they are agencies or instrumentalities:  both categories are entitled to sovereign immunity unless an exception to FSIA sovereign immunity exists.  The Court turns to that issue next.

**C.  <u>Does an exception to FSIA immunity apply in this case</u>?**  Plaintiff invokes the FSIA's (1) commercial-activity exception, 28 U.S.C. § 1605(a)(2), and (2) non-commercial tort exception, 28 U.S.C. § 1605(a)(5).  The Court addresses each in turn.

**1.  <u>The commercial-activity exception</u>.**  The FSIA provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; ***or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United State***s.

28 U.S.C. §1605(a)(2) (emphasis added).  Plaintiff relies on the emphasized clause, known as "the third clause" of the commercial-activity exception, requiring a showing

that (1) defendants engaged in "commercial activity" outside the United States; (2) the

suit is "based upon" an act outside the United States "in connection with" such

commercial activity; and (3) the act had a "direct effect" inside the United States.

**The "commercial activity" element.**   "The FSIA defines 'commercial activity' to

mean . . . either a regular course of commercial conduct or a particular commercial

transaction or act. The commercial character of an activity shall be determined by

reference to the nature of the course of conduct or particular transaction or act, rather than

by reference to its purpose." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612

(1992) (quoting 28 U.S.C. § 1603(d)).  Finding that the FSIA definition left "commercial

activity" largely undefined, *see Weltover*, 504 U.S. at 612, the Supreme Court crafted its

own definition as follows.

> [W]e conclude that when a foreign government acts, not as regulator of a
> market, but in the manner of a private player within it, the foreign
> sovereign's actions are "commercial" within the meaning of the FSIA. . . .
> [T]he question is not whether the foreign government is acting with a profit
> motive or instead with the aim of fulfilling uniquely sovereign objectives.
> Rather, the issue is whether the particular actions that the foreign state
> performs (whatever the motive behind them) are the *type* of actions by
> which a private party engages in "trade and traffic or commerce . . . ."

*Id.* at 614 (emphasis in original).  The Court held that the activity in *Weltover*--issuing

and later extending the maturity date of bonds—should be treated the same as any other

commercial activity.  *See id.* at 615-16.

**The "based upon" element.**  In interpreting the first clause of the commercial-

activities exception, the Supreme Court held that a court must look at the basis or

foundation for the claim, e.g., those elements that would entitle plaintiff to relief if

proved true, and that are the gravamen of the complaint. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33 (2015). Rather than to individually analyze each cause of action, courts should zero in on the "core" of the suit, that is, the "acts that actually injured them." *See id*. at 35; *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993); *Community Fin. Gp., Inc. v. Rep. of Kenya*, 663 F.3d 977, 980-81 (8th Cir. 2011).

**The "direct effect" element.** A direct effect is one that follows "as an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618 (internal quotation marks and quoted source omitted). In discussing "direct" effect within the meaning of the third clause of the commercial-activity exception, the Second Circuit found that the "impact need not be either substantial or foreseeable," but had to follow as an immediate consequence of the conduct at issue, meaning that there was no intervening factor. *See Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74-75 (2d Cir. 2010); *see also Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 238 (2d Cir. 2002) (requisite immediacy was lacking where alleged effect depended crucially on variables independent of conduct in the foreign state). Similarly, in *Lyon v. Agust S.P.A.*, 252 F.3d 1078, 1083 (9th Cir. 2001), the court found that a consequence was "immediate" if no intervening act broke "the chain of causation leading from the asserted wrongful act to its impact in the United States." And in applying the "direct effect" test under the third clause of the commercial-activities exception, the Eighth Circuit stated that direct effect meant immediate consequence. *See General Elec. Capital Corp. v. Grossman*, 991 F.3d 1376, 1386 (8th Cir. 1993).

**The alleged commercial activity in this case.**   Plaintiff specifies four activities in invoking the commercial-activity exception:

> (1) operation of the healthcare system in Wuhan and throughout China; (2) commercial research on viruses by the Wuhan Institute and Chinese Academy of Sciences; (3) the operation of traditional and social media platforms for commercial gain; and (4) production, purchasing, and import and export of medical equipment, such as personal protective equipment ("PPE"), used in COVID-19 efforts.

[Doc. 1 ¶ 40.]

