# United States Court of Appeals
### For The Eighth Circuit

Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Michael E. Gans**
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

January 10, 2024

Joshua Divine
ATTORNEY GENERAL'S OFFICE
207 W. High Street
P.O. Box 899
Jefferson City, MO  65102-0000

    RE:  22-2495  The State of Missouri, ex rel. Eric S. Schmitt v. The Peoples Republic of China, et al

Dear Counsel:

    The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion.

    Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. Except as provided by Rule 25(a)(2)(iii) of the Federal Rules of Appellate Procedure, no grace period for mailing is allowed. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

                                  Michael E. Gans
                                  Clerk of Court

BNW

Enclosure(s)

cc:    Clerk, U.S. District Court, Eastern District of Missouri
       Amy Collignon Gunn
       Jacqueline M. Kinder
       Elizabeth S. Lenivy

       District Court/Agency Case Number(s):   1:20-cv-00099-SNLJ

# United States Court of Appeals
### *For The Eighth Circuit*

Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Michael E. Gans**
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

January 10, 2024

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

     RE: 22-2495  The State of Missouri, ex rel. Eric S. Schmitt v. The Peoples Republic of China, et al

Dear Sir or Madam:

     A published opinion was filed today in the above case.

     Counsel who presented argument on behalf of the appellant was Joshua Divine, AAG, of Jefferson City, MO. The following attorney(s) appeared on the appellant brief;  Dean John Sauer, former AAG, of Jefferson City, MO.,  Justin D. Smith, former AAG, of Jefferson City, MO.

     No one appeared for the appellee.

     The following attorney(s) appeared on the amicus brief of The Lawyers for Upholding International Law;  Amy Collignon Gunn, of Saint Louis, MO.,  Elizabeth S. Lenivy, of Saint Louis, MO.
     The following attorney(s) appeared on the amicus brief of The China Society of Private International Law;  Jacqueline M. Kinder, of Saint Louis, MO.,

     The judge who heard the case in the district court was Honorable Stephen N. Limbaugh, Jr.

     If you have any questions concerning this case, please call this office.

                                    Michael E. Gans
                                    Clerk of Court

BNW

Enclosure(s)

cc:  MO Lawyers Weekly

     District Court/Agency Case Number(s):  1:20-cv-00099-SNLJ

# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-2495
_____

State of Missouri, ex rel. Andrew Bailey, in his official capacity as Missouri Attorney General

*Plaintiff - Appellant*

v.

The People's Republic of China; Communist Party of China; National Health Commission of the People's Republic of China; Ministry of Emergency Management of the People's Republic of China; Ministry of Civil Affairs of the People's Republic of China; People's Government of the Hubei Province; People's Government of Wuhan City; Wuhan Institute of Virology; Chinese Academy of Sciences

*Defendants - Appellees*

------------------------------

The Lawyers for Upholding International Law

*Amicus Curiae*

The China Society of Private International Law

*Amicus on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: February 16, 2023
Filed: January 10, 2024

_____

Before SMITH, Chief Judge, STRAS and KOBES, Circuit Judges.

_____

STRAS, Circuit Judge.

The COVID-19 pandemic led to a tragic loss of life and had financial effects worldwide. Missouri seeks to recover from various Chinese defendants, including the government itself, for the impact the disease had on its own economy and the health and economic security of its citizens. It turns out that the Foreign Sovereign Immunities Act stands in the way of most of its claims. Just one survives: the allegation that China hoarded personal-protective equipment while the rest of the world was in the dark about the disease. We reverse the dismissal of Missouri's hoarding claim, but otherwise affirm.

I.

Missouri's position is that China is to blame for COVID-19. In its view, negligence led to the virus's escape from the laboratories at the Wuhan Institute of Virology. From there, the Chinese government allowed the virus to spread all over the world and engaged in a campaign to keep other countries from learning about it. In the meantime, the Chinese government bought up masks (and other types of personal-protective equipment). Hoarding them allowed China to sell lower-quality masks as the outbreak spread. These actions cost the state thousands of lives and "tens of billions" of dollars in economic damage.

Missouri now seeks to hold various Chinese entities responsible. None of the defendants has appeared in court, even through counsel. Their absence led the clerk

of court for the Eastern District of Missouri to enter a default.  *See* Fed. R. Civ. P. 55(a).

The default never became a judgment, however, because the district court questioned its own subject-matter jurisdiction under the Foreign Sovereign Immunities Act.  *See* 28 U.S.C. § 1604; *see also Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97, 101 (8th Cir. 1989) (explaining that, "even if a party fails to enter an appearance and assert its claim of immunity," courts must still determine if "immunity is available" under the Foreign Sovereign Immunities Act).  It concluded that each of the defendants had immunity, which both deprived it of subject-matter jurisdiction and required dismissal of every claim in Missouri's complaint.

We must determine whether the district court made the right call.  *See LeMay v. USPS*, 450 F.3d 797, 799 (8th Cir. 2006) (explaining that our review is de novo).  In doing so, we look to "the allegations in [Missouri's] complaint, which we must accept as true."  *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707–08 (9th Cir. 1992).  The district court limited itself to those allegations, so we do too.  *Cf. BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 680 (8th Cir. 2002) (construing a Foreign Sovereign Immunities Act challenge as a facial attack on subject-matter jurisdiction).

II.

The Foreign Sovereign Immunities Act sets the ground rules for when American courts "may exercise jurisdiction over a foreign state."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610–11 (1992); *see also* 28 U.S.C. § 1604 (stating that a "foreign state *shall* be immune from the jurisdiction of the courts of the United States and of the States" (emphasis added)).  It turns out that every defendant Missouri has sued qualifies as one.

-3-

We start with the easiest calls. The People's Republic of China is the country's officially recognized government, the "body politic that governs [the] territory." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010); *see also OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 169 (3d Cir. 2023) (explaining that a foreign state is "the body politic—the country or nation"). No doubt, it is a foreign state.

So are the National Health Commission, the Ministry of Emergency Management, and the Ministry of Civil Affairs. As Missouri's complaint explains, each is part of the government. *See* 28 U.S.C. § 1603(a) (recognizing that a state "includes [its] political subdivision[s]"); *see also Berg v. Kingdom of Netherlands*, 24 F.4th 987, 992–94 (4th Cir. 2022) (treating Dutch ministries as "political subdivisions"); *Garb v. Republic of Poland*, 440 F.3d 579, 594 (2d Cir. 2006) (calling Poland's Ministry of the Treasury "an integral part of Poland's political structure" (citation omitted)).

The Chinese Communist Party may look like a nongovernmental body at first glance, but in the complaint's words, it "exercise[s] direction and control over the actions of all other Defendants," including China's official government. Given its role, it is in substance the same "body politic that governs [China]."[1] *Samantar*, 560 U.S. at 314; *see Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 196 (2d Cir. 2019) ("[A]n entity can be a 'foreign state' if it is an alter ego of a foreign state."); *The American Heritage Dictionary* 1706 (5th ed. 2016) (defining the "state" as "[t]he supreme public power within a sovereign political entity"); *see also Siderman de Blake*, 965 F.2d at 707–08 (explaining that we must accept the allegations in the complaint as true).

---

[1] It is true that Missouri denies that the Communist Party is a "foreign state." 28 U.S.C. §§ 1603(a), 1604. But we do not have to accept the complaint's *legal* conclusions as true, only its *factual* allegations. It falls upon us, after all, to "determine whether immunity is available." *Brewer*, 890 F.2d at 101.

-4-

The definition of "foreign state" in the Foreign Sovereign Immunities Act also covers other entities. *See Big Sky Network Can. Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1189 (10th Cir. 2008). One is a "political subdivision of a foreign state." 28 U.S.C. § 1603(a). Ministries qualify, as we explain above, because of their direct connection to the official government. But so do provincial- and township-level bodies like the People's Government of the Hubei Province and the People's Government of Wuhan City. *See Big Sky Network*, 533 F.3d at 1189 (reaching this exact conclusion about Sichuan Province and Qingyang District in China).

The final category includes "agenc[ies] [and] instrumentalit[ies]." 28 U.S.C. § 1603(a). The key distinction between "political subdivision[s]" and "agenc[ies] or instrumentalit[ies]" is that the latter two are, by definition, "separate legal person[s]" from the government itself. *Id.* § 1603(b)(1); *see Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 214–15 (4th Cir. 2011) (distinguishing between them). The remaining defendants, the Wuhan Institute of Virology and Chinese Academy of Sciences, are legally separate from the government, but still closely enough connected that they qualify as "organ[s] of" it. 28 U.S.C. § 1603(b)(2) (defining "agency or instrumentality of a foreign state" to include "an organ of a foreign state or political subdivision thereof"). The complaint drives this point home by alleging that they are under the "control" of the Communist Party and act as "agents" of the Chinese government. *See Gates v. Victor Fine Foods*, 54 F.3d 1457, 1461 (9th Cir. 1995) (holding that an entity was an organ of the state, in part because the entity's "ability to act independently" was "narrowly circumscribe[d]"). All "for the benefit of China."

To sum up, each of the defendants is a "foreign state" because it is part of China's official government, a "political subdivision," or a governmental "agency or instrumentality." 28 U.S.C. § 1603. The Foreign Sovereign Immunities Act, in other words, shields them from Missouri's lawsuit unless a statutory exception applies.

-5-

III.

Most of the action in these types of cases involves the exceptions. If one applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. If none do, however, a federal court lacks both personal and subject-matter jurisdiction over the foreign state. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983). The ultimate burden rests with Missouri, the plaintiff, to "show[] that an exception applies." *Cmty. Fin. Grp., Inc. v. Republic of Kenya*, 663 F.3d 977, 980 (8th Cir. 2011) (citation omitted).

Only two exceptions potentially cover the acts alleged in Missouri's complaint. One focuses on noncommercial torts. *See* 28 U.S.C. § 1605(a)(5); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439–41 (1989) (discussing this exception). The other deals with commercial activity. *See* 28 U.S.C. § 1605(a)(2); *Saudi Arabia v. Nelson*, 507 U.S. 349, 356–63 (1993) (discussing that one). Between both exceptions, only one of Missouri's claims survives.

A.

The noncommercial-tort exception does not save any of them. *See* 28 U.S.C. § 1605(a)(5). It denies immunity "for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of [any] foreign state." *Id.* Missouri's argument is that the defendants breached their duty of care by allowing COVID-19 to spread, blocking the dissemination of information about the virus, and cornering the market on personal-protective equipment.

Even if we assume that all of these "act[s] or omission[s]" were tortious, *see id.*, Missouri has a bigger problem: the exception within the exception for torts arising out of "discretionary function[s]," *id.* § 1605(a)(5)(A). The idea behind it is to "prevent judicial 'second-guessing' of . . . decisions grounded in social,

-6-

economic, and political policy." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). It places decisions "susceptible to policy analysis" outside the purview of American courts. *Croyle ex rel. Croyle v. United States*, 908 F.3d 377, 381 (8th Cir. 2018) (quoting *Gaubert*, 499 U.S. at 325).

Whatever the wisdom of China's policy decisions, they were discretionary. Every single act or omission identified in Missouri's complaint falls into this category, from continuing to allow large gatherings in Wuhan to taking legal action against doctors who tried to share information about the virus. None of these actions, as far as we can tell from the complaint, were mandatory or forbidden in China, meaning they were the subject of a "judgment or choice" by policymakers. *Riley v. United States*, 486 F.3d 1030, 1032 (8th Cir. 2007) (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *cf. Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) (holding that the post office's failure to terminate an employee despite notice of "illegal behavior . . . d[id] not represent a choice based on plausible policy considerations"). Missouri may want to hold China accountable for its role in the spread of COVID-19, but the Foreign Sovereign Immunities Act is clear that it cannot do it this way. *See* 28 U.S.C. § 1604.

B.

For Missouri, there is one last hope: the commercial-activity exception. *See* 28 U.S.C. § 1605(a)(2). It abrogates immunity for claims based upon:

> [1] a commercial activity carried on in the United States by the foreign state; . . .
> [2] an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or . . .
> [3] an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

-7-

*Id.* None of the conduct identified in the complaint occurred within the United States, so Missouri's claims hinge on the third clause, which focuses on acts with a "direct effect in the United States." *Id.*; *see* 28 U.S.C. § 1603(d) (defining a commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act").

1.

Three of Missouri's claims target the alleged "malfeasance and deception" behind the spread of COVID-19. The complaint attributes the harm Missouri suffered to the virus research undertaken by the Wuhan Institute of Virology and Chinese Academy of Sciences, the management of China's healthcare system, and "the operation of traditional and social[-]media platforms for commercial gain." The virus's spread, at least according to the complaint, caused a "loss of jobs, loss of income, [and] loss of business opportunities" in Missouri. Specifically, the "restrict[ion] [of] millions of dollars in state expenditures," widespread school closures, and visitation restrictions in hospitals and nursing homes.

The problem is that, even if these activities were commercial, their effects were "remote and attenuated," *Weltover*, 504 U.S. at 618, not "direct," 28 U.S.C. § 1605(a)(2). To be direct, an effect must "follow[] as an *immediate* consequence of the defendant[s'] activity." *Weltover*, 504 U.S. at 618 (emphasis added) (citation omitted); *see Dumont v. Saskatchewan Gov't Ins.*, 258 F.3d 880, 883 n.6 (8th Cir. 2001) (explaining that the provision of insurance to motorists in the United States was sufficient to satisfy the exception).

No direct causal chain exists here. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1133 (9th Cir. 2012) (explaining that "a consequence is immediate if no intervening act breaks the chain of causation leading from the asserted wrongful act to its impact in the United States" (citation omitted)). Start with the spread of the virus itself, which required intervening actors. *See id.* At least one infected individual (and probably more) had to travel from China to other parts of the world.

-8-

The virus then had to spread and eventually reach the United States. Only at that point could an infected individual have brought the virus to Missouri.

It took several more steps from there for Missouri's economy to suffer. Infections had to reach a high enough level in the United States and Missouri for federal, state, and local governments to issue stay-at-home orders. Missourians then had to follow them. Only then did schools and businesses close, state expenditures grind to a halt, and medical facilities close their doors to visitors. The point is that it is impossible to directly trace the economic and other harms identified in Missouri's complaint to the virus research in Wuhan, operation of the Chinese healthcare system, and social-media censorship. *See United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994) (holding there was no jurisdiction when effects in the United States were "dependent on an intervening factor").

The same was true in *Virtual Countries, Inc. v. Republic of South Africa*. 300 F.3d 230 (2d Cir. 2002). There, an internet-domain company sued South Africa over a press release it issued announcing that it had acquired a domain name the company owned. *See id.* at 234. News outlets reported on it, which caused investors to read about it. *See id.* Then some investors pulled their money. *See id.* Even though the press release impacted the company's financial fortunes, the Second Circuit held that the causal chain was too indirect because it required "numerous actions by third parties." *Id.* at 237. Just like the "tangled causal web" in *Virtual Countries*, most of the acts identified in Missouri's complaint "do[] not provide the requisite immediacy to establish jurisdiction." *Id.* at 238.

2.

The hoarding claim is different. It takes aim at the "production, purchasing, and import and export of medical equipment, such as personal[-]protective equipment ('PPE'), used in COVID-19 efforts." One allegation is that the defendants hoarded masks and then sold lower-quality equipment in the United

-9-

States.  The other is that China "t[ook] over factories that ma[de] masks on behalf of American companies," which essentially halted the export of high-quality masks to the United States.  Together, they identify classic anticompetitive behavior, except on a country-wide scale.

The defendants' anticompetitive actions were commercial in "nature."  28 U.S.C. § 1603(b).  Taking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of "a private player" in the market.  *Weltover*, 504 U.S. at 614.  The same goes for the act of selling those items for a profit.  *Id.*  The Supreme Court, for its part, has distinguished between "regulations limiting foreign currency exchange," on the one hand, and "a contract to buy army boots or even bullets," on the other.  *Id.*  Buying and selling personal-protective equipment is much more like the latter, a "commercial activity," than the former, a "sovereign" one.  *Id.* (quotation marks omitted); *see Brewer*, 890 F.2d at 101.  So is this kind of anticompetitive behavior.  *Cf. Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1870 (2018) (discussing "a class-action suit against four Chinese corporations" accused of "fix[ing] the price and quantity of vitamin C exported to the United States").

The closest call is whether the behavior had a "direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Recall that one of the specific allegations is that China "bought up much of the rest of the world's supply" of masks.  Those supply reductions allegedly led to an immediate shortage in Missouri, which then allowed the defendants to enter the market and sell lower-quality masks.  *Cf. Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 859 (7th Cir. 2012) (en banc).  Healthcare providers in Missouri either paid higher prices for the masks they could find or dealt with shortages that, in the complaint's words, made it difficult to "safely and effectively treat[] patients with the virus."  Although the underlying activity was economic, the complaint suggests that Missouri suffered effects beyond just financial loss.  *See Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 79 (2d Cir. 2010) (citation omitted) (suggesting that a financial loss to a single American

-10-

individual or firm is not enough, "standing alone," to satisfy the commercial-activity exception).

China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects. *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen.*, 600 F.3d 661, 664–66 (D.C. Cir. 2010); *cf. Minn-Chem*, 683 F.3d at 859 (interpreting a different statute and concluding that "foreign supply restrictions, and the concomitant price increases forced upon . . . purchasers, were a direct—that is, proximate—cause of . . . subsequent price increases in the United States"). They singlehandedly "t[ook] over factories that ma[d]e masks" and cornered the market before the rest of the world realized what was happening. Then, when the virus spread and people all over the world became sick, China was able to maintain its stockpile and prolong the shortage. The most basic supply-and-demand principles tell us that these market effects depended little, if at all, "on variables independent" of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time. *Guirlando*, 602 F.3d at 75 (citation omitted); *see also Ball Memorial Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986) (explaining that the ability to "control output and prices" largely depends on the ability of other market players "to increase their own output in response to a contraction by the defendants"); *cf.* Herbert Hovenkamp, *Federal Antitrust Policy* 4 (6th ed. 2020) (noting that "all participants in the market [must] have good knowledge about price, output[,] and other information" for conditions to be most "conducive to competition"). Other market players simply had no time or ability to respond. *See Ball Memorial Hosp.*, 784 F.2d at 1336.

Nor do we, contrary to the dissent's suggestion, measure the scope of the effect by reference to what "Congress would have wanted" us to do. *See post* at 14. The Supreme Court, after all, has instructed us to pay attention only to "what Congress enacted": a statute lacking a "'substantiality' or 'foreseeability'" requirement. *Weltover*, 504 U.S. at 618. Given this guidance, what we can say at

-11-

this point is that Missouri has plausibly *alleged* that the defendants' anticompetitive behavior had "a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

Finally, the commercial activity also has a "connection with," 28 U.S.C. § 1605(a)(2), the "'particular conduct' that constitutes the 'gravamen' of the suit," *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). That is, "those elements of a claim that, if proven, would entitle [Missouri] to relief under [its] theory of the case." *Nelson*, 507 U.S. at 357. Missouri's overarching theory is that China leveraged the world's ignorance about COVID-19. One way it did so was by manipulating the worldwide personal-protective-equipment market. Missouri must still prove it, but it has alleged enough to allow the claim to proceed beyond a jurisdictional dismissal on the pleadings.[2] *See* Fed. R. Civ. P. 12(h)(3); *see also* 28 U.S.C. § 1608(e) ("No judgment by default shall be entered by a court . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.").

---

[2]One of the amici suggests that Missouri lacks standing because it suffered no injury. But even it acknowledges that standing could exist under two theories. One is under the *parens-patriae* doctrine based on the harms Missourians suffered, including the lack of "safe[] and effective[] treat[ment of] patients with the virus." *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 602–07 (1982) (collecting cases and recognizing that "a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general"); *Lynch v. Nat'l Prescription Adm'rs, Inc.*, 787 F.3d 868, 872 (8th Cir. 2015) (explaining that the *parens-patriae* doctrine "permits the state to commence an action to protect a public interest, like the safety, health[,] or welfare of its citizens" (citation omitted)). The other is the "billions of dollars" Missouri lost in revenue, a more direct economic injury. So, at least at this early stage, it has alleged enough for standing.

-12-

IV.

We grant Missouri's motion to file a reply brief, reverse the judgment on Missouri's hoarding claim, otherwise affirm, and remand for further proceedings consistent with this opinion.

SMITH, Chief Judge, concurring in part and dissenting in part.

I concur in all but Part III.B.2 of the court's opinion. I would affirm the district court's dismissal of the hoarding claim. I conclude that China's behavior lacks "a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

In arguing for the applicability of the commercial-activity exception, Missouri relies on the third clause of § 1605(a)(2), which confers jurisdiction "in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." Under this clause, Missouri must show, among other things, "that [the] act cause[d] a *direct effect* in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added). The Supreme Court has explained that "an effect is *direct* if it follows as an *immediate* consequence of the defendant's activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (emphases added) (cleaned up). "The effect need not be 'substantial' nor 'foreseeable,' but it must not be 'purely trivial' or 'remote and attenuated.'" *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1140 (D.C. Cir. 2020) (quoting *Weltover*, 504 U.S. at 618). "A direct effect . . . is one which has no *intervening element*, but, rather, flows in a straight line without deviation or interruption." *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994) (emphasis added) (internal quotation marks omitted). "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *Virtual Countries, Inc. v. Republic of S. Afr.*, 300 F.3d 230, 236 (2d Cir. 2002) (internal quotation marks omitted). "[T]he requisite immediacy is lacking where the alleged effect depends crucially on variables independent of the conduct

-13-

of the foreign state." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010) (cleaned up).

Moreover, "[t]he mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States." *Id.* at 78. If this were not true "the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states" "[i]f a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement." *Id.* at 79 (emphasis omitted) (internal quotation marks omitted).

In determining whether China's hoarding of PPE had a direct effect in the United States, "the question . . . is, was the effect sufficiently *direct* and sufficiently *in the United States* that Congress would have wanted an American court to hear the case?" *Guevara v. Republic of Peru*, 608 F.3d 1297, 1309 (11th Cir. 2010) (emphases added) (internal quotation marks omitted). Here, "[t]he 'ripple effects' that [Missouri] complain[s] of occurred 'at the end of a long chain of causation.'" *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4, 9 (2d Cir. 2019) (unpublished) (quoting *Virtual Countries, Inc.*, 300 F.3d at 237). As the court recognizes, "one of the specific allegations is that China 'bought up much of the rest of the world's supply' of masks. Those supply reductions led to an alleged shortage in Missouri, which then allowed China to enter the market with its own lower-quality masks." *Supra* Part III.B.2. But "the effect of hoarding would have manifested only over time with the spread of COVID *and* resulting consumption of and need for PPE that became more urgent over time." *Missouri ex rel. Schmitt v. People's Republic of China*, 610 F. Supp. 3d 1174, 1193 (E.D. Mo. 2022) (emphasis added).

Immunity for foreign states under the Foreign Sovereign Immunities Act, while not impenetrable, is quite stout and stronger than the claim alleged in this case. It is certainly not strong enough to justify judicial intervention into an arena well populated with substantial political and diplomatic concerns. As a result, I conclude

-14-

that the direct-effect requirement is not satisfied and would affirm the district court's dismissal of the hoarding claim.

_____