## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, ex rel. ANDREW T. BAILEY, in his official capacity as Missouri Attorney General, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 1:20-cv-00099-SNLJ |
| v. | ) ) | |
| THE PEOPLE'S REPUBLIC OF CHINA, THE COMMUNIST PARTY OF CHINA, NATIONAL HEALTH COMMISSION OF THE PEOPLE'S REPUBLIC OF CHINA, MINISTRY OF EMERGENCY MANAGEMENT OF THE PEOPLE'S REUBLIC OF CHINA, MINISTRY OF CIVIL AFFAIRS OF THE PEOPLE'S REPUBLIC OF CHINA, PEOPLE'S GOVERNMENT OF HUBEI PROVINCE, PEOPLE'S GOVERNMENT OF WUHAN CITY, WUHAN INSTITUTE OF VIROLOGY, and       CHINESE ACADEMY OF SCIENCES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S FOREIGN SOVEREIGN IMMUNITY ACT DEFAULT HEARING BRIEF

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. ii

TABLE OF AUTHORITIES ....................................................................................... v

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................... 1

I. The Parties. ............................................................................................................ 6

   A. Plaintiff the State of Missouri. ........................................................................ 6

   B. Defendants the People's Republic of China and the Communist Party of China. ................................................................................................................. 7

   C. Defendants the Wuhan Institute of Virology and Chinese Academy of Science .............................................................................................................. 8

   D. All Remaining Defendants. ............................................................................ 10

II. Origins of the COVID-19 Virus and Defendants' Suppression of Information.... 10

   A. The Origins of COVID-19 ............................................................................. 10

      i.  The Wuhan Seafood Market and the Natural Vector Theory .................. 11

      ii. Coronavirus research at the WIV and the lab leak theory........................ 14

   B. The Initial Spread of COVID-19 ................................................................... 24

      i.  Defendants, suddenly and without warning, restrict access to WIV's viral pathogen database. ........................................................................... 24

      ii. Evidence suggests COVID-19 may have begun to spread among WIV researchers and residents of Wuhan in September, October, and November 2019. .......................................................................................... 26

   C. China, the CPC, and other Defendants aggressively seek to suppress information on the spread of COVID-19 ........................................................ 32

      i.  Defendants deny the existence and transmissibility of COVID-19 long after they clearly had actual knowledge to the contrary. ......................... 33

      ii. Defendants sought to suppress information that they had fully sequenced the COVID-19 genome by at least December 2019 and were likely working on a vaccine for COVID-19 months before acknowledging its transmissibility. ........................................................ 40

      iii.Defendants sought to underrepresent the spread of the virus, misrepresenting its threat to global health ............................................... 44

iv. Defendants' targeting of whistleblowers and reporters sharing information on the human-to-human transmissibility of COVID-19 ...... 49

v. Defendants' suppression of truthful information about the origin and spread of COVID-19 was for pure political purposes. ............................... 55

D. COVID-19 thereafter begins to quickly spread in the United States and around the world ................................................................................. 61

**PROCEDURAL BACKGROUND** ........................................................................ 62

**STANDARD OF REVIEW** ................................................................................. 66

**ARGUMENT** ..................................................................................................... 70

I. Defendants have breached their duty of care by hoarding personal protective equipment and allowing the export of ineffective personal protective equipment, all while knowing (and suppressing) the dangers of COVID-19 and the necessity of personal protective equipment. ........................................... 70

A. Defendants' hoarding of PPE ................................................................... 71

i. Nationalization of American Factories producing PPE ........................... 75

ii. Defendants actively hoarded PPE manufactured or for sale in the United States ........................................................................................ 77

B. In hoarding PPE and selling defective PPE to Missouri, Defendants breached multiple duties to not engage in fraudulent and deceptive practices in their misrepresentations surrounding the spread of COVID-19 and hoarding of PPE in conjunction with these misrepresentations. ...... 85

C. Defendants' anticompetitive and deceptive actions directly caused serious injury to the State of Missouri and its citizens .................................. 92

II. Missouri suffered direct and catastrophic damages because of Defendants' hoarding of PPE .......................................................................................... 100

A. Missouri only needs to prove an approximate amount of damages and any risk of uncertainty falls on Defendants as the wrongful actors ........... 101

B. Missouri has suffered billions of dollars in damages as a result of Defendants' wrongful acts. .................................................................... 104

i. Defendants' actions hoarding PPE caused tens of billions of dollars in damages to Missouri's economy. ............................................... 105

ii. Defendants' actions hoarding PPE caused tens of billions of dollars in direct lost revenue to the State of Missouri ............................................ 106

iii. Defendants' actions hoarding PPE injured Missouri through hundreds of millions of dollars in additional direct expenditures by the State on the remaining scarce PPE. ........................................................... 107

**CONCLUSION** ....................................................................................... **111**

**CERTIFICATE OF SERVICE** ............................................................. **112**

# <u>TABLE OF LEGAL AUTHORITIES</u>

## Cases

*Al-Birekdar v. Chrysler Grp., LLC,*
    499 F. App'x 641 (8th Cir. 2013) ................................................................ 98

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) .................................................................. 1, 99, 101

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC,*
    813 F.3d 98 (2d Cir. 2016) .................................................... 81, 82, 84, 85

*Ball Memorial Hosp., Inc. v. Mut. Hosp. Ins. Inc.,*
    784 F.2d 1325 (7th Cir. 1986) ................................................................ 86, 87

*Bigelow v. RKO Pictures, Inc.,*
    327 U.S. 251 (1946) ................................................................ 105

*Bundy v. Jackson,*
    641 F.2d 934 (D.C. Cir. 1981) ................................................................ 63

*Calderon-Cardona v. Democratic People's Republic of Korea,*
    723 F.Supp.2d 441 (D.P.R. 2010) ................................................................ 64

*Comcast of Ill. X v. Multi-Vision Elecs., Inc.,*
    491 F.3d 938 (8th Cir. 2007) ................................................................ 96, 97

*Conway v. CitiMortgage, Inc.,*
    438 S.W.3d 410 (Mo. 2014) ................................................................ 80

*Elahi v. Islamic Republic of Iran,*
    124 F.Supp.2d 97 (D.D.C. 2000) ................................................................ 62, 64

*Federal Trade Commission v. American Screening, LLC,*
    105 F.4th 1098 (8th Cir. 2024) ................................................ 92, 93, 104, 105

*Garnatz v. Stifel, Nicolaus & Co.,*
    559 F.2d 1357 (8th Cir. 1977) ................................................................ 98

*Gates v. Syrian Arab Republic,*
    580 F.Supp.2d 53 (D.D.C. 2008) ................................................................ 61, 62

*Gray v. Texas Co.,*
    75 F.2d 606 (8th Cir. 1935) ................................................................ 92

*Han Kim v. Democratic People's Republic of Korea,*
  774 F.3d 1044 (D.C. Cir. 2014) ................................................................. 63

*Hill v. Republic of Iraq,*
  328 F.3d 680 (D.C. Cir. 2003) ................................................. 96, 97, 98, 105

*Hughes v. United States,*
  253 F. 543 (8th Cir. 1918) ......................................................................... 92

*In re Rutledge,*
  956 F.3d 1018 (8th Cir. 2020) ................................................................... 92

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
  451 U.S. 557 (1981) ................................................................................... 98

*Karcher v. Islamic Republic of Iran,*
  396 F.Supp.3d 12 (D.D.C. 2019) .............................................................. 63

*Kilburn v. Islamic Republic of Iran,*
  699 F.Supp.2d 136 (D.D.C. 2010) ........................................................... 61

*Lynch v. Nat'l Prescription Adm'rs, Inc.,*
  787 F.3d 868 (8th Cir. 2015) ................................................... 99, 101, 105

*Maalouf v. Islamic Republic of Iran,*
  923 F.3d 1095 (D.C. Cir. 2019) ................................................................ 65

*Martin v. Feilen,*
  965 F.2d 660 (8th Cir. 1992) ............................................................. 97, 98

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) ................................................................................... 63

*Miango v. Democratic Republic of Congo,*
  288 F.Supp.3d 117 (D.D.C. 2018) ........................................................... 63

*Missouri ex rel. Bailey v. People's Republic of China,*
  90 F.4th 930 (8th Cir. 2024) ........................................................... *passim*

*Nat'l Farmers' Org., Inc. v. Assoc. Milk Producers, Inc.,*
  850 F.2d 1286 (8th Cir. 1988) .................................................................. 99

*Owens v. Republic of Sudan,*
  826 F.Supp.2d 128 (D.D.C. 2011) ..................................................... 62, 63

*Owens v. Republic of Sudan,*
  864 F.3d 751 (D.C. Cir. 2017) .......................................................... 62, 63

vi

*Ports Petroleum Co., Inc. of Ohio v. Nixon,*
  37 S.W.3d 237 (Mo. 2001) ............................................................................ 80

*Republic of Argentina v. NML Capital, Ltd.,*
  573 U.S. 134 (2014) ...................................................................................... 65

*Rux v. Republic of Sudan,*
  495 F.Supp.2d 541 (E.D. Va. 2007) ............................................................... 64

*Saharkhiz v. Islamic Republic of Iran,*
  Case No. 19-cv-2938, 2023 WL 9196605 (D.D.C. Oct. 16, 2023) ............... 62, 63, 64

*Samantar v. Yousuf,*
  560 U.S. 305 (2010) ....................................................................................... 2, 4

*Shourd v. Government of Islamic Republic of Iran,*
  Case No. 22-cv-1309, 2024 WL 4346330 (Sep. 30, 2024) ........................... 62

*Sotloff v. Syrian Arab Republic,*
  525 F.Supp.3d 121 ......................................................................................... 64

*Stahl v. United States Dept. of Agriculture,*
  327 F.3d 697 (8th Cir. 2003) ......................................................................... 92

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
  282 U.S. 555 (1931) ................................................... 95, 96, 97, 101, 105

*Thuneibat v. Syrian Arab Republic,*
  167 F.Supp.3d 22 (D.D.C. 2016) ................................................................... 63

*United States v. Gould,*
  536 F.2d 216 (8th Cir. 1976) ......................................................................... 92

*Watson v. Wells Fargo Home Mortg., Inc.,*
  438 S.W.3d 404 (Mo. 2014) ........................................................................... 80

*Yonkers Branch—NAACP v. City of Yonkers,*
  251 F.3d 31 (2d Cir. 2001) ............................................................................ 97

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  395 U.S. 100 (1969) ................................................... 98, 99, 106

## Statutes

15 U.S.C. § 1 ............................................................................... 68, 70, 71, 73

15 U.S.C. § 45(a)(1) ...................................................................................... 81

28 U.S.C. § 1608(e) ........................................................................................ 61, 94, 96

Mo. Rev. Stat. § 27.060 ............................................................................................. 2

Mo. Rev. Stat. § 407.020.1 ...................................................................................... 80

Mo. Rev. Stat. § 416.031.1 ...................................................................................... 67

Mo. Rev. Stat. §§ 407.040, .090 ........................................................................ 68, 80

**Rules**

Fed. R. Civ. P. 55(d) ................................................................................................ 62

Federal Rule of Civil Procedure 55 .................................................................. 61, 62

**Other Legal Authority**

Pres. Proc. No. 9994 ................................................................................................ 92

## **INTRODUCTION**

China has inflicted substantial harm on the State of Missouri through its actions during the COVID-19 pandemic. Whether the virus passed from animals to humans in a wet market or inadvertently escaped from a viral research lab (as SARS did in China several times before), it is clear that China knew about the existence, dangers, and human-to-human transmissibility of COVID-19 long before the rest of the world. Rather than comply with its moral and legal obligations to share this information, China engaged in a concentrated campaign of deceit and misinformation. Although likely aware of the existence of COVID-19 before November 2019, and certainly aware of the human-to-human transmission of COVID-19 in November 2019, Defendants repeatedly and loudly denied the existence, and then transmissibility, of COVID-19 long after they knew their statements were false. Defendants restricted the spread of any information related to the virus, and publicly persecuted whistleblowers who tried to share this information.

While China and its agents were making these false representations, they were aggressively buying up the America's supply of PPE and barring U.S. factories from shipping PPE to the United States. By the time the world became fully aware of the scope of the COVID-19 pandemic, it was too late—Defendants had already spent weeks (if not months) hoarding PPE. The resulting effects of China's hoarding were predictable: PPE shortages in the State of Missouri at a time the medical system

1

needed the supplies the most, and costs many times higher for those who were able to acquire the scant supply.

Reports and previously classified documents and obtained from the federal government clearly paint this picture. The Department of Homeland Security, for example, has concluded that "the Chinese Government intentionally concealed the severity of COVID-19 from the international community . . . while it stockpiled medical supplies." The State Department, in a heavily redacted memo, suggests that Defendants knew about COVID-19 "earlier than they admit" and China's Chairman "Xi lied to obfuscate his role in the cover-up." The Congressional Research Service agrees, concluding that China nationalized control of U.S. factories to prevent the export of PPE to the United States and engaged in large-scale purchases of PPE that "depleted existing supplies in the United States." To make matters worse, all of these actions occurred concurrent to (and, indeed, likely in coordination with) Defendants' long-running campaign to obfuscate and mislead the world on critical information about the COVID-19 virus and the ballooning pandemic. As the U.S. Office of the Director of National Intelligence reports, rather than engage in a transparent sharing of information about the COVID-19 pandemic, Defendants "hinder[ed]" research into the virus, "resist[ed] sharing information and blame[d] other countries, including the United States." All of this was done in an continuing attempt by Defendants to avoid responsibility for their actions during the early days of the COVID-19 pandemic.

What cannot be disputed is the incredible cost Defendants' actions have imposed on Missouri, including in terms of lives lost, businesses ruined, and other

effects still felt to this day. In response to these harms, Attorney General Andrew Bailey, on behalf of the State of Missouri and its citizens, sued The People's Republic of China, the Communist Party of China, and other related Defendants to recover damages for the injuries Defendants' actions inflicted on the State and its citizens. Defendants, despite being served by Missouri, refused to appear and answer for their actions. As a result, each has defaulted on Missouri's claims against them. That is not the end of the process, however. Because each Defendant falls under the provisions of the Foreign Sovereign Immunity Act ("FSIA"), Missouri must still prove its right to relief by at least "evidence satisfactory to the Court" before a default judgment may be entered. 28 U.S.C. § 1608(e). Missouri does so here.

The Eighth Circuit has held that one of Missouri's original claims satisfies the jurisdictional bars imposed by the FSIA: the claim that China and the remaining Defendants hoarded PPE in the early days of the pandemic, both by "[t]aking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment." *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 938 (8th Cir. 2024). In other words, that China engaged in "classic anticompetitive behavior, except on a country-wide scale." *Id.* "Then, when the virus spread and people all over the world became sick, China was able to maintain its stockpile and prolong the shortage" of PPE in Missouri. *Id.* at 939. These actions, in turn, had a direct effect on the State of Missouri and its citizens.

Missouri now proves its claim. The evidence establishes that Defendants breached numerous state and federal regulatory and statutory duties preventing the

kinds of anticompetitive commercial behaviors Defendants engaged in during the early days of the COVID-19 pandemic. Among this evidence is proof that Defendants nationalized U.S. factories in China, with Chinese officials directly seizing control of PPE production and refusing to allow U.S. companies to supply Missouri (and the rest of the United States) with much-needed masks. This had a predictable effect, multiplying China's PPE production several times over while depriving the United States of production by overseas U.S. companies. At the same time China—despite being the source of much of the world's PPE supply—began aggressively purchasing PPE manufactured or for sale in the United States. On January 30, 2020 alone, China imported 20 million respirators and surgical masks from the global market. As a report published by Congress remarked, these efforts likely exacerbated the medical supply shortages in the United States.

All of Defendants' anticompetitive actions were also conducted in the shadow of repeated their lies and misrepresentations surrounding every aspect of the COVID-19 pandemic. During much of the period Defendants hoarded PPE, they sought to distract the world from the dangers of the virus and the need for PPE in the first place. In fact, Defendants were repeatedly (and falsely) claiming they did not have any evidence of human-to-human transmission of COVID-19 *months* after they both began secretly taking official actions spread of the virus from person to person *and* began aggressively punishing whistleblowers who tried to warn the world of the spread of COVID-19. The effect of this was to allow Defendants additional time to hoard PPE from an unsuspecting market.

4

Defendants' actions, furthermore, had direct effects on the State of Missouri. As the Eighth Circuit noted, "[t]he most basic supply-and-demand principles tell us" that "China's market power" meant that the market effects from its campaign to hoard PPE "depended little, if at all, on variables independent of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id.* (internal quotation marks omitted).

Furthermore, Defendants' hoarding of PPE through anticompetitive actions, misrepresentations, and outright fraud has inflicted direct and catastrophic damages on Missouri. Missouri provides herein comprehensive evidence of the damages the State and its citizens suffered from Defendants' actions, damages to which it is entitled to recover jointly and severally through a judgment against Defendants. Calculating the harm inflicted upon Missouri and its citizens through an examination of a loss of state GDP, the data shows that Defendants' actions caused Missouri to lose over $23 billion in GDP during the relevant time period. Missouri itself directly lost approximately $700 million in state revenue during the relevant time period, a number that increases up to $15 billion when projected into the future. Finally, Missouri presents direct evidence showing that, by even the most conservative (and likely under-inclusive) estimate, Missouri's reports and data show that the State spent over $122 million on PPE-related expenses in only a portion of 2020 alone.

Missouri has satisfied the requirements of the FSIA and the Eighth Circuit's *Missouri ex rel. Bailey* decision, and may therefore receive a judgment in default

5

against each Defendant. This Court should enter a judgment holding Defendants in default and award Missouri civil damages against all Defendants.

## FACTUAL BACKGROUND

I.    **The Parties.**

A.    **Plaintiff the State of Missouri.**

Plaintiff the State of Missouri is a sovereign state. Missouri brings this action to vindicate the State's injuries to its own economic and proprietary interests the State has directly suffered due to the actions of Defendants. Compl., ECF 1 at ¶ 13. Missouri also brings this action as *parens patriae* on behalf of all Missouri citizens, to vindicate general injuries inflicted on Missouri citizens caused by Defendants. *Id.* at ¶ 14. As a sovereign State, Missouri has "a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Missouri, through its Attorney General, may act as "a representative of the public" in "complaining of a wrong which, if proven, limits the opportunities of her people [and] shackles her industries." *Id.* At 606.

Andrew Bailey is the Attorney General of Missouri. Under Missouri law, "[t]he attorney general shall institute, in the name and on behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary; and he may also appear and interplead, answer or defend,

in any proceeding or tribunal in which the state's interests are involved." Mo. Rev. Stat. § 27.060.

**B.      Defendants the People's Republic of China and the Communist Party of China.**

*Defendant the People's Republic of China*

Defendant People's Republic of China ("PRC" or "China") is a sovereign nation in Asia. "The People's Republic of China is the country's officially recognized government." *State of Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 934 (8th Cir. 2024).

*Defendant the Communist Party of China*

Defendant Communist Party of China ("CPC" or "Communist Party") is a political body which "'exercise[s] direction and control over the actions of all other Defendants,' including China's official government." *Missouri ex rel. Bailey*, 90 F.4th at 935 (quoting *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010)). Given the Communist Party's role, "it is in substance the same body politic that governs [China]." *Id.* (internal quotation marks omitted).

A stated goal of the CPC is "to 'guide public opinion' through censorship as well as controlling and shaping the flow and content of information available to the public."[1] The CPC views this censorship as "an essential element" of what it calls "'ideological work' or 'thought work.'"[2] "[S]cience, like most fields of professional

---

[1] Marco Rubio, *A Complex and Grave Situation: A Political Chronology of the SARS-COV-2 Outbreak* 130 (2023) (hereinafter "Political Chronology Report") (collecting sources)
[2] *Ibid.*

endeavor in China, is thoroughly permeated by [CPC] political influence and varying degrees of direct control, particularly at state-run research institutions such as the [Chinese Academy of Science] and the [Wuhan Institute of Virology]."[3]

## C. Defendants the Wuhan Institute of Virology and Chinese Academy of Science

*Defendant Wuhan Institute of Virology*

Defendant Wuhan Institute of Virology is "an institute under the auspices of the Chinese Academy of Sciences" and hosts "China's first high containment [virus] laboratory."[4] As commentators have noted, "[t]he WIV maintains a collaborative relationship with the [People's Liberation Army Academy of Military Sciences ("PLA AMMS")] that is routine and robust, which can be seen from its professional research publications."[5] Furthermore, "[d]espite the WIV presenting itself as a civilian institution, the United States has determined that the WIV has collaborated on publications and secret projects with China's military" and "has engaged in classified research, including laboratory animal experiments, on behalf of the Chinese military since at least 2017."[6]

*Defendant Chinese Academy of Science*

Defendant Chinese Academy of Sciences (CAS) is the national academy of the natural sciences for the PRC and describes itself as "the linchpin of China's drive to

---

[3] *Id*. at 81 (collecting reports and examples).
[4] AMEMBASSY Beijing Unclassified Memorandum, "China Opens First Bio Safety Level 4 Laboratory" (Jan. 19, 2018).
[5] Political Chronology Report at 33.
[6] U.S. State Dep't, *Fact Sheet: Activity at the Wuhan Institute of Virology* (Jan. 15, 2021).

explore and harness high technology and the natural sciences for the benefit of China."[7] "Through its network of research institutes, universities, companies, and think tanks, CAS is a core component of China's science and technology innovation ecosystem."[8]

*The relationships between the Chinese military, Defendant PRC, Defendant CPC, Defendant WIV, and Defendant CAS*

The relationships between the Chinese military and Defendants WIV and CAS are consistent with Defendants PRC and CPC's long-held goal, expressed by their Chairman Xi Jinping, "to 'deepen the advancement of military-civil fusion development research'" in order "to better incorporate the PLA's research goals into the work of the CAS."[9] All of this works towards Defendants' ultimate goal of "'bring[ing] into full effect the potential of the Chinese Academy of Sciences, high-ranked universities and colleges, and civilian and private enterprises in order to achieve the military use of civilian [resources] to the maximum degree.'"[10] "[S]tarting in spring of 2018 and continuing into [at least] 2019," the WIV and other CAS research institutes "likely experienced a growing presence of the PLA and prioritization of its research agenda."[11] WIV regularly holds "political study sessions"

---

[7] "About Us," Chinese Academy of Sciences, available at: http://english.cas.cn/about_us/introduction/201501/t20150114_135284.shtml.

[8] McFaul, C., et al., *Fueling China's Innovation: The Chinese Academy of Sciences and its Role in the PRC's S&T Ecosystem*, Center for Security and Emerging Technology (October 2024).

[9] *Id*. at 45.

[10] *Id*. at 46.

[11] *Ibid.*

which bring "into clear focus the state-run nature of the WIV, including its obligations to meet goals set by the central [CPC] authorities in Beijing."[12]

PRC and CPC leadership, likewise, specifically view WIV and the work WIV performs as extensions of the Communist Party and the Chinese State. In April 2019, He Changcai, the deputy secretary of the CPC committee at WIV, issued a speech during a gathering of WIV personnel instructing "that WIV researchers were accountable to both the [CPC] and the [PRC]."[13] The Eighth Circuit has held that both WIV and CAS are "organs" of Defendant PRC. *State of Missouri ex rel. Bailey*, 90 F.4th at 935.

### D.    All Remaining Defendants.

Defendants the National Health Commission of the People's Republic of China, the Ministry of Emergency Management of the People's Republic of China, the Ministry of Civil Affairs of the People's Republic of China, the People's Government of the Hubei Province, and the People's Government of Wuhan City are each "political subdivisions" of Defendant PRC. *Missouri ex rel. Bailey*, 90 F.4th at 935.

## II.    Origins of the COVID-19 Virus and Defendants' Suppression of Information

### A.    The Origins of COVID-19

Federal agencies and the intelligence community remain "divided on the most likely origin of COVID-19."[14] This division centers on the two hypotheses most likely

---

[12] *Id*. at 54.

[13] *Id*. at 74.

[14] Off. of the Dir. of Nat'l Intel, *Unclassified Summary of the Intelligence Community Assessment on COVID-19 Origins* (Aug. 27, 2021), available at

to explain the origin of COVID-19: "natural exposure to an infected animal and a laboratory-associated incident."[15]

Either theory demonstrates: (1) that Defendants held specialized knowledge about the existence and transmissibility of COVID-19 long before the rest of the world; and (2) knew that Defendants' oft-repeated representations to the contrary early in the pandemic were false. The lab leak theory goes even farther. The theory, if correct, conclusively demonstrates that Defendants were directly (if most likely accidentally) responsible for the initial COVID-19 outbreak and likely had extensive knowledge about its existence and spread since the beginning. Although "China's cooperation most likely would be needed to reach a conclusive assessment," Defendants "continue[] to hinder the global investigation, resist sharing information and blame other countries, including the United States."[16]

### i.   The Wuhan Seafood Market and the Natural Vector Theory

When news of the pandemic first broke, "Chinese authorities reported that many cases had occurred" in the Huanan Seafood Market, also known as a "wet market – a place selling wild animals for meat – in Wuhan."[17] The Natural Vector Theory posits that COVID-19 spread to humans from either a "direct or intermediate host[] such as avians, bats, bovines, camels, canines, civets, felines, murines, and

---

https://www.dni.gov/index.php/newsroom/reports-publications/reports-publications-2021/3562-unclassified-summary-of-assessment-on-covid-19-origins.

[15] *Ibid.*

[16] *Ibid.*

[17] Nicholas Wade, *The Origin of COVID: Did People or Nature Open Pandora's Box at Wuhan?*, Bulletin of the Atomic Scientists (May 5, 2021), https://thebulletin.org/2021/05/the-origin-of-covid-did-people-or-nature-open-pandoras-box-at-wuhan/.

procines."[18] The Huanan Seafood Market in the city of Wuhan houses many animals live for human consumption, and therefore is assumed by the theory to be the source of the initial transmission from animals to humans.[19] The U.S. National Institute of Health, while acknowledging that "the origin of the SARS-CoV-2 which caused the COVID-19 pandemic has not been identified," believes that the evidence thus far "suggests that SARS-CoV-2 likely resulted from viral evolution in nature and jumped to people or through some unidentified animal host."[20]

But researchers analyzing samples from the Wuhan Seafood Market, including samples taken from stalls selling various animals, have been unable to establish any spillover from animals to humans at the Wuhan Seafood Market.[21] On the contrary, the researchers acknowledged that "[i]t remains possible that the market may have acted as an amplifier of transmission owing to the high number of visitors every day, causing many of the initially identified infection clusters in the early stages of the outbreak."[22] Another team of researchers, analyzing data of animals sold in all Wuhan wet markets in 2018 and 2019, established that "no pangolin or bat species

---

[18] Rui Dong, et al., *Analysis of the Hosts and Transmission Paths of SARS-CoV-2 in the COVID-19 Outbreak*, 11 Genes 637 (June 9, 2020).

[19] William J. Liu, et al., *Surveillance of SARS-CoV-2 at the Huanan Seafood Market,* Nature, July 11 2024 at 402.

[20] *Origins of Coronaviruses*, National Institute of Health: National Institute of Allergy and Infectious Diseases (Mar. 16, 2022), https://www.niaid.nih.gov/diseases-conditions/origins-coronaviruses.

[21] William J. Liu, et al., *Surveillance of SARS-CoV-2 at the Huanan Seafood Market,* Nature, July 11 2024 at 402.

[22] *Ibid.*

were among th[ose] animals for sale" in any of the markets.[23] As a result, the researchers stated that "the original source of COVID-19 does not seem to have been established."[24]

On January 24, 2020, a team of Chinese researchers published an epidemiological study that examined a sample of 41 hospital patients admitted in Wuhan in December 2019 and which laboratory studies later confirmed were diagnosed with COVID-19.[25] Two points of data stand out. First, from only 41 cases analyzed by the report, the researchers were able to show that COVID-19 was circulating in Wuhan at least as early as December 1, 2019.[26] Second, the data demonstrates that, of the confirmed COVID-19 cases that occurred before December 11, 2019, three of the four diagnosed cases had *no exposure* to the Huanan seafood market at the center of the natural vector theory.[27]  In other words, either the early spread of COVID-19 was largely *not* centered around the seafood market, or even before December 11, 2019, the virus had been spreading among the population in Wuhan sufficiently long that the majority of cases were no longer tied to that market. A February 2022 study conducted by a team of Chinese epidemiologists similarly concluded that samples collected from environmental surfaces and animals in the Huanan Seafood Market could not establish whether "the animals were infected" or

---

[23] Xiao Xiao, et al., *Animal sales from Wuhan wet markets immediately prior to the COVID-19 pandemic*, Scientific Reports, at 3 (2021).
[24] *Ibid.*
[25] Chaolin Huang,  Yeming Wang, et al., *Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China*, 395 The Lancet 497, 497–506 (2020).
[26] *Ibid.*
[27] *Ibid.*

whether the virus was introduced to the Huanan Seafood market "through infected humans."[28]

Outside researchers have come to a similar result, concluding that "there is no evidentiary basis" for the theories that "COVID-19 emerged via zoonosis in the wild or spillover in a wet market . . . despite extensive testing [of those theories] over four years."[29]

### ii.    *Coronavirus research at the WIV and the lab leak theory*

The chief competing theory for the initial spread of COVID-19 is that a lab accident caused it to leak from a virology lab in WIV, where the virus was being studied. Several federal agencies have assessed COVID-19 was likely "the result of a lab accident in Wuhan, China," including the FBI (which has "moderate confidence" in this theory)[30] and the Department of Energy.[31] Outside researchers studying the early days of the COVID-19 pandemic have similarly concluded "that the COVID-19

---

[28] George Fu Gao, et al., *Surveillance of SARS-CoV-2 in the Environment and Animal Samples of the Huanan Seafood Market*, *Research Square*, pre-print, pg. 1–9 (Feb. 25, 2022), https://assets-eu.researchsquare.com/files/rs-1370392/v1_covered.pdf?c=1645813311.

[29] John Ratcliffe, *Holding China Accountable for Its Role in the Most Catastrophic Pandemic of Our Time: COVID-19*, Heritage Found., 13 (July 8, 2024) (hereinafter "Most Catastrophic Pandemic of Our Time Report"), https://www.heritage.org/china/report/holding-china-accountable-its-role-the-most-catastrophic-pandemic-our-time-covid-19.

[30] Hannah Rabinowitz, *FBI Director Wray acknowledges bureau assessment that Covid-19 likely resulted from lab incident*, CNN (Mar. 1, 2023), https://www.cnn.com/2023/02/28/politics/wray-fbi-covid-origins-lab-china/index.html.

[31] Jeremy Herb & Natasha Bertrand, *US Energy Department assesses Covid-19 likely resulted from lab leak, furthering US intel divide over virus origin*, CNN (Feb. 27, 2023), https://www.cnn.com/2023/02/26/politics/covid-lab-leak-wuhan-china-intelligence/index.html

pandemic very likely stemmed from a research-related incident in Wuhan, China."[32] Although "[t]he Chinese government has obscured much of the relevant record and obstructed all credible international efforts to investigate the origin of the virus, . . . the available evidence strongly supports a research-related accident."[33]

This conclusion is based in part on the fact that, "[w]hile Wuhan is far from the natural habitat of the relevant horseshoe bats and from the animal distribution channels that were linked to the 2003 SARS outbreak, it somehow managed to be the one city where the virus emerged, with no known independent introduction anywhere else."[34] Although Wuhan does not have natural habitats or animal distribution channels, it does have "a leading center for Chinese virology research" that is "home to multiple virology and public institutes, including [Defendant WIV]."[35]

The WIV itself has long been plagued by breaches in lab safety standards. As far back as January 2011, "an inspection of WIV laboratories working with pathogens discovered that some research groups and support departments did not meet the standards in certain areas and had hidden safety dangers with the storage of bacterial and viral samples and aspects of their experimental activities."[36] Defendants were well aware of this long history of WIV lab safety failures. As commentators have observed, "the unsafe storage of bacterial and viral samples emerged as a theme of concern in 2019 and 2020, which was raised by [CPC]

---

[32] Most Catastrophic Pandemic of Our Time Report at 13.
[33] *Ibid.*
[34] *Id.* at 14.
[35] *Ibid.*
[36] Political Chronology Report at 40–41.

leadership at the WIV as well as in a central directive issued to all BSL-3 and BSL-4 labs after the pandemic began."[37]

As early as at least 2015, some scientists had begun to sound the alarm over concerns surrounding ongoing experiments in China "that created a hybrid version of a bat coronavirus . . . related to the virus that causes SARS . . . with possible pandemic potential."[38] As one molecular biologist and viral expert put it, "[t]he only impact of this work is the creation, in a lab, of a new, non-natural risk."[39] These concerns by some scientists of "pathogens escaping" from WIV have been repeatedly raised in the years since, including when WIV's BSL-4 laboratory opened in 2017.[40] These concerns are not just limited to scientists: the U.S. State Department has warned that "[s]cientists in China have researched animal-derived coronaviruses under conditions that increased the risk for accidental and potentially unwitting exposure."[41] These concerns are also not without historical precedence. The PRC has a long history of viral lab leaks, which have previously resulted in limited community spread and at least some deaths. The SARS virus, for example, "escaped from high-level containment facilities in Beijing multiple times."[42] In fact, the SARS virus has

---

[37] *Id.* at 41.

[38] Declan Butler, *Engineered Bat Virus Stirs Debate over Risky Research*, Nature (Nov. 12, 2015), https://www.nature.com/articles/nature.2015.18787.

[39] *Ibid.*

[40] David Cyranoski, *Inside the Chinese Lab Poised to Study the World's Most Dangerous Pathogens*, Nature, at 399–402 (Feb. 23, 2017).

[41] U.S. State Dep't, *Fact Sheet: Activity at the Wuhan Institute of Virology* (Jan. 15, 2021).

[42] David Cyranoski, *Inside the Chinese Lab Poised to Study the World's Most Dangerous Pathogens*, Nature, at 399–402 (Feb. 23, 2017).

escaped "no less than four times from the Chinese National Institute of Virology in Beijing,"[43] causing "limited community spread."[44]

Defendants were well aware of the risks and concerns with their behavior. WIV BSL-4 Laboratory Director Yuan Zhiming not only oversaw the WIV's most dangerous viral research, but also was the long-serving President of the Wuhan branch of Defendant CAS, was the director of the Wuhan National Biosafety Laboratory, *and* holds a political role in Defendants PRC and CPC leadership as a member of the Chinese People's Political Consultative Conference.[45] Yuan's conclusions on the WIV lab safety standards, performed in his official capacity as a key officer of several Defendants to this lawsuit, are stark. On the WIV's new BSL-4 facility, his team noted that "[c]ertain problems exist with aspects of the building and management of [Defendant PRC's] system of high-level biosafety laboratories."[46] Although the BSL-4 laboratory was already in operation and studying some of the world's most deadly viruses, he concluded that the "management and maintenance of [the WIV BSL-4 laboratory's] key equipment and the personnel's mastery of the standardized operating procedures" were "not mature enough."[47] Yuan would continue to repeat these warnings over the coming years, in October 2018 again warning that "it is urgent to establish and implement standardized management

---

[43] Nicholas Wade, *The Origin of COVID: Did People or Nature Open Pandora's Box at Wuhan?*, Bulletin of the Atomic Scientists (May 5, 2021), https://thebulletin.org/2021/05/the-origin-of-covid-did-people-or-nature-open-pandoras-box-at-wuhan/.
[44] Political Chronology Report at 39.
[45] *Id.* at 56–57.
[46] *Id.* at 57.
[47] *Ibid.*

measures for biosafety laboratories . . . as soon as possible."[48] Defendants appear to have ignored these warnings.

Despite these well-publicized concerns, Defendant's interest in risky coronavirus research at WIV did not stop there. In March 2018, New York-based EcoHealth Alliance, in partnership with the WIV, submitted a proposal requesting $14.2 million "for a study that would take the most interesting spike proteins that the WIV collected from unpublished SARS-related coronaviruses . . . and create full-length infectious clones that they would test in human airway cultures and transgenic mice expressing the human ACE2 receptor."[49] "Among the scientific tasks" described in this proposal "was the creation of full-length infection clones of bat SARS-related coronaviruses and the insertion of a tiny part of the virus known as a "proteolytic cleavage site" into the bat coronaviruses."[50] "Of particular interest" to this grant request "was a type of cleavage site able to interact with furin, an enzyme expressed in human cells."[51] "Since the genetic code of the coronavirus that caused the pandemic was first sequenced, scientists have puzzled over the 'furin cleavage site'"—also referred to as "FCS"—a "strange feature on the spike protein of the virus [that] had never been seen in SARS-related betacoronaviruses, the class to which SARS-CoV-2, the coronavirus that causes respiratory illness Covid-19, belongs."[52]

---

[48] *Id.* at 56–57.
[49] *Id.* at 48.
[50] Sharon Lerner & Maia Hibbett, *Leaked Grant Proposal Details High-Risk Coronavirus Research*, The Intercept, (Sept. 23, 2021), https://theintercept.com/2021/09/23/coronavirus-research-grant-darpa/.
[51] *Ibid.*
[52] *Ibid.*

Furthermore, "there is published evidence that the [WIV] was already engaged in some of the genetic engineering work described in the proposal."[53] Indeed, the U.S. National Institute of Health acknowledged that certain 2018 and 2019 experiments conducted at WIV and funded through EcoHealth Alliance, had the "unexpected result" of "creating a coronavirus that was more infectious in mice."[54]

Part of what makes the SARS-CoV-2 virus unique is that it "contains distinct features and attributes" not found in nature and which "suggest a research-related origin."[55] One key example of this is the aforementioned molecular structure of the polybasic furin cleavage site found in the spike protein of SARS-CoV-2—the same type of protein site referenced in the EcoHealth Grant. This polybasic furin cleavage site found in the site protein "has never been observed in another SARS-related coronavirus of the sarbecovirus lineage"—something "widely regarded by virologists as the virus's most intriguing molecular feature."[56] "The spike protein . . . plays a key role in SARS-CoV-2 infectivity."[57] Australian and British researchers, similarly, concluded that the spike protein of SARS-CoV-2 exhibited a higher binding to the

---

[53] *Ibid.*

[54] Jocelyn Kaiser, *NIH says grantee failed to report experiment in Wuhan that created a bat virus that made mice sicker*, Science (Oct. 21, 2021), https://www.science.org/content/article/nih-says-grantee-failed-report-experiment-wuhan-created-bat-virus-made-mice-sicker.

[55] Most Catastrophic Pandemic of Our Time Report at 14.

[56] Political Chronology Report at 206–07; *see also* Gary R. Whittaker, *SARS-CoV-2 Spike and its Adaptable Furin Cleavage Site*, 2 The Lancet Microbe e488 (2021), https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00174-9/fulltext.

[57] Sakshi Piplani, et al., *In Silico Comparison of SARS-CoV-2 Spike Protein-ACE2 Binding Affinities Across Species and Implications for Virus Origin*, 11 Scientific Reports 1 (June 24, 2021).

19

ACE2 receptor of human cells than to the similar receptor of any other animal cells.[58] As the researchers explained, "this finding was surprising as a zoonotic virus typically exhibits the highest affinity initially for its original host species, with lower initial affinity to receptors of new host species until it adapts."[59] As a result, some virologists have concluded that "[t]here is a strong case to be made that the pandemic virus emerged from research in Wuhan where scientists had proposed to insert furin cleavage sites into novel SARS-like coronaviruses."[60]

As a result, WIV coronavirus expert "Shi Zhengli's research team at the WIV would have been familiar with past experiments involving the successful insertion of an FCS sequence into SARS-CoV-1 and other coronaviruses, and they had ample experience of their own with the construction of chimeric SARS-like viruses."[61] In fact, as recently as 2019, Shi Zhengli and others partnered with PRC's People's Liberation Army Acamdey of Military Sciences scientists to experiment with coronavirus entry into "human cells" and study the "[m]olecular mechanism for antibody-dependent enhancement of coronavirus entry."[62]

Shi was far from the only researcher engaged in risky coronavirus research at the WIV in 2019. "SARS-CoV0-2 is a beta-coronavirus that binds to the human ACE2

---

[58] *Ibid.*
[59] *Id.* at 3.
[60] Most Catastrophic Pandemic of Our Time Report at 15.
[61] Political Chronology Report at 49.
[62] Yushun Wan, et al., *Molecular Mechanism for Antibody-Dependent Enhancement of Coronavirus Entry*, 94 J. Virology e2015-09 (2020); Political Chronology Report at 33.

receptor with greater affinity than SARS-CoV-1."[63] In 2018, "WIV coronavirus researcher Hu Ben also reportedly received funding" from "the state-funded Natural National Science Foundation of China (NNSFC) to conduct a study starting in January 2019 that would examine the 'pathogenicity of two new bat SARS-related CoVs to transgenic mice expressing human ACE2.'"[64] "Hu's study was slated to conclude in December 2021, but no findings have been published to date."[65] It appears that all reference to Hu's research has been scrubbed from the NNSFC website "since the spring of 2020"—the same time Defendants were obfuscating information on the origin and spread of COVID-19.

As Richard Ebright, a molecular biologist at Rutgers University, explained, "[t]he relevance of this" research at WIV "is that SARS Cov-2, the pandemic virus, is the only virus in its entire genus of SARS related coronaviruses that contains a fully functional cleavage site at the S1, S2 junction. . . . And here is a proposal from the beginning of 2018, proposing explicitly to engineer that sequence at that position in chimeric lab-generated coronaviruses."[66] In other words, "[t]he work describes generating full-length bat SARS-related coronaviruses that are thought to pose a risk of human spillover. And that's the type of work that people could plausibly postulate could have led to a lab-associated origin of SARS-CoV-2."[67]

---

[63] Political Chronology Report at 63.

[64] *Ibid.*

[65] *Ibid.*

[66] Sharon Lerner & Maia Hibbett, *Leaked Grant Proposal Details High-Risk Coronavirus Research*, The Intercept, (Sept. 23, 2021), https://theintercept.com/2021/09/23/coronavirus-research-grant-darpa/.

[67] *Ibid.*

Besides Dr. Ebright's concerns about creating a chimeric, lab-generated coronavirus, reports and scientific studies demonstrate that WIV also lacked appropriate safety measures to conduct coronavirus research. "There are four biosafety levels that are implemented and defined by the CDC."[68] Biosafety Lab 3 (BSL-3) labs are the minimum safety precaution level for biohazardous agents that "may cause serious or lethal disease through respiratory transmission" and differ from BSL-2 labs "by the nature of transmission of hazardous agents."[69] In this respect, the coronavirus research coming out of WIV revealed an incredibly concerning trend. Articles published by WIV researchers demonstrated that risky virus research, including research into "bat viruses," was performed at WIV in BSL-2 labs—the "second-lowest level of laboratory biosafety."[70] Indeed, much of the research into coronaviruses, including research performed at WIV between 2016 and 2019, occurred in a BSL-2 lab.[71] This meant that WIV researchers were performing state-run coronavirus research in Wuhan "under conditions that . . . matched the biosafety level of a US dentist's office."[72] Work performed in labs with a safety equivalence of a dentist's office included "making chimeras" with eight SARS-like

---

[68] Lisa Ta, et al., *Biosafety and Biohazards: Understanding Biosafety Levels and Meeting Safety Requirements of a Biobank*, Methods Molecular Biology (Dec. 12, 2018).

[69] *Ibid.*

[70] Aksel Fridstrom, *Chinese researchers created new corona viruses under unsafe conditions*, Minerva (May 27, 2021), https://www.minerva.no/china-drastic-sars-cov-2/chinese-researchers-created-new-corona-viruses-under-unsafe-conditions/381476.

[71] Rowan Jacobsen, *Inside the risky bat-virus engineering that links America to Wuhan*, MIT Tech. Rev. (June 29, 2021), https://www.technologyreview.com/2021/06/29/1027290/gain-of-function-risky-bat-virus-engineering-links-america-to-wuhan/.

[72] *Ibid.*

coronaviruses, "two of [which] replicated well in human cells."[73] In other words, WIV was, "for all intents and purposes," creating "brand-new pathogens."[74]

Defendants' public statements also suggest WIV's risky coronavirus research was ongoing up until (at least) the weeks or months before evidence of human-to-human transmission of COVID-19 began appearing in Wuhan. On August 31 and September 1, 2019, researchers gathered in Beijing to discuss progress on a major state-run research project to study zoonotic diseases that cross the species barrier to infect humans—a description that would include COVID-19.[75] At the conference Tan Wenjie, who holds concurrent appointments with Defendant WIV and the PRC People's Liberation Army General Hospital in Wuhan, spoke on "the project team's important advancements … since the launch of the project to study cross-species infection and transmission" of "pathogens such as coronaviruses."[76]

Indeed, in a rare moment of candor, Dr. Shi—the virologist who performed much of the coronavirus research at WIV—admitted to a journalist that she "never expected this kind of thing to happen in Wuhan," and, when she heard of the spread of the virus, "remember[ed] thinking, 'could [the virus] have come from our lab?'"[77] Dr. Shi later attempted to publicly retract these statements.[78]

---

[73] *Ibid.*
[74] *Ibid.*
[75] Political Chronology Report at 95.
[76] Political Chronology Report at 96.
[77] Jane Qiu, *How China's 'Bat Woman' Hunted Down Viruses from SARS to the New Coronavirus*, Sci. Am. (June 1, 2020), https://www.scientificamerican.com/article/how-chinas-bat-woman-hunted-down-viruses-from-sars-to-the-new-coronavirus1/.
[78] Political Chronology Report at 173.

## B.    The Initial Spread of COVID-19

### i.    *Defendants, suddenly and without warning, restrict access to WIV's viral pathogen database.*

Defendants' pattern of aggressive actions to suppress any information on COVID-19 likely began as early as September 2019. Prior to the outbreak of the pandemic, WIV hosted an online depository of data on viral sequences called "the Wildlife-Borne Viral Pathogen Database."[79] In the early morning hours of September 12, 2019, WIV, without warning, took down its online viral database.[80] Years later, the database—excepting brief, intermittent accessibility in late January and early February 2022—still remained offline.[81]

It is not an understatement to say that Defendants' actions to take down the database are surprising unless viewed in the context of suppressing information about COVID-19. The database is "the most important BatCoV database in China," holding "more than 22,000 samples and sequences records" of viral "samples and sequences from the WIV."[82] It is because of this wealth of knowledge, knowledge which included over 15,000 viral samples collected from bats, including some which were "sequences of bat beta-coronaviruses gathered by the WIV … [not] made public," that researchers believe the collection is "potentially the best database for

---

[79] *Id.* at 102.

[80] Charles Small, et al., *An Investigation into the WIV Databases that Were Taken Offline*, at 1 (preprint Feb. 2021), https://www.researchgate.net/publication/ 349073738_An_investigation_into_the_WIV_databases_that_were_taken_offline.

[81] Political Chronology Report at 102.

[82] Charles Small, et al., *An Investigation into the WIV Databases that Were Taken Offline*, at 1 (preprint Feb. 2021), https://www.researchgate.net/publication/ 349073738_An_investigation_into_the_WIV_databases_that_were_taken_offline.

investigating whether the theory of natural spillover of SARS-CoV-2 is plausible."[83] "[A]t least 500" of these viral samples were "recently discovered bat coronaviruses, and at least 50 of these [are] close to SARS."[84]

Defendants' stated reasons to take the database down have continually shifted. Before Defendants acknowledged the transmission of COVID-19 (but after they had evidence of its human-to-human transmission), the stated reason was "to prevent cyber security attacks"; after they acknowledged the COVID-19 pandemic, the reason was simply that the database was taken offline "during the Covid-19 pandemic."[85] Data scientists have remarked that Defendants' excuses "do not make any sense since the main database was taken offline on the 12 Sep. 2019, 3 months at least before the [reported] start of the pandemic."[86] In other words, "either the reason given for taking the database off is not correct (which raises more questions), or the statement points at an outbreak in Sep 2019."[87]

Defendants' actions are especially concerning because, according to data science researchers, the WIV database "holds essential information on SARS-CoV-2 origins."[88] As Defendants are certainly well aware, "blocking access to these samples and related sequences *is a very effective obstruction of scientific efforts* to investigate the origin of SARS-CoV-2."[89] Researchers have called the database "potentially the

---

[83] *Ibid.*
[84] *Ibid.*
[85] *Ibid.*
[86] *Ibid.*
[87] *Ibid.*
[88] *Ibid.*
[89] *Ibid.* (emphasis added).

best database for investigating whether the theory of natural spillover of SARS-CoV-2 is plausible."[90] Various WIV officials (along with others who work closely with WIV) have continued to provide "repeated contradictions . . . about the reasons" for the removal of the vaccine database in September 2019.[91]

>    ii.    *Evidence suggests COVID-19 may have begun to spread among WIV researchers and residents of Wuhan in September, October, and November 2019.*

Defendants refused to publicly admit the existence of the COVID-19 virus until December 31, 2019,[92] and affirmatively denied human-to-human transmissibility of the virus until January 20, 2020.[93] Numerous independent sources of evidence—including from Chinese researchers on the ground, PRC government reports, and state actions taken by Defendants—demonstrate that Defendants knew about the existence and spread of COVID-19 long before publicly admitting it. The overwhelming evidence demonstrates that Defendants repeatedly and knowingly affirmatively misrepresented the existence and (critically) human-to-human transmission of the virus.

Professor Yu Chuanhua, a professor of biostatistics at Wuhan University, told the Chinese medical journal Health Times that he had access to a national database that included at least one suspected COVID-19 fatality of a patient who fell ill on

---

[90] *Ibid.*
[91] *Ibid.*
[92] Political Chronology Report at 132.
[93] *Id.* at 158.

September 29, 2019.[94] This patient, identified by their name and address, lived more than 13 miles from the Huanan seafood market. Professor Yu also noted additional suspected cases reported to Wuhan doctors in November 2019.[95] Professor Yu attempted to retract his statement only two days after it was made.[96]

Reports and statements published by the United States government and its intelligence services support Professor Yu's brief moment of transparency. The United States State Department has stated that it "has reason to believe that several researchers inside the WIV became sick in autumn 2019, before the first identified case of the outbreak," with symptoms consistent with COVID-19.[97] Expanding on this conclusion, U.S. intelligence reports state that at least three WIV researchers "became sick enough in November 2019 that they sought hospital care" with symptoms consistent with a possible COVID-19 infection.[98] But despite repeated calls for transparency, WIV "hasn't shared raw data, safety logs and lab records on its extensive work with coronaviruses in bats" with any person outside of the control of the PRC.[99] It also contradicts past statements of Shi Zhengli, "the top bat coronavirus

---

[94] Ian Birrell, *Is 'Patient Su' Covid's Patient Zero?*, Daily Mail (May 30, 2021), https://www.dailymail.co.uk/news/article-9632921/Is-Patient-Su-Covids-Patient-Zero-asks-IAN-BIRRELL.html.

[95] *Ibid.*

[96] *Ibid.*

[97] U.S. State Dep't, *Fact Sheet: Activity at the Wuhan Institute of Virology* (Jan. 15, 2021).

[98] Michael R. Gordon, et al., *Intelligence on Sick Staff at Wuhan Lab Fuels Debate on Covid-19 Origin*, Wall St. J. (May 23, 2021), https://www.wsj.com/articles/intelligence-on-sick-staff-at-wuhan-lab-fuels-debate-on-covid-19-origin-11621796228.

[99] *Ibid.*

expert at WIV," who claimed that "all staff had tested negative for Covid-19 antibodies and there had been no turnover of staff on the coronavirus team."[100]

CPC authorities in the local governments administrating WIV also began certain administrative measures around this time consistent with responding to the outbreak of a novel coronavirus. On September 18, 2019, the Wuhan Municipal Customs Administration cooperated with WIV and the Hubei Provincial Health Authority to hold an "emergency response drill activit[y]" at the Wuhan Tianhe International Airport that "simulated in real combat style ... the whole process of handling the discovery of one case of a novel coronavirus infection at the airport customs lane."[101] It has been observed that "it appears that only Wuhan had specifically drilled for a 'novel coronavirus' as a scenario for which to prepare."[102] Around this time, Hubei Province (of which Wuhan is the capital) began "dramatic[ally] increase[ing]" its pathogen detection equipment, both in "total contract value and number of contracts."[103] Hubei Province's spending on PCR equipment, for example, nearly doubled from 36.7 million RMB in 2018 to 67.36 million RMB in 2019—an amount higher than the sum of the previous two years combined.[104] Based on this data, Researchers have "conclude[d] that a significant increase in spending in PCR equipment correlates to the spread of COVID-19" and

---

[100] *Ibid.*
[101] Political Chronology Report at 104.
[102] *Id.* at 105.
[103] David Robinson, et al., *PCR Purchasing Report Wuhan China* 3 (Oct. 5, 2021), https://internet2-0.com/content/files/2023/07/PCR-Purchasing-Report-Wuhan-China-.pdf/.
[104] *Ibid.*

"*assess with high confidence* that the pandemic began *much earlier than China informed the WHO* about COVID-19."[105]

By "mid-October 2019," diplomats stationed in Wuhan had similarly noticed the significant spread of a viral illness in the city—a spread that "worsened in November" 2019.[106] COVID-19 was also spreading even further among WIV researchers at this time. In November 2019, three WIV researchers all "became sick enough . . . that they sought hospital care."[107] Intelligence reports suggest that all three of these WIV researchers were working in WIV's "bat coronavirus lab."[108] David Asher, a former U.S. official who led a State Department task force on the origins of COVID-19, remarked that he is "very doubtful that three people in highly protected circumstances in a level three laboratory working on coronaviruses would all get sick with influenza that put them in the hospital or in severe conditions all in the same

---

[105] *Ibid.*

[106] Russell J. Westergard, *Surviving the Outbreak: Reflections on ConGen Wuhan's Evacuation and Life in Quarantine*, State Mag., April 2020, https://statemag.state.gov/2020/04/0420feat05/.

[107] Michael R. Gordon, et al., *Intelligence on Sick Staff at Wuhan Lab Fuels Debate on Covid-19 Origin*, Wall St. J. (May 23, 2021), https://www.wsj.com/articles/intelligence -on-sick-staff-at-wuhan-lab-fuels-debate-on-covid-19-origin-11621796228.

[108] John Sexton, *Josh Rogin: The Sick Researchers from the Wuhan Institute of Virology Lost Their Sense of Smell*, Townhall Media (Aug. 23, 2021), https://hotair.com/john-s-2/2021/08/23/josh-rogin-the-sick-researchers-from-the- wuhan-institute-of-virology-lost-their-sense-of-smell-n411008?utm_source= hadaily&utm_medium=email&utm_campaign=nl&bcid=8096cc9b9192bfe637153a53 0c830713.

week, and it didn't have anything to do with the coronavirus."[109] Each of these three researchers was found to have "COVID specific symptoms."[110]

By some reports, "the earliest confirmed case of COVID-19," at least represented in classified "official [PRC] government data," is a 55-year-old "who contracted the virus on November 17[,]" 2019.[111] These reports on the "official [PRC] government data" provide that, from November 17, new COVID-19 cases were thereafter reported "each day."[112]

According to frontline doctors in Wuhan, by November 2019 the rate of illness in Wuhan was so high that government officials were cancelling classes in some high schools.[113] City officials began more fully "clos[ing] public schools in mid-December to control the spread of the disease."[114] In other words, by November 2019 (and certainly December 2019), local PRC government officials recognized the dangers of human-to-

---

[109] Michael R. Gordon, et al., *Intelligence on Sick Staff at Wuhan Lab Fuels Debate on Covid-19 Origin*, Wall St. J. (May 23, 2021), https://www.wsj.com/articles/intelligence -on-sick-staff-at-wuhan-lab-fuels-debate-on-covid-19-origin-11621796228.

[110] John Sexton, *Josh Rogin: The Sick Researchers from the Wuhan Institute of Virology Lost Their Sense of Smell*, Townhall Media (Aug. 23, 2021), https://hotair.com/john-s-2/2021/08/23/josh-rogin-the-sick-researchers-from-the- wuhan-institute-of-virology-lost-their-sense-of-smell-n411008?utm_source= hadaily&utm_medium=email&utm_campaign=nl&bcid=8096cc9b9192bfe637153a53 0c830713.

[111] Josephine Ma, *Coronavirus: China's First Confirmed Covid-19 Case Traced Back to November 17*, South China Morning Post (Mar. 12, 2020).

[112] Political Chronology Report at 119.

[113] *Id*. at 128.

[114] Russell J. Westergard, *Surviving the Outbreak: Reflections on ConGen Wuhan's Evacuation and Life in Quarantine*, State Mag., April 2020, https://statemag.state.gov/2020/04/0420feat05/.

human transmission of the spreading COVID-19 virus to a sufficient degree as to take affirmative steps to limit certain gatherings of people.

It was not until December 1, 2019 that a patient experiencing the onset of COVID-19 symptoms was officially later described by Defendants "as the earliest patient who had 'continuous exposure' to the Huanan Seafood Market in Wuhan."[115] By "no later than December 10[,]" 2019, Wuhan doctors had clearly documented cases of patients with COVID-19 symptoms but without exposure to the seafood market, demonstrating that (at least by that point) Defendants had "strong[]" evidence "suggesting person-to-person transmission was likely occurring."[116] Throughout December 2019, medical personnel in multiple Wuhan hospitals "were placed in quarantine" on the suspicious that they had contracted COVID-19.[117]

Despite at least a month of mounting internal evidence (and numerous actions seemingly taken by Defendants to arrest a virus spreading by human-to-human transmission), Defendants did not publicly acknowledge the existence of COVID-19 or the outbreak until December 31, 2019.[118] In their announcement of the existence of COVID-19, Defendants falsely asserted that "at the present time, inquiries have found *no obvious signs of human-to-human transmission* and have *not found infections among medical personnel*."[119] Defendants would repeat this factually

---

[115] Political Chronology Report at 129.
[116] *Ibid.*
[117] *Id*. at 135.
[118] *Id*. at 139.
[119] Political Chronology Report at 139 (emphasis added).

untrue claim of having no "signs of human-to-human transmission" until January 20, 2020, long after COVID-19 began spreading to the rest of the world.[120]

## C.    China, the CPC, and other Defendants aggressively seek to suppress information on the spread of COVID-19

As the U.S. State Department has concluded, CPC and the PRC have "systematically prevented a transparent and thorough investigation of the COVID-19 pandemic's origins, choosing instead to devote enormous resources to deceit and disinformation."[121] Or, in the words of a U.S. House Foreign Affairs Committee Minority Staff Report, "[f]rom the early stages of the pandemic," Defendants "repeatedly acted to conceal vital information about the virus from their own people, the WHO, and the world."[122] These failures by PRC, CPC, and other Defendants include: (1) "[t]he failure of [Defendants] to notify the WHO about the outbreak of a novel disease within their borders"; (2) [t]he repeated failure of [Defendants] to notify the WHO of cases meeting the WHO definition of SARS"; (3) "[t]he decision not to immediately publish the WIV's completed genetic mapping of SARS-CoV-2, the virus that causes COVID-19, which would have shown its similarity to SARS-CoV and confirmed it to be a novel coronavirus"; (4) "[t]he shuttering of the Shanghai lab that published the SARS-CoV-2 genome online"; (5) "[t]he lack of new case announcements

---

[120] *Ibid.*

[121] U.S. State Dep't, *Fact Sheet: Activity at the Wuhan Institute of Virology* (Jan. 15, 2021).

[122] Minority Staff of House Comm. On Foreign Affairs, 116th Congress, Rep. on The Origins of the COVID-19 Global Pandemic, Including the Roles of the Chinese Communist Party and the World Health Organization 23 (Sept. 21, 2020) (hereinafter "House Comm. On Foreign Affairs Report").

during the [CPC] political meetings between January 6th and January 17th"; and (6) "[t]he suppression of reports from medical doctors within the PRC providing evidence of human-to-human transmission."[123]

> ### i. Defendants deny the existence and transmissibility of COVID-19 long after they clearly had actual knowledge to the contrary.

The facts demonstrate that there was a clear period of at least "seven weeks"— if not several weeks longer—"during which Chinese officials could have shown good faith and honored their international commitments" by disclosing their knowledge of the existence, and then the human-to-human transmissibility, of the COVID-19 virus.[124] Instead, Defendants "consistently chose to do otherwise."[125] Despite the continually mounting evidence of the spread of COVID-19, and Defendants' *own actions* taken to halt human-to-human transmissibility of the virus in November and December 2019, the PRC and its officials failed to make any public acknowledgement of the outbreak until December 31, 2019.[126] Dr. Shi Zhengli, director of the WIV Research Center for Emerging Infectious Diseases, claimed that Defendants "had no knowledge of the outbreak" until 7:00 PM local time on December 31.[127] As demonstrated at length above, this representation was plainly false.

Defendants' weeks (if not months)-late acknowledgement, which sought to downplay any information about the spread of COVID-19, also doubled down on

---

[123] *Id*. at 23–24.
[124] Most Catastrophic Pandemic of Our Time Report at 17.
[125] *Ibid*.
[126] Political Chronology Report at 139
[127] *Id*. at 132.

Defendants' blatant falsehoods and denials surrounding COVID-19. In their December 31, 2019 announcement, Defendants "asserted that 'at the present time, inquiries have found no obvious signs of human-to-human transmission and have not found infections among medical personnel.'"[128] This statement was false. What's more, the evidence clearly established that Defendants knew it was false. "[A]s early as [at least] the second week of December, Wuhan doctors were finding cases that indicated the virus was spreading from one human to another."[129] It is well-recognized that "[o]ccupational transmission of a virus among medical personnel is a clear sign of sustained person-to-person transmission, which the Wuhan authorities explicitly denied was happening in their first public acknowledgment of the outbreak on December 31," 2019.[130] Many of the actions Defendants are documented taking in November and December 2019, as well as in January 2020, *see supra*, are illogical unless Defendants not only actually had knowledge of COVID-19, but *also* had knowledge of the virus' human-to-human transmission.  These actions include (as detailed at length above) not only increased purchases of pandemic response equipment and treatment of multiple WIV BSL-4 researchers with identical symptoms, but also cancelling high school classes and, eventually, fully closing public schools. And, of course, all of these state actions occurred immediately after

---

[128] *Ibid.*

[129] Jim Geraghty, *The Comprehensive Timeline of China's COVID-19 Lies*, Nat'l Rev. (Mar. 23, 2020), http://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

[130] Political Chronology Report at 136.

Defendants suddenly (and permanently) took down WIV's public viral pathogen database in September 2019.

Indeed, the timeline demonstrating Defendants' knowledge of human-to-human transmission of the virus is damning. By at least December 6, individuals with "no known history of exposure to the market" were presenting to local hospitals with COVID-19 symptoms and quickly being shuffled into "the isolation ward."[131] By December 20, 2019, Defendants were aware of at least "60 people [who] had contracted the virus, including family members in close contact with Huanan workers, but who did not have direct exposure to the market."[132] By December 25, 2019, Defendants were quarantining medical staff in two hospitals in Wuhan who were suspected of contracting the virus—"additional strong evidence of human-to-human transmission."[133] And by December 27, 2019 (at the latest), Defendants had evidence that person-to-person transmissions were occurring among family clusters."[134] Nevertheless, "[i]n [their] first public admission of the outbreak on December 31, PRC authorities would falsely claim that the cause of the outbreak was unknown and deny that any evidence of person-to-person transmission existed, much less asymptomatic transmission."[135] In fact, "PRC authorities at the central and local

---

[131] Jim Geraghty, *The Comprehensive Timeline of China's COVID-19 Lies*, Nat'l Rev. (Mar. 23, 2020), http://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.
[132] House Comm. On Foreign Affairs Report at 7.
[133] Jim Geraghty, *The Comprehensive Timeline of China's COVID-19 Lies*, Nat'l Rev. (Mar. 23, 2020), http://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.
[134] Political Chronology Report at 136.
[135] *Id*. at 137

levels continued to deny that person-to-person transmission and occupational transmission among medical personnel were occurring until January 20, 2020."[136] As noted, each instance of Defendants' initiating a quarantine—and the instances before January 20, 2020 abound—do not make sense *except* if Defendants knew of human-to-human transmission of COVID-19. It is the scope of evidence uniquely available to Defendants (and actions by Defendants) that is critical to understanding the plainly intentional nature of Defendants' misrepresentation of the transmissibility risks of COVID-19 in late 2019 and early 2020.[137] Indeed, in January 2020, 29 Chinese researchers and clinicians published a study of officially acknowledged cases from December 2019 (a list that, as addressed *infra*, likely significantly undercounted cases) showing that 34% of these cases did not have direct exposure to the Huanan seafood market.[138] Each patient in this study had been identified as "laboratory-confirmed" COVID-19 patients by January 2, 2020 at the latest—with some likely much earlier.[139] The research coming out of China demonstrates that "evidence of person-to-person transmission was available to and recognized by astute Chinese experts from the very beginning."[140] Or, as frontline Chinese doctor Dr. Zhang Li observed, "by the end of December[,] 'the signs of human-to-transmission were already very obvious.'"[141] Defendants "would withhold this information when they

---

[136] *Id.* at 136.
[137] *Id.* at 129.
[138] Chaolin Huang, Yeming Wang, et al., *Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China*, 395 The Lancet 497, 497–506 (2020).
[139] *Ibid.*
[140] Political Chronology Report at 129.
[141] Most Catastrophic Pandemic of Our Time Report at 17–18.

disclosed the outbreak to the public on December 31."[142] Even when they did finally disclose the COVID-19 outbreak to the world on December 31, 2019 (while continuing to deny evidence of human-to-human transmission), Defendants immediately "issued an order to hospitals, clinics, and other health care facilities strictly prohibiting the release of any information about treatment of this new disease."[143]

Defendants' misrepresentations are made even more blatant by the fact that, contrary to their official statements, Defendants had an analysis of the "nearly full genome sequence" of the COVID-19 virus by December 27, 2019, and a "completed genomic sequencing" by December 29, 2019[144]—not only days before Defendants even admitted COVID-19 existed, but nearly a month before Defendants conceded knowledge of the human-to-human transmissibility of the virus.

Despite months of mounting evidence—and their own actions in response to the virus that would only be logical in response to human-to-human transmission—Defendants and their agents continued to deny the critical existence of human-to-human transmission. On January 1, 2020, Defendants "ordered the WIV not to disclose anything about the epidemic such as testing, experimental data, and results—even to partner organizations and technical service companies."[145] On the same day, "sequencing companies were told to stop sequencing, to destroy samples, and not to communicate anything."[146]

---

[142] Political Chronology Report at 129.
[143] Most Catastrophic Pandemic of Our Time Report at 21.
[144] *Id.* at 19.
[145] *Id.* at 20.
[146] Most Catastrophic Pandemic of Our Time Report at 20. .

Beginning January 6, 2020, the U.S. Centers for Disease Control and Prevention "repeatedly contacted [Defendants], offering to send a team of experts" to assist in responding to, and studying, the COVID-19 outbreak.[147] Defendants refused to allow either CDC or WHO teams into China until mid-February, long after Defendants belatedly acknowledged their knowledge of the human-to-human transmission of COVID-19.[148]

On January 14, 2020, despite months of evidence of human-to-human transmission of the virus (and actions taken by Defendants to combat human-to-human transmission), the Wuhan Municipal Health Commission released a public statement again claiming that "[a]mong the close contacts [of patients diagnosed with covid], no related cases [*i.e.*, cases suggesting human-to-human transmission] were found."[149] As has been detailed at length, this was plainly false. On January 15, 2020, Japan issued a statement that the first patient in Japan likely contracted the coronavirus from an infected person in China.[150] Nevertheless, two days later, on January 17, 2020, Defendants repeated their lies of January 14, 2020 that, "[a]mong close contacts, no related cases were found."[151] It was not until an interview aired on

---

[147] House Comm. On Foreign Affairs Report at 12

[148] *Ibid.*

[149] Jim Geraghty, *The Comprehensive Timeline of China's COVID-19 Lies*, Nat'l Rev. (Mar. 23, 2020), http://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

[150] Sui-Lee Wee, *Japan and Thailand confirm New Cases of Chinese Coronavirus*, N.Y. Times (Jan. 21, 2020), https://www.nytimes.com/2020/01/15/world/asia/coronavirus-japan-china.html.

[151] Jim Geraghty, *The Comprehensive Timeline of China's COVID-19 Lies*, Nat'l Rev. (Mar. 23, 2020), http://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies/.

January 20, 2020 did a PRC official acknowledge for the first time that COVID-19 was spreading between people or that any infections among medical personnel had occurred.[152]

Defendants PRC and CPC have even gone so far in their quest to suppress knowledge of the origins and spread of COVID-19 as to attempt to meddle in the politics of other countries. "On at least two occasions," Defendants' officials "sent requests to State Senator Roger Roth, the president of the Wisconsin Senate, asking that the Senate pass a resolution *praising* the PRC's response to the pandemic."[153] Defendants have "preemptively threatened countries who were critical of the PRC's handling of the early stages of the outbreak," including "demand[ing]" that a European Union report "criticiz[ing] [Defendants] for, among other things, spreading disinformation related to the origins of SARS-CoV-2" be "censored, and then rewritten."[154] All of this is part of the "great lengths" Defendants have gone to in order "to use information both defensively and offensively to protect its international reputation as a virus that originated within its borders has gone global."[155]

---

[152] Political Chronology Report at 158.
[153] House Comm. On Foreign Affairs Report at 24 (emphasis added).
[154] House Comm. On Foreign Affairs Report at 24.
[155] Zeeshan Aleem, *China Reportedly Lobbied the EU to Dial Down Criticism of Its Covid-19 Disinformation Campaigns*, Vox (April 25, 2020), https://www.vox.com/coronavirus-covid19/2020/4/25/21236552/china-eu-coronavirus-disinformation-conspiracy.

**ii.    Defendants sought to suppress information that they had fully sequenced the COVID-19 genome by at least December 2019 and were likely working on a vaccine for COVID-19 months before acknowledging its transmissibility.**

As early as December 27, 2019, a Chinese lab "had sequenced almost all of the genome of SARS-CoV-2, and shared its findings with hospital officials by phone as well as with the state-run Chinese Academy of Medical Science."[156] On the same day, "hospitals and health officials in Wuhan were notified" that the COVID-19 genome sequencing confirmed that the virus was "a new strain a coronavirus that was 87% genetically similar to SARS-CoV, the virus that caused the 2003 SARS pandemic."[157] This was just the first of several sequences that occurred in rapid succession—around that time, "local doctors sent at least eight other patient samples from hospitals around Wuhan to multiple Chinese genomics companies."[158] By December 29, 2020, the Beijing Genomics Institute "had fully sequenced the genome" of "at least three samples of SARS-CoV-2 drawn from different patients and reported its findings to the Wuhan Municipal Health Commission."[159]

Immediately after sequencing the COVID-19 genome, Defendants took steps to hide their knowledge of the sequenced genome and delay the spread of any genomic information about the virus. On January 1, 2020, "after several batches of genome

---

[156] Political Chronology Report at 137.
[157] House Comm. On Foreign Affairs Report at 8.
[158] Gao Yu, et al., *How Early Signs of the Coronavirus Were Spotted, Spread and Throttled in China*, Straits Times (Feb. 28, 2020), https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-were-spotted-spread-and-throttled-in-china.
[159] Political Chronology Report at 138.

sequence results had been returned to hospitals and submitted to health authorities," Defendants' agents at the Hubei Provincial Health Commission "order[ed] the company to stop testing samples from Wuhan related to the new disease and destroy all existing samples."[160] Defendants also instructed the labs "to immediately cease releasing test results and information about the tests, and report any future results to [Defendants]."[161] Two days later, on January 3, 2020, "China's National Health Commission (NHC), the nation's top health authority, ordered institutions not to publish any information" related to sequencing the COVID-19 virus, "and ordered labs to transfer any samples they had to designated testing institutions, or to destroy them."[162]

For several months thereafter, Defendants "refused to acknowledge that [they] issued" the order silencing any information on the COVID-19 genomic sequence.[163] Furthermore, throughout the pandemic—and "[d]espite repeated requests"—Defendants have "refused to share PRC virus samples with the international community."[164] This instruction was codified on January 31, 2020, when Defendants "issued a nationwide directive to all of the laboratories and educational institutions" in PRC which "made clear that they should ensure that foreign scientists working in

---

[160] Gao Yu, et al., *How Early Signs of the Coronavirus Were Spotted, Spread and Throttled in China*, Straits Times (Feb. 28, 2020), https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-were-spotted-spread-and-throttled-in-china.
[161] *Ibid.*
[162] *Ibid.*
[163] House Comm. On Foreign Affairs Report at 11.
[164] *Id*. at 24.

China did not access or spread information about the outbreak that was not officially sanctioned."[165] In their own words, Defendants instructed the Chinese laboratories to "guide the foreign experts to not believe rumors and not spread rumors."[166]

Actions by Chinese researchers further suggest that Defendants had knowledge of COVID-19 and its genome long before December 29, 2019. On February 24, Zhou Yusen, a virologist with PRC's People's Liberation Army and a team of PLA researchers filed the first patent application for a COVID-19 vaccine.[167] Zhou's vaccine patent came *only 35 days* after Defendants admitted to the public that human-to-human transmission was occurring, a period far shorter than even the most ambitious vaccine development program could accomplish. On the contrary, "[b]ased on the methodology that Zhou's team used to develop the vaccine and the three experiments conducted to complete the underlying study, U.S. experts in vaccinology and immunology . . . estimated that *a minimum of 12-16 weeks lead time* (three to four months) would have been required to conduct the necessary technical and animal experimentation to prepare this patent application for submission by February 24."[168] This estimated timeline "places the beginning of Zhou's research in early November 2019 at the latest, perhaps as early as mid-October."[169] Experts have also observed that other, similar research published by Zhou beginning in April 2020, titled "*Adaption of SARS-CoV-2 in BALB/c Mice for Testing Vaccine Efficacy*" would

---

[165] Political Chronology Report at 172.
[166] *Id*. at 173.
[167] *Id*. at 197.
[168] *Id*. at 197 (emphasis added).
[169] *Ibid*.

in fact "have required a minimum of 18 weeks of focused work, or almost five months, to complete."[170] Based on this timeline, a "conservative estimate" for the timeline of the April 2020 research "would then place the beginning of Zhou's vaccine work no later than November 2019."[171] In other words, PLA researchers' own timeline suggests that Defendants were aware of the human-to-human transmissibility of the virus—and actively working on a vaccine for it—months before they disclosed these facts to the rest of the world.

On February 24, 2020, the same day PLA researchers submitted their first patent, Defendants issued an "urgent notice" to Chinese researchers that "discouraged [further] research into the novel coronavirus," ordering "that studies already submitted for publication without pre-approval should be retracted immediately" and prohibiting Defendants' researchers "from sharing any data, biological specimens, pathogens, cultures, or other information related to the pandemic with other institutions or individuals."[172] Defendants, through a confidential directive, established a state council responsible for "screen[ing] scientific papers and other publications related to SARS-CoV-2 and COVID-19 before they could be released" and prohibited the sharing of any information related to COVID-19 without state authorization.[173] Government officials were instructed to spend their efforts "[p]romptly detect[ing] and dispos[ing] of various types of online

---

[170] Political Chronology Report at 215.

[171] *Ibid.*

[172] *Id.* at 199 (internal quotation marks omitted).

[173] *Id.* at 203.

rumors and harmful information to resolutely defend the political security of the state."[174]

### iii.    *Defendants sought to underrepresent the spread of the virus, misrepresenting its threat to global health.*

Defendants' misrepresentations were not limited to concealing their knowledge of the existence, genomic structure, and human-to-human transmissibility of the virus. Rather, Defendants also affirmatively concealed the risk the virus presented to the rest of the world by taking steps to intentionally underrepresent the spread of COVID-19 in PRC's own population during the period of time Defendants were aggressively hoarding PPE. "From the beginning, [Defendants] only allowed some symptomatic cases to be reported."[175] In was not until January 15, 2020, months into the spread of COVID-19, that Defendants first issued any case definition to guide the diagnosis and public reporting of COVID-19 cases.[176] What's more, the criteria of Defendants' first definition of a positive COVID-19 diagnosis "were unusually complex, narrowly defined, and seemly designed to exclude all but the most severe cases."[177] Before a diagnosis of COVID-19 could be publicly reported, the patient was required to have travelled to Wuhan (a meaningless criteria given Defendants' existing knowledge of human-to-human transmission), display all of four distinct clinical conditions (including fever, pneumonia, and reduced white blood cell count),

---

[174] Political Chronology Report at 200.
[175] House Comm. On Foreign Affairs Report at 26.
[176] Political Chronology Report at 155.
[177] *Id*. at 155.

*and* have been subject to laboratory testing of the patient's respiratory specimens.[178] In other words, Defendants instructed doctors to only publicly report cases "that were symptomatic, clinically diagnosed, *and* confirmed by laboratory tests."[179] Even when Defendants issued a new set of guidance as late as February 4, 2020, Defendants excluded from the public count of "confirmed cases" any patients "who tested positive but were asymptomatic, pre-symptomatic, or mildly symptomatic."[180] When Defendants relaxed these reporting requirements on February 13 for a single province—Hubei province—they reported 14,840 new COVID-19 cases *in one day*.[181] Defendants' actual records of "[t]he number of known cases that were asymptomatic, pre-symptomatic, or mildly symptomatic" was not released, but instead is deemed by Defendants as "classified information."[182]

Defendants' actions had a significant impact on the scope of reported cases. Studies have reported that over one-third of all COVID-19 cases are asymptomatic.[183] When you also include "pre-symptomatic" cases (i.e., symptoms had not yet become apparent), this number rises to 42.8% of all COVID-19 cases surveyed.[184] Refusing to

---

[178] Political Chronology Report at 155.

[179] House Comm. On Foreign Affairs Report at 26 (emphasis added).

[180] Political Chronology Report at 179.

[181] Emily Feng & Scott Neuman, *A Change in How 1 Chinese Province Reports Coronavirus Adds Thousands of Cases*, NPR (Feb. 13, 2020), https://www.npr.org/sections/goatsandsoda/2020/02/13/805519117/a-change-in-how-one-chinese-province-reports-coronavirus-adds-thousands-of-cases.

[182] John Xie, *In China, Officials Exclude Asymptomatic COVID-19 Carriers From Data*, VOA (Mar. 28, 2020), https://www.voanews.com/a/science-health_coronavirus-outbreak_china-officials-exclude-asymptomatic-covid-19-carriers-data/6186569.html

[183] Pratha Sah, et al., *Asymptomatic SARS-COV-2 Infection: A Systematic Review and Meta-Analysis*, 118 PNAS 1 (August 10, 2021).

[184] *Ibid.*

include asymptomatic or presymtomatic cases (to say nothing of "mildly" symptomatic) in your "official" published numbers not only significantly underreports the existing number of infected citizens, but misrepresents the rate of spread of the virus. By some estimates, "at least 50% of transmissions" were estimated to occur from either asymptomatic or presymptomatic carriers.[185] On March 22, 2020, reports emerged that Defendants' had classified data showing "that by the end of February some 43,000 asymptomatic people in China had tested positive for the virus, representing one-third of all cases."[186] It was not until March 31, 2020, after Defendants were caught preventing asymptomatic cases from being included in the number of confirmed cases, that Defendants starting counting these cases.[187] By April 1, 2020, Defendants had switched between "eight[] different definition[s] of what constitutes a COVID-19 infection" in their official statistics.[188]

As then-U.S. Secretary of State Mike Pompeo observed, the "intentional disinformation campaign that China has been and continues to be engaged in" has led the United States "now to a place where much of the challenge we face today has put us behind the curve."[189] Asymptomatic cases were not included until the eighth definition of what constitutes a COVID-19 infection—a shocking degree of

---

[185] Michael Johansson, et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Network Open (Jan. 7, 2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707.
[186] House Comm. On Foreign Affairs Report at 26.
[187] *Ibid.*
[188] Charlie Campbell & Amy Gunia, *China Says It's Beating Coronavirus. But Can We Believe Its Numbers*, TIME (Apr. 1, 2020), https://time.com/5813628/china-coronavirus-statistics-wuhan//
[189] *Ibid.*

underreporting that has "hindered the world's ability to understand the severity of the outbreak in Wuhan."[190] Some experts believe that, although Defendants have "deliberately made estimation difficult," Defendants' public representations of the number of confirmed cases outside of Hubei province "are low by a factor of 100 or more."[191] And this underreporting assumes Defendants provide *any relevant* information to the rest of the world. In some instances, Defendants refused—despite "accountability" requirements baked into WHO "rules governing international outbreaks"—to share any information on specific categories of data at all.[192]

Furthermore, Defendants did not only attempt to misrepresent their rates of COVID-19 infections through turning the criteria into a medical shell game—at times PRC and CPC officials blatantly lied to the rest of the world in their representations of relevant data. For example, in a leaked PRC government document marked "internal document, please keep confidential," local health authorities in the Hubei province list a total of 5,918 newly detected cases for February 10, 2020—"more than double the official public number of confirmed cases."[193] On January 15, 2020, a single radiologist in a single Chinese hospital "diagnosed 50 cases by CT-scans" alone, "which was more than the *official total number of cases since the start of the outbreak*

---

[190] *Ibid.*

[191] Derek Scissors, *Estimating the True Number of China's COVID-19 Cases,* Am. Enter. Inst., April 7, 2020, https://www.aei.org/research-products/report/estimating-the-true-number-of-chinas-covid-19-cases/.

[192] Nick Paton Walsh, *The Wuhan Files*, CNN (Dec. 1, 2020), https://www.cnn.com/2020/11/30/asia/wuhan-china-covid-intl/index.html.

[193] *Ibid.*

. . . as reported by the Chinese authorities."[194] In fact, "it was not until Feb[ruary] 14," "month[s] into the crisis," that Defendants first "disclosed that about 1,700 front-line medical workers were infected at that time."[195] This disconnect between Defendant's misrepresentations and reality is not limited to discrete instances, either. On one given day, Defendants "nationwide tally . . . was 9,548 new cases and five deaths," while at the same time just one of China's provinces, Zhejiang, was by itself reporting data suggesting "about 1 million new cases a day."[196] American intelligence agencies have likewise concluded that, "since at least early February" 2020, "China has vastly understated its coronavirus infections and that its count could not be relied upon."[197] Likewise, British officials believe "that China's officially declared statistics on the number of cases of coronavirus could be downplayed by a factor of 15 to 40 times."[198]

    As then-Secretary Pompeo acknowledged, Defendants' gross underreporting of cases had the obvious effect of delaying the world's awareness of the scope and

---

[194] Most Catastrophic Pandemic of Our Time Report at 21 (emphasis added).

[195] Nick Paton Walsh, *The Wuhan Files*, CNN (Dec. 1, 2020), https://www.cnn.com/2020/11/30/asia/wuhan-china-covid-intl/index.html.

[196] Huizhong Wu & Aniruddha Ghosal, *What We Know About the COVID-19 Data China Is—And Isn't—Sharing*, PBS News (Jan. 6, 2023), https://www.pbs.org/newshour/health/what-we-know-about-the-covid-19-data-china-is-and-isnt-sharing.

[197] Julian E. Barnes, *C.I.A. Hunts for Authentic Virus Totals in China, Dismissing Government Tallies*, N.Y. Times (Apr. 16, 2020), https://www.nytimes.com/2020/04/02/us/politics/cia-coronavirus-china.html.

[198] Harry Cole & Stephen Adams, *China's Efforts to Blame Coronavirus on a US Army Delegation to Wuhan Infuriate No. 10 as Boris Johnson's Advisers Say Beijing's Statistics on Its Cases Could Be Downplayed by a Factor of 40*, Daily Mail (March 28, 2020), https://www.dailymail.co.uk/news/article-8163707/Chinas-efforts-blame-coronavirus-army-delegation-Wuhan-infuriate-No-10.html.

severity of the COVID-19 pandemic. This, in turn, gave Defendants weeks (if not months) head start on acquiring PPE—all before the rest of the world became aware of the coming risks.

### iv. Defendants' targeting of whistleblowers and reporters sharing information on the human-to-human transmissibility of COVID-19

Also well-documented are Defendants PRC and CPC's affirmative actions taken to detain and punish doctors and others who sought to warn the public about the COVID-19 outbreak.

Starting on December 2, 2019—nearly a month before Defendants acknowledged the existence of the COVID-19 virus, and seven weeks before Defendants admitted their knowledge of the human-to-human transmission of the virus—"local authorities in Wuhan issued 'an emergency notice to medical institutions' that forbade them from releasing 'unauthorized' information about the disease."[199] This notice, unlike many of Defendants' actions, was not simply political theater. Rather, Defendants aggressively prosecuted medical and scientific personnel they believed were sharing any information about the disease—even if the targeted communications were simply to try to warn others to take precautions or protect against transmission of the disease. The list below includes only some of the victims of this crackdown. Many more exist, and it is likely there were many persecuted by Defendants about which the world will never hear.

---

[199] Most Catastrophic Pandemic of Our Time Report at 18.

Dr. Li Wenliang was an ophthalmologist working at Wuhan Central Hospital when, on December 30, 2019, he sent a message to fellow doctors warning them about the human-to-human transmissibility of the virus and "to wear protective clothing to avoid infection."[200] Only four days later, Defendants forced Dr. Li to sign a letter that accused him of "'making false comments' that had 'severely disturbed the social order.'"[201] He was also investigated and threatened with public prosecution for "spreading rumors."[202] After making his forced retraction about the dangers of COVID-19, Dr. Li himself died of COVID.[203]

Dr. Ai Fen, who was the director the emergency department of the Central Hospital of Wuhan and "who shared the laboratory tests confirming SARS with Dr. Li," recognized the human-to-human transmissibility of the virus and "ordered her staff to begin wearing masks on January 1[,]" 2020.[204] Upon Dr. Ai suggesting these precautions be taken, Defendants ordered Dr. Ai "to appear before the hospital's discipline board the very next day, where she was blamed for 'spreading rumors.'"[205] Defendants later ordered that medical charts of people at the hospital who contracted COVID be altered to reflect a less serious diagnosis, and continued for weeks thereafter to deny human-to-human transmission of the virus was occurring.[206]

---

[200] *Li Weliang: Coronavirus Kills Chinese Whistleblower Doctor*, BBC, Feb. 6, 2020, https://www.bbc.com/news/world-asia-china-51403795.

[201] *Ibid.*

[202] *Ibid.*

[203] *Ibid.*

[204] House Comm. On Foreign Affairs Report at 27.

[205] *Ibid.*

[206] *Ibid.*

On the same afternoon of January 1, 2020, the Wuhan Municipal Public Security Bureau announced that it had "already investigated and dealt with eight rumormongers according to the law," who had "disseminated and reposted" information about COVID-19 which Defendants believed "caused a harmful effect on society."[207] The People's Daily, the official mouthpiece of the CPC, and state television broadcaster CCTV amplified these reports in articles and news segments the very next day.[208] The amplification of these political prosecutions as a method of silencing whistleblowers is a running theme throughout Defendants' response to the pandemic. The punishment Dr. Li Wenliang, Dr. Ai Fen, and other whistleblowers was consistently "covered prominently by media outlets that are directly controlled by [Defendants]."[209] It is estimated that "[a]t least 254 people would be punished" within this first week alone for "spreading rumors," including "[j]ournalists, lawyers, and other concerned Chinese citizens who subsequently tried to document what was happening in Wuhan."[210]

Defendants' actions to cover up the spreading COVID-19 pandemic were not limited only to punishing specific whistleblowers. Beginning on January 1, 2020, Defendants "implemented a gag order against medical professionals, academic researchers, and commercial biotechnology firms" which acted to bar the scientific community from "sharing any information related to the outbreak of SARS-CoV-2,

---

[207] Political Chronology Report at 143.
[208] *Ibid.*
[209] *Id.* at 144.
[210] *Id.* at 144.

the nature of the virus, [or] key pieces of data, such as samples of the virus."[211] This state action to affirmatively silence the spread of any information related to the COVID-19 virus or its human-to-human transmissibility was further reinforced on January 3, 2020, when the gag order was codified and applied nationally by Defendants through an official, classified directive.[212] Defendants' directive "forb[ade] researchers, medical professionals, and others from publishing or sharing any information related to the virus without state authorization and ordered labs in possession of relevant samples to transfer them to designated institutions or destroy them."[213] In case there was any doubt that Defendants sought to use the directive to silence any information on the transmissibility and spread of COVID-19, the directive "instructed hospitals to not enter data from coronavirus patients into the surveillance system set up by the CCDCP to track outbreaks."[214] For good measure, the Wuhan Municipal Health Commission also issued yet another statement on January 3, 2020, falsely claiming there was no evidence of human-to-human transmission.[215]

On January 11, 2020, after deaths began to leak to the Chinese media, Shanghai Public Health Clinical Centre Professor Zhang Yongzhen leaked his lab's genomic sequencing data of SARS-CoV-2 on open access online databases. "It was not until after Zhang released the genome that the Chinese government, the Chinese CDC, the Wuhan Institute of Virology, and the Chinese Academy of Medical Sciences

---

[211] Political Chronology Report at 144.
[212] *Id*. at 145.
[213] *Ibid*.
[214] *Ibid*.
[215] *Ibid*.

raced to publish their sequences."[216] The next day, the PRC and CPC closed Professor Zhang's lab for "rectification."[217] All of this occurred "a full two weeks" after Defendants received the genomic sequencing data of SARS-CoV-2.[218] By this point WHO officials had been "complain[ing] in meetings" for weeks "that China was not sharing enough data to assess how effectively the virus spread between people or what risk it posed to the rest of the world, costing valuable time."[219] Defendants continued to deny any evidence of human-to-human transmission of COVID-19.[220]

The effects of Defendants' cover-up are stark. Reports suggest that "the [COVID-19] outbreak arguably might have been dramatically slowed" had Defendants not "stalled" the release of the SARS-CoV-2 genome for weeks—and, potentially, would have stalled for much longer without the brave actions of whistleblowers like Zhang, Li, Ai, and others like them. As Ali Mokdad, a professor at the Institute for Health Metrics and Evaluation at the University of Washington noted, "[i]t's obvious that we could have saved more lives and avoided many, many deaths" if Defendants "had acted faster" in reporting the information in their

---

[216] Most Catastrophic Pandemic of Our Time Report at 20.

[217] *Ibid.*

[218] Kayla Bartsch, *Chinese Lab Mapped Covid-19 Virus Two Weeks Before Sharing Information Globally, Documents Reveal*, Nat'l Rev. (Jan. 17, 2024), https://www.nationalreview.com/news/chinese-lab-mapped-covid-19-virus-two-weeks-before-sharing-information-globally-documents-reveal/.

[219] Associated Press, *How China Blocked WHO and Chinese Scientists Early in Coronavirus Outbreak*, NBC News (June 2, 2020), https://www.nbcnews.com/health/health-news/how-china-blocked-who-chinese-scientists-early-coronavirus-outbreak-n1222246.

[220] Political Chronology Report at 152.

53

possession on COVID-19. Instead, Defendants sought to silence the spread of this information while they aggressively moved to secure their own benefit.[221]

PRC and CPC officials also moved to silence ordinary citizens simply trying to document the virus, such as one who was arrested for "spreading rumors" after he had "post[ed] a video he had filmed of people dying of the virus and the body bags piled up outside a hospital."[222] This man later joined the growing lists of "whistle-blowers [who were] 'disappeared' by the Chinese government for exposing the terrifying extent of the Covid-19 outbreak."[223] It is estimated that "[m]ore than 5,100 people were arrested" by Defendants "for sharing information in the first weeks of the [COVID-19] outbreak."[224]

Defendants' campaign of censorship also extended to reporters and members of the news media. In mid-February 2020, the PRC revoked press credentials of three reporters and expelled them from the country after their news outlet actively covered the COVID-19 outbreak.[225] Chinese citizen journalists who reported on the situation

---

[221] Associated Press, *How China Blocked WHO and Chinese Scientists Early in Coronavirus Outbreak*, NBC News (June 2, 2020), https://www.nbcnews.com/health/health-news/how-china-blocked-who-chinese-scientists-early-coronavirus-outbreak-n1222246.

[222] George Knowles, *China's Disappeared: At Least One Is Dead and the Rest Haven't Been Heard from in Months, So Why Isn't the World Asking What Happened to the Brave Souls Who Dared to Speak Up about the Coronavirus Outbreak After Beijing Lied to the World?*, Daily Mail (April 18, 2020), https://www.dailymail.co.uk/news/article-8233203/Chinas-disappeared-happened-dared-speak-coronavirus.html.

[223] *Ibid.*

[224] *Ibid.*

[225] *China Expels Three Wall Street Journal Reporters*, Wall St. J. (Feb. 19, 2020), https://www.wsj.com/articles/china-expels-three-wall-street-journal-reporters-11582100355.

in Wuhan were rounded up by Defendants and administratively "vanished," eventually reappearing only when they were sentenced to years in prison for "picking quarrels and provoking trouble."[226]

Perhaps most remarkably, despite eventually acknowledging the existence and spread of COVID, Defendants—including Defendant PRC—"never" actually officially "notified the WHO about the outbreak in Wuhan."[227] The world was forced to learn about it only after it was too late.

> v.  *Defendants' suppression of truthful information about the origin and spread of COVID-19 was for pure political purposes.*

Defendants aggressively sought to (quite literally) suppress every possible piece of COVID-19 information they could plausibly suppress. The purpose of Defendants' suppression of this information, which resulted in the rapid spread of COVID-19 and the untold deaths that followed, is clear: it conflicted with their carefully constructed political narrative. WIV was already seen by Defendants as a tool for their political propaganda and, consequently, was long a focus of CPC and PRC's political pressure. "[A] series of reports in 2018 and 2019 … collectively portray a picture of the WIV encountering political pressure to produce scientific

---

[226] Kasim Kashgar, *Chinese Journalist Freed After Four Years in Prison for COVID Reporting*, VOA (May 23, 2024), https://www.voanews.com/a/chinese-journalist-freed-after-four-years-in-prison-for-covid-reporting/7624437.html.

[227] House Comm. On Foreign Affairs Report at 10 (citing Michael Ryan, Exec. Dir., WHO Health Emergencies Programme, Remarks at the COVID-19 Virtual Press Conference (April 20, 2020), http://www.who.int/docs/default-source/coronavirus/transcripts/who-audio-emergencies-coronavirus-press-conference-20apr2020.pdf).

breakthroughs while struggling with personnel recruitment, equipment and construction issues, and the development of a culture of safety."[228] In May 2019, the National Health Commission of the PRC held a virtual conference for health officials from all over China.[229] At the conference, the directive from the PRC and CPC was clear: "ensure that no major safety or security accidents occur" that could disrupt the CPC or PRC's "stability in the lead up to the 70th anniversary of the founding of the PRC in October 2019."[230] These comments echoed speeches the deputy secretary of the CPC committee at WIV gave to researchers only a month prior at the conclusion of a "political inspection tour," in which the CPC committee deputy secretary invoked "the 70th anniversary of the founding of a new China" and the importance of WIV researchers "speaking from the high point of politics."[231]

While the PRC, CPC, and other Defendants have taken every opportunity to misrepresent and obfuscate the spread of COVID and its source, they have not attempted to hide their goal of promoting aggressive, pro-CPC propaganda on the subject. PRC Chairman Xi has "deployed the party-state's vast censorship and surveillance apparatus to quell public criticism of Beijing's response as well as discussion of the origin, scope, and severity of the outbreak."[232] Indeed, Defendants' Politiburo Standing Committee ordered the Cyberspace Administration of China (CAC) "to 'take the epidemic prevention and control work as your top political task at

---

[228] Political Chronology Report at 91.
[229] *Id.* at 76
[230] *Id.* at 76–77
[231] *Id.* at 73.
[232] *Id.* at 170.

present'" and to "'use the power of the whole organization and the whole system to do a good job with online propaganda and guidance work.'"[233] CAC's goal in this respect is described as "forming unity of will into an impregnable stronghold" by "constructing a favorable atmosphere online."[234] In February 2020, Chairman Xi himself ordered Defendants' state security apparatus to "redouble our efforts at propaganda and public opinion work" on COVID-19 so as to "control public opinion and diligently strive to create a good public opinion atmosphere."[235]

Political directives by CPC and PRC for the WIV to avoid any actions that would disrupt the PRC's "stability" pervaded the next several months after this speech. Only one month later, Hou Jianguo, the vice president of the CAS, visited WIV and the Wuhan branch of the CAS.[236] Demonstrating "the [CPC]'s preoccupation with maintaining a political focus on what are ostensibly centers of scientific research," Hou "urged the WIV" to "'[m]aintain a high degree of consistency with the Party Central Committee with Comrade Xi Jinping at the core in your political stance, political direction, political principles, and political path from beginning to end.'"[237] These instructions extended to local officials on the ground as well, to terrible consequences. Then-mayor of Wuhan, Zhou Xianwang, admitted that "the reason it

---

[233] Political Chronology Report at 170.
[234] *Ibid.*
[235] *Id*. at 176.
[236] *Id*. at 78
[237] *Id*. at 78 − 79.

took so long to warn the public about the virus was that [the mayor] didn't have clearance from above."[238]

Much of Defendants' obfuscations and misrepresentations were performed in a carefully orchestrated attempt to avoid drawing domestic and international ire for Defendants' role in failing to disclose or contain the spread of COVID-19, and to correspondingly secure a benefit for Defendants from their specialized knowledge of the virus. After all, "during late 2002 and early 2003, the PRC failed to report the outbreak of a new and deadly disease within their borders"—the SARS epidemic.[239] The SARS epidemic "was not simply a public health problem" for Defendants, but in fact "caused the most severe socio-political crisis for the Chinese leadership since the 1989 Tiananmen crackdown."[240] Not only then—as now—did the PRC's "inaction" and "continuous information blackout" with the SARS epidemic cause the epidemic to "quickly spread to other parts of China," but the SARS epidemic "triggered a series of protests and riots in China."[241] This is a result Defendants desperately wanted to avoid, both by controlling information and by securing the world's supply of PPE to appear publicly responsive to the virus.

---

[238] *Coronavirus: Senior Chinese Officials 'Removed' As Death Toll Hits 1,000*, BBC (Feb. 11, 2020), https://www.bbc.com/news/world-asia-china-51453848.
[239] House Comm. On Foreign Affairs Report at 29.
[240] Yanzhong Huang, *Implications of SARS Epidemic for China's Public Health Infrastructure and Political System: Testimony before the Congressional-Executive Commission on China Roundtable on SARS* (May 12, 2023), https://www.cecc.gov/ sites/evo-subsites/cecc.house.gov/files/documents/roundtables/2003/CECC%20 Roundtable%20Testimony%20-%20Yanzhong%20Huang%20-%205.12.03.pdf.
[241] *Ibid.*

58

Defendants likely sought to suppress information on the origin and spread of COVID-19, at the heavy expense of millions of deaths[242] and untold billions of dollars of injury born by both Missouri and the rest of the world, in a blatant attempt to avoid the same political backlash. After all, it could not be plausibly disputed "that the WIV's research was broadly funded by the PRC central authorities and had even received honors from them."[243] It was also clear (although only by piercing the veil of Defendants' obfuscation) that "WIV was actively working on at least two projects involving undisclosed SARS-related bat coronaviruses that they were artificially adapting to infect human cells" in the weeks and months before a SARS-related bat coronavirus adapted to infect human cells was detected in the very same city.[244] Defendants were already likely aware of the incredibly risky nature of this research. The 2003 SARS virus, after all, "escaped laboratories on multiple occasions after the initial epidemic was contained."[245] No matter the actual origin of COVID-19 (an origin which, as detailed above, points strongly to one of two competing theories), "it would be difficult for the central leadership in Beijing to distance itself from a serious research-related incident at the WIV, were such an incident to occur."[246]

---

[242] WHO COVID-19 Dashboard, WHO, (last visited Nov. 22, 2024), https://data.who.int/dashboards/covid19/deaths?n=o (showing a "total cumulative" of 7,074,400 deaths).

[243] Political Chronology Report at 63.

[244] *Ibid.*

[245] Aksel Fridstrom, *Chinese researchers created new corona viruses under unsafe conditions*, Minerva (May 27, 2021), https://www.minerva.no/china-drastic-sars-cov-2/chinese-researchers-created-new-corona-viruses-under-unsafe-conditions/381476.

[246] *Ibid.*

The actions of PRC and CPC leadership appear to demonstrate that they were acutely aware of (what they perceived to be) these political risks of the pandemic as soon as COVID-19's human-to-human transmissibility became clear—months before Defendants actually disclosed the virus. In September 2019—again, months before they disclosed any knowledge of COVID-19, but during the period in which evidence of the spread of the virus first appears—the CPC Central Committee "dispatched the No. 15 Inspection Control Group" to investigate Defendant CAS.[247] This investigation—which occurred during the first critical months of the pandemic—was described by the CPC inspection group leader as "'a comprehensive and personal political examination of the performance of political responsibilities, duties, and missions by party organizations [under the] Central Committee and state organs.'"[248] The results of this investigation of CAS, conducted during the initial days of the COVID-19 pandemic were presented to "the [CPC]'s most senior decision-making body, its Politburo Standing Committee."[249] A heavily redacted July 20, 2020 State Department memorandum, titled "[REDACTED] Say PRC Central Government – Not Local Officials – Responsible for the Coronavirus Cover-Up" suggests that the U.S. Government agrees that Defendants engaged in a state-wide coverup of the existence and spread of COVID-19. Although much of the contents of the memorandum remain classified, the headers above each section of the State Department memorandum tell a clear story: "Who Ordered the Cover Up? The Signs

---

[247] Political Chronology Report at 100.
[248] *Ibid.*
[249] *Id.* at 101.

Point to Beijing, not Local Officials"; "Beijing Knew Earlier than They Admit"; "Leaked Directive Confirms Beijing Restricted Disclosure of Virus Information and Samples"; "Xi Lied to Obfuscate His Role in the Cover-Up"; and "Initial Outbreak Could Have Been Contained in China if Beijing Had Not Covered it Up."[250]

### D. COVID-19 thereafter begins to quickly spread in the United States and around the world

The inactions, obfuscations, and misrepresentations of the PRC, CPC, and other Defendants thereafter led to COVID-19 quickly spreading across the world, killing millions and shutting down entire cities. The first confirmed case of COVID-19 in the United States was detected on January 20, 2020.[251] The "patient zero" for the spread of the virus in the United States had returned to the United States from Wuhan, China, where the patient had been traveling in early January 2020—the period in which Defendants had unquestionably known about the human-to-human transmission of the virus, but actively sought to deny its transmissibility and spread.[252] Had Defendants complied with their reporting obligations and not instead actively sought to conceal the existence, then transmission, then spread of the virus, the spread of COVID-19 in the United States may have been contained. It is certainly likely that this traveler to Wuhan, taking the necessary precautions, may not have been "patient zero."

---

[250] Political Chronology Report at 100.
[251] Press Release, Ctrs. for Disease Control, First Travel-related Case of 2019 Novel Coronavirus Detected in United States (January 21, 2020), https://archive.cdc.gov/www_cdc_gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html.
[252] *Ibid.*

Instead, the virus spread rapidly around the country, sickening and killing hundreds, then thousands, then millions of people. "During the three years of the COVID-19 pandemic, a total of 21,621 Missourians died of COVID-19 related deaths."[253]  COVID-19 was the third leading cause of death for Missourians in 2020 and 2021, and the fourth leading cause in 2022.[254]  For the first time since 1911, Missouri experienced a year-long "natural decrease," *i.e.*, more deaths than births. Missouri had a natural decrease for each of the three years from 2020 to 2022.[255] Missourian overall life expectancy decreased 2.6 years from 77.4 in 2019 to 74.8 in 2021.[256] All of this was the result of the spread of COVID-19.

## PROCEDURAL BACKGROUND

Missouri filed its Complaint on April 21, 2020, asserting several claims related to the spread of COVID-19 and related harms imposed on the State and its citizens by Defendants the People's Republic of China, the Communist Party of China, the Wuhan Institute of Virology, the National Health Commission of the People's Republic of China, Ministry of Emergency Management of the People's Republic of China, Ministry of Civil Affairs of the People's Republic of China, the People's Government of Hubei Province, the People's Government of Wuhan City, and the Chinese Academy of Sciences. ECF 1.

---

[253] Mo. Dep't Health & Senior Servs., *Missouri COVID-19 Mortality 2020-2022* (Nov. 2023), https://health.mo.gov/data/pdf/20202022-covid-deaths.pdf.
[254] *Ibid.*
[255] *Ibid.*
[256] *Ibid.*

After China spent considerable effort resisting service (including asserting frivolous objections under the Hague Convention in an attempt to defeat service), this Court granted Missouri's motion for alternative methods of service on all Defendants. ECF 22. The non-foreign-state Defendants—the Chinese Academy of Sciences (CAS) and the Wuhan Institute of Virology (WIV)—were served on May 18, 2021. ECF 23. Each non-foreign state defendant has failed to appear or file a responsive pleading, and the Clerk of the Court entered defaults against them on August 17, 2021. ECF 29. Missouri also served Defendant CPC, an alter ego of the foreign-state PRC, on May 18, 2021, and the Clerk of Court entered a default against the CPC on August 17, 2021. ECF 23, 29. Foreign-state Defendants—the People's Republic of China and its five political subdivisions—were served with process through diplomatic channels on October 7, 2021. ECF 36–41. All of these Defendants, likewise, have failed to appear or file a responsive pleading. The Clerk of Court entered defaults against each of these Defendants on December 15, 2021. ECF 44. On July 8, 2022, this Court dismissed each count of Missouri's Complaint for lack of subject matter jurisdiction. ECF 61. Missouri appealed the dismissal of its Complaint. ECF 63.

On January 10, 2024, the Eighth Circuit affirmed in part and reversed in part this Court's July 8, 2022 Order. *Missouri ex rel. Bailey*, 90 F.4th at 940. The court in *Missouri ex rel. Bailey* concluded that each defendant was subject to the immunities offered by the FSIA as either a "foreign state" (in the case of the PRC and its political subdivisions), an "agency or instrumentality of a foreign state" (in the case of the Wuhan Institute of Virology and Chinese Academy of Sciences), or, in the case of CPC,

63

an entity that "is in substance the same body politic that governs [China]," and therefore also a foreign state defendant under the FSIA. *Id*. at 934–36. "The Foreign Sovereign Immunities Act, in other words, shields [each Defendant] from Missouri's lawsuit unless a statutory exception applies." *Id*. at 936.

Analyzing the exceptions to the Foreign Sovereign Immunities Act, the Eighth Circuit concluded that Count IV of Missouri's Complaint, that Defendants "hoarded personal-protective equipment while the rest of the world was in the dark about the disease," satisfied the commercial-activity exception to the FSIA. *Missouri ex rel. Bailey*, 90 F.4th at 934, 940. Reviewing the hoarding claim, the Eighth Circuit observed that Missouri's claim, which asserts both "that the [D]efendants hoarded masks and then sold lower-quality equipment in the United States" and "that China t[ook] over factories that ma[de] masks on behalf of American companies, which essentially halted the export of high-quality masks to the United States," together "identify classic anticompetitive behavior, except on a country-wide scale." *Id*. at 938 (internal quotation marks omitted). "Taking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are actions of a 'private player' in the market," and "[t]he same goes for the act of selling those items for a profit." *Id*.

If Defendants "bought up much of the rest of the world's supply of masks," the Eighth Circuit observed that it would mean that supply reductions "led to an immediate shortage in Missouri, which then allowed the [D]efendants to enter the market and sell lower-quality masks." *Id*. (internal quotation marks omitted). As a

result "[h]ealthcare providers in Missouri either paid higher prices for the masks they could find or dealt with shortages that . . . made it difficult to safely and effectively treat[] patients with the virus." *Id.* (internal quotation marks omitted). "Although the underlying activity was economic," Missouri also "suffered effects beyond just financial loss." *Id.*

Furthermore, the Eighth Circuit held that "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects." *Id.* Defendants "singlehandedly t[ook] over factories that ma[d]e masks and cornered the market before the rest of the world realized what was happening." *Id.* (internal quotation marks omitted) Then, "when the virus spread and people all over the world became sick, China was able to maintain its stockpile [of PPE] and prolong the shortage." *Id.* Given Defendants' significant market power, "[t]he most basic supply-and-demand principles tell us that these market effects depended little, if at all, on variables independent of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id.* (internal quotation marks omitted).

On May 23, 2024, this Court entered a scheduling order setting a Foreign Sovereign Immunity Act hearing and directing Missouri to file, among other things, an FSIA pretrial brief and any written evidence in support of the State's claims. ECF 76. Missouri now does so.

## STANDARD OF REVIEW

Each Defendant was properly served with a copy of the summons and complaint in this lawsuit. ECF 23, 36–41. Each Defendant thereafter chose to ignore this lawsuit, failing to plead or otherwise defend themselves against Missouri's claims. Under Federal Rule of Civil Procedure 55, the Clerk of Court may enter a default and the plaintiff may apply to the court for a default judgment. Plaintiffs have done so, and the Clerk of Court has noted each Defendant's default. ECF 29, 44.

Although default would normally be the end of the story, each Defendant's status as a foreign state, political subdivision of a foreign state, or agency or instrumentality of a foreign state adds a final step. Under the FSIA, "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the Court." 28 U.S.C. § 1608(e). Missouri, in other words, must provide "evidence satisfactory to the court" on its claims of liability and damages before it may recover against Defendants.

"To prevail in an FSIA default proceeding, the plaintiff[] must present a legally sufficient *prima facie* case, in other words, 'a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff.'" *Kilburn v. Islamic Republic of Iran*, 699 F.Supp.2d 136, 150 (D.D.C. 2010) (quoting *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53, 63 (D.D.C. 2008)). The FSIA's "'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in

Federal Rule of Civil Procedure 55([d]).” *Owens v. Republic of Sudan*, 826 F.Supp.2d 128, 134 (D.D.C. 2011); *see also* Fed. R. Civ. P. 55(d) (“A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfies the court.”). In reviewing a plaintiff’s claim against a defaulting defendant subject to the FSIA, “the court may ‘accept as true the plaintiffs’ uncontroverted evidence.’” *Owens*, 826 F.Supp.2d at 135 (quoting *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 100 (D.D.C. 2000)); *see also Shourd v. Government of Islamic Republic of Iran*, Case No. 22-cv-1309, 2024 WL 4346330 (Sep. 30, 2024) (slip copy) (same); *Gates*, 580 F.Supp.2d at 63 (“By its failure to appear and defend itself [the foreign sovereign] put itself at risk that the Plaintiffs’ uncontroverted evidence would be satisfactory to prove its points.”).

Courts have applied a “lenient standard” for factual findings by a trial court in FSIA default hearings, recognizing that “firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign.” *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (reversed on other grounds). “Given the difficulty of obtaining direct proof of the types of conduct for which the FSIA provides a remedy, the statute permits courts to credit indirect evidence and to impose a lower evidentiary burden than they might apply in a different context.” *Saharkhiz v. Islamic Republic of Iran*, case no. 19-cv-2938, 2023 WL 9196605, at *5 (D.D.C. Oct. 16, 2023) (slip copy). Such an evidentiary standard is especially appropriate here, where Defendants have “refused to appear in court and

subject [themselves] to discovery, and [are] known to intimidate defectors and potential witnesses." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014). In such situations, "the Supreme Court has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation— to 'adjust [evidentiary requirements] to … differing situations.'" *Id.* (citing *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)); *see also Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22, 33 (D.D.C. 2016) (citing *Han Kim*). This approach recognizes the inherent difficulties of a plaintiff litigating a case (something normally not necessary against a defaulting defendant) against a party for which the plaintiff cannot seek or obtain discovery (a limitation not normally the case if the defendant appears and responds to the lawsuit). In other words, the standard recognizes the practical realities of demonstrating a claim against a hostile (and defaulting) state, and "is part of the risk a sovereign runs when it does not appear" after it has been properly served. *Id.* at 786.

"A plaintiff may submit multiple types of evidence to support FSIA claims, including 'testimony, documentation, and affidavits.'" *Saharkhiz*, 2023 WL 9196605, at *5 (quoting *Miango v. Democratic Republic of Congo*, 288 F.Supp.3d 117, 123 (D.D.C. 2018) (citing cases) (vacated on other grounds)). For example, a plaintiff may establish a defaulting foreign state defendant's liability through "evidence in the form of live testimony, videotaped testimony, affidavit, and original documentary and videographic evidence." *Owens*, 826 F.Supp.2d at 135; *see also Karcher v. Islamic*

*Republic of Iran*, 396 F.Supp.3d 12, 16 n.3 (D.D.C. 2019) (allowing "official U.S. Government reports, records, and statements" as evidence in a FSIA default hearing "[u]nder the public records exception to the hearsay rule."); *Rux v. Republic of Sudan*, 495 F.Supp.2d 541, 544 (E.D. Va. 2007) (including as evidence at the FSIA hearing "unclassified U.S. Department of State Reports; the 9/11 Commission Report; Final Report of the National Commission on Terrorist Attacks Upon the United States" and "a transcript of federal criminal proceedings against Osama Bin Laden in 2001."); *Sotloff v. Syrian Arab Republic*, 525 F.Supp.3d 121, 127 n.1–n.3 (considering as evidence in a FSIA default hearing "The State Department Overview of State-Sponsored Terrorism" as "a public record," taking "judicial notice of facts" found in other judicial decisions in that circuits, and "written testimony and reports of Plaintiffs' expert witnesses."); *Elahi*, 124 F.Supp.2d at 99–100 (noting that the court accepted 105 documentary exhibits in a FSIA trial against defendants who were in default); *Saharkhiz*, 2023 WL 9196605, at *8 (considering evidence composed of the plaintiff's "own testimony and several news articles, publications, and reports" documenting the plaintiff's claims); *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F.Supp.2d 441, 460–61 (D.P.R. 2010) (finding that plaintiffs satisfied their burden of the FSIA through "live and affidavit testimony" and "affidavits and reports.").

A defaulting defendant under the FSIA is deemed to have forfeited any affirmative defenses the defendant could have raised in response to the lawsuit, unless there are distinct and narrow circumstances, not relevant here, "in which the

judiciary's own interests are implicated and the forfeiting party is present in the litigation." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019); *see also id*. at 1113 ("It is not the responsibility of the courts to act *sua sponte* to raise affirmative defenses on behalf of [FSIA] defendants who do not appear to defend actions against them."). Additionally, "there is no room for courts to engage in discretionary, comity-based interest-balancing to decide 'whether and when to exercise judicial power over foreign states.'" *Id*. (quoting *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 140 (2014)). "The purpose of the FSIA was to put an end to that method of decisionmaking on questions of foreign sovereign immunity," and "the Supreme Court has been clear in its FSIA jurisprudence that it is not for the courts 'to consider the worrisome international-relations consequences' of adjudicating actions under the FSIA." *Id*. at 1113 (quoting *NML Capital*, 573 U.S. at 146).

## **ARGUMENT**

**I.    Defendants have breached their duty of care by hoarding personal protective equipment and allowing the export of ineffective personal protective equipment, all while knowing (and suppressing) the dangers of COVID-19 and the necessity of personal protective equipment.**

Count IV of Missouri's Complaint alleges that Defendants harmed Missouri and its residents by hoarding PPE during a time when Defendants had specialized knowledge of the COVID-19 pandemic. "Missouri's overarching theory is that China leveraged the world's ignorance about COVID-19," including "by manipulating the worldwide personal-protective-equipment market." *Missouri ex rel. Bailey*, 90 F.4th at 939. The Eighth Circuit held that these claims, if demonstrated with sufficient

evidence, "identify classic anticompetitive behavior, except on a country-wide scale." *Id.* at 938. In other words, Missouri has already "alleged enough to allow the claim to proceed"—it must just "prove it." *Id.* at 939 (emphasis and internal quotations omitted). Through this pretrial brief and the FSIA hearing, Missouri does just that.

### A. Defendants' hoarding of PPE

Personal Protective Equipment (PPE) generally "refers to worn articles or equipment that help minimize exposure to various hazards, including infectious pathogens like … COVID-19."[257] Examples of PPE "include surgical masks, N95 respirators, sterile gloves, surgical gowns, [and] face shields," as well as "medical articles or devices" and "testing supplies, hand sanitizer, [and] prophylaxes."[258]

PPE played a key role "in mitigating the spread and reducing the impacts of COVID-19," and "[t]he availability of effective PPE [was] critical to [Missouri's] pandemic response."[259] Consequently, a lack of PPE for healthcare professionals, especially early in the pandemic, significantly hampered Missouri's pandemic response. It also forced the State of Missouri, its healthcare providers, and its citizens, to pay significantly higher prices to obtain the limited PPE available after Defendants took aggressive early steps to hoard it. As late as at least December 2020, "[PPE] shortages continue[d] to be a factor in the ongoing … response to the COVID-19 pandemic."[260]

---

[257] Michael H. Cecire, Cong. Rsch. Serv., R46628, COVID-19 and Domestic PPE Production and Distribution: Issues and Policy Options (Dec. 7, 2020).
[258] *Ibid.*
[259] *Ibid.*
[260] *Ibid.*

Missouri's "hoarding claim … takes aim at the production, purchasing, and import and export of medical equipment, such as personal[-]protective equipment ('PPE'), used in COVID-19 efforts." *Missouri ex rel. Bailey*, 90 F.4th at 938 (internal quotation marks omitted). "One allegation is that the defendants hoarded masks and then sold lower-quality equipment in the United States. The other is that China t[ook] over factories that ma[de] masks on behalf of American companies, which essentially halted the export of high-quality masks to the United States." *Id*. As the Eighth Circuit held, "[t]aking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of a 'private player' in the market. The same goes for the act of selling those items for a profit." *Id*.  And this behavior is not only that of a private commercial player: it is "anticompetitive behavior." *Id.* As Missouri details below and in the written evidence provided to the Court, both allegations are supported by significant evidence demonstrating Defendants' "anticompetitive behavior."

Defendants owed duties pursuant to state and federal statutory and regulatory authorities to not engage in anticompetitive acts. Under Missouri statutory law, it is unlawful to contract or conspire to restrain trade or commerce in Missouri.  Mo. Rev. Stat. § 416.031.1.  It is equally "unlawful to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce in" Missouri.  *Id.* § 416.031.2.  It is "the duty of the attorney general to enforce the provisions of" Missouri's antitrust laws. *Id.* § 416.061.2.  Another form of anticompetitive behavior is price gouging, which is an unfair practice under Missouri's Merchandising Practices Act (MMPA).  *Id.*

§ 407.020; 15 C.S.R. § 60-8.030(1). Missouri's Attorney General is authorized to enforce the MMPA. *See*, *e.g.*, Mo. Rev. Stat. §§ 407.040, .090.

Much of the same can be said under federal antitrust law. *First*, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . with foreign nations, is declared to be illegal." 15 U.S.C. § 1. *Second*, it is likewise unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce . . . with foreign nations." *Id.* § 2. *Third*, "[e]very combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter." *Id.* § 8. *Fourth*, it is "unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of

73

the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." *Id.* § 14.  "Any attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any district court of the United States having jurisdiction of the defendant, to secure monetary relief as provided in this section for injury sustained by such natural persons to their property by reason of any violation of sections 1 to 7 of" 15 U.S.C.  *Id.* § 15c(a)(1).

Each of these provisions created independent duties for Defendants to not engage in anticompetitive hoarding actions in the purchase and sale of PPE. As demonstrated below, Defendants' campaign to hoard PPE in the early days of the pandemic, which included aggressive, intentional nationalization of American factories producing PPE and the hoarding of PPE manufactured or for sale in the United States, amounts to anticompetitive acts violating each of these duties. What's more, all of these acts were taken in conjunction with Defendants' repeated, affirmative misrepresentations about both the transmissibility of COVID-19 and scope of the early pandemic.

### i. *Nationalization of American Factories producing PPE*

One of the key ways Defendants hoarded PPE early in the pandemic was by taking unlawful, anticompetitive steps to nationalize U.S. factories producing PPE in China and by prohibiting the export of PPE from U.S. factories in China to the United States. "[By at least] early February 2020, the Chinese government nationalized control of the production and dissemination of medical supplies in China."[261] To accomplish this, Defendants "transferred authority over the production and distribution of medical supplies from the Ministry of Information Industry and Technology (MIIT) to [PRC's National Development and Reform Commission (NDRC)], China's powerful central economic planning ministry."[262] Defendants' actions transferring authority over the production and distribution of medical supplies to PRC's economic planning ministry had an immediate effect. NDRC quickly "commandeered medical manufacturing and logistics down to the factory level and directed the production and distribution of all medical-related production, including U.S. companies' production lines in China, for domestic use."[263]

Additionally, Defendants engaged in a number of "soft" or "informal" regulatory measures that had the purpose of limiting PPE exports to the United

---

[261] Karen M Sutter, et al., Cong. Rsch. Serv., R46304, COVID-19: China Medical Supply Chains and Broader Trade Issues 15 (Dec. 23, 2020); *see also* Michael H. Cecire, Cong. Rsch. Serv., R46628, COVID-19 and Domestic PPE Production and Distribution: Issues and Policy Options (Dec. 7, 2020) ("[By at least] early February 2020, the Chinese government nationalized control of the production and distribution of medical supplies in China, including PPE.").

[262] *Ibid.*

[263] *Ibid.*

States. For example, "some U.S. legal experts observed that China may have used informal measures, such as administrative guidance, to prioritize exports to certain countries ahead of the United States."[264] Several U.S. manufacturers with factories based in China have stated "that the PRC would not authorize them to export PPE produced in their [Chinese] facilities" to the United States.[265]

All of these actions by Defendants had the intended effect. The nationalization of U.S. factories in China "enabled the PRC to increase production of face masks from 20 million to *more than 100 million per day*, at the expense of foreign companies being allowed to export their products."[266] Although "China made half the world's masks before the coronavirus emerged there," and "has expanded production nearly 12-fold since then," Defendants have "claimed [the] mask factory output for [themselves]."[267] Peter Navarro, then a Presidential advisor on manufacturing and trade, directly characterized Defendants' actions as effectively "nationaliz[ing]" American factories."[268] All of this is on top of the fact that "China did not just stop selling masks," but "also bought up much of the rest of the world's supply."[269]

---

[264] Karen M Sutter, et al., Cong. Rsch. Serv., R46304, COVID-19: China Medical Supply Chains and Broader Trade Issues (Dec. 23, 2020).
[265] House Comm. On Foreign Affairs Report at 33.
[266] *Ibid.* (emphasis added).
[267] Keith Bradsher & Liz Alderman, *The World Needs Masks. China Makes Them, but Has Been Hoarding Them*, N.Y. Times (April 2, 2020), https://web.archive.org/web/20240826064944/https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html.
[268] *Ibid.*
[269] *Ibid.*

Defendants were also well aware of the effects of this nationalization on U.S. healthcare and medical systems. In March 2020, for example, a state-run press agency remarked that Defendants, by choosing to ban various exports (such as pharmaceutical ingredients), could "plunge[] [the United States] into the mighty sea of coronavirus."[270] In that same month, the U.S. Federal Emergency Management Agency (FEMA) and Department of Health and Human Services (HHS) depleted "the remaining PPE held in the HHS Strategic National Stockpile."[271]

As the Congressional Research Service concluded in a December 2020 report, Defendants' actions to nationalize U.S. factories and limit any export of PPE "may have denied the United States and other countries that depend on open and free markets for their health care supply chains timely access to critical medical supplies."[272] A House of Representatives report was even more damning: "[i]t is highly likely that China's nationalization of the manufacturing capacity of foreign companies, including 3M and General Motors, directly impacted the ability of the United States and other countries to procure PPE on the global market."[273]

### ii. *Defendants actively hoarded PPE manufactured or for sale in the United States*

In addition to nationalizing U.S. factories, Defendants took aggressive steps to capitalize on their unequal knowledge of the existence and transmissibility of

---

[270] House Comm. On Foreign Affairs Report at 34.

[271] Michael H. Cecire, Cong. Rsch. Serv., R46628, COVID-19 and Domestic PPE Production and Distribution: Issues and Policy Options (Dec. 7, 2020).

[272] Karen M Sutter, et al., Cong. Rsch. Serv., R46304, COVID-19: China Medical Supply Chains and Broader Trade Issues (Dec. 23, 2020).

[273] House Comm. On Foreign Affairs Report at 33.

COVID-19 to hoard PPE. All of this occurred while Missouri (and the rest of the world) was left in the dark on the dangers of COVID-19—a darkness caused by Defendants' own actions. "In January and February 2020, . . . the Chinese government organized a large-scale purchase of PPE for China on the global market, *depleting existing supplies in the United States and other countries* such as Australia and Canada."[274] To accomplish this goal, "China's Ministry of Commerce (MOFCOM) . . . called on its regional offices in China and overseas to work with PRC industry associations to prioritize securing [PPE] from global sources and importing these products."[275] Circulars issued by the PRC euphemistically characterized as "facilitating the import" of PPE in fact "directed the national bureaucracy, local governments, and Chinese industry to secure supplies from global markets."[276] Along with these circulars, Defendants "provided a list of 51 medical suppliers and distributors in 14 countries and regions to target in quickly assuring supply."[277] Chinese trade data reflects that "these policies led to steep increases in China's imports of essential PPE and medical supplies," which corresponded with "sharp decreases in China's exports of these critical medical products to the world."[278]

---

[274] Michael H. Cecire, Cong. Rsch. Serv., R46628, COVID-19 and Domestic PPE Production and Distribution: Issues and Policy Options (Dec. 7, 2020) (emphasis added).
[275] Karen M Sutter, et al., Cong. Rsch. Serv., R46304, COVID-19: China Medical Supply Chains and Broader Trade Issues (Dec. 23, 2020).
[276] *Ibid.*
[277] *Ibid.*
[278] *Ibid.*

Breakdowns of Chinese exports and imports demonstrates that Defendants were successful in their efforts to hoard PPE manufactured or for sale in the United States.[279] The Congressional Research Service prepared a table demonstrating the change of China's exports and imports of critical PPE products between January–February 2019 and January–February 2020. The table demonstrates the percentage change of China's exports of these PPE to the United States and world, as well as China's import of critical PPE from the United States and the rest of the world.

---

[279] *Id*. at 13-14.

## Table 2. Change in China's Exports and Imports of Select Medical Products
### YTD 2019 (January-February) vs. YTD 2020 (January-February)

| HS Code | Description | World Exports % Change | World Imports % Change | United States Exports % Change | United States Imports % Change |
|---|---|---|---|---|---|
| 6210.10 | Garments, Made-Up of Fabrics of Felts and Nonwovens (Including Disposable Hospital Gowns and Lab Coats) | -13 | 40,582 | -21 | 297,288 |
| 6307.90* | Made-Up Textile Articles* | -16 | 2,176 | -19 | 1,615 |
| 2939.80 | Alkaloids | 13 | 1,019 | -18 | - |
| 4015.11 | Surgical and Medical Gloves | 4 | 210 | -8 | 93 |
| 3002.14 | Immunological Products | -30 | 197 | 121,302 | 626 |
| 3808.94 | Disinfectants | 46 | 192 | 35 | 155 |
| 6210.30 | Women's or Girls' Protective Garments | -35 | 188 | -48 | -75 |
| 9004.90 | Spectacles and Goggles | -20 | 185 | -12 | 164 |
| 9019.20 | Medical Ventilators and Respiration Apparatus | -20 | 174 | -35 | 209 |
| 2936.26 | Vitamin B12 and Its Derivatives | -6 | 113 | -21 | -33 |
| 6506.10 | Safety Headgear | -15 | 106 | -19 | 277 |
| 4015.19 | Gloves | -13 | 77 | -35 | 514 |
| 8419.20 | Medical, Surgical or Laboratory Sterilizers | -34 | 66 | -70 | 317 |
| 3926.20 | Gloves, Mittens, and Mitts of Plastics | -15 | 66 | -13 | 74 |
| 9025.19 | Thermometers and Pyrometers | -12 | 65 | -16 | 15 |
| 9020.00 | Breathing Appliances and Gas Masks Having Mechanical Parts or Replaceable Filters | -23 | 34 | 27 | 5 |
| 3005.90 | Wadding, Gauze, Bandage, and Similar Articles for Medical, Surgical Purposes | -12 | 27 | -8 | 131 |
| 3004.20 | Medicaments Containing Antibiotics | -11 | 23 | -18 | 69 |
| 4818.90 | Bed Sheets and Similar Household or Hospital Articles of Paper | -12 | 21 | -7 | -26 |
| 6505.00 | Hats and Other Headgear of Textile Fabric | -22 | 16 | -24 | -8 |
| 3702.10 | X-Ray Film in Rolls | -43 | 15 | - | 50 |
| 9022.90 | X-Ray Generators, High Tension Generators, Control Panels and Desks, Screens, Examination Or Treatment Tables, Chairs | -11 | 15 | -17 | 12 |
| 3402.20 | Surface-Active Preparations, Washing Preparations, and Cleaning Preparations | -18 | 8 | -21 | -18 |
| 9022.30 | X-Ray Tubes | -17 | 5 | 115 | -6 |
| 6116.10 | Gloves | -16 | -11 | -21 | -86 |
| 2936.27 | Vitamin C | -39 | -16 | -37 | -95 |
| 9025.11 | Thermometers and Pyrometers | -31 | -22 | -10 | 299 |

<u>Source</u>: CRS, COVID-19: China Medical Supply Chains and Broader Trade Issues (Dec. 23, 2020), p. 13.

The trade data in the table is shocking. In January and February 2020—which includes at least some of the time Defendants affirmatively had knowledge of, but denied, human-to-human transmissibility of COVID-19—China's import of N95 masks and other protective masks (traditionally classified under the tariff category of "Made-Up Textile Articles") from the United States[280] increased by 1,615%. In other words, in January and February 2020 China, one of the world's largest producers of PPE, imported *over sixteen times as many medical masks* from just the United States alone, all while affirmatively misrepresenting its knowledge about both the scope and human-to-human transmissibility of COVID-19. Similarly shocking examples of the scope of Defendants' hoarding of PPE manufactured or for sale in the United States abound. Defendants' imports of disposable hospital gowns from the United States during the period of January and February 2020 increased by over 297,288%, while Defendants' imports of gloves and medical sterilizers from the United States increased by 514% and 317%, respectively. In absolute terms, this had the effect of tens of millions of articles of PPE flowing from the United States to China every week. On January 30, 2020, alone, for example, Defendants "import[ed] 20 million respirators and surgical masks in just 24 hours."[281]

---

[280] The table's reference to "imports" references Chinese imports from the United States and world, and the table's reference to "exports" references Chinese exports to the United States and world.

[281] Keith Bradsher & Liz Alderman, *The World Needs Masks. China Makes Them, but Has Been Hoarding Them*, N.Y. Times (April 2, 2020),

Direct examples of Defendants' campaign to hoard PPE purchased from other countries besides the United States during the early months of the pandemic also abound. One notable fact about Defendants' campaign is Defendants' attempts to mask their initial purchases of PPE. Defendants' "efforts were often implemented through non-traditional buyers, likely in an effort to reduce competition."[282] In Australia, CPC-affiliated companies "had staff secure more than 100 tonnes of equipment and ship it" to the PRC.[283] These shipments, made in February 2020, included 100,000 medical gowns, 1,400,000 pairs of gloves, 3 million protective masks, and 700,000 hazmat suits.[284] All of these actions to hoard PPE occurred "at the direction of the PRC government."[285] Defendants' efforts to ship as much PPE to PRC as possible went so far as to compel Australia to "place[] severe, immediate and indefinite restrictions on all foreign investment bids" during the pandemic.[286]

The trade data from the early days of the pandemic—including the period during which Defendants affirmatively misrepresented their knowledge of the

---

https://web.archive.org/web/20240826064944/https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html.

[282] House Comm. On Foreign Affairs Report at 34

[283] Phillip Coorey, *China Spree Sparks FIRB Crackdown*, Fin. Rev. (Mar. 29, 2020), https://www.afr.com/politics/federal/china-spree-sparks-firb-crackdown-20200329-p54exo.

[284] Kate McClymont, *Second Developer Flew 82 Tonnes of Medical Supplies to China*, Sydney Morning Herald (Mar. 26, 2020), https://www.smh.com.au/national/second-developer-flies-82-tonnes-of-medical-supplies-to-china-20200326-p54e8n.html?_gl=1*loxv4c*_ga*MTM0NzQ3MTQ0LjE3MjQ5NjU4NzE.*_ga_7P81FZJZ1C*MTcyNDk2NTg3MC4xLjEuMTcyNDk2NTg4OC40OC40Mi4wLjA.

[285] House Comm. On Foreign Affairs Report at 34 (emphasis omitted).

[286] Phillip Coorey, *China Spree Sparks FIRB Crackdown*, Fin. Rev. (Mar. 29, 2020), https://www.afr.com/politics/federal/china-spree-sparks-firb-crackdown-20200329-p54exo.

transmissibility of the virus and number of people infected with COVID-19—demonstrates a concentrated effort to hoard PPE for sale in the United States. The U.S. Department of Homeland Security has already concluded as much, and did not mince words: according to a 2020 Department of Homeland Security Economic Security Mission Center report only later declassified, "the Chinese Government *intentionally concealed the severity of COVID-19 from the international community* in early January while it stockpiled medical supplies by both increasing imports [(i.e., purchasing and hoarding medical supplies from other parts of the world)] and decreasing exports [(i.e., nationalization of factories)]."[287] Furthermore, the Federal Government concluded that "the Chinese Government attempted to hide its actions by denying there were export restrictions and obfuscating and delaying provision of this trade data."[288]  The Department of Homeland Security, like Missouri, relied in part on changes in trade data to observed that "China substantially increased its imports of surgical facemasks (278 percent), surgical gowns (72 percent), and surgical gloves (32 percent)" in a manner which "would have [to be] started . . . in early January for those purchases to be reflected in worldwide January export statistics."[289] In fact, according to DHS, Defendants "likely delayed informing the WHO on 20 January 2020, that COVID-19 was a contagion u*ntil after it purchased medical*

---

[287] Econ. Sec. Mission Ctr., Dep't of Homeland Sec., *New Analytic Technique Indicates China Likely Hid Severity of COVID-19 from the International Community While it Stockpiled Medical Supplies* (May 1, 2020), https://www.dhs.gov/sites/default/files/publications/china_and_covid-19.pdf (emphasis added).
[288] *Ibid.*
[289] *Ibid.*

*supplies from abroad.*"[290] The U.S. Department of Homeland Security has concluded, with "a 95 percent probability," that "these increased imports and decreased exports of medical supplies were not within a normal range."[291] Instead, it represented an intentional campaign by Defendants to hoard PPE manufactured or for sale in the United States.

Defendants were also clearly successful in their goal to hoard PPE, to the detriment of Missouri. "As a result of intentional efforts to mislead the global community and delays in releasing factual information about the virus, [Defendants'] cover-up greatly impacted the global response to COVID-19."[292] In fact, Defendants' actions "likely exacerbated medical supply shortages in the United States and other countries" precisely when the supplies were needed most.[293] Missouri addresses these harms at length *infra*.

The effects of Defendants' actions on Missouri (and, indeed, the rest of the country) continued to be felt long after they occurred. Despite later efforts to combat PPE shortages caused by Defendants' hoarding, these shortages "continued to be reported into the summer and fall of 2020."[294] In other words, for at least the first year of the pandemic, Missouri was forced to continue to bear the harms of Defendants' anticompetitive actions.

---

[290] *Ibid* (emphasis added).

[291] *Ibid*.

[292] House Comm. On Foreign Affairs Report at 35.

[293] *Ibid*.

[294] Michael H. Cecire, Cong. Rsch. Serv., R46628, COVID-19 and Domestic PPE Production and Distribution: Issues and Policy Options (Dec. 7, 2020).

**B.      In hoarding PPE and selling defective PPE to Missouri, Defendants breached multiple duties to not engage in fraudulent and deceptive practices in their misrepresentations surrounding the spread of COVID-19 and hoarding of PPE in conjunction with these misrepresentations.**

Defendants breached not only duties to not engage in anticompetitive behavior, but also breached their duties to not engage in fraudulent and deceptive practices. As previously noted, "Missouri's overarching theory is that China leveraged the world's ignorance," including "by manipulating the worldwide personal-protective-equipment market." *Missouri ex rel. Bailey*, 90 F.4th at 939. Part of Defendants' "leverag[ing] [of] the world's ignorance" included aggressively promoting false statements and misrepresentations surrounding COVID.

Defendants owed duties as commercial actors pursuant to state and federal statutory and regulatory laws to not engage in deceptive commercial activity. The MMPA, as first adopted by the legislature in 1967, protects consumers by expanding the common law definition of fraud "to preserve fundamental honesty, fair play and right dealings in public transactions." *Watson v. Wells Fargo Home Mortg., Inc.*, 438 S.W.3d 404, 407 (Mo. 2014). Thus, under Missouri statutory law, it is an unlawful practice for any person to "act, use or employ[] . . . any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri." Mo. Rev. Stat. § 407.020.1. The words "unfair practice" are ""unrestricted, all-encompassing and exceedingly broad." *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 416 (Mo. 2014) (quoting *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo.

2001)).  "[T]he literal words cover every practice imaginable and every unfairness to whatever degree."  *Conway*, 438 S.W.3d at 416 (quoting Ports Petroleum Co., 37 S.W.3d at 240).  Missouri's Attorney General is authorized to enforce the MMPA.  See, e.g., Mo. Rev. Stat. §§ 407.040, .090.

The Federal Trade Commission Act prohibits much of the same.  "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."  15 U.S.C. § 45(a)(1).  It is "unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or (2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics."  *Id.*  § 52.

"[A]n alleged misrepresentation actionable under Section 10(b)—just like a claim for common-law fraud—arises 'where its economic impact is felt, normally the plaintiffs' residence.'"  *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 110 (2d Cir. 2016).  "[T]he locus of an alleged misrepresentation actionable under Section 10(b) is the forum 'where the loss is sustained, not where fraudulent misrepresentations are made.'"  *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016). Defendants breached

their duties when they engaged in massive, large-scale fraud in conjunction with their commercial actions.

Furthermore, Defendants' duties are not limited only to not engaging in fraud or misrepresentation but, in certain medical circumstances, extend to an affirmative duty to disclose. In 2005, the WHO Member States, of which PRC is a member, agreed to amendments of the International Health Regulations (IHR)—a "legally binding instrument that obligates all Member States of the WHO to carry out certain public health functions."[295] Relevant here, "Article 6 requires Member States to inform the WHO of all events occurring within their borders that may constitute a Public Health Emergency of International Concern (PHEIC)."[296] Article 6 lays out the framework for what constitutes a PHEIC.[297] By at least "as early as mid-December, and no later than December 27th"—indeed, as demonstrated above, likely even much earlier than December—Defendants "had enough information to assess [they were] legally obligated to inform the WHO that the outbreak in Wuhan was an event 'that may constitute a Public Health Emergency of International Concern.'"[298] Defendants "failure to notify the WHO about the [COVID-19] outbreak was a violation of Article 6 of the IHR," and Defendants failure to report that the COVID-19 patients they were

---

[295] House Comm. On Foreign Affairs Report at 29.
[296] *Ibid.*
[297] WHO, *WHO Guidance for the Use of Annex 2 of the International Health Regulations (2005)* (Apr. 6, 2010), https://www.who.int/publications/m/item/who-guidance-for-the-use-of-annex-2-of-the-international-health-regulations-(2005).
[298] House Comm. On Foreign Affairs Report at 29–30.

treating met the "clinical definition of SARS" was *also* an independent violation of Article 6 of the IHR.[299]

Defendants' actions to hoard PPE directly profited from Defendants' affirmative misrepresentations and obfuscations of the origin, danger, scope, and transmissibility of COVID-19. As Zuo-Geng Zhang, an epidemiologist at the University of California observed, if Defendants had released data on COVID-19 in a timely manner (or, indeed, had not taken numerous steps to aggressively silence those trying to share data), "there would have been much fewer patients and medical facilities would have been sufficient."[300]

Indeed, by some estimations, Defendants PRC and CPC "could have reduced the number of cases in China by up to 95%, had [Defendants] fulfilled [their] obligations under international law and implemented a public health response at an earlier date."[301] Researchers have confirmed that "the spread of COVID-19 from Hubei to the rest of China was driven primarily by human mobility from Wuhan."[302] Much of this "human mobility from Wuhan," including possibly patient zero in the United States, was almost certainly driven by Defendants' repeated, full-throated, and false denial of both the existence of human-to-human transmissibility of COVID-

---

[299] *Id.* at 31–32

[300] *China Didn't Warn Public of Likely Pandemic for 6 Key Days*, Associated Press (April 15, 2020), https://apnews.com/article/virus-outbreak-health-ap-top-news-international-news-china-clamps-down-68a9e1b91de4ffc166acd6012d82c2f9.

[301] House Comm. On Foreign Affairs Report at 6 (citing Lai, Shengjie, et al., *Effect of Non-Pharmaceutical Interventions for Containing the COVID-19 Outbreak in China*, MedRxiv (2020)).

[302] Benjamin Rader, et al., *Crowding and the Shape of COVID-19 Epidemics*, 26 Nature Medicine 1829 (2020).

19 and the scope of those infected. As Chinese bioethicists have noted, Defendants' silencing of doctors and other medical professionals attempting to warn the world about COVID-19 "impeded early control of the [COVID-19] epidemic."[303] Instead of complying with their legal and moral obligations to share their knowledge with the world, Defendants used their unique knowledge, fraudulently rendered secret to the world through Defendants' repeated falsehoods and aggressive targeting of whistleblowers, to secretly hoard much of the world's supply of PPE before the rest of the world could act. This is laid bare by both Missouri's factual demonstrations, *see supra*, and the written evidence submitted by Missouri. And Defendants' actions in this respect caused significant harm to both the State of Missouri and its citizens.

As noted above, Missouri is not even the first government conclude that the PRC, CPC, and other Defendants fraudulently relied on misrepresentation and falsehoods to obtain commercial advantage in their hoarding of PPE from the United States. As referenced above, the United States Department of Homeland Security has already concluded that "the Chinese Government intentionally concealed the severity of COVID-19 from the international community in early January while it stockpiled medical supplies." Furthermore, "China likely delayed informing the WHO on 20 January 2020, that COVID-19 was a contagion, until after it purchased medical

---

[303] Ruipeng Lei & Renzong Qiu, *Chinese Bioethicists: Silencing Doctor Impeded Early Control of Coronavirus*, The Hastings Center (19 Mar. 2020), www.thehastingscenter.org/coronavirus-doctor-whistleblower/.

supplies from abroad."[304] Defendants "attempted to hide [their] actions" hoarding PPE "by denying there were export restrictions and obfuscating and delaying provision of [PRC] trade data."[305]

This conclusion is buttressed, as noted by the federal government, through "trade data show[ing] that China likely stockpiled medical supplies for domestic use before its official notification to the World Health Organization (WHO) that COVID-19 was contagious."[306] Bulk orders of PPE "generally require two to four weeks to be delivered"—in other words, orders must be placed approximately a month before the import numbers reflect increased imports.[307] "This means the Chinese Government would have started mobilizing its purchasing agents and identifying international suppliers in early January"—if not earlier, in December 2019—"for those purchases to be reflected in worldwide January export statistics."[308] "Global trade data from February [also] shows a significant decline in worldwide imports *from China* of surgical gloves (48 percent), surgical gowns (71) percent), surgical facemasks (48 percent), medical ventilators (45 percent), intubation kits (56 percent), thermometers (53 percent), and cotton balls and swabs (58 percent), among others. "[T]he February worldwide import data likely reflects a January reduction in exports from China as

---

[304] Econ. Sec. Mission Ctr., Dep't of Homeland Sec., *New Analytic Technique Indicates China Likely Hid Severity of COVID-19 from the International Community While it Stockpiled Medical Supplies* (May 1, 2020), https://www.dhs.gov/sites/default/files/publications/china_and_covid-19.pdf

[305] *Ibid.*

[306] *Ibid.*

[307] *Ibid.*

[308] *Ibid.*

90

cargo typically takes over 30 days to ship via ocean freight."[309] The trade data reveals that Defendants were affirmatively seeking to profit from their fraud and misrepresentations, aggressively buying up PPE during the period they were misrepresenting the scope and transmissibility of COVID-19.

*          *          *

The evidence proffered by Missouri demonstrates that Defendants "singlehandedly 't[ook] over factories that ma[d]e masks' and cornered the market before the rest of the world realized what was happening." *Missouri ex rel. Bailey*, 90 F.4th at 939. "Then, when the virus spread and people all over the world became sick, [Defendants] w[ere] able to maintain [their] stockpile and prolong the shortage." *Id.* Missouri has provided sufficient evidence, including trade data, government reports, and statements from both Chinese and American officials, to conclusively establish each of these allegations. This is precisely what the Eighth Circuit held that Missouri must prove to satisfy its hoarding claim—that "China leveraged the world's ignorance about COVID-19" by "manipulating the worldwide personal-protective-equipment market" to its benefit. "The most basic supply-and-demand principles tell us that these market effects depended little, if at all, on variables independent of the [D]efendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id.*; *see also id.* (citing *Ball Memorial Hosp., Inc. v. Mut. Hosp. Ins. Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986) for the prospect "that the ability to 'control output and prices' largely depends on the ability of other market players 'to

---

[309] *Ibid.*

increase their own output in response to a contraction by the defendants.'"). Missouri and its citizens, as "market players[,] simply had no time to respond." *Id*.

As Missouri has demonstrated, Defendants breached multiple duties related to their anticompetitive and fraudulent behaviors in their hoarding of PPE in the early days of the pandemic. Missouri, in other words, has carried its minimal burden to demonstrate Defendants' liability under the FSIA default standard.

### C.   Defendants' anticompetitive and deceptive actions directly caused serious injury to the State of Missouri and its citizens.

The COVID-19 pandemic caused a staggering loss of life around the world, as well as significant economic repercussions still felt to this day. Under-resourced hospitals and communities suffered from a lack of PPE—exacerbating the pandemic's death toll in Missouri and the United States more broadly. Meanwhile, as early as fall 2019, Defendants prepared themselves for what they understood to be a catastrophic health emergency by exponentially slashing their PPE exports by approximately 50% in September of 2019.[310] U.S. hospitals correspondingly reported that critical PPE had gone on backorder by the last months of 2019, leaving the healthcare industry scrambling when the pandemic reached the U.S.[311] By the first quarter of 2020, Chinese mask export volumes were 12.5% down from the first

---

[310] Ashley Rindsberg, *China 'Began Stockpiling PPE Months Before Covid Outbreak,'* The Telegraph (Oct. 8, 2022), https://www.telegraph.co.uk/news/2022/10/08/china-began-stockpiling-ppe-months-covid-outbreak/.

[311] *Ibid.*; *China Began Stockpiling PPE Months Before Notifying World of Covid Outbreak*, Tibetan Review, Oct. 10, 2022, https://www.tibetanreview.net/china-began-stockpiling-ppe-months-before-notifying-world-of-covid-outbreak/.

quarter of 2019, and Chinese protective garment exports were 22.1% down.[312] Critically, "China's market power and its superior knowledge about the virus meant that no one else other than the [D]efendants had to act to create those effects," *Missouri ex rel. Bailey*, 90 F.4th at 939. And Missouri acutely experienced them.

Tragically, COVID-19 ultimately killed over one million Americans,[313] and resulted in astronomical economic loss. This included 21,621 Missourians who died from COVID-19 between 2020 to 2022.[314] The loss of life in Missouri was nothing short of "catastrophic," with COVID-19 as the third leading cause of death in Missouri in 2020, 2021, and the first quarter of 2022.[315]

The pandemic also had great economic effects on Missouri and, indeed, the entire United States. By one estimate, "as of December 2023, the total cost of the COVID-19 pandemic in the U.S. had reached $18.007 trillion."[316] With "the total net value of U.S. wealth in 2022" calculated at "$135.555 trillion," "the total dollar cost of the pandemic thus far," in other words, "is roughly 13 percent of the U.S. wealth."[317] The total value of damages can be calculated from the sum of a number of factors, with researchers including in calculations of the costs of the COVID-19 pandemic

---

[312] Chad P. Brown, *How COVID-19 Medical Supply Shortages Led to Extraordinary Trade and Industrial Policy*, 17 Asian Economic Policy Review 114, 118 (2022), doi: 10.1111/aepr.12359.

[313] Centers for Disease Control & Prevention, Provisional COVID-19 Deaths by Sex and Age (last updated Sept. 2023).

[314] Mo. Dep't Health & Senior Servs., *Missouri COVID-19 Mortality 2020-2022* (Nov. 2023), https://health.mo.gov/data/pdf/20202022-covid-deaths.pdf.

[315] *Ibid.*

[316] Most Catastrophic Pandemic of Our Time Report at 7.

[317] *Ibid.*

including factors such as: (1) the loss of life (calculated through the value of a statistical year of life), totaling $8.625 trillion nationally; (2) lost income, totaling $1.825 trillion; (3) chronic conditions, totaling $6.026 trillion; (4) mental health damages, totaling $1.096 trillion; and (5) educational losses, totaling $0.435 trillion. In other words, the COVID-19 pandemic has inflicted a staggering toll on both the State of Missouri and the United States as a whole.

Prior to the COVID-19 pandemic, China played a role as a major supplier of PPE to both Missouri and the rest of the United States. The Congressional Research Authority has cited data that, in FY2019, China exported $9.8 billion in medical supplies to the United States.[318] This market power meant that any actions taken by Defendants to hoard PPE, including both restricting any exports of PPE and buying up PPE available in the United States, would have a serious, detrimental effect on Missouri. As a House Foreign Affairs Committee report concluded, it is "highly likely that China's nationalization of the manufacturing capacity of foreign companies . . . directly impacted the ability" to acquire PPE on the open market.[319] Or, in the words of the U.S. Congressional Research Service, PPE hoarding by Defendants "led to shortages of critical medical supplies in the United States."[320]

Missouri alleged in its complaint "that China bought up much of the rest of the world's supply of masks." *Missouri ex rel. Bailey*, 90 F.4th at 938. "Those supply

---

[318] Karen M Sutter, et al., Cong. Rsch. Serv., R46304, COVID-19: China Medical Supply Chains and Broader Trade Issues 15 (Dec. 23, 2020).
[319] House Comm. On Foreign Affairs Report at 33.
[320] *Ibid*.

reductions allegedly led to an immediate shortage in Missouri, which then allowed the [D]efendants to enter the market and sell lower-quality masks." *Id*. The evidence supports Missouri's allegations. China is the world's largest exporter of medical masks and eye protection.[321] When COVID-19 began spreading in China in 2019, Defendants both restricted PPE exports and purchased much of the global supply.[322] This had a devastating effect on the U.S., which is "by far" the world's largest importer of masks.[323]

The demonstrated effect of these actions, consequently, was that "[h]ealthcare providers in Missouri" were forced to "pa[y] higher prices for the masks they could find or dealt with shortages that … made it difficult to safely and effectively treat patients with the virus." *Missouri ex rel. Bailey*, 90 F.4th at 938 (internal quotation marks omitted). Missouri healthcare workers reported scouring home improvement and paint stores "to find gloves, masks, and respirators" for on-the-job use and reusing masks even though "[a]ll FDA-cleared N95 respirators are labeled as 'single use,' disposable devices."[324]

---

[321] Jennifer Cohen &Yana van der Meulen Rodgers, *Contributing Factors to Personal Protective Equipment Shortages During the COVID-19 Pandemic*, 141 Preventative Medicine 5 (2020), https://doi.org/10.1016/j.ypmed.2020.106263.

[322] *Id*. at 6.

[323] *Id*. at 5.

[324] Katie Moore, et al., *They're Scared: Doctors Lack Safety Gear in Fight Against Coronavirus in KC Region,* Kansas City Star (Mar. 29, 2020), https://www.kansascity.com/news/coronavirus/article241468706.html; *see also 95 Respirators, Surgical Masks, Face Masks, and Barrier Face Coverings* FDA (Oct. 21, 2024), https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/n95-respirators-surgical-masks-face-masks-and-barrier-face-coverings.

These effects were strongly felt by healthcare providers all over the state. Missouri's official online PPE marketplace reported "[e]normous demand and short supplies of PPE" in 2020.[325] Before the pandemic, CoxHealth, a nonprofit health system in Springfield, Missouri, used "approximately 40 N95 masks per month." At the height of the pandemic, that number "grew up to 1,000 per day," during a time when many of its shipments for masks were "being pulled and redirected."[326] Not only were Missouri health systems like CoxHealth forced to deal with "profiteering middlemen and counterfeits," but the price of N95 masks increased by more than a factor of ten.[327] Despite state spending in the tens of millions on PPE,[328] the situation became so dire that Missouri Governor Michael Parson announced an N95 mask "decontamination system" for health care providers and first responders. These professionals could drop off their masks for decontamination at thirteen sites throughout the State. The system permitted a single mask to be decontaminated up to twenty times.[329] This emergency program had to be instituted by the state to address "the N95 mask shortage" caused by Defendants' hoarding of PPE.[330] The

---

[325] Alex Smith, Coronavirus Safety Gear Leaves Businesses Open to Scams, NPR (June 24, 2020), https://www.kcur.org/2020-06-24/missouris-online-marketplace-for-coronavirus-safety-gear-leaves-businesses-vulnerable-to-scams-price-gouging

[326] *Id.*

[327] *Id.*

[328] Katie Moore, et al., *They're Scared: Doctors Lack Safety Gear in Fight Against Coronavirus in KC Region,* Kansas City Star (Mar. 29, 2020), https://www.kansascity.com/news/coronavirus/article241468706.html.

[329] Press Release, Mo. Gov. Michael L. Parson, Governor Parson Announces Deployment of Decontamination System in Missouri to Assist with N95 Mask Shortage (April 22, 2020), https://governor.mo.gov/press-releases/archive/governor-parson-announces-deployment-decontamination-system-missouri-assist.

[330] *Ibid.*

Missouri Hospital Association was compelled to make public requests for "[a]ny PPE that businesses or individuals have that can be put into the healthcare pipeline" in effort "to address the COVID-19 crisis in Missouri."[331]

Indeed, the problems of PPE shortages in Missouri between March 2020 and (at least) December 2020 were so severe and wide-spread that the existence of such shortages rises to the kind of "'common knowledge'" or "'settled, undisputed, things of life'" which "courts may take judicial notice of." *United States v. Gould*, 536 F.2d 216, 218–19 (8th Cir. 1976) (quoting *Hughes v. United States*, 253 F. 543, 545 (8th Cir. 1918)); *see also Gray v. Texas Co.*, 75 F.2d 606, 611 (8th Cir. 1935) (judicial notice may be taken of "the fund of common knowledge of facts and principles which is possessed by all persons of average intelligence"); *Stahl v. United States Dept. of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records."). The regular, everyday occurrences all people in the State of Missouri experienced—including the effects of COVID-19 and the existence of mask shortages—are exactly the kind of "common knowledge" of which courts may take judicial notice. The legal framework reflects this reality as well. The President issued a public emergency early in COVID-19's presence in the United States, recognizing the threat of COVID-19 and the national importance of "the acquisition of personal protective equipment." Pres. Proc. No. 9994, 85 Fed. Reg. 15337, 2020 WL 1272563 (Mar. 13, 2020). The Eighth Circuit, for its part, observed at the height of the COVID-

---

[331] *Hospital association asks for donation of protective gear*, Houston Herald (Mar. 27, 2020), available at https://houstonherald.com/2020/03/hospital-association-asks-for-donation-of-protective-gear/

19 pandemic that "personal protective equipment (PPE) for healthcare workers is in short supply while concerns remain about the demand" for PPE. *In re Rutledge*, 956 F.3d 1018, 1023 (8th Cir. 2020). Even looking back years later, the Eighth Circuit concluded that consumers (including consumers in Missouri, where the case in question originated) were "desperate" at "the beginning of the pandemic" to acquire PPE. *Fed. Trade Comm'n v. Am. Screening, LLC*, 105 F.4th 1098, 1103 (8th Cir. 2024).

Neither could the State of Missouri, its hospitals, or its citizens reasonably obtain alternative PPE to the equipment hoarded by Defendants without incurring significant additional costs—if they could obtain the equipment at all. Defendants, of course, had already by this point nationalized any U.S. factories within PRC borders that could be reasonably be used to manufacture additional PPE. Although U.S.-based factories could produce PPE, the existing U.S.-based factories were limited, and much of those factories' supplies had already been bought up in Defendants' campaign to hoard PPE from the American market in the early months of the pandemic. Indeed, China purchased "more than $17.5 million worth of face masks, more than $13.6M in surgical garments and more than $27.2M in ventilators" from American companies January through February 2020.[332] As many manufacturing experts noted, "building new production centers or retrofitting manufacturing plants"

---

[332] Dian Zhang, et al., *U.S. Exported Millions in Masks and Ventilators Ahead of the Coronavirus Crisis*, USA Today (April 2, 2020), https://www.usatoday.com/story/news/investigations/2020/04/02/us-exports-masks-ppe-china-surged-early-phase-coronavirus/5109747002/.

in the United States "would take too long" to provide relief to shortages of necessary PPE, "even with a massive outlay of public funds."[333] For example, expanding the "ventilator production industry"—a critical industry at the height of the COVID-19 pandemic—"at best would take a year or longer to do," and "would probably take 18 months."[334] Accordingly, Missourians had to bear the consequences of China's actions by going without PPE, reusing single-use products, or wearing ineffective alternatives such as cloth masks. Each of these inadequate solutions could not replace high-quality PPE, which has been shown to have reduced COVID transmission and deaths.[335]

It is readily apparent that Defendants' actions to hoard PPE directly, and severely, harmed the State of Missouri and its citizens. China was the world's largest supplier of PPE before the pandemic, and its anticompetitive and fraudulent actions to hoard PPE had a clear effect on both the availability and price of PPE for Missouri and its citizens. Defendants' "market power and [their] superior knowledge about the virus meant that no one else other than defendants had to act to create those effects." *Missouri ex rel. Bailey*, 90 F.4th at 939. Rather, "[t]he most basic supply-and-demand principles tell us that these market effects depended little, if at all, on variables independent of the defendants' conduct given the information asymmetry and tight

---

[333] Dan Lamothe, et al., *Making Automakers Churn Out Ventilators Won't be so Easy, Manufacturers and Former Officials Say*, (Mar. 20, 2020), https://www.washingtonpost.com/business/2020/03/20/making-auto-makers-churn-out-ventilators-wont-be-so-easy-manufacturers-former-officials-say/.
[334] *Ibid.*
[335] Erik Rogenstrom, et al., *High-Quality Masks Reduce Covid-19 Infections and Death in the US*, medRxiv (2021).

timeframe that existed at the time." *Id*. (internal quotation marks omitted). And the injuries Defendants inflicted on the State and its citizens as a result of its actions were dire.

## II.     Missouri suffered direct and catastrophic damages because of Defendants' hoarding of PPE.

Missouri suffered a direct injuries as a result of China's PPE hoarding and provides evidence that more than meets its burden of providing "satisfactory" evidence under the relaxed standard for an FSIA default hearing. 28 U.S.C. § 1608(e). The fact that Missouri has satisfied its burden is further buttressed by the nature of the torts committed by Defendant, which include attempts to obfuscate their own role in the damage caused. "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). As discussed above, Defendants have lied about, concealed, and obscured the facts since the discovery of the COVID-19 virus. They lied about and concealed its origins. They buried information about how the virus spreads. They bought up massive amounts of PPE before telling the rest of the world about a danger they knew existed. And they suppressed dissent and forced anyone who even accidently broke from the party line to retract their statements.

The evasive behavior continued once this suit was initiated. Defendants tried to avoid service under the Hague Convention. Once they were served, they failed to

appear, and the Court had to enter default. As a result, Missouri has been unable get any discovery from Defendants that a litigant would normally be able to obtain in order to assist it in proving its claims and ascertaining its damages. Where uncertainty in calculating damages is "caused by the defendant's own wrongful act," "justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced." *Id.* at 565.

### A. Missouri only needs to prove an approximate amount of damages, and any risk of uncertainty falls on Defendants as the wrongful actors.

An FSIA plaintiff can obtain a default judgment when "the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The FSIA also provides that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 1606. Construed together, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 683–84 (D.C. Cir. 2003).

Federal Courts, including the Eighth Circuit, look to *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) for the rule on determining damages in a cases like this. "Damages 'may not be determined by mere speculation or guess,' but they may be subject to 'just and reasonable inference, although the result be only approximate.'" *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 947 (8th Cir. 2007) (quoting *Story Parchment*, 282 U.S. at 563). That is especially true when the defendant's wrongful conduct makes it difficult or impossible to calculate damages with specificity:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment*, 282 U.S. at 563.

The D.C. Circuit has looked to the FSIA's legislative history to inform its rule for calculating damages. "The Report of the House Judiciary Committee . . . observed that "[i]n determining whether the claimant has established his claim or right to relief, it is expected that courts will take into account the extent to which the plaintiff's case depends on appropriate discovery against the foreign state." *Hill*, 328 F.3d at 683–84 (quoting H.R. Rep. No. 94–1487, at 26). The D.C. Circuit relied on that legislative history to impose a "relaxed evidentiary burden on the FSIA plaintiff." *Id*. at 684. A "district court properly could take into account any special problems of proof arising from the defendant's absence." *Id*. at 685. For damages based on future consequences, the D.C. Circuit requires "that the projected consequences are 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate.'" *Id*. And for "past damages," the court should "take into account any special problems of proof arising from the defendant's absence." *Id*.

That approach is consistent with Eighth Circuit precedent on proving default-judgment damages. "Once liability has been established, 'the risk of uncertainty in

calculating damages falls upon the wrongdoer.'" *Comcast of Ill. X*, 491 F.3d at 947 (quoting *Yonkers Branch—NAACP v. City of Yonkers*, 251 F.3d 31, 40 (2d Cir. 2001)). The Eighth Circuit has even reversed a district court decision to award no damages, despite the fact that the plaintiff "presented only an unsound global damage theory." *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992). Once an injury has been proved, the district court's function is "to fashion the remedy best suited to the harm." *Id.* (quoting *Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357, 1360 (8th Cir. 1977)); *see also Al-Birekdar v. Chrysler Grp., LLC*, 499 F. App'x 641, 647 (8th Cir. 2013) (recognizing "that at times the evidence presented regarding economic damages was unclear," but holding that it was sufficient "because the damages need only be approximate"). The D.C. Circuit has similarly admonished a district court to "confine itself to the evidence actually presented and not speculate about what other evidence might have been brought to the court's attention in a two-sided proceeding." *Hill*, 328 F.3d at 685.

When calculating damages stemming from fraudulent and anticompetitive behavior, it is helpful to look to how damages are calculated in the antitrust context. Both here and in the antitrust context, "[t]he vagaries of the marketplace usually deny [the court] sure knowledge of what plaintiff's situation would have been in the absence of the defendant's" wrongful conduct. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) Because of the "difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land," courts are "willing[ ] to accept a degree of

uncertainty." *Id*; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969) ("[D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."). "Therefore, in proving the amount of damage, the antitrust plaintiff need only present evidence from which the fact finder may make a just and reasonable estimate of the damage that is not based on speculation or guesswork." *Nat'l Farmers' Org., Inc. v. Assoc. Milk Producers, Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988), amended, 878 F.2d 1118 (8th Cir. 1989). As in other contexts, the "lower standard" for proving damages in the antitrust context "derives from the principle that a wrongdoer should not profit from the harm occasioned by its act." *Id*. "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim" and "be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Zenith*, 395 U.S. at 124. "[T]he more grievous the wrong done, the less likelihood there would be of a recovery." *Id*.

### B. Missouri has suffered billions of dollars in damages as a result of Defendants' wrongful acts.

The Eighth Circuit has already acknowledged that, so long as evidence supports its claims, Missouri suffered an injury "under two theories." *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 939 n.2 (8th Cir. 2024). First, Missouri can show an injury "under the *parens-patriae* doctrine based on the harms Missourians suffered, including the lack of 'safe[ ] and effective[ ] treat[ment of] patients with the virus.'" *Id*. (citing *Alfred L. Snapp & Son*, 458 U.S. at 602–07; *Lynch v. Nat'l Prescription Adm'rs, Inc.*, 787 F.3d 868, 872 (8th Cir. 2015)). Second,

Missouri can show injury by evidencing "the 'billions of dollars' Missouri [itself] lost in revenue," which the Eighth Circuit called "a more direct economic injury." *Id.* Missouri now presents evidence and expert testimony establishing damages under both of those theories.

### i. Defendants' actions hoarding PPE caused tens of billions of dollars in damages to Missouri's economy.

Dr. Joseph H. Haslag is a Professor and the Kenneth Lay Chair in Economics at the University of Missouri-Columbia. Dr. Haslag has spent decades teaching and researching economics, including 12 years in the Research Department at the Federal Reserve Bank of Dallas and as a visiting scholar at the Federal Reserve Banks of St. Louis, Kansas City, Atlanta, and Cleveland. His work has been published in many prestigious academic journals and cited over 1,690 times.

Missouri has retained Dr. Haslag as an expert in this case, and Dr. Haslag has prepared an expert report calculating the damages Missouri has suffered from Defendants' actions hoarding PPE.[336] Dr. Haslag provides two ways of measuring the economic damages to Missouri. First, he provides evidence of the overall loss to Missouri's Gross Domestic Product ("GDP"). Because GDP is all encompassing, and because it is measured in dollars, GDP is the natural metric for quantifying the total impact of all-encompassing events like the COVID-19 pandemic. Dr. Haslag compares what Missouri's GDP would have been without the pandemic and Defendants' wrongful conduct with what it was and will be in the wake of the

---

[336] Joseph H. Haslag, The Economic Impact of the COVID-19 Pandemic: Quantifying the Damages to the Missouri Economy

pandemic. That analysis will show that the spread of COVID-19 in Missouri, an event directly tied to Defendants' actions, caused Missouri to lose over $23 billion in GDP between the first quarter of 2020 and the second quarter of 2023. When those losses are projected into the future, Missouri will have lost over $500 billion. GDP loss is an appropriate measure of damages under the *parens patriae* theory, because it covers the injury to the Missouri's "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Lynch*, 787 F.3d at 872 (quoting *Alfred L. Snapp & Son*, 458 U.S. at 607). Dr. Haslag's GDP-loss calculation cannot take into account every possible variable related to the effects of Defendants' actions. But, as the Eighth Circuit already recognized, the "most basic supply-and-demand principles tell us that these market effects depended little, if at all, on variables independent of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Missouri ex rel. Bailey*, 90 F.4th at 939 (internal quotation marks omitted). That evidence is "sufficient to show the extent of damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment*, 282 U.S. at 563.

### ii. Defendants' actions hoarding PPE caused tens of billions of dollars in direct lost revenue to the State of Missouri

Dr. Haslag's second measure of damages directly measures the loss of revenue Missouri suffered as a result of the COVID-19 pandemic. Since Missouri collected 3.1 cents per dollar of its GDP, the measure of lost revenue is straightforward. Lost revenue between the first quarter of 2020 and the second quarter of 2023 was over $700 million. And when projected into the future, Missouri will have lost over $15

billion in revenue. While lost revenue fails to capture the full extent of Defendants injury to Missouri, it represents direct economic losses suffered by the State.

### iii. Defendants' actions hoarding PPE injured Missouri through hundreds of millions of dollars in additional direct expenditures by the State on the remaining scarce PPE.

Finally, the State offers to the Court evidence about Missouri's direct expenditures on PPE. During early months of the pandemic, Missouri spent millions more on PPE than it otherwise would have because of Defendants' hoarding. One study by the Society for Healthcare Organization Procurement Professionals (SHOPP) found that the patient per day cost of PPE when following CDC guidelines increased by 1,064%.[337] Another study found that "PPE prices were significantly higher during the pandemic compared to prepandemic prices (Figure 1)."[338] The average cost per unit (CPU) for disposable gowns was 7.5 times higher than prepandemic prices, the average CPU for N95 respirators was 8 times higher, the CPU for face masks was 9 times higher, and gloves averaged 2.5 times higher than prepandemic prices.

---

[337] Letter from SHOPP to All Post-Acute Care Provider Advocates (April 7, 2020), https://cdn.cnn.com/cnn/2020/images/04/16/shopp.covid.ppd.costs.analysis_.pdf.

[338] Ria Patel, et al., *Cost of personal protective equipment during the first wave of the coronavirus disease 2019 (COVID-19) pandemic*, 44 Infection Control & Hospital Epidemiology 1897–99 (2023), https://www.cambridge.org/core/services/aop-cambridge-core/content/view/F7502E36D8D1785DE772317D11B60966/S0899823X23001150a.pdf/cost-of-personal-protective-equipment-during-the-first-wave-of-the-coronavirus-disease-2019-covid-19-pandemic.pdf.



**Fig. 1.** Cost of personal protective equipment per unit in US dollars.

China's PPE hoarding had a controlling impact on the PPE market. China is "the global leader in producing a vast range of manufactured goods, including protective face masks, gloves, and gowns," and "[e]ven with the emergence of other low-cost exporters, China dominates the global market for PPE exports."[339] "According to U.S. trade data, in 2019 China supplied over 70% of U.S. imports of textile face masks, 55% of U.S. imports of protective eyewear, and 55% of U.S. imports of protective garments for surgical and medical use."[340] As the Eighth Circuit already acknowledged, "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create" the PPE shortages and price increases. *Missouri ex rel. Bailey*, 90 F.4th at 939. "The most basic supply-and-demand principles tell us that these market effects depended little,

---

[339] Jennifer Cohen & Yana van der Meulen Rogers, *Contributing factors to personal protective equipment shortages during the COVID-19 pandemic*, 141 Preventative Medicine (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7531934/pdf/main.pdf.

[340] Michael H. Cecire, Cong. Rsch. Serv., R46628, COVID-19 and Domestic PPE Production and Distribution: Issues and Policy Options (Dec. 7, 2020).

if at all, 'on variables independent' of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id.*

Missouri has made some of its spending on COVID-19 expenses publicly available in a database.[341]   The database does not begin collecting data until April, 22, 2020—months after the pandemic began.  Between April 22, 2020 and December 31, 2020, Missouri spent $122,941,819 on PPE-related expenses.[342] Because the line-item characterization of each expense is not always clear, this number is likely under-inclusive of the total amount of public funding spent on PPE.  Large amounts of COVID funding was spent by municipalities and schools without specifying what percentage was spent on PPE, and other expenses are only described as "medical supplies."  Those line-items were excluded from the calculation.  The $122 million sum includes only items that are clearly related to PPE based on the description in the database. As such, this $122 million amount represents the bare minimum (if not less than the bare minimum) the State spent on its PPE during the early days of the COVID-19 pandemic.

The Eighth Circuit recently upheld a multimillion dollar damages award against a domestic PPE manufacture who misrepresented the shipping timeline for its products during the pandemic.  *Fed. Trade Comm'n v. Am. Screening, LLC*, 105 F.4th 1098, 1102 (8th Cir. 2024).  The court held that the PPE manufacturer could be

---

[341] Mo. Accountability Portal, COVID-19 Expenditures (last visited November 22, 2024), https://mapyourtaxes.mo.gov/MAP/Covid19/Expenditures/Agency/ ExpendituresByAgency.aspx
[342] *See* Plaintiff's Submission of Written Evidence Cited in Brief, pp. 745–96.

held liable for damages amounting to its *entire revenue* for products that were not delivered on the advertised timeline. *Id*. The PPE manufacturer was forced to "bear the risk of uncertainty that its deception . . . created, as '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *Id*. at 1105 (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S.251, 265 (1946)). For the same reasons, Defendants should be held accountable for the full amount of the funds spent on PPE expenses during the early months of the pandemic.

That said, using Missouri's direct expenditures on PPE as the measure of damages fails to capture the true nature of the harm to the state. It covers that fact that Missouri had to spend millions more dollars on PPE, but it misses the injuries caused by the PPE that Missouri *could not buy*. Missouri citizens got sick, missed work, and died because of the PPE shortage Defendants caused. Missouri businesses were forced to shut down, and Missouri citizens lost their jobs. The exponential increase in the price of PPE does not get at the injury to "the safety, health or welfare of [Missouri's] citizens." *Lynch*, 787 F.3d at 872. Nor does it begin to touch the "'billions of dollars' Missouri lost in revenue, a more direct economic injury." *Missouri ex rel. Bailey*, 90 F.4th at 940.

The damages Missouri seeks are significant, but they are not based on "mere speculation or guess." *Hill*, 328 F.3d at 684 (quoting *Story Parchment*, 282 U.S. at 563). The evidence presented demonstrates that the damages are a just and reasonable approximation of Missouri's injuries. The damages are reasonable

because they are tied directly to the economic injuries Missouri suffered. The damages are just because of Defendants should not "profit by [their] wrongdoing at the expense of [the] victim." *Zenith*, 395 U.S. at 124.

## **CONCLUSION**

As Missouri has demonstrated at length, the PRC, CPC, and other Defendants engaged in a complex, long-running campaign to hoard PPE from Missouri and its citizens in the early days of the COVID-19 pandemic. Defendants did this while aggressively suppressing and misrepresenting their knowledge of the virus, taking advantage of this fraud and misrepresentation to further Defendants' goals to hoard additional PPE. In the course of these actions, Defendants breached numerous duties related to their anticompetitive behavior, as well as related to their fraud and deceit in their activities. Defendants actions directly harmed the State of Missouri and its citizens. Defendants have refused to appear or otherwise answer for their actions, and each is in default. Missouri has provided sufficient evidence to "satisfactorily" demonstrate both Defendants' liabilities and Missouri's entitlement to damages. As such, Missouri is entitled to a default judgment against Defendants under the FSIA.

For the foregoing reasons, Plaintiff the State of Missouri ex rel. Andrew Bailey respectfully requests that this Court: (1) enter a judgment of liability against all Defendants on Count IV of Plaintiffs' Complaint; (2) issue an award of civil damages against all Defendants in the amount this Court deems fair and appropriate to remedy the damages suffered by Missouri and its citizens by Defendants' actions; (3) order that Defendants pay prejudgment and postjudgment interest on every amount

of damages awarded by this court; and (4) award such further relief as the Court deems just and appropriate.

Date: November 22, 2024                    Respectfully submitted,

ANDREW T. BAILEY
Attorney General

*/s/ Samuel C. Freedlund*
Joshua M. Divine, 69875MO
*Solicitor General*
Samuel C. Freedlund, 73707MO
*Deputy Solicitor General*
Dominic X. Barceleau, 76510MO
*Assistant Attorney General*
Office of the Attorney General
815 Olive St.
Suite 200
St. Louis, Missouri 63101
Phone: (314) 340-4869
Fax (573) 751-1774
Samuel.Freedlund@ago.mo.gov

*Attorneys for Petitioner.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, a true and accurate copy of the foregoing was electronically filed by using the Court's CM/ECF system to be served on all counsel of record entered in the case.

/s/ Samuel C. Freedlund

112