# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, ex rel. ANDREW T. BAILEY, in his official capacity as Missouri Attorney General, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:20-cv-00099-SNLJ |
| v. | ) ) ) | |
| THE PEOPLE'S REPUBLIC OF CHINA, THE COMMUNIST PARTY OF CHINA, NATIONAL HEALTH COMMISSION OF THE PEOPLE'S REPUBLIC OF CHINA, MINISTRY OF EMERGENCY MANAGEMENT OF THE PEOPLE'S REUBLIC OF CHINA, MINISTRY OF CIVIL AFFAIRS OF THE PEOPLE'S REPUBLIC OF CHINA, PEOPLE'S GOVERNMENT OF HUBEI PROVINCE, PEOPLE'S GOVERNMENT OF WUHAN CITY, WUHAN INSTITUTE OF VIROLOGY, and    CHINESE ACADEMY OF SCIENCES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S SUPPLEMENTAL BRIEFING IN SUPPORT OF HIS FOREIGN SOVEREIGN IMMUNITY ACT DEFAULT HEARING BRIEFING

Plaintiff the State of Missouri, ex rel. Andrew Bailey, in his official capacity as Missouri Attorney General ("Plaintiff"), pursuant to this Court's December 6, 2024 order, respectfully submits the following supplemental briefing in support of his Foreign Sovereign Immunity Act Default Hearing Briefing.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. ii

TABLE OF AUTHORITIES .........................................................iv

INTRODUCTION ................................................................... 1

ARGUMENT ....................................................................... 2

I.  **Plaintiff's Evidence Satisfies Each Element Of Several Federal And State Causes Of Action Prohibiting Defendants' Deceptive And Anticompetitive Behavior.** ........................................................ 2

A.  Missouri can recover for harm it experienced to state revenue and from heightened PPE prices, 15 U.S.C. § 15, because Defendants' actions have violated 15 U.S.C. § 2. ................................................ 4

  i.  Missouri is an aggrieved party that can sue to recover for harm to its state revenue (attributable to China's hoarding of PPE worsening the pandemic and shutdowns) and harm caused by the inflated costs of PPE that occurred because of the hoarding. ........................................... 4

  ii.  Plaintiff has demonstrated each element of 15 U.S.C. § 2 ................... 7

B.  Missouri can sue on behalf of the People of Missouri, 15 U.S.C. § 15c, to obtain treble damages for China's violation of the Sherman Act, 15 U.S.C. § 2. ........................................................................... 11

  i.  15 U.S.C. § 15c(a)(1) provides a statutory cause of action by which Plaintiff, as the Missouri Attorney General, may recover monetary damages suffered by the people of Missouri as a result of Defendant's actions. ..................................................................... 11

  ii.  Plaintiff has demonstrated each element of 15 U.S.C. § 2 ................. 12

C.  Missouri can sue under state law, Mo. Rev. Stat. § 416.061, to recover damages suffered by the State of Missouri and its political subdivisions

and public agencies because China's actions have violated state antitrust law, Mo. Rev. Stat. § 416.031.1–2. ............................................................... 13

**II. China's hoarding of PPE has directly inflicted significant monetary harm upon the State of Missouri and its citizens which Plaintiff may recover, either directly or as *parens patriae*, in this action................. 15**

    A. Dr. Haslag's methodology and calculation of damages suffered by the State of Missouri and its citizens from China's hoarding of PPE. ............. 18

    B. The damages suffered by the State of Missouri and its citizens from China's hoarding of PPE are significant. .................................................... 23

**CONCLUSION ........................................................................................... 26**

**CERTIFICATE OF SERVICE ............................................................. 27**

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Bigelow v. RKO Radio Pictures,*
   327 U.S. 251 (1946) ................................................................................. 19

*Burnett v. National Association of Realtors,*
   No. 4:19-cv-00332, 2022 WL 17741708 (W.D.Mo. Dec. 16, 2022) ......................... 13

*C. Bennett Bldg. Supplies, Inc. v. Jenn Air Corp.,*
   759 S.W.2d 883 (Mo. App. E.D. 1988) ................................................................. 13

*Chesapeake & Oil R. Co. v. Kelly,*
   241 U.S. 485 (1916) ................................................................................. 6

*Comcast of Ill. X v. Multi-Vision Elecs., Inc.,*
   491 F.3d 938 (8th Cir. 2007) ................................................................. 15

*Concord Boat Corp. v. Brunswick Corp.,*
   207 F.3d 1039 (8th Cir. 2000) ................................................................. 8

*Fed. Trade Comm'n v. Am. Screening, LLC,*
   105 F.4th 1098 (8th Cir. 2024) ................................................................. 19

*Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.,*
   586 S.W.2d 310 (Mo. banc 1979) ................................................................. 14

*Guirlando v. T.C. Ziraat Bankasi A.S.,*
   602 F.3d 69 (2d Cir. 2010) ................................................................. 9

*Hill v. Republic of Iraq,*
   328 F.3d 680 (D.C. Cir. 2003) ................................................................. 15

*InfoDeli, LLC v. Western Robidoux, Inc.,*
   No. 4:15-cv-00364, 2020 WL 1855289 (W.D.Mo. Feb. 21, 2020) ......................... 13

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC,*
   962 F.3d 1015 (8th Cir. 2020) ................................................................. 8

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
   451 U.S. 557 (1981) ................................................................. 16

*Jones & Laughlin Steel Corp. v. Pfeifer,*
   462 U.S. 523 (1983) ................................................................. 6

*Missouri ex rel. Bailey v. People's Republic of China*,
  90 F.4th 930 (8th Cir. 2024) ................................................................ *passim*

*Nat'l Farmers' Org., Inc. v. Assoc. Milk Producers, Inc.*,
  850 F.2d 1286 (8th Cir. 1988) ...................................................... 16

*Owens v. Republic of Sudan*,
  826 F.Supp.2d 128 (D.D.C. 2011) ................................................ 25

*Par v. Wolfe Clinic, P.C.*,
  70 F.4th 441 (8th Cir. 2023) ........................................................ 7

*Shourd v. Government of Islamic Republic of Iran*,
  Case No. 22-cv-1309, 2024 WL 4346330 (D.D.C. Sep. 30, 2024) .......... 25

*Sitzen v. National Associaton of Realtors*,
  420 F.Supp.3d 903 (W.D. Mo. 2019) ............................................ 14

*State of Ga. v. Pennsylvania R. Co.*,
  324 U.S. 439 (1945) ...................................................................... 5

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) .................................................................... 15

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) .................................................................. 7, 9

*Yonkers Branch—NAACP v. City of Yonkers*,
  251 F.3d 31 (2d Cir. 2001) .......................................................... 16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) .................................................................... 16

**Statutes**

15 U.S.C. § 2 ........................................................ ii, 4, 7, 10, 11, 12

15 U.S.C. § 7a(6) .......................................................................... 5

15 U.S.C. § 12(a) ...................................................................... 4, 5

15 U.S.C. § 15 ...................................................... ii, 4, 5, 7, 25

15 U.S.C. § 15(a) .......................................................................... 4

15 U.S.C. § 15(b)(1) .................................................................... 5

15 U.S.C. § 15c ...................................................................................ii, 4, 5, 11, 12, 25

15 U.S.C. § 15c(a)(1) ......................................................................ii, 4, 11, 12

15 U.S.C. § 15c(a)(2) ............................................................................... 12

28 U.S.C. § 1605(a)(2) ............................................................................... 4

Mo. Rev. Stat. § 416.031.1–2 ......................................................iii, 12, 13, 14

Mo. Rev. Stat. § 416.061 .........................................................................ii, 12

Mo. Rev. Stat. § 416.21(2) ........................................................................ 14

**Other Authorities**

Limbaugh, *Historic Origins of Anti-Trust Legislation*,
    18 Mo. L. Rev. 215 (1953) ...................................................................... 14

## INTRODUCTION

Plaintiff provides supplemental briefing in support of his FSIA Default Hearing Brief. Specifically, pursuant to the leave granted in this Court's December 6, 2024 order, Plaintiff provides supplemental briefing on two topics regarding Plaintiff's right to relief.

First, Missouri provides supplemental briefing on the elements of federal and state statutory causes of action by which Plaintiff may recover on behalf of the State of Missouri and its citizens. In addition to the common-law claim that Missouri already briefed at length, China's[1] hoarding of PPE violated at least two federal and state statutes: Section 2 of the Sherman Antitrust Act, which prohibits acquisition or maintenance of monopoly power; and Missouri antitrust law, which carries a similar prohibition. Attorney General Bailey is authorized to enforce these causes of action (1) on behalf of the State itself (including seeking to recover losses of tax revenue and being forced to pay inflated prices for products due to China's monopolization); (2) on behalf of the State's localities; and (3) as parens patriae on behalf of the People of Missouri.

Second, Missouri provides additional calculations specifically demonstrating the degree of damages suffered by the State of Missouri and its citizens from China's hoarding of PPE—as opposed to damages from COVID more generally. In addition

---

[1] The Eighth Circuit has concluded that each of the Defendants is "part of China's official government, a 'political subdivision,' or a governmental 'agency or instrumentality.'" *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 935 (8th Cir. 2024). For ease of reference, Plaintiff therefore uses the term "China" to refer collectively to all Defendants.

to measurably higher costs the State had to pay for PPE, Missouri's expert witness has calculated how much the COVID-19 infection rate increased because of China's hoarding of PPE. Based on that increased infection rate, Missouri's expert witness is able to calculate how much PPE hoarding worsened national lockdowns, which harmed Missouri's economy and let to a decrease in the net tax revenue Missouri collected (and will continue to collect) each year. Missouri's expert is thus able to isolate, with reasonable precision, the discounted value of the net amount of tax revenue the State of Missouri itself lost due to China's PPE hoarding, as opposed to net tax revenue or GDP losses from COVID more generally. The expert's most conservative calculation is $8.04 billion. Because federal and state law require awarding treble damages, the monetary harm recoverable by Missouri from China's actions hoarding PPE is over $24 billion.

China engaged in a complex, long-running campaign to hoard PPE from Missouri and its citizens during the COVID-19 pandemic. China took these actions to hoard control of, and monopolize production of, PPE while it was at the same time aggressively suppressing and misrepresenting its knowledge of the virus. Missouri has provided sufficient evidence to "satisfactorily" demonstrate China's liability, and is entitled to a default judgment against all Defendants under the FSIA.

## ARGUMENT

**I.    Plaintiff's evidence satisfies each element of several federal and state causes of action prohibiting Defendants' deceptive and anticompetitive behavior.**

2

Count IV of Plaintiff's Complaint alleges that Defendants harmed Missouri and its residents by hoarding PPE during a time when Defendants had specialized knowledge of the COVID-19 pandemic.  Plaintiff's FSIA Default Hearing Brief addresses at length, among other things, Defendant's violation of the common-law tort of hoarding and establishes each common-law tort element.  *See* FSIA Default Hearing Brief at 70–100.  Plaintiff incorporates herein his briefing on the common-law tort claim by reference.  In this supplemental brief, Plaintiff provides additional briefing on federal and state statutory causes of action, under each of which Plaintiff may recover damages against all Defendants.

As the Eighth Circuit found, Plaintiff's hoarding claim alleges (and Plaintiff has now demonstrated in his FSIA Default Hearing Brief) that China "hoarded [PPE]" and "took over factories that made masks on behalf of American companies, which essentially halted the export of high-quality masks to the United States." *Bailey*, 90 F.4th at 938 (internal quotation marks and brackets omitted).  These allegations "identify classic anticompetitive behavior, except on a country-wide scale."  *Id*.  "[D]efendants' anticompetitive actions were commercial in nature," as "[t]aking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of a private player in the market."  *Id*. (internal citations and quotation marks omitted).  What's more, Defendants "leveraged the world's ignorance about COVID-19" to "manipulate[e] the worldwide personal-protective-equipment market." *Id*. at 939.

3

Missouri is entitled to prevail under at least three different statutory causes of action.  First, Missouri has a federal statutory cause of action for the discrete harm that Missouri incurred to its net revenue collected and because of heightened purchasing prices it was forced to pay for PPE.  Second, Missouri can recover, under federal law, as parens patriae for harm experienced by the people of Missouri.  Third, Missouri may recover under state antitrust laws breached by China's hoarding of PPE.

### A.    Missouri can recover for harm it experienced to state revenue and from heightened PPE prices, 15 U.S.C. § 15, because Defendants' actions have violated 15 U.S.C. § 2.

Missouri both has a cause of action for harm it experienced to its revenue and because of the inflated prices it had to pay, and Missouri has satisfied all the elements of 15 U.S.C. § 2.

### i.    Missouri is an aggrieved party that can sue to recover for harm to its state revenue (attributable to China's hoarding of PPE worsening the pandemic and shutdowns) and harm caused by the inflated costs of PPE that occurred because of the hoarding.

Plaintiff, on behalf of the State of Missouri, has a clear federal statutory vehicle, 15 U.S.C. § 15, by which he may recover direct damages suffered by Missouri as a result of China's unlawful hoarding and monopolization of PPE.  Section 15 provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue to recover "threefold the damages by him sustained."  For the purpose of the relevant antitrust statutes, "person" is defined broadly "to include corporations and associations existing under

4

or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." [2]  15 U.S.C. § 12(a); *see also* 15 U.S.C. § 7a(6) (incorporating the definition of the term "person" contained in §12(a)); 15 U.S.C. § 15(b)(1) (recognizing that a foreign state may be treated as a "person" under antitrust law and limiting the recovery of plaintiff foreign states). The Supreme Court has recognized that a state, "suing for her own injuries, is a 'person'" within the meaning of federal antitrust statutes and "is authorized to maintain suits to restrain violations of the anti-trust laws or to recover damages by reason thereof." *State of Ga. v. Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945). Plaintiff is, furthermore, expressly empowered under Missouri law to not only recover any damages suffered directly by the State of Missouri, but also any damages suffered by each Missouri political subdivision and political agency as a result of China's hoarding of PPE.  More specifically, § 416.061.3 empowers Plaintiff, as the Attorney General of Missouri, to seek damages on behalf of, "besides the state and any of its

---

[2] 15 U.S.C. § 15 (but not 15 U.S.C. § 15c, addressed *supra*) includes a provision governing the venue of actions that may be brought under that statute. *See* 15 U.S.C. § 15(a).  When a defendant is a foreign state or instrumentality of a foreign state, however, the Foreign Sovereign Immunity Act ("FSIA") provides broad jurisdiction to "courts of the United States or of the States" in "any case" in which "the action is based upon a commercial activity" that "causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).  This interaction through the FSIA, creating different venue rules when a foreign state or its instrumentality is sued, makes sense.  Without the FSIA providing appropriate venue for suits against a foreign state, foreign states could shield themselves from having claims brought against them in *any* U.S. court under 15 U.S.C. § 15 (but not 15 U.S.C. 15c) by limiting where the foreign state's agents could be found.  The statute's express inclusion of foreign states in the definition of "person" demonstrates that this cannot be the case, and that the FSIA interacts with 15 U.S.C. § 15 to provide a venue for claims brought against foreign states.

political subdivisions or public agencies, all other political subdivisions, school districts and municipalities within the state . . . in actions brought in the federal courts under any federal statute pertaining to antitrust, trade regulation, restraint of trade or price fixing activities."

As Plaintiff addresses below—as well as in his FSIA Default Hearing Brief, and in the expert reports attached to the FSIA Default Hearing Brief and in this supplemental brief—Missouri and its political bodies have suffered significant direct damages from China's hoarding of PPE. These direct damages to the State can be measured through two, distinct categories. The first category of direct damages to the State is the amount of harm Missouri's PPE hoarding had on Missouri's specific net general revenue collected by the State (discounted to account for the time value of money). China's unlawful hoarding measurably worsened harm to Missouri's economy from the pandemic, directly causing measurable, decreased revenue to the State. The result is a concrete harm to the State. As laid out in greater detail below, the total discounted value of the net general revenue Missouri lost causally tied to China's hoarding of PPE (as opposed to the pandemic in general) amounts to—under the most conservative estimate—$8.4 billion in lost revenue. The Eighth Circuit has stated that these "'billions of dollars' Missouri lost in revenue" from China's hoarding of PPE constitute a "direct economic injury" to the State. *Bailey*, 90 F.4th at 939 n.2.

Missouri is entitled to recoup not only past revenue harm tied to China's PPE hoarding, but also future revenue harm tied to China's past hoarding activities. It is "settled" that a party is entitled to the discounted value of "ascertained future

6

benefits" lost by the plaintiff as a result of a defendant's unlawful action. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 (1983) (citing *Chesapeake & Oil R. Co. v. Kelly*, 241 U.S. 485, 490 (1916)).

The second category of direct damages to the State are the hundreds of millions of dollars of direct state expenditures to purchase some of the remaining scarce PPE at artificially heightened prices. *See* FSIA Default Hearing Brief at 107–11. China's hoarding of PPE significantly drove up the price Missouri was required to pay to acquire PPE, with costs of certain items (such as face masks) reaching nine times higher than before China's hoarding. Indeed, as one study by the Society for Healthcare Organization Procurement Professionals found, the patient per day cost of PPE when following CDC guidelines increased by 1,064%. *Id.* at 107. Missouri's own—likely underinclusive—publicly available data shows that, between April 22, 2020 and December 31, 2020, Missouri spent $122,941,819 on PPE-related expenses—much more than would have occurred absent China's hoarding. *Id.* at 109. These direct expenditures, of hundreds of millions of dollars in expenses, constitute yet another independent category of direct injury suffered by the State of Missouri.

### ii.    Plaintiff has demonstrated each element of 15 U.S.C. § 2

As stated above, Missouri can sue China for "anything forbidden in the antitrust laws." 15 U.S.C. § 15. China has violated Section 2 of the Sherman Act, which makes it unlawful to "monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. The Eighth Circuit uses a two-part test for Section 2 monopolization claims. "Monopolization requires: '(1)

the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 446 (8th Cir. 2023) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). And the Eighth Circuit has already held that China's hoarding of PPE from the start of the COVID-19 pandemic, if established by sufficient factual basis by Plaintiff, satisfies each of those elements. *Bailey*, 90 F.4th at 938–39.

First, the Eight Circuit found that Missouri's claim (if backed by sufficient evidence) establishes that China has monopoly power in the worldwide market for PPE. The court explained that "China 'bought up much of the rest of the world's supply' of masks," which "led to an immediate shortage" and "allowed [China] to enter the market and sell lower-quality masks." *Id.* at 938 (quoting Doc. [1], ¶ 132). And because of China's unilateral actions, Missourians "paid higher prices for the masks they could find or dealt with shortages that . . . made it difficult to 'safely and effectively treat[ ] patients with the virus.'" *Id.* (quoting ECF 1, at ¶ 138). "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects." *Id.* at 939. That is a textbook example of monopoly power. *See Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1024 (8th Cir. 2020) ("Monopoly power is defined as the power to control prices or exclude competition.") (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000)). Plaintiff has, furthermore,

provided extensive evidence in its FSIA Default Hearing Brief of China's possession of monopoly power in the PPE market. *See, e.g.*, FSIA Default Hearing Brief at 76–84, 90–2, 94–100. This uncontroverted evidence establishes the first factor the Eighth Circuit considers.

Second, the Eighth Circuit's opinion found that Missouri's claim (if backed by sufficient evidence) establishes that China's monopoly power resulted from "classic anticompetitive behavior," not legitimate business practices or luck. *Bailey*, 90 F.4th at 938. "The most basic supply-and-demand principles tell us that these market effects depended little, if at all, 'on variables independent' of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id.* at 939 (quoting *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010)). China "singlehandedly 't[ook] over factories that ma[d]e masks' and cornered the market before the rest of the world realized what was happening." *Id.* at 939 (quoting ECF 1 at 131). And "when the virus spread and people all over the world became sick, China was able to maintain its stockpile and prolong the shortage." *Id.* China managed to exploit its monopoly power not because of "a superior product, business acumen, or historic accident," but because China concealed, suppressed, and lied about the coronavirus. *Grinnell Corp.*, 384 U.S. at 571. Far from being a historic accident, China exploited the global PPE market during the pandemic in a manner that amounts to a historic (and deadly) deception. Again, Plaintiff's FSIA Default Hearing Brief provides extensive evidence of China's anticompetitive and monopolistic behaviors, including China's actions directly suppressing and

misrepresenting the existence, and then transmissibility, of the COVID-19 virus. *See, e.g.*, FSIA Default Hearing Brief at 32–55; 75–84. As the U.S. Department of Homeland Security concluded, in unflinching terms, "the Chinese Government intentionally concealed the severity of COVID-19 from the international community . . . while it stockpiled medical supplies." *Id*. at 83.

The American Bar Association's model jury instructions for 15 U.S.C. § 2 claims break the elements down in more detail, but the outcome is the same.   The ABA describes the elements of a Section 2 claim as follow:

> (1) the alleged market is a valid antitrust market;
> (2) defendant possessed monopoly power in that market;
> (3) defendant willfully acquired or maintained monopoly power in that market by engaging  anticompetitive conduct;
> (4) defendant's conduct occurred in or affected interstate [or foreign] commerce; and
> (5) plaintiff was injured in its business or property because of defendant's anticompetitive conduct.

Am. Bar Ass'n, Model Jury Instructions in Civil Antitrust Cases § 3.A.1 (2016) (alteration in original).

Again, the Eighth Circuit's opinion shows that each of these elements is satisfied.   First, the court acknowledged that there is a "worldwide personal-protective-equipment market." *Bailey*, 90 F.4th at 939.  Second and third, for the reasons discussed above, China possessed monopoly power—the power to control prices or exclude competition—in that market and obtained that monopoly power through "classic anticompetitive behavior . . . on a country-wide scale." *Id*. at 938. Fourth, China's anticompetitive conduct affected foreign commerce because it (1) "led to an immediate shortage in Missouri, which then allowed the defendants to enter

10

the market and sell lower-quality masks," (2) required "[h]ealthcare providers in Missouri" to pay "higher prices for the masks they could find," and (3) allowed China "to maintain its stockpile and prolong the shortage" while "the virus spread and people all over the world became sick." *Id.* Fifth, Missouri was injured by China's anticompetitive hoarding to the tune of "'billions of dollars' Missouri lost in revenue" and hundreds of millions in direct PPE expenditures. *Id.* at 939 n.2; *see also* Section II.B, supra. Plaintiff's FSIA Default Hearing Brief, combined with this supplemental briefing, provides uncontroverted evidence clearly establishing each element.

The evidence Missouri submitted to the Court confirms what was plead in the Complaint and more. China's abuse of its "market power and its superior knowledge about the virus" was "classic anticompetitive behavior," and Missouri suffered billions of dollars in injuries as a result. Missouri has satisfied each element of 15 U.S.C. § 2, and may recover damages under this statutory claim.

**B.    Missouri can sue on behalf of the People of Missouri, 15 U.S.C. § 15c, to obtain treble damages for China's violation of the Sherman Act, 15 U.S.C. § 2.**

Missouri both has a cause of action to sue on behalf of the People of Missouri, and has satisfied all the elements of 15 U.S.C. § 2.

> ### i.    *15 U.S.C. § 15c(a)(1) provides a statutory cause of action by which Plaintiff, as the Missouri Attorney General, may recover monetary damages suffered by the people of the State of Missouri as a result of Defendant's actions.*

15 U.S.C. § 2 prohibits, in relevant part, any attempt to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to

11

monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 15c(a)(1) in turn expressly provides State Attorneys General a cause of action to sue on behalf of the residents of their States:

> Any attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any district court of the United States having jurisdiction of the defendant, to secure monetary relief as provided in this section for injury sustained by such natural persons to their property by reason of any violation of sections 1 to 7 of this title.

The only restrictions on the scope of monetary relief which Plaintiff may recover on behalf of the citizens of Missouri are that the Court "shall exclude from the amount of monetary relief" any amount of monetary relief "which duplicates amounts which have been awarded for the same injury"; or "which is properly allocable" to "natural persons who have excluded their claims" (not relevant here) or "any business entity." 15 U.S.C. § 15c(a)(1). Furthermore, upon a finding of damages, Plaintiff is again entitled to recover from Defendants "monetary relief threefold the total damage sustained." 15 U.S.C. § 15c(a)(2).

### ii. *Plaintiff has demonstrated each element of 15 U.S.C. § 2*

As addressed above, Plaintiff has sufficiently satisfied each element of 15 U.S.C. § 2 to entitle Missouri to relief. For the same reasons, Plaintiff has satisfied each element of a *parens patriae* 15 U.S.C. § 2 claim brought on behalf of the people of Missouri under 15 U.S.C. § 15c.

**C.    Missouri can sue under state law, Mo. Rev. Stat. § 416.061, to recover damages suffered by the State of Missouri and its political subdivisions and public agencies because China's actions have violated state antitrust law, Mo. Rev. Stat. § 416.031.1–2.**

Missouri both has a cause of action under state law to sue for China's hoarding of PPE, and has satisfied all the elements of that cause of action.

Plaintiff has an additional independent statutory basis for recovery against China under Missouri's state laws prohibiting monopolistic and anticompetitive behavior. Section 416.031.1–2 of the Missouri Revised Statutes provides, in relevant part, that it is unlawful to monopolize, conspire to monopolize, or restrain trade:

> (1) "[e]very contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful"; and
> (2) "[i]t is unlawful to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce in this state."

Plaintiff, as the Attorney General of the State of Missouri, has a duty under § 416.061.2 to "enforce the provisions of sections 416.011 to 416.161." As with federal antitrust laws, Plaintiff is further empowered, under § 416.061.3, to "represent, besides the state and any of its political subdivisions or public agencies, all other political subdivisions, school districts and municipalities within the state in suits to enforce the provisions of sections 416.011 to 416.161." Claims brought under § 416.031 may be heard in federal court alongside federal antitrust and anticompetitive claims brought under Chapter 15 of the U.S. Code. *See, e.g. Burnett v. National Association of Realtors*, No. 4:19-cv-00332, 2022 WL 17741708, at *5 (W.D.Mo. Dec. 16, 2022) (bringing both federal and state antitrust claims); *InfoDeli,*

13

*LLC v. Western Robidoux, Inc.*, No. 4:15-cv-00364, 2020 WL 1855289, at *3 (W.D.Mo. Feb. 21, 2020) (same).

Sections 416.011 to 416.161 may form a valid basis for a state law antitrust claim even in instances where the state law claim "regulates or affects interstate commerce." C. *Bennett Bldg. Supplies, Inc. v. Jenn Air Corp.*, 759 S.W.2d 883, 889 (Mo. App. E.D. 1988).  The effect of § 416.031 is to "make unlawful every contract, combination or conspiracy in restraint of trade or commerce," to "make[] unlawful monopolization, attempted monopolization, and conspiracy to monopolize trade or commerce," and to "make[] unlawful specified acts that substantially lessen competition or tend to create a monopoly." *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, 312–13 (Mo. banc 1979); *see also* Limbaugh, *Historic Origins of Anti-Trust Legislation*, 18 Mo. L. Rev. 215 (1953).  The statute adopts the broadest definition of the term "person," "appl[ying] to 'any individual, corporation, firm, partnership, incorporated or unincorporated association o[r] any other legal or commercial entity.'" *Fischer*, 586 S.W.2d at 313 (quoting Mo. Rev. Stat. § 416.21(2)).

The Missouri Supreme Court has not adopted model jury instructions for a violation of § 416.031.  Section 416.141 provides, however, that § 416.031 (along with the rest of §§ 416.011–161) "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes."  Consequently, federal courts analyzing a claim brought under § 416.031 apply the same standard as is applied to equivalent federal prohibitions contained in the Sherman Antitrust Act.

14

*See, e.g. Sitzen v. National Associaton of Realtors*, 420 F.Supp.3d 903, 919 (W.D. Mo. 2019) (applying the same standard for a claim brought under § 416.031 as the plaintiffs' "federal antitrust claims."). As addressed *supra*, Plaintiff has established each element of his federal antitrust claims. Construing § 416.031 "in harmony" with federal antitrust provisions, Plaintiff has also demonstrated entitlement to relief under § 416.031.

## II. China's hoarding of PPE has directly inflicted significant monetary harm upon the State of Missouri and its citizens which Plaintiff may recover, either directly or as *parens patriae*, in this action.

In his FSIA Default Hearing Briefing and attached exhibits, Plaintiff demonstrated how China's anticompetitive, monopolistic, and deceptive actions directly caused serious injury to the State of Missouri and its citizens. *See, e.g.,* Plaintiff's Foreign Sovereign Immunity Act Default Hearing Brief ("FSIA Default Hearing Brief"), ECF 79 at 92–111. Plaintiff now provides the Court with additional, supplemental briefing by which the Court may calculate the scope of the significant monetary harm causally tied to China's hoarding activities.

The evidentiary standard here is relaxed for several reasons. First, the evidentiary standard is relaxed for default judgments, as an "FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 683–84 (D.C. Cir. 2003). In default cases, a damages calculation "may be subject to 'just and reasonable inference, although the result be only approximate.'" *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 947 (8th Cir. 2007) (quoting *Story Parchment Co. v. Paterson*

*Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).  That is especially true in cases like this where the nature of the defendant's wrongful conducted makes it difficult to calculate damages with specificity.  Thus, the D.C. Circuit has placed only a "relaxed evidentiary burden on the FSIA plaintiff."  *Hill*, 328 F.3d at 684.  And the Eighth Circuit has explained that, "[o]nce liability has been established, 'the risk of uncertainty in calculating damages falls upon the wrongdoer.'" *Comcast of Ill. X*, 491 F.3d at 947 (quoting *Yonkers Branch—NAACP v. City of Yonkers*, 251 F.3d 31, 40 (2d Cir. 2001)).

Second, the evidentiary standard is relaxed in cases involving claims of anticompetitive behaviors or market manipulation.  As the Supreme Court has explained, a relaxed standard is necessary where ""[t]he vagaries of the marketplace usually deny [the court] sure knowledge of what plaintiff's situation would have been in the absence of the defendant's" wrongful conduct.  *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).  In such cases, the plaintiff "need only present evidence from which the fact finder may make a just and reasonable estimate of the damage that is not based on speculation or guesswork."  *Nat'l Farmers' Org., Inc. v. Assoc. Milk Producers, Inc.*, 850 F.2d 1286, 1293 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989).  "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim" and "be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969).

16

Dr. Joseph H. Haslag is a Professor and the Kenneth Lay Chair in Economics at the University of Missouri-Columbia. *See* FSIA Default Hearing Brief at 105. Dr. Haslag has spent decades teaching and researching economics, including 12 years in the Research Department at the Federal Reserve Bank of Dallas and as a visiting scholar at the Federal Reserve Banks of St. Louis, Kansas City, Atlanta, and Cleveland. *Id*. His work has been published in numerous prestigious economics journals and has been cited over 1,690 times. *Id*. Missouri has retained Dr. Haslag as an expert in this case, and Dr. Haslag previously prepared an expert report providing calculations for damages Missouri has suffered. *Id*.; *see also id*. at Ex. 7. Attached as Exhibit 1 to this Supplement Brief is an additional, supplemental report prepared by Dr. Haslag offering further calculations of damages suffered by the State of Missouri and its people causally tied to China's hoarding of PPE.

In his supplemental report, Dr. Haslag provides numerical formulae, supplemented with academic and governmental authorities, "identify[ing] the . . . quantitative impact that China's PPE supply hoarding had" on the State of Missouri, its economy, and its citizens. Ex. 1 at 2. In other words, Dr. Haslag's supplemental report provides further direct evidence of damages specifically tied to PPE hoarding (as opposed to COVID more generally), quantifying "the mechanisms through which PPE hoarding affects economic activity" through calculations measuring "the difference between" economic activity and Missouri's revenue "without PPE hoarding," and "the isolated economic activity that is attributed to PPE hoarding." *Id*. (emphasis omitted). Ultimately, Dr. Haslag's supplemental report provides a

range of calculations for economic damages suffered by the State of Missouri as a direct result of China's hoarding of PPE.  Dr. Haslag's damages calculations apply economic analyses to establish a dollar value for the damages suffered by the State of Missouri and its citizens, and then, as an alternative, applies a much more conservative set of variables by reducing certain variables in his calculations by up to a factor of 10.  Even at the "low-end" of Dr. Haslag's damages calculation range, the injury suffered by the State of Missouri and its citizens is at least $8.04 billion.

## A. Dr. Haslag's methodology and calculation of damages suffered by the State of Missouri and its citizens from China's hoarding of PPE.

"China's market power and its superior knowledge about the [COVID-19] virus meant that no one else other than the defendants had to act to" cause shortages in the PPE market. *Bailey*, 90 F.4th at 938.  China "singlehandedly took over factories that made masks and cornered the market before the rest of the world realized what was happening." *Id.* (internal quotation marks and brackets omitted).  Then, "when the virus spread and people all over the world became sick, China was able to maintain its stockpile and prolong the shortage." *Id.*  "Healthcare providers in Missouri either paid higher prices for the masks they could find or dealt with shortages" that "made it difficult to safely and effectively treat patients with the virus." *Id.* at 938 (internal quotation marks and brackets omitted).  "The most basic supply-and-demand principles tell us that these markets depended little, if at all, on variables independent of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id.* at 939.  In other words, because of

Defendants' actions, "[o]ther market players simply had no time or ability to respond." *Id*.

Missouri has demonstrated in its FSIA Default Hearing Brief that, between April 22, 2020 and December 31, 2020 alone, the State spent $122,941,819 on PPE-related expenses—a number that is likely underinclusive of the total amount of PPE expenditures.[3]  FSIA Default Hearing Brief at 107–11.  As Dr. Haslag details in his supplemental report, however, China's hoarding of PPE has inflicted even greater direct harm to Missouri and its citizens beyond just heightened direct expenditures by the State.  One method by which these direct damages can most clearly be demonstrated is in the discounted value of the net general revenues the State of Missouri and its political subdivisions would have collected in taxes but-for China's hoarding of PPE.  In other words, this is money Missouri would have directly received (with future values discounted to account for the time value of money) to fund its public operations, had China not unlawfully and improperly hoarded PPE.

---

[3] The Eighth Circuit has recently held that a PPE manufacturer who made misrepresentations during the COVID-19 pandemic could be held liable for damages amount to the *entire revenue* of products that were not delivered as advertised. *See Fed. Trade Comm'n v. Am. Screening, LLC*, 105 F.4th 1098, 1102 (8th Cir. 2024). The PPE manufacturer in *Am. Screening* was forced to "bear the risk of uncertainty that its deception . . . created, as '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *Id*. at 1105 (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)). For the same reasons, China should be held accountable for the full amount of the funds Missouri spent on PPE expenses during the early months of the pandemic. This is especially the case considering the significant disparity of the cost of PPE before and after China's hoarding (with the costs of some PPE nine times higher because of China's hoarding) and the underinclusive nature of Missouri's request for direct expenditure damages (not accounting for any PPE purchased before April 22, 2020). *See* FSIA Default Hearing Brief at 107–11.

19

To calculate these damages, Dr. Haslag calculates how much more quickly COVID spread because of the China-induced shortage of PPE. He first demonstrates "a model of the infection level as a function of PPE units," which can be used to express the link "between the shortage of PPE and the number of infections" from COVID-19. Ex. 1 at 3. To do so, Dr. Haslag lays out a "formula that characterizes the relationship between the number of infections with full PPE supply and the number of infections with [China's] PPE hoarding." *Id.* at 3–4. From this equation, Dr. Haslag can calculate "the difference in the [COVID-19] infection [rates] as a function of the number of PPE units." *Id.* at 4.

Based on this model and data collected by the academic literature, Dr. Haslag demonstrates that "it is reasonable to conclude that PPE hoarding played a quantitatively important role in the number of [COVID-19] cases in the United States." *Id.* at 6. Indeed, holding other variables constant, "the probability of becoming infected" by the COVID-19 virus during the relevant time period could have been decreased "by as much as one-third" absent China's PPE hoarding. *Id.* at 6–7. Even "with the more conservative 15-percentage-point reduction in contact rate," China's hoarding of PPE had a significant impact on the number of COVID-19 cases in the United States. *Id.* at 7. Indeed, "[f]or the sake of being conservative," Dr. Haslag also provides an analysis assuming that "the contact rate declines by [only] 2.5 percentage points" if China had not hoarded PPE—a rate *six times* below the "conservative" calculation of a 15-percentage-point reduction in the contact rate demonstrating the lowest bound of potential damages. *Id.* at 8. Under even only a

20

conservative 2.5 percentage point decrease in the COVID-19 contact rate, Dr. Haslag estimates Missouri would have seen a 20 percent decrease in the number of COVID-19 cases that occurred between September 2020 and January 2021.

Next, Dr. Haslag establishes the degree to which lockdowns can be tied specifically to PPE hoarding. Specifically, he "establish[es] the link between infection rates and the sequestration and lockdown policies implemented at the national level." *Id*. at 8. To do so, Dr. Haslag formulates "a characterization of the production of final goods and services in the State of Missouri" through "[a] production function [which] describes how factor inputs, like labor and physical capital, are combined to produce final goods and services." *Id*. This economic formula demonstrates "how sequestration and lockdown policies affect economic activity" in the State of Missouri. *Id*. These "[s]equestration and lockdowns were implemented based on the projected increase in infections," and, "[i]f the number of infections could have been sharply reduced with adequate PPE," then "there would have been no need for sequestration and lockdowns." *Id*. at 8–9. As such, the next question becomes, "what fraction of the sequestration and lockdown policies would have been implemented" if China had not hoarded PPE and, consequently, COVID-19 contact rates were lower than they were with the PPE hoarding. This question is important because, "[w]ith PPE hoarding, the number of [COVID-19] cases increased, leading to stronger sequestration and lockdown policies being implemented, leading to reductions in final goods and services"—"the essence of economic damages." *Id*. at 9.

Because "there is no counterfactual that would help us identify the incidence rate that would have triggered lockdown policies," Dr. Haslag instead relies on the "Stringency Index," a quantitative model developed by researchers at Oxford University to "measure the degree to which governments imposed lockdown conditions" on a country in response to changing rates of COVID-19. *Id*. at 9. "The value of the Stringency Index is that it provides a numerical measure of the degree to which sequestration and lockdown policies were implemented." *Id*. at 10. Dr. Haslag then expresses "the relationship between the Stringency Index and real GDP," using an economic equation capturing "different values for the total factor productivity, physical capital, and labor dependent on the Stringency Index." *Id*. at 11–12. This allows Dr. Haslag to express a relationship between the Stringency Index and real GDP, with shifts in the former demonstrating downstream changes in the latter. Dr. Haslag can then express a relationship between the Stringency Index and real GDP, with shifts in the former causing changes in the latter. *Id*. at 12.

With these equations in hand, Dr. Haslag is able to run two different scenarios to establish damages suffered by the State of Missouri and its citizens—one scenario constituting a "quite straightforward" application of the estimated COVID-19 contact rate, and another scenario that applies the much more conservative estimate of a contact rate six times less than what was calculated. *Id* at 12–14. These calculations show the harm causally tied directly to PPE hoarding, as opposed to the harm imposed by COVID more generally. The damages to Missouri and its citizens caused

by China's hoarding of PPE, as demonstrated by each of these alternative scenarios, are significant.

**B.**     **The damages suffered by the State of Missouri and its citizens from China's hoarding of PPE are significant.**

As Dr. Haslag's supplemental report (as well as Plaintiff's FSIA Default Hearing Brief and submitted written evidence) demonstrates, the scope of damages inflicted upon the State of Missouri and its citizens by China, through the hoarding of PPE during the relevant period, is staggering.  Out of an abundance of caution, Dr. Haslag calculates his damages using a range of values for the COVID-19 contact rate used in his formulae: specifically, two possible contact rate values obtained through economic equations derived from academic literature, and an additional third possible contact rate value six times lower than the lowest alternative value.  This third value, much lower than the estimated contact rate, is included to establish a "floor" value of the likely economic harms suffered by the State of Missouri.  Even the lowest end of Missouri's range of damages demonstrates that China's hoarding of PPE inflicted significant direct harm to Missouri.  The discounted sum of net general revenue the State of Missouri lost as a direct result of China's hoarding of PPE (*i.e.*, the tax revenue the State would have directly itself collected but-for China's hoarding of PPE) is between $8.04 billion and $15.61 billion.  Ex. 1 at 14.  This discounted value of general revenue collections the State of Missouri would have received but-for China's hoarding of PPE is a direct harm suffered by the State of Missouri (as well as a harm to the millions of Missouri citizens whose government was deprived of state revenue).  *See* § 416.061.3 (empowering Plaintiff, in his role as Attorney General, to

seek damages in such cases on behalf of all political subdivisions and agencies in the State of Missouri).  Indeed, of this amount, at least $384,400,000 was net general revenues that Missouri should have *already* collected as revenue between Q3 2020 and Q2 2023, but for China's hoarding of PPE.[4]

As addressed *infra*, Plaintiff is, in the alternative, entitled to seek damages as *parens patriae* on behalf of the citizens of Missouri.  Under a *parens patriae* theory of recovery, the range of damages Missouri suffered through the discounted value of lost revenue remains a useful—if markedly underinclusive—measure of damages suffered by the people of the State of Missouri. Indeed, the cumulative loss of real GDP to the State reveals as much.  Between Q3 of 2020 and Q2 of 2023 *alone*, Missouri suffered a cumulative real GDP loss of at least $12.4 billion from China's PPE hoarding.  Ex. 1 at 14.  The ultimate discounted sum of economic damages to the State and its people, calculated in the discounted value of future real GDP the Missouri economy lost as a result of China's hoarding of PPE from 2024 to 2051, is between $246.96 billion and $480.24 billion.

Although this measurement of lost revenue by the State only captures a portion of the economic harms suffered by the citizens of Missouri, it provides a useful (if underinclusive) model of at least a portion of parens patriae damages.  As Dr.

---

[4] The net general revenues collected in taxes by the State of Missouri equal approximately 3.1 cents per dollar of GDP.  *See* Ex. 1 at 13.  Between Q3 2020 and Q2 of 2023 alone, Missouri suffered a cumulative real GDP loss of at least $12.4 billion from China's hoarding of PPE. *Id*. at 14.  As such, the additional Net General Revenues that should have been collected by Missouri during that time, but-for China's hoarding of PPE, amounts to at least $384,400,000 in past lost revenue.

Haslag explains in his supplemental report, revenue collected by the State is a function of, and can be measured in relation to, the economic productivity of Missouri's citizens. Ex. 1 at 13. Consequently, any decrease in revenue collected by the State as a result of China's hoarding of PPE encompasses not only a measurement of the State's direct damages, but also demonstrates (at least) a portion of the damages suffered by the citizens of Missouri paying taxes towards the State's general revenue in the first place. In other words, because the amount lost by the people of Missouri must be *at least* the amount of revenue the State did not collect from its citizens due to China's hoarding (and, in actuality, is almost certainly much greater than the revenue lost), the measure of Missouri discounted lost net revenue (between $8.04 billion and $15.61 billion) provides at least a floor of possible *parens patriae* damages.

Dr. Haslag's supplemental report conclusively demonstrates that, either under a theory of direct damages or *parens patriae*, the injuries attributable to China's hoarding of PPE amount to, at a minimum, at least $8.04 billion. As Defendants have been properly served with this lawsuit but failed to appear, Plaintiff's evidence of damages is deemed uncontroverted for the purpose of the FSIA default hearing. *See, e.g.*, *Owens v. Republic of Sudan*, 826 F.Supp.2d 128, 134 (D.D.C. 2011); *Shourd v. Government of Islamic Republic of Iran*, Case No. 22-cv-1309, 2024 WL 4346330 (D.D.C. Sep. 30, 2024) (slip copy). Under both the direct recovery of 15 U.S.C. § 15 and the *parens patriae* recovery of 15 U.S.C. § 15c, Plaintiff may recover "threefold the damages" sustained by Missouri or her citizens from China's hoarding of PPE.

25

Plaintiff may, likewise, recover "threefold damages" under his state law antitrust claim. *See* § 416.121(1). As such, Plaintiff has demonstrated, through uncontroverted evidence, an entitlement to recover damages under his federal or state statutory antitrust claims in the amount of at least $24,488,825,457.[5] Alternatively, Plaintiff has demonstrated, through uncontroverted evidence, an entitlement to recover damages under his common-law claim for relief in the amount of $8,162,941,819.[6]

## CONCLUSION

For the foregoing reasons and the reasons stated in Plaintiff's November 22, 2024 Foreign Sovereign Immunity Act Default Hearing Brief, Plaintiff the State of Missouri ex rel. Andrew Bailey respectfully requests that this Court: (1) enter a judgment of liability against all Defendants on Count IV of Plaintiff's Complaint; (2) issue an award of civil damages against all Defendants in an amount of at least $24,488,825,457 or, in the alternative, $8,162,941,819; (3) order that Defendants pay prejudgment and postjudgment interest on every amount of damages awarded by this court; and (4) award such further relief as the Court deems just and appropriate.

Date: January 8, 2025                              Respectfully submitted,

---

[5] This number accounts for treble the $8.04 billion damages constituting of the lost discounted value of net revenue that would have been collected by the State ($24,120,000,000) and treble the $122,941,819 of damages constituting the amount of expenditures on PPE by the State of Missouri between late April 2020 and December 2020 ($368,825,457).

[6] This number accounts for the uncontroverted damages established by the State of Missouri, but without the statutory grant for recovery of treble damages.

ANDREW T. BAILEY
Attorney General

Joshua M. Divine, 69875MO
*Solicitor General*

*/s/ Samuel C. Freedlund*
Samuel C. Freedlund, 73707MO
*Deputy Solicitor General*

Office of the Attorney General
815 Olive St.
Suite 200
St. Louis, Missouri 63101
Phone: (314) 340-4869
Fax (573) 751-1774
Samuel.Freedlund@ago.mo.gov

*Attorneys for Petitioner*


## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2025, a true and accurate copy of the foregoing was electronically filed by using the Court's CM/ECF system to be served on all counsel of record entered in the case.

/s/ Samuel C. Freedlund