**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSOURI,<br>ex rel. ANDREW T. BAILEY, in his official<br>capacity as Missouri Attorney General, | ) ) ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | Case No. 1:20-cv-00099-SNLJ |
| v. | ) | |
| | ) | |
| THE PEOPLE'S REPUBLIC OF CHINA,<br>THE COMMUNIST PARTY OF CHINA,<br>NATIONAL HEALTH COMMISSION<br>OF THE PEOPLE'S REPUBLIC OF<br>CHINA, MINISTRY OF EMERGENCY<br>MANAGEMENT OF THE PEOPLE'S<br>REPUBLIC OF CHINA, MINISTRY OF<br>CIVIL AFFAIRS OF THE PEOPLE'S<br>REPUBLIC OF CHINA, PEOPLE'S<br>GOVERNMENT OF HUBEI<br>PROVINCE, PEOPLE'S GOVERNMENT<br>OF WUHAN CITY, WUHAN INSTITUTE<br>OF VIROLOGY, and THECHINESE<br>ACADEMY OF SCIENCES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
|    Defendants. | ) | |

**PLAINTIFF'S THIRD SUPPLEMENTAL BRIEF IN RESPONSE TO THE
COURT'S ORDER AND PLAINTIFF'S RESPONSE CHINA SOCIETY OF
PRIVATE INTERNATIONAL LAW'S SUPPLEMENTAL *AMICUS CURIAE*
BRIEF**

Plaintiff the State of Missouri, ex rel. Andrew Bailey ("Plaintiff") submits the

following Response to the Court's February 28, 2025 Order for Briefing on Two

Additional Legal Questions and Response to the China Society of Private

International Law's ("China Society") Supplemental Amicus Curiae Brief.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................II

TABLE OF AUTHORITIES ......................................................................................IV

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S FEBRUARY 28, 2025 ORDER ON TWO ADDITIONAL LEGAL QUESTIONS** ........................................................................................................ 1

    INTRODUCTION ............................................................................................ 1

    ANALYSIS ........................................................................................................ 2

        I.    Plaintiff's Count IV may also encompass the assertion of state and federal antitrust violations as alternative theories of recovery. .................. 2

            A.    Eighth Circuit precedent permits plaintiffs to pursue separate legal theories for the same factual allegations, so Missouri's antitrust legal theories need not be pleaded as an alternative cause of action. ....................................................................................... 3

            B.    Even if state and federal antitrust violations were claims distinct from the "classic anticompetitive" claim in Count IV, service of an amended Complaint would be unnecessary. .......................................... 9

        II.    Even if Missouri cannot pursue relief under these statutes directly, these statutes impose a duty that can serve as the basis for a common law negligence claim. .................................................................................. 13

**PLAINTIFF'S RESPONSE TO CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW'S SUPPLEMENTAL AMICUS CURIAE BRIEF** ...... 17

    INTRODUCTION .......................................................................................... 17

    ANALYSIS ...................................................................................................... 21

        I.    China Society's amicus curiae brief should be stricken or otherwise set aside as an improper attempt by a purported "amicus" to in fact argue the merits of the case on behalf of defaulting parties. ............................... 21

        II.    Defendants' hoarding of PPE falls within the scope of federal antitrust laws. .................................................................................................... 24

        III.    Defendants' hoarding of PPE falls within the scope of state antitrust laws. .................................................................................................... 34

        IV.    Missouri has demonstrated the direct effects of Defendants' actions in the United States. .............................................................................. 41

        V.    The Act of State Doctrine does not apply to Missouri's claim. ................. 45

VI. China Society's evidentiary arguments are both incorrect and
    foreclosed by this Court's previous decisions in this case..........................47

**CONCLUSION** .................................................................................**53**

**CERTIFICATE OF SERVICE** .............................................................**55**

## TABLE OF AUTHORITIES

**Cases**                                              **Page(s)**

*Alberici Constructors, Inc. v. Dir. of Revenue,*
452 S.W.3d 632 (Mo. 2015) ................................................................ 36

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
425 U.S. 682 (1976) ............................................................ 20, 46, 47

*Aragon v. Wal-Mart Stores East, LP,*
924 F.Supp.2d 1066 (E.D. Mo. 2013) ............................................ 14, 16

*Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
784 F.2d 1325 (7th Cir. 1986) ............................................................. 9

*Belkin v. Islamic Republic of Iran,*
667 F. Supp. 2d 8 (D.D.C. 2009) ....................................................... 10

*Blais v. Islamic Republic of Iran,*
459 F. Supp. 2d 40 (D.D.C. 2006) .................................................. 9, 10

*BMW of North America, Inc. v. Gore,*
517 U.S. 559 (1996) ........................................................................ 40

*Boggs ex rel. Boggs v. Lay,*
164 S.W.3d 4 (Mo. App. E.D. 2005) .................................................. 15

*Bowan ex rel. Bowan v. Express Medical Transporters, Inc.,*
135 S.W.3d 452 (Mo. App. E.D. 2004) ............................................... 13

*Brown v. Kansas City Live, LLC,*
931 F.3d 712 (8th Cir. 2019) .......................................................... 2, 4

*Bryant v. Smith Interior Design Grp., Inc.,*
310 S.W.3d 227 (Mo. 2010) .......................................................... 34, 39

*Bundy v. Jackson,*
641 F.2d 934 (D.C. Cir. 1981) .......................................................... 48

*Cass County Music Co. v. C.H.L.R., Inc.,*
88 F.3d 635 (8th Cir. 1996) ............................................................... 8

*Celestine v. Caribbean Air Mail, Inc.,*
30 F.4th 1233 (2d Cir. 2022) ........................................................... 45

iv

*City of Lafayette, La. v. Louisiana Power & Light Co.*
435 U.S. 389 (1978).................................................................. 26, 32, 33

*City of Wellston v. SBC Commc'ns, Inc.,*
203 S.W.3d 189 (Mo. 2006)........................................................... 36

*Connolly v. Union P. R. Co.,*
453 F. Supp. 2d 1104 (E.D. Mo. 2006) ............................................ 14, 16

*Denbow v. State,*
309 S.W.3d 831 (Mo. App. W.D. 2010)............................................... 38

*Downing v. Goldman Phipps, PLLC,*
764 F.3d 906 (8th Cir. 2014) ........................................................ 35

*Fischer, Spuhl, Herzwurm & Assocs., Inc. v. Forrest T. Jones & Co.,*
586 S.W.2d 310 (Mo. 1979)......................................................... 37, 38

*Han Kim v. Democratic People's Republic of Korea,*
774 F.3d 1044 (D.D.C. 2014) ....................................................... 48, 50

*Hofbauer v. Northwestern Nat. Bank of Rochester, Minn.,*
700 F.2d 1197 (8th Cir. 1983) ................................................... 14, 15, 16

*Hopkins v. Saunders,*
199 F.3d 968 (8th Cir. 1999) ......................................................... 4

*Huch v. Charter Communications, Inc.,*
290 S.W.3d 721 (Mo. 2009)........................................................... 15

*Hunt v. Mobil Oil Corp.,*
550 F.2d 68 (2d Cir. 1977) .......................................................... 25

*Iconco v. Jensen Const. Co.,*
622 F.2d 1291 (8th Cir. 1980) .................................................. 14, 15, 16

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,*
307 F. Supp. 1291 (D. Del. 1970) .................................................. 25

*Int'l Ass'n of Machinists & Aerospace Workers v. Org. of Petroleum Exporting Countries,*
477 F. Supp. 553 (C.D. Cal. 1979)........................................ 28, 29, 30, 32, 33

*King Gen. Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints,*
821 S.W.2d 495 (Mo. 1991)........................................................... 4

*Larson v. Allina Health System,*
    17-cv-3835, 2020 WL 583082 (D. Minn. Feb. 6, 2020) ........................................... 48

*Leigh v. Engle,*
    535 F. Supp. 418 (N.D. Ill. 1982) ........................................................................ 24

*M.E. v. T.J.,*
    854 S.E.2d 74 (N.C. App. 2020)........................................................................... 21

*Maalouf v. Islamic Republic of Iran,*
    923 F.3d 1095 (D.C. Cir. 2019)...................................................................... 30, 47

*Mallory v. Norfolk Southern Railway Co.,*
    600 U.S. 122 (2023) ........................................................................................... 40

*McDonnell Douglas Corporation v. Green,*
    411 U.S. 792 (1973) ........................................................................................... 48

*Missouri ex rel. Bailey v. People's Republic of China,*
    90 F.4th 930 (8th Cir. 2024).................................................................... passim

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ..................................................................................... 35, 36

*New York Life Ins. Co. v. Head,*
    234 U.S. 149 (1914) ........................................................................................... 40

*NEXTEP, LLC v. KABA Workforce Sols., Inc.,*
    No. 4:07 CV 01107 RWS, 2007 WL 9809030 (E.D. Mo. Oct. 5, 2007).................... 35

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island,*
    883 F.2d 1101 (1st Cir. 1989).......................................................................... 15, 16

*Owens v. Republic of Sudan,*
    864 F.3d 751 (D.C. Cir. 2017).............................................................................. 49

*Parker v. Brown,*
    317 U.S. 341 (1943) ..................................................................................... 32, 33

*Parkhill v. Minn. Mut. Life Ins. Co.,*
    286 F.3d 1051 (8th Cir. 2002) ............................................................................... 4

*Parra v. Bldg. Erection Services,*
    982 S.W.2d 278 (Mo. App. W.D. 1998)........................................................... 13, 14

*Petersen Energía Inversora S.A.U. v. Argentine Republic and YPF S.A.*,
  895 F.3d 194 (2d Cir. 2018) ................................................................... 46

*Pfizer, Inc. v. Government of India*,
  434 U.S. 308 (1978) ............................................................... 25, 26, 32

*Republic of Argentina v. NML Capital, Ltd.*,
  573 U.S. 134 (2014) .......................................................................... 30

*Republic of Hungary v. Simon*,
  145 S. Ct. 480 (2025) ....................................................................... 30

*Roeman v. United States*,
  No. 4:19-cv-4006, 2024 WL 4372197 (D.S.D. Oct. 2, 2024) .................................... 12

*Scales v. Whitaker*,
  615 S.W.3d 425 (Mo. App. E.D. 2020) ....................................................... 15

*Scheibel v. Hillis*,
  531 S.W.2d 285 (Mo. 1976) .................................................................. 13

*Schwartz & Assocs. v. Elite Line, Inc.*,
  751 F. Supp. 1366 (E.D. Mo. 1990). ......................................................... 35

*State ex rel. Key Ins. Co. v. Roldan*,
  587 S.W.3d 638 (Mo. 2019) .................................................................. 35

*TLC Vision (USA) Corp. v. Freeman*,
  No. 4:12CV01855ERW, 2013 WL 230254 (E.D. Mo. Jan. 22, 2013) ................................ 35

*Topchian v. JPMorgan Chase Bank, N.A.*,
  760 F.3d 843 (8th Cir. 2014) ........................................................... passim

*Trone Health Services, Inc. v. Express Scripts Holding Co.*,
  974 F.3d 845 (8th Cir. 2020) ............................................................... 15

*Troutman v. Modlin*,
  353 F.2d 382 (8th Cir. 1965) ............................................................... 12

*Turtle Island Foods, SPC v. Thompson*,
  725 F. Supp. 3d 963 (W.D. Mo. 2024) ....................................................... 35

*Tuttle v. Dobbs Tire & Auto Centers, Inc.*
  590 S.W.3d 307 (Mo. 2019) .................................................................. 39

*U.S. Postal Service v. Flamingo Industries (USA) Ltd.*,
  540 U.S. 736 (2004) ................................................................... 27, 33

*United States v. Na'l Assoc. of Sec. Dealers, Inc.*,
    422 U.S. 694 (1975) ......................................................................... 38

*United States v. Puerto Rico*,
    398 F. Supp. 3d 1 (D.P.R. 2019) .................................................... 21

*W.S. Kirkpatrick & Co, Inc. v. Environmental Tectonics Corp., Inter.*,
    493 U.S. 400 (1990) ................................................................ 45, 46

*Warmbier v. Democratic People's Republic of Korea*,
    356 F.Supp.3d 30 (D.D.C. 2018) .................................................... 49

## Statutes

15 U.S.C. § 7 ........................................................................... 26, 27, 31

15 U.S.C. § 15(b) ............................................................................ 31

28 U.S.C. § 1608 ............................................................................. 11

Mo. Rev. Stat. § 213.065 .................................................................. 39

Mo. Rev. Stat. § 416.041 ............................................................. 38, 39

## Rules

Fed. R. Evid. 801(6) ........................................................................ 52

Fed. R. Evid. 801(c) ........................................................................ 52

Fed. R. Evid. 801(d) ........................................................................ 52

Federal Rule of Civil Procedure 8(a)(2)–(3) ...................................... 3

Federal Rule of Civil Procedure 54(c) ..................................... 5, 11, 12

FRCP 5(a)(2) .................................................................................... 7

FRCP 55 .......................................................................................... 11

## Regulations

49 CFR § 392.9 ................................................................................ 14

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S FEBRUARY 28, 2025 ORDER ON TWO ADDITIONAL LEGAL QUESTIONS**

### Introduction

On February 28, 2025, this Court ordered Plaintiff to provide supplemental briefing on two additional legal questions: (1) "[w]hether plaintiff's Count IV, which is addressed to negligence and a common law hoarding claim, can also encompass statutory causes of action for state and federal antitrust violations"; and (2) "[t]he source of the duty alleged for Count IV's negligence action." Order, ECF 92.

As to the first question, the answer is yes. In short, the Eighth Circuit distinguishes between a factual *claim*, which must be set out in the complaint, and the legal *theories* that support that claim, which can be asserted later. Because Missouri pleaded a sufficient factual claim for legal hoarding, it is entitled to press any legal theory that would lead to recovery for that claim. "[I]t is the facts alleged in a complaint, and not the legal theories, that state a claim," which is why courts assess "whether [a plaintiff] has pleaded sufficient facts in [the] complaint to state a claim under *any* legal theory," even a legal theory "presented for the first time on appeal." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 849 (8th Cir. 2014) (emphasis added). So long as a plaintiff pleaded a *factual* claim (as Missouri did here), the plaintiff is free later to present any legal theory that would lead to relief on that claim. *Id.* at 847, 849 (considering legal theories of "breach of contract, fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment" even though plaintiff "did not include legal theories for his claims" in the complaint).

1

As to the second question, both federal and state antitrust statutes can independently create a duty enforceable under Missouri common law. The three legal theories Missouri presents (state and federal antitrust statutes and state common law) are simply three different ways of proving the same hoarding claim and therefore may each be asserted in this case. *Id.*; *Brown v. Kansas City Live, LLC*, 931 F.3d 712, 715 (8th Cir. 2019). But even if this Court construed the theories as separate legal claims, state and federal antitrust statutes still serve as a source for a *duty* in a negligence action under Count IV of Missouri's Complaint. The Eighth Circuit, Missouri state courts, and courts in this district have all been clear that federal or state statutes may serve as a source of a defendant's duty (and, consequently, the breach of a duty) underpinning a negligence action brought under Missouri common law.

## Analysis

### I.  Plaintiff's Count IV may also encompass the assertion of state and federal antitrust violations as alternative theories of recovery.

The Court has asked for supplemental briefing on the question of whether the allegations contained in Plaintiff's Count VI encompass not only a common law claim, but also legal theories for recovery under state and federal antitrust violations. The answer is yes. Because the state and federal antitrust violations are alternative legal theories for the same recovery, Count IV of Missouri's Complaint encompasses all three (federal antitrust, state antitrust, and common law) alternative theories. Furthermore, even if state and federal antitrust violations constituted causes of action distinct from Count IV of Missouri's Complaint (they do not), service on

2

Defendants of an amended complaint would be unnecessary to assert any cause of action the Court deems distinct from Count IV.

**A.  Eighth Circuit precedent permits plaintiffs to pursue separate legal theories for the same factual allegations, so Missouri's antitrust legal theories need not be pleaded as an alternative cause of action.**

Count IV of Missouri's Complaint seeks to recover damages from China's "hoarding of personal protective equipment" and provides, both in the Count and in the general factual allegations of the Complaint, allegations surrounding Defendants' anticompetitive and monopolistic behaviors.  Compl. at 46; *see also Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 938 (8th Cir. 2024) (construing the complaint as alleging "classic anticompetitive behavior").  Missouri's allegations of "classic anticompetitive behavior" was sufficient to put Defendants on notice that Missouri may pursue any *legal* theory to recover damages for China's *factual* anticompetitive hoarding.

The notice pleading standard of Federal Rule of Civil Procedure 8(a)(2)–(3) requires that Missouri give "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought."  And the Eighth Circuit has distinguished between claims and legal theories, making clear that a single factual "claim" can be pursued through alternative legal theories not expressed in the complaint:  "'Separate legal theories are not to be considered as separate claims, even if the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief.'"  *Brown v. Kansas City Live, LLC*, 931 F.3d

3

712, 715 (8th Cir. 2019) (quoting *King Gen. Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints*, 821 S.W.2d 495, 501 (Mo. 1991)).

Although the court in *Brown* was addressing this doctrine under the question of claim preclusion, *Brown* is consistent with the Eighth Circuit's handling of notice pleading as an exercise in giving a defendant fair notice of the nature of the alleged harm and relief sought, rather than a listing of legal theories. "'The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a *general* indication of the type of litigation involved.'" *Topchian*, 760 F.3d at 848 (emphasis added) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). To that end, a complaint which "'provide[s] the necessary notice and thereby stated a claim" need not state "'the legal theories of recovery or legal conclusions identified therein,'" but rather only a sufficient volume of "well-pleaded facts" necessary to state a claim. *Id.* (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051, 1057–58 (8th Cir. 2002)). That is because "it is the facts alleged in a complaint, and not the legal theories, that state a claim." *Id.* at 849.

*Topchian* is especially instructive here because it makes clear that legal theories need not be stated in the complaint at all, so long as the factual claim is. There, the plaintiff pressed factual claims but "did not include legal theories for his claims" in his complaint. *Topchian*, 760 F.3d at 847. After the district court dismissed the complaint, the defendant argued that the plaintiff should not be allowed to press these legal theories "for the first time on appeal." *Id.* at 849. The

4

Eighth Circuit rejected that argument because "it is the facts alleged in a complaint, and not the legal theories, that state a claim" and because Topchian's legal theories were all "based on the facts that he has alleged in his amended complaint." *Id.* The court further noted that "[t]he well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice." *Id.* at 848 (citation omitted).

Missouri's Complaint satisfies this standard. By giving fair notice of its factual allegations based on Defendants' anticompetitive and monopolistic activities, *see, e.g.*, Compl. at ¶¶ 130–38, Missouri provided the necessary notice to Defendants of "the nature and basis or grounds for a claim, and a *general* indication of the type of litigation involved." *Topchian*, 760 F.3d at 848 (emphasis added). Just like *Topchian* was not required to "include legal theories for his claims" at all, Missouri was not required to expressly state all possible "legal theories of recovery" under state and federal antitrust law for its Complaint to sufficiently state a hoarding claim. *Id.* at 847–48 ("[W]e must decide whether Topchian has pleaded sufficient facts in his amended complaint to state a claim under *any* legal theory.") (emphasis added). Having stated a hoarding claim, Missouri can press any legal theory, including statutory antitrust theories, that enable Missouri to recover damages on that hoarding claim.

It is, of course, the normal rule that, pursuant to Federal Rule of Civil Procedure 54(c), "[a] default judgment must not differ in kind from, or exceed in

5

amount, what is demanded in the pleadings." But this provides no barrier to Missouri's recovery under causes of action for state and federal antitrust violations. Nothing about Missouri's assertion of causes of action for state and federal antitrust violations as a means of recovery of damages "differ[s] in kind" from Missouri's allegations in the Complaint. The statutory causes of action are just one legal theory to obtain relief for the factual allegations pressed in Count IV.

Missouri's Complaint is replete with factual allegations that not only detail Defendants' hoarding of PPE, but in fact directly reference the anticompetitive and monopolistic nature of Defendants' actions. *See, e.g.*, Compl. at ¶ 40 (including in the description of Defendants' "commercial activities" the "production, purchasing, and import and export of medical equipment, such as personal protective equipment[], used in COVID-19 efforts."); ¶ 134 (alleging that China's hoarding of PPE was a "deliberate attempt by China to corner the [PPE] market as it concealed and downplayed the danger posed by the outbreak"); ¶¶ 174–81 (alleging harms stemming from Defendants' anticompetitive "restrict[ion] [of] exports of PPE" and "hoard[ing] of PPE[,] all while Defendants "kn[ew] (and even suppress[ed] the dangers of COVID-19"). As the Eighth Circuit summed it up, the Complaint alleges "classic anticompetitive behavior." *Bailey*, 90 F.4th at 939.

Furthermore, nothing in Missouri's claimed statutory damages "exceed[s] in amount[] what is demanded in the pleadings." In Count IV, Missouri directly alleges that, "[a]s a proximate result of Defendants' conduct, the State and its residents have suffered billions and possibly tens of billions of dollars in economic damages, as well

6

as substantial non-economic damages." Compl. at ¶ 179. In other words, Missouri's Complaint has always sought "tens of billions of dollars" in damages from Defendants for its "classic anticompetitive behavior" from hoarding, and the more precise final damages figure offered in Missouri's later briefing of $24,488,825,457 in statutory damages does not "exceed in amount" what was sought in Missouri's pleadings.[1] China was on notice both of the amount of damages Missouri would seek and that Missouri would press legal theories for "classic anticompetitive behavior." Antitrust statutory legal theories are, of course, a standard way of punishing classic anticompetitive behavior.

The fact that a portion of the damages sought by Missouri in its briefing are statutorily-entitled treble damages under antitrust provisions does not alter the kind or amount of damages sought by Missouri. The Eighth Circuit has held "that

---

[1] It is for the same reasons that FRCP 5(a)(2)'s requirement that "a pleading that asserts a new claim for relief . . . must be served on that party under Rule 4" does not apply in this context. Missouri's claim for relief in Count IV of its Complaint has remained unchanged since the beginning of this case—Defendants' hoarding of PPE, including through anticompetitive actions such as the nationalization of U.S. factories and direct hoarding of PPE manufactured for sale in the United States, has inflicted actual damages on Missouri and its citizens as high as "tens of billions of dollars." Missouri's decision to argue multiple legal theories supporting its factual claim for relief (federal and state statutory theories, as well as a common law theory) does not alter the notice China received of the facts and damages underlying the claim for relief in Count IV of its Complaint. FRCP 5(a)(2) does not require that a party serve an amended complaint each time an alternative legal theory is expressed. Additionally, as addressed below, even if FRCP 5(a)(2) would have otherwise applied, district courts have held that a plaintiff is *not* required to re-serve an amended complaint on a defaulting foreign sovereign under the FSIA so long as any amendment to the complaint is "not substantial" and the foreign sovereign had "fair notice of the allegations and relief sought." *See supra.* For each reason, the requirements of FRCP 5(a)(2) does not limit Missouri's ability to seek damages from Defendants under federal and state antitrust theories.

statutory damages are by definition a substitute for unproven or unprovable *actual damages*," even "notwithstanding [the fact] that the amount of statutory damages assessed may go beyond literal restitution." *Cass County Music Co. v. C.H.L.R., Inc.*, 88 F.3d 635, 642–43 (8th Cir. 1996) (emphasis added). As such, Missouri's allegation that Defendants' actions have potentially made them liable for "tens of billions of dollars in economic damages, as well as substantial non-economic damages" states a potential actual damages value that inherently may include any statutory damages that are deemed a subset of Missouri's total actual (as opposed to putative) damages. Defendants, in other words, have been on notice of the potential scope of actual damages Missouri may seek against them in this action.

Further buttressing this conclusion is the manner in which the Eighth Circuit has already reviewed and interpreted Count IV of Missouri's Complaint in this case. Reviewing Missouri's "hoarding claim," the Eighth Circuit observed that the allegations contained in Count IV together "identify *classic anticompetitive behavior*, except on a country-wide scale." *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 938 (8th Cir. 2024) (emphasis added). In reaching its conclusion, the court expressly contemplated antitrust elements such as "China's market power" and "basic supply-and-demand principles," all in order to consider how Defendants' actions "cornered the market before the rest of the world realized what was happening." *Id.* at 939.

Indeed, in reviewing Count IV, the Eighth Circuit expressly relied upon antitrust cases and authorities interpreting federal antitrust statutes to reach its

conclusion. *Id.* (citing Herbert Hovenkamp, *Federal Antitrust Policy 4* (6th ed. 2020); *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986)). In other words, the Eighth Circuit itself has already treated federal antitrust statutes as a permissible legal theory that can be used to obtain relief for the factual claim, in part analyzing Count IV of Missouri's Complaint under that lens long after Defendants already defaulted. The Eighth Circuit's handling of Count IV of Missouri's Complaint demonstrates that the court directly contemplated federal antitrust statutes as a legal theory for Count IV of Missouri's Complaint, rather than as a distinct claim not raised in the Complaint. Finally, the Eighth Circuit's decision demonstrates that Defendants should have been on notice, long before this Court's FSIA default hearing, that federal and state antitrust statutes served as potential legal theories under which Missouri may recover damages.

### B. Even if state and federal antitrust violations were claims distinct from the "classic anticompetitive" claim in Count IV, service of an amended Complaint would be unnecessary.

To the extent the Complaint needed to be amended to press the antitrust statutory legal theories (it does not), due process would not require any amendment to be served again. Where a plaintiff properly serves a foreign sovereign under the FSIA and the foreign sovereign defaults, courts do not require a plaintiff re-serve any amended complaint on the FSIA defendant so long as any amendment was "not substantial" and Defendants "had fair notice of the allegations and relief sought." *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46 (D.D.C. 2006); *see also id.* ("Accordingly, this Court will not require plaintiff to serve the amended complaint

[on the FSIA defendants].”); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C. 2009) (“Plaintiff did not serve the amended complaint on defendants. Where changes made in an amended complaint are ‘not substantial,’ the requirement” that the amended pleading “must be served on that party is not applicable.”) (quoting *Blais*, 459 F. Supp. 2d at 46).

Here, to the extent the Complaint would need to be amended to make the statutory legal theories express, the change would not be substantial, and China has been on notice.

As to the change, an amended complaint would simply include a line or two expressly invoking federal and state antitrust statutes. The Complaint would be amended only to make more express a legal theory, not to change the underlying facts. *Cf. Topchian*, 760 F.3d at 848.

As to notice, the Eighth Circuit had no problem perceiving that Missouri is asserting “classic” antitrust claims, which explains why the Eighth Circuit cited authorities construing antitrust statutes. *Missouri ex rel. Bailey*, 90 F.4th at 938. Further, Missouri has been open and explicit about its invocation of federal and state antitrust statutes as legal theories of recovery alternative to its common-law legal theory of recovery in each substantive filing it has submitted on the merits of this case since this case was remanded from the Eighth Circuit. *See, e.g.*, Pl.’s Foreign Sovereign Immunity Act Default Hearing Brief, ECF 79 at 72–74 (discussing the applicability of federal and state antitrust laws); Pl.’s Supp. Br. in Support of His Foreign Sovereign Immunity Act Default Hearing Brief, ECF 87 at 3–15 (same); Pl.’s

10

Second Supp. Br. in Support of His Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 90 at 2–19 (same).   In other words, even if any change to the Complaint would be required for Missouri to assert its federal and state antitrust theories (it is not), any such amendment would not be substantial and has been telegraphed to Defendants for months (if not longer).   To the extent any change to Missouri's Complaint was necessary for Missouri to press its federal and state statutory legal theories (it is not), any such changes—which would be made to confirm the Complaint to months (if not longer) of significant, public briefing—would certainly not be "substantial."   Asserting federal and state antitrust legal theories requires *no* new factual allegations or assertions of damages—a fact that, itself, evidences that these are alternative legal theories rather than a new cause of action.

Inherent in the decisions in *Blais* and *Belkin*—particularly in those courts' decisions not to require an amended pleading be served—is the recognition that a default by a foreign sovereign under the FSIA, governed by 28 U.S.C. § 1608, is inherently different from the procedures of a "traditional" default under FRCP 55. A decision against a defaulting defendant under the FSIA—made only after a plaintiff satisfies an evidentiary standard unique to the FSIA and default judgments against the U.S. government, has built-in judicial review of allegations that make such a decision more akin to "[e]very other final judgment," made after a review of the merits of the case, contemplated under FRCP 54(c).   In such instances of a merits-based decision of a defendant not in default, the Eighth Circuit has "consistently held that . . . the final judgment shall grant the relief to which the prevailing party is entitled,

11

*regardless of the relief demanded.*" *Troutman v. Modlin*, 353 F.2d 382, 385 (8th Cir. 1965) (emphasis added).  *See also Roeman v. United States*, No. 4:19-cv-4006, 2024 WL 4372197, at *3 (D.S.D. Oct. 2, 2024) (slip copy) (collecting cases saying the same); FRCP 54(c) (noting that, except for standard default judgments, "[e]very other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings").

Any amendment to Missouri's Complaint to add the alternative federal and state antitrust violation legal theories of recovery would not alter any factual allegations or the amount of damages sought in Missouri's Complaint; it would only make more express a legal theory that was implicit.  As such, any amendment would not be substantial, and would not implicate any due process rights Defendants have in this action.  Furthermore, this Court's FSIA standard transforms the default judgment into something more akin to a "merits-based" decision under FRCP 54(c)— the kind of decision where the final judgment grants the relief Missouri is entitled to, regardless of the relief sought in the Complaint.

If this Court rejects the argument in Part I.A. that no amendment is necessary but agrees with the argument in Part I.B. that an amendment would not need to be reserved, Missouri moves for leave to slightly amend the Complaint to express the statutory legal theories.

12

## II.    Even if Missouri cannot pursue relief under these statutes directly, these statutes impose a duty that can serve as the basis for a common law negligence claim.

This Court has additionally requested supplemental briefing on the legal question whether federal and state antitrust actions can serve as the source of a duty under a negligence claim brought in Count IV of Plaintiff's Complaint. The answer, again, is yes. The Eighth Circuit, joined by federal courts in this district applying Missouri common law and Missouri state courts applying the same, has repeatedly affirmed that a federal statute may serve as the basis for a duty under a state common law negligence claim. To the extent this Court analyzes Count IV of Missouri's Complaint under a negligence (or other common law) standard, the federal and state antitrust statutes Missouri has cited in its briefing establish a common-law duty—a duty which the evidence clearly establishes Defendants have breached.

Missouri courts have long recognized that a duty sufficient to establish a common law claim of negligence can arise from statutory law. When assessing whether a defendant has a common law duty, Missouri courts "look to the body of statutes, rules, principles and precedents which make up the law." *Bowan ex rel. Bowan v. Express Medical Transporters, Inc.*, 135 S.W.3d 452, 457 (Mo. App. E.D. 2004) (internal quotation marks omitted); *see also id.* ("duty to exercise care can be imposed by a controlling statute or ordinance") (*citing Scheibel v. Hillis*, 531 S.W.2d 285, 288 (Mo. 1976)) (emphasis added); *Parra v. Bldg. Erection Services*, 982 S.W.2d 278, 283 (Mo. App. W.D. 1998) (look "to the body of statutes, rules, principles and precedents which make up the law"). Indeed, in assessing a common law negligence claim, Missouri courts first look to whether there is a "statutory duty imposed" from

which a defendant deviated, and only then "look to the case law" if there is no statute from which to draw a common law duty. *Parra*, 982 S.W.2d at 283 (citation omitted).

This Court has previously recognized that duties under Missouri common law can arise from violations of federal law. For example, this Court remanded a case to state court even though the complaint argued that the defendant had violated a federal regulation, reasoning that the federal regulation was "a means of creating a duty, the violation of which may constitute negligence under Missouri law." *Connolly v. Union P. R. Co.*, 453 F. Supp. 2d 1104, 1109–10 (E.D. Mo. 2006). Even though "federal authorities are 'elements' of the state claim," they are elements only because "they provide a reference as a means of creating a duty … under Missouri law." *Id.; see also Aragon v. Wal-Mart Stores East, LP*, 924 F.Supp.2d 1066, 1072 (E.D. Mo. 2013) (concluding that "[t]he Federal Motor Carrier Safety Administration Regulations . . . found at 49 CFR § 392.9, give rise to duties relevant to" the plaintiff's negligence action).

The Eighth Circuit has also recognized the same, repeatedly (and directly) holding that federal statutes create an underlying duty and serve as evidence of a breach of the duty in a common-law action. *See, e.g.*, *Iconco v. Jensen Const. Co.*, 622 F.2d 1291, 1296 (8th Cir. 1980) (holding that "Iowa is free to look to a federal statute . . . for standards to apply in fashioning its common law."); *Hofbauer v. Northwestern Nat. Bank of Rochester, Minn.*, 700 F.2d 1197, 1201 (8th Cir. 1983) (holding that "federal statutes may create a standard of conduct which, if broken, would give rise to an action for common-law negligence"). The Eighth Circuit in *Hofbauer* in fact

14

described its decision in *Iconco* as "expressly h[olding]" that courts are "'certainly free to look to the provisions of a federal statute for guidance in applying [] longstanding common-law remedies.'" *Hofbauer*, 700 F.2d at 1201 (quoting *Iconco*, 622 F.2d at 1296); *see also Trone Health Services, Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 851–52 (8th Cir. 2020) (citing the court's *Hofbauer* and *Iconco* decisions as relying upon federal statutes to "creat[e] a standard of conduct which, if broken, would give rise to an action for common-law negligence").

Other federal courts have, likewise, recognized that federal antitrust laws may serve as evidence of a defendant's duty under common law claims. As the First Circuit has held, it can often be the case that "[a]ntitrust law provides the best available barometer—indeed the only available barometer—of whether or not [a defendant's] conduct can be found to be 'wrongful' or 'illegitimate'—and, hence, tortious" under state common law. *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1114 (1st Cir. 1989).[2]

---

[2] Missouri state courts have, similarly, concluded that Missouri state statutes can serve to establish a defendant's duties under common law negligence actions. *See, e.g., Boggs ex rel. Boggs v. Lay*, 164 S.W.3d 4, 15 (Mo. App. E.D. 2005) ("A duty to exercise care may be imposed by a controlling statute or ordinance"); *Scales v. Whitaker*, 615 S.W.3d 425, 431 (Mo. App. E.D. 2020) ("a legal duty owed by one party to another . . . may be prescribed by the legislature"). Additionally, Missouri state law has expressly defined "unfair practice[s]" to include any activity which, among other things, "offends any public policy as it has been established by the Constitution, statutes or common law of this state." *Huch v. Charter Communications, Inc.*, 290 S.W.3d 721, 725 (Mo. 2009) (cleaned up). Either provides an independent basis allowing § 416.031.2 to serve to establish Defendants' duties for the purpose of a common law negligence action.

15

In other words, both controlling authority from the Eighth Circuit and Missouri state courts, as well as persuasive authority from this district and courts around the country, establish that Missouri may rely on federal statutes, including federal antitrust provisions, to establish a source of duty for a negligence claim under Missouri common law. *Iconco*, 622 F.2d at 1296; *Hofbauer*, 700 F.2d at 1201; *Connolly*, 453 F.Supp.2d at 1109–10; *Aragon*, 924 F.Supp.2d at 1072; *Ocean State*, 883 F.2d at 1114. To the extent the Court concludes that Missouri's federal and state antitrust legal theories may not be expressed through Count IV of Missouri's Complaint, the fact remains that the relevant state and federal antitrust statutes still serve to establish Defendants' duties for the purpose of a common law negligence action under Count IV of Missouri's Complaint.[3]

In support of this duty, Missouri has provided extensive briefing to the Court demonstrating that federal and state antitrust laws apply to Defendants, and, therefore, impose upon Defendants duties under the common law. *See, e.g.*, Pl.'s Supp. Br. in Support of his Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 87 at 3–13; Pl.'s Second Supp. Br. in Support of His Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 90 at 2–19. Missouri has, furthermore, provided the Court with extensive evidence that Defendants have breached this duty

---

[3] Although federal and state antitrust statutes provides the clearest examples of a duty (and Defendants' breach of that duty), Missouri has also previously briefed examples (alongside the federal and state antitrust statutes) of alternative sources of Defendants' common-law duties in this action. Missouri's FSIA trial brief additionally provides alternative examples of sources of Defendants' duty stemming from both federal law and a common-law duty arising out of Defendants' affirmative misrepresentations. *See* Pl.'s FSIA Default Hearing Br. at 86–88.

16

through their anticompetitive and monopolistic activities, as well as the scope of damages directly caused by Defendants' hoarding of PPE. *See, e.g.*, FSIA Default Hearing Br. at 32–55, 75–84, 90–111; Pl.'s Supp. Br. in Support of his Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 87 at 15–26. To the extent the Court concludes Count IV does not allow Missouri assert legal theories of recovery based in federal or state antitrust statutes, Missouri has, in the alternative, demonstrated each necessary element of a common-law negligence claim and damages suffered by the state in the amount of $8,162,941,819.00.

### PLAINTIFF'S RESPONSE TO CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW'S SUPPLEMENTAL AMICUS CURIAE BRIEF

### Introduction

At the eleventh hour—indeed, waiting until a month after the FSIA default hearing and a day after Missouri's own supplemental briefing deadline on a question presented by the court had passed—China Society moved to file a supplemental amicus curiae brief in this case. Each of the arguments raised in China Society's brief—a brief that improperly seeks to act as a stand-in for defaulting parties—is incorrect. Missouri, pursuant to the Court's February 28, 2025 order, files this response to highlight to the court some of these legal and factual errors.

As an initial matter, China Society's amicus should be struck or otherwise set aside as an improper attempt by a (purported) amicus to litigate on behalf of Defendants. China Society does not even attempt to maintain the illusion of seeking to be a proxy for Defendants in this action, attempting to directly argue post-hoc this Court's evidentiary decisions or that particular affirmative defenses should apply. It

is perhaps unsurprising that China Society seeks to argue on behalf of Defendants, as available evidence suggests that China Society, despite holding itself out as an "academic organization" based in Wuhan, is in fact largely (if not entirely) operated and controlled by Chinese state officials.  But this Court should not accept such blatant gamesmanship by Defendants who refuse to appear but then attempt to send a proxy to argue in their stead.

On the merits, China Society's arguments in support of Defendants clearly fail. China Society first attacks Missouri's reliance on federal antitrust statutes as both a legal theory and a source of a duty of Defendants for a common-law claim.  Missouri has extensively briefed this question, explaining how both controlling Supreme Court decisions and the rules of textual interpretation demonstrate that Defendants each fall under the definition of "person" as used in federal antitrust laws.  China Society, despite waiting to file its amicus brief until after Missouri submitted briefing on this question, grapples with none of Missouri's arguments.  Instead, China Society relies largely on out-of-circuit cases that were issued *before* the Supreme Court's *Pfizer* and *City of Lafayette* decisions establishing that Defendants may be sued under federal antitrust laws.  China Society's only other authority, a 1979 district court case from the Central District of California, is not only distinguishable on its face but contains fundamental legal errors that make it serve only dubious (if any) persuasive authority.  Even if Supreme Court precedents did not already conclusively demonstrate that each Defendant falls under the definition of "person," none of China

Society's arguments support its attempt to shield Defendants from federal antitrust laws.

China Society's attempt to argue that Missouri state antitrust laws do not apply to Defendants and their actions at issue in this lawsuit fares no better.  China Society entirely fails to reference the correct state antitrust statute Missouri is asserting, let alone cite any cases analyzing the statute.  Its sole legal argument, that Missouri law can never apply to extraterritorial conduct that has effects in Missouri, is refuted not only by the text and structure of Missouri's antitrust statutes, but also how Missouri law has been applied by this Court, the Missouri Supreme Court, and the Eighth Circuit.  This Court should reject China Society's argument.

Further disavowing any illusion of being merely an "amicus curiae," China Society additionally attempts to attack the sufficiency of Missouri's evidence demonstrating that Defendants engaged in anticompetitive behavior which had a direct effect on the United States and the State of Missouri.  These arguments fail.  Missouri has clearly established the direct effects of Defendants' actions, not only in the United States but in the State of Missouri itself.  China Society offers no argument to the contrary beyond bare, conclusory statements that seemingly attempt to simply ignore the wealth of evidence submitted into the record.  China Society's alternative argument, attempting to claim—without factual or legal support—the existence of an "intervening cause[]" similarly fails.  The Eighth Circuit has already recognized that "[t]he most basic supply-and-demand principles tell us that these market effects depended little, if at all, on variables independent of [China's] conduct

19

given the information asymmetry and tight timeframe that existed at the time." *Missouri ex rel. Bailey*, 90 F.4th at 939. Nothing has changed since this decision, except for the addition of significant, uncontroverted evidence submitted to the record demonstrating that the Eighth Circuit's conclusion was correct.

Perhaps sensing the weakness of their arguments, China Society ultimately pivots its brief to argue that Defendants anticompetitive acts "should be deemed valid under the act of state doctrine" and, therefore, immune from antitrust law. China Society Br. at 15. As Missouri has already demonstrated in its February 26, 2025 Supplemental Brief, controlling Supreme Court decisions demonstrate that the act of state doctrine does not apply here for multiple, independent reasons. The act of state doctrine "has no application" where, as here, a plaintiff seeks liability against a foreign sovereign but does not ask for a court to enter an order declaring that the foreign sovereigns acts themselves are legally invalid. Separately, the Supreme Court has said that act of state doctrine *does not apply* to lawsuits involving the "purely commercial conduct of foreign governments." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 698 (1976). Each of these are fatal to China Society's arguments. Were all of this not enough, the act of state doctrine is an affirmative defense which the Defendants carry the burden of both asserting and proving—two requirements clearly not met here because China defaulted.

Finally, China Society's brief closes with a series of nonspecific arguments about the evidentiary standard and evidence already admitted into the record. China Society's attempt to relitigate the admission of evidence this Court *already admitted*

20

*into the record* over a month ago on behalf of Defendants again demonstrates the improper nature of its purported "amicus" brief.  What's more, these evidentiary arguments clearly fail.  China's challenge to the evidentiary standard of FSIA default cases both lacks legal support and fails to acknowledge the fact that China is *exactly* the kind of "absent and likely hostile" sovereign for which the standard most clearly applies.  Finally, China Society's attempt to attack the "admissibility" or strength of evidence already admitted by the Court is both legally incorrect and fails to actually identify any specific evidentiary deficiencies with the record.

Despite its best efforts to act as a stand-in proxy for Defendants, China Society can offer the Court nothing more than erroneous legal conclusions and a handful of arguments divorced of factual or legal support.  Missouri respectfully requests that this Court enter a judgment against all Defendants on Count IV of its Complaint.

## Analysis

## I.    China Society's amicus curiae brief should be stricken or otherwise set aside as an improper attempt by a purported "amicus" to in fact argue the merits of the case on behalf of defaulting parties.

As an initial matter, the contents of China Society's amicus should be struck or otherwise set aside as an improper attempt by a (purported) amicus curiae to litigate on behalf of Defendants in this action.  It is "improper" for an amicus to "act[] as a party litigant."  *United States v. Puerto Rico*, 398 F. Supp. 3d 1, 2 (D.P.R. 2019); *see also M.E. v. T.J.*, 854 S.E.2d 74, 114 (N.C. App. 2020), *aff'd as modified*, 869 S.E.2d 624 (N.C. 2022) (similar).

21

Whereas before China Society may have sought to appear to raise only jurisdictional concerns, its most recent (untimely) brief maintains no such illusion and instead makes clear that it seeks to litigate this case on behalf of China. China Society's amicus brief directly seeks to argue questions directly on the merits of the case—for example, they (unsuccessfully) attempt to directly argue that Missouri has "failed" to meet its burden or that certain *affirmative defenses* that could only be invoked by Defendants (such as the act of state doctrine) should apply. *See, e.g.*, China Society Br. at 5, 15. This is not the proper role of an amicus. Indeed, to allow China Society to argue in such a capacity would mean that no foreign country need ever appear and respond to a claim brought against them in U.S. courts. After all, why would a foreign country answer and respond (subjecting the foreign country to the various requirements of litigation, such as discovery obligations) when they could just send a surrogate to argue all of their points for them as an amicus? Such a situation appears to be the precise case here. To allow China Society to do so would significantly weaken any future litigation against foreign states under the FSIA—hamstringing the express statutory avenue to bring these claims. The Court should not brook such gamesmanship.

The reality is that China Society simply seeks to litigate this case on behalf of Defendants while shielding Defendants from any actual participation in this lawsuit. This is unsurprising, given available evidence strongly suggests China Society, despite its representations to the Court as merely "an academic organization," ECF 91 at 1, is actually controlled by Defendants. China Society (*i.e.*, the Chinese Society

22

of Private International Law) bears a close relationship with the Chinese Society of International Law (CSIL), an organization expressly founded by China's Ministry of Foreign Affairs (itself the international diplomacy arm of the CPC and PRC).[4]  To give one example, China Society and CSIL appear to have the same President—a President who is also a government official in China's legal field.[5]  The organizations' share a president, a Chinese government official named Huang Jin, who, in addition to these (and other) presidencies, also currently works as "Special Counsel of the Supreme People's Court" and Expert Counselor of the Supreme People's Procuratorate—the top prosecutorial agency of the People's Republic of China.[6]  The list of direct overlap in leaders between China Society and CSIP (an express arm of the CPC), many of whom also appear to conveniently work as high-ranking government officials in China, goes on and on.  For example, Yongping Xiao works concurrently as Executive Vice President of China Society and Vice President of

---

[4]   *Foreign Affairs*, ASIA SOC'Y POL'Y INST. (Mar. 5, 2024), https://asiasociety.org/sites/default/files/inline-files/Center%20for%20China%20Analysis_Decoding%20Chinese%20Politics_Foreign%20Affairs_5.pdf; Dylan M.H Loh, *China's Rising Foreign Ministry: Practices and Representations of Assertive Diplomacy*, STAN. UNIV. PRESS, https://www.sup.org/books/politics/chinas-rising-foreign-ministry/excerpt/introduction (last visited Feb. 28, 2025) (describing how China's Ministry of Foreign Affairs, in its "representational role," "acts [and] speaks on behalf of the . . . [Chinese Communist] Party and express[es] [the Chinese Communisty Party's] interests, values, and ideologies").

[5] https://www.chinajusticeobserver.com/contributors/jin-huang#google_vignette.

[6] *Supreme People's Procuratorate: Ensuring Legal Integrity in China*, CHOI & PARTNERS, https://www.chinalegalexperts.com/news/supreme-peoples-procuratorate (last visited Feb. 28, 2025).

SCIP, while *also* working as a member of the Advisory Committees of the Supreme People's Procuratorate of China and the Ministry of Foreign Affairs.[7]

In other words, the purported "academic organization" that seeks to file an amicus supporting Defendants is in fact directly controlled and directed by Defendants' agents—while it seeks to argue on behalf of Defendants, who themselves have refused to appear.  The Court should not accept such blatant gamesmanship by an "amicus" apparently controlled by the very same Defendants who refused to participate after they were properly served.

China Society's proffered amicus brief "is not a memorandum *amicus curiae*, one filed as a friend of the court.  In fact, to coin a Latin phrase, it is a memorandum *amicus petitor*," or, perhaps more accurately here, *amicus reus*, "one proffered as a friend of the [Defendants]."  *Leigh v. Engle*, 535 F. Supp. 418, 422 (N.D. Ill. 1982).  As such, this Court should strike or otherwise set aside the arguments of China Society as an improper attempt by a purported amicus to litigate this case on behalf of a defaulting party.

## II.   Defendants' hoarding of PPE falls within the scope of federal antitrust laws.

Turning to the arguments raised in China Society's amicus (petitor) brief, China Society first argues that "federal antitrust law does not create any duty for foreign sovereigns" and, therefore (according to China Society), Defendants'

---

[7] https://www.chinajusticeobserver.com/contributors/yongping-xiao#google_vignette%20https://scdr-conference.mlaw.gov.sg/speakers-and-moderators/panel-2

anticompetitive actions in violation of the Sherman Act cannot either serve as a basis for recovery under the statutes or form a common-law duty Defendants breached. This is plainly incorrect. Missouri has briefed this question at length, including providing arguments which China Society, although delaying filing its amicus until after Missouri submitted its Second Supplemental Brief, wholly fails to even respond to. This silence is telling. What's more, China Society's attempt to argue this position on behalf of Defendants in fact clearly demonstrates the deficiencies in its own argument.

One of the fundamental deficiencies of China Society's argument is apparent in its near-total reliance on district court and out-of-circuit cases issued before the Supreme Court's 1978 *Pfizer* and *City of Lafayette* decisions—all while studiously avoiding *any actual analysis* of the relevant Supreme Court cases (all previously cited by Missouri) that control. *See* China Society Br. at 6 (citing *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291 (D. Del. 1970); *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977)). This failure alone is telling. Missouri has detailed at length how the Supreme Court has squarely held that the term "person" includes foreign countries. *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 213 (1978). As the Court observed in *Pfizer*, "the phrase 'any person'" should be interpreted to have a "broad and inclusive meaning" that "is inclusive rather than exclusive, *and does not by itself imply that a foreign government, any more than a natural person, falls without its bounds*." *Id.* at 312, 312 n.9 (emphasis added).

25

Although *Pfizer* considered whether the term "person" encompassed foreign nations as plaintiffs, the Court never suggested it read the definition's language (which itself makes no distinction between "person" as used for a plaintiff or a defendant) to hold any difference if the foreign state is named as a defendant in an antitrust action. Indeed, only a few months later, the Court explained that the term "person" means the same thing throughout the statute; whether a "person" is a plaintiff or defendant is a distinction without a difference for purposes of the statutory definition. In *City of Lafayette, La. v. Louisiana Power & Light Co.*, the Supreme Court held that, although cases such as *Pfizer* and *Georgia v. Evans* interpreted the scope of "person" under antitrust law as "involve[ing] the public bodies as plaintiffs," rather than defendants, "the basis of those decisions *plainly precludes* a reading of 'person' or 'persons'" which would include public bodies "that sue as plaintiffs *but not to include* such" public bodies as "persons" "when sued as defendants." 435 U.S. 389, 397 (1978) (emphasis added). As the Court explained, the definition of "person" as used in 15 U.S.C. § 7 is a "general definition section[]" that maintain[s] a consistent definition of the terms "wherever used in this [Act]." *Id.* at 395. This is especially the case given, as the Supreme Court has held, any reading of the Sherman Act must be made with a "presumption *against* implied exclusion from coverage under the antitrust laws." *Id.* at 398; *see also id.* at 408 (rejecting the argument that "governmental entities . . . are, simply by reason of their status as such, exempt from the antitrust laws.").

Both the Supreme Court and other federal courts have since affirmed that the treatment of foreign states as "persons" under antitrust laws applies regardless of whether the foreign state is a plaintiff or a defendant. In *Flamingo Industries*, a unanimous Supreme Court, citing *Pfizer*, again recently reaffirmed that, under the Sherman Act, "corporate or governmental status in most instances"—specifically, in every instance in which the U.S. federal government is not a party to the antitrust action—"is not a bar to the imposition of liability on an entity as a 'person' under the Act." *U.S. Postal Service v. Flamingo Industries (USA) Ltd.*, 540 U.S. 736, 744–45 (2004). And, in *Celestine v. Caribbean Air Mail, Inc.*, the Second Circuit concluded that the plaintiffs were not barred from asserting an antitrust claim against the government of Haiti.[8] 30 F.4th 1233, 135–36 (2d Cir. 2022); *see also* Pl.'s Second Supp. Br. in Support of His Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 90 at 5–19, 13–15 (providing additional legal analysis on the definition of "person" under antitrust statutes).

---

[8] As with the Supreme Court's *Pfizer* and *City of Lafayette* cases, China Society demonstrates that it is aware of the Second Circuit's decision in *Celestin*, and yet entirely fails to grapple with the fact the Second Circuit's opinion runs contrary to its argument. *See* China Society Br. at 6 n.5 (citing *Celestin* with no mention of the fact the Second Circuit concluded the plaintiffs were not barred from asserting an antitrust claim against the government of Haiti). Indeed, *Celestin* demonstrates China Society's error in attempting to minimize the role of *Pfizer* and *City of Lafayette* in antitrust jurisprudence. It is notable, for example, that the Second Circuit issued *both* the pre-*Pfizer Hunt* and the post-*Pfizer Celestin* decisions. Those two decisions on whether an antitrust claim could be brought against a foreign sovereign could not be further apart, and for good reason—in between the two decisions came the Supreme Court's controlling decisions in *Pfizer* and *City of Lafayette*.

Furthermore, as Missouri detailed at length in its second supplemental brief, the Supreme Court's construction of 15 U.S.C. § 7 in *City of Lafayette*, even if it were not binding on this Court, is consistent with well-established methods and presumptions of textual interpretation. *See* Pl.'s Second Supp. Br. in Support of His Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 90 at 9–12.

China Society, despite waiting to file an amicus until *after* Missouri presented these arguments in response to the Court's order, does not grapple with any of these cases (or, indeed, even the language of the Sherman Act). Instead, China Society largely attempts to ignore these cases in favor of contradictory lower-court decisions issued *before* the Supreme Court's *Pfizer* and *City of Lafayette* decisions. Indeed, the *only* decision China Society materially relies upon that was issued after the Supreme Court's *Pfizer* and *City of Lafayette* is a single, 1979 district court decision out of the Central District of California. *See* China Society Br. at 6–9 (citing *Int'l Ass'n of Machinists & Aerospace Workers v. Org. of Petroleum Exporting Countries*, 477 F. Supp. 553 (C.D. Cal. 1979) ("*IAM*")). China Society's reliance on this single case is, to put it mildly, strained.

*IAM* is clearly distinguishable on its face. In *IAM*, the plaintiff sought injunctive relief against the actions of foreign states to enjoin actions by those states which the district court concluded were sovereign—rather than commercial—activities. *IAM*, 477 F. Supp. at 559 (noting the plaintiffs are seeking in part "injunctive relief . . . praying this Court to enjoin the price setting activities of . . . OPEC and member nations"); *id.* at 569 ("this Court finds that the activity carried on

28

by the defendant OPEC member nations is [n]ot 'commercial activity'").  Neither of these aspects is the case here.  The Eighth Circuit has already held that Defendants' actions, forming the basis of Count IV of Plaintiff's Complaint, "were commercial in nature."  *Missouri ex rel. Bailey*, 90 F. 4th at 938.  Furthermore, Missouri is not seeking any injunctive relief, but, rather, only recovery of the damages it has suffered (and will continue to suffer) from China's hoarding of PPE.  As noted below, each of these distinctions is fundamental.

On the merits, China Society's reliance on *IAM* fares no better.  Indeed, the district court's reasoning in *IAM* suffers the same deficiency as China Society's argument—an almost exclusive reliance on lower-court cases issued *before* the Supreme Court's decisions in *Pfizer* and *City of Lafayette* and which contradict the later decisions of both the Supreme Court and the Second Circuit.  *Id*. at 571 (citing *Hunt* and *Interamerican Refining Corporation*).  As such, the district court's analysis holds little (if any) persuasive value.

Of course, this reasoning eventually must run headlong into the Supreme Court's reasoning of *Pfizer*, which clearly contradicts the district court's conclusion.  The court in *IAM* claimed, therefore, that it could distinguish away the Supreme Court's recent decision in *Pfizer* to only "the strict confines of that case" because, according to that court (and China Society), "[t]o include foreign nations with the ambit of 'persons' who may be sued as defendants, . . . would require judicial interference in sensitive foreign policy matters."  *Id*. at 572; *see also* China Society Br. at 8 (raising identical arguments).  On this basis alone, the district court in *IAM*,

29

and China Society, assert that the identical textual definition of "person" should be read differently depending on whether a foreign state is a plaintiff or defendant. *Id*. Several problems with the *IAM* court's (and China Society's) reasoning become immediately apparent.

*First*, the Supreme Court has *expressly rejected* the reasoning in *IAM*. The *sole* basis in *IAM* for trying to narrow *Pfizer* to its facts was the concern that applying *Pfizer* according to its plain language "would require judicial interference in sensitive foreign policy matters." *Id*. at 572. But the Supreme Court has since rejected the idea that courts should "consider the worrisome international-relations consequences" of any decision or whether any decision would "threaten harm to the United States' foreign relations more generally." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 146 (2014). As the D.C. Circuit has explained, since at least *NML Capital*, "there is no room for courts to engage in discretionary, comity-based interest-balancing to decide 'whether and when to exercise judicial power over foreign states.'" *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019) (quoting *NML Capital*, 573 U.S. at 140).[9] This Court should not accept China

---

[9] China Society cites the Supreme Court's recent decision of *Republic of Hungary v. Simon* for the prospect that courts should purportedly "avoid, where possible, producing friction in our relations with [other] nations . . . ." China Society Br. at 8 (quoting *Republic of Hungary v. Simon*, 145 S. Ct. 480, 494 (2025)). China Society provides no more than passing reference to this case, and likely for good reason: the language used by the Court in *Simon* in fact *strongly supports* Missouri's argument. China Society's quote relates to the Supreme Court's interpretation of the expropriation exception to sovereign immunity under the FSIA and whether that exception is broad enough to allow for Holocaust survivor victims to overcome the FSIA's "baseline presumption of immunity" and sue for expropriated property. *Simon*, 145 S. Ct. at 494. *Simon's* reaffirmance of the narrow reading of certain

Society's suggestion to adopt an interpretative method not grounded in the text and case law but instead judicial policymaking that the Supreme Court has expressly rejected.[10]

*Second*, the court in *IAM* provided no authority for its proposition that "sensitive foreign policy matters" counsel its interpretation of antitrust laws, beyond a citation of a single-justice dissenting opinion from the majority's holding in *Pfizer*. *Id*. The district court's lack of authority for its proposition (besides, again, a single-justice dissenting opinion) that it should read a Supreme Court decision issued *less than a year prior* as limited to "the strict confines of that case" itself limits any persuasive authority of its holding.

*Third*, the court's conclusion entirely fails to grapple with 15 U.S.C. § 7 or 15 U.S.C. § 15(b)'s text defining and using the term "person," *see* Pl.'s Second Supp. Br. in Support of His Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 90

---

exceptions to sovereign immunity in the FSIA has no bearing on this case. On the other hand, in the same section of the opinion as the quoted language, the Supreme Court observed that permissible "litigation against foreign states" include "litigation . . . premised on the foreign state's private, commercial conduct." *Id*. at 493. Litigation "premised on the foreign state's private commercial conduct" is *exactly* the category of allegations underpinning Count IV of Missouri's Complaint. To the extent *Simon* relates to this case, it shows that Missouri's lawsuit is exactly the kind of "usual[]" case against a foreign state contemplated by the Supreme Court. *Id*.

[10] China Society, while offering (legally incorrect) arguments on behalf of Defendants concerning whether antitrust laws apply to foreign sovereigns, offers no argument antitrust laws do not apply to non-state Defendants Wuhan Institute of Virology and Chinese Academy of Sciences. The Eighth Circuit has held that both Defendants, although constituting "instrumentalities" of China for the purpose of the FSIA, remain "legally separate from the government." *Missouri ex rel. Bailey*, 90 F. 4th at 935. Even China Society appears to concede federal antitrust laws apply to those Defendants.

at 9–12, and instead simply concludes that the case involves "sensitive foreign policy matters" and therefore the court lacked any jurisdiction.  The court's interpretation of the Sherman Act's definition of person (to the extent the court's conclusion can be described as such), however, directly contradicts the Supreme Court's instruction on interpreting the term as used in antitrust laws.  The Court has instructed that the term "person" should have a "broad and inclusive meaning," and that the term must be read in light of the Court's "presumption against implied exclusion from coverage under antitrust laws." *Pfizer*, 434 U.S. at 312, *City of Lafayette*, 435 U.S. at 398.  Both of these principles are contradicted by the district court's summary conclusion of the meaning of the term "person."  The district court's failure to grapple with the Court's instruction results in a decision of dubious value.

Were that not enough, this is where some of the key distinguishing factors of *IAM* comes into play.  As noted above, the Court in *IAM* was asked to issue injunctive relief against a series of countries to enjoin actions which the district court concluded were sovereign acts.  *IAM*, 477 F. Supp. at 559, 569.  To the extent it is ever appropriate for a court to consider "foreign policy matters" when interpreting a general commercial statute (it is not), such concerns would be at their zenith when a plaintiff is seeking to *enjoin* sovereign actions of other states.  On the other end, the current case is markedly distinct.  Missouri is present seeking damages—not injunctive relief—against foreign defendants for *commercial* acts the foreign defendants engaged in.  To the extent the district court's foreign policy considerations

could even be given any weight at all (which they cannot, for the reasons addressed below), they are entitled to markedly little weight here.[11]

Missouri has demonstrated at length, both above and in previous briefing, how federal antitrust statutes both may be directly applied against Defendants and create a duty of Defendants under Missouri common law. None of China Society's arguments to the contrary seriously engage with the binding Supreme Court precedents and textual analysis Missouri provides. Instead, China Society relies almost exclusively on legal decisions that have since been abrogated, supplemented with a single district court decision of dubious persuasive authority. The Court should find that the duties arising out of federal antitrust statutes apply to

---

[11] The court in *IAM* also makes passing reference to *Parker v. Brown* to assert that its determination "is consistent with the Court's rulings concerning domestic States." *IAM*, 477 F. Supp. 572 at n. 19. China Society, likewise, attempts to make a similar argument. China Society Br. at 9. *Parker* is inapplicable, as it was based on reasoning that clearly *could not apply* to foreign countries. Specifically, the Supreme Court based its conclusions in *Parker* on state rights expressed through our "dual system of government . . . under the Constitution." *Parker v. Brown*, 317 U.S. 341, 351 (1943). The concerns underpinning the court's decision in *Parker* clearly do not apply here, where Defendants, as foreign states and agencies, do not have the same federalism rights under the Constitution. Indeed, the court in *IAM* did not reference, and Plaintiff is not aware, of any application of *Parker* or its doctrine to foreign countries. The logical gap is especially stark here, where all of the challenged acts of Defendants were commercial, rather than sovereign acts. Additionally, any such application to foreign countries would be barred by the Supreme Court's later decision in *City of Lafayette* (not addressed by the district court) that the basis for decisions interpreting the term "person" under antitrust law "plainly precludes a reading of 'person' or 'persons'" which include public bodies suing as plaintiffs, but not when the bodies are "sued as defendants." 435 U.S. at 397. Finally, the even-later *Flamingo* decision puts the final nail in the coffin because it explains that if a government can sue as a plaintiff (as *Pfizer* holds), "then the Government would be exposed to liability as an antitrust defendant." 540 U.S. at 745. The district court in *IAM* did not have access to *Flamingo*, which was decided a quarter-century later.

Defendants, and that Missouri has provided evidence sufficient to satisfy the Court of a breach of those duties.

## III.    Defendants' hoarding of PPE falls within the scope of state antitrust laws.

China Society next attempts to argue that Missouri's state antitrust laws also do not extend to cover the actions of Defendants or otherwise impose a duty on Defendants. This argument fares no better.

As an initial matter, China Society's surface-level discussion of Missouri law entirely ignores the relevant statutory text and fails to engage with judicial interpretations of Missouri antitrust law. Indeed, China Society does not even analyze the correct statute forming the basis for Missouri's state-law antitrust claims and a common-law duty deriving from state law. The only Missouri statute China Society cites is the Missouri Merchandising Protections Act (MMPA), § 407.010. But of course, as Missouri has detailed at length, its statutory state antitrust legal theory is based on the language of *§ 416.031.2*, not the MMPA. *See, e.g.*, Pl.'s Second Supp. Br. in Supp. of His Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 90 at 16–19. China Society's refusal to even grapple with the language of the correct statute is telling.

In its amicus brief, China Society instead makes only one argument regarding Missouri law: it makes a sweeping assumption that Missouri law can never apply extraterritorially. But the text and structure of Missouri's antitrust statute prove China Society wrong for several reasons.

34

*First*, China Society ignores that China's actions had *effects* in Missouri, and there is no dispute Missouri's antitrust laws cover conduct that has effects in the State. Missouri law encompasses "[e]xtraterritorial acts that produce consequences in the state." *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 232 (Mo. 2010); *see also Schwartz & Assocs. v. Elite Line, Inc.*, 751 F. Supp. 1366, 1369 (E.D. Mo. 1990); *TLC Vision (USA) Corp. v. Freeman*, No. 4:12CV01855ERW, 2013 WL 230254, at *7 (E.D. Mo. Jan. 22, 2013); *NEXTEP, LLC v. KABA Workforce Sols., Inc.*, No. 4:07 CV 01107 RWS, 2007 WL 9809030, at *3 (E.D. Mo. Oct. 5, 2007). Missouri's damages claim concerns China's commercial actions that had effects in Missouri.

That is why this Court, the Missouri Supreme Court, and the Eighth Circuit *all* apply Missouri law to acts that occur outside Missouri. *See, e.g.*, *Schwartz*, 751 F. Supp. at 1369 (applying Missouri tort law claims to out-of-state defendants related to actions occurring in China); *State ex rel. Key Ins. Co. v. Roldan*, 587 S.W.3d 638, 643 (Mo. 2019) (applying Missouri tort law claims to out-of-state defendants); *Downing v. Goldman Phipps, PLLC*, 764 F.3d 906, 911 (8th Cir. 2014) (same); *Turtle Island Foods, SPC v. Thompson*, 725 F. Supp. 3d 963, 974 (W.D. Mo. 2024) (applying Missouri statute to out-of-state defendants). This is because "many (maybe most) state laws have the practical effect of controlling extraterritorial behavior." *Turtle Island Foods*, 725 F. Supp. at 974 (quoting *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023)) (internal quotation marks omitted) (upholding a Missouri meat regulation statute that had extraterritorial reach). Therefore, China Society's sweeping assertion that "Missouri statutes generally have no extraterritorial effect,"

China Society Br. at 11, is plainly false.  Implementing China Society's "*per se* rule" against state laws with extraterritorial application "would cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers." *Turtle Island Foods*, 725 F. Supp. at 974 (quoting *Ross*, 598 U.S. at 375). Missouri law not only applies extraterritorially but also covers Defendants' actions here.

*Second*, the language of various provisions in Missouri antitrust law explicitly cover foreign entities.  Section 416.131 prohibits the barring of any state antitrust action "on the ground that the activity or conduct complained of in any manner affects or involves *interstate* or *foreign* commerce" (emphasis added).  By using both "interstate" and "foreign," the legislature intended to include commerce with foreign nations, not just with other states inside the U.S.  "Where the legislature uses two different terms in the same statute, it must be presumed that it intended the terms to be given different meanings." *City of Wellston v. SBC Commc'ns, Inc.*, 203 S.W.3d 189, 196 (Mo. 2006), *as modified on denial of reh'g* (Oct. 31, 2006); *see also Alberici Constructors, Inc. v. Dir. of Revenue*, 452 S.W.3d 632, 638 (Mo. 2015) ("The legislature's use of different terms in the same statute is presumed to be intentional."). If the legislature only intended Missouri antitrust law to apply to other U.S. states, it need only have said "interstate commerce."  The additional term "foreign" shows the legislature intended Missouri antitrust law to apply to foreign nations.  In any event, interstate or foreign commerce is, by definition, extraterritorial.  Interstate or foreign commerce is only possible if the defendant

resides outside the state of Missouri or if the illegal activity occurs entirely or partially outside Missouri's borders.

*Third*, § 416.031, the section of Missouri antitrust law under which Plaintiffs seek recovery, is broad by its plain terms.  Subsection (1) provides that "[e]very contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful."  Similarly, subsection (2) states that "[i]t is unlawful to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce" in the state of Missouri.  § 416.031(2).  These provisions do not limit their application and thus sweep up *all illegal conduct* by *any defendant*.  *See* Pl.'s Second Supp. Br. in Support of His Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 90 at 17–19.  Moreover, Missouri's "antitrust laws are to be construed liberally and exceptions from their application are to be construed strictly."  *Fischer, Spuhl, Herzwurm & Assocs., Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, 313 (Mo. 1979).  This interpretive presumption supports a broad reading of § 416.031(1)–(2) that leaves no room for unstated exemptions.

China Society further raises a discussion of the term "person" in the MMPA— a statute Plaintiffs do not rely on for their theory of recovery.  China Society Br. 10–11.  To the extent that China Society's discussion of the word "person" is relevant (it is not), this Court need not decide the meaning of the word "person" under Missouri antitrust law.  China Society makes no arguments about the word "person" under any provision of Missouri antitrust law, or grapples with the fact that § 416.031(2) never once uses the word "person."

What's more, China Society's argument on the meaning of "person" under the MMPA, to the extent it is relevant at all, in fact demonstrates the error of its argument. China Society argues that "person" under the MMPA is narrow, excluding foreign states. Under this argument, it is significant that the drafters of § 416.031 chose to use the limiting term of "person" in § 416.031.3, but not § 416.031.2. The disparate language between the two subsections is a "significant indicator" of the intent of the drafters to *exclude* any such limiting language in § 416.031.2. *Denbow v. State*, 309 S.W.3d 831, 835 (Mo. App. W.D. 2010). After all, § 416.031(1)–(2) intentionally leave out the word "person," sweeping up all unlawful conduct in restraint of trade without any limitation on who may be deemed to have breached those provisions.. If it were true that "person" is narrow (it is not), China Society's argument would actually support a broad interpretation of § 416.031(1)–(2).

*Fourth*, the provision creating express exemptions to Missouri's antitrust laws *does not* exempt foreign states. *See* Mo. Rev. Stat. § 416.041. Any "exceptions from [the] application [of Missouri antitrust laws] are to be construed strictly" and "narrowly." *Fischer*, 586 S.W.2d at 313. As the Missouri Supreme Court has held, "[i]mplied antitrust immunity is not favored, and can be justified only by a *convincing showing*" that an entity clearly falls within the exemption. *Id.* at 313 (emphasis added) (quoting *United States v. Na'l Assoc. of Sec. Dealers, Inc.*, 422 U.S. 694, 719–20 (1975)). Section 416.041 explicitly exempts only four entities: (1) certain labor organizations, (2) certain agricultural organizations, (3) persons carrying out certain activities regulated by state or federal law, and (4) utility cooperatives. Because none

38

of these covers Defendants, Missouri courts, construing the exceptions to antitrust law strictly, would not exempt Defendants from the scope of § 416.031.2. *See Fischer*, 586 S.W.2d at 313–14 (refusing to exempt an entity where Missouri antitrust law contained no "express exemption" for that entity, in order to "adhere to the narrow construction given to exemptions to the federal antitrust statutes, as we are directed to do by [§] 416.141"). Failing to engage with § 416.041 altogether, China Society does not come close to "convincing[ly] showing" that Defendants are exempt from Missouri antitrust law.

China Society's legal authority not only provides no cases that are controlling— it entirely fails to cite any legal authority addressing a state antitrust regime (like Missouri's) that mentions or contemplates foreign application. *See* China Society Br. at 10–11. But that is the case here. Indeed, the only Missouri Supreme Court case China Society cites, *Tuttle v. Dobbs Tire & Auto Centers, Inc.*, dealt exclusively with the Missouri Human Rights Act (MHRA)—an entirely distinct statute in text and purpose. 590 S.W.3d 307 (Mo. 2019). The language of the MHRA—at issue in *Tuttle*—explicitly states that it applies *only* "within the jurisdiction of the state of Missouri." Mo. Rev. Stat. § 213.065. By contrast, Missouri antitrust law—at issue here—explicitly envisions application against foreign entities. Additionally, in *Tuttle*, the MHRA did not apply because there was "no actionable adverse impact *in Missouri*." *Tuttle*, 590 S.W.3d at 312 (emphasis added). Here, the Eighth Circuit already found that Missouri has alleged actionable adverse impact to Missourians from China's illegal hoarding—allegations which Missouri has, since then,

39

conclusively demonstrated to the Court. *See Missouri ex rel. Bailey*, 90 F.4th at 930, 938. Missouri's law *does* extend to "[e]xtraterritorial acts that produce consequences in the state." *Bryant*, 310 S.W.3d at 232. *Tuttle* does not control here.

*Finally*, China Society claims that applying Missouri statutes "to foreign sovereigns would likely violate the U.S. Constitution" because, according to China Society, "state law does not apply extraterritorially." China Society Br. at 11 (citing *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914)). But China Society's reliance on *Head* and its progeny is plainly misplaced. The Supreme Court's decision in *Head* has only been applied by the Supreme Court and lower courts for the uncontroversial proposition one State may not "impose its own policy choice on neighboring States." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 571 (1996); *see also Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring) (citing *Head* for the proposition "that the Constitution restricts a State's power to reach out and regulate conduct *that has little if any connection with the State's legitimate interests*.") (emphasis added). As detailed at length above, Missouri is not attempting to "impose its own policy choice" through injunctive relief or any other similar means. Rather, Missouri is simply seeking to recover economic damages inflicted by Defendants' commercial acts—a quintessential type of commercial claim—and inflicted *in Missouri*. China Society, of course, fails to grapple with any of these realities besides simply providing a string-cite of cases it claims supports their advocacy for Defendants' position. Furthermore, as shown above, courts, in the decades since *Head*, consistently apply Missouri law to acts that have

40

effects in Missouri.  China Society cites no authority that rebuts a reading that Missouri antitrust law applies extraterritorially and therefore covers Defendants' illegal actions.

China Society's arguments on the scope of Missouri's state antitrust laws fail to actually grapple with either the language of the relevant antitrust provision or any Missouri cases applying those antitrust laws.  Missouri courts would hold that Missouri antitrust laws cover Defendants and the actions at issue in this lawsuit, and this Court should do the same.

## IV.   Missouri has demonstrated the direct effects of Defendants' actions in the United States.

China Society next attempts to attack the sufficiency of Missouri's evidence, submitted into the record at the Court's January 27, 2025 hearing, demonstrating that Defendants' engaged in anticompetitive behavior which had a direct effect on the United States.  Again, China Society's purported "amicus" is remarkable in its attempt to simply litigate this case on behalf of Defendants—here, going so far as to make factual arguments on the sufficiency of evidence before the Court. Nevertheless, even with China Society trying to act as a stand-in litigant, its arguments fail.

At the outset, China Society's arguments are too little too late.  The trial has already occurred, and this Court already accepted the evidence submitted as uncontroverted and admitted that evidence into the record.  There is a time and place for factual arguments, and China's surrogate missed it.

41

In addition, Missouri has clearly established the direct effects of Defendants' actions, not only in the United States, but in the State of Missouri itself.  China Society offers no argument beyond conclusory statements that "Plaintiff has failed to show adequate legal and factual basis for any legal nexus between the alleged anticompetitive acts and the injury."  China Society Br. at 13.  This argument, made without any support, seemingly attempts to ignore the overwhelming amount of evidence Missouri has submitted into the record in this respect.  Much of this evidence is detailed at length in several of Missouri's filings.  *See, e.g.*, ECF 79 (Plaintiff's Foreign Sovereign Immunity Act Default Hearing Brief); ECF 90-1 (Plaintiff's Proposed Opinion and Judgment).  The evidence submitted by Missouri (deemed uncontroverted by Defendants' default) includes significant evidence that China, among other things, repeatedly and knowingly misrepresented the existence and human-to-human transmission of the COVID-19 virus for months after it knew the public statements it was making were false,[12] aggressively sought to suppress the spread of any information about COVID-19 (including by systematically targeting whistleblowers),[13] and, while denying and suppressing the knowledge of the existence and transmissibility of the COVID-19 virus, engaged in an aggressive campaign to hoard and monopolize PPE from the rest of the world.[14]  Missouri has, furthermore, provided substantial evidence demonstrating the direct effects of Defendants' actions on the United States—actions which include injuries inflicted upon Missouri and its

---

[12] *See, e.g.*, Pl.'s Ex. 3, 6, 9, 24, 33.
[13] *See, e.g.*, Pl.'s Ex. 6, 9, 24, Doc. 79 at 46, 49–55.
[14] *See, e.g.*, Pl.'s Ex. 2, 7, 8, 9, 29.

citizens through higher prices and PPE shortages.[15]  Missouri's evidence of damages in this respect includes not only unrebutted expert reports, but also evidence of direct expenditures provided by the State of Missouri.  In other words, Plaintiff has provided significant evidence to the Court of both Defendants' anticompetitive acts and the injury directly inflicted on Missouri as a result of these anticompetitive acts.  China Society provides no support for its baseless assertion to the contrary, besides willful blindness to the record.

China Society's fallback argument on behalf of Defendants is to argue that "even if we assume Defendants . . . engaged in the hoarding"—which, as Missouri has repeatedly noted, the evidence clearly demonstrates—the coronavirus pandemic itself was purportedly an "intervening cause[]" which means Defendants' global campaign of PPE hoarding should not be linked to a rise in PPE prices.  China Society Br. at 13.  Nonsense.  Missouri's claim is that China unlawfully hoarded and monopolized PPE in the early days of the pandemic, and this hoarding of PPE in turn caused prices to rise and shortages in Missouri of PPE.  Higher prices and shortages of PPE were clearly foreseeable and direct effects of China's actions to hoard the world's supply of PPE.  This is especially because, as Missouri has demonstrated, China knew about the risks and scope of COVID-19 before the rest of the world and aggressively sought to suppress that knowledge in order to support its campaign to hoard PPE.  *See supra.*

What's more, China's market size and role meant that its actions to hoard PPE would clearly have a direct and foreseeable role on the PPE market.  The Eighth

---

[15] *See, e.g.*, Pl.'s Ex. 1, 2, 7, 8, 9, 15, 29, 39.

Circuit has already directly recognized as much.  In holding that Missouri alleged China's actions had a direct effect on the United States, the Eighth Circuit noted that "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create" the harms to Missouri.  *Missouri ex rel. Bailey*, 90 F.4th at 939.  Indeed, as the Eighth Circuit held, "[t]he most basic supply-and-demand principles tell us that these market effects depended little, if at all, on variables independent of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time."  *Id.*  Nothing has changed since the court made that observation, and China Society offers no legal or factual support for any change since the observation was made.  Indeed, were there any doubt of the accuracy of this holding, Missouri has, since the Eighth Circuit's decision, provided extensive evidence to the Court demonstrating, China's market power in PPE, the information asymmetry that existed during the relevant times, and the incredible scope of China's hoarding campaign.  *See, e.g.*, Pl.'s FSIA Default Hearing Br. at 75–84.

China Society's attempt to serve as a surrogate party for Defendants by making factual arguments regarding the evidentiary record is an improper role for an amicus.  Even if considered, however, China Society's arguments challenging the sufficiency of Missouri's evidence fails.  Missouri has submitted significant evidence to the record demonstrating both Defendants' anticompetitive acts and the direct effects those actions had on the United States and State of Missouri.  What's more, China Society's attempt to muddy the water for Defendants by claiming "intervening

causes" is not only unsupported by any factual or legal authority—it was directly rejected by the Eighth Circuit and is refuted by the evidence Missouri has submitted in this case.

## V.    The Act of State Doctrine does not apply to Missouri's claim.

Perhaps sensing the weakness of their arguments, China Society then pivots and attempts to argue that Defendants' "anticompetitive acts . . . should be deemed valid under the act of state doctrine" and, therefore, immune from antitrust law. China Society Br. at 15.  China Society's only argument in this respect is that "[t]he act of state doctrine requires reviewing courts to 'deem valid' the acts of foreign sovereigns taken within their own jurisdictions.'"  China Society Br. at 15–16.

As Missouri demonstrated in its February 26, 2025 Supplemental Brief, controlling Supreme Court decisions demonstrate that the act of state doctrine does not apply to this case for several reasons.  *See* Pl.'s Second Supp. Br. in Support of his Foreign Sovereign Immunity Act Default Hearing Briefing, ECF 90 at 13 n. 4.  China Society, again, failed to respond to any of these arguments. Missouri repeats many of these arguments below in response to China Society's amicus brief.

*First*, the Supreme Court has clarified, as even China Society conceded, that the act of state doctrine applies only in the narrow instances where "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co, Inc. v. Environmental Tectonics Corp., Inter.*, 493 U.S. 400, 405 (1990); *see also Celestin*, 30 F.4th at 135 ("We hold that the act of state doctrine does

45

not foreclose [p]laintiffs' antitrust claim because no official act of Haiti must be deemed invalid for liability to attach under federal law."). None of Plaintiff's legal theories asks (or requires) this Court to enter a judgment legally declaring "invalid" or "ineffective" any official act by the People's Republic of China or any of its agencies in finding that these official acts violated antitrust laws and common law duties. As such, the act of state doctrine does not apply. As the Supreme Court observed, "[t]he act of state doctrine does not establish an exception that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken with their own jurisdictions shall be deemed valid." *Kirkpatrick*, 493 U.S. at 409–10. The doctrine "has no application to the present case, because the validity of no foreign sovereign act is at issue." *Id*. at 410.

*Second*, the commercial nature of Defendants' actions at issue in this case renders the act of state doctrine inapplicable. As previously noted, Eighth Circuit has already held that Defendants actions at issue in this lawsuit "were commercial in nature." *Missouri ex rel Bailey*, 90 F.4th at 938. The Supreme Court, in turn, has squarely rejected the argument that the act of state doctrine should be extended to claims based upon "the purely commercial conduct of foreign governments." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 698 (1976). As such, the act of state doctrine does not apply to Defendants' commercial actions at issue in this case.

*Third*, the act of state doctrine is an *affirmative defense* to antitrust claims, which the Supreme Court has expressly held the defendant bears the burden of

46

establishing.  *Id*. at 694 (holding that the defendant failed to satisfy their "burden of establishing their act of state defense."); *see also Petersen Energía Inversora S.A.U. v. Argentine Republic and YPF S.A.*, 895 F.3d 194, 212 (2d Cir. 2018) ("The act of state doctrine . . . [is] an affirmative defense.").  As Defendants are each in default, they are deemed to have waived any affirmative defenses in this lawsuit.  *Maalouf*, 923 F.3d at 1112.  And, even if they were not deemed to have waived any affirmative defenses, Defendants, by virtue of their default, have certainly failed to provide evidence carrying their burden of establishing a defense under the act of state doctrine.  *Dunhill*, 425 U.S. at 694.  As such, even if the act of state doctrine would otherwise apply (it does not), Defendants have failed to preserve it here.

China Society has offered no support that each of these hurdles—some of which are insurmountable in the event of a default—may be overcome.  As such, the Court should reject China Society's argument that the act of state doctrine applies.

## VI.    China Society's evidentiary arguments are both incorrect and foreclosed by this Court's previous decisions in this case.

China Society's brief pivots one more time, quibbling with the FSIA evidentiary standard and attempting to raise post-facto evidentiary challenges.  Both of these arguments are foreclosed by the Court's past decisions.  Furthermore, even if they were not, they are without merit.

China Society is effectively attempting to challenge post-hoc the admissibility of Missouri's evidence at the January 27, 2025 default judgment hearing.  But the Court has already ruled on this matter, accepting all of Plaintiff's proffered evidence

into the record at the hearing.  China Society has not provided any legal basis for the Court to reopen the record or allow these post-hoc challenges to the Court's evidentiary decisions through an amicus brief, and the Court should not entertain such gamesmanship.  Even if it were proper for a party to make these post-hoc evidentiary challenges (it is not), courts have regularly rejected attempts by amicus curiae to challenge or relitigate decisions the court already made.  *See, e.g., Larson v. Allina Health System*, 17-cv-3835, 2020 WL 583082, at *2 (D. Minn. Feb. 6, 2020) (denying a motion for leave to file an amicus brief in part because the amicus brief sought to argue issues already decided by the Court)

Nevertheless, even if China Society was seeking to challenge a future evidentiary ruling (it is not) and were properly arguing as a Defendant, rather than as an amicus (it is not), its arguments would still fail.

*First*, China Society takes issue with Missouri's citation of the D.C. Circuit's decision in *Owens v. Republic of Sudan*, claiming that the D.C. Circuit's standard should not apply "because *Owens* is a terrorism case."  China Society Br. at 16 (citing *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017)).  But the evidentiary standard expressed in *Owens* is consistent with other types of FSIA default cases. "[T]he Supreme Court has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.D.C. 2014) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981); *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 n. 14 (1973)).

48

Although it is certainly the case that the most common instance under the FSIA in which a foreign sovereign fails to appear and respond to a lawsuit is when the foreign sovereign is accused of being a state sponsor of terrorism (as in *Han Kim*), the D.C. Circuit's handling of the question in *Bundy* demonstrates that such is not always the case. The principles underpinning the evidentiary standard against a defaulting sovereign remain the same, regardless of whether the hostile sovereign engaged in terrorism or hoarded global medical supplies. The standard recognizes the practical realities of demonstrating a claim under the FSIA against a hostile (and defaulting) state, and "is part of the risk a sovereign runs when it does not appear" after it has been properly served. *Warmbier v. Democratic People's Republic of Korea*, 356 F.Supp.3d 30, 43 (D.D.C. 2018) (quoting *Owens*, 864 F.3d at 785).

Furthermore, China Society is incorrect to assert that the court in *Owens* required that the standard it expressed only applied to terrorism cases. The D.C. Circuit's decision observed that a "lenient standard is *particularly appropriate*" in such a case—not that it is "only" appropriate in such as case. *Owens*, 864 F.3d at 785. On the contrary, the language of *Owens* explaining why the evidentiary standard is appropriate—instances in "which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign"—clearly may apply beyond only the terrorism context. *Id.*

Indeed, the facts of this case (and the Defendants) demonstrate that the D.C. Circuit's standard is particularly appropriate here. The Court in *Owens* found that the evidentiary standard was "particularly appropriate" for an FSIA case in which

"firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens*, 864 F.3d at 785. As Missouri has demonstrated at length in this lawsuit, China certainly fits into the *Owens* court's definition of "an absent and likely hostile sovereign." China has a long, well-documented history of aggressively and systematically targeting whistleblowers— including even its own ordinary citizens—who try to speak out about the abuses of the Chinese government. And, as Missouri has demonstrated at length in this case, this unfortunate pattern only became more aggressive during the COVID-19 pandemic.[16] Pl.'s FSIA Default Hearing Br. at 49–55. Whistleblowers targeted by China for speaking out include Dr. Li Wenliang (who was forced by the PRC to make public retractions of truthful information before he ultimately died of COVID-19), Dr. Ai Fen (who was disciplined for trying to protect her hospital staff in the face of China's campaign of misinformation), and Professor Zhang Yongzhen (who had his career destroyed by Defendants after blowing the whistle on China's knowledge of the COVID-19 genome). *Id*. at 50–53. This is to say nothing of the long list of ordinary citizen "whistle-blowers [who were] 'disappeared' by the Chinese government for exposing the terrifying extent of the Covid-19 outbreak." *Id*. at 54. In other words, China is well known for "refus[ing] to appear in court and subject itself to discovery,

---

[16] China Society claims, without any citation, that Missouri "fails to explain why China should be deemed a 'hostile sovereign' or why firsthand evidence or eyewitness testimony is not required." China Society Br. at 17. This statement strains credulity. Missouri's briefing is replete with examples of China both acting as a hostile sovereign and its silencing of whistleblowers—including even its own citizens. *See, e.g.*, Pl.'s Foreign Sovereign Immunity Act Default Hearing Br., ECF 79 at 33–61.

and is known to intimidate defectors and potential witnesses." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014). China Society's argument on the proper evidentiary standard amounts to little more than attempted further obfuscation on behalf of Defendants.

China Society's remaining evidentiary objections (which it attempts to make on behalf of defaulting parties that failed to appear at the default hearing) are, similarly, without any merit. As already noted, this Court has already admitted each of Plaintiff's trial exhibits into the record without any objection from any party. China Society appears to post-facto challenge the evidentiary basis of an unknown number of these exhibits already admitted into the record, all without even citing any specific examples of exhibits they would seek (if they even could) to bring an untimely challenge against. Instead, China Society simply raises generic, conclusory arguments around "Plaintiff's trial exhibits" without providing any argument as to which exhibits they believe are inadmissible in the record or why. China Society Br. at 17–18. This Court should not allow parties to litigation, let alone last-minute amicus briefs, to engage in roving, nonspecific evidentiary challenges to the weight or admissibility of the evidence.

China Society's argument is particularly strained in the face of the broad expanse of different exhibits Missouri has offered, and the Court accepted, into the record. Some of Missouri's exhibits came from the State itself, while others are official U.S. government reports, trade and cost data, expert reports from Plaintiff's expert, or otherwise include statements made by Defendants' agents. China Society,

51

for its part, provides no identification of what it (an amicus attempting to raise evidentiary challenges) believes to be hearsay or otherwise inadmissible—all questions that, either way, are foreclosed by Defendants' failure to raise any such challenge at the Court's hearing.  China Society's generic claim of the existence of "inadmissible hearsay" is made even weaker, of course, by the fact that numerous exceptions to hearsay apply to Missouri's different exhibits—only two of which are even acknowledged by China Society.[17]  Of course, it is black letter law that a statement is only hearsay if it meets particular requirements, Fed. R. Evid. 801(c), that certain statements made by a party or party's agents are not hearsay, Fed. R. Evid. 801(d), and that numerous exceptions to hearsay exist under the rules of evidence.  *See, e.g.*, Fed. R. Evid. 801(6) (records of a regularly conducted activity); 801(8) (public records); 801(18) (statements in learned treatises, periodicals, or pamphlets).  China Society's failure to even come to terms with most of these

---

[17] Even those exceptions China Society acknowledges demonstrate the fundamental deficiencies in its argument.  For example, China Society states that "although a properly qualified expert may base his opinion upon otherwise inadmissible sources of information under certain conditions . . . the expert's opinion cannot be used as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."  China Society Br. at 18 (internal quotation marks and citation omitted).  Nothing in this statement *even asserts* that China Society believes Missouri's retained expert "introduc[ed] hearsay," let alone what China Society believes that hearsay is.  Similarly, China Society references the "'public records' exception" to hearsay, all without detailing why it vaguely believes that unidentified government reports submitted by Plaintiff are of "limited trustworthiness."  China Society Br. at 18.  China Society may not—as it does here— simply reference a handful of out-of-circuit cases and leave it to the Court and Missouri to attempt to divine what parts of the record exactly it believes are "inadmissible" or of "limited trustworthiness."  China Society Br. at 18.  The Court should disregard such a lackadaisical approach to challenging the sufficiency of the evidence.

exceptions, let alone provide anything more than vague, conclusory statements on the strength of the evidence, demonstrates the weakness of their evidentiary arguments.

China Society's attempt to relitigate evidentiary issues perfectly demonstrates the improper nature of its purported "amicus" brief, and that it actually simply seeks to litigate this case on behalf of Defendants. Even if China Society's arguments were proper, however, its attempt to attack the admissibility and weight of Missouri's evidence would fail. China's challenge to the evidentiary standard of FSIA default cases not only lacks legal support, but also fails to grapple with the fact that China is exactly the kind of "absent and likely hostile" sovereign for which the standard was intended in the first place. Furthermore, China Society's attempt to attack the "admissibility" or strength of the evidence already admitted by the Court into the record fails to is not only incorrect, but fails to actually identify any particular evidentiary deficiencies with the record. The Court should disregard China Society's untimely challenges to the admissibility and weight of the evidence.

## CONCLUSION

Each of China Society's arguments—many of which are improper advocacy by an amicus curiae brief—is legally and factually deficient.  Missouri has demonstrated, through both evidence and legal support, its entitlement to a judgment in its favor on Count IV of its Complaint. For the foregoing reasons and the reasons stated in Plaintiff's November 22, 2024 Foreign Sovereign Immunity Act Default Hearing Brief, Plaintiff's January 8, 2025 Supplemental Briefing in Support of his Foreign Sovereign Immunity Act Default Hearing Briefing, and Plaintiff's Second

Supplemental Briefing in Support of his Foreign Sovereign Immunity Act Default Hearing Briefing, Plaintiff the State of Missouri ex rel. Andrew Bailey respectfully requests that this Court: (1) enter a judgment of liability against all Defendants on Count IV of Plaintiff's Complaint; (2) issue an award of civil damages against all Defendants in an amount of at least $24,488,825,457 or, in the alternative, $8,162,941,819; (3) order that Defendants pay postjudgment interest on every amount of damages awarded by this Court; and (4) award such further relief as the Court deems just and appropriate.

Date: March 6, 2025                                Respectfully submitted,


                                                   ANDREW T. BAILEY
                                                   Attorney General

                                                   Joshua M. Divine, 69875MO
                                                   *Solicitor General*

                                                   */s/ Samuel C. Freedlund*
                                                   Samuel C. Freedlund, 73707MO
                                                   *Deputy Solicitor General*

                                                   Office of the Attorney General
                                                   815 Olive St.
                                                   Suite 200
                                                   St. Louis, Missouri 63101
                                                   Phone: (314) 340-4869
                                                   Fax (573) 751-1774
                                                   Samuel.Freedlund@ago.mo.gov

                                                   *Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2025, a true and accurate copy of the foregoing was electronically filed by using the Court's CM/ECF system to be served on all counsel of record entered in the case.

/s/ Samuel C. Freedlund