IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, <br> ex rel. ANDREW T. BAILEY, in his official <br> capacity as Missouri Attorney General, <br><br>     Plaintiff, <br><br> v. <br><br> THE PEOPLE'S REPUBLIC OF CHINA, <br> THE COMMUNIST PARTY OF CHINA, <br> NATIONAL HEALTH COMMISSION <br> OF THE PEOPLE'S REPUBLIC OF <br> CHINA, MINISTRY OF EMERGENCY <br> MANAGEMENT OF THE PEOPLE'S <br> REPUBLIC OF CHINA, MINISTRY OF <br> CIVIL AFFAIRS OF THE PEOPLE'S <br> REPUBLIC OF CHINA, PEOPLE'S <br> GOVERNMENT OF HUBEI <br> PROVINCE, PEOPLE'S GOVERNMENT <br> OF WUHAN CITY, WUHAN INSTITUTE <br> OF VIROLOGY, and THE CHINESE <br> ACADEMY OF SCIENCES, <br><br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 1:20-cv-00099-SNLJ |

## MEMORANDUM AND JUDGMENT

Plaintiff the State of Missouri ex rel. Missouri Attorney General Andrew Bailey ("Plaintiff

or "Missouri") brought suit against nine defendants—the People's Republic of China, the

Communist Party of China, the National Health Commission of the People's Republic of China,

the Ministry of Emergency Management of the People's Republic of China, the Ministry of Civil

Affairs of the People's Republic of China, the People's Government of Hubei Province, the

People's Government of Wuhan City, the Wuhan Institute of Virology, and the Chinese Academy

of Sciences (collectively, "Defendants" or "China")—for Defendants' actions during the COVID-

19 pandemic. Each Defendant has failed to appear or otherwise answer after being properly served,

and is therefore in default. After Plaintiff's Complaint was previously dismissed, the U.S. Court of Appeals for the Eighth Circuit remanded Count IV of Missouri's Complaint to proceed with a Foreign Sovereign Immunity Act ("FSIA") default hearing under 28 U.S.C. § 1608(e). Under § 1608(e), the Court may not enter a judgment of default against a foreign state or a foreign state's political subdivisions, agencies, or instrumentalities until Plaintiff establishes his right to relief "by evidence satisfactory to the Court." Missouri has submitted substantial briefing and evidence of its right to relief from Defendants, and the Court held a hearing on the matter on January 27, 2025.

For the reasons listed below, the Court finds that Missouri has provided evidence satisfactory to the Court to establish each Defendant's liability to Missouri under Count IV of Plaintiff's Complaint. The Court therefore enters a judgment against Defendants, jointly and severally, in the amount of $24,488,825,457.00, plus postjudgment interest.

## I. BACKGROUND

### A.    Factual Background

Missouri has submitted substantial written evidence in support of its claim. [Pl.'s Ex. 1–39; Doc. 79; Doc. 87]. At the January 27, 2025 default hearing, the Court admitted Missouri's submitted evidence to the record. For the purpose of a party in default under the FSIA, "the court may 'accept as true the plaintiffs' uncontroverted evidence.'" *Owens v. Republic of Sudan*, 826 F.Supp.2d 128, 135 (D.D.C. 2011) (quoting *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 100 (D.D.C. 2000)); *see also Shourd v. Government of Islamic Republic of Iran*, Case No. 22-cv-1309, 2024 WL 4346330 (D.D.C. Sep. 30, 2024) (slip copy) (same); *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53, 63 (D.D.C. 2008) ("By its failure to appear and defend itself, [the foreign sovereign] put itself at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to prove its points."). The Court deems Missouri's submitted evidence in support of

its claim as uncontroverted by each defaulting Defendant. The Court summarizes some of the pertinent evidence below.

### 1.    The Parties

#### i.    Plaintiff the State of Missouri

Plaintiff the State of Missouri is a sovereign State. Missouri brings this action to vindicate the injuries the State has suffered to its own economic and proprietary interests as a result of Defendants' actions. [Doc. 1 at 4]. Missouri also brings this action as *parens patriae* on behalf of all Missouri citizens, to vindicate general injuries inflicted on Missouri citizens caused by Defendants. [Doc. 1 at 4]. As a sovereign State, Missouri has "a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Missouri, through its Attorney General, may act as "a representative of the public" in "complaining of a wrong which, if proven, limits the opportunities of her people [and] shackles her industries." *Id*. at 606.

Andrew Bailey is the Attorney General of Missouri. Under Missouri law, "[t]he attorney general shall institute, in the name and on behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary; and he may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved." Mo. Rev. Stat. § 27.060.

### ii.    Defendants the People's Republic of China, the Communist Party of China, and other related Defendants.

Defendant the People's Republic of China ("PRC") is a sovereign nation in Asia. "The People's Republic of China is the country's officially recognized government." *State of Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 934 (8th Cir. 2024).

Defendant Communist Party of China ("CPC") is a political body which "'exercise[s] direction and control over the actions of all other Defendants,' including China's official government." *Id*. at 935 (quoting *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010)). Given the CPC's role, "it is in substance the same body politic that governs [China]." *Id*. (internal quotation marks omitted).

Defendant Wuhan Institute of Virology ("WIV") is "an institute under the auspices of the Chinese Academy of Sciences" which hosts "China's first high containment [virus] laboratory." [Pl.'s Ex. 11]. Despite the WIV presenting itself as a civilian institution, the United States has determined that the WIV has "collaborated on publications and secret projects with China's military" and "has engaged in classified research, including laboratory animal experiments, on behalf of the Chinese military since at least 2017." [Pl.'s Ex. 3].

Defendant Chinese Academy of Sciences ("CAS") is the national academy of the natural sciences for the PRC, and has been described by some commentators as a "core component of China's science and technology innovation ecosystem." [Doc. 79 at 9].  The Eighth Circuit has held that both WIV and CAS are "organs" of Defendant PRC. *State of Missouri ex rel. Bailey*, 90 F.4th at 935.

Defendants the National Health Commission of the People's Republic of China, the Ministry of Emergency Management of the People's Republic of China, the Ministry of Civil

4

Affairs of the People's Republic of China, the People's Government of the Hubei Province, and the People's Government of Wuhan City are each "political subdivisions" of Defendant PRC. *Id.*

> **2.    China engaged in a campaign to suppress information about the existence, scope, and then human-to-human transmissibility, of COVID-19.**

China's pattern of actions strongly suggests that it had knowledge of the existence and human-to-human transmission of the COVID-19 virus as early as September 2019. China's actions also suggest that China engaged in a deliberate campaign to suppress information about the COVID-19 pandemic in order to support its campaign to hoard PPE from Missouri and an unsuspecting world.

Federal agencies and the intelligence community remain "divided on the most likely origin of COVID-19." [Pl.'s Ex. 4]. This division centers on the two hypotheses most likely to explain the origin of COVID-19: "natural exposure to an infected animal and a laboratory-associated incident." [Pl.'s Ex. 4]. The U.S. National Institute of Health, while acknowledging that "the origins of the SARS-CoV-2 which caused the COVID-19 pandemic has not been identified," believes that the evidence thus far "suggests that SARS-CoV-2 likely . . . jumped to people or through some unidentified animal host" in Wuhan, China. [Doc. 79 at 12]. On the other hand, several federal agencies have assessed that COVID-19 was likely "the result of a lab accident in Wuhan, China," including the FBI (which has "moderate confidence" in this theory) and the Department of Energy. [Doc. 79 at 14]. Either theory demonstrates, however: (1) that Defendants held specialized knowledge about the existence and transmissibility of COVID-19 long before the rest of the world; and (2) that Defendants' knew their oft-repeated representations to the contrary early in the pandemic were false. Although the U.S. government has concluded that "China's cooperation most likely would be needed to reach a conclusive assessment" on the origins of

COVID-19, China ultimately "continues to hinder the global investigation, resist sharing information and blame other countries, including the United States." [Pl.'s Ex. 4].

China refused to publicly admit the existence of the COVID-19 virus until December 31, 2019, and affirmatively denied human-to-human transmissibility of the virus until January 20, 2020. [Pl.'s Ex. 6 at 132, 158]. Evidence submitted by Missouri, however, demonstrates Missouri's claim that China repeatedly and knowingly misrepresented the existence and human-to-human transmission of the virus for months prior to these admissions. [Pl.'s Ex. 3; Pl.'s Ex. 6]. This evidence include a statement by a Chinese professor of biostatistics at Wuhan University, who told a Chinese medical journal (in a statement he later attempted to retract) that he had access to a confidential national database that included at least one suspected COVID-19 fatality of a patient living more than 13 miles from the Huanan seafood market and who fell ill in September 2019. [Pl.'s Ex. 33]. The U.S. State Department, for its part, has stated that it "has reason to believe" that several researchers inside the WIV became sick with symptoms consistent with COVID-19 in autumn 2019. [Pl.'s Ex. 3]. Around this time, Hubei Province (of which Wuhan is the capital) began "dramatic[ally] increas[ing]" its pathogen detection equipment, both in "total contract value and number of contracts." [Doc. 79 at 28].

According to frontline doctors, by November 2019 the rate of illness in Wuhan was so high that government officials were cancelling classes in some high schools. [Pl.'s Ex. 6]. City officials began more fully closing public schools in mid-December to control the spread of the disease. [Pl.'s Ex. 6]. In other words, by November 2019 (and certainly December 2019), local Chinese officials recognized the dangers of human-to-human transmission of the COVID-19 virus to a sufficient degree that they were taking affirmative steps to limit gatherings of people. By "no later than December 10[,]" 2019, Wuhan doctors had clearly documented cases of patients contracting

6

COVID-19 symptoms without any exposure to the seafood market—*i.e.*, human-to-human transmission. [Pl.'s Ex. 6]. Throughout December 2019, medical personnel in multiple Wuhan hospitals "were placed in quarantine" on the suspicion that they had contracted COVID-19. [Pl.'s Ex. 6].

As the U.S. State Department concluded, China has "systematically prevented a transparent and thorough investigation of the COVID-19 pandemic's origins, choosing instead to devote enormous resources to deceit and disinformation." [Pl.'s Ex.3]. Or, in the words of a U.S. House Foreign Affairs Committee Minority Staff Report, "[f]rom the early stages of the [COVID-19] pandemic," Defendants "repeatedly acted to conceal vital information about the virus from their own people, the WHO, and the world." [Pl.'s Ex. 9]. Despite continually mounting evidence of the spread of COVID-19, and Defendants' own actions (clearly taken to halt human-to-human transmissibility of the virus in November and December 2019), Defendants, in the early months of the pandemic, sought to both suppress accurate information about the spread of COVID-19 and promulgate misinformation about the virus.

In their December 31, 2019 announcement acknowledging the existence of COVID-19 (made months after they knew about the virus), Defendants "asserted that at the present time, inquiries have found no obvious signs of human-to-human transmission and have not found infections among medical personnel." [Pl.'s Ex. 6]. This statement was false. What's more, Plaintiff's uncontroverted evidence demonstrates that Defendants knew this statement was false. By at least December 6, 2019, individuals with no known history of exposure to the Wuhan seafood market were presenting to local hospitals with COVID-19 symptoms and were being isolated from other patients. [Doc. 79 at 35]. By December 20, 2019, Defendants were aware of at least 60 people who had contracted the virus, including patients who were in close contact with workers at the

seafood market but who did not themselves have direct exposure to the market. [Pl.'s Ex. 9]. By December 25, 2019, Defendants were quarantining medical staff in two hospitals in Wuhan who were suspected of contracting the virus, [Doc. 79 at 35], and, on December 27, 2019, Defendants obtained further evidence that person-to-person transmissions were occurring among family clusters. [Pl.'s Ex. 6]. Nevertheless, in their first public admission of the outbreak on December 31, 2019, Chinese officials would falsely deny that any evidence of person-to-person transmission or any infection of medical personnel existed—a denial that would continue until January 20, 2020. [Pl.'s Ex. 6].

Yet additional evidence that China knew its representations of no evidence of human-to-human transmission of COVID-19 were false can be found it the actions Chinese officials took in November and December 2019, including quarantining medical doctors and closing schools. Many of the actions Defendants took between November 2019 and January 2020 in response to the spread of COVID-19 are illogical unless Chinese officials not only had actual knowledge of the COVID-19 virus long before it was reported, but also had knowledge of the virus' human-to-human transmission. Actions such as the isolated treatment of multiple WIV researchers with identical COVID-19 symptoms, quarantining doctors, and closing public schools in Wuhan are all responses public officials would only take if they were concerned about a virus spread by human-to-human transmission. The actions of Chinese officials, in other words, demonstrate the plainly intentional nature of Defendants' misrepresentation of the transmissibility and scope of COVID-19 in late 2019 and early 2020. Even when they did finally admit their knowledge of the COVID-19 outbreak to the world on December 31, 2019, Defendants immediately "issued an order to hospitals, clinics, and other health care facilities strictly prohibiting the release of any information about [the] treatment" of COVID-19. [Pl.'s Ex. 24].

Defendants' misrepresentations are made even more blatant by the fact that, contrary to their official statements, Chinese officials had a report of the "nearly full genome sequence" of the COVID-19 virus by December 27, 2019, and a "completed genomic sequencing" of the virus by December 29, 2019—not only days before Defendants even admitted COVID-19 existed, but nearly a month before Defendants conceded knowledge of the human-to-human transmissibility of the virus. [Pl.'s Ex. 24]. Immediately after sequencing the COVID-19 genome, Defendants took steps to hide their knowledge of the sequenced genome and delay the spread of any genomic information about the virus. Only days after sequencing the virus, Defendants ordered genomic companies to stop testing samples from Wuhan and to immediately cease releasing any information related to the testing or results—an order they later denied issuing for months after. [Pl.'s Ex. 9].

Defendants also sought to affirmatively conceal the risk the virus presented to the rest of the world by intentionally targeting and punishing doctors and other whistleblowers who sought to warn the public about the COVID-19 outbreak. On December 2, 2019—nearly a month before Defendants acknowledged the existence of the COVID-19 virus, and seven weeks before Defendants admitted their knowledge of the human-to-human transmission of the virus—local authorities in Wuhan issued an "emergency notice to medical institutions" that forbade them from releasing any "unauthorized" information about COVID-19. [Pl.'s Ex. 24]. Following this notice, Chinese officials aggressively prosecuted medical and scientific personnel they believed were sharing any information about the disease—even if the targeted communications were simply trying to warn others to protect against transmission of the disease. [Pl.'s Ex. 9]. During this period Defendants went so far as to order that medical charts of people who contracted COVID-19 be altered to reflect less serious diagnoses, in order to maintain their lie that Chinese officials had no

evidence of human-to-human transmission. [Pl.'s Ex. 9]. In early January 2020, Defendants went so far as to issue a nationwide directive "instruct[ing] hospitals to not enter data from coronavirus patients into the surveillance system set up . . . to track outbreaks." [Pl.'s Ex. 6].

As then-U.S. Secretary of State Mike Pompeo observed, the "intentional disinformation campaign that China has been and continues to be engaged in" led the United States "to a place where much of the challenge we face today has put us behind the curve." [Doc. 79 at 46]. The COVID-19 virus has since that point spread rapidly around the United States, killing hundreds of thousands of people. During the three years of the COVID-19 pandemic, more than 20 thousand Missourians alone died of COVID-19 related deaths. [Pl.'s Ex. 14]. COVID-19 was the third leading cause of death for Missourians in 2020 and 2021, and the fourth leading cause of death in 2022. [Pl.'s Ex. 14]. As a result of the COVID-19 pandemic, Missouri, for the first time since 1911, experienced a "natural decrease" of more recorded deaths than births for each of the three years from 2020 to 2022. [Pl.'s Ex. 14].

> ### 3. Defendants, while denying and suppressing their knowledge of the existence and transmissibility of the COVID-19 pandemic, engaged in an aggressive campaign to hoard and monopolize PPE.

The term "PPE" generally "refers to worn articles or equipment that help minimize exposure to various hazards, including infectious pathogens like . . . COVID-19." [Pl.'s Ex. 8]. Examples of PPE "include surgical masks, N95 respirators, sterile gloves, surgical gowns, [and] face shields," as well as "medical articles or devices" and "testing supplies, hand sanitizer, [and] prophylaxes." [Pl.'s Ex. 8]. PPE played a key role "in mitigating the spread and reducing the impacts of COVID-19," and the availability of effective PPE was "critical" to Missouri's pandemic response. [Pl.'s Ex. 8]. Consequently, a lack of PPE for healthcare professionals, especially early in the pandemic, significantly hampered Missouri's pandemic response. It also forced the State of

Missouri, its healthcare providers, and its citizens, to pay significantly higher prices to obtain the limited PPE still available after China took aggressive early steps to hoard PPE. As late as December 2020, "[PPE] shortages continue[d] to be a factor in the ongoing . . . response to the COVID-19 pandemic." [Pl.'s Ex. 8].

Plaintiff's uncontroverted evidence, which the Court summarizes in part below, demonstrates that Defendants engaged in monopolistic actions to hoard PPE through both the nationalization of U.S. factories and the direct hoarding of PPE manufactured or for sale in the United States. At the same time, China was misleading the world about the dangers and scope of the COVID-19 pandemic in order to facilitate, and extend, Defendants' campaign to hoard PPE.

### i. China nationalized American factories producing PPE

One of the key ways Defendants hoarded PPE early in the COVID-19 pandemic was by taking monopolistic steps to both nationalize U.S. factories producing PPE in China and prohibit the export of PPE from U.S. factories in China to the United States. "[By at least] early February 2020, the Chinese government nationalized control of the production and dissemination of medical supplies in China." [Pl.'s Ex. 7]. Chinese officials acted quickly to "commandeer[] medical manufacturing and logistics down to the factory level and direct[] the production and distribution of all medical-related production, including U.S. companies' production lines in China, for domestic use." [Pl.'s Ex. 7]. As a result, by March 2020, the U.S. Federal Emergency Management Agency (FEMA) and the Department of Health and Human Services (HHS) had depleted "the remaining PPE held in the HHS Strategic National Stockpile." [Pl.'s Ex. 8].

Direct control of factories was not the only regulatory measure China adopted to limit PPE exports to the United States. "[S]ome U.S. legal experts observed that China may have used informal measures, such as administrative guidance, to prioritize exports to certain countries ahead

of the United States." [Pl.'s Ex. 7]. Several U.S. manufacturers with factories based in China have stated "that the PRC would not authorize them to export PPE produced in their [Chinese] facilities" to the United States. [Pl.'s Ex. 9].

China's actions appear to have had their intended effect. For example, the nationalization of U.S. factories in China "enabled the PRC to increase production of face masks from 20 million to more than 100 million per day, at the expense of foreign companies being allowed to export their products." [Pl.'s Ex. 9]. Although "China made half the world's masks before the coronavirus emerged there," and "expanded production nearly 12-fold since then," early in the pandemic China entirely "claimed [the] mask factory output for [itself]." [Pl.'s Ex. 29]. Peter Navarro, at that time (and currently) a Presidential advisor on manufacturing and trade, in fact directly characterized Defendants' actions as "nationaliz[ing]" American factories producing PPE. [Pl.'s Ex. 29].

As the Congressional Research Service concluded in a December 2020 report, Defendants' actions to nationalize U.S. factories and limit any export of PPE "may have denied the United States and other countries that depend on open and free markets for their health care supply chains timely access to critical medical supplies." [Pl.'s Ex. 7]. A report from the U.S. House of Representatives put the effects even more starkly. In the words of the report, "[i]t is highly likely that China's nationalization of the manufacturing capacity of foreign companies, including 3M and General Motors, directly impacted the ability of the United States and other countries to procure PPE on the global market." [Pl.'s Ex. 9].

### ii. China hoarded PPE manufactured or available for sale in the United States

Another key way China monopolized PPE during the COVID-19 pandemic was by taking aggressive steps to capitalize on its unequal knowledge of the existence and transmissibility of COVID-19 to directly hoard PPE manufactured or available for sale in the United States. The

Congressional Research Service has concluded that, "[i]n January and February 2020, . . . the Chinese government organized a large-scale purchase of PPE for China on the global market *depleting existing supplies in the United States* and other countries such as Australia and Canada." [Pl.'s Ex. 8 (emphasis added)]. To accomplish this goal, China's Ministry of Commerce called on its regional offices, both domestically and overseas, to work with government actions to "prioritize securing [PPE] from global sources and importing these products." [Pl.'s Ex. 7]. Chinese trade data reflects that these policies led to steep increases in China's imports of essential PPE and medical supplies, which corresponded with sharp decreases in China's exports of these critical medical products to the rest of the world. [Pl.'s Ex. 7].

Trade data of Chinese exports and imports demonstrates that Defendants were successful in their efforts to hoard PPE manufactured or for sale in the United States. For example, in January and February 2020—which includes a portion of the time Defendants affirmatively had knowledge of, but denied, the scope and human-to-human transmissibility of COVID-19—China's import of N95 masks and other protective masks from the United States alone increased by over 1,600%. [Pl.'s Ex. 7]. In other words, in January and February 2020, China, one of the world's largest producers of PPE, imported over sixteen times as many medical masks as usual from the United States alone, all while affirmatively misrepresenting its knowledge about the scope and spread of COVID-19. Similar shocking examples of the scope of Defendants' hoarding of PPE manufactured or for sale in the United States abound. China's imports of disposable hospital gowns from the United States during the period of January and February 2020 increased by over 297,288%, while China's imports of gloves and medical sterilizers from the United States increased during that period by 514% and 317%, respectively. [Pl.'s Ex. 7]. In absolute terms, China's hoarding campaign caused tens of millions of articles of PPE to flow from the United States to China each

week. On January 30, 2020 alone, for example, Defendants imported 20 million respirators and surgical masks in just 24 hours. [Pl.'s Ex. 29]. Defendants, furthermore, took steps to mask their hoarding of PPE. For example, Defendants' "efforts were often implemented through non-traditional buyers, likely in an effort to reduce competition." [Pl.'s Ex. 9].

Reports published by the federal government further demonstrate the scope of China's hoarding of PPE and its obfuscation of critical information surrounding COVID-19. According to a 2020 Department of Homeland Security report only later declassified, "the Chinese Government intentionally concealed the severity of COVID-19 from the international community in early January while it stockpiled medical supplies by both increasing imports and decreasing exports." [Pl.'s Ex. 2]. The federal government, furthermore, concluded that "the Chinese Government attempted to hide its actions by denying there were export restrictions and obfuscating and delaying provision of this trade data." [Pl.'s Ex. 2]. In fact, according to the Department of Homeland Security, China "likely delayed informing the WHO . . . that COVID-19 was a contagion until after it purchased medical supplies from abroad." [Pl.'s Ex. 2].

Defendants were also successful in their goal to hoard PPE, to the detriment of Missouri and the rest of the country. As one U.S. House of Representatives report concluded, "[a]s a result of intentional efforts to mislead the global community and delays in releasing factual information about the COVID-19 virus, [Defendants'] cover-up greatly impacted the global response to COVID-19." [Pl.'s Ex. 9]. In fact, China's actions "likely exacerbated medical supply shortages in the United States and other countries" precisely when the supplies were needed most. [Pl.'s Ex. 9]. Furthermore, the effects of Defendants' actions on Missouri (and, indeed, the rest of the country) continued to be felt long after they occurred. Despite later efforts to combat PPE shortages caused by Defendants' hoarding, shortages of PPE in the United States continued to be reported

into the summer and fall of 2020. [Pl.'s Ex. 8]. In other words, for at least the first year of the pandemic, Missouri was forced to continue to bear the harms of Defendants' anticompetitive actions.

### B.    Procedural Background

#### 1.    Missouri files its complaint and serves each Defendant

Missouri filed its Complaint on April 21, 2020, asserting several claims related to the spread of COVID-19 and related harms imposed on the State and its citizens by Defendants. [Doc. 1]. Relevant here, Count IV of Missouri's Complaint sought the recovery of damages stemming from Defendants' hoarding of personal protective equipment during the COVID-19 pandemic. [Doc. 1 at 44–46].

Missouri attempted to serve summonses and copies of the complaint on the defendants by submitting each through a professional international process server to be served on China's central authority under the Hague Convention. [Doc. 22 at 1]. China refused to effect service, objecting under Article 13 of the Hague Convention. [Doc. 22 at 1–2]. Therefore, pursuant to 28 U.S.C. § 1608(a)(4) and Federal Rule of Civil Procedure 4(f)(3), the Court granted Missouri's motion for alternative methods of service on all Defendants. [Doc. 22 at 7]. Missouri effectuated service on Defendants the Chinese Academy of Sciences and Wuhan Institute of Virology on May 18, 2021. [Doc 23]. Missouri effectuated service on Defendants the People's Republic of China, the Communist Party of China, the National Health Commission of the People's Republic of China, the Ministry of Emergency Management of the People's Republic of China, the Ministry of Civil Affairs of the People's Republic of China, the People's Government of Hubei Provide, and the People's Government of Wuhan City by service of process through diplomatic channels on October 7, 2021. [Docs. 36–41]. Each Defendant has failed to appear or file a responsive pleading.

Between August and December 2021, Clerk of Court entered defaults against each Defendant. [Docs. 29, 44].

On July 8, 2022, this Court dismissed each count of Missouri's Complaint for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). [Doc. 61].

### 2. The Eighth Circuit's decision in *Missouri ex rel. Bailey v. People's Republic of China*.

On January 10, 2024, the Eighth Circuit affirmed in part and reversed in part this Court's July 8, 2022 Order. *Missouri ex rel. Bailey*, 90 F.4th at 940. The Eighth Circuit in *Missouri ex rel. Bailey* concluded that each Defendant was subject to the immunities of the FSIA as either: (1) a "foreign state" (Defendant People's Republic of China and its political subdivisions); (2) an "agency or instrumentality of a foreign state" (Defendants Wuhan Institute of Virology and Chinese Academy of Sciences); or (3) an entity that "is in substance the same body politic that governs [China]," and therefore is also a foreign state defendant under the FSIA (Defendant Communist Party of China). *Id*. at 934–36. As such, the Eighth Circuit held that the FSIA "shields [each Defendant] from Missouri's lawsuit unless a statutory exception applies." *Id*. at 936.

Analyzing the statutory exceptions to immunity under the FSIA, the Eighth Circuit concluded that Count IV of Missouri's Complaint, that Defendants "hoarded personal-protective equipment while the rest of the world was in the dark about the disease," satisfied the commercial-activity exception to the FSIA. *Missouri ex rel. Bailey*, 90 F.4th at 934, 940.  The Eighth Circuit observed that Missouri's hoarding claim, which asserts both "that the [D]efendants hoarded masks and then sold lower-quality equipment in the United States" and "that China t[ook] over factories that ma[de] masks on behalf of American companies, which essentially halted the export of high-quality masks to the United States" each "identify classic anticompetitive behavior, except on a country-wide scale." *Id*. at 938 (internal quotation marks omitted). "Taking over mask-producing

factories and buying up a substantial portion of the world's supply of personal-protective equipment are actions of a 'private player' in the market." *Id*.

The Eighth Circuit, furthermore, observed that if Defendants "bought up much of the rest of the world's supply of masks," it would mean that supply reductions "led to an immediate shortage in Missouri." *Id*. (internal quotation marks omitted). As a result, "[h]ealthcare providers in Missouri either paid higher prices for the masks they could find or dealt with shortages that . . . made it difficult to safely and effectively treat[] patients with the virus." *Id*. (internal quotation marks omitted). "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects." China "singlehandedly t[ook] over factories that ma[d]e masks and cornered the market before the rest of the world realized what was happening." *Id*. (internal quotation marks omitted). Then, "when the virus spread and people all over the world became sick, China was able to maintain its stockpile [of PPE] and prolong the shortage." *Id*. Given Defendants' significant market power, "[t]he most basic supply-and-demand principles tell us that these market effects depended little, if at all, on variables independent of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id*. (internal quotation marks omitted).

### 3. Procedural background following remand of Count IV of Missouri's Complaint.

Following remand, the Court, on May 23, 2024, entered a scheduling order setting a Foreign Sovereign Immunity Act hearing and directing Missouri to file a FSIA pretrial brief and any written evidence in support of the State's claims. [Doc. 76]. Pursuant to the Court's scheduling order, Plaintiff submitted his FSIA default hearing brief on November 22, 2024 and submitted his trial exhibits on December 2, 2024. [Docs. 79, 80]. Plaintiff submitted additional supplemental briefing and a supplemental expert report on January 8, 2025. [Doc. 87].

The Court held a hearing in this matter on January 27, 2025. Plaintiff appeared through counsel at the hearing. Each Defendant failed to appear at the hearing and was found to be in default. At the hearing, the Court heard argument from counsel for Plaintiff and accepted into the record all of Plaintiff's submitted written evidence, Plaintiff's expert report, and Plaintiff's supplemental expert report. At the hearing, the Court asked for additional supplemental briefing on one remaining discrete legal question. Plaintiff submitted supplemental briefing and a proposed judgment on February 26, 2025.  This Court then sought additional supplemental briefing on related legal questions, and Plaintiff submitted that third supplemental briefing on March 6, 2025.

## II. LEGAL STANDARD

Each Defendant was properly served with a copy of the summons and Complaint in this lawsuit. [Docs. 23, 36–41]. Each Defendant thereafter, and with full knowledge of this lawsuit, chose to ignore this lawsuit by failing to plead or otherwise defend themselves against Missouri's claims. Plaintiff previously applied for the Clerk of Court to note the default against each Defendant, and the Clerk of Court has done so. [Docs. 29, 44].

Each Defendant's status as a foreign state, political subdivision of a foreign state, or agency or instrumentality of a foreign state adds a final step. Under the FSIA, "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the Court." 28 U.S.C. § 1608(e). Missouri, in other words, must provide "evidence satisfactory to the court" on its claims of liability and damages before it may obtain a judgment against Defendants.

"To prevail in an FSIA default proceeding, the plaintiff[] must present a legally sufficient *prima facie* case, in other words, 'a legally sufficient evidentiary basis for a reasonable jury to find

18

for the plaintiff.'" *Kilburn v. Islamic Republic of Iran*, 699 F.Supp.2d 136, 150 (D.D.C. 2010) (quoting *Gates*, 580 F.Supp.2d at 63). The FSIA's "'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55([d])." *Owens*, 826 F.Supp.2d at 134; *see also* Fed. R. Civ. P. 55(d) ("A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfies the court.").

In reviewing a plaintiff's claim against a defaulting defendant subject to the FSIA, "the court may 'accept as true the plaintiffs' uncontroverted evidence.'" *Owens*, 826 F.Supp.2d at 135 (quoting *Elahi*, 124 F.Supp.2d at 100; *see also Shourd*, 2023 WL 9196605, at*5 (slip copy) (same); *Gates*, 580 F.Supp.2d at 63 ("By its failure to appear and defend itself, [the foreign sovereign] put itself at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to prove its points."). Courts apply a "lenient standard" for factual findings by a trial court in FSIA default hearings, recognizing that "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (reversed on other grounds). "Given the difficulty of obtaining direct proof of the types of conduct for which the FSIA provides a remedy, the statute permits courts to credit indirect evidence and to impose a lower evidentiary burden than they might apply in a different context." *Saharkhiz v. Islamic Republic of Iran*, Case No. 19-cv-2938, 2023 WL 9196605, at *5 (D.D.C. Oct. 16, 2023) (slip copy).

Such an evidentiary standard is especially appropriate here, where Defendants, including China and its agencies, have "refused to appear in court and subject [themselves] to discovery, and [are] known to intimidate defectors and potential witnesses." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014). In such situations, "the Supreme Court

has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'" *Id.* (citing *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)); *see also Thuneibat v. Syran Arab Republic*, 167 F.Supp.3d 22, 33 (D.D.C. 2016) (citing *Han Kim*).

A defaulting defendant under the FSIA is deemed to have forfeited any affirmative defenses that the defendant could have raised in response to the lawsuit, absent distinct and narrow circumstances, not relevant here, "in which the judiciary's own interests are implicated and the forfeiting party is present in the litigation." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019). Consequently, Defendants, through their failure to appear, are deemed in default and to have waived any affirmative defenses they may have otherwise raised.

### III. DISCUSSION

#### A.    Missouri has demonstrated Defendants' liability on Count IV of its Complaint to the Court's satisfaction.

Missouri's Complaint originally raised four counts against each Defendant. [Doc. 1]. Following remand, one count remains: Count IV, alleging that Defendants hoarded PPE during the COVID-19 pandemic while knowing (and even suppressing) the dangers of COVID-19. [Doc. 1 at 44]. Along with substantial evidence supporting the allegations in its Complaint, Missouri has provided the Court with three distinct statutory causes of action through which Defendants' liability may be found under 28 U.S.C. § 1608(e).

Specifically, Missouri argues that two distinct federal causes of action (15 U.S.C. § 15 and 15 U.S.C. § 15c), and one state cause of action (Mo. Rev. Stat. § 416.031.2) provide independent causes of action through which the Court may impose liability on Defendants for their hoarding of PPE. Missouri has, furthermore, submitted significant written evidence into the record in support

20

of Defendants' liability under each cause of action. Under any of these statutory theories, Missouri has demonstrated Defendants' liability on Count IV of Plaintiff's Complaint to this Court's satisfaction sufficiently to satisfy the requirements of 28 U.S.C. § 1608(e).

           **1.**      **Missouri has established Defendants' liability under 15 U.S.C. § 15, for Defendants' violations of 15 U.S.C. § 2 through evidence satisfactory to the Court.**

Missouri has established Defendants' liability under 15 U.S.C. § 15, for Defendants' violations of 15 U.S.C. § 2, through evidence satisfactory to the Court sufficient to meet the requirements of 28 U.S.C. § 1608(e). 15 U.S.C. § 15 provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue to recover "threefold the damages by him sustained." Plaintiff, as the Attorney General of Missouri, is empowered under state law to seek damages on behalf of, "besides the state and any of its political subdivisions or public agencies, all other political subdivisions, school districts and municipalities within the state [of Missouri] . . . in actions brought in the federal courts under any federal statute pertaining to antitrust, trade regulation, restraint of trade or price fixing activities." Mo. Rev. Stat. § 416.061.3.

Pursuant to 15 U.S.C. § 15, Missouri may recover "threefold the damages" it has suffered from Defendants' actions "by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 2, in turn, declares it unlawful for any "person" to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States, or with foreign nations." Missouri asserts (and, as addressed below, has demonstrated to the Court's satisfaction) that China's actions hoarding PPE violate 15 U.S.C. § 2, and that Missouri has a cause of action to recover on such a violation under 15 U.S.C. § 15.

The first question is whether Missouri, on the one hand, and each Defendant on the other, may properly be parties to a federal antitrust action. 15 U.S.C. § 2 provides that "[e]very person who shall monopolize, or attempt to monopolize" trade or commerce violate antitrust laws, while 15 U.S.C. § 15 creates a cause of action for "any person" injured by a violation of antitrust law. The Supreme Court has held that States are included in the statutory definition of "person" for the purpose of antitrust law. *See State of Georgia v. Evans*, 316 U.S. 159, 161 (1942) (including the State of Georgia in the definition of "person" under antitrust laws). The Supreme Court, likewise, held in *Pfizer Inc. v. Government of India* that the foreign nation of India is included in the statutory definition of "person" for the purpose of antitrust statutes. 434 U.S. 308, 312 (1978). Although Georgia and India were acting as plaintiffs in their respective antitrust actions, the Supreme Court further held, in the same term as *Pfizer*, that the term "person" is read the same regardless of whether the State or foreign nation is a plaintiff or defendant. *City of Lafayette, La. v. Louisiana Power & Light Co.*, 435 U.S. 389, 397 (1978). As such, this Court finds that both Missouri and Defendants qualify as "persons" under the relevant antitrust statutes.

Turing to the merits of Missouri's claim, the Eighth Circuit has adopted a two-part test for claims brought under 15 U.S.C. § 2. "Monopolization requires: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 446 (8th Cir. 2023) (quoting *United States v. Grinnell Corp.*, 384 U.S. 570–71 (1966)). Missouri has submitted evidence to the Court demonstrating each element to the Court's satisfaction.

First, Missouri has provided evidence satisfactory to the Court establishing that China, during the relevant time period, held monopoly power in the worldwide market for PPE. As the

Eighth Circuit explained, "China bought up much of the rest of the world's supply of masks," which "led to an immediate shortage" and "allowed [China] to enter the market and sell lower-quality masks." *Missouri ex rel. Bailey*, 90 F.4th at 938 (internal quotation marks omitted). Missouri has submitted substantial evidence in the record that China took steps to monopolize the market for PPE early in the COVID-19 pandemic, including by nationalizing U.S. factories in China and by aggressively hoarding PPE manufactured or available for sale in the United States. All the while, China was concealing and misrepresenting to the world its knowledge of the existence, and then human-to-human transmissibility of, the COVID-19 virus—despite legal obligations to disclose its knowledge. These misrepresentations allowed China to more easily hoard and monopolize PPE from an unsuspecting world. And because of China's unilateral actions, Missourians "paid higher prices for the masks they could find or dealt with shortages that . . . made it difficult to safely and effectively treat[] patients with the virus." *Id*. (internal quotation marks omitted). "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects." *Id*. at 939. That is a textbook example of monopoly power. *See Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1024 (8th Cir. 2020) ("Monopoly power is defined as the power to control prices or exclude competition.") (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000)). Missouri has submitted substantial evidence into the record, including written evidence, expert reports, and the State's own records of expenditures, demonstrating that Missourians were forced to both pay higher prices for the limited PPE available and suffer the effects of PPE shortages.

Second, Missouri has established, with evidence sufficient to satisfy the Court, that China's monopoly power resulted from "classic anticompetitive behavior," rather than legitimate business

practices or luck. *Bailey*, 90 F.4th at 938. As this Court has addressed above, China's campaign to hoard the global supply of PPE was performed in conjunction with its repeated misrepresentations on the existence, and then scope and human-to-human transmissibility of, the COVID-19 virus. Plaintiff has submitted into the record substantial evidence demonstrating as much, including a report by the U.S. Department of Homeland Security which concluded that "the Chinese Government intentionally concealed the severity of COVID-19 from the international community" while it "attempted to hide its actions" and "stockpiled medical supplies" hoarded from the rest of the world. [Pl.'s Ex. 2]. In other words, the evidence establishes that China "singlehandedly t[ook] over factories that ma[d]e masks and cornered the market before the rest of the world realized what was happening." *Id*. at 939 (internal quotation marks omitted). The effect of all of these actions was that China managed to exploit its monopoly power not because of "a superior product, business acumen, or historic accident," but rather because it concealed, suppressed, and lied about the coronavirus while aggressively hoarding the world's supply of PPE. *Grinnel Corp.*, 384 U.S. at 571. These actions, suppressing and misrepresenting the existence, and then transmissibility, of the COVID-19 virus, were taken while China was hoarding PPE from an unsuspecting world. China took all of these actions in an effort to monopolize the global PPE market during the COVID-19 pandemic.

In sum, Missouri has provided evidence demonstrating, to the Court's satisfaction, that Defendants' actions hoarding PPE violated 15 U.S.C. § 2 and that Plaintiff has a cause of action against all Defendants under 15 U.S.C. § 15. Missouri may, therefore, obtain a judgment in default against all Defendants under 28 U.S.C. § 1608(e).

> **2.    Missouri has established Defendants' liability through evidence satisfactory to the Court under 15 U.S.C. § 15c, for Defendants' violations of 15 U.S.C. § 2.**

Missouri has also established Defendants' liability under 15 U.S.C. § 15c, for Defendants' violations of 15 U.S.C. § 2 with evidence satisfactory to the Court to sufficiently meet the requirements of 28 U.S.C. § 1608(e). 15 U.S.C. § 15c provides Plaintiff, as the Attorney General of Missouri, with a cause of action to sue on behalf the residents of the State of Missouri:

> Any attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any district court of the United States having jurisdiction of the defendant, to secure monetary relief as provided in this section for injury sustained by such natural persons to their property by reason of any violation of sections 1 to 7 of this title.

The only restrictions on the scope of monetary relief which Plaintiff may recover on behalf of the citizens of Missouri are that the Court "shall exclude from the amount of monetary relief" any amount of monetary relief "which duplicates amounts which have been awarded for the same injury"; or "which is properly allocable" to "natural persons who have excluded their claims" (not relevant here) or "any business entity." 15 U.S.C. § 15c(a)(1). Furthermore, upon a finding of damages, Plaintiff is again entitled to recover from Defendants "monetary relief threefold the total damages sustained." 15 U.S.C. § 15c(a)(2).

As addressed above, Plaintiff has submitted sufficient evidence demonstrating, to the Court's satisfaction, that Defendants' actions hoarding PPE violated 15 U.S.C. § 2 and that Plaintiff has a cause of action under 15 U.S.C. § 15. Even if Missouri had not demonstrated Defendants' liability under 15 U.S.C. § 15, however, the Court concludes that Missouri has demonstrated Defendants' liability under 15 U.S.C. § 15c to the Court's satisfaction and is entitled to obtain a judgment in default against all Defendants under 28 U.S.C. § 1608(e).

> **3.    Missouri has established Defendants' liability through evidence satisfactory to the Court under Mo. Rev. Stat. § 416.061, for Defendants' violations of Mo. Rev. Stat. § 416.031.2.**

Missouri has also established Defendants' liability under Missouri's state-law anti-monopolization provision, contained in Mo. Rev. Stat. § 416.031.2, through evidence satisfactory to the Court.

Section 416.031.2 of the Missouri Revised Statutes establishes, in relevant part, a broad prohibition on any attempt to monopolize, conspire to monopolize, or restrain trade in the State of Missouri:

> (2)    [i]t is unlawful to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce in this state.

Plaintiff, as the Attorney General of Missouri, has a duty under § 416.061.2 to "enforce the provisions of sections 416.011 to 416.161." As for federal antitrust laws, Plaintiff is empowered, under § 416.061.3, to "represent, besides the state and any of its political subdivisions or public agencies, all other political subdivisions, school districts and municipalities within the state in suits to enforce the provisions of sections 416.011 to 416.161." Claims for relief invoking § 416.031 may be heard in federal court alongside federal antitrust and anticompetitive claims brought under Chapter 15 of the United States Code. *See, e.g. Burnett v. National Association of Realtors*, No. 4:19-cv-00332, 2022 WL 17741708, at *5 (W.D. Mo. Dec. 16, 2022) (district court asserting jurisdiction over both federal and Missouri state antitrust claims); *InfoDeli, LLC v. Western Robidoux, Inc.*, No. 4:15-cv-00364, 2020 WL 1855289, at *3 (W.D.Mo. Feb. 21, 2020) (same).

Sections 416.011 to 416.161 may form a valid basis for a state law antitrust claim even in instances where the state law claim "regulates or affects interstate commerce." *C. Bennett Bldg. Supplies, Inc. v. Jenn Air Corp.*, 759 S.W.2d 883, 889 (Mo. App. E.D. 1988). The effect of § 416.031.2 is to "make[] unlawful monopolization, attempted monopolization, and conspiracy to monopolize trade or commerce." *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, 312–13 (Mo. 1979).

26

The Missouri Supreme Court has not adopted model jury instructions for a violation of § 416.031.2. Section 416.141 of the Missouri Revised Code provides, however, that § 416.301.2 (along with the rest of §§ 416.011–.161) "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." Consequently, federal courts analyzing claims brought under § 416.031 apply the same standard as is applied to equivalent federal prohibitions contained in the Sherman Antitrust Act. *See, e.g. Sitzen v. National Association of Realtors*, 420 F.Supp.3d 903, 919 (W.D. Mo. 2019) (applying the same standard for a claim brought under § 416.031 as the plaintiffs' "federal antitrust claims.").

As explained above, the Court concludes that Missouri has provided evidence to the Court's satisfaction that the defaulting Defendants' hoarding of PPE during the COVID-19 pandemic violated 15 U.S.C. § 2's prohibition on "monopoliz[ing] or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." For the same reasons, the Court concludes that Missouri has provided sufficient evidence demonstrating, to the Court's satisfaction, Defendants' liability under Missouri Revised Statute § 416.061 for Defendants' violation of Missouri Revised Statute § 416.031.2.

### B.    Missouri has demonstrated the damages it has suffered from Defendants' liability on Count IV of its Complaint to the Court's satisfaction.

Missouri has also established its claim of direct damages through evidence satisfactory to the Court according to the standard laid out in 28 U.S.C. § 1608(e), in the amount of $24,488,825,457.00.

An "FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default [judgment] winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 683–84 (D.C. Cir. 2003) (quoting 28 U.S.C. § 1606). In a default judgment case, a damages calculation "may be subject to 'just and reasonable inference, although the result be only approximate.'" *Comcast of*

*Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 947 (8th Cir. 2007) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). "Once liability has been established, 'the risk of uncertainty in calculating damages falls upon the wrongdoer.'" *Id*. (quoting *Yonkers Branch—NAACP v. City of Yonkers*, 251 F.3d 31, 40 (2d Cir. 2001)).

In demonstrating its damages by evidence satisfactory to the Court, Missouri provides two categories of direct damages suffered by the State as a result of China's hoarding of PPE. The Court addresses each below.

### 1.    Direct harm to the State of Missouri from lost tax revenue caused by China's hoarding of PPE.

Missouri has demonstrated that the State has suffered significant harm in the form of lost net general tax revenue the State of Missouri would have collected but-for Defendants' hoarding of PPE. The Eighth Circuit, in *Missouri ex rel. Bailey*, held that "the 'billions of dollars' Missouri lost in revenue" constitutes a "direct economic injury" to the State, of which the State may recover. *Missouri ex rel. Bailey*, 90 F.4th at 939 n.2. Missouri is entitled to recoup not only past lost revenue from Defendants' hoarding, but also the discounted value of future revenue lost as a result of Defendants' past PPE hoarding activities. The Supreme Court has held that it is "settled" that a party is entitled to the discounted value of "ascertained future benefits" the plaintiff lost as a result of a defendant's unlawful action. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 (1983) (citing *Chesapeake & Oil R. Co. v. Kelly*, 241 U.S. 485, 490 (1916)).

In support of its claim of damages, Missouri has submitted into evidence an expert report, and an additional supplemental expert report, prepared by Missouri's expert, Dr. Joseph H. Haslag. [Pl.'s Ex. 1; Pl.'s Ex. 39]. Dr. Haslag is a Professor and the Kenneth Lay Chair in Economics at the University of Missouri-Columbia. [Pl.'s Ex. 1]. Dr. Haslag has spent decades teaching and researching economics, including 12 years in the Research Department at the Federal Reserve

Bank of Dallas and as a visiting scholar at the Federal Reserve Banks of St. Louis, Kansas City, Atlanta, and Cleveland. [Pl.'s Ex. 1]. His work has been published in numerous academic journals, and has been cited over 1,690 times. [Pl.'s Ex. 1]. Missouri has offered Dr. Haslag as an economics expert, in order to quantify the damages Missouri has suffered as a result of Defendants' hoarding of PPE. The Court finds Dr. Haslag's expert report and supplemental expert report credible and helpful to the Court. Additionally, as noted above, because each Defendant is in default, the facts contained in Dr. Haslag's expert report and supplemental expert report are deemed uncontroverted by Defendants. *See, e.g.*, *Owens*, 826 F.Supp.2d at 135; *Shourd*, 2024 WL 4346330, at *5 (slip copy); *Gates*, 580 F.Supp.2d at 63.

Dr. Haslag's supplemental expert report, coupled with the evidence submitted to the record by Missouri, establishes that Defendants' hoarding of PPE has directly reduced Missouri's collection of net general tax revenue by billions of dollars between 2020 and 2051. In his supplemental expert report, Dr. Haslag provides numerical formulae, supplemented with academic and governmental authorities, identifying the quantitative impact that China's hoarding of PPE had on the State of Missouri and its economy. [Pl.'s Ex. 39]. His report demonstrates the direct lost tax revenue damages the State of Missouri suffered by quantifying the mechanisms through which the past and future effects of China's PPE hoarding on Missouri's economic activity and Missouri's tax revenue may be isolated and measured. [Pl.'s Ex. 39].

Ultimately, Dr. Haslag's supplemental report provides a range of calculations for economic damages suffered by the State of Missouri as a direct result of China's hoarding of PPE. Plaintiff has sought to recover the most conservative estimate of direct damages from lost tax revenue contained in Dr. Haslag's supplemental report, totaling $8.04 billion for the combined value of Missouri's lost past tax revenue and the discounted value of Missouri's lost future tax revenue

from China's PPE hoarding. The Court holds that Missouri has established this claim of damages through evidence satisfactory to the Court according to the standard laid out in 28 U.S.C. § 1608(e).

### 2.    Direct harm to the State of Missouri from heightened PPE expenditures paid by Missouri.

Missouri has additionally demonstrated direct heightened PPE expenditures by the State of Missouri caused by Defendants' hoarding of PPE totaling $122,941,819.00. During the early months of the pandemic, Missouri spent millions more on PPE than it otherwise would have because of Defendants' hoarding. According to the Congressional Research Service, relying upon U.S. trade data, in 2019 China supplied over 70% of U.S. imports of textile face masks, 55% of U.S. imports of protective eyewear, and 55% of U.S. imports of protective garments for surgical and medical use." [Pl.'s Ex. 8]. As the Eighth Circuit has observed, "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create" the PPE shortages and price increases. *Missouri ex rel. Bailey*, 90 F.4th at 939. "The most basic supply-and-demand principles tell us that these market effects depended little, if at all, 'on variables independent' of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id*. Missouri seeks to recover, in addition to the present value of its lost tax revenue, the damages it suffered from heightened direct expenditures on PPE caused by Defendants' hoarding activities.

To establish the scope and amount of direct expenditure damages, Missouri has provided the Court with records of certain publicly available expenditures it has made to acquire PPE between April 22, 2020, and December 31, 2020. [Pl.'s Ex. 15]. Plaintiff, although acknowledging that these records are likely underinclusive of the total heightened direct expenditures on PPE by the State of Missouri, relies on these records of heightened expenditures to demonstrate an additional claim of damages to the State from China's hoarding of PPE in the amount of

$122,941,819.00. The Court holds that Missouri has established this claim of damages through evidence satisfactory to the Court according to the standard laid out in 28 U.S.C. § 1608(e).

Totaled together with the $8.04 billion in direct lost tax revenue as a result of China's hoarding of PPE, Missouri has established this claim of damages through evidence satisfactory to the Court according to the standard laid out in 28 U.S.C. § 1608(e) in an amount totaling $8,162,941,819.00.

### 3. Plaintiff is entitled to treble damages under federal and state antitrust laws.

Missouri asserts causes of action entitling it to a judgment against Defendants under federal or, in the alternative, state antitrust law. As detailed above, the Court has concluded that Missouri has established its right to relief under any of these three causes of action to the Court's satisfaction. Each of the federal or state causes of action Missouri asserts contains statutory language allowing for the recovery of treble the damages sustained by the Plaintiff. *See* 15 U.S.C. § 15(a) (providing that a plaintiff "shall recover threefold the damages by him sustained"); 15 U.S.C. § 15c(a) ("The court shall award the State as monetary relief threefold the total damage sustained"); Mo. Rev. Stat. § 416.121 ("[I]f the judgment is for the plaintiff he shall be awarded threefold damages by him sustained."). The Court finds that, under any of Missouri's three asserted statutory causes of action establishing Defendants' liability, the statutory award of treble damages applies to Missouri's claim.

As such, Missouri is entitled to recover treble the damages it sustained. Missouri is, therefore, entitled to recover damages in the amount of $24,488,825,457.

### 4. Plaintiff is entitled to post-judgment interest on its award of damages.

28 U.S.C. § 1961(a) provides that interest "shall be allowed on any money judgment in a civil case recovered in a district court." Post-judgment interest awarded under 28 U.S.C. § 1961(a)

is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." Courts have included post-judgment interest in awards against foreign states on claims brought under the FSIA. *See, e.g., Selig v. Islamic Republic of Iran*, 573 F.Supp.3d 40, 78 (D.D.C. 2021); *Flanagan v. Islamic Republic of Iran*, 87 F.Supp.3d 93, 127 (D.D.C. 2015). The Court will therefore award post-judgment interest at the statutory rate.

Accordingly,

**IT IS HEREBY ORDERED** that a judgment by default is entered against Defendants the People's Republic of China, the Communist Party of China, the National Health Commission of the People's Republic of China, the Ministry of Emergency Management of the People's Republic of China, the Ministry of Civil Affairs of the People's Republic of China, the People's Government of Hubei Province, the People's Government of Wuhan City, the Wuhan Institute of Virology, and the Chinese Academy of Sciences on Count IV of Plaintiff's Complaint. It is further ordered that Plaintiff is entitled to an award of damages on Count IV of his Complaint against defaulting Defendants, jointly and severally, in an amount of $24,488,825,457.00. Post-judgment interest shall accrue on this judgment at a rate of 3.91 percent, compounded annually.


Dated this 7th day of March, 2025


_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE