**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSOURI, ex rel. CATHERINE L. HANAWAY, in her official capacity as Missouri Attorney General,<br><br>Plaintiff,<br><br>v.<br><br>THE PEOPLE'S REPUBLIC OF CHINA, THE COMMUNIST PARTY OF CHINA, NATIONAL HEALTH COMMISSION OF THE PEOPLE'S REPUBLIC OF CHINA, MINISTRY OF EMERGENCY MANAGEMENT OF THE PEOPLE'S REUBLIC OF CHINA, MINISTRY OF CIVIL AFFAIRS OF THE PEOPLE'S REPUBLIC OF CHINA, PEOPLE'S GOVERNMENT OF HUBEI PROVINCE, PEOPLE'S GOVERNMENT OF WUHAN CITY, WUHAN INSTITUTE OF VIROLOGY, and THE CHINESE ACADEMY OF SCIENCES,<br><br>Defendants. | ) | Case No. 1:20-cv-00099-SNLJ |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANTS' MOTIONS TO VACATE THE DEFAULT JUDGMENT**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... iii

**INTRODUCTION** .......... 1

**STATEMENT OF THE FACTS** .......... 2

**LEGAL STANDARD** .......... 5

**ARGUMENT** .......... 7

I. China's motions are untimely, so this Court lacks jurisdiction to vacate the judgment. .... 7

II. China's attempt to vacate the judgment under Rule 60(b)(4) fails. .......... 10

A. To prevail under Rule 60(b)(4), China must establish that this Court plainly usurped its power and lacked even an arguable basis for jurisdiction. .......... 10

B. The Eighth Circuit and this Court already found subject-matter jurisdiction, so China fails to establish a plain usurpation of authority by this Court. .......... 12

1. The Eighth Circuit already held that the FSIA abrogated China's immunity from suit, and China merely quibbles with this Court's prior factual findings supporting subject-matter jurisdiction. .......... 12

2. The political-question doctrine does not establish that this Court lacked even an "arguable basis" for jurisdiction. .......... 16

C. China's challenge to personal jurisdiction fails. .......... 18

1. Missouri complied with the FSIA's personal jurisdiction provisions. .......... 18

2. China's claim that Missouri violated Federal Rule of Civil Procedure 5(a)(2) provides no basis to vacate this Court's judgment. .......... 22

3. This Court has personal jurisdiction over CAS. .......... 23

III. China's Rule 60(b)(6) arguments are equally unavailing. .......... 24

IV. Rule 55 has nothing to do with vacatur of a default judgment. .......... 25

**CONCLUSION** .......... 25

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Albert v. Carovano*,
851 F.2d 561 (2d Cir. 1988) .................... 20

*Al-Tamimi v. Adelson*,
916 F.3d 1 (D.C. Cir. 2019).................... 17

*Baker v.* Carr,
369 U.S. 186 (1962) .................... 16

*Bazarian Int'l Fin. Ass., LLC v. Desarrollos Aerohotelco, C.A.*,
168 F.Supp.3d 1 (D.D.C. 2016).................... 24

*Belkin v. Islamic Republic of Iran*,
667 F.Supp.2d 8 (D.D.C.2009).................... 21

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
734 F.3d 1175 (D.C. Cir. 2013).................... 11

*Blais v. Islamic Republic of Iran*,
459 F.Supp.2d 40 (D.D.C. 2006).................... 21, 22

*Bouret-Echevarria v. Caribbean Aviation Maint. Corp.*,
784 F.3d 37 (1st Cir. 2015).................... 7, 8

*Brown v. Kansas City Live, LLC*,
931 F.3d 712 (8th Cir. 2019) .................... 19

*Buck v. Davis*,
580 U.S. 100 (2017) .................... 24, 25

*CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*,
605 U.S. 223 (2025) .................... 18, 20, 24

*Cent. Vt. Pub. Serv. Corp. v. Herbert*,
341 F.3d 186 (2d Cir. 2003) .................... 11

*Coney Island Auto Parts Unlimited, Inc. v. Burton Tr. for Vista-Pro Auto., LLC*,
607 U.S. 155 (2026) .................... 1, 7, 10

*Cotto v. United States*,
993 F.2d 274 (1st Cir. 1993).................... 8

*Dammarell v. Islamic Republic of Iran*,
370 F.Supp.2d 218 (D.D.C. 2005).................... 21, 22

*Est. of Crespo v. Democratic People's Republic of Korea*,
2026 WL 2110733 (D.D.C. 2026) .... 21, 22

*FG Hemisphere Associates, LLC v. Democratic Republic of Congo*,
447 F.3d 835 (D.C. Cir. 2006) .... 8, 9

*Flanagan v. Islamic Republic of Iran*,
190 F.Supp.3d 138 (D.D.C. 2016) .... 5, 20

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) .... 23

*Gates v. Syrian Arab Republic*,
646 F.3d 1 (D.C. Cir. 2011) .... 22

*Gross v. German Found. Indus. Initiative*,
456 F.3d 363 (3d Cir. 2006) .... 16

*Hunter v. Underwood*,
362 F.3d 468 (8th Cir. 2004) .... 10, 13

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
478 U.S. 221 (1986) .... 16

*Johnson v. Lucas Indus.*,
2017 WL 513043 (E.D. Mo. 2017) .... 25

*Kansas City S. Ry. Co. v. Great Lakes Carbon Corp.*,
624 F.2d 822 (8th Cir. 1980) .... 6, 11

*Kenny v. Islamic Republic of Iran*,
2024 WL 4297682 (D.D.C. 2024) .... 20

*Maalouf v. Islamic Republic of Iran*,
2016 WL 11771416 (D.D.C. 2016) .... 21, 22

*Maalouf v. Islamic Republic of Iran,*
923 F.3d 1095 (D.C. Cir. 2019) .... 16, 17

*Magness v. Russian Fed'n*,
247 F.3d 609 (5th Cir. 2001) .... 23

*Missouri ex rel. Bailey v. China*,
90 F.4th 930 (8th Cir. 2024) .... passim

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) .... 6, 11

*Nikollbibaj v. US Foods, Inc.*,
2026 WL 1998670 (7th Cir. 2026) ..... 8

*Nucor Corp. v. Neb. Pub. Power Dist.*,
999 F.2d 372 (8th Cir. 1993) ..... 2, 7, 10

*Parkhill v. Minn. Mut. Life Ins. Co.*,
286 F.3d 1051 (8th Cir. 2002) ..... 20

*PIRS Cap., LLC v. Williams*,
54 F.4th 1050 (8th Cir. 2022) ..... passim

*Practical Concepts, Inc. v. Republic of Bolivia*,
811 F.2d 1543 (D.C. Cir. 1987) ..... 5, 20

*Printed Media Servs., Inc. v. Solna Web, Inc.*,
11 F.3d 838 (8th Cir. 1993) ..... 12

*Rajab v. United States*,
2026 WL 205537 (D.S.D. 2026) ..... 7, 8

*Republic of Argentina v. NML Cap., Ltd.*,
573 U.S. 134 (2014) ..... 16, 17

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992) ..... 13, 14

*Shoham v. Islamic Republic of Iran*,
922 F.Supp.2d 44 (D.D.C. 2013) ..... 21, 22

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
632 F.3d 938 (5th Cir. 2011) ..... 17

*Tamayo v. Stephens*,
740 F.3d 986 (5th Cir. 2014) ..... 8

*Topchian v. JPMorgan Chase Bank, N.A.*,
760 F.3d 843 (8th Cir. 2014) ..... 19, 20

*United Student Aid Funds v. Espinosa*,
559 U.S. 260 (2010) ..... passim

*Watkins v. Lundell*,
169 F.3d 540 (8th Cir. 1999) ..... 8, 10

**Statutes**

15 U.S.C. § 2 ..... 14

28 U.S.C. § 1330(b) ........ 18, 20

28 U.S.C. § 1603(d) ........ 13

28 U.S.C. § 1605(a)(2) ........ 16

28 U.S.C. § 1608(b) ........ 23

28 U.S.C. § 1608(e) ........ 3, 9

28 U.S.C. § 1610(c) ........ 9

**Rules**

Fed. R. Civ. P. 5(a)(2) ........ 22

Fed. R. Civ. P. 60(b) ........ 5, 7, 8

Fed. R. Civ. P. 60(b)(4) ........ 7, 10, 11, 22, 24

Fed. R. Civ. P. 60(b)(6) ........ 7, 24

Fed. R. Civ. P. 60(c)(1) ........ 7, 8, 9, 10

## INTRODUCTION

Facing a $24.5 billion judgment, the Chinese Academy of Sciences, the People's Government of the Hubei Province, and the Ministry of Emergency Management of the People's Republic of China (collectively the "moving Defendants" or "China") have finally appeared in this litigation to challenge this Court's judgment. But they are about six years too late. Seeking a do-over, China tries to contest facts that Missouri established to this Court's satisfaction. China also tries to dress up merits arguments as jurisdictional ones. But China forfeited its ability to contest the merits by refusing to participate before final judgment—opting instead to rely on an amicus to do its bidding. *See United Student Aid Funds v. Espinosa*, 559 U.S. 260, 270–71 (2010) (reaffirming that a judgment can be reopened only if there was no "arguable basis" for jurisdiction).

In any event, the Court need not reach China's Rule 60(b) motions because they are untimely—being made 17 months after this Court entered judgment. Even now, only three of the Defendants move for vacatur while the remaining Defendants still refuse to appear.[1] Incredibly, the moving Defendants nonetheless seek vacatur of the default judgment "as to all Defendants." Doc. 129 at 21. But that is not how vacatur of a default judgment works, even on questions of jurisdiction. Rule 60(c)(1) makes clear that, to escape a default judgment, the defaulting party must submit a timely motion to vacate. Earlier this year, the U.S. Supreme Court also made clear that this requirement applies even when the moving party alleges a lack of jurisdiction. *See Coney Island Auto Parts Unlimited, Inc. v. Burton Tr. for Vista-Pro Auto., LLC*, 607 U.S. 155, 158–61 (2026). All Defendants flunk the timeliness requirement—but this is especially obvious for the non-moving Defendants. This Court has "no jurisdiction to entertain" an "untimely" Rule 60(b)

[1] The remaining Defendants are the People's Republic of China, the Communist Party of China, the National Health Commission of the People's Republic of China, the People's Government of Wuhan City, and the Wuhan Institute of Virology (collectively the "non-moving Defendants").

motion, *Nucor Corp. v. Neb. Pub. Power Dist.*, 999 F.2d 372, 373, 375 (8th Cir. 1993), so the Court must reject China's motions.

**STATEMENT OF THE FACTS**

Missouri sued China six-and-a-half years ago, Doc. 1, asserting several claims related to the spread of COVID-19 and related harms caused by China's "classic anticompetitive behavior" during the pandemic, Doc. 95 at 23–24 (quoting *Missouri ex rel. Bailey v. China*, 90 F.4th 930, 938 (8th Cir. 2024)). Missouri alleged that it suffered "billions and possibly tens of billions of dollars in economic damages, as well as substantial non-economic damages." Doc. 1 ¶ 179. As this Court noted in its judgment, "Each Defendant was properly served with a copy of the summons and Complaint in this lawsuit," and "[e]ach Defendant thereafter, and with full knowledge of this lawsuit, chose to ignore this lawsuit by failing to plead or otherwise defend themselves against Missouri's claims." Doc. 95 at 18. The Clerk entered defaults against each Defendant. Docs. 29, 44. But, in July 2022, this Court dismissed Missouri's Complaint for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). Doc. 61. Missouri appealed.

In January 2024, the Eighth Circuit affirmed in part and reversed in part. *Bailey*, 90 F.4th at 940. Acknowledging that the FSIA presumptively shielded all Defendants from suit, the court nevertheless concluded that Count IV of Missouri's Complaint satisfied the commercial-activity exception to the FSIA. *Id.* at 937–940. The court observed that Count IV "identif[ied] classic anticompetitive behavior." *Id*. at 938. "Taking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of 'a private player' in the market," and "[t]he same goes for the act of selling those items for a profit." *Id*. Also, "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects." *Id*. at 939. China "singlehandedly

t[ook] over factories that ma[d]e masks and cornered the market before the rest of the world realized what was happening." *Id*. (alterations in original) (quotation omitted). Then, "when the virus spread and people all over the world became sick, China was able to maintain its stockpile [of PPE] and prolong the shortage." *Id*. Given China's significant market power, "[t]he most basic supply-and-demand principles tell us that these market effects depended little, if at all, 'on variables independent' of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id*. (citation omitted). Accordingly, the Eighth Circuit reversed this Court's dismissal as to Count IV. *Id.* at 939–40.

On remand, Missouri submitted four rounds of briefing and over a thousand pages of exhibits to establish its "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see* Docs. 79, 80, 87, 90, 94 (exhibits in attachments). Among other things, Missouri's evidence included several federal reports documenting China's systematic effort to horde PPE while minimizing the spread of information about COVID-19's transmissibility. *E.g.*, Docs. 80-1–80-11. Missouri also provided two expert reports and "the State's own records of expenditures" to establish damages directly caused by China's actions. Doc. 95 at 23; *see also* Docs. 80-1, 87-1.

On March 7, 2025, this Court entered default judgment against all Defendants. Doc. 95. Misreading this Court's judgment, the moving Defendants wrongly claim that the Court entered judgment on claims outside the Complaint. Doc. 107 at 9. But that conflicts with this Court's order. The Court made clear that Missouri "demonstrated Defendants' liability *on Count IV* of its Complaint to the Court's satisfaction," and that Missouri "demonstrated the damages it has suffered from Defendants' liability *on Count IV*." Doc. 95 at 20–21, 27 (emphasis added). The Court explained that Missouri "provided the Court with three distinct statutory causes of action through which Defendants liability may be found." *Id.* at 20. And "[u]nder any of these statutory

theories, Missouri has demonstrated Defendants liability *on Count IV*." *Id.* at 21 (emphasis added).

The Court also based its damages award on findings of "direct harm" under Count IV: (1) "Direct harm to the State of Missouri from lost tax revenue caused by China's hoarding of PPE," and (2) "Direct harm to the State of Missouri from heightened PPE expenditures paid by Missouri." *Id.* at 28, 30. As to lost tax revenue, the Court based its findings on two expert reports from Dr. Joseph H. Haslag, an economist at the University of Missouri-Columbia. *See id.* at 28–30 (citing Docs. 80-1, 87-1). As this Court noted, "Dr. Haslag's supplemental report provide[d] a range of calculations for economic damages suffered by the State of Missouri as a direct result of China's hoarding of PPE," and Missouri "sought to recover *the most conservative estimate* of direct damages from lost tax revenue." Doc. 95 at 29–30 (emphasis added). Next, as to heightened PPE expenditures, the Court found that Missouri established direct damages based on "publicly available" records of PPE expenditures between April 2020 and December 2020. *Id.* at 30. The Court noted that this evidence was "likely underinclusive of" Missouri's "total heightened direct expenditures." *Id.* Together, these conservative estimates totaled $8,162,941,819.00 in damages. *Id.* at 31. The Court tripled this figure after finding that all of Missouri's state and federal causes of action permitted recovery of treble damages "sustained by" Missouri. *Id.*

China knew about these developments. Before entering its judgment, the Court itself noted that Defendants had "full knowledge of this lawsuit," and simply "chose to ignore" it. Doc. 95 at 18 (citing Docs. 23, 36–41). Also, two weeks after this Court's judgment, Missouri received a letter from the Consulate General of the PRC stating that "[t]he Chinese government urge[d]" Missouri to "refrain[] from enforcement of the judgment." Ex. 1 at 11. In this letter, China raised jurisdictional complaints and demonstrated knowledge of the FSIA process for default judgments. *See id.* at 9–10. On April 30, 2025, three of the Defendants also filed a lawsuit in Chinese court

against Missouri and two previous Missouri Attorneys General seeking over $53 billion in damages. Ex. 2 at 11–12. These Defendants acknowledged this Court's judgment and Attorney General Bailey's statements that Missouri "intend[ed] to collect every penny." Ex. 2 at 13.

In November 2025, Attorney General Catherine Hanaway reiterated Missouri's commitment to collecting on the judgment, stating that Missouri was "moving full speed ahead to secure [the] judgment for the people of Missouri." Ex. 3 at 2. That same day, Missouri initiated collection proceedings by dispatching service packets to the six governmental defendants. Doc. 97; Ex. 2 at 33. In December 2025, China added General Hanaway as a defendant in its lawsuit in Chinese court, acknowledging her intent to collect on the judgment. Ex. 2 at 34. On September 14, 2026, the State Department confirmed service on the six governmental defendants. Doc. 134.

On August 31, 2026, over a year after the Chinese government sent its initial letter and filed its lawsuit in China, Chinese Academy of Sciences ("CAS") and Hubei Province finally appeared and moved to vacate the default judgment and dismiss the action. Docs. 106, 107. Three days later, the Ministry of Emergency Management of the People's Republic of China (the "Ministry") filed its own motion seeking the same relief. Docs. 126, 129.

## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) governs attempts to obtain relief from a final default judgment. Rule 60(b) is not a vehicle for relitigation of the merits—even after a default judgment. A default judgment "is not void … simply because it is or may have been erroneous." *Espinosa*, 559 U.S. at 270, 275–76; *Flanagan v. Islamic Republic of Iran*, 190 F.Supp.3d 138, 150 (D.D.C. 2016) (holding that defaulting FSIA defendants are "foreclosed from challenging the underlying merits of the plaintiff's claims"). Indeed, a defaulting defendant "forfeit[s] [the] right to defend on the merits" by refusing to participate in the litigation before the default judgment. *Practical*

*Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 (D.C. Cir. 1987).

A defaulting defendant's ability to object to the Court's jurisdiction is also severely limited. Federal courts "generally have reserved relief only for the exceptional case in which the court that rendered judgment lacked even an arguable basis for jurisdiction." *PIRS Cap., LLC v. Williams*, 54 F.4th 1050, 1054 (8th Cir. 2022) (quoting *Espinosa*, 559 U.S. at 271). This requires proof of a "plain usurpation" of jurisdiction. *Kansas City S. Ry. Co. v. Great Lakes Carbon Corp.*, 624 F.2d 822, 825 (8th Cir. 1980) (en banc). The Eighth Circuit rigorously enforces this standard because of the strong "policy favoring certainty" in final judgments. *Id.* at 826.

A movant might also allege that a default judgment is "void" because of a deprivation of "notice or the opportunity to be heard." *Espinosa*, 559 U.S. at 270–71. However, a judgment can become void only through a notice violation so severe as to abridge the "constitutional right to due process." *Id.* at 271–72. The Supreme Court will not void a judgment because of "a right granted by a procedural rule." *Id.* at 272. Also, due process simply "requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). The U.S. Supreme Court has also made clear that this standard "does *not* require actual notice." *Id.* (emphasis added) (quotation omitted). Thus, proof of "*actual* notice" by the defaulting defendant "more than satisfie[s]" the defendant's "due process rights," and precludes vacatur of a default judgment. *Id.* (emphasis in original).

Next, this Court's prior factual findings are virtually ironclad at this stage. Even *before* entering a default judgment, this Court correctly recognized that "[c]ourts apply a 'lenient standard' for factual findings … in FSIA default hearings, recognizing that 'firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile

sovereign.'" Doc. 95 at 19 (citation omitted). That was the applicable factual standard *before* the Court entered a default judgment. Now, *post*-judgment, the limits on vacatur of a judgment overlay the FSIA's standard for factual findings. Post-judgment, China must show a factual error so severe as to destroy even an "arguable basis" for this Court's jurisdiction. *PIRS*, 54 F.4th at 1054.

## ARGUMENT

### I. China's motions are untimely, so this Court lacks jurisdiction to vacate the judgment.

To obtain relief under Rule 60(b)(4) or Rule 60(b)(6), China must file its motion to vacate "within a reasonable time." Fed. R. Civ. P. 60(c)(1); *Coney Island*, 607 U.S. at 162. This is a mandatory, threshold requirement. The Eighth Circuit has held that if a "Rule 60(b) motion [i]s untimely," the district court has "no jurisdiction to entertain the motion." *Nucor*, 999 F.2d at 373, 376; *see also Rajab v. United States*, 2026 WL 205537, at *4 (D.S.D. 2026) ("Because [the movant's] Rule 60(b) motion was untimely, the court is without jurisdiction to entertain it.").

Whether Defendants have met Rule 60(c)(1)'s timeliness requirement depends upon the circumstances of the case. *Bouret-Echevarria v. Caribbean Aviation Maint. Corp.*, 784 F.3d 37, 43 (1st Cir. 2015). "The determination of what constitutes a 'reasonable' period of time requires a district court to examine when a movant *could* have filed a Rule 60(b)(6) motion." *Id.* (emphasis added). Applying this standard here, Rule 60(c)(1) forecloses jurisdiction to vacate the default judgment, *Nucor*, 999 F.2d at 373, 376—both as to the moving and non-moving Defendants.

Start with the moving Defendants, who "could have filed" their Rule 60 motions 17 months ago. *Bouret-Echevarria*, 784 F.3d at 43. China had "full knowledge of this lawsuit" when this Court rendered its judgment in March 2025, Doc. 95 at 18, yet the moving Defendants waited 17 months after entry of the default judgment and learning of Missouri's intent to collect. The same day that the Court entered its default judgment, the Attorney General announced that Missouri

"intend[ed] to collect every penny." Ex. 4 at 2. Fourteen days later, the Chinese government sent a letter to Missouri asserting that the default judgment was improper for lack of jurisdiction. Ex. 1 at 9–11. This letter showed significant familiarity with Missouri's claims and with the FSIA itself. *See id.* at 6, 9–11. Then, just over a month after this Court's default judgment, CAS and two of the non-moving Defendants initiated a lawsuit in China acknowledging the judgment and Missouri's intent to "collect every penny." Ex. 2 at 14. Thus, within days of this Court's judgement, China plainly had full notice of the judgment and knew it would be enforced. Yet the moving Defendants failed to act until August 31, 2026—over 17 months later.

Courts have regularly found that delays between 8 and 17 months render a motion untimely under Rule 60(c)(1). *See Watkins v. Lundell*, 169 F.3d 540, 544 (8th Cir. 1999) (17-month delay was likely untimely); *Tamayo v. Stephens*, 740 F.3d 986, 991 (5th Cir. 2014) (8-month delay was untimely); *Nikollbibaj v. US Foods, Inc.*, 2026 WL 1998670, at *1 (7th Cir. 2026) (11-month delay was untimely); *Cotto v. United States*, 993 F.2d 274, 280 (1st Cir. 1993) (16-month delay was untimely). In *Watkins*, for example, the Eighth Circuit noted that a 17-month delay in challenging a default judgment likely rendered a Rule 60(b) motion untimely. 169 F.3d at 544; *see also Rajab*, 2026 WL 205537, at *4 (holding that a 17-month delay was untimely).

Perhaps knowing that their 17-month delay dooms their motions, the moving Defendants try to shift focus to Missouri's timing in beginning official enforcement efforts. *See* Doc. 107 at 3–4; Doc. 129 at 13. But that does not save their delay. Again, courts measure timeliness from the moment that the foreign defendant "could have filed" a Rule 60(b) motion. *Bouret-Echevarria*, 784 F.3d at 43. China claims that the D.C. Circuit held otherwise in *FG Hemisphere Associates, LLC v. Democratic Republic of Congo*, 447 F.3d 835, 839–40 (D.C. Cir. 2006), supposedly "measuring timeliness" based on the plaintiff's filing of the "motion to execute" the judgment.

Doc. 129 at 12. But China misinterprets the D.C. Circuit's holding. The D.C. Circuit's opinion concerns Rule 60(b)(1), not the meaning of "reasonable time" for purposes of Rule 60(c)(1). *See FG Hemisphere*, 447 F.3d at 838–39. In any event, the D.C. Circuit's opinion supports Missouri. The D.C. Circuit measured timeliness based on the filing of the motion to execute because "that represented the first time that the [defendant] received the *slightest hint* that its diplomatic properties were in jeopardy." *Id.* at 839 (emphasis added). Moreover, the defendant appeared and responded within "two-and-a-half month[s]" of receiving "the slightest hint" of enforcement. *Id.* Comparatively, China waited 17 months after receiving "the slightest hint" of enforcement.

Even if this Court prefers to measure timeliness based on the beginning of official enforcement proceedings, Defendants' motions are still untimely. The Attorney General announced the dispatch of diplomatic packets pursuant to the FSIA in November 2025. *See* Ex. 4.[2] Defendants were aware of Missouri's attempt to begin this official process; CAS even acknowledged this effort in its lawsuit. Ex. 2 at 33–34. Even on the most generous timeline, the moving Defendants delayed over 9 months from the initiation of enforcement.[3]

One final point: Any motion to vacate is obviously untimely as to the *non-moving* Defendants. Their failure to move for relief means they certainly fail Rule 60(c)(1). Curiously,

---

[2] The State Department later determined this service was deficient, Doc. 100, but this hiccup does not buy Defendants more time. Missouri began official enforcement proceedings in November 2025, giving Defendants more than a "slight[] hint" of its intent to collect on the judgment. *FG Hemisphere*, 447 F.3d at 839. Defendants could not have known of the procedural deficiency in the service packets and are not absolved of their failure to move with reasonable diligence.

[3] Defendant's reliance on the absence of a § 1610(c) order is likewise unavailing. *See* Doc. 107 at 4; Doc. 129 at 10. Missouri was unable to request a § 1610(c) order prior to proof of service from the State Department in accordance with 28 U.S.C. § 1608(e). *See* 28 U.S.C. § 1610(c). The State Department delivered proof of service in September 2026, after Defendants filed their motions. Doc. 134. In any event, the critical moment is when Defendants had the "slightest hint" of Missouri's intent to enforce the judgment, not the filing of a § 1610(c) order. *FG Hemisphere*, 447 F.3d at 839.

the moving Defendants insist that the Court should vacate the default judgment even as to the non-moving Defendants because the Court can consider a lack of jurisdiction at any time. Doc. 129 at 21–22. However, that argument conflicts with the Supreme Court's 2026 holding in *Coney Island*, which made clear that Rule 60(c)(1) always requires a timely motion—even to vacate a default judgment for lack of jurisdiction. *See* 607 U.S. at 158–60, 162. In this instance, where the moving Defendants waited over 17 months after learning of Missouri's intent to collect, and where the non-moving Defendants failed to submit a timely motion to vacate, this Court lacks jurisdiction to vacate its prior judgment. *See Nucor*, 999 F.2d at 373; *see also Watkins*, 169 F.3d at 544.

## II. China's attempt to vacate the judgment under Rule 60(b)(4) fails.

In any event, even if this Court somehow has jurisdiction over China's untimely motions, China's motions fail for the reasons explained below.

### A. To prevail under Rule 60(b)(4), China must establish that this Court plainly usurped its power and lacked even an arguable basis for jurisdiction.

China claims that vacatur is warranted under Rule 60(b)(4) because this Court somehow lacked subject-matter jurisdiction and personal jurisdiction. Doc. 129 at 11–21; Doc. 107 at 4–11. Before addressing these arguments specifically, it is worth re-emphasizing that "Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *Espinosa*, 559 U.S. at 271. The jurisdictional error must be so severe as to deprive this Court of "even an 'arguable basis' for jurisdiction" to enter judgment. *Id.*; *PIRS*, 54 F.4th at 1054. Said another way, "[a] Rule 60(b)(4) motion to void [a] judgment for lack of subject matter jurisdiction will succeed only 'if the absence of jurisdiction was so glaring as to constitute a total want of jurisdiction or a plain usurpation of power so as to render the judgment void from its inception.'" *Hunter v. Underwood*, 362 F.3d 468, 475 (8th Cir. 2004) (citation omitted).

Additionally, precedent makes clear that this "arguable basis" standard applies to regular judgments and default judgments alike. *See Espinosa*, 559 U.S. at 271; *PIRS*, 54 F.4th at 1054; *Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 190 (2d Cir. 2003). Seeking to create an exception to this rule for default judgments, China cites a D.C. Circuit case that declined to apply the "arguable basis" standard to a motion to vacate a default judgment. Doc. 129 at 11 (citing *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1180–82 (D.C. Cir. 2013)). But the D.C. Circuit's decision conflicts with Eighth Circuit and U.S. Supreme Court precedent, *Espinosa*, 559 U.S. at 271; *PIRS*, 54 F.4th at 1054, and the D.C. Circuit expressly declined to apply the "arguable basis" standard from the Eighth Circuit's en banc decision in *Kansas City Southern Railway Co. v. Great Lakes Carbon Corp.*, 624 F.2d 822, 823-24 (8th Cir. 1980) (en banc). *See Bell Helicopter*, 734 F.3d at 1182 n.3 (declining to follow *Kansas City S. Ry.*, 624 F.2d at 823–24). Because this Court is bound by Supreme Court and Eighth Circuit precedent, the Court must reject China's motion unless it lacked even an "arguable basis" for jurisdiction.

Of course, China also seeks vacatur by claiming that Missouri provided inadequate notice. And to be sure, a defaulting party can hypothetically prevail on a Rule 60(b)(4) motion by showing "a violation of due process that deprives a party of notice or the opportunity to be heard." *Espinosa*, 559 U.S. at 271. However, as the Supreme Court emphasized in *Espinosa*, this requires more than a deprivation of "a right granted by a procedural rule." *Id.* at 272. Due process itself merely "requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* (quoting *Mullane*, 339 U.S. at 314). This standard "does not require actual notice." *Id.* (quotation omitted). That makes this case easy because China had *actual notice*. Doc. 95 at 18. "[*A*]*ctual* notice" by the defaulting defendant "more than satisfie[s]" the defendant's "due process

rights," and therefore precludes vacatur of a default judgment. *Espinosa*, 559 U.S. at 272 (emphasis in original).[4]

**B. The Eighth Circuit and this Court already found subject-matter jurisdiction, so China fails to establish a plain usurpation of authority by this Court.**

Defendants first argue that Missouri failed to prove the commercial-activity exception to the FSIA. Doc. 129 at 13–16; Doc. 107 at 4–8. However, the Eighth Circuit already held in *Bailey* that Missouri successfully alleged a claim consistent with the commercial-activity exception to the FSIA. *See* 90 F.4th at 939. Thus, Missouri's legal arguments for abrogation of China's immunity are unassailable under Eighth Circuit precedent. *Id.* Knowing this, China takes the unusual step of challenging the facts underlying this Court's subject-matter jurisdiction. Doc. 107 at 5–8; Doc. 129 at 14–16. This argument fails.

**1. The Eighth Circuit already held that the FSIA abrogated China's immunity from suit, and China merely quibbles with this Court's prior factual findings supporting subject-matter jurisdiction.**

The Eighth Circuit already held that Missouri's Complaint successfully alleged that the FSIA's commercial-activity exception abrogates China's immunity from suit. *See Bailey*, 90 F.4th at 938–39. China cannot escape *Bailey*, so China emphasizes a single line of the Eighth Circuit's opinion—that "Missouri must still prove" jurisdiction under the FSIA, *Bailey*, 90 F.4th at 939, even though China acknowledges that "Missouri's Count IV *alleged* jurisdiction." Doc. 129 at 13 (emphasis in original). China then urges this Court to question its own factual findings based on

[4] Arguing for a contrary rule, China cites a 1993 case for the proposition that a defaulting party can prevail on a Rule 60(b)(4) motion even if they had "actual notice." Doc. 129 at 17 (citing *Printed Media Servs., Inc. v. Solna Web, Inc.*, 11 F.3d 838, 843 (8th Cir. 1993)). However, *Printed Media*—the 1993 case cited by China—is distinguishable. That case involved a defendant who was "never served" at all. *See* 11 F.3d at 843. In any event, to the extent that *Printed Media* establishes a broad rule that "actual notice" cannot preclude vacatur of a default judgment, it has been abrogated by the U.S. Supreme Court's decision in *Espinosa*. *PIRS*, 54 F.4th at 1054 (recognizing that, "The Supreme Court in *Espinosa* expressly stated that receiving actual notice 'more than satisfied [the defendant's] due process rights.'" (quoting *Espinosa*, 559 U.S. at 272)).

the evidence submitted at trial. Doc. 129 at 13–16; Doc. 107 at 4–8.

However, China overcomplicates what Missouri needed to prove to satisfy the commercial-activity exception. The Eighth Circuit's summary of the critical facts was quite simple:

> Missouri's overarching theory is that China leveraged the world's ignorance about COVID-19. One way it did so was by manipulating the worldwide personal-protective-equipment market. *Missouri must still prove it*, but it has alleged enough to allow the claim to proceed beyond a jurisdictional dismissal on the pleadings.

*Bailey*, 90 F.4th at 939 (emphasis added). Missouri submitted a mountain of evidence showing that is exactly what China did. *See, e.g.*, Docs. 79, 80, 87, 90, 94. This Court then made factual findings that "China engaged in a deliberate campaign to suppress information about the COVID-19 pandemic in order to support its campaign to hoard PPE from Missouri and an unsuspecting world." Doc. 95 at 5–15. Nothing that China now presents shows that this Court's factual findings on jurisdiction were so egregiously wrong as to suggest "a total want of jurisdiction or a plain usurpation of power." *Hunter*, 362 F.3d at 475 (quotation omitted).

China first claims that the challenged actions were sovereign in nature. Doc. 107 at 5–6; Doc. 129 at 15–16. But the Eighth Circuit directly addressed this issue, holding that "[t]aking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment," as well as "selling those items for a profit," "are the actions of 'a private player' in the market." *Bailey*, 90 F.4th at 938 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). China cannot re-litigate that holding before this Court. Regardless, that holding was correct because Defendants' actions were commercial in nature. "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Weltover*, 504 U.S. at 614. This is determined by the "nature" of the act, not its "purpose." *Id.* (quoting 28 U.S.C. § 1603(d)). "[T]he issue is whether the particular actions that the foreign state performs

(whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (citation omitted).

Defendants engaged in actions that a private business could have undertaken. Missouri alleged in its Complaint—and proved at trial—that Defendants, by purchasing market supply and directing factory output, artificially prevented the PPE market from operating properly, to Missouri's detriment. *See* Doc. 1 ¶¶ 130–138, 175–79; *also* Doc. 79 at 70–84; Doc. 95 at 5–15. The Eighth Circuit held that Missouri's allegations, if true, would satisfy the commercial-activity exception. *Bailey*, 90 F.4th at 939. After a bench trial and several rounds of briefing, this Court determined—as a factual matter—that Missouri's allegations are true. Doc. 95 at 10–15.

China also claims that "PPE purchasing, at least at any scale to affect the market, was conducted by *non*-state actors at China's sovereign directive." Doc. 107 at 6 (emphasis in original). That is wrong, Doc. 95 at 12–14, but would not make a difference in any event. First, directing other companies to engage in certain behavior is not a uniquely sovereign act, as any sufficiently large private business could coordinate its subsidiaries and shell companies to engage in cornering a market. *Contra* Doc. 107 at 6; Doc. 129 at 15–16. And second, the actions of the entities engaging in the purchases are imputable to the entity directing them to do so. The Sherman Act expressly imposes liability for that exact action. *See* 15 U.S.C. § 2 (prohibiting conspiracy to monopolize). Thus, using private entities to purchase PPE would not eliminate China's liability.

Defendants also allege that their actions had no direct effect on the United States. Doc. 107 at 6–8; Doc. 129 at 14–15. However, the Eighth Circuit already recognized that if Missouri could prove PPE shortages and that China "cornered the market before the rest of the world realized what was happening," the "*most basic* supply-and-demand principles" would tell us that the observed "market effects depended little, if at all, 'on variables independent' of the defendants'

conduct given the information asymmetry and tight timeframe that existed at the time." *Bailey*, 90 F.4th at 938–39 (emphasis added). Following the Eighth Circuit's decision, Missouri provided significant evidence at trial supporting a "direct effect" on the United States and this Court made corresponding factual findings in its final judgment. First, Missouri provided "publicly available" records of "heightened expenditures" that Missouri "made to acquire PPE between April 22, 2020, and December 31, 2020." Doc. 95 at 30 (citing Doc. 80-15). The Court found that this evidence, among other evidence, supported Missouri's claim of hundreds of millions of dollars in heighted expenditures caused directly by "China's hoarding of PPE." *Id.* at 30–31; *see also id.* at 23. The Court also noted that Missouri's evidence was "likely *underinclusive* of the total heightened direct expenditures" caused by China's hording of PPE. *Id.* at 30 (emphasis added).

Second, "The Eighth Circuit, in *Missouri ex rel. Bailey*, held that 'the billions of dollars Missouri lost in revenue' constitutes a 'direct economic injury' to the State, of which the State may recover." *Id.* at 28 (quoting *Bailey*, 90 F.4th at 939 n.2). To support its claim of this "direct economic injury," Missouri retained Dr. Joseph Haslag—a respected professor at the University of Missouri. *Id.* As this Court noted, Missouri "sought to recover the most *conservative estimate* of *direct* damages from lost tax revenue contained in Dr. Haslag's supplemental report, totaling $8.04 billion for the combined value of Missouri's lost past tax revenue and the discounted value of Missouri's lost future tax revenue from China's PPE hording." *Id.* at 29–30 (emphasis added).

Thus, Missouri *did* "prove" the Complaint's allegations that "China leveraged the world's ignorance about COVID-19 … by manipulating the worldwide personal-protective-equipment market." *Bailey*, 90 F.4th at 939. And Missouri tailored its demand for damages, with conservative estimates, based solely on lost tax revenue and heightened direct expenditures caused by China's conduct. Doc. 95 at 29–31. It therefore defies credulity for China to claim that this

Court lacked even an "arguable" basis for jurisdiction. *PIRS*, 54 F.4th at 1054.

**2. The political-question doctrine does not establish that this Court lacked even an "arguable basis" for jurisdiction.**

China next argues that this case presents a non-justiciable political question. Doc. 107 at 8–9; Doc. 129 at 17–20. However, the "political question doctrine excludes from judicial review" only controversies that are "constitutionally committed for resolution to the halls of Congress or the confines of the Executive branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Here, the FSIA—which itself satisfied bicameralism and presentment—unambiguously provides that China "*shall not* be immune from the jurisdiction of courts of the United States … in any case" based on China's acts "outside the territory of the United States in connection with a commercial activity" and those "act[s] cause[] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The FSIA itself thus unambiguously communicates the political branches' view that federal courts possess subject-matter jurisdiction over this case. *See Bailey*, 90 F.4th at 938–40. And "the Supreme Court has been clear in its FSIA jurisprudence that it is not for the courts 'to consider the worrisome international-relations consequences' of adjudicating actions under the FSIA." *Maalouf v. Islamic Republic of Iran (Maalouf II)*, 923 F.3d 1095, 1113 (D.C. Cir. 2019) (quoting *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 146 (2014)).

Even setting the FSIA aside, China's political-question argument also fails under the traditional political-question factors. *See Baker v*. Carr, 369 U.S. 186, 217 (1962). Whether China has violated statutory antitrust laws does not bear on the Executive Branch's authority to conduct foreign relations. "There is no possibility of expressing a lack of respect due the Executive branch when the Executive has not expressed its interest in the dispute." *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 390 (3d Cir. 2006). That is especially true here—where the federal government has neither moved to intervene nor filed an amicus brief in this case. What's more,

the federal government has consistently iterated its opinion that China's hoarding of PPE and monopolization of the PPE market were improper. *See, e.g.*, Ex. 5 (remarks by President Trump).

China also claims that this Court's judgment disrespected China's sovereignty over its affairs, and that the Court lacked judicially discoverable and manageable standards for resolving this case. Doc. 107 at 8; Doc. 129 at 18–19. However, any concern about impinging China's sovereignty is foreclosed by the FSIA's authorization of Missouri's lawsuit. *See Maalouf II*, 923 F.3d at 1113 (Again, "the Supreme Court has been clear in its FSIA jurisprudence that it is not for the courts 'to consider the worrisome international-relations consequences' of adjudicating actions under the FSIA." (quoting *NML Cap.*, 573 U.S. at 146)). Also, in finding China liable, this Court did not sit in judgment of the wisdom of China's actions; it simply determined that China violated federal and state antitrust laws—an issue that courts possess judicially manageable standards for resolving. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 12 n.6 (D.C. Cir. 2019).

In arguing otherwise, Defendants rely heavily on *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938 (5th Cir. 2011), where plaintiffs challenged price fixing by oil companies owned by OPEC-member states. *See* Doc. 129 at 18–19; Doc. 107 at 8–9. However, *Spectrum Stores* is plainly distinguishable. *Spectrum Stores* never considered whether the FSIA authorized the plaintiff's suit. *See* 632 F.3d at 945 n.10 (noting "[t]he parties did not raise arguments regarding" the "FSIA"). There, the Fifth Circuit emphasized that the plaintiff's lawsuit could interfere with the Executive Branch's longstanding diplomatic policy toward OPEC and its member states, and the Court noted that adjudicating the plaintiff's claims required a federal court to command foreign nations "to dismantle their international agreements." *Id* at 948–954. These concerns are not present here. The Executive Branch does not maintain a longstanding diplomatic policy toward China regarding its hoarding of PPE. Also, adjudicating these claims does not

require the Court to declare unlawful international agreements made between sovereign nations. China thus fails to demonstrate that this Court lacks even an "arguable basis" for jurisdiction in light of the political-question doctrine. *PIRS*, 54 F.4th at 1054.

### C. China's challenge to personal jurisdiction fails.

China next turns to personal jurisdiction to attack the default judgment. However, under the text of the FSIA, "'[p]ersonal jurisdiction over a foreign state *shall exist*' whenever (1) an exception to foreign sovereign immunity applies, and (2) the foreign defendant has been properly served." *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 605 U.S. 223, 226 (2025) (emphasis added) (quoting 28 U.S.C. § 1330(b)). The Supreme Court has emphasized that the "use of the word 'shall' creates an obligation impervious to judicial discretion." *Id.* at 232 (quotation omitted). Here, the FSIA required this Court's exercise of personal jurisdiction over China. As explained above, the FSIA's commercial-activity exception applies. And, as explained further below, Missouri properly served China in compliance with the FSIA.

#### 1. Missouri complied with the FSIA's personal jurisdiction provisions.

China claims that this Court lacked personal jurisdiction over the Defendants as to Missouri's causes of action under state and federal antitrust statutes. Doc. 107 at 9–10; Doc. 129 at 16–17. However, personal jurisdiction in FSIA cases depends *only* on whether (1) an exception to the FSIA exists and (2) Defendants were properly served in accordance with the FSIA. *CC/Devas*, 605 U.S. at 226. The Supreme Court has expressly foreclosed additions to the personal jurisdiction requirements. *See id* at 226, 237. For example, *CC/Devas* held that the traditional "minimum contacts" standard does not apply under the FSIA. *Id.* at 226, 233. Similarly, nothing in the FSIA makes personal jurisdiction depend on the contents of a Complaint. Rather, when subject-matter jurisdiction is established and service of process is complete, "the statute declares that personal jurisdiction 'shall exist.'" *Id.* at 232 (quoting 28 U.S.C. § 1330(b)).

As the Eighth Circuit recognized, Count IV of Missouri's Complaint—which Missouri served on China—alleged "classic anticompetitive behavior" because China "hoarded personal-protective equipment while the rest of the world was in the dark about the disease." *Bailey*, 90 F.4th at 938. Count IV of Missouri's Complaint also alleged that Missouri "and its residents have suffered billions and possibly *tens of billions* of dollars in economic damages, *as well as substantial* non-economic damages." Doc. 1 ¶ 179 (emphasis added). To be sure, Missouri later clarified the precise state and federal antitrust causes of action under which it would seek "tens of billions of dollars" in damages. *Id.* But this Court's judgment makes clear that it awarded relief based on Count IV of Missouri's Complaint—not on separate claims. Doc. 95 at 20–21, 27. And the Court awarded this relief after specifically requiring Missouri to brief "[w]hether plaintiff's Count IV, which is addressed to negligence and a common law hoarding claim, can also encompass statutory causes of action for state and federal antitrust violations." Doc. 92 at 1. Missouri responded with authority showing that "Eighth Circuit precedent permits plaintiffs to pursue separate legal theories for the same factual allegations," so Missouri's federal and state antitrust theories need not be pleaded as an alternative claims. Doc. 94 at 3–4 (citing *Brown v. Kansas City Live, LLC*, 931 F.3d 712, 715 (8th Cir. 2019); *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848–49 (8th Cir. 2014)). Indeed, as the Eighth Circuit recognized in *Topchian*:

> The well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules. … The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of the claim. Factual allegations alone are what matters.

760 F.3d at 849 (cleaned up) (citations omitted).[5] By entering judgment in Missouri's favor on

[5] China claims that *Topchian*'s rule applies only to *pro se* parties. Doc. 107 at 14. But the language that Missouri quoted is not so limited, and *Topchian* relied on cases that applied the same standard

Count IV, this Court already held that Missouri's Complaint was sufficient to support Missouri's claim—on the merits—with causes of action and theories of recovery under state and federal antitrust statutes. Doc. 95 at 20–21, 27. If Missouri's Complaint was sufficient to support such claims *on the merits*, then it certainly was sufficient to at least provide *notice* to China.

China now seeks to contest this Court's determination—construing its argument as a matter of personal jurisdiction. Doc. 107 at 9–11; Doc. 129 at 16–17. However, whether the Complaint properly states a claim does not bear on personal jurisdiction. *See CC/Devas*, 605 U.S. at 233 ("[S]ubject matter jurisdiction plus service of process equals personal jurisdiction."); 28 U.S.C. § 1330(b). Rather, challenges to the substance of the claims included in the Complaint are reserved for the merits. And Defendants waived this non-jurisdictional defense by opting not to participate in the initial proceedings. *See Flanagan*, 190 F.Supp.3d at 150; *Practical Concepts*, 811 F.2d at 1547. China nonetheless insists that "claim for the same damages arising from the same facts, but based on a different legal theory, is sufficiently 'new' to require an amended complaint and service." Doc. 129 at 16 (citing *Kenny v. Islamic Republic of Iran*, 2024 WL 4297682, at *7 (D.D.C. 2024)). But the lone case that China cites for this proposition—*Kenny v. Islamic Republic of Iran*—did not vacate a default judgment, nor did it reject entry of a default judgment based on personal jurisdiction. Rather, the Court easily found that it possessed "personal jurisdiction over Iran" because "[s]ervice documents were delivered to the Iranian Ministry of Foreign Affairs on June 20, 2023." *Kenny*, 2024 WL 4297682, at *7. The court's separate, *merits* ruling had nothing to do with personal jurisdiction. *Id.* at *7–8.

Nor did the amount of damages the Defendants faced require an amended complaint.

---

to parties that were not *pro se*. *See* 760 F.3d at 848–49 (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051 (8th Cir. 2002); citing *Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988)).

*Contra* Doc. 107 at 10; Doc. 129 at 17. Missouri's Complaint already alleged that Defendants' anticompetitive behavior cost "the State and its residents . . . billions and possibly tens of billions of dollars in economic damages, as well as substantial non-economic damages." Doc. 1 at ¶ 179. Thus, China had adequate notice of a potential $24.5 billion judgment. Doc. 95 at 32.

Moreover, even if this Court *had* required Missouri to amend its Complaint, service of an amended complaint would not have been necessary. *See* Doc. 94 at 9–12. Courts have held that, under the FSIA, "service of the new complaint is only necessary if the changes are 'substantial.'" *Shoham v. Islamic Republic of Iran*, 922 F.Supp.2d 44, 47 (D.D.C. 2013) (quoting *Belkin v. Islamic Republic of Iran*, 667 F.Supp.2d 8, 20 (D.D.C.2009)). Courts impose this standard to avoid "repeating the onerous process of serving a foreign state defendant." *Est. of Crespo v. Democratic People's Republic of Korea*, 2026 WL 2110733, at *5 (D.D.C. 2026). Courts have also emphasized that the "substantial" amendment standard is "consistent with the text of Section 1608, which appears to contemplate only service of the initial pleading." *Id.*

Under the "substantial" amendment standard, courts have repeatedly held that an amendment is not substantial if it merely "'provide[s] the particularity required' that plaintiffs must 'identify a particular cause of action arising out of a specific source of law' other than the FSIA itself." *Shoham*, 922 F.Supp.2d at 47 (quoting *Dammarell v. Islamic Republic of Iran*, 370 F.Supp.2d 218, 225 (D.D.C. 2005)); *accord Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 46 (D.D.C. 2006); *Maalouf v. Islamic Republic of Iran, (Maalouf I)* 2016 WL 11771416, at *1 (D.D.C. 2016) ("An alteration is not substantial where, for example, an amendment merely adds additional details to clarify existing claims, or makes clear that a claim is grounded in state as well as federal law." (citations omitted)). An amendment that merely "identif[ies] a particular cause of action arising out of a specific source of law," or that clarifies that the claims are grounded in

additional state or federal law, does not require additional service to comply with the FSIA's notice requirement. *See Shoham*, 922 F.Supp.2d at 47; *Dammarell*, 370 F.Supp.2d at 225; *Blais*, 459 F.Supp.2d at 46; *Maalouf I*, 2016 WL 11771416, at *1. Because the FSIA would not have required service of an amended pleading (even if one had been necessary), China fails to establish that this Court lacked personal jurisdiction.

**2. China's claim that Missouri violated Federal Rule of Civil Procedure 5(a)(2) provides no basis to vacate this Court's judgment.**

China next argues that this Court should vacate the default judgment because Missouri supposedly failed to comply with Federal Rule of Civil Procedure 5(a)(2). Doc. 107 at 9–10; Doc. 129 at 17. This argument fails for many reasons. *First*, "Rule 5(a)(2) does not apply" in cases, like this one, where the "FSIA provides special rules for service of process on foreign states." *Gates v. Syrian Arab Republic*, 646 F.3d 1, 6 (D.C. Cir. 2011). *Second*, because Missouri made no substantial alteration to its claims, Rule 5(a)(2) did not require service of an amended pleading. "Allowing [non-substantial] amendments like these without renewed service is consistent with Federal Rule of Civil Procedure 5(a), which provides that '[n]o service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them.'" *Crespo*, 2026 WL 2110733, at *5 (alteration in original) (quoting Fed. R. Civ. P. 5(a)(2)). *Third*, even if Missouri *had* violated Rule 5(a)(2), that would not be a basis for vacating this Court's default judgment. Only a "violation of due process"—*not* a violation of a "right granted by a procedural rule"—provides grounds for vacatur of a judgment under Rule 60(b)(4). *Espinosa*, 559 U.S. at 271–72; *PIRS*, 54 F.4th at 1054. Also, "receiving actual notice 'more than satisfie[s] [a defaulting defendant's] due process rights.'" *PIRS*, 54 F.4th at 1054 (quoting *Espinosa*, 559 U.S. at 272). Here, all the Defendants have at least received actual

notice. Doc. 95 at 18.[6]

**3. This Court has personal jurisdiction over CAS.**

Finally, CAS raises a personal-jurisdiction challenge raised by no other Defendant: It wrongly claims that Missouri's service of CAS via email was insufficient. Doc. 107 at 10–11. In making this argument, CAS asks this Court to reverse is prior determinations—reached after briefing, Docs. 54, 75—that CAS (like every other Defendant) "was properly served with a copy of the summons and Complaint," Doc. 95 at 18 (citing Doc. 23); Doc. 22 at 3–5, 7. This Court also emphasized that CAS had "full knowledge of this lawsuit," and "chose to ignore this lawsuit by failing to plead or otherwise defend" itself. Doc. 95 at 18. Also, Missouri served CAS via email under this Court's order granting Missouri permission to do so. *See* Doc. 22 at 3–5, 7.

Missouri served CAS in accordance with 28 U.S.C. § 1608(b)—the FSIA's service provision applicable to agencies and instrumentalities of a foreign state. *See Bailey*, 90 F.4th at 935 (holding that CAS is an agency or instrumentality of China). The Third, Fifth, Sixth, Ninth, Eleventh, and D.C. Circuits have held that "substantial compliance with the [FSIA's] provisions of service upon an agency or instrumentality of a foreign state—that is, service that gives *actual notice* of the suit and the consequences thereof to the proper individuals within the agency or instrumentality—is sufficient to effectuate service under section 1608(b)." *Magness v. Russian Fed'n*, 247 F.3d 609, 616–17 (5th Cir. 2001) (emphasis added) (collecting cases). Missouri certainly complied with this standard here. It served CAS via email pursuant to this Court's order, Doc. 22, it submitted briefing supporting service via email, Docs. 54, 75, and no one disputes that CAS had actual notice, Doc. 95 at 18. Also, as CAS acknowledges, Chinese law does not outright

[6] Moreover, foreign governments and their agents lack a constitutional right to due process in the first place. The "consensus" amongst the Circuits is that "foreign states are not entitled to the protections of the Due Process Clause." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 29–30 (2025) (Thomas, J., concurring) (quotation omitted) (collecting cases).

prohibit service via email, Doc. 107 at 10–11, nor does the Hague Convention foreclose service via email, *see, e.g.*, *Bazarian Int'l Fin. Ass., LLC v. Desarrollos Aerohotelco, C.A.*, 168 F.Supp.3d 1, 17 (D.D.C. 2016). Serving CAS via email was therefore sufficient to effectuate service.[7]

* * *

This Court plainly had personal jurisdiction. As this Court found, "Each Defendant was properly served with a copy of the summons and Complaint in this lawsuit." Doc. 95 at 18 (citing Docs. 23, 36–41). Meanwhile, the FSIA's command is unequivocal: "[T]he statute declares that personal jurisdiction 'shall exist,' and, … 'the use of the word "shall" creates an obligation impervious to judicial discretion.'" *CC/Devas*, 605 U.S. at 232 (citation omitted).

## III. China's Rule 60(b)(6) arguments are equally unavailing.

Next, Hubei and CAS move for vacatur under Rule 60(b)(6). Doc. 107 at 11–15. However, Rule 60(b)(6) has no bearing on this case. "Rule 60(b)(6) is a 'catchall' option that 'is available only when Rules 60(b)(1) through (b)(5) are inapplicable.'" *PIRS*, 54 F.4th at 1055 (citation omitted). And importantly, China's failure to successfully move for vacatur under Rule 60(b)(4) does not make Rule 60(b)(4) "inapplicable"—thereby opening the door to Rule 60(b)(6). *PIRS*, 54 F.4th at 1055. The Eighth Circuit confronted this exact scenario in *PIRS*, and it summarily rejected the defendant's motion to vacate under Rule 60(b)(6) after the defendant failed to obtain vacatur under Rule 60(b)(4). *See* 54 F.4th at 1055. So too here. Hubei and CAS cannot pivot to a motion to vacate under Rule 60(b)(6) merely because their motion under Rule 60(b)(4) will fail.

In any event, "relief under Rule 60(b)(6) is available only in 'extraordinary circumstances'" and only when the defaulting defendant can raise "good claim[s] or defense[s]." *Buck v. Davis*,

[7] At the very least, even if the Court somehow reverses its prior findings as to CAS, *contra* Doc. 95 at 18, that would not justify vacatur of the entire default judgment. Rather, the judgment would remain as to all other Defendants, who are "jointly and severally" liable. Doc. 95 at 32.

580 U.S. 100, 123, 126 (2017) (citation omitted). Hubei and CAS satisfy neither element here. This Court has already considered and rejected application of the act-of-state doctrine. *See, e.g.*, Doc. 90 at 13–14 n.4; Doc. 95. Also, this Court already rejected Hubei's and CAS's argument that Missouri failed to state antitrust claims. *See, e.g.*, Docs. 92, 94, 95. Further, the Court's judgment is not "extraordinary." *Buck*, 580 U.S. at 123. The Court's judgment was based on "the most conservative estimate[s] of direct damages." Doc. 95 at 29–30. Defendants had "full knowledge of this lawsuit," and "chose to ignore [it] by failing to plead or otherwise defend themselves against Missouri's claims" for tens of billions of dollars. Doc. 95 at 18; *see also* Doc. 1 ¶ 179. To the extent this case presents extraordinary damages, it is a result of the unprecedented actions taken by Defendants to capture the global market for PPE, while concealing the spread of COVID-19.

## IV. Rule 55 has nothing to do with vacatur of a default judgment.

Finally, contrary to the Ministry's argument, Doc. 129 at 22–24, Rule 55(c) is not available at this stage. Rule 55(c) provides that, "The court may set aside an entry of *default* for good cause, and it may set aside a *final default judgment* under Rule 60(b)." (Emphasis added). Now that a default judgment has been entered, Rule 60(b) is the only procedural mechanism available to China. *See Johnson v. Lucas Indus.*, 2017 WL 513043, at *1 (E.D. Mo. 2017) (Limbaugh, J.).

## CONCLUSION

The Court should deny the motions to vacate the judgment and to dismiss this action. Alternatively, if this Court vacates the default judgment, that should mark the beginning of this action, not the end. The Eighth Circuit already reversed this Court's pleading-stage dismissal and held that Count IV of Missouri's complaint adequately pled a claim under the commercial-activity exception to the FSIA. *Bailey*, 90 F.4th at 939. All that is left is for Missouri to "prove" its case. *Id.* To the extent that this Court reverses its prior factual findings, the correct course is to permit Missouri to pursue discovery—not to dismiss adequately-pleaded claims altogether.

Date: October 19, 2026

Respectfully submitted,

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi III*
Louis J. Capozzi III, 77756MO
*Solicitor General*
J. Michael Patton, 76490MO
*Deputy Solicitor General*
Madeline S. Lansdell, 78538MO
*Assistant Solicitor General*
Ryan Dugan, 77805MO
*Assistant Solicitor General*
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, Missouri 63101
Phone: (314) 340-4978
Fax (314) 340-7981
Louis.Capozzi@ago.mo.gov
Michael.Patton@ago.mo.gov
Madeline.Lansdell@ago.mo.gov
Ryan.Dugan@ago.mo.gov

*Attorneys for Plaintiff State of Missouri*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2026, a true and accurate copy of the foregoing was electronically filed by using the Court's CM/ECF system to be served on all counsel of record entered in the case.

/s/ *Louis J. Capozzi III*