**Is the alleged activity commercial?**   Because China permits private sectors of the economy to operate, albeit under the state's control, this Court finds it expedient simply to assume for the sake of argument that the identified activities are commercial, and move on to the other elements of the commercial-activity exception.  *See* Larkin, *supra* at 101-02 (PRC's Constitution makes it clear that China is a socialist state but at the same time "the Chinese [C]onstitution permits 'private sectors of the economy' to operate, although the state at all times is responsible for their 'supervision and control'"; "[f]actors like those make it uncertain how the FSIA would treat the four undertakings that Missouri has cited as 'commercial activities.'").

Is the complaint "based upon" an act outside the United States "in connection with" commercial activity outside the United States?  Although the Supreme Court's *Nelson* and *Sachs* "gravamen" test was based on analysis of the first clause of the commercial-activity exception whereas plaintiff relies on the third clause, the commercial-activity language--"based upon"--relates to all three clauses.  Thus, the Court will determine what acts constitute the gravamen or core of the suit.  This is consistent

with the approach of the Second Circuit in analyzing the third clause.  *See Garb,* 440

F.3d at 586 ("As a threshold step in assessing plaintiff's reliance on the 'commercial

activity' exception, we must identify the act of the foreign sovereign State that serves as

the basis for plaintiff's claims.") (citing *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1109

(5th Cir. 1985) (explaining that to determine the basis of a claim, a court should focus on

the "gravamen of the complaint").)

 In this case, this Court finds that the gravamen of the complaint--the actual

conduct that injured plaintiff--is that defendants failed to contain the virus within Wuhan,

and later within PRC's borders, while lying to its citizens and the world about

transmissibility of the virus and delaying, censoring, or withholding critical information

about the virus.  This type of conduct is not the type of conduct by which a private party

engages in "trade and traffic or commerce" and thus it is not commercial activity.  *See*

*Weltover*, 504 U.S. at 614. Moreover, this Court does not view the PPE-hoarding as core

misconduct:  the PPE hoarding caused injury only because defendants mishandled the

pandemic.

Plaintiff points out that, under the third clause of the commercial-activity

exception, the activity constituting the wrong needs only to have a "connection with"

commercial activity, e.g., China's operation of a healthcare system, research on viruses,

operation of social media platforms, and production and export/import of PPE.  Plaintiff

relies on *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997), in

which the Ninth Circuit--interpreting the third clause of the commercial-activity

exception--concluded that "[a]ll acts need not be commercial activity themselves; they must merely have been made 'in connection with' such activity."  *Id.*

If *Adler* is applied mechanically, and to its logical extreme, courts would have to conclude that no matter how sovereign an "act" is, and no matter how much the core and gravamen of the complaint is based on that sovereign act, suit may be brought under the FSIA as long as the complaint pleads that the act was made in connection with commercial activity.  Notably, in *Nelson,* the Supreme Court addressed "semantic ploys" in pleading cases under the FSIA.  The Court had found that the gravamen of the complaint--Nelson's arrest, torture, and imprisonment in Saudi Arabia--did not satisfy the commercial-activities first clause requiring commercial activity *within* the United States, even though Saudi Arabia recruited Nelson for work while he was in the United States, because the act that injured him was police conduct within Saudi Arabia.  The Court refused to accept--as commercial activity within the United States--an alternative claim that Saudi Arabia failed to warn Nelson, at the time of his recruitment, that he might encounter tortious conduct while in Saudi Arabia.  *See Nelson*, 507 U.S. at 363.  The Supreme Court admonished that "this is merely a semantic ploy. For aught we can see, a plaintiff could recast virtually any claim of intentional tort committed by sovereign act as a claim of failure to warn, simply by charging the defendant with an obligation to announce its own tortious propensity before indulging it. To give jurisdictional significance to this feint of language would effectively thwart the Act's manifest purpose to codify the restrictive theory of foreign sovereign immunity."

The Supreme Court's rejection of artful pleading as a means of avoiding the FSIA's restrictive theory of sovereign immunity signals that caution should be exercised before finding that a plaintiff may sue for sovereign acts so long as the plaintiff also pleads that the acts were taken in connection with commercial activity.  And in fact, the Second Circuit holds that the "in connection with" language is a term of art to be interpreted narrowly, and that there must be a substantive connection or causal link between the act and the commercial activity.  *See Garb,* 440 F.3d at 587.  In that case, the Second Circuit identified the expropriation of property--clearly a sovereign act--as the gravamen of the complaint.  The court then found that Poland's subsequent commercial handling of the expropriated property was too attenuated and not substantive enough to satisfy the "in connection with" requirement, in keeping with "Congress's intention to deny sovereign immunity to foreign States only with respect to commercial, *and not sovereign,* acts."  *Id.* (emphasis added).

Thus, to find the "in connection with" language satisfied, the Court must find that the sovereign acts--the gravamen of the complaint--had a substantive connection with and clear causal link to China's alleged commercial activities of running a health care system, researching viruses, operating social media platforms, and producing and exporting PPE. Plaintiff argues there is such a causal link and substantive connection; and to be sure, a link and connection is more apparent in these circumstances than in the subsequent commercial handling of the expropriated property that was at issue in *Garb.*

Nonetheless, concluding that the clearly sovereign acts at the core of this suit are exempt from the FSIA because they were made in connection with commercial activity seems inconsistent with the restrictive theory of sovereign immunity.  In fact, a noted commentator wrote that the FSIA's division of activity between "commercial and subject to suit" or "governmental and immune from suit" results in only a "rough approximation of sovereign value" and thus "courts should use the purposes of the [FSIA], and the general policies embodied in the restrictive sovereign immunity doctrine as reference points in making immunity decisions."  David  A. Brittenham, Note, *Foreign Sovereign Immunity and Commercial Activity: A Conflicts Approach*, 83 COLUM. L. REV. 1440, 1452 (1983).  In keeping with this principle, the court in *Eisenberg* concluded that a prisoner's COVID-related claim against PRC did not fall within the commercial-activity exception, because "the core of [the] claim . . . is not 'based upon' commercial activity, but rather political, non-commercial activity of the PRC."  *Eisenberg*, 2022 WL 1591541, at *5.  But ultimately, the Court need not rest its sovereign-immunity conclusion on the "based upon" element, because as an independent basis for finding that the commercial-activity exception does not apply, the Court finds that the complaint does not meet the "direct effect" element.  This is discussed next.

**Did the acts constituting the gravamen of the complaint have a "direct effect" within the United States?**  The Court cannot conclude that the core misconduct had an immediate consequence--a "direct effect"--in the United States:  many intervening events would necessarily have occurred before the mishandling and coverup resulted in COVID

cases inside the United States.  In fact, the time frame alone shows the lack of immediacy as weeks passed between the core misconduct and when COVID cases reached United States shores.  The existence of intervening factors would necessarily include the decision of unsuspecting infected Wuhan residents to leave the city, causing the virus to spread elsewhere in China --and ultimately to the United States following international travel as to which the also-unsuspecting WHO had issued no cautionary note.  Similarly, although this Court does not view the PPE hoarding as the core of the complaint, the effect of hoarding would have manifested only over time with the spread of COVID and resulting consumption of and need for PPE that became more urgent over time.

Plaintiff relies on *Dumont v. Saskatchewan Gov't Ins.,* 258 F.3d 880 (8th Cir. 2001).  That case involved an insurance dispute arising out of a car crash in the United States in which Canadian citizens were killed.  In a footnote, the Eighth Circuit noted that subject matter jurisdiction for the dispute existed under the FSIA under the third clause of the commercial-activity exception.  The court reasoned that the Canadian insurance company had acted outside the United States in connection with commercial activity, because the company had written the insurance policy; and issuing the policy had a "direct effect" within the United States in that the Canadian citizens had insurance coverage while they motored within the United States.  *See id.* n.6.  This Court finds *Dumont* inapposite.  In that case, the link between issuing an insurance policy (the commercial act) and foreign citizens being insured for travel inside the United States (the legally significant direct effect) occurred immediately regardless of actual travel.  In this

case, however, the legally significant direct effect--arrival of the virus in the United

States and the resulting havoc--occurred well after the core misconduct.

Plaintiff also likens this case to product liability cases in which defective products

manufactured abroad cause injuries within the United States after the product travels in

commerce.  The Court does not find the analogy persuasive.  Even if the product was

used for some time before the defect caused the injury, the defectively manufactured

product itself was the immediate cause of the injuries.

**2.  The non-commercial (personal injury or property damage) exception.**  A

second FSIA exception exists for cases

> not otherwise encompassed in paragraph (2) above, in which money
> damages are sought against a foreign state for personal injury or death, or
> damage to or loss of property, occurring in the United States and caused by
> the tortious act or omission of that foreign state or of any official or
> employee of that foreign state while acting within the scope of his office or
> employment.

28 U.S.C. § 1605(a)(5).  Notably there are two "exceptions to the exception" above for

> **(A)** any claim based upon the exercise or performance or the failure to
> exercise or perform a discretionary function regardless of whether the
> discretion be abused, or

> **(B)** any claim arising out of malicious prosecution, abuse of process, libel,
> slander, misrepresentation, deceit, or interference with contract rights . . .

28 U.S.C. § 1605(a)(5).

Thus, if the complaint falls within either of the exceptions to the exception, the

FSIA does not permit suit.

35

**Discretionary function exception in § 1605(a)(5)(A).** "The existence of a

discretionary function under the FSIA is generally analyzed under the principles

developed pursuant to the Federal Tort Claims Act's ('FTCA') discretionary function

exception."). *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1026 (9th

Cir.1987) (citing in *Croyle by and through Croyle v. United States*, 908 F.3d 377, 382

(8th Cir. 2018.  As the Eighth Circuit explained in *Croyle*, 908 F.3d at 381, which

analyzed the discretionary function exception under the FTCA, a two-part test governs

the exception.

 First, the conduct must involve an element of judgment or choice, and if a federal

statute, regulation, or policy mandates certain action, the discretionary function exception

will not apply.  *See id.* (cited cases omitted).  "Second, the judgment or choice must be

'the kind that the discretionary function exception was designed to shield.'"  *Id.* (quoted

case omitted); *see also United States v. Gaubert,* 499 U.S. 315, 322 (1991) (discussing

FTCA discretionary function exception; noting that nature of conduct, rather than status

of actor governs whether exception applies).  The exception is intended to prevent

judicial second-guessing of legislative and administrative decisions that are grounded in

social, economic, and political policy through a tort action.  *See Gaubert*, 499 U.S. at

323.  Notably, in the landmark *Gaubert* decision, the Supreme Court was addressing a

motion to dismiss, *see id.* at 324-25, whereas the inquiry here is a facial review of the

complaint to determine whether subject matter jurisdiction exists.  Nonetheless, the

complaint allegations themselves establish that the core conduct was a matter of

sovereign policy.  The complaint cites no Chinese statute, regulation, or policy *mandating* any of the conduct.  The conduct does not involve ministerial tasks.  Rather, the allegations reflect matters of judgment and choice, e.g., delaying information, providing misinformation, suppressing information, censoring information, allowing massive public gatherings, allowing unencumbered travel, and publicly punishing citizens who sought to warn the public about the virus.  [Doc. 1 ¶¶ 65-84.]  *See Fagot Rodriguez v. Republic of Costa Rica*, 297 F.3d 1, 8-9 (1st Cir. 2002) (foreign government conduct that constitutes "a matter of choice" or that "involves an element of judgment" is outside the FSIA tortious-activity exception).  And finally, the purpose of the exception is served because it prevents lawsuits (however tragic the result for the injured parties) for torts arising out of a sovereign's exercise of public policy in conjunction with its sovereign acts.  This is, after all, the very purpose of the FSIA.  Because the discretionary-function exception to the non-commercial tort exception applies, it is not necessary to consider the second "exception to the exception" for claims arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract**.**

Thus, the Court concludes that neither the commercial-activity exception nor the non-commercial tort exception applies.  The court in *Eisenberg* reached the same result, concluding that the "allegations that PRC government officials engineered COVID-19, decided to conceal information concerning its escape from a lab, and failed to prevent the spread of the virus by, among other things, permitting international air travel is not

subject to the commercial activity or non-commercial tortious activity exceptions to the FSIA. Instead, [the plaintiff] has alleged non-commercial, discretionary acts or omissions by the PRC, and therefore it is not subject to suit under the FSIA." *Eisenberg*, 2022 WL 1591541, at \*5.  The court added that it had "not located a single case that has determined that any exception of the [FSIA] affirmatively applies to COVID-19 damages claims to individuals based on allegations that the PRC is responsible for the spread of the virus throughout the World." *Eisenberg*, 2022 WL at \*4.

Given the Court's conclusions based on the face of the complaint that (1) all named defendants are deemed foreign states under the FSIA, and (2) no exception to FSIA sovereign immunity applies, the service-of-process issues are moot.  All in all, the Court has no choice but to dismiss this novel complaint for lack of subject matter jurisdiction.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's complaint is **DISMISSED** in its entirety for lack of subject matter jurisdiction.

Dated this 8th day of July, 2022.

_____

STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE